1   **LAW OFFICE OF JOSE H. ROBLES**
    The Johnson House Offices
2   455 West Paseo Redondo
    Tucson, Arizona 85701-8254
3   Telephone: (520) 628-1300
    Fax:   (520) 882-8414
4   Arizona State Bar No. 010705
    Pima County Bar No. 48876
5   Attorney for Petitioner

___ FILED   ___ LODGED
___ RECEIVED   ___ COPY

SEP 0 7 2000

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ Z  DEPUTY

6           IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8   David Martinez Ramirez,            )
                                       )
9                     Petitioner,      )      CASE NO. CIV-97-1331-PHX-RGS
              vs.                      )
10                                     )      MEMORANDUM ON THE MERITS
    Terry Stewart, Et. Al.,            )
11                                     )
                      Respondents.     )
12                                     )
                                       )
13  _____

14          It is expected that excludable delay under Title 18, United States Code, Section 3161

15  (h) (1) (F), will occur as a result of this motion or an order based thereon.

16          Petitioner, DAVID MARTINEZ RAMIREZ, pursuant to the July 24, 2000, Order of

17  this Court, submits this Memorandum regarding the merits of Claims 1 (in part), and 2 (in

18  part), and respectfully requests this Court issue a Writ of Habeas Corpus to have Petitioner

19  brought before it so that he might be discharged from his unconstitutional confinement and

20  restraint, relieved of his unconstitutional sentences of death and imprisonment and granted a

21  new trial or sentencing in accordance with constitutional mandates. Petitioner submits the

22  following grounds:

23          1. The improper prosecutorial comment, during closing argument at trial, infers guilt

24  from silence in violation of the Fifth Amendment right against self-incrimination; and

25          2. The Public Safety Exception does not apply to the statements taken without the

26  benefit of Miranda.

# MEMORANDUM

## FACTS

In his closing argument, the prosecutor stated:

> Officer Hartson asks three really quick questions. What happened. We had a big fight. Well, who's in there. My girlfriend and her daughter. Are they okay. They're hurt pretty bad. We're all hurt pretty bad. Defense attorney asks Sergeant Hartson, what does the Defendant say. Well, I think it was, I didn't kill them.
> Now, this is the same person who tells Officer Hartson, that's my girlfriend and her daughter inside. That's the same person who said, we're supposed to be married. Where is the screaming by the Defendant, my girlfriend is hurt. What would you do if you were in this position inside this apartment, much like the Defendant, four walls, a floor and a roof. Would you be screaming your head off for a neighbor, for help. Or would you be using -see that little thing up there to the top of Exhibit 2, that's the phone. The phone that was in the cradle, the phone with the blood droplets on it. The phone that was functional, the phone that worked. 911. Real fast. Three punches.

State v. Ramirez, 178 Ariz. 116, 124-125 (1994).

Witness Larry Bernabe, a neighbor, went to the victims' apartment twice after hearing strange noises and screaming. State v. Ramirez, 178 Ariz. at 119. At one point, Bernabe attempted to kick the door down. Id, at 119. Bernabe testified he yelled out the names of the victims. Id.

The state court recognized the defense was "no direct evidence linked [Petitioner] to the crime". State v. Ramirez, 178 Ariz. at 121. The defense "maintained that another person had entered the apartment while Defendant, Mrs. G., and the daughter were asleep, and that person committed the murders." Id, at 121.

Police officers arrested Petitioner inside the apartment. State v. Ramirez, 178 Ariz., at 120. The officers initially directed Petitioner to "go to the front door" of the apartment "and unlock it." Id, at 119. Officers used a "passkey" to enter the apartment. Id, at 120.

Sergeant Howk was at the front door of the apartment. State v. Ramirez, 178 Ariz., at 120. The sergeant entered. Lieutenant Richards was informed that a male suspect was

1  detained. <u>State v. Ramirez</u>, 178 Ariz., at 120. The lieutenant asked if the male wore

2  suspenders. Id, 178 Ariz., at 120. When Richards learned the male did not wear suspenders,

3  he advised other officers, "There is a guy in that apartment with suspenders, you need to find

4  him." Id, at 120.

