1  Fredric F. Kay
   Federal Public Defender
2  Dale A. Baich (Ohio Bar No. 0025070)
   Paula K. Harms (Missouri Bar No. 50331)
3  Assistant Federal Public Defenders
   850 West Adams Street, Suite 201
4  Phoenix, Arizona 85007
   602.382.2816
5  602.889.3960 (facsimile)

6

7  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF ARIZONA

8  David Martinez Ramirez,

9          Petitioner,

10  vs.

11  Dora Schriro, et al.,

12          Respondents.

13

No. CIV 97-1331-PHX-JAT

FILED _____ LODGED
RECEIVED _____ COPY

NOV 2 6 2003

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

FILED _____ LODGED
RECEIVED _____ COPY

JUL 0 6 2004

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

14

15

16

17

18  PETITIONER'S   SUPPLEMENTAL
    FIRST  AMENDED  PETITION  FOR
19  WRIT OF HABEAS CORPUS

20

21

22

23

24

25

26

27

28



1

Table of Contents

2

3 Notice of intention to challenge presumption of correctness of all state
court fact findings under U.S.C. § 2254(d) . . . . . . . . . . . . . . . . . . . . . . . . 1

4 Exhaustion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5 Reservation of right to amend this petition . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6 Federal constitutional grounds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7 Thirteenth claim for relief
The refusal to answer the jury's question regarding Mr. Ramirez's
8 failure to testify was fundamental error. This violated Mr. Ramirez's
rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the
9 United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

10 Fourteenth claim for relief
The prosecutor shifted the burden of proof and commented
11 on Ramirez's right to remain silent by implying that the
defense had an obligation to conduct their own scientific
12 testing. This violated Mr. Ramirez's rights under the Fifth,
Sixth, Eighth and Fourteenth Amendments to the United
13 States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

14 Fifteenth claim for relief
Arizona's statutory scheme for the imposition of the death
15 penalty, under which Ramirez was sentenced to death, is
unconstitutional in that: 1) it allowed the imposition of
16 sentence by the trial judge, after the judge rather than a jury
made findings of fact as to the aggravating factors
17 necessary for the imposition of the death penalty, and 2) it
failed to require that Ramirez receive notice by indictment
18 of all aggravating factors and all facts necessary to make
him eligible for the death penalty, in violation of his rights
19 under the Fifth, Sixth, Eighth and Fourteenth Amendments
to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . 9

20
21 Sixteenth claim for relief
The consideration of victim impact evidence violated
22 Ramirez's rights under the Fifth, Sixth, Eighth and
Fourteenth Amendments to the United States
23 Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

24 Seventeenth claim for relief
The death qualification of the jury violated Ramirez's
25 rights under the Fifth, Sixth, Eighth and Fourteenth
Amendments to the United States Constitution . . . . . . . . . . . . . . . 13

26

27

28

i

Eighteenth claim for relief
      Arizona's death penalty statute is unconstitutional because
      it allows mitigating evidence to be concealed by the court,
      in violation of Ramirez's rights under the Fifth, Sixth,
      Eighth and Fourteenth Amendments to the United States
      Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Nineteenth claim for relief
      Ramirez's death sentence was based upon several findings
      of fact which were not proven beyond a reasonable doubt,
      in violation of Mr. Ramirez's rights under the Fifth, Sixth,
      Eighth and Fourteenth Amendments to the United States
      Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Twentieth claim for relief
      The especially heinous, cruel, or depraved aggravating
      circumstance is unconstitutionally vague, overbroad, and
      unconstitutionally applied in violation of Ramirez's rights
      under the Fifth, Sixth, Eighth and Fourteenth Amendments
      to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . 20

      1.    Section 13-703 (F)(6) is unconstitutionally
            overbroad and vague . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      2.    Under *Ring v. Arizona,* the standards for
            finding § 13-703 (F)(6) are no longer valid . . . . . . . . . . . . . 26

Twenty-first claim for relief
      The balancing test of aggravation versus mitigation used
      by the trial court and the Arizona Supreme Court creates a
      burden on the defendant that is not contemplated by the
      statute and is more onerous than what the statute requires
      in violation of Ramirez's rights under the Fifth, Sixth,
      Eighth, and Fourteenth Amendments to the United States
      Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Twenty-second claim for relief
      The death penalty statute is unconstitutional because it
      does not require the government to prove beyond a
      reasonable doubt that the aggravating factors outweighed
      the mitigating factors in violation of Ramirez's rights under
      the Fifth, Sixth, Eighth and Fourteenth Amendments to the
      United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Twenty-third claim for relief
The death penalty statute is unconstitutional because it requires that the death sentence be imposed whenever one aggravating and no sufficient mitigating circumstances are found, regardless of the trial court's belief that a life sentence may be warranted under the facts of the case, in violation of Ramirez's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Twenty-fourth claim for relief
Arizona's statutory scheme for the imposition of the death penalty is unconstitutional because it imposes the death penalty in a discriminatory manner against poor male defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Twenty-fifth claim for relief
Arizona's death penalty statute provides more opportunity for appellate review for non-capital defendants than it does for capital defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Twenty-sixth claim for relief
The death sentence imposed against Ramirez is inappropriate because he was denied the procedural safeguard of a proportionality review of his sentence. The state courts failed to engage in any meaningful review. This limitation by the state courts violated Ramirez's rights as guaranteed by the Fifth, Sixth, Eighth, And Fourteenth Amendments to the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Twenty-seventh claim for relief
Counsel was ineffective in his representation of Ramirez on direct appeal. This violated Ramirez's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution . . . . . . . . . . . . . . 42

Twenty-eighth claim for relief
The statutory provisions governing the Arizona capital punishment scheme violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. This scheme is unconstitutional on its face and as applied to Ramirez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Societal interests are not served . . . . . . . . . . . . . . . . . . . . . . . . . 46

The Arizona death penalty statute . . . . . . . . . . . . . . . . . . . . . . . 47

iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Twenty-ninth claim for relief
      Ramirez will not die instantly and he will feel extreme pain
      and suffering as a result of an inappropriate mixture of the
      drugs that will be used to execute him by lethal injection.
      Similarly, Ramirez will not die instantly and he will feel
      extreme pain and suffering if he is executed by lethal gas.
      These forms of physical torture, as well as psychological
      torture, violate the Eighth and Fourteenth Amendments to
      the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

      A.  Constitutional and statutory background . . . . . . . . . . . . . . . . 49

      B.  Lethal injection procedure . . . . . . . . . . . . . . . . . . . . . . . . . 50

      C.  Drugs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

      D.  Previous executions by lethal injection in Arizona . . . . . . . . . 56

      E.  Lethal injection causes pain . . . . . . . . . . . . . . . . . . . . . . . . . 60

      F.  Lethal gas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

      G.  Choice of method of execution . . . . . . . . . . . . . . . . . . . . . . . 66

Thirtieth claim for relief
      Ramirez is not competent to be executed.  Ramirez's
      execution while he is incompetent violates the Fifth, Sixth,
      Eighth and Fourteenth Amendments to the United States
      Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Thirty-first claim for relief
      Ramirez is being denied a fair clemency process in
      violation of the Fifth, Sixth, Eighth and Fourteenth
      Amendments to the United States Constitution . . . . . . . . . . . . . . . 69

Technical Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

iv

Fredric F. Kay
Federal Public Defender
Dale A. Baich (Ohio Bar No. 0025070)
Paula K. Harms (Missouri Bar No. 50331)
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
602.382.2816
602.899.3960 facsimile

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

David Martinez Ramirez,

       Petitioner,

  vs.

Dora Schriro, et al.,

       Respondents.

No. CIV 97-1331-PHX-JAT

Death Penalty Case

Supplement to First Amended Petition Under 28 U.S.C. §2254 for Writ of Habeas Corpus by a Person in State Custody

    Petitioner David Martinez Ramirez ("Ramirez") submits the following Supplemental First Amended Petition for Writ of Habeas Corpus pursuant to this Court's orders dated March 25, 2002 and November 7, 2003. [District Court Docket Entry Numbers ("Doc. No(s).") 55, 73.].[1]

### I.  Notice of intention to challenge presumption of correctness of all state court fact findings under U.S.C. § 2254(d).

    1.    Ramirez hereby provides notice of his intention to challenge the presumption of correctness of certain findings of fact made by the state court in his case pursuant to 28 U.S.C. §§ 2254(b)(1)(B)(i-ii), 2254(e), and 2254(f).

    2.    Certain findings of fact by the state court in Mr. Ramirez's case, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C.

---

[1]Through a separate pleading, Ramirez seeks leave to file the Supplemental First Amended Petition for Writ of Habeas Corpus.

1   § 2254(e)(1).  These include, but are not limited to, any and various factual findings

2   made by the trial court before, during, and after Mr. Ramirez's trial, and the opinion

3   by the Arizona Supreme Court on direct appeal.  Under 28 U.S.C. § 2254(e)(1),

4   Ramirez intends to assert that certain findings of fact by the state court at trial or on

5   direct appeal, if any are found to exist, are not fairly supported by the record.

6   Ramirez also intends to assert other exceptions to the presumption of correctness

7   under 28 U.S.C. §§ 2254(b)(1)(B) (i-ii), 2254(e) and 2254(f) including, but not

8   limited to: that the procedures employed by the state courts to make findings of facts

9   were not adequate to afford him full and fair hearings; that material facts were not

10   adequately developed at the state court hearings; that he did not receive full, fair and

11   adequate hearings in the state court proceedings; that the state process is ineffective

12   to protect his rights; and that he was otherwise denied due process of law in the state

13   court proceedings.

14          3.      In addition, Ramirez asserts that certain findings of fact by the state court

15   in regard to his state post-conviction proceedings, if any are found to exist, are not

16   entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1).  These

17   include, but are not limited to any and all factual findings made by the trial court in

18   regard to Ramirez's state post-conviction proceedings.   Under 28 U.S.C. §

19   2254(e)(1), Ramirez intends to assert that certain findings of fact by the state court

20   concerning his state post-conviction proceeding, if any are found to exist, are not

21   fairly supported by the record.  Ramirez also intends to assert other exceptions to the

22   presumption of correctness under 28 U.S.C. §§ 2254(b)(1)(B) (i-ii), 2254(e) and

23   2254(f) including, but not limited to: that the procedures employed by the state courts

24   to make findings of facts were not adequate to afford him full and fair hearings; that

25   material facts were not adequately developed at the state court hearings; that he did

26   not receive full, fair and adequate hearings in the state court proceedings; that the

27   state process is ineffective to protect his rights; and that he was otherwise denied due

28

1   process of law in the state court proceedings.

## II. Exhaustion.

3       4.     Ramirez states that each of the federal constitutional claims alleged
4   herein have been exhausted in proceedings before the Arizona courts, unless
5   otherwise noted. If any claims are deemed not to have been exhausted, Ramirez
6   requests his case be held in abeyance while he returns to state court to exhaust the
7   claims.

8       5.     The burden is on the respondents to demonstrate that Ramirez failed to
9   exhaust a particular claim. *See, e.g., Johnson v. Zerbst*, 304 U.S. 458, 464 (1938);
10  *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902,
11  905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994);
12  *Brown v. Maass*, 11 F.3d 914 (9th Cir. 1993).

13      6.     For those claims not identified as exhausted, they are either not ripe for
14  review, exhaustion would be futile, or this is the only forum within which to raise the
15  claim.

## III. Reservation of right to amend this petition.

17      7.     Ramirez expressly reserves his right to amend this petition. In
18  *McCleskey v. Zant*, 499 U.S. 467 (1991), the Supreme Court reaffirmed the "principle
19  that [a] petitioner must conduct a reasonable and diligent investigation aimed at
20  including all relevant claims and grounds for relief in the first federal habeas
21  petition." *Id.* at 498. Referring to Rule 6 (discovery), Rule 7 (expansion of the
22  record) and Rule 8 (evidentiary hearing), of the Rules Governing Section 2254 Cases
23  in the District Courts, the Supreme Court held that a habeas petitioner has to have
24  reasonable means and the ability to investigate in order to form a sufficient basis to
25  allege a claim in the first petition. *Id.* Ramirez believes additional claims may be
26  identified through investigation, after discovery is conducted and completed, or after
27  an evidentiary hearing is held. At the appropriate time during these proceedings,

28

1    Ramirez will present the additional claims through amendments to the petition.

2    ## IV.  Federal constitutional grounds.

3        8.    Ramirez challenges his convictions and sentences and alleges the

4    following constitutional violations occurred either after he was taken into custody,

5    during the course of proceedings in the state courts, or as a result of systemic

6    infirmities that are endemic to the Arizona death penalty statute and process.

7    ### Thirteenth claim for relief.

8        **The refusal to answer the jury's question regarding
     Mr. Ramirez's failure to testify was fundamental error.**

9    **This violated Mr. Ramirez's rights under the Fifth,
     Sixth, Eighth and Fourteenth Amendments to the**

10   **United States Constitution.**

11       9.    Ramirez raised this claim on direct appeal to the Arizona Supreme

12   Court.[2] This issue was decided on the merits. *State v. Ramirez*, 178 Ariz. 116, 125-

13   27, 871 P.2d 237, 246-48.

14       10.    During jury deliberations, the jury sent three notes to the judge. One of

15   the notes asked: "Was it a decision of both Stalzer (the prosecutor) or Seagle (sic, the

16   defense attorney) not to call Rameriz (sic) on stand -- or just Seagle's.[3]  Without

17   objection, the court responded, "[p]lease rely on the jury instructions in answering

18   this question."[4]

19       11.    The legal question confusing the jury was not minor, collateral, or

20   applicable to a relatively minor charge. Ramirez was charged with two counts of first

21   degree murder and the jury was improperly considering the fact that he did not testify,

22   considering it to the extent that they wrote a note to the judge to settle their concerns.

23   It appears that some of the jury members believed that the prosecutor may have had

24   _____

25       [2]Arizona Supreme Court Direct Appeal Index ("AZ S.Ct. Appeal") No. 25 at
     19-27.

26       [3]State Court Index ("Index") at 77.

27       [4]Index at 77; Reporter's Transcript ("R.T.") 7/26/90 at 3.

28

1   some role in keeping the appellant off the stand, but others believed it was the

2   defense attorney alone.

3        12.    A reasonable interpretation of the jury note was that some jury members

4   believed the defense attorney was keeping her client off the stand for a reason -- he

5   was guilty. It was crucial to immediately instruct the jury that Mr. Ramirez's failure

6   to testify was not to be considered during deliberations.

7        13.    A jury cannot perform its duty if it is confused by such as basic and

8   fundamental concept as the defendant's Fifth Amendment right to remain silent.

> "Discharge of the jury's responsibility for drawing
> appropriate conclusions from the testimony depended on
> discharge of the judge's responsibility to give the jury the
> required guidance by a lucid statement of the relevant legal
> criteria. When a jury makes explicit its difficulties a trial
> judge should clear them away with concrete accuracy . . .
> . [T]he trial judge had no business to be 'quite cursory' in
> the circumstances in which the jury here asked for
> supplemental instruction."

14   *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946). *Bollenbach* plainly

15   requires a trial judge "to respond to the jury's request with sufficient specificity to

16   clarify the jury's problem." *Davis v. Greer*, 675 F.2d 141, 145 (7th Cir. 1982). When

17   constitutional requirements, such as the Fifth Amendment are involved, the execution

18   of this duty involves insuring due process of law. *See Estelle v. McGuire*, 502 U.S.

19   62, 72 (1991) (jury instruction violates due process if it affects an identifiable

20   constitutional right).

21        14.    In this case, the trial judge's overarching and general response was

22   inadequate given the known confusion that remained in the jury's mind. They had

23   already read the jury instructions given to them on the effect of the defendant's failure

24   to testify and apparently, these instructions were not enough. Merely referring the

25   jury back to the instructions as a whole, without even pinpointing the relevant one,

26   clarified nothing. *United States v. Warren*, 984 F.2d 325, 330 (9th Cir. 1993).

27        15.    In *Warren*, the Ninth Circuit held that referring the jury back to the

28

1   original instruction was insufficient, given that it was apparent that at least some

2   members of the jury held a legally inappropriate view of the definition of intent. *Id.*

3   Once the confusion was made known to the trial judge, he had a duty to provide "a

4   supplemental instruction sufficient to clear up the uncertainty that the jury had

5   brought to the Court's attention." *Id.; see also, Belmontes v. Woodford*, 335 F.3d

6   1024, 1067 (9th Cir. 2003) (when the jury's questions made clear that they were not

7   sure how to follow the already given instructions, "the trial judge had a duty to cure

8   any ambiguity . . . by providing a clear description fo the jury's obligations"); *United*

9   *States v. McIver*, 186 F.3d 1119, 1130 (9th Cir. 1999) (because the jury's question

10  clearly indicated confusion, the judge had an obligation to concretely clear away the

11  confusion); *United States v. Frega*, 179 F.3d 793, 808-811 (9th Cir. 1999) (it is

12  reversible error to give an answer to a jury's question that is unresponsive).

13      16.     The jury's question indicated that they needed help and referring them

14  back to the instructions as a whole did not resolve the confusion generated by the

15  original instructions. *See United States v. Zimmerman*, 943 F.2d 1204, 1213 (10th

16  Cir. 1991); *see also, United States v. Duran*, 133 F.3d 1324, 1334 (10th Cir. 1998)

17  ("vague answers . . . are plainly inadequate when the jury has demonstrated its

18  misunderstanding"). The trial judge should have responded that the jury could not

19  consider in anyway the defendant's failure to testify. *Id.* at 1214 ("[t]he jury should

20  have been instructed in a way that there was no possibility that the conviction was

21  based on an incorrect legal basis. The questions from the jury certainly pointed up

22  the problem").