5      Officer Hartson took Petitioner out on the grass outside the apartment. <u>State v.</u>

6  <u>Ramirez</u>, 178 Ariz., at 120. Sergeant Howk stepped outside and asked Officer Hartson if

7  anyone else was in the apartment. Id. Without advising Petitioner of his <u>Miranda</u> rights,

8  Officer Hartson asked him three questions. Id. The officer asked Petitioner what was going

9  on, he asked him who was inside the apartment and if anyone else was hurt. Id. Petitioner

10 responded to the officer's questions. Id.

12 **POINTS AND AUTHORITIES**

13                          **CLAIM 1**

14            **IMPROPER PROSECUTORIAL COMMENT INFERS**
              **GUILT FROM SILENCE IN VIOLATION OF FIFTH**
15            **AMENDMENT RIGHT AGAINST COMPULSORY SELF-**
              **INCRIMINATION**

16     In <u>Doyle</u>, the U.S. Supreme Court holds that "<u>Miranda</u>, warnings contain an implied

17 promise, rooted in the Constitution, that `silence will carry no penalty"', <u>Wainwright v.</u>

18 <u>Greenfield</u>, 474 U.S. 284, 295 (1986) (Citing <u>Doyle v. Ohio</u>, 426 U.S. 610, 618 (1976). The

19 Fifth Amendment forbids the prosecution in a criminal case from commenting on a defendant's

20 absence to testify at trial. <u>Griffin v. California</u>, 380 U.S. 609, 615 (1965).

21     To determine the existence of a <u>Griffin</u> violation, a court must consider "whether the

22 language used was manifestly intended or was of such a character that the jury would naturally

23 and necessarily take it to be a comment on the failure to testify." <u>U.S. v. Mende</u>, 43 F.3d

24 1298, 1301 (9th Cir. 1995). The prosecution "may properly comment upon the defendant's

25 failure to present exculpatory evidence, as long as it is not phrased to call attention to the

26

1   defendant's own failure to testify." U.S. v. Mende, 43 F.3d at 1301. A prosecutor may

2   properly call attention to the failure by the defense, "as opposed to the defendant to counter or

3   explain the testimony presented or evidence introduced" without violating a defendant's Fifth

4   Amendment privilege. Id, F.3d at 1301.

5        Reversal of a conviction is the rule where prosecutorial comment on the defendant's

6   failure to testify is "extensive, where an inference of guilt from silence is stressed to the jury

7   as a basis for conviction, and where the evidence could have supported acquittal." U.S. v.

8   Tarazon, 989 F.2d 1045, 1052 (9th Cir. 1993). Reversal is only necessary if the comment

9   could have affected the verdict. U.S. v. Tarazon, 989 F.2d at 1052. There is no violation of

10  the Fifth Amendment privilege where prosecutorial comment is a "single, isolated incident,"

11  that "does not stress an inference of guilt from silence as the basis of conviction, and is

12  followed by a curative instruction." Id, at 1052.

13       The privilege against compulsory self-incrimination is violated where a prosecutor on

14  his or her "own initiative asks the jury to draw an adverse inference from a defendant's

15  silence". U.S. v. Robinson, 485 U.S. 25, 32, (1988). Where the prosecutor's reference to the

16  defendant's opportunity to testify is "a fair response to a claim made by defendant or his

17  counsel," there is no violation. U.S. v. Robinson, 485 U.S. at 32.