23      17.     Because Ramirez has shown that the trial judge failed in his duty to

24  clarify the jury's confusion about his Fifth Amendment rights, the state now bears the

25  burden of proving to the court that there was no effect on the verdict. *Belmontes*, 335

26  F.3d at 1069. The question from the jury indicates there is a reasonably probability

27

28                                      Page 6 of 74

1   the jury may have convicted Ramirez on an improper basis, his failure to testify.[5] *See*

2   *Zimmerman*, 943 F.2d at 1214. Because of the lack of the appropriate legal guidance

3   on a fundamental tenet of our Constitution, Ramirez must be afforded a new trial. *See*

4   *United States v. Bolden*, 514 F.2d 1301, 1308-09 (D.C. Cir. 1975) (conviction

5   reversed where court refused to do anything more than reread the statute and the

6   standard instruction when the jury had expressed obvious confusion in understanding

7   this instruction).

8        18.   "A question from a deliberating jury often represents a pivotal moment

9   in a criminal trial . . . . [A] trial judge has a 'duty of special care' when responding to

10   a request for 'further light on a vital issue' from the foreperson of a confused jury."

11   *United States v. Duncan*, 850 F.2d 1104, 1114 (6th Cir. 1988), *abrogated on other*

12   *grounds by, Schad v. Arizona,* 501 U.S. 624 (1991). By failing in his duty, the trial

13   judge created a reasonably possibility that the jury held Mr. Ramirez's failure to

14   testify against him, an unconstitutional inference which requires the verdict to be set

15   aside. *See id.*

16        19.   The failure by the trial court to answer the jury's question violated Mr.

17   Ramirez's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the

18   United States Constitution.

19

20

21

22

23

24       [5]In addition to asking about Ramirez's failure to testify, the jury also asked the

25   following: "Can we see part of the testimony stating anything about whether the deadbolt was locked when the police arrived?" R.T. 7/26/90 at 2; "Does

26   premeditation mean before you stab or during the stabbing, before death occurs?" R.T. 7/27/90 at 2. These questions demonstrate that Ramirez's guilt on the charge of

27   first degree murder, the death eligible offense, was not a foregone conclusion in the minds of the jurors.

28

### Fourteenth claim for relief.

**The prosecutor shifted the burden of proof and commented on Ramirez's right to remain silent by implying that the defense had an obligation to conduct their own scientific testing.   This violated Mr. Ramirez's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

20.    This claim was raised by Ramirez in his Opening Brief on direct appeal.[6]

21.    During direct examination, the prosecutor asked the state's criminalist why she did not test some of the vaginal swabs taken from the victim's body.  The criminalist responded: "[t]he other swabs were left for somebody else to analyze, perhaps a defense expert."[7]  During the ensuing conversation, the prosecutor again referred to the fact that "somebody else" could have had the samples tested.[8]

22.    A criminal defendant has no burden of proof. He is not required to call witnesses or present evidence to contradict that adduced by the prosecution. However, at trial, the prosecutor implied that the defense had a reciprocal burden of testing or affirmatively accessing the state's evidence in order to disprove the state's claims.

23.    The due process clause places the burden on the prosecution to prove beyond a reasonable doubt every element of a criminal offense.  *In re Winship*, 397 U.S. 358, 365 (1970).  This burden *never shifts* to the defendant, even when the fact is solely within the province of the defendant. *See, e.g., Mullaney v. Wilbur*, 421 U.S. 684, 702 (1975) ("And although intent is typically considered a fact peculiarly within the knowledge of the defendant, this does not . . . justify shifting the burden to him").

24.    The Supreme Court has held that "one accused of a crime is entitled to

---

[6]AZ S.Ct. Appeal No. 25 at 14.

[7]R.T. 7/20/90 at 19.

[8]*Id.*

Page 8 of 74

1     have his guilt or innocence determined solely on the basis of the evidence introduced

2     at trial, and not on [the basis of] . . . circumstances not adduced as proof at trial."

3     *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978). A criminal defendant is within his

4     rights to cloak himself in the presumption of innocence and require the prosecution

5     to prove his guilt with its own evidence. It is a violation of due process for a

6     prosecutor to induce the jury to infer guilt from a defendant's decision not to collect,

7     test or present evidence on his own behalf.

8         25.   In *Doyle v. Ohio*, 426 U.S. 610, 617 (1976), the Supreme Court found

9     that due process is violated when a defendant's assertion of his right to remain silent

10    is introduced at trial as evidence of guilt. In addition to improperly shifting the

11    burden of proof, the criminalist's testimony and the prosecutor's response were

12    impermissible comments on Mr. Ramirez's right to remain silent.

13        26.   The conduct of the prosecutor and the testimony of the criminalist

14    violated Mr. Ramirez's rights under the Fifth, Sixth, Eighth and Fourteenth

15    Amendments to the United States Constitution.

16                      **Fifteenth claim for relief.**

17          **Arizona's statutory scheme for the imposition of the**
          **death penalty, under which Ramirez was sentenced to**
18        **death, is unconstitutional in that: 1) it allowed the**
          **imposition of sentence by the trial judge, after the judge**
19        **rather than a jury made findings of fact as to the**
          **aggravating factors necessary for the imposition of the**
20        **death penalty, and 2) it failed to require that Ramirez**
          **receive notice by indictment of all aggravating factors**
21        **and all facts necessary to make him eligible for the**
          **death penalty, in violation of his rights under the Fifth,**
22        **Sixth, Eighth and Fourteenth Amendments to the**
          **United States Constitution.**

23
          27.   Ramirez raised this claim in state post-conviction proceedings.[9]  The
24
      superior court found this claim "precluded from being raised . . . because [it was]
25
      either raised and rejected on direct appeal or could have been raised . . . but [was]
26

27        [9]Index at 190 at 8.

28                        Page 9 of 74

1    not."[10]   In making this finding, the superior court relied on the state supreme court

2    decision on direct appeal and Ariz. R. Crim. P. 32.2(a).[11]

3         28.     After *Ring v. Arizona*, 536 U.S. 584 (2002), held that Arizona's death

4    sentencing scheme was unconstitutional, Ramirez again sought state post-conviction

5    relief in state court, arguing that the *Ring* decision was a significant change of law,

6    as contemplated by Ariz. R. Crim. P. 32.1(g), and thus, he was entitled to relief.[12]

7    The superior court denied the claim, relying upon *State v. Towery*, 204 Ariz. 386, 64

8    P.3d 828 (Ariz. 2003).[13]   The Arizona Supreme Court denied the petition for review

9    without comment.[14]

10        29.     Ramirez had a constitutional right to have a jury make all factual

11   determinations necessary to impose a death sentence, rather than allow the  a judge

12   to do so, because *Ring* held that capital defendants are entitled to a jury determination

13   of the presence or absence of aggravating factors that may lead to the imposition of

14   the death penalty.  *Ring*, 536 at 607.

15        30.     A jury -- not a judge -- must determine the existence of any statutory

16   aggravating factors and any other facts that must be established to make a defendant

17   eligible for the death penalty.   The aggravators and other essential facts constitute

18   essential elements that must be noticed and proved by the state, beyond a reasonable

19   doubt, to a jury of twelve.  This did not happen in Mr. Ramirez's case.

20        31.     Ramirez was not provided with notice of the aggravating factors and all

21   facts necessary to make him eligible for the death penalty.

22

23        [10]Minute entry ("M.E.") 192 at 2.

24        [11]*Id.*

25        [12]Index at 190 at 4-5.

26        [13]M.E. 3/21/03.

27        [14]AZ S.Ct. Review No. 3.

28                              Page 10 of  74

32.    Ramirez had a right to a jury trial on all factual allegations which, if proved, enhance the sentence from one of life, to death.

33.    Ramirez was not provided a jury trial on such facts.

34.    As a result, Mr. Ramirez's rights, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments were, violated.

### Sixteenth claim for relief.

**The consideration of victim impact evidence violated Mr. Ramirez's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

35.    Ramirez did not raise this claim in sate court.  Ramirez contends this claim was examined by the Arizona Supreme Court at part of their fundamental error and/or independent review.

36.    A presentence investigative report was prepared and submitted to the trial court for consideration at the sentencing phase of the proceedings.[15]

37.    This report contained statements from the victim's family and the police officer concerning their views of the sentence to be imposed.

38.    The presentence investigative report stated that "Mary Sandoval, the mother and grandmother of the victims, . . . has hopes that the defendant will be sentenced to death."[16]

39.    The probation officer also included statements from interested parties. For some reason, the deputy county attorney and the lead homicide investigator on the case were considered to be an interested parties. "Deputy County Attorney Louis Stalzer indicated that he believes that the defendant should be sentenced to death."[17] Detective Fuqua, after expressing his psychological and psychiatric diagnosis of

---

[15]Index at 171.

[16]Index at 171 at 1.

[17]Index at 171 at 2.

1    Ramirez from his armchair, stated that "the death penalty on each count is
2    appropriate."[18]

3         40.    The inclusion of these comments in the presentence report was so unduly
4    prejudicial to Ramirez that it rendered the sentencing phase fundamentally unfair.
5    Neither statement served any legitimate purpose and the statements were outside the
6    realm of permissible victim impact evidence the sentencing judge could consider
7    under *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) or *Gretzler v. Stewart*, 112 F.3d
8    992, 1009 (9th Cir. 1997).  The statements by the victim's mother/grandmother, the
9    prosecutor and Detective Fuqua were nothing but blatant attempts to prejudice the
10   sentencing judge and induce him to sentence Ramirez to death.  *See Summerlin*, 341
11   F.3d at 1112-1113 (in noting the systemic problems with Arizona's judge-only
12   sentencing scheme, the *en banc* panel specifically pointed out the frequency to which
13   Arizona judges were exposed to inadmissible sentencing recommendations from the
14   victim's family).

15        41.    The admission of a victim's family members' opinions about the
16   appropriate sentence violates the Eighth Amendment.  *Payne*, 501 U.S. at 830, n.2
17   (leaving undisturbed this holding in *Booth v. Maryland*, 482 U.S. 496 (1987)).  The
18   victims's recommendation as to sentence injects an arbitrary factor into the capital
19   sentencing process because it means that death sentences are handed out depending
20   upon the varying needs for vengeance felt by each individual victim.  Emotionally
21   charged opinions by the victim as to sentence, no matter how understandable and
22   sympathetic, are inconsistent with the reasoned decision making that is
23   constitutionally required in capital cases.  *Booth*, 482 U.S. at 509; *Payne,* 501 U.S.
24   at 830, n. 2.

25        42.    The submission of these statements to the sentencing judge for
26
27        [18]Index at 171 at 2.

28                              Page 12 of 74

consideration in determining Mr. Ramirez's sentence, denied Ramirez his right to a fair sentencing and violated Mr. Ramirez's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**Seventeenth claim for relief.**

**The death qualification of the jury violated Ramirez's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

43.   Ramirez raised this claim in state post-conviction proceedings.[19]   The superior court found this claim "precluded from being raised . . . because [it was] either raised and rejected on direct appeal or could have been raised . . . but [was] not."[20]   In making this finding, the superior court relied on the state supreme court decision on direct appeal and Ariz. R. Crim. P. 32.2(a).[21]   *Id.*

44.   Ramirez was entitled to a jury panel that is both impartial and represents a cross-section of the community.  Death qualification, the efforts by the state to eliminate jurors that oppose the death penalty but who nevertheless are willing to follow the court's instructions and abide by their oaths as jurors, violated Mr. Ramirez's constitutional rights to a fair trial and an impartial and representative jury.

45.   At the time of Ramirez's trial, in Arizona capital cases the court alone assessed the presence of aggravating and mitigating factors and determined sentence. *See, e.g., State v. LaGrand*, 153 Ariz. 21, 734 P.2d 563 (1987). The jury plays no role

---

[19]Index at 190.

[20]M.E. 192.

[21]Rule 32.2(a) provided:
A defendant shall be precluded from relief under this rule based upon any ground:
  (1) Still raisable on direct appeal under Rule 31 or on post-trial motion under Rule 24;
  (2) Finally adjudicated on the merits on appeal or in any previous collateral proceeding;
  (3) That has been waived at trial, on appeal, or in any previous collateral proceeding.

1   in the sentencing phase of the trial.  Death qualification is intended to assure that

2   jurors will be able to adequately consider and vote for a capital sentence if the

3   accused is convicted and the circumstances warrant such a sentencing decision. *See*

4   *Witherspoon v. Illinois*, 391 U.S. 510, 521-23 (1968).  Because the jurors do not

5   participate in the sentencing process in Arizona, their views on the death penalty are

6   irrelevant and death qualification of the jury unconstitutionally biases the juror pool.

7          46.     Through jury questionnaires, the trial court asked the members of the

8   jury venire,

> In this case, if the Defendant is found guilty of first degree
> murder, the Court may impose either life imprisonment or
> the death penalty, so-called capital punishment.  There are
> no other alternatives under Arizona law.  The decision
> regarding sentencing is left solely to the Court and is not in
> any way to be considered by the jury in its deliberation.
> Do any of you have any views on capital punishment, that
> is, the death penalty, whether conscientious, religious,
> philosophical, moral, or otherwise that would prevent or
> substantially impair the performance of your duties as a
> juror to give careful attention to the proceedings and decide
> the case fairly and impartially without bias or prejudice in
> accordance with the evidence presented, the Court's
> instructions on the law, and the oath you will take as a
> juror?"[22]

17         47.     The superior court asked this question despite the fact that, in Arizona,

18  at the time, the judge, and not the jury, determines the statutory aggravating elements

19  of the crime and decides the sentence of life or death.  Because the jurors are not

20  involved at all in the sentencing process, and are instructed not to consider the

21  sentence when deliberating on questions of guilt, it is prejudicial to inquire as to their

22  beliefs regarding the death penalty.

23         48.     In *Witherspoon*, the United States Supreme Court prohibited excusing

24  potential jurors for cause simply because they opposed the death penalty.  391 U.S.

25  at 523.  Only if the juror's attitude or belief "made unmistakably clear . . . that they

26

27  [22]R.T. 7/11/90 at 12-13.

28                              Page 14 of 74

1   would *automatically* vote against the imposition of capital punishment. . . ," could the

2   court excuse that juror for cause. 391 U.S. at 522-23, n.21 (emphasis in original).

3   This standard has been interpreted further as permitting exclusion of a juror only if

4   his attitude would "prevent or substantially impair the performance of his *duties as*

5   *a juror* in accordance with his instructions and oath." *Wainwright v. Witt*, 469 U.S.

6   412, 419 (1985) (emphasis added); *see also, Adams v. Texas*, 448 U.S. 38, 45 (1980).

7          49.     Sociological studies have demonstrated that death-qualified juries are

8   more conviction prone than non-death qualified juries. *See Story v. Kindt*, 26 F.3d

9   402, 410 (3rd Cir. 1994) (Cowen, J., dissenting) ("sociological studies on death-

10  qualified juries cited in *McCree* sufficiently demonstrate that death-qualified juries

11  are problematic and not impartial in the true sense of the term").

12         50.     The only important state interests which justify empaneling such a jury

13  are the interests in: 1) obtaining one jury that can decide both guilt and sentence and

14  2) allowing the defendant to benefit at sentencing from any "residual doubts" the jury

15  has retained from the guilt phase. *Lockhart v. McCree*, 476 U.S. 162, 180-81 (1986).

16  As to non-capital defendants, death-qualified juries are allowed in joint trials with

17  capital defendants because of the strong state interest in having a joint trial.

18  *Buchanan v. Kentucky*, 483 U.S. 402, 418-20 (1987). None of these state interests are

19  present in Mr. Ramirez's case.

20         51.     In Arizona, the duties of the juror do not include sentencing; therefore,

21  their beliefs as to the death penalty do not impact their abilities to determine guilt or

22  innocence.  If potential jurors are able to state that they will render a verdict in

23  keeping with the law as instructed by the court, there is no purpose to questioning

24  them further as to their beliefs regarding capital punishment.

25         52.     Mr. Ramirez's rights as guaranteed by the Due Process Clause of the

26  Fifth Amendment to the United States Constitution, the Right to Counsel Clause of

27  the Sixth Amendment to the United States Constitution, the Eighth Amendment

28                              Page 15 of 74

1  protections against cruel and unusual punishment, and the Due Process and Equal

2  Protection Clauses of the Fourteenth Amendment to the United States Constitution

3  were violated when Ramirez failed to receive a jury panel that was both impartial and

4  represented a cross-section of the community.

### Eighteenth claim for relief.

**Arizona's death penalty statute is unconstitutional because it allows mitigating evidence to be concealed by the court, in violation of Ramirez's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

9      53.    Ramirez raised this claim on direct appeal to the Arizona Supreme

10  Court.[23]

11      54.    Arizona's death penalty statute allows the court to withhold mitigating

12  "presentence information" from the defendant if, in the court's opinion, its disclosure

13  would endanger human life:

> In the sentencing hearing the court shall disclose to the defendant or defendant's counsel all material contained in any presentence report, if one has been prepared, except such material as the court determines is required to be withheld for the protection of human life. Any presentence information withheld from the defendant shall not be considered in determining the existence or nonexistence of the circumstances included in subsection F or G of this section.

19  Ariz. Rev. Stat. § 13-703(C)(1990). Ramirez has no way of learning what potentially

20  mitigating evidence was withheld from him because the law does not require that

21  such information be filed and sealed for appellate review.