18       Prosecutorial comment "must be examined in context." U.S. v. Robinson, 485 U.S. at

19  33. In Lockett v. Ohio, 438 U.S. 586, 595 (1978), the defendant claimed a violation of the

20  Fifth Amendment where the prosecutor repeatedly stated the evidence was uncontradicted. An

21  examination of the record revealed that the defendant's own counsel "clearly focused the jury's

22  attention on her silence, first by outlining her contemplated defense in his opening statement

23  and, second, by stating to the court and jury near the close of the case, that Lockett would be

24  the `next witness."' Lockett, 438 U.S. at 595. In rejecting the defendant's claim, the court

25  noted "the prosecutor's closing remarks added nothing to the impression that had already been

26  created by Lockett's refusal to testify after the jury had been promised a defense by her lawyer

4

1  and told that Lockett would take the stand." Id, 438 U.S. at 595.

2  The court "must consider the probable effect the prosecutor's response would have on

3  the jury's ability to judge the evidence fairly." U.S. v. Young, 470 U.S. 1, 12 (1985).

4  "Especially when addressing plain error, a reviewing court cannot properly evaluate a case

5  except by viewing such a claim against the entire record." Young, 470 U.S. at 16. It is

6  important that a reviewing court "relive the whole trial imaginatively and not to extract from

7  episodes in isolation abstract questions of evidence and procedure." Id, 470 U.S. at 16.

8  The inquiry is "whether, in light of the record as a whole," the state's improper

9  prosecutorial comment of Petitioner's absence of testimony at trial, had a substantial and

10  injurious effect or influence in determining the jury's verdict. Brecht v. Abrahamson, 507

11  U.S. 619, 638 (1993); O'Neal v. McAninch, 537 U.S. 432. If there is grave doubt about

12  whether the error had a substantial and injurious effect or influence in determining the jury's

13  verdict, the error is not harmless, and Petitioner must be granted relief. O'Neal v. McAninch,

14  537 U.S. at 435.

15

### *Improper Prosecutorial Comment*

16  In his closing argument, the prosecutor stated:

17

18  Officer Hartson asks three really quick questions. What happened. We had a big fight. Well, who's in there. My girlfriend and her daughter. Are they okay. They're hurt pretty bad. We're all hurt pretty bad. Defense attorney asks Sergeant Hartson, what does the Defendant say. Well, I think it was, I didn't kill them.

19

20  Now, this is the same person who tells Officer Hartson that's my girlfriend and her daughter inside. That's the same person who said, we're supposed to be married. Where is the screaming by the Defendant, in girlfriend is hurt. What would you do if you were in this position inside this apartment, much like the Defendant, four walls, a floor and a roof. Would you be screaming your head off for a neighbor, for help Or would you be using--see that little thing up there to the top of Exhibit 2, that's the phone. The phone that was in the cradle, the phone with the blood droplets on it. The phone that was functional, the phone that worked. 911. Real fast. Three punches.

21

22

23

24

25

26  State v. Ramirez, 178 Ariz. 116, 124125.

The prosecutorial comments were made in response to Officer Hartson's testimony that Petitioner stated he "didn't kill them." Petitioner did not testify. The prosecutor directed the jury's attention to a question asked by the defense.

> "Defense attorney asks Sergeant Hartson, what does the Defendant say. Well, I think it was I didn't kill them.

State v. Ramirez, 178 Ariz. at 124.

The testimony by the officer, that Petitioner stated he did not kill the victims, does not indicate the defense argued that the government unfairly denied him the opportunity to explain his actions. U.S. v. Robinson, 485 U.S. at 27. In U.S. v. Robinson, at 32, the "prosecutorial" comment did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his side of the case."

Standing alone, the prosecutor's comments that there was an absence by Petitioner to scream to a neighbor for help, or, to use the telephone is a proper comment on the absence of the defense to produce exculpatory evidence. U.S. v. Mende, 43 F.3d 1298, 1301 (9th Cir. 1995). Witness Bernabe, a neighbor, testified he went to the victims' apartment twice after hearing strange noises and screaming. State v. Ramirez, 178 Ariz. at 119. At one point Bernabe attempted to kick the door down. Id, at 119. Bernabe testified he yelled out the names of the victims. Id.