22      55.    By taking information out of the realm of mitigating evidence, this

23  statute violates the constitutional requirement that the sentencing authority must

24  consider all factors that relate to (1) "any aspect of a defendant's character or record,"

25  and (2) "any of the circumstances of the offense." *Lockett v. Ohio*, 438 U.S. 586, 604

26      

---

27  [23]AZ S.Ct. Appeal No. 25 at 36-38.

28

1    (1978).

2        56.    The statute also violates Ramirez's right to a public trial and his right to

3    compulsory process. Ramirez cannot subpoena mitigating witnesses if the court can

4    conceal from him their identity or existence.

5        57.    The Arizona statute violated Mr. Ramirez's rights under the Fifth, Sixth,

6    Eighth and Fourteenth Amendments to the United States Constitution.

### Nineteenth claim for relief.

**Ramirez's death sentence was based upon several findings of fact which were not proven beyond a reasonable doubt, in violation of Ramirez's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

11       58.    This claim was raised in Ramirez's Opening Brief on Direct appeal.[24]

12       59.    In deciding whether a given murder is "especially heinous, cruel, or

13   depraved" under Ariz. Rev. Stat. §13-703(F)(6), courts must determine that a given

14   crime is somehow "set . . . apart from the usual or the norm." *State v. Knapp,* 114

15   Ariz. 531, 543, 562 P.2d 704, 716 (Ariz. 1977). The aggravating circumstance of

16   "especially cruel, heinous, or depraved" is an element of the crime that the State has

17   the burden of proving beyond a reasonable doubt. *See* Ariz. Rev. Stat. § 13-703(B)

18   (2003); *Ring v. Arizona,* 536 U.S. 584, 609 (2002); *State v. Miles,* 186 Ariz. 10, 16,

19   918 P.2d 1028, 1034 (Ariz. 1996).

20       60.    The burden placed upon the State "is a requirement and a safeguard of

21   due process" and it impresses upon the trier of fact the necessity of "reaching a

22   subjective state of certitude of the facts in issue." *In re Winship,* 397 U.S. 358, 362,

23   364 (1970). "Mere suspicion or speculation cannot be the basis for creation of logical

24   inference." *United States v. Lewis,* 787 F.2d 1318, 1323 (9th Cir. 1986), *amended on*

25   *denial of reh'g,* 798 F.3d 1250 (9th Cir. 1986). Habeas relief may be granted if the

---

[24]AZ S.Ct. Appeal No. 25 at 28-30.

1   court finds the evidence at trial "too speculative." *Speigner v. Jago*, 603 F.2d 1208,

2   1209 (6th Cir. 1979).

3       61.    The trial court fell prey to a subjective determination based less on

4   certitude, and more on a conclusory piecing together of events.  This determination

5   was contrary to the dictates of *Winship* and, therefore, in violation of 28 U.S.C. §

6   2254(d)(1); *see also Williams v. Taylor*, 529 U.S. 362 (2000).

7       62.    In the sentencing judge's special verdict, there were several findings of

8   fact which were not supported by the record.  These findings were used to support the

9   aggravating factor of "especially cruel, heinous, or depraved."  The unsupported

10  findings were as follows:

11              ". . . both Murders were unprovoked, senseless and without
                apparent motive. . . . he had sexual intercourse with Candie
12              Gortarez either shortly before or when he killed her, show
                that he was acting in an especially perverted, hateful, cold
13              blooded, sadistic and reprehensible manner in killing both
                victims.
14
                Finally, that the Defendant acted in an especially heinous
15              and depraved manner is evidenced by the fact that Candie
                Gortarez was only 15 years of age, and that both victims
16              were smaller, weaker and essentially helpless in the face of
                the Defendant's overpowering, armed and prolonged
17              assaults."[25]

18      63.    The finding that the murders were unprovoked was clearly erroneous as

19  no such evidence was introduced by the state.  Aggravating circumstances must be

20  proven beyond a reasonable doubt.

21      64.    Although Ramirez may have had intercourse with one of the victims,

22  there is no evidence to indicate that the intercourse was anything but consensual and

23  Ramirez was not charged with rape.[26]  The attempt to parse the underlying rationale

24  for the murders is unsubstantiated guesswork at best, and insufficient to a finding of

25

26      [25]R.T. 12/18/90 at 8-9.

27      [26]Index at 1; R.T. 7/25/90 at 17.

28                              Page 18 of 74

1   "cruel, heinous, or depraved."

2   65.   Finally, the court's finding that both of the victims were "physically

3   smaller" and "unevenly matched" with the defendant is simply wrong. Ramirez was

4   the approximately the same size as both victims.[27]

5   66.   In a weighing state such as Arizona, the sentencer violates the Eighth

6   Amendment when he weighs an "invalid" aggravating circumstance in deciding to

7   impose a death sentence. *See Clemons v. Mississippi*, 494 U.S. 738, 752 (1990).

8   Employing an invalid aggravating factor in the weighing process "creates the

9   possibility . . . of randomness" by placing a "thumb [on] death's side of the scale,"

10  thereby "creat[ing] the risk [of] treat[ing] the defendant as more deserving of the

11  death penalty." *Stringer v. Black*, 503 U.S. 222, 232, 235-36 (1992).

12  67.   The weighing of aggravating factors must be done in a way that is

13  "neutral and principled so as to guard against bias and caprice in the sentencing

14  decision." *Jones v. United States*, 527 U.S. 373, 402 (1999).   Even if other

15  aggravating factors exist, merely affirming a sentence reached by weighing an invalid

16  aggravating factor deprives a defendant of "the individualized treatment that would

17  result from actual reweighing of the mix of mitigating factors and aggravating

18  circumstances." *Clemons*, 494 U.S. at 752 (*citing Lockett v. Ohio*, 438 U.S. 586

19  (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982)); *see also, Parker v. Dugger*, 498

20  U.S. 308, 321 (1991).

21  68.   Because the state supreme court made factual assumptions unsupported

22  by the record to support the "cruel, heinous and depraved" factor, this case must be

23  remanded for resentencing.  The court found one statutory and seven nonstatutory

24  mitigating factors. Without the addition of these erroneous facts to the equation, the

25  aggravating factors would have been insufficient to impose the death penalty.

26  

27  [27]R.T. 7/24/90 at 36; R.T. 7/25/90 at 22.

28

69.   The state courts' reliance on this aggravating factor for Mr. Ramirez's death sentence violates his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### Twentieth claim for relief.

**The especially heinous, cruel, or depraved aggravating circumstance is unconstitutionally vague, overbroad, and unconstitutionally applied in violation of Mr. Ramirez's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

70.   Ramirez raised this claim in state post-conviction proceedings.[28]   The superior court found this claim "precluded from being raised . . . because [it was] either raised and rejected on direct appeal or could have been raised . . . but [was] not."[29]   In making this finding, the superior court relied on the state supreme court decision on direct appeal and Ariz. R. Crim. P. 32.2(a).[30]

71.   Section 13-706(F)(6) fails to provide any principled means to distinguish those who receive the death penalty from those who do not and results in the risk of arbitrary and capricious action.  In this case, the Arizona courts failed to narrow the application of this aggravating circumstance, such that the application against Ramirez was unconstitutional.  *See Arave v. Creech*, 507 U.S. 463 (1993); *Godfrey v. Georgia*, 446 U.S. 420 (1980).

---

[28]Index at 190 at 9.

[29]M.E. 192 at 2.

[30]*Id.*

### 1. Section 13-703 (F)(6) is unconstitutionally overbroad and vague.

72.     The application of Ariz. Rev. Stat. §13-703 (F)(6) (1990),[31] Arizona's statutory aggravator factor of committing the offense in an "especially cruel, heinous or depraved" manner, is constitutionally infirm.  Because the courts have failed to adopt a construction of the terminology that is sufficiently narrow, the aggravator has been interpreted in a manner that makes it a catch-all for cases that would not otherwise qualify as death eligible.

73.     The United States Supreme Court has consistently held that death penalty statutes must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983).  A capital sentencing statute must provide "a meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J., concurring).  For this reason, aggravators may not be automatic or apply to every first degree murder.

74.     Section 13-703(F)(6) of the Arizona Revised Statute makes any defendant death-eligible who committed first degree murder in an "especially heinous, cruel or depraved" manner.  In *State v. Gretzler*, the Arizona Supreme Court held that the state may prove a murder is especially cruel by a showing that a victim suffered physical pain or mental anguish before her death in a fashion foreseeable to the defendant.  135 Ariz. at 51, 659 P.2d at 10.  "For a killing to be especially cruel,

---

[31]In 2001, the statutory sentencing scheme was changed to include a prohibition on the death penalty for the mentally retarded.  Ariz. Rev. Stat. § 13-703(B).  To accommodate for this new subsection, the § 13-703(F)(6) "especially cruel, heinous or depraved" statutory aggravator has been changed to (G)(6).  For the purposes of this petition, this aggravating circumstance will be referenced as the (F)(6) aggravator because this was the sentencing scheme at the time Ramirez was convicted and sentenced.

the perpetrator must senselessly or sadistically inflict great pain on his victim." *State v. Lujan*, 124 Ariz. 365, 372, 604 P.2d 629, 636 (Ariz. 1979). Likewise, it must be a "conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Watson*, 120 Ariz. 441, 447, 586 P.2d 1253, 1259 (1978).

75.    Arizona's definitions of "heinous" and "depraved" also look at the "senselessness" or "needlessness" of the act. The terms focus on the defendant's state of mind at the time of the offense. *See Gretzler*, 135 Ariz. at 51-52, 659 P.2d at 10-11; *accord State v. Tison*, 129 Ariz. 526, 543, 633 P.2d 335, 352 (Ariz. 1981); *State v. Vickers*, 129 Ariz. 506, 515, 633 P.2d 315, 324 (Ariz. 1981). A finding of heinousness or depravity then, is determined by the motivation or purpose of the defendant.

76.    Arizona courts have construed the (F)(6) language in the disjunctive so that the prosecution's burden is satisfied upon a showing that a murder is either heinous, depraved or cruel. *State v. Castaneda*, 150 Ariz. 382, 393, 724 P.2d 1,12 (Ariz. 1986). Because the statutory construction is so broad, (F)(6) is the single most common aggravator in Arizona. *See* Capital Case Commission Final Report, Office of the Attorney General for the State of Arizona (2003), *available at* http://www.attorney_general.state.az.us/CCC/final-DelRec.pdf, p. 14.

77.    The broad net of the (F)(6) aggravator can encompass almost every first degree murder imaginable. Any murder that has no apparent motive, *State v. Wallace*, 151 Ariz. 362, 368, 728 P.2d 232, 238 (Ariz. 1986) or that is motivated by a desire to eliminate a witness, *State v. Smith*, 141 Ariz. 510, 512, 687 P.2d 1265, 1267 (Ariz. 1984), or that is motivated by hatred or revenge (and is therefore "relished") can be considered "especially heinous" or "especially depraved." Any murder in which the killer uses excessive force, *State v. Summerlin*, 138 Ariz. 426, 436, 675 P.2d 686, 696 (Ariz. 1983), or in which he uses insufficient force *State v. Chaney*, 141 Ariz. 295, 302, 686 P.2d 1265, 1272 (Ariz. 1984), can be considered

1    "especially heinous" or "especially depraved."

2        78.    Four justices of the United States Supreme Court have strenuously

3    objected to Arizona's use of the overbroad (F)(6) aggravator:

> Indeed, there would appear to be few first-degree murders which the Arizona Supreme Court would *not* define as especially heinous or depraved – and those murders which *do* fall outside this aggravating circumstance are likely to be covered by some other aggravating factor. Thus, the court will find heinousness and depravity on the basis of "gratuitous violence" if the murderer uses more force than necessary to kill the victim, . . . but the murder will be deemed cruel if the killer uses insufficient force and the victim consequently dies a lingering death. . . . A determination that a particular murder is "senseless" will support a finding of depravity; but a murder to eliminate a witness is also depraved, a murder for pecuniary gain is covered by a separate aggravating circumstance, and evidence showing that the defendant killed out of hatred for the victim or a desire for revenge may be used to buttress the court's conclusion that the killer "relished" the crime.

*Walton v. Arizona*, 497 U.S. 639, 696-97 (1990) (Blackmun, J, Brennan, J., Marshall, J. and Stevens, J., *dissenting*) (internal citations omitted).

        79.    Cruelty is similarly broad. To establish that a murder is "especially cruel," the defendant must either intend to cause the victim pain and anguish or must reasonably foresee a substantial likelihood that the victim will suffer. *State v. Van Adams*, 194 Ariz. 408, 984 P.2d 16 (Ariz. 1999); *State v. Adamson*, 136 Ariz. 250, 267, 665 P.2d 972, 989 (Ariz. 1983). However, the application of the especially cruel circumstance "has been expanded to cover any murder wherein the victim experiences fear or uncertainty as to his fate" or suffers some period of consciousness of his wounds before death. *Walton*, 497 U.S. at 698-99 (Blackmun, J., dissenting).

        80.    Other murders which appear to meet these criteria are inexplicably excluded from imposition of the death penalty, thereby making the application of the (F)(6) factor that much more mysterious. *See State v. Arias*, 131 Ariz. 441, 641 P.2d 1285 (Ariz. 1982) (81-year-old woman burglary victim bound, gagged and strangled;

death penalty not imposed); *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (Ariz. 1981) (victim was strangled, sustained two severe blows to the head, had lacerations over entire body and a ligature of twine tied around her neck; death penalty not imposed); *State v. Cookus*, 115 Ariz. 99, 563 P.2d 898 (Ariz. 1977) (victim lured into desert and beaten, defendant's gun misfired six times before he switched guns and shot victim; death penalty not imposed); *State v. Billhymer*, 114 Ariz. 340, 561 P.2d 311 (Ariz. 1977) (nude, bound victims had been stabbed repeatedly; death penalty not imposed); *State v. Encinas*, 132 Ariz. 493, 647 P.2d 624 (Ariz. 1982) (victim beaten for 10-15 minutes, then run over with car while accomplices held him down, victim then stabbed 30-40 times in the head and chest with a screwdriver; death penalty not imposed).

81.    The Arizona Supreme Court's decisions regarding the (F)(6) aggravating circumstance are similarly all over the board. *Compare State v. Smith*, 146 Ariz. 491, 504, 707 P.2d 289, 302 (Ariz. 1985) (not cruel even though victim shot in the head and did not die for two weeks), *with Chaney*, 141 Ariz. at 312, 686 P.2d at 1282 (cruel because victim suffered mental anguish prior to being shot as evidenced by his call for help and because victim "was conscious for approximately thirty minutes"); *compare State v. Lujan*, 124 Ariz. 365, 373, 604 P.2d 629, 637 (Ariz. 1979) (reversed even though victim was stabbed after falling to the ground, after being punched where he lay helpless, and killing was unnecessary to accomplish defendants' plan of burglary), *with State v. Correll*, 148 Ariz. 468, 481, 715 P.2d 721, 734 (Ariz. 1986) (cruelty and depravity affirmed because victims helpless, killing was unnecessary to accomplish the robbery, victims bound and gagged); *compare State v. Graham*, 135 Ariz. 209, 213, 660 P.2d 460, 463 (Ariz. 1983) (reversed even though defendant "smiled" as he told friends that "the victim 'squealed like a rabbit' when he was shot"), *and State v. Madsen*, 125 Ariz. 346, 352-58, 609 P.2d 1046 1052-53 (Ariz. 1980) (reversed even though defendant bragged it was "easy to get money, you just

1  blow someone away" and collect insurance money) *with State v. Martinez-Villareal*,

2  145 Ariz. 441, 444, 451, 702 P.2d 670, 673, 680 (Ariz. 1985) (depravity affirmed

3  because defendant bragged to a friend that he "killed 'because of his pure balls, that

4  he was very macho'") *and State v. Clark*, 126 Ariz. 428, 437, 616 P.2d 888, 897

5  (Ariz. 1980) (depravity affirmed where defendant told friend, "You should have seen

6  Charley when I hit him with those cutters"); *compare State v. Fisher*, 141 Ariz. 227,

7  252, 686 P.2d 750, 775 (Ariz. 1984) (heinousness and depravity upheld because

8  defendant hit victim three times in the head with a hammer, any one of which blows

9  would have been have been fatal and, therefore, was "more than was necessary to rob

10  and even kill" victim, plus victim had shown defendant and his wife "generosity and

11  concern"), *with State v. Johnson*, 149 Ariz. 395, 410, 710 P.2d 1050, 1056 (Ariz.

12  1985) (reversed on heinous and depraved even though murder was senseless and

13  victim had allowed defendant to stay with him for two weeks; other victim, who

14  survived, was a childhood friend of the defendant, who shot her after she tried to

15  escape, realizing her finance had already been shot by defendant); *compare State v.*

16  *Brookover*, 124 Ariz. 38, 601 P.2d 1322 (Ariz. 1979) (not cruel or depraved where

17  victim shot in the back, "fell to the floor moaning and asked the defendant what he

18  had done. The defendant said, 'Don't worry . . . it will be over soon' and shot him

19  once more in the back." Defendant and accomplice abandoned body in victim's car

20  at the airport), *with State v. Bracy*, 145 Ariz. 520, 538, 703 P.2d 464, 482 (Ariz.

21  1985) (heinousness and depravity affirmed where first victim shot twice and throat

22  slashed and killing of second victim senseless where it "in no way furthered the plan

23  of the killers"); *compare State v. Watson*, 120 Ariz. 441, 448, 586 P.2d 1253, 1260

24  (Ariz. 1978) (not heinous, cruel or depraved even where victim shot four times in the

25  back, the last time when face down on the floor), *with State v. Ceja* 126 Ariz. 35, 37,

26  40, 612 P.2d 491, 493, 496 (Ariz. 1980) (cruelty reversed, but heinousness and

27  depravity affirmed where one victim shot twice, then shot in the head four more

28  Page 25 of 74

1    times, "for no apparent reason" and other victim shot four times "two of the four shots

2    were fired at extreme (sic) close range").