The prosecutor uses the comments regarding Petitioner's absence of calling for help, together with Officer Hartson's testimony that Petitioner did not commit the homicides, as substantive evidence of guilt to clearly make the point that an innocent person would have testified at trial. The prosecutor asks the jury to place themselves at the scene of the murders, under the circumstances of Petitioner, and consider what they would do. Ramirez, 178 Ariz. at 124-125. The prosecution calls attention to the jury to consider what an innocent person would do at the scene of a murder. The comments eviscerate the right to remain silent

6

by calling attention to the jury that an innocent person would be screaming his head to a neighbor for help. The prosecutor remarks an innocent person would be using the blood-spattered telephone calling for help. The comment treats Petitioner's right to silence as substantive evidence of guilt. <u>U.S. v. Robinson</u>, 485 U.S. at 32.

The manner in which the prosecutor phrases his argument calls attention to Petitioner's failure to testify. <u>Griffin v. California</u>. It calls attention to the fact that Petitioner is the only individual that can explain the absence of a call for help. Id.

## *<u>Prosecutorial Comment Had Substantial and Injurious Effect or Influence In Determining Jury's Verdict</u>*

In <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), the Court considered the standard in determining whether to grant habeas corpus relief. It noted the <u>Doyle</u> rule "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." <u>Brecht</u>, 507 U.S. at 628. The court reasoned the "`implicit assurance' upon which we have relied in our <u>Doyle</u> line of cases is the right-to-remain-silent component of <u>Miranda</u>." Id, 507 U.S. at 628.

In <u>Brecht</u>, 507 U.S. at 630, the court considered the trial error in <u>Chapman v. California</u>, 386 U.S. 18 (1967), when it addressed whether a prosecutor's reference to the defendant's failure to testify at trial was a Fifth Amendment violation of the right against self-incrimination. The court in <u>Chapman</u> rejected the argument that the Constitution required a "blanket rule of automatic reversal in the case of constitutional error". <u>Brecht</u>, 507 U.S. at 630. The <u>Chapman</u> decision held "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless." <u>Brecht</u>, 507 U.S. at 630.

In <u>Brecht</u>, 507 U.S. at 637-638, the court held that habeas petitioners may obtain

7

1    plenary review if the trial type constitutional error "had substantial and injurious effect or

2    influence in determining the jury's verdict." A petitioner is entitled to relief if he can establish

3    the error resulted in "actual prejudice". Id, 507 U.S. at 637. The court held the <u>Doyle</u> error

4    that occurred in the petitioner's trial did not substantially influence the jury's verdict. Id, at

5    639.

6         The language in <u>Brecht</u> requiring "actual prejudice" as a requisite for habeas relief " is

7    not determinative." <u>O'Neal v. McAninch</u>, 513 U.S. at 438. In <u>O'Neal v. McAninch</u>, 513 U.S.

8    at 435, the defendant filed a federal habeas corpus petition challenging his state court

9    convictions relating to murder and other crimes. The federal district court agreed with some of

10   the claims of constitutional trial error. Id, 513 U.S. at 435. The appellate court disagreed with

11   the district court, with one exception. Id, at 435.

12
13
14
15
> That exception focused on possible jury "confusion" arising out
> of a trial court instruction about the state of mind necessary for
> conviction combined with a related statement by a prosecutor.
> The Sixth Circuit assumed, for argument's sake, that the
> instruction (taken together with the prosecutor's statement) had
> indeed violated the Federal Constitution by misleading the jury.
> Nonetheless, the court disregarded the error on the ground that it
> was harmless.

16

17 <u>O'Neal v. McAninch</u>, 513 U.S. at 435. The court vacated the judgment and remanded for

18 further proceedings. Id, at 445.

19         If there is grave doubt as to the harmlessness of the error, relief must be granted. Id, at

20 440. The error is of constitutional dimension where it "risks an unreliable trial outcome and

21 the consequent conviction of an innocent person." Id, at 442. Where there is "grave doubt

22 about the likely effect of an error on the jury's verdict" the error is treated "not as if it were

23 harmless, but as if it affected the verdict." Id, at 435. "Grave doubt", to a judge exists where

24 the `` matter is so evenly balanced that he feels himself in virtual equipoise as to the

25 harmlessness of the error." Id, at 435.