3       82.    Arizona's application of (F)(6) fails to genuinely narrow the class of

4    persons subject to the death penalty.  By a virtually limitless extension of (F)(6),

5    Arizona violates the constitutional requirement that the death penalty be reserved in

6    the limited circumstance where there is an elevated justification for sentencing some

7    defendants to death and others to life in prison.  *Zant v. Stephens,* 462 U.S. at 877.

8    The elements overlap in a manner that renders the term "especially cruel, heinous or

9    depraved" overly broad as applied to all first degree murder cases.  Used collectively

10   or individually, the words create a catch-all that fails to adequately narrow and

11   provide discretion.  This is in direct contradiction to the proposition that the death

12   penalty is reserved for the worst of the worst cases.  "When the purpose of a statutory

13   aggravating circumstance is to enable the sentencer to distinguish between those who

14   deserve capital punishment from those who do not, the circumstance must provide a

15   principled basis for doing so." *Arave,* 507 U.S. at 474.  A principled basis does not

16   exist when a "sentencer fairly could conclude that an aggravating circumstance

17   applies to every defendant. . . ." *Id.*

18      83.    Due to the arbitrary and casual manner in which this aggravating factor

19   is applied, the finding of this factor in this case violated Mr. Ramirez's rights as

20   guaranteed by the Due Process Clause of the Fifth Amendment to the United States

21   Constitution, the Right to Counsel Clause of the Sixth Amendment to the United

22   States Constitution, the Eighth Amendment protections against cruel and unusual

23   punishment and the Due Process and Equal Protection Clauses of the Fourteenth

24   Amendment to the United States Constitution.

25      **2.    Under *Ring v. Arizona,* the standards for finding § 13-
              703 (F)(6) are no longer valid.**

26

27      84.    At Mr. Ramirez's Aggravation-Mitigation hearing, the state requested

28                                   Page 26 of 74

1   the death penalty, urging the trial court to find the existence of the aggravating factor

2   of especially heinous, cruel, or depraved manner.  The court found that the murder

3   was committed in an especially cruel manner, and in an especially heinous and

4   depraved manner.[32]

5       85.   Section 13-703 (F)(6) has been challenged numerous times on the

6   grounds that it is vague and overbroad.  In *Walton v. Arizona,* 497 U.S. 639 (1990),

7   the Supreme Court found that the terminology of "especially cruel, heinous or

8   depraved" is unconstitutionally vague on its face.  *Id.* at 654.  However, the

9   aggravator was saved because the Arizona Supreme Court had adopted a

10  constitutionally sufficient narrowing construction, specifically defining each element

11  individually.  *Id* at 655.  The Court pointed out the fact that a judge made the

12  determination of cruel, heinous and depraved was "crucial" to their decision to

13  uphold the aggravating circumstance.  *Id.* at 653.  The court stated that  trial judges

14  are presumed to know and follow the narrowed construction and it is "irrelevant" that

15  the statute itself does not narrow the definition.  *Id.*  However, when a jury is the fact-

16  finder, more explicit instructions beyond the vague definition of the statute are

17  required.

18      86.   *Walton* was recently overruled by *Ring v. Arizona,*536 U.S. 584 (2002),

19  and now jurors in Arizona must find the aggravating factors.  The Supreme Court of

20  the United States held that "[c]apital defendants, no less than non-capital defendants

21  . . . are entitled to a jury determination of any fact on which the legislature conditions

22  an increase in their maximum punishment."  *Id.* at 589.  The *Ring* Court upheld its

23  decision based on the fundamental constitutional principles it articulated in *Jones v.*

24  *United States,* 526 U.S. 227, 243, n. 6 (1999).  "[U]nder the Due Process Clause of

25  the Fifth Amendment and the notice and jury trial guarantees of the Sixth

26

27  [32]R.T. 12/18/90 at 6-9.

28

1   Amendment, any fact (other than prior conviction) that increases the maximum

2   penalty for a crime must be charged in an indictment, submitted to a jury, and proven

3   beyond a reasonable doubt." *Id*.

4       87.   *Ring* made clear that a jury must make the findings of aggravating factors

5   in order to comport with the United States Constitution. *Walton,* however, upheld 13-

6   703 (F)(6) as an aggravator because the judge, not the jury made the finding.

7   Although the language regarding "cruel, heinous or depraved" statutory aggravator

8   is nebulous, the *Walton* court presumed that the standards set by the Arizona Supreme

9   Court sufficiently cured this infirmity.

10      88.   No court has determined whether, under *Ring,* this reasoning is still

11  valid.  The Ninth Circuit however, expressed serious doubts as to whether courts

12  could continue to apply narrowing instructions to ameliorate unconstitutionally vague

13  statutes.  *Valerio v. Crawford*, 306 F.3d 742, 756-763 (9th Cir. 2002). The court

14  noted that "it appears to us inescapable" that this aspect of *Walton* could not stand

15  under the rationale of *Ring*.  *Id.* at 756, n.6.

16      89.   In *Valerio*, the Ninth Circuit has held that the *Walton* procedure of

17  employing a narrowing construction to cure a vague aggravator is not available when

18  a jury rather than a judge is making the sentencing determination.  *Id.* at 747.  The

19  Supreme Court has "never applied, or approved, a *Walton* analysis where the

20  factfinder was a jury." *Id.* at 757.  The Supreme Court clearly stated in *Walton* that

21  its analysis did not apply in jury cases. *Id.* at 758. Therefore, it seems highly unlikely

22  that the method that has preserved "cruel, heinous, or depraved" as a constitutionally

23  statutory aggravator will survive scrutiny under *Ring*.

24      90.   A statute that is unconstitutionally vague cannot be saved by a method

25  of decision making [capital judge sentencing] that has also been ruled

26  unconstitutional. Juries are required to find all facts, other than prior convictions, that

27  increase the maximum penalty of the crime.  Consequently, the vague standards of

28                                  Page 28 of 74

1   13-703 (F)(6) are not appropriate because they fail to give juries discretion on when

2   to impose the death penalty. "[A]n ordinary person could honestly believe that every

3   unjustified, intentional taking of human life is 'especially heinous.'" *Maynard v.*

4   *Cartwright,* 486 U.S. 356, 364(1988) (*quoting Godfrey v. Georgia,* 446 U.S. 420,

5   428-429 (1980)).

6       91.   The presumption that the fact-finder knows the definition of especially

7   cruel, heinous and depraved cannot serve to protect the vague and overly broad

8   wording of the statutory aggravator. A standardless capital punishment statute causes

9   imposition of the death penalty in an arbitrary and capricious manner and violates the

10   Eighth Amendment. *Furman,* 408 U.S. at 310. *Ring* not only overrules a Judge's

11   finding of aggravating factors, but also overrules *Walton*'s misplaced acceptance of

12   Ariz. Rev. Stat. § 13-703 (F)(6) as constitutional aggravator.

**Twenty-first claim for relief.**

**The balancing test of aggravation versus mitigation used by the trial court and the Arizona Supreme Court creates a burden on the defendant that is not contemplated by the statute and is more onerous than what the statute requires in violation of Ramirez's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

18       92.   Ramirez raised this claim in state post-conviction proceedings.[33]  The

19   superior court found this claim "precluded from being raised . . . because [it was]

20   either raised and rejected on direct appeal or could have been raised . . . but [was]

21   not."[34]  In making this finding, the superior court relied on the state supreme court

22   decision on direct appeal and Ariz. R. Crim. P. 32.2(a).[35]

23       93.   Mitigating factors must be weighed both individually and collectively

---

25   [33]Index at 190 at 8-9.

26   [34]M.E. 192 at 2.

27   [35]*Id.*

1   in deciding whether to impose the death penalty. *Jeffers v. Lewis*, 5 F.3d 1199, 1204

2   (9th Cir. 1993); *Smith v. McCormick*, 914 F.2d 1153, 1164 (9th Cir. 1990); *State v.*

3   *Correll*, 148 Ariz. 468, 483, 715 P.2d 721, 736 (Ariz. 1985) (court considers

4   mitigation evidence in combination). Under the Arizona sentencing scheme in Ariz.

5   Rev. Stat. § 13-703 (E), the "mitigating and aggravating circumstances must be

6   weighed against each other to determine whether the mitigating circumstances are

7   sufficiently substantial to call for leniency." *State v. Stevens*, 158 Ariz. 595, 601, 764

8   P.2d 724, 730 (Ariz. 1988). However, prior to balancing the weight of the mitigating

9   and aggravating circumstances, the court must first determine the existence of each

10   factor. Clearly, the law holds that the state must prove beyond a reasonable doubt the

11   presence of each aggravating circumstance to be considered by the court. The burden

12   on showing the presence of each mitigating circumstance falls upon the defendant.

13   *See* Ariz. Rev. Stat. § 13-703(C).

14       94.    "[T]he Arizona statute . . . imposes on defendants the burden of

15   establishing, by a preponderance of the evidence, the existence of mitigating

16   circumstances. . . ." *Walton v. Arizona*, 497 U.S. 639, 649 (1990). Furthermore, the

17   Supreme Court in *Walton* held that the state could not restrict the mitigating

18   circumstances to be considered by the sentencing court. "[T]he Court has refused to

19   countenance state-imposed restrictions on what mitigating circumstances may be

20   considered in deciding whether to impose the death penalty." *Id.*

21       95.    The trial court failed to abide by the Arizona sentencing statute and its

22   holding in Ramirez's case is contrary to *Walton*. The court  was required to

23   determine the absence or presence of each of the mitigating factors by a

24   preponderance of the evidence. When the burden is preponderance and the state

25   offers no contradictory evidence, the defendant meets his burden.

26       96.    The court misapplied the balancing test by requiring each mitigating

27   circumstance to be sufficient to outweigh the aggravating circumstances. The

28

1    sentencing court relied upon the wrong test to determine if a mitigating circumstance
2    is to be considered further. The court must determine the presence or absence of each
3    mitigating circumstance individually based upon the preponderance of the evidence
4    and only then is the court to weigh the cumulative effect of the established mitigators
5    against the cumulative effect of the aggravating factors. Because Mr. Ramirez's
6    mitigation was not considered cumulatively, the "constitutionally indispensable"
7    process of considering the "character and record of the individual offender and the
8    circumstances of the particular offense" is a process devoid of the necessary
9    protections to avoid an arbitrary sentence. *Eddings*, 455 U.S. at 112, (*quoting*
10   *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)).

11        97.    Under the proper standard of review, the finding by the sentencing
12   court is clearly an unreasonable finding of the facts. Ramirez did meet his burden in
13   establishing the presence of these mitigating factors, and these mitigators clearly
14   outweigh the aggravators. Consequently, Ramirez should have been sentenced to a
15   life term rather than death.

16        98.    Placement of the burden on Ramirez to prove the existence of mitigating
17   circumstances undermines the reliability of the fact-finding process and creates an
18   undue risk that the death penalty will be imposed despite factors which call for a
19   lesser sentence -- particularly where, as here, Ramirez was given ineffective court
20   appointed counsel and inadequate resources with which to investigate and discover
21   mitigation.

22        99.    The balancing test of aggravation versus mitigation used by the trial
23   court and the Arizona Supreme Court creates a burden on Ramirez that is not
24   contemplated by the statute and is more onerous than what the statue requires in
25   violation of the Due Process Clause of the Fifth Amendment to the United States
26   Constitution; the Right to Counsel Clause of the Sixth Amendment to the United
27   States Constitution; the Eighth Amendment protections against cruel and unusual

28

1   punishment; and the Due Process and Equal Protection Clauses of the Fourteenth

2   Amendment to the United States Constitution.

### Twenty-second claim for relief.

**The death penalty statute is unconstitutional because it does not require the government to prove beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors in violation of Ramirez's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

8   100.   Ramirez raised this claim in state post-conviction proceedings.[36] The

9   superior court found this claim "precluded from being raised . . . because [it was]

10  either raised and rejected on direct appeal or could have been raised . . . but [was]

11  not."[37] In making this finding, the superior court relied on the state supreme court

12  decision on direct appeal and Ariz. R. Crim. P. 32.2(a).[38]

13  101.   The Arizona death sentencing statute does not require that the sentencer

14  find beyond a reasonable doubt that the statutory sentencing formula has been met,

15  before a death sentence is imposed.  The requirement of proof beyond a reasonable

16  doubt applies to all elements of the charges in criminal trials because it reduces the

17  risk of wrongful convictions.  The wrongful imposition of a death sentence violates

18  societal standards of fairness and decency at least as much as does a wrongful

19  conviction.

20  102.   Because the penalty of death is qualitatively different from a sentence

21  of imprisonment, there is a corresponding difference in the need for reliability in the

22  determination that death is the appropriate punishment in a specific case. *Woodson*

23  *v. North Carolina*, 428 U.S. 208, 305 (1976); *California v. Ramos*, 463 U.S. 992,

---

25  [36]Index at 190 at 8.

26  [37]M. E. 192 at 2.

27  [38]*Id.*

28  Page 32 of 74

1    998-99 (1983). Thus, in addition to determining that the defendant is death eligible,

2    the sentencer must also determine that death is the appropriate punishment for the

3    defendant.

4        103.   In Arizona, the sentencing phase of a capital case resembles a separate

5    trial in all meaningful respects. *Arizona v. Rumsey*, 467 U.S. 203, 210 (1984). Under

6    *Rumsey*, aggravating circumstances are the functional equivalent of the elements of

7    the crime, and must be established before a defendant is eligible for the death penalty.

8    Yet, there is no requirement, either statutory or otherwise, that the state prove that

9    death is the appropriate sentence in an individual's case.

10       104.   Arizona's failure to require that the sentencer find that there are not

11   sufficient mitigating circumstances to warrant leniency beyond a reasonable doubt

12   has resulted in the imposition of the death sentence in many cases like Mr. Ramirez's,

13   where it is not warranted according to the standards of most triers of facts.

14       105.   The failure of the statute to provide that the state must prove all the

15   aggravating elements exist beyond a reasonable doubt constitutes a violation of the

16   Due Process Clause of the Fifth Amendment to the United States Constitution; the

17   Right to Counsel Clause of the Sixth Amendment to the United States Constitution;

18   the Eighth Amendment protections against cruel and unusual punishment; and the

19   Due Process and Equal Protection Clauses of the Fourteenth Amendment to the

20   United States Constitution.

21                           **Twenty-third claim for relief.**

22           **The death penalty statute is unconstitutional because it**

        **requires that the death sentence be imposed whenever**

23           **one aggravating and no sufficient mitigating**

        **circumstances are found, regardless of the trial court's**

24           **belief that a life sentence may be warranted under the**

        **facts of the case, in violation of Mr. Ramirez's rights**

25           **under the Fifth, Sixth, Eighth and Fourteenth**

        **Amendments to the United States Constitution.**

26

27

28

106.   Ramirez raised this claim in state post-conviction proceedings.[39]   The superior court found this claim "precluded from being raised . . . because [it was] either raised and rejected on direct appeal or could have been raised . . . but [was] not."[40]   In making this finding, the superior court relied on the state supreme court decision on direct appeal and Ariz. R. Crim. P. 32.2(a).[41]

107.   The Arizona death penalty statute, under which Ramirez was sentenced, mandates the death sentence unless there are sufficient mitigating circumstances to warrant leniency.  Thus, under the Arizona death penalty statute, in order to have his life spared, Ramirez bears the risk of nonpersuasion as to the existence and sufficiency of mitigating circumstances.

108.   Under the Arizona statute, a death sentence must be imposed and upheld even for crimes which the sentencer, in reflecting contemporary community values, believes are not sufficiently serious to warrant this ultimate penalty.  By foreclosing the sentencer's ability to return a life sentence unless the mitigating factors outweigh the aggravating factors, Arizona's statute creates a mandatory death penalty.

109.   Merely concluding that the aggravating circumstances outweigh the mitigating factors is constitutionally inadequate, as a sentencer still could have concluded that "a comparison of the totality of the aggravating factors with the totality of the mitigating factors leaves it in doubt as to the proper penalty," *i.e.*, in doubt as to whether death is the *appropriate* punishment in a specific case.  *Smith v. North Carolina*, 459 U.S. 1056 (1982) (Stevens, J., dissenting from denial of certiorari).

110.   The fatal flaw of mandatory death penalty statutes is that, without

[39]Index at 190 at 8-9.

[40]M.E. 192 at 2.

[41]*Id.*

1 specific standards, the process of deciding who is to be sentenced to death is shielded

2 from judicial review. *See Woodson*, 428 U.S. at 303.

3 > [The] mandatory death penalty statute provides no standard
> to guide the jury in its inevitable exercise of the power to

4 > determine which first degree murderers shall live and
> which shall die. And there is no way under the North

5 > Carolina law for the judiciary to check arbitrary and
> .capricious exercise of that power through a review of death

6 > sentences.

7 *Id.* at 303.

8    111.   Such statutory presumptions as to the imposition of the death penalty are

9 inconsistent with the standards of decency in the United States and certainly creates

10 an undue risk that the death penalty will be imposed where a lesser sentence is

11 appropriate. Under this mandatory scheme, the sentencing judge is essentially barred

12 from using its discretion in deciding whether the death penalty is an appropriate

13 sentence in a given case.

14    112.   In Mr. Ramirez's case, a reasonable sentencer could have found that

15 Ramirez does not deserve the death penalty. In fact, throughout the United States,

16 noncapital sentences have been imposed for the vast majority of such crimes,

17 especially when the evidence is of a circumstantial nature as in this case.