26         In "light of the record as a whole", the prosecutorial comment inferring that an

1   innocent person would explain his absence of calling for help, "had a substantial and injurious

2   effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 639. The record

3   shows petitioner represented himself at voir dire. 07-13-90, p.13. The parties selected a jury.

4   07-11-90, pp.86-87. The court instructed the jury about "rules of law you have a duty to

5   follow in considering this case" prior to opening statements. Id at 88."

> [Y]ou should not form any opinion about any fact or about the
> outcome of the case until you're (sic) heard all the evidence, the
> closing arguments of the attorneys and <u>the Defendant</u>, and the
> rest of the instructions that Ill give you regarding the law. Form
> your opinions only after you've retired to deliberate and have had
> an opportunity to discuss the case with each other in the jury
> room at the end of the trial."

10  07-11-90, p.91 (Emphasis added). The trial court instructed the jury not to form an opinion of

11  the case until it heard from the attorneys and Petitioner. On the following day, the court

12  advised the jury that Petitioner would no longer represent himself. 07-12-90, p 8. The court

13  did not instruct the jury to disregard they would hear from Petitioner. Id. There was no input

14  from the defense. Id.

15      Prior to giving the case to the jury for deliberation, the trial court instructed:

> The defendant is not required to testify. The decision whether to
> testify is left to the Defendant acting with the advice <u>of an</u>
> <u>attorney</u>. You must not conclude that the Defendant is likely to
> be guilty because the Defendant does not testify. You must not let
> this choice affect your deliberation in any way.

19  <u>State v. Ramirez</u>, 178 Ariz., at 125. (Emphasis added). The court instructed the jury the

20  Petitioner's decision not to testify is left to him upon advice from "an attorney". The jury was

21  not told which attorney made the decision about not testifying. At the time the prosecutor

22  made his improper comments in closing argument, there was no objection by Petitioner and no

23  curative instruction by the trial court. <u>U. S. v. Altavilla</u>, 419 F.2d 815 (9th Cir. 1969) (No

24  error where trial court interrupts prosecutor to instruct jury re improper statement).[1]

25  ─────────────────────────

26  [1]This Court ordered Petitioner from raising effect of jury note during
    deliberation that asked if it was prosecutor's decision to call Petitioner to

1    The prosecutorial comment during closing argument focused on defendant's absence of

2    testimony and its failure to explain his reasons for not calling for help if he was innocent.

3    Griffin v. California. The comment raised the inference that an innocent person would explain

4    the absence of the call for help. The trial court called attention to the jury that it should not

5    form any opinion of the case until it heard from the attorneys and Petitioner.

6    Defense counsel focused on Petitioner's right to silence in response to the prosecutorial

7    comment in her closing argument. 07-25-90, p.22. Defense counsel remarked Petitioner did

8    not have to testify. Id, at 23. She argued to the jury they could not consider "if Mr. Ramirez

9    was really innocent, he'd get up there on the stand and tell us what really happened." Id, at

10   24. Defense counsel emphasized the court would instruct Petitioner did not have to testify. Id.

11   The comments by defense counsel fairly responded to an improper prosecutorial comment

12   adverting to that silence. U.S. v. Robinson, 485 U.S. at 34.

13   During trial, the attorneys must refrain "from interjecting personal beliefs in the

14   presentation of his [or her] case." U.S. v. Young, 470 U.S. at 8-9. Defense counsel raised

15   what may be deemed an improper point for Petitioner's absence of testimony during trial:

16          "What I'm her to tell you is, this is a decision, a decision Mr.
            Ramirez and I made together. If you want to blame any body
17          blame me, and don't blame Mr. Ramirez."

18   07-25-90, p.24. There was no objection by the prosecution. Id, at 24.