18    113.   The mandatory imposition of the death penalty when the defendant is

19 unable to convince the court that his mitigating factors outweigh the aggravating

20 factor is unconstitutional under the Due Process Clause of the Fifth Amendment to

21 the United States Constitution; the Right to Counsel Clause of the Sixth Amendment

22 to the United States Constitution; the Eighth Amendment protections against cruel

23 and unusual punishment; and the Due Process and Equal Protection Clauses of the

24 Fourteenth Amendment to the United States Constitution.

25

26

27

28

1

## Twenty-fourth claim for relief.

2

**Arizona's statutory scheme for the imposition of the death penalty is unconstitutional because it imposes the death penalty in a discriminatory manner against poor male defendants.**

3

4

5        114.   This claim was raised in Mr. Ramirez's Petition for Review of the order

denying post-conviction relief.[42]

6

7        115.   Arizona's death penalty statute at the time of Mr. Ramirez's sentencing

8   was applied in a manner that discriminates against poor, male defendants in violation

9   of the due process and equal protection clauses of the state and federal constitutions.

10   *McClesky v. Kemp*, 481 U.S. 279, 320 (1987) (Brennan, J., dissenting; Blackmun, J.,

dissenting).

11

12            [T]he discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and

13            despised, and lacking political clout, or if he is a member of a suspect and unpopular minority, and saving those who,

14            by social position, may be in a more protected position.

15   *Furman*, 408 U.S. at 255 (Douglas, concurring).

16        116.   Mr. Ramirez's case and uncontroverted statistics prove this point.

17   Ramirez was an indigent male defended by a state public defender at trial.

18   Prosecutors seek the death penalty more against poor males than any other group.

19        117.   The United States Supreme Court has recognized that distinctions based

20   on wealth have a measure of special constitutional significance. *McDonald v. Board*

21   *of Election Com'rs of Chicago*, 394 U.S. 802, 807(1969); *Harper v. Virginia Bd. of*

22   *Elections*, 383 U.S. 663, 670 (1966).   When justifying the different treatment of

23   similarly situated people, the state must show the advancement of a substantial state

24   interest. *See Plyler v. Doe,* 457 U.S. 202, 230 (1982). There simply is no legitimate

25   reason why persons of wealth and influence do not face the death penalty when, for

26

27        [42]AZ S.Ct. Review Doc. 1. at 7-8.

28

1    identical conduct, the poor uniformly do.   As such the death penalty is

2    unconstitutional.

3        118.   Furthermore, the death penalty is disproportionately given to males over

4    females.  In the United States, while women account for one in ten (10%) of murder

5    arrests, they account for only one in fifty-two (1.9%) of death sentences imposed at

6    the trial level.  Most of those women, however, are never actually executed as they

7    account for only one in sixty-nine (1.5%) of persons presently on death row, and only

8    ten of the 807 (1.2%) of persons actually executed in this modern era.  *See* Victor

9    Streib, *Death Penalty for Female Offenders: January 1, 1973 to June 20, 2003* (Rev.

10   July 1, 2003), at http://www.law.onu.edu/faculty/streib/femdeath.pdf, p. 3.  Further,

11   there is currently only one woman on death row in Arizona and she was convicted for

12   the murder of her four-year-old son.[43]  These statistics illustrate not only that the

13   death penalty rate for women is in gross disproportion to the rate for men, but also

14   that prosecutors purposely seek the death penalty discriminatorily against men.

15       119.   No compelling or even important, state interest can be advanced to

16   justify the discriminatory application of the death penalty, in violation of Mr.

17   Ramirez's rights under the Due Process Clause of the Fifth Amendment to the United

18   States Constitution, the Right to Counsel Clause of the Sixth Amendment to the

19   United States' Constitution, the Eighth Amendment protections against cruel and

20   unusual punishment, and the Due Process and Equal Protection Clauses of the

21   Fourteenth Amendment to the United States Constitution.[44]

22

23   _____

24       [43]*See* http://www.adc.state.az.us/DeathRow/DeathRow.htm#Number.

25       [44]The discriminatory application of the death penalty against Ramirez is even
     more suspect when viewed in light of *Ring v. Arizona, supra.*  Had a jury of twelve
26   been present at the sentencing phase of trial, Ramirez would have received a
     consideration of his mitigating evidence by people from all walks of life.  However,
27   because Ramirez was sentenced by a judge, his claims would succeed or fail based
     upon the opinion of one man.

28

1

**Twenty-fifth claim for relief.**

2

**Arizona's death penalty statute provides more opportunity for appellate review for non-capital defendants than it does for capital defendants.**

3

4

120.   Ramirez presented this claim on direct appeal.[45]

5

121.   Under Ariz. Rev. Stat. § 13-4031 (1992), Mr. Ramirez's conviction was

6 automatically appealed to the Arizona Supreme Court. The statute provides that

7 death-sentenced defendants can only have their appeal heard in the Arizona Supreme

8 Court. *Id.* However, non-capital defendants have two chances for appellate review.

9 They are entitled to have their appeal heard in the Arizona Court of Appeals and if

10 unsuccessful, they can then petition the Arizona Supreme Court for review. Ariz.

11 Rev. Stat. § 12-120.21 (1992); Ariz. Rev. Stat. § 12-120.24 (1992). This arrangement

12 violates Equal Protection.

13

122.   Irrational and unfair distinctions, made by state courts in the application

14 of state law, violate the equal protection clause of the Fourteenth Amendment. *Myers*

15 *v. List*, 897 F.2d 417, 421 (9th Cir. 1990). The Arizona Constitution guarantees both

16 capital and non-capital defendants the right to an appeal. Ariz. Const. Art. 2, § 24.

17 Neither the legislature nor the courts of Arizona have a rational basis for selectively

18 excluding capital defendants from two levels of appellate review, even though the

19 right is extended to all other criminal cases on factual issues similar to the

20 determination of aggravating factors.

21

123.   Capital defendants should be provided with additional appellate

22 protections, given the importance the Supreme Court's Eighth Amendment

23 jurisprudence has placed upon "close appellate scrutiny." *Stringer v. Black*, 503 U.S.

24 222, 230 (1992). The lack of any rational explanation for this distinction renders this

25 capital sentencing scheme and Mr. Ramirez's death sentence unconstitutional under

26

27 [45]AZ S.Ct. Appeal No. 25 at 6-8.

28

the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### Twenty-sixth claim for relief.

**The death sentence imposed against Ramirez is inappropriate because he was denied the procedural safeguard of a proportionality review of his sentence. The state courts failed to engage in any meaningful review. This limitation by the state courts violated Mr. Ramirez's rights as guaranteed by the Fifth, Sixth, Eighth, And Fourteenth Amendments to the United States Constitution.**

124.    Ramirez raised this claim in state post-conviction proceedings.[46]   The superior court found this claim "precluded from being raised . . . because [it was] either raised and rejected on direct appeal or could have been raised . . . but [was] not."[47]   In making this finding, the superior court relied on the state supreme court decision on direct appeal and Ariz. R. Crim. P. 32.2(a).[48]

125.    Mr. Ramirez's death sentence is inappropriate because he was denied the procedural safeguard of a meaningful proportionality review by the state appellate courts.  Even when a proportionality review is conducted, the state courts limit the comparison to only those cases in which the death penalty was imposed, thus biasing the sampling pool, and consequently the courts fail to engage in any meaningful review.

126.    Appellate review plays an essential role in eliminating the systemic arbitrariness and capriciousness which infected death penalty schemes invalidated by *Furman v. Georgia*, 408 U.S. 238 (1972). The teaching of *Furman* was that a state may not leave the decision of whether a defendant lives or dies to the unfettered discretion of the jury because such a scheme inevitably results in death sentences that

---

[46]Index at 190 at 9.

[47]M. E. 192 at 2.

[48]*Id.*

are "wantonly and . . . freakishly imposed" and "are cruel and unusual in the same way that being struck by lightening is cruel and unusual." *Id.* at 309-310. (Stewart, J., concurring). Therefore, some form of meaningful appellate review is required to assess the sentencer's imposition of the death penalty.

127.   In response to *Furman*, many states added the concept of proportionality review to their capital statutes. In a series of cases decided four years after *Furman*, the United States Supreme Court upheld the capital statutes of states that require proportionality review, *see Gregg v. Georgia*, 428 U.S. 153 (1976), and the capital statutes of states that do not require proportionality but in which the courts perform review anyway, *see Proffitt v. Florida*, 428 U.S. 242 (1976). In each instance, the Court based its approval on the premise that those statutes insured that sentencers would be "given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." *Gregg*, 428 U.S. at 192, (plurality opinion of Stewart, Powell, and Stevens, JJ.).

128.   The *Gregg* Court, in particular, spoke of the useful function of proportionality review and characterized it as assuring that "'no death sentence is affirmed unless in similar cases throughout the State the death penalty has been imposed generally. . . .'" *Gregg*, 428 U.S. at 205, (*quoting Moore v. State*, 233 Ga. 861, 864, 213 S.E.2d 829, 832 (1975)).

129.   While proportionality review is not constitutionally required, once a state chooses to include proportionality review, the state cannot administer that safeguard in an unconstitutional manner. *See Evitts v. Lucey*, 469 U.S. 387, 401 (1985). "Proportionality review is one of several respects in which we have held that 'death is different,' and have imposed protections that the Constitution nowhere else provides." *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991). Therefore, the components of the appellate review system must comport with the demands of the due

1    process and equal protection clauses. *See Evitts*, 469 U.S. at 403-04.

2        130.   Arizona's courts have no adequate standards for determining the

3    appropriateness of the death penalty in a given case.   Adequate appellate review is

4    a precondition to a finding that a state death penalty system is constitutional. *Zant*,

5    462 U.S. at 879.   Review must be based on a comparison of similar cases and

6    ultimately must focus on the character of the individual and the circumstances of the

7    crime. *Id.*

8        131.   Furthermore, when a limited proportionality review is conducted, the

9    mechanisms of this review are highly skewed such that death penalty cases are only

10   compared to other death penalty cases and not to those receiving life sentences. This

11   lopsided method of review leads to the predictable foregone conclusion that the death

12   penalty is always proportionate.   This method does not provide a meaningful

13   proportionality review.   It may be appropriate for a court to begin a proportionality

14   analysis with the aggravating circumstances. However, finding other death cases with

15   the same circumstances, and concluding that the death penalty is proportionate or

16   appropriate does not meet constitutional mandates.   No meaningful manner exists in

17   which to distinguish those capital defendants who are deserving of the death penalty

18   from those who are not.

19       132.   Mr. Ramirez's sentence is disproportionate to other Arizona defendants

20   who received life in prison. In *State v. Jimenez*, 165 Ariz. 444, 799 P.2d 785 (Ariz.

21   1990), another Arizona defendant's death sentence was reduced to life in prison on

22   appeal despite the fact the defendant's sexually-influenced murder of a five-year-old

23   girl was found aggravated because the murder was heinous and depraved.   In *State*

24   *v. Valencia*, 121 Ariz. 139, 645 P.2d 239 (Ariz. Ct. App. 1982), a death sentence

25   given to a defendant was modified to life imprisonment despite the application of

26   aggravating factors of the defendant's previous convictions for kidnaping, robbery,

27   and rape. In *State v. Marlow*, 163 Ariz. 65, 786 P.2d 395 (Ariz. 1989), a sentence of

28                                   Page 41 of 74

1    death was reduced to life imprisonment even though the victim was killed to prevent

2    him from providing evidence of defendant's involvement in a robbery.

3        133.    This limitation by the state courts violated Mr. Ramirez's rights as

4    guaranteed by the Due Process Clause of the Fifth Amendment to the United States

5    Constitution; the Right to Counsel Clause of the Sixth Amendment to the United

6    States Constitution; the Eighth Amendment protections against cruel and unusual

7    punishment; and the Due Process and Equal Protection Clauses of the Fourteenth

8    Amendment to the United States Constitution.

9                          **Twenty-seventh claim for relief.**

10       **Counsel was ineffective in his representation of**
         **Ramirez on direct appeal. This violated Ramirez's**
11       **rights as guaranteed by the Fifth, Sixth, Eighth and**
         **Fourteenth Amendments to the United States**
12       **Constitution.**

13       134.    Ramirez alleged that his direct appellate counsel was ineffective in his

14   reply to the state's response to the petition for post-conviction relief.[49]

15       135.    The United States Supreme Court in *Strickland v. Washington*, 466 U.S.

16   668 (1984), set forth the test for ineffective assistance of counsel. The inquiry must

17   focus on (1) whether Ramirez received reasonably effective assistance and, (2) if not,

18   whether counsel's errors resulted in a reasonable probability that the outcome would

19   have been different. *Id.*

20       136.    Arizona provides for automatic direct review of capital cases, as a matter

21   of right. *See* Ariz. R. Crim. P. 31.2. A capital defendant has the right to counsel in

22   the presentation of his claims during this first appeal as a matter of right. *See*

23   *Douglas v. California*, 372 U.S. 353, 357 (1963). Any counsel provided pursuant to

24   *Douglas* must function as the effective counsel envisioned by the Sixth Amendment.

25   *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).

26   _____

27       [49]Index at 191 at 1.

28                                  Page 42 of 74

137.   Appellate counsel performs ineffectively when he fails to discover and brief nonfrivolous issues. *Delgado v. Lewis*, 223 F.3d 976, 980-81 (9th Cir. 2000). In order to show prejudice, a petitioner must show a reasonable probability that, but for appellate counsel's failure to brief the nonfrivolous issue, he would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

138.   Appellate counsel failed to exercise the skill, judgment and diligence expected of reasonably competent criminal defense lawyers.  There was no tactical or strategic reason for counsel's failure to review and prepare adequately for the appellate phase of the capital proceedings.  In addition, the ABA Guidelines specifically provide that appellate counsel should be familiar with federal post-conviction remedies and that he "should seek to present . . . all arguably meritorious issues." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 11.9.2(a), (d); 11.9.3 (a), (c) (1989).  By failing to properly federalize Ramirez's claim, appellate counsel performed deficiently by possibly foreclosing federal review of several of petitioner's claims.

139.   Appellate counsel was ineffective as he failed to raise or he failed to adequately present the issues now raised in the Amended Petition in claims one through twelve, and in the Supplemental Amended Petition, claims thirteen through thirty-one, *supra* and *infra*.  Those claims, rather than being listed here, are incorporated by reference. Ramirez relies on the merits of these claims to show that appellate counsel's performance prejudiced his case.

140.   Ramirez's rights as guaranteed by the Due Process Clause of the Fifth Amendment to the United States Constitution; the Right to Counsel Clause of the Sixth Amendment to the United States Constitution; the Eighth Amendment protections against cruel and unusual punishment; and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, were violated as a result of the failures by appellate counsel.

1

## Twenty-eighth claim for relief.

2    **The statutory provisions governing the Arizona capital**
**punishment scheme violate the Fifth, Sixth, Eighth and**
3    **Fourteenth Amendments to the United States**
**Constitution. This scheme is unconstitutional on its**
4    **face and as applied to Ramirez.**

5    141. Ramirez raised this claim in state post-conviction proceedings.[50] The

6    superior court found this claim "precluded from being raised . . . because [it was]

7    either raised and rejected on direct appeal or could have been raised . . . but [was]

8    not."[51]   In making this finding, the superior court relied on the state supreme court

9    decision on direct appeal and Ariz. R. Crim. P. 32.2(a).[52]

10    142. The Eighth Amendment, as applied to the States through the Fourteenth

11    Amendment, prohibits cruel and unusual punishment and promises to all that the

12    state's power to punish will be exercised within the limits of civilized standards.

13    What constitutes cruel and unusual punishment is not a static concept, but rather must

14    draw its meaning from evolving standards of human decency. *Trop v. Dulles*, 356

15    U.S. 86, 101 (1958); *see also, Weems v. United States*, 217 U.S. 349, 378 (1910)

16    (stating that the Eighth Amendment is "not fastened to the obsolete but may acquire

17    meaning as public opinion becomes enlightened by a humane justice"). This concept

18    must be interpreted in a flexible and dynamic manner.

19    143. Punishment which is "excessive" constitutes cruel and unusual

20    punishment. A punishment is excessive if it makes no measurable contribution to

21    acceptable goals of punishment and hence is nothing more than the purposeless and

22    needless imposition of pain and suffering, or is grossly out of proportion to the

23    gravity of the offense. If the death penalty makes no measurable contribution to

24

25    [50]Index at 190 at 9.

26    [51]M. E. 192 at 2.

27    [52]*Id.*

28

1    acceptable goals of punishment, or if it is disproportionate to the seriousness of the
2    offense committed, it is excessive and therefore unconstitutional.

3        144.    Equal protection under the law, as guaranteed by the Fourteenth
4    Amendment, requires that similarly situated persons be treated similarly. This right
5    extends to the protection against cruel and unusual punishment. A death penalty
6    imposed in violation of the equal protection guarantee is a cruel and unusual
7    punishment.

8        145.    The Eighth Amendment concept of cruelty is not a prohibition against
9    all suffering, but it is a prohibition against inflicting suffering greater than is
10   necessary to serve the legitimate needs underlying a compelling state interest. Every
11   punishment contains an element of cruelty. A convicted individual who is deprived
12   of his freedom and imprisoned will feel society has been cruel. Generally, society
13   tolerates the degree of cruelty that is necessary to serve its legitimate needs.
14   However, when the level of cruelty is disproportionate to the crime, and consequently
15   does not serve the needs of society, courts must find the punishment to be "cruel"
16   within the meaning of the Eighth Amendment.