19   The key issue is to determine the probable effect on the jury's ability to judge the

20   evidence fairly in light of the prosecutor's inference, that an innocent person, under

21   Petitioner's circumstances, would have explained the absence of calls for help. Cf. U.S. v.

22   Young, 470 U.S. at 12.

23

24   testify. Order, 07-24-00. Petitioner has filed a Petition to Reconsider asking
     the Court to reconsider preclusion of the jury effect on the grounds that
     prosecutorial comment must be examined in context; an examination of the
25   entire court record. Brecht v. Abrahamson; U.S. v. Robinson, 485 U.S. at 33.
     Petitioner reserves the opportunity to supplement this factor if
26   reconsideration is permitted. Id.

The evidence presented at trial supported a verdict of not guilty. The state court recognized the defense was "no direct evidence linked [Petitioner] to the crime". State v. Ramirez, 178 Ariz. at 121. The defense "maintained that another person had entered the apartment while Defendant, Mrs. G., and the daughter were asleep, and that person committed the murders." Id, at 121.

Officer Hartson testified he observed injuries to Petitioner on the inside of his hands. 07-16-90, p.12. The injuries appeared severe. Id, at 12.

A knife blade was found near the front door. 07-16-90, p.54. It was covered in blood. Id, at 54. There was a blood transfer of a hand above a light switch by the front door of the apartment. Id, at 55. A fingerprint and a palm print were lifted from the door knob. 07-20-90, p. 58. The latent print examination did not identify Petitioner or the victims. Id, at 58. A finger print was lifted from the inside part of the front door. Id, at 58. It did not belong to Petitioner or the victims. Id.

A cake knife, the knife blade, a pair of scissors in the bathroom and a box cutter were identified as weapons used in the homicides. 07-17-90, pp. 35-36. Fingerprints were found on a beer can, the kitchen faucet, the bathroom toilet, a bedroom doorjamb, a dresser in the bedroom and on the kitchen window. 07-20-90, pp.58, 59, 60. None of the fingerprints belonged to Petitioner or the victims. Id.

Blood on a rolling pin matched Petitioner's. 07-20-90, p.6. The blood did not match that of the victims. Id, at 6. The rolling pin was not identified as a weapon used in the homicides. 07-17-90, p.35-36.

Police officers arrested Petitioner inside the apartment. State v. Ramirez, 178 Ariz., at 120. The officers initially directed Petitioner to "go to the front door" of the apartment "and unlock it." Id, at 119. Officers used a "passkey" to enter the apartment. Id, at 120.

Investigator Fuqua supervised a detailed examination of the apartment. State v. Ramirez, 178 Ariz., at 120. Investigator Fuqua testified he directed a photographer to take

11

1   photographs of the outside of the apartment. 07-16-90, p.49. The detective observed blood

2   stains outside the front door. <u>Trial Exhibit</u> 115, 07-17-90, p.38. The blood stains ran along the

3   side of the building. Id, at 38. The stains appeared to be smear marks and fingers. Id. The

4   marks showed three fingers dragging across the surface. Id.

5        Sergeant Howk was at the front door before officers entered the apartment. <u>State v.</u>

6   <u>Ramirez</u>, 178 Ariz., at 120. The sergeant entered the apartment. Id, at 120. He could not

7   remember the condition of the front door upon entry with a passkey. Id. 07-23-90, p.54.

8        Detective Fuqua found three blood markings inside the apartment similar to or

9   consistent to the markings found on the exterior of the apartment. 07-16-90, p.55. One of the

10   blood smears was on one the victim's bedroom door. Id, at 55-56. Another smear was found

11   on the foyer wall, just above a light switch. Id, at 56. Similar smears were in the corner of one

12   of the victim's bedroom, near a base board. Another smear was found in the bathroom. Id.

13        The jury sent out two questions on the second day of deliberations at 4:20 p.m.. 07-26-

14   90, pp. 2, 3. The first question requested "testimony stating anything about whether the

15   deadbolt was locked when the police arrived". Id, at 2.