17       146.    The right to life is a constitutionally protected fundamental right. The
18   Fifth and Fourteenth Amendments to the Constitution state explicitly that neither the
19   United States government nor any of the individual state governments may deprive
20   a person of his life without due process of law.

21       147.    Due process guarantees prohibit the taking of life unless the state can
22   show a legitimate and compelling state interest. Moreover, when fundamental rights
23   are involved, substantive due process requires that the state demonstrate that its
24   action is the least restrictive means toward furtherance of a compelling state purpose.

25       148.    The societal interests commonly advanced to justify capital punishment
26   are saving lives, protecting citizens, and ensuring justice. These goals are often
27   referred to, in penological terms, as deterrence, incapacitation/isolation, and

28                                          Page 45 of 74

1    retribution/moral reinforcement.

2        149.   The death penalty is neither the least restrictive nor an effective means

3    of deterrence.   Historically, capital punishment has not had a deterrent effect.

4    Isolation of the offender can be effectively served by means less restrictive than the

5    death penalty, as can retribution.   These societal interests do not justify the death

6    penalty, thus, such punishment is cruelly and unusually applied.

7        150.   Due process and equal protection rights require that states not impose a

8    capital sentence through procedures that create a substantial risk of arbitrary and

9    capricious application.   The Arizona scheme does not meet these requirements.

10   **Societal interests are not served.**

11       151.   The Eighth Amendment to the United States Constitution prohibits

12   infliction of cruel and unusual punishment.   The meaning of the term "cruel and

13   unusual" must be established based on the values and ideals of an enlightened

14   society.   Current social values have progressed from those of the past where the

15   "justice" system called for "an eye for an eye."   Contemporary societal values are

16   inconsistent with the purposeless extinction of life.   The death penalty, by these

17   standards, is cruel and unusual punishment.

18       152.   The Fifth and Fourteenth Amendments of the United States Constitution

19   provide guarantees to equal protection of the law and due process.   These guarantees

20   are further safeguards against imposition of the death penalty, even if it is not found

21   to be inherently cruel and unusual.

22       153.   Due process guarantees that, where fundamental rights are at risk, the life

23   of the individual may not be taken without substantive safeguards first being met.

24   Governmental action cannot be justified unless the interest to be served is a

25   compelling governmental interest. *Reno v. Flores,* 507 U.S. 292, 301-302 (1993).

26   Further, that interest must be promoted through use of the least restrictive means that

27   can effectively serve the stated interest. *Id.* The state of Arizona has failed to

28

1    establish a compelling state interest.  Moreover, the state of Arizona has failed to

2    show that a less restrictive means, such as life imprisonment or life without parole,

3    could not effectively serve the interests the state has asserted as justifying the death

4    penalty.

5           154.   Due process also guarantees fair proceedings through which sentencing

6    is accomplished. Where procedures implemented do not adequately ensure reliability

7    in the guilt and sentencing determinations, there is an increased risk that the death

8    penalty will be imposed arbitrarily and discriminatorily, in violation of due process

9    and equal protection guarantees.  Where this occurs, the death penalty, as applied,

10   constitutes cruel and unusual punishment.

11                       **The Arizona death penalty statute.**

12          155.   The Arizona statute under which Ramirez was sentenced mandates the

13   death sentence unless there are sufficient mitigating circumstances to warrant

14   leniency.

15          156.   The Arizona statute thus places on Ramirez the risk of nonpersuasion as

16   to the existence and sufficiency of mitigating circumstances, to have his life spared.

17          157.   Such statutory presumptions of the imposition of the death penalty, even

18   in cases where the sole aggravation is the participation of the petitioner in a felony

19   murder, is inconsistent with the standards of decency in the United States and creates

20   an undue risk that the death penalty will be imposed where a lesser sentence is

21   appropriate.

22          158.   The Arizona statute under which Ramirez was sentenced requires that

23   mitigating circumstances be proved to exist, by a preponderance of the evidence,

24   before they can be considered by the sentencing judge.

25          159.   Ramirez's case presented evidence of mitigating factors which the trial

26   judge, at resentencing, did not include in his decision, and therefore presumably did

27   not consider, because they were not established by the statutory burden of proof.

28                                 Page 47 of  74

160.   Placement of the burden on Ramirez to prove the existence of mitigating circumstances creates an undue risk that the death penalty will be imposed despite factors which call for a lesser sentence particularly where, as here, Ramirez was provided with ineffective court appointed counsel and inadequate resources with which to investigate and discover mitigation.

161.   The Arizona death penalty statute mandates a death sentence where the sentencing and reviewing court find statutory aggravating circumstances and no mitigating circumstances sufficient to warrant leniency, regardless of the appropriateness of a death sentence for the crime.

162.   Under this Arizona statute, a death sentence must be imposed and upheld even for crimes which the sentencer, reflecting contemporary community values, believes that the crime is not sufficiently serious to warrant the ultimate penalty.

163.   A reasonable sentencer could find that Ramirez's was such a crime; in fact, in Arizona and throughout the United States noncapital sentences have been imposed for the vast majority of such crimes.

164.   By mandating the death sentence where the statutory criteria are met, regardless of the appropriateness of the sentence in the particular case, the Arizona death penalty statute violates the Eighth and Fourteenth Amendments.

165.   The Arizona death sentencing statute does not require that the sentencer find, beyond a reasonable doubt, that the statutory sentencing formula has been met, before a death sentence is imposed.

166.   The requirement of proof beyond a reasonable doubt applies to all elements of the charges in criminal trials because it reduces the risk of wrongful convictions.

167.   The wrongful imposition of a death sentence violates societal standards of fairness and decency at least as much as does a wrongful conviction.

168.   Arizona's failure to require that the sentencer find that there are not

Page 48 of 74

1    sufficient mitigating circumstances to warrant leniency, beyond a reasonable doubt,

2    has resulted in the arbitrary imposition of the death penalty generally, and its

3    imposition in many cases like Ramirez's, where it is not warranted according to the

4    standards of most jurors and judges.

5        169.    Arizona's statutory scheme under which the death penalty is authorized

6    fails to ensure that arbitrary and discriminatory imposition of the death penalty will

7    not occur.  The procedures utilized under this scheme actually promote and provide

8    for the mandatory imposition of the death penalty and, thus, are constitutionally

9    intolerable and violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the

10   United States Constitution on its face and as applied to Ramirez.

### Twenty-ninth claim for relief.

**Ramirez will not die instantly and he will feel extreme pain and suffering as a result of an inappropriate mixture of the drugs that will be used to execute him by lethal injection.  Similarly, Ramirez will not die instantly and he will feel extreme pain and suffering if he is executed by lethal gas.  These forms of physical torture, as well as psychological torture, violate the Eighth and Fourteenth Amendments to the United States Constitution.**

17       170.    This claim was not previously presented to the Arizona Supreme Court

18   in this case.  It is nevertheless ripe for adjudication because, among other things, there

19   is an absence of an available state corrective process.    *See* 28 U.S.C.A. §

20   2254(b)(1)(B)(i).

### A. Constitutional and statutory background.

22       171.    On December 18, 1990, the Maricopa County Superior Court imposed

23   the sentence of death upon Ramirez.[53]  At that time, the Arizona Constitution required

24   that the sentence of death be carried out in the following manner: "[t]he judgment of

25   death shall be inflicted by administering lethal gas."  Ariz. Const. art. 22, § 22.

---

27   [53]Index at 169.

1  (1933).   The statutory authority providing for execution by lethal gas was contained

2  in Ariz. Rev. Stat. § 13-704(B).

3      172.   On November 23, 1992, the Arizona Constitution was amended to

4  provide:

> 5   The judgment of death shall be inflicted by administering
> 6   an intravenous injection of a substance or substances in a
>   lethal quantity sufficient to cause death except that
>   defendants sentenced to death for offenses committed prior
> 7   to the effective date of the amendment to this section shall
>   have the choice of either lethal injection or lethal gas. . . .

8  Ariz. Const. Art. 22, § 22. (1992).

9      173.   Following the amendment to the Arizona Constitution, the Arizona

10  legislature amended Arizona Revised Statute § 13-704(B) to provide:

> 11   A defendant who is sentenced to death for an offense
> 12   committed before November 23, 1992 shall choose either
>   lethal injection or lethal gas at least twenty days before the
> 13   execution date.   If the defendant fails to choose either
>   lethal injection or lethal gas, the penalty of death shall be
> 14   inflicted by lethal injection.

15  Ariz. Rev. Stat. § 13-704 (B) (1993).

16      **B. Lethal injection procedure.**

17      174.   The Eighth Amendment prohibits methods of carrying out the death

18  sentence that involve the "unnecessary and wanton infliction of pain," unneeded

19  terror or disgrace, or "lingering death."  *Gregg*, 428 U.S. at 173;  *Louisiana ex rel.*

20  *Francis v. Resweber*, 329 U.S. 459, 463 (1947);  *In re Kemmler*, 136 U.S. 436, 447

21  (1890);  *Wilkerson v. State of Utah*, 99 U.S. 130, 135 (1878).   The lethal injection

22  method of execution to be used by Arizona in this case, and as applied to Ramirez,

23  violates this fundamental constitutional mandate. The method devised by the Arizona

24  Department of Corrections ("ADOC"),[54] entails a substantial risk of gratuitous,

25

26      [54]The Respondent Dora Schriro, and her predecessors and successors, as the

27  Director of ADOC are responsible for adopting and implementing the execution
 protocol.

28

1    torturous pain and prolonged suffering and thus violates the Eighth Amendment.

2        175.    To Ramirez's knowledge and belief, the following procedures will take

3    place to cause death of Ramirez by lethal injection.

4        176.    On the day prior to the scheduled execution, the "drugs" to be used to

5    cause    death    --    prescribed    by    a    medical    doctor[55]    --    are    picked

---

[55]Arizona Department of Corrections (ADOC) regulations, followed by Respondents, require that a physician be present at all executions. Specifically, "[t]he Assistant Director of Health Services shall: Arrange for a physician to be present during the execution of a condemned prisoner."
ADOC regulations on executions by lethal injection require a medical doctor to take action which would assist, supervise, or contribute to the ability of another individual to cause directly the death of the condemned by mandating that a physician:

a)    Monitor vital signs on site through the use of an electrocardiogram;
b)    Attend and observe the execution as a physician;
c)    Render technical advice regarding the execution--*i.e.* check all equipment, advise warden when all medical support devices and personnel are ready to proceed with the execution, and pronounce death;
d)    Prescribe by procedure, or "chart," and supervise the injection of prescription-only, lethal drugs; and
e)    Consult with and supervise lethal injection personnel as mandated by Arizona Revised Statute § 32-1491, which states that the prescribing practitioner must "provide direct supervision of a nurse or attendant involved in the dispensing process."

Redacted documents obtained by Ramirez call for physician participation in the execution procedures. This calls for an express violation of the ethics of the profession of medicine. Every major medical society which has addressed this issue has declared physician participation in any manner, even to the examination of the inmate and determination of death, as being prohibited by the ethical standards of the medical profession.

The State of Arizona Medical Practices Acts licenses physicians to perform acts of healing, not acts of killing. Physicians have no authority to misuse the privileges granted by the medical licensure to participate in executions. The execution procedure is in conflict with this medical licensure act.

The execution procedure calls for state employees, such as the warden or his designee, to violate federal regulations which establish restrictions on the use of controlled substances and other drugs. Sodium pentothal, Valium, morphine, Demoral and Narcan, drugs listed in the "Execution By Lethal Injection Supply

Page 51 of 74

1    up from the pharmacy at the Arizona State Prison-Florence by the Special Operations
2    Team Leader.

3        177.   At approximately 5:30 p.m. on the day of the scheduled execution, the
4    Special Operations Team Leader and designated medical staff member conduct an
5    inventory of equipment and materials.

6        178.   At approximately 7:00 a.m. on the day of the scheduled execution, all
7    inventoried materials, equipment, and drugs are secured in the equipment area
8    adjacent to the execution chamber.

9        179.   At approximately noon on the day of the scheduled execution, the
10   executioners arrive at Arizona State Prison - Florence.

11       180.   At 12:05 p.m. on the day of the scheduled execution, the "drug" box is
12   delivered to the warden.

13       181.   At approximately 12:10 p.m. on the day of the scheduled execution, the
14   warden delivers the "drug" box to the executioners.

---

Inventory" checklist, are all medications which are controlled substances under
federal drug regulations and are approved only for medicinal use, not for executions.

    The American Medical Association Code of Ethics strictly forbids any
physician to assist in an execution. The AMA definition of assistance includes, but
is not limited to, the following:

    a)   An action which would assist, supervise, or
         contribute to the ability of another individual to
         directly cause the death of the condemned;
    b)   Monitoring vital signs on sight or remotely
         (including monitoring electrocardiograms);
    c)   Attending or observing an execution as a physician;
    d)   Rendering technical advice regarding execution;
    e)   Prescribing, preparing, administering, or supervising
         injection drugs or their doses or types;
    f)   Consulting with or supervising lethal injection
         personnel.

    ADOC policy requires a physician to prescribe and direct the administration
of prescription-only drugs for use not in accord with their generally accepted
therapeutic purposes. This action constitutes unprofessional conduct as defined by
Ariz. Rev. Stat. § 32-1401 (25)j and is grounds for disciplinary action under Ariz.
Rev. Stat. § 32-1451 (A).

1    182.   At approximately 1:00 p.m. on the day of the scheduled execution, the

2    Special Operations Restraint Team reports to the Special Operations Team Leader in

3    the execution building security area.  At about the same time either the Director of

4    ADOC or the warden will call the Governor of Arizona.

5    183.   At approximately 1:05 p.m. on the day of the scheduled execution, a

6    medical doctor arrives at Arizona State Prison - Florence.

7    184.   At approximately 1:30 p.m. on the day of the scheduled execution, the

8    Special Operations Team Leader holds a final briefing with the Special Operations

9    Restraint Team.

10    185.   At approximately 2:00 p.m. on the day of the scheduled execution, the

11    warden gives the signal to proceed.

12    186.   At approximately 2:05 p.m. on the day of the scheduled execution, the

13    Special Operations Restraint Team removes the inmate from his cell, conducts a strip

14    search, and escorts him to the execution chamber.  At that time the Director of ADOC

15    asks the inmate if he has any last words.

16    187.   At approximately 2:30 p.m. on the day of the scheduled execution, the

17    restraint of the inmate is completed and the Special Operations Team exits the

18    execution chamber.

19    188.   Between 2:35 and 2:55 p.m. on the day of the scheduled execution, the

20    executioners insert the "IV's," and a heart monitor is positioned.

21    189.   At approximately 2:55 p.m. on the day of the scheduled execution, the

22    witnesses to the execution are admitted to the witness observation area.

23    190.   At approximately 3:02 p.m. on the day of the scheduled execution, a

24    medical examiner is admitted to the staging area and the warden gives a signal that

25    the witnesses are in place.

26    191.   At approximately 3:03 p.m. on the day of the scheduled execution, the

27    Director of ADOC may tell the witnesses that there has been no reprieve.

28

192.   At approximately 3:04 p.m. on the day of the scheduled execution, the Director of ADOC tells the warden to proceed and the Special Operations Team Leader exits the execution chamber. After a thirty (30) second wait, the blinds to the witness area are opened.

193.   At approximately 3:05 p.m. on the day of the scheduled execution, the warden tells the executioners to proceed and the execution commences.

194.   At approximately 3:10 p.m. on the day of the execution, the executioners notify the warden when the execution is completed. The warden than awaits a signal from the medical doctor that the heart monitor indicates death.

195.   At approximately 3:20 p.m. on the day of execution, the blinds to the witness area are closed. The medical examiner is admitted to the execution chamber.

196.   At approximately 3:25 p.m. on the day of the execution, either the Director of ADOC or the warden advise the witnesses that the execution was completed.

### C. Drugs.

197.   To Ramirez's knowledge and belief, the following drugs will be used to cause his death: Pentothal; Pancuronium (Pavulon™) and Potassium Chloride. In addition, Valium, Lidocaine HCL, Epinephrine, Xylocaine, Narcan, Morphine and Demoral are available for use during the lethal injection process. Of these drugs, Pentothal, Valium, Narcan, Morphine and Demoral are all medications that are controlled substances under federal drug regulations and are approved only for medicinal use, not for executions. Possession and use of these drugs is restricted to individuals properly licensed by the Internal Revenue Service.

198.   Pentothal, Pancuronium, and Potassium Chloride are prescription-only drugs as defined by Ariz. Rev. Stat. §32-1901 (57)(a), which provides: "[a]ny drug which because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not generally recognized

1   among experts . . . , as safe for use except by or under the supervision of a medical

2   practitioner."

3       199.   The "prescription-only drugs" that will be used to cause the death of

4   Ramirez are not being used for the intended therapeutic value.

5       200.   Ariz. Rev. Stat. § 32-1968 mandates that, "A prescription-only drug shall

6   be dispensed only . . . (1) [by] a medical practitioner in conformance with § 32-1921;

7   (2) Upon a written prescription order;[56] (3) On an oral prescription order. . . ; [or] (4)

8   By renewing any written or oral prescription order. . . ."

9       201.   Respondents engage in a practice whereby the "prescription-only drugs"

10   used in lethal injection executions are dispensed upon a prescription procedure

11   identified as "charting." The "charting" procedure is a prescription order, necessarily

12   made by a medical doctor, which is entered into the condemned prisoner's medical

13   "chart." After "charting" is complete, Respondents allow for the drugs to be

14   dispensed to the Special Operations Team Leader and administered by the

15   executioners at the execution.