16        The prosecutorial comments at Petitioner's trial substantially influenced the jury's

17   verdict. <u>Brecht</u>. The prosecutorial comments clearly raising the inference that an innocent

18   person would have testified to explain his absence of calling for help is a violation of

19   Petitioner's Fifth Amendment right against compulsory self-incrimination. <u>Griffin v.</u>

20   <u>California</u>. The error is one that "risks an unreliable trial outcome and the consequent

21   conviction of an innocent person. <u>O'Neal v. McAninch</u>.

22        Petitioner was bleeding severely from his hands at the time of his arrest. 07-16-90,

23   p.12. Testimony at trial did not show the blood on the knife blade belonged to Petitioner. The

24   only blood belonging to Petitioner was found on a rolling pin, which was not identified as a

25   weapon in the homicides. The State remarked Officer Hartson testified Petitioner told him he

26   did not kill the victims. <u>State v. Ramirez</u>, 178 Ariz., at 124. The statement triggered the

1  prosecutorial inference stressing guilt to the jury from Petitioner's absence of testimony at

2  trial. <u>Griffin v. California</u>.

3         The comments affected the verdict of the jury where they plainly assumed that an

4  innocent person in Petitioner's circumstances would have testified explaining the absence of his

5  calls for help. <u>Griffin v. California</u>. The trial court informed the jury prior to opening

6  statements that it would hear from Petitioner. There was no instruction after the prosecutorial

7  comments. Nowhere is it more important than to instruct a jury in the context of compulsory

8  self-incrimination. <u>Carter v. Kentucky</u>, 450 U.S. 288, 302(1981). The prosecutor asked the

9  jury to draw an adverse inference from Petitioner's silence in violation of the privilege against

10  compulsory self-incrimination. <u>Griffin v. California</u>. The prosecutorial comment had a

11  "substantial and injurious effect or influence in determining the jury's verdict. Cf. <u>O'Neal v.</u>

12  <u>McAninch</u>.

13

14                                    **CLAIM 2**

15         **THE PUBLIC SAFETY EXCEPTION DOES NOT APPLY**
           **TO THE STATEMENTS TAKEN WITHOUT THE**
16         **BENEFIT OF <u>MIRANDA</u>.**

17         The Public Safety Exception is applied to legitimize the failure to inform Mr. Ramirez

18  of his <u>Miranda</u> rights at the time of his arrest prior to questioning. That exception applies to

19  three questions and the responses thereto:

20                Q. What is going on?

21                A. We had a big fight.

22                Q. Who else was inside?

23                A. My girlfriend and her daughter.

24                Q. Is any body else hurt?

25                A. Yeah, they're hurt pretty bad. We're all hurt pretty bad.

26  <u>State v. Ramirez</u>, 178 Ariz. at 123, 124.

                                        13

At the time of the questions Mr. Ramirez was in-custody. He was placed by Officer Hartson in an arm bar and made to kneel on the ground. Officer Hartson specifically stated that Mr. Ramirez was not free to leave. Id at 123. It is the questioning that followed, taking Mr. Ramirez into custody, that required the appropriate Miranda warnings.

Miranda requires the police to give certain warnings to a person in custody before interrogating him. United States v. Brady, 819 F.2d 884, 887 (9th Cir. 1987). "A person is in custody if he is under arrest or if his freedom of movement is restrained to a degree associated with formal arrest." Brady, supra at 887, citing New York v. Quarles, 467 U.S. 649, 655, 104 S.Ct. 2626, 2631, 81 L.Ed.2nd 550 (1984).

Yet the officers specifically questioned Mr. Ramirez as they had him kneeling on the ground in an arm bar applied by a police officer. These warnings are "measures to ensure that the right against compulsory self-incrimination is protected." Quarles, 467 U. S. 654, 104 S.Ct. at 2630, quoting Michigan v. Tucker, 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974).