16       202.   Under Ariz. Rev. Stat. § 32-1491(D), the prescribing practitioner, in this

17   case a medical doctor, must "provide direct supervision of a medical assistant, nurse

18   or attendant involved in the dispensing process."

19       203.   A number of states have outlawed the use of Pancuronium, a

20   neuromuscular blocking agent, to euthanize animals. *See, e.g.,* T.C.A. § 44-17-303(c)

21   (2003). Recently, a Tennessee court found that the use of Pancuronium was arbitrary

22   because the state failed to demonstrate any need whatsoever for the injection of the

23   drug. *See Abdur'Rahman v. Sundquist,* No. 02-2236-III, p. 2 (Tenn. Chancery Court,

24

25       [56]Ariz. Rev. Stat. § 32-1901 (66), defines in pertinent part, a prescription order
as (a) "An order to a pharmacist for drugs or devices issued and signed by a duly
26   licenced medical practitioner in the authorized course of his professional practice;"
or (b) "An order transmitted to a pharmacist through word of mouth, telephone or
27   other means of communication directed by such medical practitioner."

28

20th   Judicial   District,   Davidson   Co.,   Part   III   June   2,   2003),
http://www.tsc.state.tn.us/OPINIONS/TSC/CapCases/Rahman/06022003/ruling.pdf.
Pancuronium produces a "chemical veil", which because of its paralytic effect on the
muscles, makes the prisoner appear serene. *Id.* at 5. Pancuronium does not paralyze
the brain, consciousness, or nerves.   *Id.* at 12.   Pancuronium has the effect of
disguising any problems that arise during lethal injection because although the
prisoner may be undergoing torturous pain, Pancruonium prevents them from being
able to communicate this pain to outsiders. *Id.* at 5.   It violates conventional
standards of decency to allow the same drug which is considered inhumane for the
euthanization of animals to be utilized against human beings.

### D. Previous executions by lethal injection in Arizona.

204.   In 1976, the United States Supreme Court permitted the states to again
carry out executions.   *Gregg v. Georgia*, 428 U.S. 153 (1976).   Since that time,
Arizona has executed twenty-two (22) individuals.   Twenty (20) of the twenty-two
(22) men were executed by lethal injection.

205.   On April 6, 1992, Donald Gene Harding was executed by lethal gas. His
execution will be described *infra*.

206.   On March 3, 1993, John George Brewer was executed by lethal injection.
Mr. Brewer waived his appeals.   To Ramirez's knowledge and belief, the first drug
administered to Mr. Brewer was pentothal.   This drug was intended to sedate Mr.
Brewer.   The anesthesia-inducing actions of pentothal are  very brief.   A subject
awakens rapidly from its effects.   It is classified as an ultra short-acting barbiturate.
Recovery from the effects of this drug, which has occurred when completion of
execution has been prolonged, subjects the inmate to suffering and torture because
of the painful sensations of suffocation produced by the paralyzing effects of
Pancuronium and the extreme sensation of burning produced by potassium chloride.
The level of pentothal listed in the autopsy report is well below the therapeutic

1    range.[57]

2         207.   On April 14, 1993, James Dean Clark was executed by lethal injection.

3    To Ramirez's knowledge and belief, the first drug administered to Mr. Clark was

4    pentothal. The intended effect of this drug was to sedate Mr. Clark. The anesthesia-

5    inducing actions of sodium pentothal are of very brief duration. A subject awakens

6    rapidly from its effects. It is classified as an ultra short-acting barbiturate. Recovery

7    from the effects of this drug, which has occurred when completion of execution has

8    been prolonged, subjects the inmate to suffering and torture because of the painful

9    sensations of suffocation produced by the paralyzing effects of Pancuronium and the

10   extreme sensation of burning produced by potassium chloride. The level of pentothal

11   listed in the autopsy report is well below the therapeutic range.[58]

12        208.   On September 13, 1995, Jimmie Wayne Jeffers was executed by lethal

13   injection. Ramirez does not presently possess information to describe the execution

14   of Mr. Jeffers.

15        209.   On June 19, 1996, Darren Bolton was executed by lethal injection. Mr.

16   Bolton waived his appeals. Ramirez does not presently possess information to

17   describe the execution of Mr. Bolton.

18        210.   Luis Mata was executed on August 22, 1996. Under established

19   procedures, Mata was strapped to a gurney at approximately 11:30 p.m. on August

20   21st and the lethal injection needles were inserted. To Ramirez's knowledge and

21   belief, Mr. Mata remained in this position in the execution chamber for one hour and

22

23

24

_____

25   [57]Ramirez will provide factual support for this allegation through his first Rule
     7 Motion.

26

27   [58]Ramirez will provide factual support for this allegation through his first Rule
     7 Motion.

28

ten minutes while his attorneys were arguing to the Arizona Supreme Court.[59]

211. When the execution went forward, the following occurred:

> All of a sudden, the praying stopped. Immediately, Mr. Mata's head jerked back and from side to side several times. Then, his face contorted.

> Then, his mouth and lips flapped in a very unnatural way -- sort of like one does when one is exhausted and says "phew" or sort of like when one makes a raspberry sound, but more extreme and unnatural and involving the entire mouth area instead of just his lips. . . .

> Mr. Mata's body stopped moving, and I thought it was over. I was watching Mr. Mata at this time and not my watch, so I do not know exactly how much time passed, but it seemed like a couple of minutes.

> Then, his chest and stomach began quick, sharp heaving. His chest and stomach went up and down about six or seven times. Then, he did not move.

> The execution was not like going to sleep. There were several contortions and jerks in the body, such that I cannot get the picture of them out of my mind. Because the execution chamber is soundproof, I do not know what sounds were made as Mr. Mata was dying.[60]

212. On June 25, 1997 William Woratzeck was executed by lethal injection. Ramirez does not presently possess information to describe the execution of Mr. Woratzeck.

213. Jose Jesus Ceja was executed on January 21, 1998. Under established procedures, Ceja was strapped to a gurney at approximately 11:30 p.m. and the lethal injection needles were inserted.

---

[59]Ramirez will provide factual support for this allegation through his first Rule 7 Motion. This is not the only instance of an inmate being strapped to the gurney with the lethal needle in his arm. For instance, on January 8, 1997, Kirt Wainwright was strapped to a gurney with the needle inserted in his arm for forty-five minutes while the United States Supreme Court considered his appeal. Rick Bragg, *An Evening of Death, Punishment for 3 Murderers*, THE NEW YORK TIMES, January 10, 1997 at A1.

[60]Ramirez will provide factual support for this allegation through his first Rule 7 Motion. *See also,* Steve Benson, *Bearing witness to a wrongful execution*, THE ARIZONA REPUBLIC, Sept. 1, 1996 at B1.

1       214.    When the execution went forward, the following occurred:

2               This is what the Arizona Department of Corrections did to
                Jose Jesus Ceja. I was there.

3                                    □     □     □

4
5               They led him to a gurney in the execution chamber and
                strapped him down. Then they put catheters into the veins
6               of his arms. They may or may not have had to dissect an
                arm -- with the inmate fully conscious -- in order to find
7               the correct veins. When this is necessary, they call it
                "cutting down." They left him lying like that for about a
8               half-hour, and then, when they knew there had been no
                last-minute reprieve, they gave the order to open the
9               curtain that hid him from the view of the witnesses -- the
                inmate's witnesses, state's witnesses and journalists. No
10              "victim's witnesses" -- members of the Leons' family --
                attended.

11              When the curtain opens, Ceja looks like a man tucked
                cozily in bed. It's a cosmetic maneuver worthy of an
12              advertising agency. Witnesses weren't allowed to see him
                being strapped down, or his arms being pierced by needles.
13              Because of the sheet that's tucked around him, and the
                strategic positioning of the gurney, there's no indication
14              that he has needles in his arms. There's no sign of any
                tubes or catheters.

15
16              I have the best -- or worst -- view a witness can have.
                Because I was invited by Ceja, I'm standing right down at
17              the front. . . .

18                                   □     □     □

19              When the order comes to open the curtain, and a guard
                does it, I almost recoil. I'd imagined there would be some
20              distance, that it would all be far away. But I'm standing so
                close to Ceja that, if it weren't for the soundproof window,
21              we could hold a conversation without having to raise our
                voices.

22                                   □     □     □

23              When he realizes the curtain has been removed, he raises
                his head and looks at the witnesses. . . .
24
                Terry Stewart, the DOC's director, enters the death room
25              and stands beside Ceja. An intercom system is turned on,
                and we hear Stewart ask Ceja if he has anything he wants
26              to say.

27              "No," Ceja answers, his voice tinged with a Mexican

28                                  Page 59 of 74

1    accent.

2    Stewart asks him if he's waiving his right to say anything.

3    "That's right," Ceja answers. His manner is calm, his tone
     of voice flat but not hostile.

4

5    Stewart exits. Then Meg Savage, warden of Florence
     prison, comes in and reads Ceja his death warrant. He lies
     there impassively as she does. Then she leaves, and Ceja is
6    killed.

7    We can't see it happen, but he's injected with Pentothal, an
     ultra-short-acting sedative. Then Pancuronium, which
8    paralyzes every voluntary muscle in the body. The purpose
     of this is to make death look peaceful -- even if the inmate
9    is in intense pain, he won't be able to show it. Finally, they
     inject him with potassium chloride, which stops the heart.

10

11   Nothing changes in the death room, except for Ceja. He
     closes his eyes, and his breathing gets quicker. His face
     goes into spasm, as though there's an explosion going on
12   just under his skin. His upper lip trembles and then billows
     out from his face, like a rag flapping in a strong wind. . . .
13   After a minute or so -- or maybe longer, I don't know --
     Ceja is just lying there. I look for signs of breathing and
14   don't see any. Then the order comes to close the curtain,
     and the guard does. There's no announcement that Ceja is
15   dead, just the order to close the curtain.[61]

16       215.   The Eighth Amendment prohibits methods of carrying out the death

17   sentence that involve the "unnecessary and wanton infliction of pain," unneeded

18   terror or disgrace, or "lingering death." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976);

19   *Louisiana ex rel Francis v. Resweber*, 329 U.S. 459, 463 (1947); *In re Kemmler*, 136

20   U.S. 436 (1890); *Wilkerson v. Utah*, 99 U.S. 130 (1879). The lethal injection method

21   of execution to be used by Arizona in this case, and as applied to Ramirez, violates

22   this fundamental constitutional mandate.

23                      **E.  Lethal injection causes pain.**

24       216.   Ramirez's death will not be immediate.

25       217.   Arizona's death penalty scheme currently requires that the condemned

26

27   [61]Barry Graham, *Witness at an execution: Graham watches as the state gets
     away with murder*, PHOENIX NEW TIMES, Feb. 5-11, 1998 at 15.

28                              Page 60 of 74

be put to death "by administering an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death . . . ."[62]  However, the method devised by the Respondents entails a substantial risk of gratuitous, torturous pain and prolonged suffering and thus violates the Eighth Amendment.

218.   To Ramirez's knowledge and belief, Respondents have not devised a set of written standards or procedures to be followed by the executioners in carrying out an execution.

219.   The procedure, with its absence of guidelines and instructions and failure to require the executioners to be properly trained, increases the risk of error and unnecessary pain and prolonged suffering many times over.

220.   The heightened fear that Ramirez will experience while strapped and hooked up to the lethal needle for a period of thirty-five (35) minutes -- waiting to die -- before the execution can even go forward, will cause psychological suffering by, and torture of, Ramirez.

221.   The executioners, who are unskilled personnel, may be unable to insert successfully an IV catheter into Ramirez.[63]  The insertion of the catheter can be extremely difficult, especially if Ramirez has constricted veins due to the stress of the impending execution. Ramirez's anxiety in the minutes leading up to the execution will most likely cause constriction of his veins.  If the catheter is not properly inserted, there is a risk that the chemicals will be injected into Ramirez's muscle and other tissue rather than directly into his bloodstream, causing extreme pain in the

---

[62]Ariz. Const. art. 22, § 22. (1992).

[63]To carry out the execution, the preparations to insert the lethal needle begin thirty-five (35) minutes before the stated time for the execution.  An IV placement is a procedure which ordinarily is complete within 3 to 5 minutes.  If a surgical cut-down procedure is required -- meaning that the executioners need to dissect Ramirez in order to insert the IV -- it should be completed by competent medical personnel within 10 to 15 minutes.

1   form of a severe burning sensation.  Furthermore, a failure to inject the chemicals

2   directly into the bloodstream will cause the chemicals to be absorbed far more slowly,

3   and the intended effect of sedation will not occur.

4       222.   Improper insertion of the IV catheter into Ramirez could also result in

5   its falling out of the vein, resulting in a failure to inject the intended dosage of

6   chemicals.  There is also a risk that the catheter will rupture or leak as pressure builds

7   up during the administration of the chemicals unless the catheter has adequate

8   strength and all the joints and connections are adequately reinforced.

9       223.   The Arizona lethal injection protocol allows for severe risks of error in

10  the complicated set-up procedure.  There is no procedure for the labeling of the

11  syringes in which the various chemicals and saline solution are to be placed.  Unless

12  labeled or otherwise marked, the syringes are almost completely indistinguishable.

13  Mistakes in this process would result in the chemicals being administered to Ramirez

14  in the wrong sequence which would cause extreme torture, suffering and pain.

15      224.   There have been other instances instance of an inmate being strapped to

16  the gurney with the executioner attempting to insert the lethal needle in their arms.[64]

17  In one case,

18          The execution team began trying to find a veins in each
            arm at 12:14 a.m. and continued until 12:30 a.m. according
19          to DOC records.

20          At that point the doctor was called in and gave [Tommie]
            Smith a local anesthetic.  Then he tried to insert the tube in
21          his neck.

22          When that failed he was able to insert the angiocath in
            Smith's foot completing the procedure at 12:55 a.m.
23

24          . . .

25          "he just laid there very still with his eyes closed," [prison

26  _____

27      [64]Rick Bragg, *An Evening of Death, Punishment for 3 Murderers,* THE NEW
    YORK TIMES, January 10, 1997 at A1.

28                          Page 62 of 74

1        spokeswoman] Pattison said.[65]

2        225.   To Ramirez's knowledge and belief, Respondents do not have in place

3    rules or regulations to ensure that executioners are properly and sufficiently trained

4    to handle the technical aspects of the execution, *i.e.*, the insertion of needles and

5    catheters, the preparation of the lethal substances, the determination of proper dosage

6    and sequence of the drugs, etc.  Respondents do not require the executioners to have

7    any level of medical training or competency.  Respondents do not provide any written

8    guidelines or instructions to the executioners regarding the preparation of the drugs,

9    the intravenous injection, the sequence of the drugs, or the determination of proper

10   dosage.

11       226.   The procedures employed by Respondents do not take into account

12   Ramirez's body weight in accounting for the amount of "drugs" that the executioners

13   will administer.  Ramirez will *unquestionably* experience pain as a result of the

14   practices of Respondents in not considering the body weight in determining the

15   amount of lethal "drugs" to administer Ramirez.  "Even a slight error in dosage or

16   administration can leave a prisoner conscious but paralyzed while dying, a sentient

17   witness of his or her own slow, lingering asphyxiation." *Chaney v. Heckler*, 718 F.2d

18   1174, 1191 (D.C. Cir. 1983), *rev'd on other grounds*, *Heckler v. Chaney*, 470 U.S.

19   821 (1985).

20       227.   At the very least, written standards and procedures are necessary to

21   minimize the risk of error.  The requisite written instructions and guidelines would

22   indicate the proper methods for determining appropriate dosage and for setting up the

23   IV.   Further, written instructions would set forth the requisite training and

24   qualifications for the technicians.   The failure to provide such instruction and

25   established procedure combined with the failure to require that the execution

26

27       [65]Sherri Edwards and Suzanne McBride, *Doctor's aid in injection violated ethics rules,* THE INDIANAPOLIS STAR, Jul. 19, 1996 at A1.

28                              Page 63 of 74

1    technicians be trained and certified amounts to nothing short of unauthorized,

2    unethical and inhumane treatment of Ramirez.

3         228.    Death, "where unconsciousness is likely to be immediate or within a

4    matter of seconds, is apparently within constitutional limits . . . the persistence of

5    consciousness for over a minute or between a minute and a minute-and-a-half, but no

6    longer than two minutes might be outside of constitutional boundaries." *Fierro v.*

7    *Gomez*, 77 F.3d 301, 308 (9th Cir. 1996) *vacated on other grnd's by Gomez v. Fierro*,

8    519 U.S. 918 (1996) (remanded for reconsideration in light of changing statute).  A

9    method is unconstitutional if Ramirez faces a "substantial risk" of suffering "extreme

10   pain for several minutes." *Id.*  This risk is heightened if the execution protocol is

11   created in an "unscientific, slapdash manner." *Fierro v. Gomez*, 865 F. Supp. 1387,

12   1413 (N.D. Cal. 1994).

### F.  Lethal gas.

14        229.    Execution by cyanide gas is in essence asphyxiation by suffocation or

15   strangulation.  *Gomez v. United States District Court*, 503 U.S. 653, 655 (1992)

16   (Stevens and Blackmun, JJ., dissenting).

17        230.    On April 6, 1992, Arizona executed Don Eugene Harding.

18       When the fumes enveloped Don's head he took a quick
         breath.   A few seconds later he again looked in my
19       direction.  His face was red and contorted as if he were
         attempting to fight through tremendous pain.  His mouth
20       was pursed shut and his jaw was clenched tight.  Don then
         took several more quick gulps of the fumes.

21       At this point Don's body started convulsing violently. . . .
22       His face and body turned a deep red and the veins in his
         temple and neck began to bulge until I thought they might
23       explode.