Much is made of the fact that at the time Officer Hartson questioned defendant he was operating under a great deal of uncertainty in a potentially dangerous situation. The police for some reason were under the impression that there was someone in the apartment wearing what they thought was a red shirt and suspenders. As the officers made their way through the apartment they came upon the defendant who was without a shirt but nevertheless had evidence of blood stains on his person. At the time of Mr. Ramirez' arrest, one of the officers specifically requested:

> [t]here is a guy in that apartment with suspenders, you need to find him...

State v. Ramirez, 178 Ariz. at 123.

In response to that question and allegedly with the intent to find the other "guy," Officer Hartson, without benefit of Miranda, began questioning Mr. Ramirez.

14

1   The questions are unquestionably outside the public safety concern. More importantly,

2   they fall under the right against compulsory self-incrimination which is protected under

3   Quarles, supra at 654. There is no mention in any of Officer Hartson's questions; of a man

4   being inside; whether the defendant was previously wearing a red shirt or suspenders; any

5   mention of any additional weapons. Rather the open-ended question of what is going on

6   mirrors the first question any detective would have presented Mr. Ramirez at the police station

7   following a reading and waiver of Mr. Ramirez' Miranda rights.

8   The focus of the questions needs to be on the nature and context of what was asked. It

9   is clear from that *nature* and *context* that the questions were motivated, not by public safety

10  concerns, but rather to obtain evidence of a crime. Brady, 819 F.2d at 888. More importantly,

11  they were in fact designed to obtain evidence of a crime by Officer Hartson asking "what is

12  going on." The dearth of questioning regarding: someone wearing a red in shirt; someone

13  wearing suspenders; or someone who is in the apartment, who was not injured; is all the

14  evidence this Court needs to recognize the true *nature* and *context* of the questions. The fact

15  that Officer Hartson asked specifically, "is any body else hurt," rather than whether or not the

16  person with the suspenders and red shirt is still inside, provides this Court the final word on

17  the Public Safety Exception.

18  *Relevancy*

19  If this Court is to believe that the questions and answers were actually in regard to the

20  Public Safety Exception rather than designed to obtain evidence of a crime, this Court then

21  must make a determination as to whether or not any of those items should have been

22  admissible as relevant. They contain no admissions by defendant as to his culpability within

23  the case, and they were merely designed, as the government would have this Court believe, to

24  determine who was in the house at the time they arrived, they hold no evidentiary value under

25  the Rules of Evidence.

26  Rule 401 of the Arizona Rules of Evidence define "relevant evidence" as:

15

1    "Relevant evidence" means evidence having any tendency to
     make the existence of any fact that is of consequence to the
2    determination of the action more probable or less probable than it
     would be without the evidence.
3
     Arizona Rules of Evidence, Rule. 401.
4
     Statements by Mr. Ramirez if they are subject to the Public Safety Exception were not
5
     designed to provide evidence of a crime, and consequently in this case reveal no incriminating
6
     intent on Mr. Ramirez' part. As a result, if in fact they were taken pursuant to Public Safety
7
     Exception, the relevance in this particular case does not comport with Rule 401 of the Arizona
8
     Rules of Evidence and therefore should not have been introduced.
9
             RESPECTFULLY SUBMITTED THIS 7th day of September, 2000.
10
     Law Office of **JOSE H. ROBLES**          Law Office
11                                             **CLAY HERNANDEZ, P.C.**
12
     By_____               By_____
13    JOSE H. ROBLES                            CLAY HERNANDEZ
      Attorney for Petitioner                   Attorney for Petitioner
14
     Original filed and copy of the foregoing provided
15   by mail this 7th day of September, 2000 to:

16   John Pressley Todd, Assistant
     Attorney General's Office - Criminal Appeals Section
17   1275 West Washington
     Phoenix, Arizona 85007-2997
18
     Juliana Zolynas, Capital Case Staff Attorney
19   United State District Court, District of Arizona
     U.S. Courthouse
20   230 N. First Avenue
     Phoenix, Arizona 85025
21
     David Martinez Ramirez
22   # 39656
     Arizona State Prison
23   P.O. Box 8600
     Florence, AZ 85232
24

25

26
                                    16