24       After about a minute Don's face leaned partially forward,
         but he was still conscious.   Every few seconds he
25       continued to gulp in.  He was shuddering uncontrollably
         and his body was racked with spasms. His head continued
26       to snap back.  His hands were clenched.

27       After several more minutes, the most violent of the

1   convulsions subsided.   At this time the muscles along
    Don's left arm and back began twitching in a wavelike
2   motion under his skin.  Spittle drooled from his mouth. . .

3   Don did not stop moving for approximately eight minutes,
    and after that he continued to twitch and jerk for another
4   minute. Approximately two minutes later, we were told by
    a prison official that the execution was complete.
5
    Don Harding took ten minutes and thirty one seconds to
6   die.

7   *Id.* at 655-56.

8       231.   On March 3, 1999, Walter LaGrand was executed by lethal gas.

9   Bart Graves, a media witness with KTAR, said that
    LaGrand, 37, gurgled and coughed violently and his back
10  muscles contorted until, finally, his head dropped.

11  He said the execution was difficult to watch because of
    "the sounds he was making and the intense gurgling and
12  coughing."

13                  □    □    □

14  As a cloud of white, steamlike mist rose, LaGrand began
    coughing, shook his head and gagged several times. A
15  couple of minutes later, his head slumped forward. He
    coughed again, raised his head and slumped forward. He
16  didn't raise his head after that, though over the next few
    minutes his shoulders appeared to move involuntarily.
17
                    □    □    □
18
    The cyanide gas began to flow from the floor of the gas
19  chamber at 9:12 p.m. At 9:30, Walter LaGrand was
    pronounced dead. Heather Urquides, a reporter with the
20  Arizona Daily Star, said LaGrand strained against the chair
    straps until he slumped over.
21
    "It seemed like forever until the guy came over and said he
22  was dead," she said.

23  Dawn Lopez, a Marana bank teller who survived the 1982
    knife attack by LaGrand and his brother, Karl, asked to
24  leave the room before the execution was over.[66]

25

26       [66]Christina Leonard, LAGRAND DIES IN STATE GAS CHAMBER.   KILLER
    EXECUTED DESPITE PROTESTS FROM GERMANY, *Arizona Republic*, Mar. 4, 1999 A-1,
27  1999 WL 4155711.

28                          Page 65 of 74

232.   The unnecessary cruelty of this method of execution convinced Arizona's Attorney General that the state should abandon execution by gas in favor of execution by lethal injection.  His conclusion coincides with that of numerous medical, legal, and ethical experts.  *Gomez v. United States District Court*, 503 U.S. at 656.

233.   Execution by lethal gas is unconstitutional under the Eighth and Fourteenth Amendments.  *Fierro v. Gomez*, 77 F.3d 301, 309 (9th Cir.) *vacated on other grnd's* 519 U.S. 918, (1996) (remanded for reconsideration in light of changing statute).

### G.  Choice of method of execution.

234.   The method of execution specified by Arizona Constitution and state statutes at the time of Ramirez's death sentence was death by lethal gas.

235.   By a constitutional amendment dated November 3, 1992, the method of carrying out a death sentence was changed in Arizona from death by lethal gas to death by lethal injection. The Amendment, which became effective on November 23, 1992, gives those defendants sentenced to death prior to its enactment the option of choosing death by gas or injection.

236.   The *Ex Post Facto Clause* of the United States Constitution, Article I, § 10, is based upon the notion that persons have a right to fair warning of that conduct which will give rise to a criminal penalty and what this penalty consists of.  A law violates the *Ex Post Facto Clause* if it makes more burdensome the punishment for a crime after its commission.

237.   The Constitutional Amendment at issue imposes a new penalty of death by lethal injection in the event that Ramirez does not choose death by lethal gas.  This change violates the *Ex Post Facto Clause.*  The new law further violates the *Ex Post Facto Clause* because it materially changes and increases the sentence pronounced on Ramirez by requiring him to choose the method of execution to be applied to him.  Such infliction amounts to a greater punishment by making Ramirez an active

1  participant in his own execution.

2      238.  The Constitutional Amendment and proposed legislation further violate

3  Ramirez's Due Process rights under the Fourteenth Amendment to the United States

4  Constitution as they alter Ramirez's sentence without any opportunity for judicial

5  hearing.

6      239.  Alternatively, assuming the Constitutional Amendment and the proposed

7  legislation can alter the state court's prior sentence of death by lethal gas, it is cruel

8  and unusual punishment to require Ramirez to choose his own method of execution,

9  in violation of the Eighth Amendment.

10                    ☐      ☐      ☐

11      240.  Application of the execution of the sentence of death by lethal injection

12  or lethal gas upon Ramirez will violate his right to be free from cruel and unusual

13  punishment as guaranteed by the Eighth and Fourteenth Amendments to the United

14  States Constitution.

15  **Thirtieth claim for relief.**

16  **Ramirez is not competent to be executed. Ramirez's**
   **execution while he is incompetent violates the Fifth,**
17  **Sixth, Eighth and Fourteenth Amendments to the**
   **United States Constitution.**
18

19      241.  This claim was not presented in the state courts.

20      242.  Ramirez will not be competent to be executed when his execution

21  becomes imminent. *See Ford v. Wainwright*, 477 U.S. 399 (1986).  Ramirez will

22  neither understand that he has been convicted of murder, that he is to be executed for

23  the crime, or that the penalty of death is related to his conviction.  Further, Ramirez

24  will be unable to assist his counsel in their efforts to challenge his sentence in the

25  courts or before the executive branch of the Arizona government.

26      243.  Ramirez recognizes that this claim is not ripe for review.  However, the

27  law is unclear as to whether, under the Antiterrorism and Effective Death Penalty Act

28

1   of 1996, a capital habeas petitioner must plead a *Ford* claim in his first petition and

2   request that the claim be dismissed without prejudice as not ripe, or risk having the

3   claim be declared successive once the claim ripens. *Cf. Martinez-Villareal*, 523 U.S.

4   at 642-44 (*Ford* claim could properly be brought as a first petition where claim had

5   been included in first petition and dismissed as not ripe); *Nguyen v. Gibson*, 162 F.3d

6   600, 601 (10th Cir. 1998) (AEDPA precluded consideration of *Ford* claim which had

7   not been included in first petition); *In re Davis*, 121 F.3d 952 (5th Cir. 1997); *In re

8   Medina*, 109 F.3d 1556 (11th Cir. 1997).

9         244. Because the United States Supreme Court specifically declined to

10  address this disagreement among the circuits in *Martinez-Villareal* and the Tenth

11  Circuit has precluded federal review of a *Ford* claim, *Nguyen*, 162 F.3d at 601,

12  counsel has included this claim in this petition.

13        245. The conditions of confinement on Arizona's death row are calculated to

14  produce psychiatric breakdowns. The extreme isolation and dehumanization of

15  inmates, especially since September 1997, when inmates were moved to the so-called

16  Special Management Unit II, are certain to increase the risk that Ramirez will be

17  incapable of appreciating his situation at the time he faces execution.

18        246. The state of Arizona imposes upon mentally ill prisoners the obligation

19  to rebut a presumption of competence by "clear and convincing evidence," Ariz. Rev.

20  Stat. § 13-4022(F), thereby permitting the execution of a person who, more likely

21  than not, is unaware of the fact of his execution or the reason therefore, or who cannot

22  plead for mercy or assist his counsel in doing so. This excessive burden of proof will

23  likely result in an execution otherwise forbidden by the Fifth, Sixth, Eighth and

24  Fourteenth Amendments to the United States Constitution.

25        247. Ramirez's rights as guaranteed by the Due Process Clause of the Fifth

26  Amendment to the United States Constitution; the Right to Counsel Clause of the

27  Sixth Amendment to the United States Constitution; the Eighth Amendment

28

1   protections against cruel and unusual punishment; and the Due Process and Equal

2   Protection Clauses of the Fourteenth Amendment to the United States Constitution

3   will be violated if he is executed while he is incompetent.

4   248.   Ramirez submits that this claim should be dismissed without prejudice

5   until such time as the claim becomes ripe. This claim is included herein because the

6   conflicting case law on this issue requires its presentation at this time. In the event

7   this Court concludes that the inclusion of this issue constitutes the presentation of an

8   unexhausted claim, Ramirez requests that he be given the opportunity to present his

9   arguments and/or dismiss the claim before this Court takes further action.

10   **Thirty-first claim for relief.**

11   **Ramirez is being denied a fair clemency process in**
**violation of the Fifth, Sixth, Eighth and Fourteenth**
12   **Amendments to the United States Constitution.**

13   249.   Ramirez has not previously raised this claim as it is not yet ripe for

14   review. When it becomes ripe, these habeas corpus proceedings will be the only

15   available forum within which to seek relief. In the alternative, these proceedings

16   should be held in abeyance and counsel for Ramirez directed to return to state court

17   to fully exhaust this claim.

18   250.   In a capital case in Arizona, a reprieve hearing is required by law when

19   an execution is imminent. Ramirez now raises this claim because a clemency

20   challenge may not be cognizable in a successive petition. *Woratzeck v. Stewart*, 118

21   F.3d 648, 653, (9th Cir. 1997).

22   251.   The Arizona Constitution gives the governor the power to grant

23   reprieves, commutations and pardons subject to the conditions, restrictions, and

24   limitations set by law. Pursuant to this power, state statutes provide for a Board of

25   Executive Clemency ("Board"). This is a five-member Board, with members

26   appointed by the governor on recommendation of a selection committee appointed by

27   the governor. The selection committee consists of the director of the Department of

28

1   Public Safety, the director of the Department of Corrections--both offices which are

2   appointed by the governor -- and three other members of the governor's choosing.

3   No more than two members may be from the same professional discipline.

4   Appointments to the Board of Executive Clemency are subject to the approval of the

5   Senate. The governor may remove members of the Board "for cause." The governor

6   also selects the chairman of the Board.   The attorney general is responsible for

7   training members of the Board.

8        252.   The Arizona Constitution provides a person under a sentence of death

9   with a right to fair, meaningful clemency proceedings in which the applicant is given

10  a genuine opportunity to produce evidence that justifies clemency -- whether a

11  pardon, commutation, or reprieve -- and to seek judicial review of the procedures of

12  that proceeding.  Ramirez cannot have fair clemency proceedings given the attorney

13  general's conflicting roles as the Board's legal advisor and as advocate against

14  Ramirez.    Further, the Board's selection process, composition, training, and

15  procedures also prevent a fair and impartial proceeding.

16       253.   The Board has the discretion to decide whether to deny or recommend

17  commutation, pardon, or reprieve.  Judicial review is available to insure the inmate

18  is given due process.

19       254.   The Board's power in a capital case is of Constitutional significance. It

20  is clear that inmates have a *right* to a clemency hearing and that due process rights

21  apply in the commutation/reprieve process since clemency proceedings are part of the

22  Constitutional scheme.

23       255.   A person under sentence of death must be provided with a hearing where

24  the condemned prisoner may produce evidence to establish extenuating or mitigating

25  circumstances or otherwise justify clemency.  Due process of law requires notice and

26  an opportunity to be heard, and there must be a hearing in a substantial sense.  The

27  unlawful taking of human life has from time immemorial been considered improper

28                                      Page 70 of 74

1   even if done by the state, and if it is to be justified under the law, it must not be done

2   with less formality than the spirit and the traditions of the law contemplate.

3   256.   A fundamental component of due process for full consideration and a fair

4   determination is a hearing before a disinterested, unbiased, and impartial decision

5   maker.   Due process proscribes decision making mechanisms that result in

6   prejudgment of a defendant's case.   *See Gibson v. Berryhill*, 411 U.S. 564, 579

7   (1973); *Ward v. Village of Monroeville*, 409 U.S. 57 (1972).   Due process also

8   entitles the defendant to a "neutral and detached" decision maker.   *Morrisey v.*

9   *Brewer*, 408 U.S. 471, 489 (1972); *see also, Tumey v. Ohio*, 273 U.S. 510, 532

10  (1927).   Due process requires that the adjudicator never act in the dual capacity of

11  judge and advocate.   The Arizona clemency procedures do not comport with due

12  process.

13  257.   The Fourteenth Amendment provides:  "[N]or shall any State deprive

14  any person of life, liberty, or property, without due process of law."  U.S. Const.

15  amend. XIV, § 1; *see also, Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (Due

16  Process Clause and state law can independently confer the same protectable

17  interests); *Meachum v. Fano*, 427 U.S. 215, 226 (1976); *Wolff v. McDonnell*, 418 U.S.

18  539, 557 (1974).

19  258.   Where a state has created a substantive right to life or liberty, federal due

20  process must be satisfied.   *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (state's

21  failure to afford criminal defendant important state-created rights violated due

22  process). By incorporating the Board of Executive Clemency in the statutory process

23  by which Arizona authorizes the ultimate criminal sanction in its laws, and by

24  requiring the Board to consider and to decide a capital clemency request prior to

25  execution of a death sentence, the state has created a life interest of sufficient

26  magnitude and meaning to require comportment with at least the core values of due

27  process.

28

1    259.   The United States Supreme Court has recognized executive clemency

2    proceedings as being fundamental to the assurance of due process in a capital case.

3    Clemency is not a private act of grace from an individual who has the authority to

4    grant it.  Rather "[i]t is part of the Constitutional scheme." *Biddle v. Perovich*, 274

5    U.S. 480, 486 (1927).

6    260.   In *Herrera v. Collins*, the Court noted that although the U.S. Constitution

7    does not require the states to enact a clemency mechanism, "all 36 states that

8    authorize capital punishment have constitutional or statutory provisions for

9    clemency." 506 U.S. 390, 413 (1993).  The court described the role of executive

10   clemency in terms that highlight its adjudicative importance to the criminal justice

11   system:

12            Executive clemency has provided the 'fail safe' in our
              criminal justice system.  It is an unalterable fact that our
13            judicial system, like the human beings who administer it,
              is fallible.   But history is replete with examples of
14            wrongfully convicted persons who have been pardoned in
              the wake of after-discovered evidence establishing their
15            innocence.

16   *Id.* at 415.  Justice O'Connor noted that innocent persons will not be executed "[i]f

17   the Constitution's guarantees of fair procedure and the safeguards of clemency and

18   pardon fulfill their historical mission." *Id.* at 427 (O'Connor, J., concurring).

19   261.   The constitutional and statutory grants of the right to a clemency

20   proceeding in Arizona have created a federal constitutional due process right for

21   Ramirez.  The proceeding is an integral and vital part of the justice system.

22   262.   The Arizona clemency process is unconstitutional and Ramirez's rights

23   as guaranteed by Due Process Clause of the Fifth Amendment to the United States

24   Constitution; the Right to Counsel Clause of the Sixth Amendment to the United

25   States Constitution; the Eighth Amendment protections against cruel and unusual

26   punishment; and the Due Process and Equal Protection Clauses of the Fourteenth

27   Amendment to the United States Constitution will be violated if he is not afforded a

28

Page 72 of 74

1  fair clemency hearing.

## V. Technical information.

3  263.   All the grounds for relief set forth above, with exceptions, were

4  previously presented to the Maricopa County Superior Court and the Supreme Court

5  of Arizona.

6  264.   Ramirez has no other appeal or petition now pending in any court, state

7  or federal, as to the judgment under attack in this petition.

8  265.   Ramirez has been represented by the following attorneys:

9  a)  At the pretrial hearings and voir dire, Ramirez appeared *pro se*;

10  b)  At trial and at sentencing by Mara Siegel;

11  c)  On the direct appeal by Neal W. Bassett;

12  d)  On petition for post-conviction relief pursuant to Arizona Rule of

13  Criminal Procedure 32, and on Petition for Review of the denial to the Arizona

14  Supreme Court, by John C. Williams.

15  266.   Ramirez was sentenced on more than one count of an indictment, but

16  only one indictment.

## VI. Prayer for Relief.

18  267.   WHEREFORE, Petitioner Ramirez respectfully prays that this Court:

19  a)  Order the respondents to provide the Court with a
20  complete record of all proceedings in Ramirez's case;

21  b)  Order that Ramirez be granted leave to conduct
discovery pursuant to Rule 6 of the Rules Governing §2254
Cases;

22
23  c)  Order that upon completion of discovery, Ramirez be
granted leave to amend the instant petition;

24  d)  Order that respondent file an answer or other responsive
25  pleading to Ramirez's amended petition;

26  e)  Grant an evidentiary hearing at which proof may be
offered concerning the allegations of this petition;

27  f)  Issue a writ of habeas corpus to have Ramirez brought

28  Page 73 of 74

1   before it to the end that he may be discharged from his
    unconstitutional confinement and restraint;

2

3   g)  In the alternative to the relief requested in Paragraph f,
    if this Court should deny the relief as requested Paragraph
    f, issue a writ of habeas corpus to have Ramirez brought

4   before it to the end that he may be relieved of his
    unconstitutional sentences;

5

6   h)  Grant such other relief as may be appropriate and to
    dispose of the matter as law and justice require.

7   Respectfully submitted this 26th day of November, 2003.

8                                   Fredric F. Kay
                                    Federal Public Defender
9                                   Dale A. Baich
                                    Paula K. Harms
10

11

12   By_____
                    Counsel for Petitioner
13

14   A copy of the foregoing mailed this
     26th day of November, 2003 to:
15

16   John Pressley Todd
     Assistant Attorney General
17   Capital Litigation Section
     1275 West Washington
     Phoenix, Arizona 85007-2997
18

19

20

21   I:\Baich 2_Open Cases\ramirez\usdc\petition.supp.2d.,wpd

22

23

24

25

26

27

28                       Page 74 of 74