1  Jon M. Sands
   Federal Public Defender
2  Paula Harms (Arizona Bar No. 022489)
   Dale A. Baich (Ohio Bar No. 0025070)
3  Assistant Federal Public Defenders
   850 West Adams Street, Suite 201
4  Phoenix, Arizona 85007
   602.382.2816
5  602.889.3960 facsimile

6

7              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ARIZONA
8

9  David Martinez Ramirez,              No.  CIV 97-1331-PHX-JAT

10             Petitioner,                    Death Penalty Case

11     vs.                              Petitioner's Second Memorandum
                                        Regarding   the   Merits   of   the
12  Dora Schriro, et al.,               Remaining Claims

13             Respondents.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FILED          LODGED
RECEIVED        COPY

SEP 1 0 2004

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY                    DEPUTY

**Table of Contents**

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Relevant facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       A.  The Santos Ramirez Family—the migrant farm life . . . . . . . . . . . . . . . 2

       B.  A family history of substance abuse and sexual abuse . . . . . . . . . . . . . 3

       C.  Maria Santos Ramirez—birth mother . . . . . . . . . . . . . . . . . . . . . . . . . 4

       D.  The childhood of David Ramirez . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       E.  The prior conviction used in aggravation, an opportunity for mental
           health intervention ignored . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       F.  The crime . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       G.  Pre-trial proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       H.  The guilt phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       I.  The sentencing phase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       J.  The direct appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

       K.  The post-conviction proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

       L.  Federal review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

III.   Notice of intention to challenge presumption of correctness of all
       state court findings of fact under 28 U.S.C. § 2254(D) . . . . . . . . . . . . . . 26

IV.    Reservation of right to amend the petition . . . . . . . . . . . . . . . . . . . . . . . . 27

V.     Response to specific claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Second claim for relief
       Mr. Ramirez's statements to police were taken in violation of *Miranda*
       and wrongfully admitted pursuant to the public safety exception to
       *Miranda*, in violation of Mr. Ramirez's Fifth, Sixth, and Fourteenth
       Amendment rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       A.  Facts underlying the claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       B.  Mr. Ramirez was in custody, subjected to police interrogation and
           entitled to a *Miranda* warning . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

       C.  Officers were aware that the custodial interrogation of Mr. Ramirez
           would likely result in incriminating statements, and no public safety
           concerns existed which permitted application of the *Quarles* exception
           to *Miranda* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

       D.  *Quarles* is distinguishable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

i

E.  *Vickers* is distinguishable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

F.  Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Third claim for relief
The trial court erred in failing to properly weigh the mitigating evidence presented by Mr. Ramirez, in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fourth claim for relief
The Arizona courts erred in rejecting Mr. Ramirez's prison work record as a mitigating factor in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Sixth claim for relief
The "especially heinous, cruel or depraved" aggravating factor is unconstitutionally vague and overbroad, on its face and as applied, resulting in the arbitrary and capricious imposition of the death penalty, in violation of Mr. Ramirez's Fifth, Sixth Eighth and Fourteenth Amendment rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

A.  The narrowing purpose of aggravating factors . . . . . . . . . . . . . . . . . . 43

B.  Arizona's construction of "especially heinous, cruel or depraved" is overbroad and vague . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

C.  The trial court's finding of the § 13-703 (F)(6) aggravating factor is unconstitutional as applied to this case . . . . . . . . . . . . . . . . . . . . . . . 53

Ninth claim for relief
The imposition of the death penalty on persons who have not been found guilty of intentional murder violates due process of law and results in cruel and unusual punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Twelfth claim for relief
The trial court denied Mr. Ramirez due process of law when it rejected his request for funds to hire a mitigation specialist and other experts to assist in preparing his defense in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . 60

A.  Facts underlying the claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

B.  The Due Process Clause of the Fourteenth Amendment gives indigent capital murder defendants the right to have the government pay for the basic tools of a capital defense . . . . . . . . . . . . . . . . . . . . . . . . 65

C.  The logic of *Ake* requires the government to afford an indigent capital defendant access to a mitigation specialist because such an expert is "crucial to the defendant's ability to marshal his defense" to the government's assertion that he is morally worthy of the death penalty . . . 70

D.  The error committed by the trial court in not affording Mr. Ramirez a mitigation specialist and other experts was not harmless; therefore, this Court must grant Mr. Ramirez relief on this claim . . . . . . . . . . . . . . . . . 77

ii

1
VI.  Prayer for relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iii

1  Jon M. Sands
   Federal Public Defender
2  Paula Harms (Arizona Bar No. 022489)
   Dale A. Baich (Ohio Bar No. 0025070)
3  Assistant Federal Public Defenders
   850 West Adams Street, Suite 201
4  Phoenix, Arizona 85007
   602.382.2816
5  602.889.3960 facsimile

6

7                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF ARIZONA
8

9  David Martinez Ramirez,                    No. CIV 97-1331-PHX-JAT

10            Petitioner,                      Death Penalty Case

11   vs.                                       Petitioner's Second Memorandum
                                               Regarding the Merits of the
   Dora Schriro, et al.,                       Remaining Claims
12
              Respondents.
13

14        Petitioner, David Martinez Ramirez, pursuant to this Court's Order,[1] offers his

15  second memorandum addressing the merits of claims two, three, four, six, nine, and

16  twelve, that are now pending before this Court.

17                              **I. Introduction.**

18        1.     Because this is a capital case, it is not just the facts of the crime that are

19  relevant, but also the facts of David Ramirez's life.  The explanation for how this

20  crime occurred does not begin a few days or months before the deaths of the victims,

21  it begins long ago, with the nightmarish childhood David Ramirez experienced.

22  Conceived in rape, after his uncle/father attacked his fifteen-year old mother, and

23  exposed to alcohol and pesticides *in utero*, David Ramirez had several cards stacked

24  against him before he was even born.  Respondents often suggest that we need only

25  look at the crime in order to condemn the man.  However, the Eighth Amendment

26  teaches us that this is not that case, the defendant must also be given the opportunity

27

28        [1]District Court Docket Entry Number ("Dist. Ct. Doc. No.") 83.

                              Page 1 of 83

1   to tell his story.

2

## II.  Relevant facts.

3

### A.  The Santos Ramirez Family—the migrant farm life.

4      2.    David Ramirez's maternal grandparents, Julian Ramirez and Benita

5 Santos, had twelve children, including Maria, David Ramirez's mother.[2] Julian and

6 Benita supported their large family through migrant farm work.  The family traveled

7 around the country in trucks or buses, moving from camp to camp in several different

8 states, including: Texas, Arizona, Idaho, California, Colorado, Washington,

9 Michigan, Nebraska, and Illinois.  They picked apples, cherries, strawberries,

10 cucumbers, onions, carrots, cucumbers, green beans, potatoes, beets, lettuce, cotton,

11 and tomatoes.  They simply went where there was work and picked whatever was in

12 season.

13      3.    Benita worked the fields while she was pregnant with many of her

14 children, including Maria.  David's grandfather, Julian, forced his children to work

15 in the fields as soon as they were five or six, for ten to twelve hours each day, six

16 days a week.

17      4.    The conditions in the migrant farm camps the family lived in were

18 deplorable.  The camps were overcrowded, situated in or near the fields where they

19 worked.  They lived in the same shacks or tents previously used by other migrant

20 workers, and they were often run down and filthy.  When no tents or shacks were

21 available, the family slept in the field.

22      5.    The fields they worked and lived in were constantly sprayed with

23 herbicides and pesticides.  Although they sometimes covered their mouths with

24

25      [2]Petitioner will provide support for the factual allegations in this petition in his

26 First Motion to Expand the Record under Rule 7 of the Rules Governing Habeas Corpus Proceedings under § 2254, pursuant to this Court's Order Re: Motion to

27 Amend, filed July 6, 2004.  Dist. Ct. Doc. No. 83.  Habeas counsel obtained most of this information from family members who were never contacted by the defense team

28 and who would have provided this information, or testified, if they had been asked to by the defense team.

Page 2 of 83

1  handkerchiefs, it was impossible to work without inhaling vapors from the spray.
2  They saw clouds of chemicals fill the air above them, and then saw it settle on the
3  water, in the soil, in the camps, and on their skin.  They often had open sores on their
4  bodies that went untreated.  Their water supply for drinking, cooking, and bathing
5  came directly from the ponds in the sprayed fields.  They carried their own salt and
6  pepper with them to the fields, so they could eat the produce while they worked,
7  because there was little other food to be had.  They ate the produce without washing
8  it off first.  Sometimes the pesticide-laden produce, particularly cherries, would make
9  them ill.
10      6.    A fellow farm worker was told by his doctor that his illness, which lead
11  to his death, was caused by his exposure to pesticides in the fields.  Family members
12  have experienced several health problems which may be attributable to their exposure
13  to pesticides and herbicides, including respiratory problems; cancers at an early age;
14  strokes at an early age; epileptic seizures; and mysterious infant deaths.
15      7.    In 1957, while pregnant with David Ramirez, Maria was fifteen years old
16  and working the fields of Arizona.  Mr. Ramirez's mother continued to work the
17  fields while he was a child, and he himself began working in the cherry orchards in
18  Arizona at a young age.  David Ramirez loved to eat the cherries directly from the
19  trees, without rinsing them first.  David Ramirez's exposure to pesticides, *in utero*,
20  during the developmental period, and throughout life, was never even mentioned
21  during the sentencing phase.  Likewise, the hardships of migrant farm life was never
22  raised as a mitigating circumstance.
23      **B.  A family history of substance abuse and sexual abuse.**
24      8.    Alcoholism permeates the Santos Ramirez family.  David Ramirez's
25  maternal grandparents, Benita and Julian, were both alcoholics. Other maternal aunts
26  and uncles have also struggled with alcoholism and drug use.  There are countless
27  stories about the alcoholism of David Ramirez's mother, Maria, recounted *supra*.
28      9.    The alcoholism of Julian and Benita Ramirez lead to the sexual abuse of

Page 3 of 83

1   their children by a man named Freddie Garza. David Ramirez's aunt married Freddie
2   Garza a few years before David Ramirez's birth. Freddie Garza was a driving force
3   in making sure that everyone in the family worked the fields at every opportunity.
4   Freddie Garza kept most of the money they made, and because Julian was an
5   alcoholic, Freddie would simply give him some alcohol and some of the money in
6   order to keep him in line and remain on his good side. Mr. Garza sexually abused
7   and raped female members of the family with Julian Ramirez's knowledge and
8   permission. Julian would tell Freddie, "Freddie, take my wife" or "Freddie, take my
9   daughter" when Mr. Garza wanted to have sex. One of David Ramirez's aunts was
10  lucky enough to have successfully have fought off Mr. Garza, but she recalls sleeping
11  with a hammer by her side in anticipation of Mr. Garza's advances. Julian and Benita
12  knew that their daughters were being abused, but they did nothing to stop it. Later
13  when Benita remarried, a stepfather also raped one of the David Ramirez's aunts,
14  when the aunt was just five years old.

15      10.    David Ramirez was the product of rape and his uncle Freddie is also his
16  father. Freddie Garza, her own brother-in-law, raped Maria in a car when she was
17  just fifteen years old. An aunt witnessed this rape and recalls that Mr. Garza
18  continued to have sex with Maria after this. This traumatic event was to change
19  Maria forever.

20                  **C. Maria Santos Ramirez—birth mother.**

21      11.    David Ramirez, Jr. was born on April 7, 1957, when his mother, Maria,
22  was just sixteen-years old. David Ramirez, Jr. was born in Phoenix, Arizona and
23  although the birth certificate describes a David Ramirez, resident of Mexico and a
24  farm laborer, as his biological father,[3] family members say the true father was Freddie

25

26      [3]Td. 149, Exhibit A. There are four separate dockets from the state court
    proceedings. The Maricopa County Superior Court docket is referenced as "Td." The
27  docket entry begins with 1 and ends with 201. The first entry is dated June 5, 1989
    and the last entry is dated June 5, 1996. State court proceedings after June 5, 1996
28  are referenced by date of filing. The direct appeal docket is referred to as "AzSCt.

                                Page 4 of 83

1  Garza.

2      12.    In addition to being exposed to pesticides *in utero*, and being conceived

3  through rape, Maria also drank heavily while she was pregnant with David Ramirez,

4  often staying out all night and disappearing from the rest of the family for days.[4]

5  After having been raped and forced into motherhood at a young age, David Ramirez's

6  mother appears to have coped by drowning her problems in alcohol.  Maria was a

7  lifelong alcoholic who died of liver failure in 1981, at the age of thirty-nine.[5]

8      13.    The rapes and sexual exploitation so prevalent in the Santos-Ramirez

9  family seems to have affected Maria's later adult relationships with men.  Julian,

10  Maria's father, often hustled her mother out to other men in the fields.  When Julian

11  left Benita and abandoned her with the children, Benita's circumstances forced her

12  to continue to sell her body.  Like her mother, Maria would often exchange her body

13  to men for money and alcohol.  Maria also allowed various men to have sex with one

14  of her daughters in order  to support her drinking and drug habit.

15      14.    Maria had eight children by four different fathers, of which David

16  Ramirez was the oldest.[6]  She would frequently leave David Ramirez and the other

17  children alone, even when they were very young, so that she could go out drinking

18  at the bars, often accompanied by her mother, Benita.  Sometimes Maria would leave

19  the children alone for two to three days at a time and this was a regular occurrence

20  until David Ramirez married and left home at age seventeen.

21

22  DA. Dkt."  The docket entry review proceedings are listed on the trial court docket,
23  they are also referenced as "Td."  The petition for review by the Arizona Supreme
    Court is referred to as "AzSCt. Review Dkt."  The docket entry number begins with
24  1 and ends with 3.  The first entry is dated August 12, 1996, and the last entry is dated
    May 20, 1997.  The transcripts of the state court proceedings are referred to as
25  ("TR"), followed by the date of the proceeding and the transcript page number.

26      [4]TR 10/19/90 at 33.

27      [5]TR 10/19/90 at 64.

28      [6]TR 10/19/90 at 36, 37, 71.

15.     While at the bars, she would solicit men in order to get money or alcohol, bringing them home for sex. She would have sex with some of these men while her children were in the same room. Maria frequently had combative relationships with these men, and David Ramirez witnessed his mother being physically abused from a young age. An aunt recalls that Maria once had a broken leg from a beating she received from one of her boyfriends.

16.     In addition to the eight children who survived, Maria also gave birth to another child that died as an infant as a result of her neglect. This child was born when David Ramirez was approximately ten years old. Early one winter morning, an aunt of Mr. Ramirez took Maria home after a night of drinking. When they got to the house, the aunt noticed there was no heat in the house and no adult was present. David Ramirez and the other children were home alone, sleeping. They found the infant on the couch—dead. This event caused Maria to sink into a deeper depression, fueled by her continued alcoholism. Oftentimes when she was intoxicated, Maria would cry for the infant, blaming herself for its death.

17.     Maria was also known to have abused drugs, such as cocaine and marijuana, whenever they were available. For a time, she was also addicted to Vicodin and when her regular doctors refused to continue the prescription, she was able to obtain it from an unscrupulous clinic. David Ramirez once took his mother's Vicodin and became ill as a result. Maria often spoke of suicide and on one occasion, she was hospitalized after trying to commit suicide with alcohol and drugs. David Ramirez was approximately ten years old at the time.

18.     At the end of her life, Maria's sister and her mother learned of Maria's liver test results and went to her house to see her. She was not home, but they located her at a cheap motel in Phoenix where she used to hang out. Maria would not come out of her room, so they waited for a few hours until Maria finally came out to get more beer. Maria died of cirrhosis of liver within the week.

## D. The childhood of David Ramirez.

19.   Because of Maria's neglect, David Ramirez was often shuffled around from family member to family member when Maria could not be bothered to take care of him.  An aunt, who lived with David from the time he was about a year and a half to age three, describes him as a very frightened child.  He would urinate on himself if scolded or if he thought he was going to be punished.  David Ramirez was never right mentally and he was a slow learner who often had difficulty grasping ideas.

20.   When Maria left her children to go drinking, she often left them without proper food.  Sometimes the children had to steal milk or other food if they wanted to eat.  David Ramirez was caught shoplifting on several occasions.   When David Ramirez was a toddler, his mother would put beer in his bottle to keep him quiet and put him to sleep.  As a child, Mr. Ramirez got to the point where he liked to drink beer.  Maria and Benita both thought it was "cute" to let their children drink from beer glasses as toddlers.  In addition to drinking during her pregnancy with David Ramirez, Maria also drank while she was pregnant with her other children.  For example, while pregnant with one of Mr. Ramirez's younger siblings, Maria got drunk on New Year's and partied until the day the baby was born, on January 2.

21.   Maria also physically abused her children, hitting David Ramirez and the others on the head, or slapping them in the face.  She also neglected their hygiene, and the children had lice in the hair.  She would drive drunk with the children in the car.  On one occasion, with David Ramirez in the car, Maria ran over her husband, Mr. Ramirez's stepfather, causing an injury to his leg.

22.   David Ramirez was forced to have sex at age ten with an aunt and another female cousin sexually molested him several more times after that.[7]  Family members also suspect that a male landlord molested David Ramirez as a child.  The landlord was always hugging and kissing him.  Maria allowed her young son to be

---

[7]Td. 149, Exhibit I, at 4.

1   alone with the landlord quite often, and the landlord gave him lots of gifts and
2   attention. The landlord never expressed any interest in the other children, just David
3   Ramirez. The landlord gave Maria a break on her rent, presumably in exchange for
4   her willingness to allow him to have contact with her son. Dr. McMahon opined that
5   David Ramirez's molestation as a boy led him to have inappropriate sexual relations
6   with the victim and that it was a possibility that the childhood molestation may have
7   triggered the crime.[8]

8        23.     Because of her alcoholism, Maria found it difficult to hold down a job
9   and she was constantly moving from place to place with her children.[9]   David
10  Ramirez's school records illustrate this chaotic home life, as evidenced by the
11  frequency with which he changed schools.[10] In the 1963-64 school year, when David
12  Ramirez was in first grade, he attended three different elementary schools.[11] The next
13  year, in the second grade, David Ramirez went to five different schools.[12]   David
14  Ramirez was apparently held back in second grade, because it took him from 1964
15  to 1967 to finally be promoted to third grade.[13]   From the ages of ten to thirteen,
16  David Ramirez would change Phoenix elementary schools three more times.[14]
17  During 1971-1973 school year, David Ramirez moved to California and attended
18  eighth and ninth grade at El Monte.[15] Mr. Ramirez claimed to have left school in
19
20  _____

21      [8]Td. 149, Exhibit I, at 8.

22      [9]TR 10/19/90 at 33-34, 53, 65.

23      [10]Td. 149, Exhibit C.

24      [11]Td. 149, Exhibit C.

25      [12]Td. 149, Exhibit C.

26      [13]Td. 149, Exhibit C.

27      [14]Td. 149, Exhibit C.

28      [15]Td. 149, Exhibit F.

Page 8 of 83

1  tenth grade because he got involved with a teenage gang.[16]

2      24.    The school records also evidence more than a chaotic home life, they
3  illustrate that David Ramirez struggled at school. At age nine, after being held back
4  in second grade, David Ramirez was given an IQ test and he received a score of 70,
5  which is within the range of mental retardation.[17]  His grade cards from El Monte
6  consists mainly of D's, with one lone A for citizenship.[18]

7      25.    In addition to being surrounded by violence at home, at age 11, Mr.
8  Ramirez saw a woman lying on the street who had been beaten to death.[19] At age 13,
9  he saw another boy shot with a pistol in a gang fight.[20]  At around age 14, David
10  Ramirez was hit by a car while crossing the street. He suffered a severe leg injury as
11  a result.

12      26.    Mr. Ramirez's first record of criminal involvement occurred at age 12,
13  when he was detained for theft.[21]  Just a few months later, at age 13, he is again
14  arrested for petty theft, but no disposition is recorded.[22]  Less than a month after this
15  arrest, Mr. Ramirez is arrested for assault with deadly weapon, at age 13.[23]  He
16  continues this pattern of brushes with the law until he is incarcerated at age 22 for a
17  robbery and a probation violation.[24]

18      27.    Mr. Ramirez functioned relatively well under the structure of prison life.

19
20      [16]Td. 149, Exhibit I at 6.

21      [17]Td. 149, Exhibit D.

22      [18]Td. 149, Exhibit F.

23      [19]Td. 149, Exhibit I, at 3.

24      [20]Td. 149, Exhibit I, at 3.

25      [21]Td. 149, Exhibit J.

26      [22]Td. 149, Exhibit J.

27      [23]Td. 149, Exhibit J.

28      [24]Td. 149, Exhibit J.

His supervisor in the prison kitchen noted that Mr. Ramirez was dependable, cooperative, and he received high marks for effort.[25] However, soon after his release in August 1980, Mr. Ramirez had problems adapting to life outside the prison walls and he began abusing alcohol again, living up to his prison nickname of "Wino."[26] While at the halfway house, he returned one night, bleeding from the mouth and nose, and staggered off to his room to sleep.[27] Later, he received medical attention for these wounds—a fractured jaw and the surgical removal of two teeth.[28] He was sanctioned for breaking house rules by becoming intoxicated.[29] He was eventually released, in November 1980, to the supervision of his grandmother.[30]

**E.    The prior conviction used in aggravation, an opportunity for mental health intervention ignored.**

28.    Soon after his release from the halfway house, David Ramirez learned that his mother was on the verge of death because of damage to her liver, after years of alcohol abuse, and he went to her bedside to comfort her.[31] When she died the next day, Mr. Ramirez took the loss hard, and he began to drink heavily in an effort to avoid dealing with his grief.[32] Nine days after his mother's death, he went to visit a female friend who was a prison guard.[33] After drinking heavily all day long, Mr. Ramirez left the woman's apartment to get more alcohol, drank it, and began to think

---

[25]Td. 149, Exhibit K, L, M

[26]TR 11/30/90 at 22; Td. 149, at 12.

[27]Td. 149, Exhibit T.

[28]Td. 149, Exhibit T.

[29]Td. 149, Exhibit U.

[30]Td. 149, Exhibit W.

[31]TR 10/19/90 at 64; Td. 149, Exhibit I at 5; Td. 149.

[32]Td. 149, Exhibit I at 5.

[33]Td. 149, Exhibit I at 5.

1    about his mother, concluding that "I'd be better off if I was dead."[34]  Upon returning
2    to the woman's apartment, David Ramirez begged his friend to kill him.[35]  Frustrated
3    at the woman's resistance to this idea, David Ramirez told her, "[k]ill me or I'll kill
4    you!".[36]  Dr. McMahon concluded that the death of Mr. Ramirez's mother, in addition
5    to his substance abuse, "played a significant part, if not the major part, in the
6    assaultive behavior he exhibited at the time."[37]  An evaluation, done one month after
7    the crime by the Arizona Department of Corrections, stated that Mr. Ramirez "shows
8    evidence of substantial generalized psychotic illness."[38]

9         29.   Mr. Ramirez was incarcerated for this crime, but it does not appear that
10   he received any mental health treatment.  Back in prison, Mr. Ramirez again receives
11   high marks for his willingness to work hard at the various physical tasks he was
12   assigned.[39]

13                          **F. The crime.**

14       30.   In the two months leading up to the crime, Mr. Ramirez was abusing
15   alcohol and cocaine.[40]  Mr. Ramirez had injected cocaine several times and was
16   drinking very heavily the night the killings occurred.[41]  His intoxication was apparent
17   to officers at the scene of the crime.[42]  Dr. McMahon opined that David Ramirez's

18

19   _____
20       [34]Td. 149, Exhibit I at 5.

21       [35]Td. 149, Exhibit I at 5.

22       [36]Td. 149, Exhibit I at 5.

23       [37]Td. 149, Exhibit I at 3, 8.

24       [38]Td. 149, at 13-14.

25       [39]Td. 149, Exhibits AA, BB, CC, EE, GG, QQ, YY, ZZ, 2-10.

26       [40]Td. 149, Exhibit I at 8.

27       [41]Td. 149, Exhibit I at 1-2.

28       [42]TR 7/16/90 at 12, 15-16.

1   abuse of alcohol and cocaine was the "primary factor" which caused the crimes.[43]

2   **G. Pre-trial proceedings.**

3       31.    Early on in the case, Mr. Ramirez expressed a desire to represent

4   himself.[44] After noting that the request filed by Mr. Ramirez was illegible,[45] the trial

5   judge conducted a short inquiry and allowed Mr. Ramirez to proceed pro se.[46] Ms.

6   Siegel and Mr. Larry Matthew were appointed as advisory counsel.[47] Throughout the

7   pre-trial proceedings Mr. Ramirez relied heavily upon the assistance of advisory

8   counsel.[48]   He adopted the motions written by advisory counsel, but when Mr.

9   Ramirez and advisory counsel expressed a desire to have advisory counsel argue

10  these motions on his behalf, the court refused.[49] Again, later in the proceedings, Mr.

11  Ramirez stated, "I want my lawyer to tell you what I want."[50] The judge responded:

12  "I don't think we can permit your counsel to express what you want."[51]

13      32.    On November 7, 1989, defense counsel pointed out that *Adamson v.*

14  *Ricketts*, 865 F.2d 1011 (9th Cir. 1988), which was then prevailing federal precedent,

15  held unconstitutional Arizona's judge-only sentencing scheme.[52]   The judge was

16

17  _____

18  [43]Td. 149, Exhibit I at 7.

19  [44]TR 10/6/89 at 4.

20  [45]Although the record references a written request filed by Mr. Ramirez, TR
    10/6/89 at 4, the state court docket does not mention such a document and habeas
21  counsel was unable to locate this request anywhere in the state court record.

22  [46]TR 10/6/89 at 4-7.

23  [47]TR 10/6/89 at 7-8.

24  [48]*See, e.g.*, TR 10/6/89 at 11; TR 11/7/89 at 15-16.

25  [49]TR 10/6/89 at 9-11.

26  [50]TR 3/13/90 at 3.

27  [51]TR 3/13/90 at 3.

28  [52]TR 11/7/89 at 16-17.

1   unconcerned about Ninth Circuit Court of Appeals precedent and the constitutional
2   problems with Arizona's system, noting that "I try not to clutter my mind with things
3   like that."[53]  He then noted proudly that, "I've probably imposed the death sentence,
4   . . . more than any other judge in this state."[54]  Defense counsel continued to argue
5   the constitutionality of Arizona's death penalty statute, but the judge was
6   uninterested: "[F]or years and years they've argued over Tweedle-Dee and Tweedle-
7   Dum."[55]  In response to an argument that the statute results in a mandatory death
8   sentence as long as one aggravating circumstance is found, the judge remarked that
9   "[m]ost judges know long before if they're going to impose the death sentence.  At
10  least, I think they do."[56]  When asked to clarify this, the judge explained that he does
11  not think judges "pay much heed" to mitigating circumstances.[57]  In accordance with
12  his viewpoint that mitigation was basically useless to judges anyway, the judge
13  refused to appoint a mitigation expert to the case.[58]  This judge was later replaced and
14  did not preside over trial or sentencing proceedings.[59]

15                              **H. The guilt phase.**

16          33.    Voir dire began on July 10, 1990.[60]  After the jury was chosen, Mr.
17  Ramirez indicated that he no longer wanted to represent himself and Ms. Siegel,

18
19
20          [53]TR 11/7/89 at 17.
21          [54]TR 11/7/89 at 18.
22          [55]TR 11/7/89 at 18-19.
23          [56]TR 11/7/89 at 18-19.
24          [57]TR 11/7/89 at 19.
25          [58]TR 12/12/89 at 4, 16.
26          [59]The judge was replaced approximately one month prior tor trial.  *See* Td. 81
27  (last minute entry signed by this judge); Td. 88 (first minute entry signed by new
    judge).
28          [60]TR 7/10/90 at 13.

                              Page 13 of 83

1  formerly advisory counsel, took over presentation of the case.[61]

2      34.    Admitted at trial was Mr. Ramirez's statement, made in response to a
3  question from an officer and without the benefit of the *Miranda* warnings, while in
4  custody, that "[w]e had a big fight" and "[t]hey were hurt pretty bad."[62] At the scene,
5  an officer testified that Mr. Ramirez spoke as if in a daze, and he appeared to be under
6  the influence of drugs or alcohol.[63]

7      35.    One witness was called on behalf of the defense.[64] Russel Davis, a
8  homicide detective, testified that he spoke to Ken Strunk, who was the apartment
9  manager where the crime had occurred.[65]   Strunk informed him that he had
10 experienced problems with the victims' apartment since they had moved in, that
11 several different males were always coming in and out of the apartment, that he
12 suspected drug activity, and that a lot of drinking went on there at night.[66]

13     36.    The jury was given an instruction on premeditation that has since been
14 declared unconstitutional by the Arizona Supreme Court, under both the federal and
15 state constitutions, because it fails to provide a meaningful distinction between first
16 and second degree murder.[67] *State v. Thompson*, 204 Ariz. 471, 65 P.3d 420 (Ariz.
17 2003). The instruction overemphasizes how quickly premeditation can occur, leading
18 the jury to believe that "the only difference between first and second degree murder
19 is the mere passage of time." *Thompson*, 204 Ariz. At 478, 65 P.3d at 427.  The
20 prosecutor highlighted this erroneous concept in both his opening and closing

21 _____
22     [61]TR 7/11/90 at 96-97.
23     [62]TR 7/16/90 at 10.
24     [63]TR 7/16/90 at 12, 15-16.
25     [64]TR 7/23/90 at 62.
26     [65]TR 7/23/90 at 63.
27     [66]TR 7/23/90 at 64-65.
28     [67]TR 7/25/90 at 51.

1  statements.[68] The length of time necessary for premeditation was a key issue for the
2  jury because during deliberations they specifically asked, "[D]oes premeditation mean
3  before you stab or during the stabbing, before death occurs?"[69]   The trial court
4  referred the jury back to the instructions, which included the erroneous instruction on
5  premeditation which violates the due process clause.[70]

6      37.   The jury deliberated for over two days.[71]   On the first full day of
7  deliberations, the jury asked a question which demonstrated that they were improperly
8  considering Mr. Ramirez's failure to testify: "[w]as it a decision of both [the
9  prosecutor] and [defense counsel] not to call Ramirez on the stand or just [defense
10  counsel's]?"[72]  Instead of specifically instructing them that Mr. Ramirez's failure to
11  testify was not an issue they could consider in their deliberations, the jury was merely
12  given a general instruction to rely on the jury instructions.[73]  On the second full day
13  of deliberations, the jury asked the question regarding premeditation, discussed
14  above.[74]  They then returned with a verdict of guilty on two counts of premeditated
15  first degree murder.[75]

### I. The sentencing phase.

17      38.   The aggravation/mitigation hearing lasted two days, with a recess of over

21      [68]TR 7/12/90 at 10-11; TR 7/24/90 at 32-33; TR 7/25/90 at 43.

22      [69]TR 7/27/90 at 2.

23      [70]TR 7/27/90 at 3.

24      [71]TR 7/25/90 at 58-59; TR 7/26/90 at 2, 4; TR 7/27/90 at 2-3.

25      [72]TR 7/26/90 at 3.

26      [73]TR 7/26/90 at 2.

27      [74]TR 7/27/90 at 2.

28      [75]TR 7/27/90 at 3-4.

1   one month between the first and second day of testimony.[76]  The judge included, as

2   part of the sentencing record, a letter from relatives of the victims which asks the

3   judge to sentence Mr. Ramirez to death, despite the fact that clearly established

4   Supreme Court law precludes such recommendations.[77] *Booth v. Maryland,* 482 U.S.

5   496 (1987) (admission of victims' recommendation as to sentence violates the Eighth

6   Amendment).

7       39.   The state called pathologist George Bolduc.[78]  The pathologist was

8   unable to pinpoint how quickly the victims died after receiving the fatal stab wounds

9   or when in the sequence of events the fatal wounds were inflicted.[79]  Dr. Bolduc

10  admitted it was possible that these wounds could have caused the victims to lose

11  consciousness.[80]  The state also called a fingerprint examiner.[81]

12      40.   On October 12, 1990, defense counsel filed a sentencing memorandum,

13  attaching several exhibits, and this evidence was considered by the trial judge in

14  reaching his decision.[82]  The exhibits included the report of Dr. Mickey McMahon,

15  a psychologist.[83]  Mr. Ramirez informed Dr. McMahon that he had injected cocaine

16  several times and was drinking heavily on the night of the crime.[84]  Dr. McMahon

17  then had to stop the interview when he began to discuss the crime in more detail as

18  Mr. Ramirez, although denying involvement, began to cry and state that he was

19

20      [76]TR 10/19/90; TR 11/30/90.

21      [77]TR 10/19/90 at 4-5.

22      [78]TR 10/19/90 at 10.

23      [79]TR 10/19/90 at 16-18, 22.

24      [80]TR 10/19/90 at 19-21, 23-24.

25      [81]TR 10/19/90 at 25.

26      [82]Td. 149; TR 10/19/90 at 4; TR 12/7/90 at 2.

27      [83]Td. 149, Exhibit I.

28      [84]Td. 149, Exhibit I, at 1-2.

1    responsible because he did not save the victims from the intruders.[85]

2         41.    Dr. McMahon then proceeds to describe Mr. Ramirez's "background"

3    in his report. Dr. McMahon obviously never talked to any members of Mr. Ramirez's

4    family nor was informed of the family history by anyone on the defense team.  His

5    description of Mr. Ramirez's childhood relies solely on Mr. Ramirez as the source of

6    information, while at the same time recognizing that Mr. Ramirez is not a reliable

7    source about his family's history because he is trying to be loyal and protect them

8    from any negative aspersions on their character.[86]  David Ramirez's mother, the

9    chronic alcoholic who could not hold down a regular job because she was always

10   drinking in bars and sleeping with different men for money[87], was described by Dr.

11   McMahon as "a traditional Mexican-American mother whose responsibility revolves

12   around the home and her children."[88]

13        42.    Defense counsel began her mitigation evidence by calling Erlinda

14   Martinez, an aunt of Mr. Ramirez.[89]  She and her sister, Mr. Ramirez's mother, grew

15   up in a household of twelve children, six sisters and six brothers.[90]  She testified that

16   Mr. Ramirez's mother was about 16 when he was born and that she had a drinking

17   problem.[91]  Mr. Ramirez's natural father was not around to help take care of Mr.

18   Ramirez.[92]  It was acknowledged within the family that Mr. Ramirez's mother drank

19

20   _____

21        [85]Td. 149, Exhibit I, at 2.

22        [86]Td. 149, Exhibit I, at 3.

23        [87]TR 10/19/90 at 33-34, 36-37, 53, 71.

24        [88]Td. 149, Exhibit I, at 3.

25        [89]TR 10/19/90 at 30.

26        [90]TR 10/19/90 at 70.

27        [91]TR 10/19/90 at 31-33.

28        [92]TR 10/19/90 at 36.

Page 17 of 83

1    while she was pregnant with him, staying out all night and disappearing for days.[93]
2    Mr. Ramirez's mother was involved with "a lot of men,"[94] and she had eight children
3    by four different fathers.[95] Mr. Ramirez's mother died prematurely because her liver
4    was so damaged by years of alcoholism.[96]

5         43.    Because being a mother interfered with her drinking habit, Mr.
6    Ramirez's mother would often neglect to care for her children and she could not hold
7    down any job.[97] Aunt Erlinda could recall at least seven different schools that Mr.
8    Ramirez attended because his mother was always moving.[98]  Mr. Ramirez's
9    grandmother was upset about her daughter's treatment of him and his mother gave up
10   custody to the grandmother for approximately three years.[99] However, his mother got
11   remarried to Richard Garcia, and a big battle ensued in which Mr. Ramirez was taken
12   from his grandmother's house by his mother, without his grandmother's
13   knowledge.[100] It was at this point, at around age eight, that Mr. Ramirez's behavioral
14   problems began.[101]  Before Mr. Ramirez was forced to go back and live with his
15   mother, he was characterized by his Aunt Erlinda as a "good kid."[102]

16        44.    Mr. Ramirez would often run away from his mother's home, back to his

17

18   _____
19        [93]TR 10/19/90 at 33.
20        [94]TR 10/19/90 at 33.
21        [95]TR 10/19/90 at 36-37, 71.
22        [96]TR 10/19/90 at 64.
23        [97]TR 10/19/90 at 33-34, 53.
24        [98]TR 10/19/90 at 65.
25        [99]TR 10/19/90 at 35.
26        [100]TR 10/19/90 at 35.
27        [101]TR 10/19/90 at 37.
28        [102]TR 10/19/90 at 37-38.

1  grandmother's, because he was having problems getting along with his stepfather.[103]
2  During this time, Aunt Erlinda testified that Mr. Ramirez always had belt marks on
3  his body, and that one time he received a busted lip.[104]  In addition, his stepfather and
4  his mother were constantly fighting.[105]  At some point, Mr. Ramirez's mother left his
5  stepfather and took all of the children back to Arizona, after having resided in
6  California for a few years.[106]  Mr. Garcia came back for his biological children, but
7  Mr. Ramirez and three other children were left with their mother.[107]

8.     45.    Mr. Ramirez married and had two sons.[108]  He found employment at
9  menial jobs, such as dishwasher and janitor.[109]  Aunt Erlinda characterized the adult
10  Mr. Ramirez as a very sentimental and caring man.[110]  Mr. Ramirez was the only
11  person she could talk to about her marital problems because he sensed what she was
12  going through and she could trust him to keep her confidences secret.[111]  He would
13  advise her to listen to God for answers to her problems.[112]  When she heard about the
14  crime, she could not believe that Mr. Ramirez could have done such a thing.[113]  When
15  Mr. Ramirez found out that she was testifying, he apologized that she had to go

16

17  _____

18  [103]TR 10/19/90 at 40.

19  [104]TR 10/19/90 at 41.

20  [105]TR 10/19/90 at 43.

21  [106]TR 10/19/90 at 44.

22  [107]TR 10/19/90 at 44.

23  [108]TR 10/19/90 at 45.

24  [109]TR 10/19/90 at 61-62.

25  [110]TR 10/19/90 at 48.

26  [111]TR 10/19/90 at 48-49.

27  [112]TR 10/19/90 at 49.

28  [113]TR 10/19/90 at 50.

1 through the experience.[114]

2   46. Defense counsel then called her second witness in mitigation, Mary

3 Castillo, Mr. Ramirez's younger sister.[115] She testified that Mr. Ramirez was always

4 there for her as a brother and he was very affectionate with all of his brothers and

5 sisters, being quick to express his love for them.[116] She never knew her own father,

6 nor Mr. Ramirez's father.[117] She testified that it would her hurt their family very

7 much, including Mr. Ramirez's sons, if he were to receive the death penalty.[118] Mr.

8 Ramirez's sons were thirteen and fourteen at the time of the sentencing proceedings,

9 which they attended.[119]

10   47. Defense counsel then called another younger sister of Mr. Ramirez,

11 Cynthia Orozco.[120] She testified that Mr. Ramirez was a good brother to her and her

12 siblings.[121] She lived with Mr. Ramirez and his wife for two months when she was

13 about 13.[122] Mr. Ramirez supported his wife and son and it seemed to her like they

14 had regular family.[123] Later, in the year before the crime, Mr. Ramirez came to live

15 with Ms. Orozco, her husband and children.[124] Mr. Ramirez was working at Aspen

16

17

18    [114]TR 10/19/90 at 51.

19    [115]TR 10/19/90 at 72-73.

20    [116]TR 10/19/90 at 73, 84.

21    [117]TR 10/19/90 at 75.

22    [118]TR 10/19/90 at 81.

23    [119]TR 10/19/90 at 81-82.

24    [120]TR 10/19/90 at 89.

25    [121]TR 10/19/90 at 90-91.

26    [122]TR 10/19/90 at 93.

27    [123]TR 10/19/90 at 94.

28    [124]TR 10/19/90 at 97.

1  Furniture while he was living with them, doing manual labor.[125] Mr. Ramirez helped

2  out with household chores while he was staying with them and he helped support her

3  family by giving her money every week, without Ms. Orozco ever asking him to

4  contribute.[126]  Mr. Ramirez was seeing the victim when he was living with Ms.

5  Orozco, and he told his sister that the victims were wonderful people.[127] Mr. Ramirez

6  was supposed to bring them over for dinner the night after the crime occurred.[128] He

7  never gave her any indication that there were any problems in his relationship with

8  the victims; to the contrary, he appeared happy with the way things were going.[129]

9  She testified that it would be very difficult for her were her brother to receive the

10  death penalty.[130]

11       48.   At the end of the first day of the aggravation/mitigation hearing, the

12  judge indicated that he was going to consider the presentence report determining

13  aggravating factors, even though the prosecutor specifically cautioned the judge that

14  he could not consider the presentence report for that purpose.[131]

15       49.   The second and final day of the aggravation/mitigation hearing was held

16  over a month later, on November 30, 1990.[132] Defense counsel began by calling a

17  Department of Corrections employee, Mr. Eggar, who supervised Mr. Ramirez while

18

19

20  _____

21  [125]TR 10/19/90 at 98.

22  [126]TR 10/19/90 at 98, 100.

23  [127]TR 10/19/90 at 99.

24  [128]TR 10/19/90 at 100.

25  [129]TR 10/19/90 at 102.

26  [130]TR 10/19/90 at 108.

27  [131]TR 10/19/90 at 115.

28  [132]TR 11/30/90.

1    he was working in the prison kitchen.[133]  Mr. Ramirez did his work without any
2    problems and he received the highest employee rating because he was very willing
3    and cooperative.[134]    She then called Mr. Larry, another food supervisor at the
4    Department of Corrections who worked with Mr. Ramirez.[135]  He testified that Mr.
5    Ramirez was very polite, a good worker, always on time, and very clean about his
6    work.[136]  Mr. Ramirez's nickname among the inmates and the prison staff was
7    "Wino."[137]

8         50.    On December 7, 1990, the sentencing judge heard final sentencing
9    arguments.[138]  When defense counsel began to sum up the evidence by emphasizing
10   Mr. Ramirez's troubled childhood, the judge cut her off, stating that this was already
11   on the record and that he did not think the sentencing statute allowed him to consider
12   it as a substantial mitigating factor.[139]  After being cut-off by the judge early on in her
13   closing sentencing argument, defense counsel then simply asked the judge whether
14   he had any questions she could address.[140]  She then briefly argued that Mr. Ramirez
15   does well in a structured environment, relying on the testimony of the two food
16   supervisors.[141]  Mr. Ramirez declined to address the court.[142]

17

18   _____

19       [133]TR 11/30/90 at 4, 6.

20       [134]TR 11/30/90 at 10.

21       [135]TR 11/30/90 at 17-18.

22       [136]TR 11/30/90 at 19.

23       [137]TR 11/30/90 at 22.

24       [138]TR 12/7/90 at 2.

25       [139]TR 12/7/90 at 4-5.

26       [140]TR 12/7/90 at 7.

27       [141]TR 12/7/90 at 8.

28       [142]TR 12/7/90 at 9.

Page 22 of 83

1    51.    The sentencing judge issued his decision on December 18, 1990.[143] The
2  sentencing judge began by noting that he specifically considered all the information
3  in the presentence reports in reaching his decision.[144] The court found the following
4  aggravating factors: 1) previously felony conviction involving the use or threat of
5  violence on another person; 2) the murders were committed in an "especially" cruel
6  manner; 3) the murders were committed in an "especially heinous and depraved"
7  manner; and 4) multiple homicides.[145] Despite the testimony of the pathologist that
8  he could not establish when the victims lost consciousness during the crime and that
9  they could have lost consciousness very early on,[146] the trial judge found that the
10  victims were conscious during the entire attack.[147] The trial judge also used against
11  Mr. Ramirez the fact that the state produced no evidence of motive against Mr.
12  Ramirez, finding that the absence of motive proved that the killings were senseless,
13  unprovoked, and committed in an "especially heinous and depraved" manner.[148] He
14  also found that the killing were especially heinous and depraved because the victims
15  were smaller than Mr. Ramirez, even though there was testimony presented that Mr.
16  Ramirez was about the same size as the victims.[149]

17    52.    The trial judge did find that Mr. Ramirez's capacity to appreciate the
18  wrongfulness of his conduct or conform his conduct to the law was significantly

19
20
21 _____
22  [143]TR 12/18/90.
23  [144]TR 12/18/90 at 3.
24  [145]TR 12/18/90 at 4-6, 9.
25  [146]TR 10/19/90 at 16-24.
26  [147]TR 12/18/90 at 6.
27  [148]TR 12/18/90 at 8.
28  [149]TR 7/12/90 at 63; TR 12/18/90 at 8-9; TR 7/23/90 at 19.

Page 23 of 83

1   impaired during the time of the crime, a statutory mitigating circumstance.[150]   The

2   trial judge found that the cause of this lack of capacity was a combination of Mr.

3   Ramirez's psychological makeup and his alcohol and cocaine intoxication at the time

4   of the offense.[151]   The trial judge also found that Mr. Ramirez's intoxicated state "was

5   also affected by more than two months of alcohol and cocaine abuse he underwent

6   prior to the offense."[152]   He found the following other mitigating circumstances by a

7   preponderance of the evidence:  1) unstable family background; 2) poor education

8   experience; 3) being sexually abused as a youth; 4) his gang-affiliation; 5) chronic

9   substance abuse; 6) his psychological history; and 7) love of family.[153]   However, the

10   trial  judge  found  that  these  mitigating  circumstances  were  not  sufficiently

11   substantially to call for leniency.[154]   Mr. Ramirez was then sentenced to death.[155]

12                                   **J.  The direct appeal.**

13           53.     Mr. Ramirez's opening brief on direct appeal was filed on January 22,

14   1992.[156]   The Arizona Supreme Court affirmed the conviction and sentence on March

15   24, 1994.  *State v. Ramirez*, 178 Ariz. 116, 871 P.2d 237 (1994).

16                            **K.  The post-conviction proceedings.**

17           54.     On November 6, 1995, Mr. Ramirez filed his petition for post-conviction

18   relief.[157]   The post-conviction court summarily denied the petition, without holding

19

20   _____

21           [150]TR 12/18/90 at 10.

22           [151]TR 12/18/90 at 10.

23           [152]TR 12/18/90 at 11.

24           [153]TR 12/18/90 at 12.

25           [154]TR 12/18/90 at 13.

26           [155]TR 12/18/90 at 14.

27           [156]AzSCt. DA. Dkt. 25.

28           [157]Td. 190.

1  an evidentiary hearing, on February 16, 1996.[158]  On August 12, 1996, post-

2  conviction counsel filed a petition for review from this decision in the Arizona

3  Supreme Court.[159] The petition for review was summarily denied on May 20, 1997.[160]

4       55.    On February 14, 2003, Mr. Ramirez filed a second notice of post-

5  conviction relief, alleging a *Ring* claim and that no reasonable jury or judge would

6  have sentenced him to death had he been able to: 1) present evidence to them in

7  opposition to the state's aggravating evidence, and 2) present his fully developed

8  mitigating evidence.[161]  The post-conviction court summarily dismissed the petition,

9  without taking into consideration Mr. Ramirez's claim that no reasonable judge,

10  given the fully-developed mitigation evidence, would have sentenced him to death.[162]

11  On April 21, 2003, Mr. Ramirez filed a petition for review from this decision in the

12  Arizona Supreme Court and review was summarily denied on September 11, 2003.[163]

13                              **L.  Federal review.**

14       56.    Ramirez then filed a Petition for Writ of Habeas Corpus and Application

15  for Appointment of Counsel in the United States District Court for the District of

16  Arizona.[164]  After issuing a stay of execution and setting a schedule for the filing of

17  various pleadings, the Court ruled on the procedural status of Ramirez's

18  constitutional claims.[165]  Pursuant to 28 U.S.C. § 2254 and subsequent orders issued

19  by this Court, Ramirez's Second Memorandum Regarding the Merits of the

20  _____

21       [158]Td. 192.

22       [159]AzSCt. Review Dkt. 1.

23       [160]AzSCt. Review Dkt. 3.

24       [161]2nd PCR 2/14/03.

25       [162]2nd PCR 3/26/03.

26       [163]2nd PCR 4/21/03.

27       [164]Dist. Ct. Doc. No. 1.

28       [165]Dist. Ct. Doc. No. 83.

1  Remaining Claims is properly before this Court.

2  **III.   Notice of intention to challenge presumption of**
3  **correctness of all state court findings of fact under 28**
   **U.S.C. § 2254(D).**

4  57.   Mr. Ramirez hereby provides notice of his intention to challenge the

5  presumption of correctness of certain findings of fact made by the state court in his

6  case pursuant to 28 U.S.C. § 2254(b)(1)(B)(i)-(ii), (e), and (f).

7  58.   Certain findings of fact by the state court in Mr. Ramirez's case, if any

8  are found to exist, are not entitled to the presumption of correctness under 28 U.S.C.

9  § 2254(e)(1). These include, but are not limited to, any and various factual findings

10  made by the trial court before, during, and after Mr. Ramirez's trial, and the opinion

11  by the Arizona Supreme Court on direct appeal. Under 28 U.S.C. § 2254(e)(1), Mr.

12  Ramirez intends to assert that certain findings of fact by the state court at trial or on

13  direct appeal, if any are found to exist, are not fairly supported by the record.

14  59.   In addition, Mr. Ramirez asserts that certain findings of fact by the state

15  court in regard to his state post-conviction proceedings, if any are found to exist, are

16  not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These

17  include, but are not limited to any and all factual findings made by the trial court in

18  regard to Mr. Ramirez's state post-conviction proceedings. Under 28 U.S.C. §

19  2254(e)(1), Mr. Ramirez intends to assert that certain findings of fact by the state

20  court concerning his state post-conviction proceeding, if any are found to exist, are

21  not fairly supported by the record.

22  60.   Mr. Ramirez also intends to assert other exceptions to the presumption

23  of correctness under 28 U.S.C. § 2254(b)(1)(B)(i)-(ii), (e), and (f) including, but not

24  limited to the following: that the procedures employed by the state courts to make

25  findings of facts were not adequate to afford him full and fair hearings; that material

26  facts were not adequately developed at the state court hearings; that he did not receive

27  full, fair and adequate hearings in the state court proceedings; and that he was

28  otherwise denied due process of law in the state court proceedings.

Page 26 of  83

1    61.    None of the claims Mr. Ramirez raised in his post-conviction petition
2    can be judged under the deferential standard of the AEDPA.  Because no evidentiary
3    hearing was held, and Mr. Ramirez simply did not have an opportunity to prove
4    prejudice.  Ineffective assistance of counsel claims are supposedly reserved for post-
5    conviction, rather than direct appeal, because proving these claims requires putting
6    on evidence outside the trial court record.  Mr. Ramirez deserved a hearing on his
7    claims.  Because no hearing was held, the post-conviction court's fact-finding process
8    was defective.  "If, for example, a state court makes evidentiary findings without
9    holding a hearing and giving petitioner an opportunity to present  evidence, such
10   findings clearly result in an 'unreasonable determination' of the facts."  *Taylor v.*
11   *Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

12   62.    The AEDPA's presumption of correctness and "clear and convincing"
13   standard of proof are not applicable because the post-conviction court's "factual
14   findings" simply do not exist and because the process employed by the post-
15   conviction judge in reaching his conclusions was defective.  *Id.* at 1000.

16   **IV.  Reservation of right to amend the petition.**

17   63.    Mr. Ramirez expressly reserves his right to amend this petition.  In
18   *McCleskey v. Zant*, 499 U.S. 467 (1991), the Supreme Court reaffirmed the "principle
19   that [a] petitioner must conduct a reasonable and diligent investigation aimed at
20   including all relevant claims and grounds for relief in the first federal habeas
21   petition."  *Id.* at 498.  Referring to Rule 6 (discovery), Rule 7 (expansion of the
22   record) and Rule 8 (evidentiary hearing), of the Rules Governing Section 2254 Cases
23   in the District Courts, the Supreme Court held that a habeas petitioner needs
24   reasonable means and the ability to investigate in order to form a sufficient basis to
25   allege a claim in the first petition.  *Id.*

26   64.    Mr. Ramirez believes additional claims may be identified through
27   investigation, after discovery is conducted and completed, or after an evidentiary
28   hearing is held.  At the appropriate time during these proceedings, Mr. Ramirez will

1   present the additional claims through amendments to the petition.

2                    **V. Response to specific claims.**

3                       **Second claim for relief.**

4            **Mr. Ramirez's statements to police were taken in**
             **violation of *Miranda* and wrongfully admitted pursuant**
5            **to the public safety exception to *Miranda*, in violation of**
             **Mr. Ramirez's Fifth, Sixth, and Fourteenth**
6            **Amendment rights.**

7            65.    The merits of this claim are before this Court pursuant to its Order dated

8    July 6, 2004.[166] The state court's rejection of this claim was contrary to, or involved

9    an unreasonable application of, clearly established federal law, as determined by the

10   United States Supreme Court. The state court's rejection of this claim was also based

11   on an unreasonable determination of the facts in light of the evidence presented in the

12   state court proceedings.

13           66.    The state court erred in admitting Mr. Ramirez's statements under the

14   public safety exception announced in *Quarles*. *See New York v. Quarles*, 467 U.S.

15   649 (1984) (describing the "public safety exception" to *Miranda*). Mr. Ramirez's

16   Fifth, Sixth, and Fourteenth Amendments were violated because he was both in

17   custody and subject to interrogation, which gave him rights under *Miranda v. Arizona*

18   and a Fifth Amendment right to counsel during a custodial interrogation. 384 U.S.

19   436, 498 (1966). Finally, the admission of Mr. Ramirez's statements was prejudicial

20   to his defense and the error was not harmless.

21           67.    If the state court's holding that this statement is admissible under the

22   public safety exception stands, then it holds true that the police will be able to ask

23   general investigatory questions such as "what happened" in nearly every situation

24   where the police arrest someone after a violent crime.

25                    **A. Facts underlying the claim.**

26           68.    On May 25, 1989, police received a domestic violence call and

27

28   _____
             [166]Dist. Ct. Doc. No. 83.

1    proceeded to the Gortarez apartment, where Mr. Ramirez was taken into custody and
2    eventually arrested.[167] Upon arrival, some of the officers stationed themselves at a
3    back window of the apartment, and some of the officers went to the front door.[168] The
4    officers at the front door knocked with no response.  The two groups of officers
5    continued to communicate by radio.[169] One of the officers reported seeing someone
6    moving inside of the apartment.[170] The officer also indicated, via radio, that the
7    person had attempted to get out through a back window.[171] At this time, the officers
8    at the front door also reported hearing someone moving around.[172] The officers
9    eventually secured a key from the apartment manager and entered the apartment.[173]
10   Two police sergeants entered first with guns drawn.[174] They realized immediately
11   that a major crime had occurred.  Blood was splattered all over the apartment, and a
12   body was lying on the living room floor.[175] They then saw Mr. Ramirez approach
13   them from the back of the apartment.  They ordered him to put his hands on his head,
14   and Officer Hartson "confronted" him, "immobiliz[ed]"[176] him utilizing an arm bar,
15   and led him outside, forcing him to kneel on the grass.[177] Hartson testified that at this

16

17       _____

18       [167]TR 7/6/90 at 10.

19       [168]TR 7/6/90 at 12.

20       [169]TR 7/6/90 at 13.

21       [170]TR 7/6/90.

22       [171]TR 7/6/90 at 15.

23       [172]TR 7/6/90 at 14.

24       [173]TR 7/6/90 at 14.

25       [174]TR 7/6/90 at 16-17.

26       [175]TR 7/6/90 at 18.

27       [176]TR 7/6/90 at 17.

28       [177]TR 7/6/90 at 19.

1   time Mr. Ramirez was not free to leave.[178]

2       69.   Before the two officers proceeded further into the apartment, one of them

3   asked Hartson to find out "who was in the apartment."[179] Rather than asking who else

4   was in the apartment, as the officers currently attempting to enter the apartment had

5   asked, Hartson testified that he asked, "what happened":

6              Sergeant Howk stepped back out of the doorway, and he
           asked me who else was inside the apartment.  And so I
7              asked, I asked, I asked Mr. Ramirez what was going on,
           and he replied to me, he said, we had a big fight.  And I
8              asked who else was inside, and he said, my girlfriend and
           her daughter.  And I asked him if anybody else was hurt,
9              and he said, yeah, they're hurt pretty bad.  Then he said,
           we're all hurt pretty bad.  And as he was explaining that to
10             me, I relayed the information to Sergeant Howk so they
           know what to expect inside the apartment.[180]

11

12      70.   Defense counsel filed a motion to suppress Mr. Ramirez's statements,[181]

13  and a suppression hearing was held.[182]

14      71.   The day after the hearing, the court heard argument on the suppression

15  issue.   The court found the appellant had been in custody when he made his

16  statements.[183] However, the court found the questioning was done:

17             [p]rimarily for the purpose of attempting to find out more
           about whether anybody was in that apartment, whether the
18             officers who were in the process of planning to go into the
           apartment were going to be safe or not, and to prepare for
19             any dangers that may exist.[184]

20      72.   The court ruled the statements were admissible, agreeing with the state

21

22  [178]TR 7/6/90 at 28.

23  [179]TR 7/6/90 at 29.

24  [180]TR 7/6/90 at 20.

25  [181]Td. 34.

26  [182]TR 7/6/90.

27  [183]TR 7/9/90 at 10.

28  [184]TR 7/9/90 at 11.

that the circumstances satisfied the "public safety exception" to *Miranda* as described in *New York v. Quarles*, 467 U.S. 649, 655 (1984), and *State v. Vickers*, 159 Ariz. 532, 538, 768 P.2d 1177, 1182 (1989). These self-incriminating statements were used in the opening[185] and closing arguments[186] of the prosecutor, to the prejudice of Mr. Ramirez.

### B. Mr. Ramirez was in custody, subjected to police interrogation and entitled to a *Miranda* warning.

73.    Despite being both in custody and subject to police interrogation, Mr. Ramirez was not afforded a *Miranda* warning at any time prior to making the incriminating statements at issue. The Arizona Supreme Court concluded that Mr. Ramirez was in custody at the time his interrogation occurred. *See State v. Ramirez*, 178 Ariz. 116, 123, 871 P.2d 237, 244 (1994). The Arizona Supreme Court, therefore, by considering the *Miranda* issue, conceded that Mr. Ramirez was subject to custodial interrogation, affording him a Fifth Amendment right to counsel. *See United State v. Wauneka*, 770 F.3d 1434, 1438 (9th Cir. 1985) (*Miranda* is not implicated unless custodial interrogation has occurred). *Miranda* warnings are required when a suspect is both *in custody and subject to police interrogation*. *Miranda*, 384 U.S. at 498 (emphasis added).

74.    The primary purpose of this rule is to preserve an accused's Fifth Amendment right against self-incrimination. Accordingly, "[t]he Fifth Amendment protection against compelled self-incrimination provides the right to counsel at custodial interrogations." *Michigan v. Jackson*, 475 U.S. 625, 629 (1986). It is clear that Mr. Ramirez, under *Jackson*, has a Fifth amendment right to counsel during a custodial interrogation, and a right to be forewarned of this constitutional right under *Miranda*. However, the state court, in this instance, cast aside these constitutionally

---

[185]TR 7/12/90 at 20.

[186]TR 7/24/90 at 51; TR 7/25/90 at 44.

Page 31 of 83

1   mandated demands and judicial safeguards, and unreasonably applied the public

2   safety exception.

3           **C.  Officers were aware that the custodial interrogation**
            **of Mr. Ramirez would likely result in incriminating**
4           **statements, and no public safety concerns existed which**
            **permitted application of the *Quarles* exception to**
5           ***Miranda.***

6           75.     It is readily apparent upon even a cursory analysis of the record that Mr.

7   Ramirez was subjected to a custodial interrogation. Yet, the state court, via a tenuous

8   analysis, found the exception to *Miranda* applied, placing it above constitutional

9   concerns regarding Mr. Ramirez's federal rights. At trial, the state presented *State*

10  *v. Heath*, 122 Ariz. 36, 592 P.2d 1302 (Ct. App. 1979), for the proposition that Mr.

11  Ramirez's statement was not made during interrogation. The case was easily

12  distinguishable.

13          76.     In *Heath*, the police stated that when they arrived they only found what

14  appeared to be two individuals who had either "passed out" or had some sort of

15  "unknown medical problem." *Id.* at 38, 592 P.2d at 1304. It wasn't until later that

16  the officers learned the individuals were suffering from gunshot wounds. *Id.* Upon

17  entering the apartment, the police had no idea or evidence that one of the victims was

18  actually the perpetrator. Even after speaking with the appellant and noticing blood

19  on what turned out to be the victim, the officer was still not aware of the fact that a

20  crime had occurred, "he still did not know what had happened." *Id.* After surveying

21  the scene the officer realized that the appellant was conscious and had opened her

22  eyes, he approached her and asked her for identification. *Id.* After ascertaining her

23  identification, the officer then asked her what had happened. *Id.* Therefore, the

24  "victim" was not in custody, and since the "victim" was not a suspect the officer

25  could not have known that the question, "what happened," would elicit an

26  incriminating statement. Therefore, interrogation did not occur.

27          77.     In the case at bar, the Arizona Supreme Court concluded that the Mr.

28  Ramirez was indeed in custody when interrogated. *Ramirez*, 178 Ariz. at 123, 871

1    P.2d at 244.  Further, there was no doubt that officers subjectively believed Mr.
2    Ramirez to be a primary suspect in the crime, as evidenced by his immediate
3    immobilization and forced removal from the scene.[187] Nevertheless, based on flawed
4    factual analysis and distinguishable case law, the court applied the public safety
5    exception, and permitted incriminating statements made by Mr. Ramirez to be
6    admitted into evidence.

7        78.    In *Rhode Island v. Innis*, the Supreme Court held that, "the term
8    'interrogation' under *Miranda* refers not only to express questioning, but also to any
9    words or actions on the part of the police . . . that the police should know are
10   reasonably likely to elicit an incriminating response . . . ." 466 U.S. 291, 301(1980).
11   In determining whether an interrogation has occurred, the primary focus is upon the
12   perceptions of the suspect, rather than the intent of the police. *Id.*

13       79.    In *Innis*, the Court held that the defendant was not subjected to
14   interrogation, as no response was ever elicited from the defendant.  *Id.*   The
15   defendant, while being transported in the car, merely overheard a discussion between
16   officers regarding the firearm used in the commission of the crime.  He then chose,
17   without any questioning by the officers, to reveal the location of the firearm to the
18   officers. *Id.* at 295.

19       80.    In this case, Officer Hartson testified that after removing Mr. Ramirez
20   from the crime scene, "immobilizing" him, and making it clear that Mr. Ramirez was
21   not free to leave, he then asked Mr. Ramirez "what happened," prior to asking him
22   "who else was inside" and "if anybody else was hurt."[188]  Clearly, any reasonable
23   officer would  know that the first question would be more likely than not to elicit
24   some sort of incriminating remark.  It is also apparent that the officer was aware of
25   the appropriate questions to ask, had public safety been the primary motive behind
26

27       [187]TR 7/6/90 at 17-19, 28.
28       [188]TR 7/6/90 at 17-19, 28

Page 33 of 83

1 the questioning, as his second and third questions were more properly limited to
2 assessing this issue.

3    81.   Mr. Ramirez's self-incriminating statements were used in opening[189] and
4 closing arguments[190] by the prosecution, resulting in prejudicial error.

5    **D. *Quarles* is distinguishable.**

6    82.   The Court in *Quarles* states that in order for the public safety exception
7 to apply there must be an "objectively reasonable need" for safety or protection. 467
8 U.S. at 656. This reasonableness standard is based on what the officers knew at the
9 time in question. *Id.*   Based on the Court's reasoning, this same reasonableness
10 standard should be applied to determine whether the officer knew or should have
11 known that the question as posed would likely elicit incriminating statements. Such
12 a standard puts Mr. Ramirez's constitutional rights on par with alleged possible
13 public safety concerns, rather then assuming *any* allegation of a public safety concern
14 is paramount to an actual violation of Mr. Ramirez's constitutional rights. *Miranda*
15 is, and has always been, a constitutional rule of law. *Dickerson v. United States*, 530
16 U.S. 428, 444 (2000); *Soffar v. Cockrell*, 300 F.3d 588, 607 (5th Cir. 2002). The
17 spectrum of claims to which *Quarles* may be applied is limited by the constitutional
18 nature of *Miranda*.  *See Allen v. Roe*, 305 F.3d 1046, 1050 (9th Cir. 2000).

19    83.   In *Quarles*, there was an objectively reasonable concern for safety, as the
20 crime was on-going and the necessity for identifying the whereabouts of a gun
21 became immediately apparent while in the course of apprehending the suspect. 467
22 U.S. at 657. In addition, the officer, despite being confronted with an emergent
23 situation, as the gun was in a public place and whereabouts unknown, limited his
24 inquiry only to the location of the weapon. The only question asked was, "where [is]
25 the gun." *Id.* at 652. In addition, the suspect was wearing an empty shoulder holster,
26

27    [189]TR 7/12/90 at 20.
28    [190]TR 7/24/90 at 51; TR 7/25/90 at 44.

**Page 34 of 83**

1  further indicating the presence of a gun nearby.  Again, however, the officer did not

2  ask any questions which would likely elicit a confession or additional evidence.  The

3  officer only asked about the weapon itself.

4       84.    In this case, however, despite the crime being isolated to a non-public

5  area and the fact that petitioner was easily taken into custody, the officer chose to ask

6  an initial broad investigatory question: "what is going on."[191]  *See United States v.*

7  *Bater*, 830 F.Supp. 28, 38  n.6 (D. Mass. 1993) ("The public safety exception cases,

8  however, are confined to situations in which there is general, public access to

9  dangerous instruments. In the instant case, the weapon was in a dresser drawer in a

10  private apartment.");  *State v. Montoya*, 937 P.2d 145, 151 (Utah Ct. App. 1997)

11  (*Quarles* not applicable where there "was no showing that there was any danger of

12  imminent harm to the public at large.").

13       85.    In addition, the officer did not immediately ask Mr. Ramirez this

14  question when he apprehended him, as in *Quarles*.  Instead, he waited until Mr.

15  Ramirez was outside on the grass.  It wasn't until Mr. Ramirez had already made

16  incriminating statements that the officer asked *Quarles* appropriate questions, had

17  there been a threat to the general public, such as, "who is inside" and "is anybody else

18  hurt."[192]  The officer did not even question Mr. Ramirez as to whether there were any

19  weapons present in the home or any additional armed persons.  These types of

20  questions are arguably, according to *Quarles*, of the highest concern in terms of safety

21  issues in situations of this type.

22       86.    The admission of Mr. Ramirez's incriminating statements serves no

23  purpose other than to undermine the constitutional underpinnings of *Miranda* and the

24  Fifth Amendment right to counsel at a custodial interrogation.

25

26

27       [191]TR 7/6/90 at 20.

28       [192]TR 7/6/90 at 20.

1                              **E. *Vickers* is distinguishable.**

2        87.    The Arizona Supreme Court inappropriately relied upon *Vickers*, where

3   the court determined that the defendant was neither in custody, nor under

4   interrogation, when questioned. *State v. Vickers*, 159 Ariz. 532, 538, 768 P.2d 1177,

5   1183 (1989). Therefore, the court was not required to balance the defendant's

6   constitutional rights under *Miranda* against possible public safety concerns.

7        88.    In *Vickers*, the court's ruling pursuant to the public safety exception was

8   secondary in nature, as the defendant was not likely entitled to *Miranda* rights in any

9   event. Here, the state court concluded that Mr. Ramirez was subjected to custodial

10  interrogation affording certain constitutional rights. *See Ramirez*, 178 Ariz. at 123,

11  871 P.2d at 244. The state court went on to indicate that but for the public safety

12  exception, Mr. Ramirez would have undoubtedly been entitled to rights under

13  *Miranda* in order for his statements to be admissible. *Id*. Therefore, the court's

14  analysis in *Vickers* should not be likened to that of the Mr. Ramirez in this case.

15       89.    Ultimately, *Vickers* is factually distinguishable. In *Vickers*, officers were

16  faced with an extremely clear cut example of a situation where the public safety

17  exception should apply. In *Vickers*, prison officials were responding to a fire alarm

18  on death row. 159 Ariz. at 535. The prison officials were in a unique situation as

19  they were aware that at least one inmate, Vickers, was already out of his cell, and

20  potentially more. Furthermore, officials did not know the reason for the fire nor how

21  it was started. Again, this presents a unique set of problems not applicable to Mr.

22  Ramirez's case. In *Vickers*, the prison officials were met with thick smoke, fire, and

23  low visibility, not to mention potentially four freed inmates. *Id*. Although officials

24  quickly learned that all the inmates were accounted for, this did not lessen the safety

25  threat, as Vickers was on the ground, two inmates unconscious and a third on fire.

26  *Id*. After several unsuccessful attempts to pull the two unconscious inmates from the

27  fire, Vickers was finally pulled clear of the scene. It was at this point that Vickers

28  was asked, "what happened." *Vickers*, 159 U.S. at 535.

90.     Although this is the same question asked of the Mr. Ramirez in the case at bar, the circumstances significantly alter the appropriateness of the question. In *Vickers*, the question was clearly appropriate, as Vickers was not even a suspect at this time. In addition, prison officials needed to specifically know "what happened" in order to: (1) rule out an escape attempt by other inmates, (2) establish where the fire was originating from, and (3) determine the substance(s) fueling the fire to allow them to properly extinguish the blaze and possibly save the burning inmate.

91.     However, in Mr. Ramirez's case, "what happened" was clearly an inappropriate investigatory question aimed at or likely to elicit incriminating evidence of known suspect in a crime. In *Vickers*, officials asked "what happened" because it was the appropriate question given the nature of the safety concern. In Mr. Ramirez's case, the question was inappropriate and did not address the safety concerns present at that time. Mr. Ramirez had been pulled out of the apartment and immobilized.[193] The officers did not need to know "what happened" in order to handle the situation. The officers simply needed to know whether there was anyone else in the apartment. Given the circumstances, this was nothing more than a general investigatory question, highly likely to elicit an incriminating response.

92.     If the state court's holding that this statement is admissible under the public safety exception stands, then it holds true that the police will be able to ask "what happened" in nearly every situation where the police arrest someone after a violent crime. Such a ruling would indicate a broadening of the holding in *Quarles* and degradation of *Miranda* that would be contrary to the constitution and established law. Accordingly, the statement should have been suppressed.

### F. Summary.

93.     Given the circumstances under which Mr. Ramirez's statements were made, subsequently admitted, and used to prejudice his defense, it is clear that absent

---

[193]TR 7/6/90 at 17-19.

Page 37 of 83

1  an extremely clear and imminent public safety concern, any application of this
2  exception to *Miranda* was inappropriate in this case.  Therefore, the court erred in
3  admitting Mr. Ramirez's statements pursuant to the public safety exception to
4  *Miranda*.

5        94.  In this case, the questioning officer knew his line of questioning would
6  likely result in the incriminating statements, yet he failed to alter it, eliciting
7  statements from Mr. Ramirez in violation of *Miranda*.  Furthermore, given the facts
8  of the case, there was not an "objectively reasonable" need for safety or protection
9  which justified the investigatory nature of the officers questions.   These self-
10 incriminating statements were then used as evidence of guilt in opening[194] and closing
11 arguments[195] by the prosecution, resulting in prejudicial error.

12       95.  If the state court's holding, that this statement is admissible under the
13 public safety exception, stands then it holds true that the police will be able to ask
14 "what happened" in nearly every situation where the police arrest someone after a
15 violent crime.  Such a ruling would indicate a broadening of the holding in *Quarles*
16 and degradation of *Miranda* that would be contrary to the constitution and established
17 law.  Accordingly, the statement should have been suppressed.

### Third claim for relief.

19 **The trial court erred in failing to properly weigh the**
**mitigating evidence presented by Mr. Ramirez, in**
20 **violation of his Fifth, Sixth, Eighth, and Fourteenth**
**Amendment Rights.**

21       96.  The merits of this claim are before this Court pursuant to its Order dated
22 July 6, 2004.[196] The state court's rejection of this claim was contrary to, or involved
23 an unreasonable application of, clearly established federal law, as determined by the

---

26 [194]TR 7/12/90 at 20.

27 [195]TR 7/24/90 at 51; TR 7/25/90 at 44.

28 [196]Dist. Ct. Doc. No. 83.

1    United States Supreme Court. The state court's rejection of this claim was also based

2    on an unreasonable determination of the facts in light of the evidence presented in the

3    state court proceedings.

4        97.    The trial court found that Mr. Ramirez proved the existence of one

5    statutory mitigating circumstance and seven non-statutory mitigating circumstances.

6    *Ramirez*, 178 Ariz. at 131, 871 P.2d at 292. The court found that petitioner's capacity

7    to appreciate the wrongfulness of his conduct and maintain conduct in accordance

8    with the requirements of the law was significantly impaired, a statutory mitigating

9    circumstance.[197] This finding established that numerous questions existed regarding

10   petitioner's mental condition and psychological makeup. In addition, by the court's

11   own admission, additional questions, regarding Mr. Ramirez's drug use and

12   intoxicated state at the time of the crime, raised significant and important mitigating

13   considerations.

14       98.    In addition to the above statutory finding, seven non-statutory mitigating

15   circumstances were found by the sentencing judge: 1) unstable family background,

16   2) poor education experience, 3) being sexually abused as a youth, 4) his

17   gang-affiliation, 5) chronic substance abuse, 6) his psychological history and 7) love

18   of family.[198]

19       99.    The mitigating facts and circumstances that the trial court did find,

20   established that petitioner should have been treated with leniency. *Walton v. Arizona*,

21   497 U.S. 639 (1990). The circumstances were sufficient to call for leniency, and the

22   court should not have imposed the death penalty.

23       100.   The court had a duty to both "consider and give effect" to the mitigating

24   evidence. *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (rev'd on other grounds).

25   "Death is not automatically imposed upon conviction for certain types of murder. It

26   _____

27       [197]TR 12/18/90 at 10.

28       [198]TR 12/18/90 at 12.

1    is imposed only after a determination that the aggravating circumstances outweigh

2    the mitigating circumstances. . . ." *Blystone v. Pennsylvania*, 494 U.S. 299, 305

3    (1990).    In order to ensure "reliability in the determination that death is the

4    appropriate punishment in a specific case," *Woodson v. North Carolina*, 428 U.S.

5    280, 305 (1976), "the jury must be able to consider and give effect to any mitigating

6    evidence relevant to a defendant's background and character or the circumstances of

7    the crime." *Penry*, 492 U.S. at 328.

8        101.    Accordingly, "the sentencing judge must consider 'any aspect of the

9    defendant's character or record and any circumstance of the offense relevant to

10   determining' whether the death penalty is appropriate." *State v. Ramirez*, 178

11   Ariz.116,131, 871 P.2d 237, 252 (1994) (quoting *State v. McCall*, 139 Ariz. 147, 162,

12   677 P.2d 920, 935 (1983)); *see also*, *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).    In

13   doing so, the Ninth Circuit has held that it is unconstitutional when weighing

14   mitigating factors to determine if leniency is appropriate, to "run down a list of

15   possible mitigating factors . . . deciding whether each one meets a threshold weight

16   . . ." *Smith v. McCormick*, 914 F.2d 1153, 1168 (9th Cir. 1990).    Such a process fails

17   to determine the appropriateness of death for that specific individual. *Id.* at 1168.

18       102.    In this case, the trial court failed to conduct a proper cumulative

19   weighing of the substantial mitigating evidence present in this case.    Done properly,

20   the weighing would have led to leniency for Mr. Ramirez.    Instead, the court

21   determined the aggravating factors outweighed the mitigating circumstances,

22   including petitioner's diminished capacity, drug abuse, intoxication, minimal

23   education, sexual abuse and abusive childhood. While it may be true that in isolation

24   each of these circumstances does not call for leniency, the same does not hold true

25   when the circumstances are viewed as a whole, cumulatively, and their role in Mr.

26   Ramirez's life and this crime are taken into account.

27

28

1

### Fourth claim for relief.

2

### The Arizona courts erred in rejecting Mr. Ramirez's prison work record as a mitigating factor in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

3

4

5       103.    The merits of this claim are before this Court pursuant to its Order dated

6  July 6, 2004.[199]  The state court's rejection of this claim was contrary to, or involved

7  an unreasonable application of, clearly established federal law, as determined by the

8  United States Supreme Court.  The state court's rejection of this claim was also based

9  on an unreasonable determination of the facts in light of the evidence presented in the

10 state court proceedings.

11      104.    The Arizona Supreme Court, in adopting the lower court's holding which

12 rejected petitioner's excellent prison work record as mitigation, failed to

13 independently evaluate the claim and give it appropriate consideration. *See Penry v.*

14 *Lynaugh*, 492 U.S. 302, 328 (1989) (rev'd on other grounds) (stating courts have a

15 duty to both "consider and give effect" to mitigating evidence).  The fact finder is

16 required to "consider and give effect" to any mitigating evidence relevant to a

17 defendant's background and character. *Id.*

18      105.    In this case, petitioner submitted his excellent prison work record as

19 mitigation evidence.  This assertion was supported at trial through the testimony of

20 two department of corrections employees and Mr. Ramirez's prison record, which

21 showed that petitioner was a model employee while he worked in the kitchen and

22 dining hall.[200]  The trial court asserted, and the Arizona Supreme Court adopted its

23 holding, that Mr. Ramirez failed to establish this excellent prison work record by a

24 preponderance of the evidence, despite the fact that the court heard testimony to that

25

26

27      [199]Dist. Ct. Doc. No. 83.

28      [200]TR 11/30/90 at 10, 19; Td. 149, Exhibits AA, BB, CC, EE, GG, QQ, YY, ZZ, 2-10.

1   effect.[201]  *Ramirez*, 178 Ariz. at 132, 871 P.2d at 253.

2          106.  In support of this proposition, the trial court indicated that because

3   petitioner had been written up on several occasions, unrelated to his prison work

4   record, and has an escape conviction, he cannot establish an excellent prison work

5   record.  However, the fact that petitioner has a disciplinary record, in regard to

6   separate actions wholly unrelated to his excellent prison work in the kitchen and

7   dining area, has no bearing on his ability to establish his work record via direct

8   testimony and prison work records and use it for mitigation purposes.  If this were the

9   case, no mitigating circumstance could ever be established by a preponderance of the

10  evidence, as it could simply be negated by presentation of a categorically unrelated

11  negative action by a defendant at some time in his past.

12         107.  Therefore, the court should have found the excellent prison record was

13  established by a preponderance of the evidence, and then independently and

14  cumulatively weighed the evidence in light of the additional mitigating circumstance.

15  Accordingly, the Arizona Supreme Court's rejection of mitigating evidence and

16  subsequent failure to weigh all relevant mitigating evidence together to determine if

17  leniency was called for violated petitioner's state and federal constitutional rights.

18                              **Sixth claim for relief.**

19                 **The  "especially  heinous,  cruel  or  depraved"**
                   **aggravating  factor  is  unconstitutionally  vague  and**
20                 **overbroad, on its face and as applied, resulting in the**
                   **arbitrary  and  capricious  imposition  of  the  death**
21                 **penalty,  in  violation  of  Mr.  Ramirez's  Fifth,  Sixth**
                   **Eighth and Fourteenth Amendment rights.**
22
           108.  The merits of this claim are before this Court pursuant to its Order dated
23
    July 6, 2004.[202]  The state court's rejection of this claim was contrary to, or involved
24
    an unreasonable application of, clearly established federal law, as determined by the
25

26
    _____

27  [201]TR 12/18/90 at 12-13.

28  [202]Dist. Ct. Doc. No. 83.

1   United States Supreme Court. The state court's rejection of this claim was also based
2   on an unreasonable determination of the facts in light of the evidence presented in the
3   state court proceedings.

4       109.   The application of Arizona's statutory (F)(6)[203] aggravator, "especially
5   cruel, heinous  or depraved," is constitutionally infirm for two reasons.   First,
6   Arizona has failed to adopt a construction of this factor that is sufficiently narrow to
7   make the sentencer's discretion "suitably directed and limited." *Gregg v. Georgia*,
8   428 U.S. 153, 189 (1976).  Instead, the (F)(6) aggravator has been interpreted in a
9   manner that makes it a catch-all for cases that would not otherwise qualify as death
10  eligible.

11      110.   Second, the trial court failed to employ a properly narrowed construction
12  of this aggravating factor to the facts of David Ramirez's case, and the state failed to
13  prove this factor beyond a reasonable doubt. *See Godfrey v. Georgia*, 446 U.S. 420,
14  432 (1980).

15              **A. The narrowing purpose of aggravating factors.**

16      111.   The fundamental Eighth Amendment principle established in *Furman*
17  *v. Georgia*, 408 U.S. 238 (1972) and expressed in the resulting body of law, is that
18  state death sentencing procedures must provide "a meaningful basis for distinguishing
19  the few cases in which [the death penalty] is imposed from the many cases in which
20  it is not." *Id.* at 313 (White, J., concurring). Later United States Supreme Court cases
21  reiterate that "there is a required threshold below which the death penalty cannot be
22  imposed.  In this context, the state must establish rational criteria that narrow the
23  decision maker's judgment as to whether the circumstances of a particular case meet
24

---

25      [203]In 2001, the statutory sentencing scheme was changed to include a
26  prohibition of the death penalty on the mentally retarded.  Ariz. Rev. Stat. § 13-703(B).  To accommodate for this new subsection, the § 13-703(F)(6) "especially
27  cruel, heinous or depraved" statutory aggravator has been changed to (G)(6).  For
    purposes of this petition, this aggravating circumstance will be referenced as the
28  (F)(6) aggravator because this was the sentencing scheme in effect at the time David
    Ramirez was convicted and sentenced.

1    the threshold." *Blystone*, 494 U.S. at 308 (quoting *McCleskey v. Kemp*, 481 U.S. 279

2    (1987)).

3         112.   In Arizona and most other states, these "criteria" are established by

4    statutory "aggravating circumstances." Aggravating circumstances "must genuinely

5    narrow the class of persons eligible for the death penalty and must reasonably justify

6    the imposition of a more severe sentence on the defendant compared to others found

7    guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983) (footnote omitted);

8    *Arave v. Creech*, 507 U.S. 463, 474 (1993); *Stringer v. Black*, 503 U.S. 222, 233

9    (1992). A properly applied narrowing device therefore provides not only a principled

10   way to distinguish the capital homicide from the many noncapital homicides, but also

11   "differentiate[s] this [death penalty] case in an objective, evenhanded, and

12   substantively rational way from the many . . . murder cases in which the death penalty

13   may not be imposed." *Stephens*, 462 U.S. at 879.

14        113.   "Genuine narrowing" serves its Eighth Amendment purpose by reducing

15   the opportunities for the "freakish" and "wanton" imposition of the death penalty in

16   two ways. First, narrowing limits the class of murderers for whom the death sentence

17   can be considered.  By restricting eligibility, it assures that the death penalty cannot

18   be imposed indiscriminately. *See, e.g., Walton v. Arizona*, 497 U.S. 639, 715 (1990),

19   (overturned on separate grounds) (Stevens, J., dissenting) ("The risk of arbitrariness

20   condemned in *Furman* is a function of the size of the class of convicted persons or

21   eligible for the death penalty.").

22        114.   Second, "narrowing" limits the death penalty to those murderers whose

23   culpability makes the death penalty particularly appropriate, insuring rationality by

24   avoiding purely arbitrary sentencing.  Not all murderers may be sentenced to death,

25   and those who receive the death penalty must be rationally distinguishable from those

26   who do not on grounds that reflect their respective degrees of culpability. Qualitative

27   narrowing and not simply numerical narrowing is required. A state must not only

28   genuinely narrow the class of death-eligible defendants, but must do so in a way that

1  reasonably justifies the imposition of a more severe sentence on the defendants

2  compared to others found guilty of murder.

3       115. "Genuine narrowing" precludes the undifferentiated infliction of the

4  death sentence upon all murders. *Woodson v. North Carolina*, 428 U.S. 280, 304

5  (1976). It restricts the death penalty in a manner that assures proportionality by

6  requiring that only the most severe offenses, or the most deserving offenders, be

7  considered for the most severe punishment. For, it would be the height of

8  arbitrariness if less morally culpable murderers were always subject to the death

9  penalty while more morally culpable murderers were systematically spared.

10       116. "Genuine narrowing" thus promotes the "rational and equitable

11  administration of the death penalty" because it insures that the death penalty can be

12  considered for only those offenders who demonstrate the most culpability or who

13  cause the most harm. *Boyde v. California*, 494 U.S. 370, 377 (1990) (quoting

14  *Franklin v. Lynaugh*, 487 U.S. 164, 181 (1988)). By insisting that the states draw

15  meaningful, rational distinctions between those persons who receive the death penalty

16  and those who do not, the Eighth Amendment narrowing requirement stands at the

17  heart of an "evenhanded, rational, and consistent imposition of death sentences under

18  law." *Jurek v. Texas*, 428 U.S. 262, 276 (1976).

19         **B.**  **Arizona's construction of "especially heinous, cruel**
          **or depraved" is overbroad and vague.**

20

21       117. Because its statutory construction is so broad, "especially heinous, cruel

22  or depraved" is the single most common aggravating factor found in Arizona. *See*

23  Capital Commission Final Report, Office of the Attorney General for the State of

24  Arizona (2003), *available at* http://www.ag.state.az.us/CCC/FinalReport.html, p. 12,

25  (last visited Sept. 7, 2004). In addition, because of the evolution of this factor in the

26  courts, any number of facts or possibilities can be manipulated to support this finding.

27  The result is an aggravating factor that can encompass every first degree murder

28  imaginable. This is direct tension with *State v. Gretzler*, where the court held that in

1    determining whether murder is cruel, heinous, or depraved, the facts of the case must
2    set it apart from the norm of first degree murders. 135 Ariz. 42, 53, 659 P.2d 1, 12
3    (1983).

4        118.   The individual elements of this factor are overly broad because they are
5    merely descriptive adjectives that a sentencer could conceivably impose on the facts
6    of every murder. *See, e.g., Godfrey*, 446 U.S. at 428 (there is nothing in the words
7    "outrageously or wantonly vile, horrible and inhuman" that implies any restraint on
8    the arbitrary infliction of the death penalty); *Maynard v. Cartwright*, 486 U.S. 356,
9    363-64 (1988) ("especially heinous, atrocious, or cruel" provides no more guidance
10   than the language employed in *Godfrey*). Despite the narrowing construction adopted
11   in *Gretzler*, the elements operate together as a catch-all provision and are conceivably
12   applicable to the facts of any first-degree murder case.

13       119.   A review of Arizona Supreme Court decisions on "especially heinous,
14   cruel or depraved" illustrates that the Court has not provided sentencing judges with
15   a consistent or rational narrowing construction of this factor. Any murder that has no
16   apparent motive, *State v. Wallace*, 151 Ariz. 362, 368, 728 P.2d 232, 238 (1986) or
17   that is motivated by a desire to eliminate a witness, *State v. Smith*, 141 Ariz. 510, 512,
18   687 P.2d 1265, 1267 (1984), or that is motivated by hatred or revenge (and is
19   therefore "relished") *State v. Comer*, 165 Ariz. 413, 429, 799 P.2d 333, 349 (1990);
20   can be considered "especially heinous" or "especially depraved." Further, any murder
21   in which the killer uses excessive force, *State v. Summerlin*, 138 Ariz. 426, 436, 675
22   P.2d 686, 696 (1983), or in which insufficient force is used, *State v. Chaney*, 141
23   Ariz. 295, 302, 686 P.2d 1265, 1272 (1984), can be considered "especially heinous"
24   or "especially depraved." For example, if a rape occurred during the murder and the
25   victim was alive during the rape, it would qualify as cruel, *State v. Amaya-Ruiz*, 166
26   Ariz. 152, 177, 800 P.2d 1260, 1285 (1990), if the victim was dead, it would qualify
27   as heinous or depraved. *State v. Brewer*, 170 Ariz. 486, 826 P.2d 783 (1992).

28       120.   Heinous and depravity has been held to focus on the motivations of the

Page 46 of 83

1   defendant and his state of mind at the time of the offense. *See Gretzler*, 135 Ariz. at
2   51-52, 659 P.2d at 1011. However, the actual application of this factor is all over the
3   board, offering no coherent guidance as to exactly what qualifies the defendant's
4   actions as "heinous or depraved." *Compare State v. Graham*, 135 Ariz. 209, 213, 660
5   P.2d 460, 463 (1983) (reversed even though defendant "smiled" as he told friends that
6   "the victim 'squealed like a rabbit' when he was shot"), *and State v. Madsen*, 125
7   Ariz. 346, 352-58, 609 P.2d 1046, 1052-53 (1980) (reversed even though defendant
8   bragged it was "easy to get money, you just blow someone away" and collect
9   insurance money) *with State v. Martinez-Villareal*, 145 Ariz. 441, 444, 451, 702 P.2d
10  670, 673, 680 (1985) (depravity affirmed because defendant bragged to a friend that
11  he "killed 'because of his pure balls, that he was very macho'") *and State v. Clark*,
12  616 P.2d 888, 897, 126 Ariz. 428, 437 (1980) (depravity affirmed where defendant
13  told friend, "You should have seen Charley when I hit him with those cutters.");
14  *compare State v. Fisher*, 141 Ariz. 227, 252, 686 P.2d 750, 775 (1984) (heinousness
15  and depravity upheld because defendant hit victim three times in the head with a
16  hammer, any one of which blows would have been have been fatal and, therefore, was
17  "more than was necessary to rob and even kill" victim, plus victim had shown
18  defendant and his wife "generosity and concern"), *with State v. Johnson*, 147 Ariz.
19  395, 410, 710 P.2d 1050, 1056 (1985) (reversed on heinous and depraved even
20  though murder was senseless and victim had allowed defendant to stay with him for
21  two weeks; other victim, who survived, was a childhood friend of the defendant, who
22  shot her after she tried to escape, realizing her fiancè had already been shot by
23  defendant); *compare State v. Brookover*, 124 Ariz. 38, 39, 601 P.2d 1322, 1323
24  (1979) (not cruel or depraved where victim shot in the back, "fell to the floor
25  moaning and asked the defendant what he had done. The defendant said, 'Don't
26  worry *** it will be over soon' and shot him once more in the back." Defendant and
27  accomplice abandoned body in victim's car at the airport), *with, State v. Bracy*, 145
28  Ariz. 520, 538, 703 P.2d 464, 482 (1985) (heinousness and depravity affirmed where

1    first victim shot twice and throat slashed and killing of second victim is senseless

2    where it "in no way furthered the plan of the killers"); *compare State v. Watson*, 120

3    Ariz. 441, 448, 586 P.2d 1253, 1260 (1978) (not heinous, cruel or depraved even

4    where victim shot four times in the back, the last time when face down on the floor),

5    *with State v. Ceja*, 126 Ariz. 35, 37, 40, 612 P.2d 491, 493, 496 (1980) (cruelty

6    reversed, but heinousness and depravity affirmed where one victim shot twice, then

7    shot in the head four more times, "for no apparent reason" and other victim shot four

8    times "two of the four shots were fired at extreme (sic) close range").

9        121.  Arizona courts have also determined that "especially heinous" or

10   "especially depraved" is applicable when the murder is "senseless." *See Bracy,* 145

11   Ariz. at 538 703 P.2d at 482. The trial judge in this case found that the killings were

12   "heinous and depraved" because they were "senseless."[204] However, this supposedly

13   narrowing interpretation is unconstitutional on its face. Arguably, every first degree

14   murder, whether premeditated or felony murder, is "senseless," in the sense that the

15   killing is unnecessary. If there were any legal justification for killing, the state would

16   prosecute it as a lesser homicide (*e.g.*, manslaughter arising from sudden heat of

17   passion) or would not charge a crime at all.   Arizona homicide laws already

18   distinguish between "senseless" and other killings.

19       122.  First degree murder is committed by either killing with premeditation or

20   causing a death in the course and furtherance of a felony. *See* Ariz. Rev. Stat. § 13-

21   1105. Arguably, in every felony murder case, the predicate felony could have been

22   committed without killing the victim.   In this way, every felony murder is

23   automatically a death eligible case because it is senseless. It is almost impossible to

24   imagine a premeditated murder that is *not* senseless. There is never any need to kill

25   another human being, and in cases where there is a legally justified reason to kill,

26   there either has been no crime at all, or a lesser degree of homicide has been

27

28   [204]TR 12/18/90 at 8.

Page 48 of 83

1 | committed.

2 |     123.  As evidenced above, the standard for "cruelty" is similarly broad.  To
3 | establish the murder is "especially cruel," the defendant must either intend to cause
4 | the victim pain and anguish, or reasonably foresee a substantial likelihood that the
5 | victim will suffer. *State v. Van Adams*, 194 Ariz. 408, 421, 984 P.2d 16, 29 (1999);
6 | *State v. Adamson*, 136 Ariz. 250, 267, 655 P.2d 972, 989 (1983).  The application of
7 | the "especially cruel" circumstance "has been expanded to cover any murder wherein
8 | the victim experiences fear or uncertainty as to his fate" or suffers some period of
9 | consciousness of his wounds before death.  *Walton,* 497 U.S. at 698-99 (Blackmun,
10 | J., dissenting).  An examination of the precedent on this factor illustrates that there
11 | is no rhyme nor reason to its application in Arizona.  *Compare State v. Smith* 146
12 | Ariz. 491, 504, 707 P.2d 289, 302 (1985) (not cruel even though the victim was shot
13 | in the head and did not die for two weeks), *with Chaney*, 141 Ariz. at 312, 686 P.2d
14 | at 1282 (cruel because the victim suffered mental anguish prior to being shot as
15 | evidenced by his call for help and because victim "was conscious for approximately
16 | thirty minutes"); *compare State v. Lujan*, 124 Ariz. 365, 373, 604 P.2d 629, 637
17 | (1979) (reversed even though victim was stabbed after falling to the ground after
18 | being punched where he lay helpless, and killing was unnecessary to accomplish
19 | defendants' plan of burglary), *with State v. Correll*, 148 Ariz. 468, 481, 715 P.2d 721,
20 | 734 (1986) (cruelty and depravity affirmed because victim was helpless, killing was
21 | unnecessary to accomplish the robbery, victims bound and gagged); *compare State*
22 | *v. Hyde*, 186 Ariz. 252, 28-81, 921 P.2d 655, 683-84 (1996) (heinous and depraved
23 | if beat victims after they had already died), *with State v. Richmond*, 886 P.2d 1329,
24 | 1335 (1994) (not heinous and depraved even though defendant ran over an
25 | unconscious victim with his car), *abrogated on other grounds by State v. Mata*, 185
26 | Ariz. 319, 916 P.2d 1035 (1996).

27 |     124.  The Arizona Supreme Court has stated that "cruelty" can be established
28 | if the victim was conscious for as little as eighteen seconds before his death, *State v.*

1  *Herrera*, 176 Ariz. 21, 34, 859 P.2d 131, 144 (1993), or even if the victim was
2  "probably . . . conscious for a minute or two." *State v. Schackart*, 190 Ariz. 238, 248,
3  947 P.2d 315, 325 (1997).  Because a victim need only be fearful for eighteen
4  seconds, the Arizona Supreme Court has expanded the application of the "cruelty"
5  factor "to cover any murder in which the victim is shown to have experienced fear or
6  uncertainty as to his ultimate fate."  *Walton*, 497 U.S. at 698 (Blackmun, J.,
7  dissenting).  Such broadly applicable aggravating factors are unconstitutional.  By
8  way of example, the Supreme Court has stated that an interpretation of an aggravating
9  factor "to include all murders resulting in gruesome scenes would be totally
10  irrational." *Godfrey*, 446 U.S. at 433 n.16.

11      125.  In addition, Arizona recognizes that "[f]irst degree murder is by its
12  nature willful, cruel and repugnant."  *Gretzler*, 135 Ariz. at 52, 659 P.2d at 11
13  (quoting *State v. Brookover,* 124 Ariz. 38, 601 P.2d 1322 (1979)). While cruelty is
14  recognized as an inherent aspect of first-degree murder, Arizona also allows the
15  cruelty element to establish the death qualifying (F)(6) aggravator. Therefore, cruelty
16  is already established by virtue of the crime involving first-degree murder.

17      126.  On the other end of the spectrum, murders which appear to meet the
18  "especially heinous, cruel or depraved" criteria are often inexplicably excluded from
19  imposition of the death penalty, thereby making the application of the (F)(6) factor
20  even more mysterious. *See State v. Arias*, 131 Ariz. 441, 641 P.2d 1285 (1982) (an
21  81-year-old woman burglary victim bound, gagged, and strangled; death penalty not
22  imposed); *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981) (victim was
23  strangled, sustained two severe blows to the head, had lacerations over entire body
24  and a ligature of twine tied around her neck; death penalty not imposed); *State v.*
25  *Cookus*, 115 Ariz. 99, 563 P.2d 898 (1977) (victim lured into the desert and beaten,
26  defendant's gun misfired six times before he switched guns and shot the victim; death
27  penalty not imposed); *State v. Billhymer*, 114 Ariz. 390, 561 P.2d 311 (1977) (nude,
28  bound victims had been stabbed repeatedly; death penalty not imposed); *State v.*

1    *Encinas*, 132 Ariz. 493, 647 P.2d 624 (1982) (victim beaten for 10-15 minutes, then
2    run over with car while accomplices held him down, the victim was then stabbed 30-
3    40 times in the head and chest with a screwdriver; death penalty not imposed).

4         127.   Arizona's application of (F)(6) fails to genuinely narrow the class of
5    persons subject to the death penalty.  Through its virtually limitless extension of
6    (F)(6), Arizona violates the constitutional requirement that the death penalty be
7    reserved for limited circumstances where there is an elevated justification for
8    sentencing some defendants to death as opposed to life in prison. *Stephens,* 462 U.S.
9    at 877.   The components of (F)(6) overlap in a manner that renders the phrase
10   "especially cruel, heinous or depraved" overly broad as applied to all first degree
11   murder cases.  Used collectively or individually, the words create a catchall that fails
12   to adequately narrow and provide discretion.   This is in direct contradiction to the
13   proposition that the death penalty is reserved for murders which are above the norm.
14   A principled basis does not exist when a "sentencer fairly could conclude that an
15   aggravating circumstance applies to every defendant. . . ." *Arave,* 507 U.S. at 474.

16        128.   The "especially heinous, cruel or depraved" aggravating factor has been
17   challenged numerous times on the grounds that it is vague and overbroad.  In *Walton*
18   *v. Arizona,* 497 U.S. 639 (1990), the Supreme Court found that the terminology of
19   "especially cruel, heinous or depraved" is unconstitutionally vague on its fact. *Id.* at
20   654.  However, the aggravator was saved because the Arizona Supreme Court had
21   adopted a constitutionally sufficient narrowing construction, specifically defining
22   each element individually. *Id* at 655.  The court pointed out the fact that a judge
23   made the determination of cruel, heinous and depraved was "crucial" to their decision
24   to uphold the aggravating circumstance. *Id.* at 653.  The court stated that trial judges
25   are presumed to know and follow the narrowed construction and it is "irrelevant" that
26   the statute itself does not narrow the definition. *Id.* However, when a jury is the fact-
27   finder, more explicit instructions beyond the vague definition of the statute are
28   required. *Id.*

1    129.  *Walton* was overruled by *Ring v. Arizona,* 536 U.S. 584 (2002), and now
2    jurors in Arizona must find the aggravating factors. The Supreme Court of the United
3    States held that "[c]apital defendants, no less than non-capital defendants . . . are
4    entitled to a jury determination of any fact on which the legislature conditions an
5    increase in their maximum punishment." *Id.* at 589.  The *Ring* Court upheld its
6    decision based on fundamental constitutional principles: "'[u]nder the Due Process
7    Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth
8    Amendment, any fact (other than prior conviction) that increases the maximum
9    penalty for a crime must be charged in an indictment, submitted to a jury, and proven
10   beyond a reasonable doubt." *Id.* (citation omitted).

11   130.  *Ring* made clear that a jury must make the findings of aggravating factors
12   in order to comport with the United States Constitution. *Walton,* however, upheld 13-
13   703(F)(6) as an aggravator because the judge, not the jury made the finding.
14   Although the language regarding "cruel, heinous or depraved" statutory aggravator
15   is nebulous, the *Walton* court presumed that the standards set by the Arizona Supreme
16   Court sufficiently cured this infirmity.  No court has determined whether, under *Ring,*
17   this reasoning is still valid.  The Ninth Circuit however, expressed serious doubts as
18   to whether courts could continue to apply narrowing instructions to ameliorate
19   unconstitutionally vague statutes. The court noted that "it appears to us inescapabale"
20   that this aspect of *Walton* could not stand under the rationale of *Ring.*  *Valerio v.*
21   *Crawford,* 306 F.3d 742, 756 n. 6 (9th Cir. 2002).  In *Valerio,* the Ninth Circuit has
22   held that the *Walton* procedure of  employing a narrowing construction to cure a
23   vague aggravator is not available when a jury rather than a judge is making the
24   sentencing determination.  *Id,* at 747.  The Supreme Court has "never applied, or
25   approved, a *Walton* analysis where the factfinder was a jury."  *Id.* at 757.  The
26   Supreme Court clearly stated in *Walton* that its analysis did not apply in jury cases.
27   *Id.* at 758.  Therefore, it seems highly unlikely that the unconstitutional method that
28   has preserved "cruel, heinous, or depraved" as a constitutionally statutory aggravator

Page 52 of  83

1    will survive scrutiny after *Ring.*

2       131.   A statute that is unconstitutionally vague cannot be saved by a method
3    of decision making, capital judge sentencing, that has also been ruled
4    unconstitutional.  The broad and vague standards of "especially heinous, cruel and
5    depraved", as interpreted by the Arizona Supreme Court, failed to sufficiently channel
6    the fact-finder's discretion on when to impose the death penalty.  "[A]n ordinary
7    person could honestly believe that every unjustified, intentional taking of human life
8    is 'especially heinous.'" *Maynard v. Cartwright,* 486 U.S. 356, 364 (1988) (quoting
9    *Godfrey v. Georgia,* 446 U.S. 420, 428-29 (1980)).

10      132.   The presumption that the fact-finder knows the definition of especially
11   cruel, heinous and depraved cannot serve to protect the vague and overly broad
12   wording of the statutory aggravator.  A standardless capital punishment statute causes
13   imposition of the death penalty in an arbitrary and capricious manner and violates the
14   Eighth Amendment.  *Furman* 408 U.S. at 310.  *Ring* not only overrules a judge's
15   finding of aggravating factors, but also overrules *Walton*'s misplaced acceptance of
16   (F)(6) as constitutional.

17      133.   Due to the arbitrary and capricious manner in which this aggravating
18   factor is applied, the finding of this factor in this case violated Mr. Ramirez's
19   constitutional rights.

20      **C.   The trial court's finding of the § 13-703 (F)(6)**
        **aggravating factor is unconstitutional as applied to this**
21      **case.**

22      134.   Even if (F)(6) is not unconstitutionally vague and overbroad on its face,
23   the aggravating circumstance is unconstitutional as applied to this case.  The judge
24   found that the crime was both "cruel" and "heinous and depraved."[205]  The Arizona
25   Supreme Court has attempted to narrow the definitions of conduct that satisfies each
26   of the (F)(6) factors, and each narrowed definition requires specific actions by the

27   _____

28      [205]TR 12/18/90 at 6-9.

1   perpetrator of the crime in question. *Gretzler*, 135 Ariz. at 52-53, 659 P.2d at 11-12.
2   Unless this aggravating factor is so narrowed, its application violates the Eighth and
3   Fourteenth Amendments because it fails to sufficiently channel the sentencer's
4   discretion. In addition, the trial court is required to find this factor beyond a
5   reasonable doubt. *State v. Kayer*, 194 Ariz. 423, 433, 984 P.2d 31, 41 (1999). These
6   standards were not satisfied in David Ramirez's case.

7       135.   Cruelty has specifically been defined to involve the infliction of pain on
8   the victims. *Id.* In order to find cruelty as an aggravating circumstance, the state must
9   prove beyond a reasonable doubt that the victim consciously suffered physical pain
10  or mental distress. *See State v. Deitrich*, 188 Ariz. 57, 67, 932 P.2d 1328, 1338
11  (1997).  Where there is no evidence that the victim actually suffered physical or
12  mental pain prior to death, or where the evidence presented is inconclusive, cruelty
13  is not established. *See, e.g., State v. Ortiz*, 131 Ariz. 195, 210, 639 P.2d 1020, 1035
14  (1982); *State v. Bishop*, 127 Ariz. 531, 534, 622 P.2d 478, 481 (1981); *State v. Clark*,
15  126 Ariz. 428, 436, 616 P.2d 888, 896 (1980); *State v. Ceja*, 126 Ariz. 35, 39, 612
16  P.2d 491, 495 (1980).  Additionally, "where shots, stabbings, or blows are inflicted
17  in a quick succession, one of them leading to unconsciousness," cruelty has not been
18  established. *State v. Soto-Fong,* 187 Ariz. 186, 204, 928 P.2d 610, 628 (1996).

19      136.   In *Oritz*, the defendant attacked a woman and her children while in their
20  home. Ortiz stabbed the defenseless woman several times in the neck and chest areas.
21  He then attacked the victim's young daughters, stabbing them with the same knife he
22  stabbed their mother with. Ortiz next poured gasoline on the body of the mother and
23  throughout the home and lit the house on fire with the children still inside. While the
24  children escaped, the mother died during the attack.  In its Special Verdict, the trial
25  court found that the murder of the mother was committed in an especially heinous,
26  cruel and depraved manner. *Ortiz*, 131 Ariz. at 210, 639 P. 2d at 1035. The Arizona
27  Supreme Court upheld the trial court's finding that the murder was especially heinous
28  and depraved, but reversed the trial court's finding that the murder was especially

1   cruel. Specifically, the court held that "the state did not prove beyond a reasonable
2   doubt that the victim suffered during commission of the murder." *Id.*

3       137.  Similarly, in *State v. Hinchey*, 165 Ariz. 432, 799 P. 2d 352 (1990), the
4   Arizona Court of Appeals reversed the trial court's reliance on the cruelty element of
5   the especially heinous, cruel and depraved aggravator. In *Hinchey*, the defendant got
6   into an argument with a woman he had lived with for twelve years. After she went
7   downstairs to sleep, defendant followed her and shot her four times with pistol he
8   purchased the day before. The defendant then kicked in the locked bedroom door of
9   the woman's seventeen-year-old daughter and her infant son. The daughter was
10  asleep but awoke when the door was kicked in. After breaking in, defendant shot the
11  daughter twice in the face. In the meantime, the mother managed to run outside.
12  Defendant chased the mother outside and beat her with the pistol until it broke. He
13  then hit her head several times against some nearby rocks.

14      138.  Hinchey left the broken gun lying beside the mother and returned to
15  daughter's bedroom and heard her moaning. He grabbed a water bottle and beat her
16  over the head until the bottle shattered. The daughter however, continued to moan.
17  Hinchey went to the kitchen, got a knife and returned to the daughter's room where
18  he stabbed her several times, leaving the knife in her abdomen. Ultimately, the
19  daughter died, her infant son was unharmed, and the mother lived. *Hinchey*, 165
20  Ariz. at 433, 799 P. 2d at 353. The trial court based the finding of cruelty on the
21  following facts: that the victim and her infant child were asleep when the defendant
22  broke in, that defendant used three separate instruments to commit the murder and
23  that the victim moaned several times. *Id.* at 438, 799 P. 2d at 358. In vacating the
24  cruelty finding, the Arizona Court of Appeals noted although the defendant's actions
25  were reprehensible, it could not agree with the trial court that the evidence supported
26  a finding that the crime was committed in an especially cruel manner as the term has
27  been defined. *Id.* Relying on *Gretzler*, the court stated a finding of this factor
28  "depend[s] on the state presenting evidence establishing beyond a reasonable doubt

Page 55 of 83

1    that the victim actually suffered physical or mental pain prior to death." *Id.*

2    139.   In *Hinchey*, the medical examiner explained that the gunshot wound

3    could have rendered the victim unconscious, thereby making the evidence

4    inconclusive as to whether the victim <u>actually</u> suffered pain during the crime. *Id.*

5    Despite the continuous moaning of the victim throughout the ordeal, the State failed

6    in its burden to establish cruelty as articulated in *Gretzler*. "Although defendant's acts

7    no doubt satisfy the everyday meaning of the term "cruel," the evidence is insufficient

8    to satisfy the State's burden of proving beyond a reasonable doubt that the

9    defendant's acts meet the statutory definition of "especially cruel" in the context of

10   first-degree murder cases." *Id.*

11   140.   The evidence of the victim's pain and suffering in David Ramirez's case

12   is equally lacking.   The trial court based its finding of "especially cruel" on its

13   conclusion that the victims were conscious during the attack.[206]   The trial court

14   asserted that he relied on the testimony of Dr. Bolduc, the state pathologist, to support

15   this finding.[207]   However,  Dr. Bolduc's testimony was inconclusive at best, and

16   insufficient to support a finding of cruelty. *State v. Medrano*, 173 Ariz. 393, 397, 844

17   P.2d 560, 564 (1992) (if "evidence of consciousness is inconclusive, a finding of

18   cruelty cannot be supported.").

19   141.   Dr. Bolduc testified that the cause of death for both victims was fatal

20   stab wounds to the neck.[208] There is no way Dr. Bolduc could tell in what order the

21   wounds were inflicted, and thus, it was possible that the fatal wounds were inflicted

22   first, after consciousness had already been lost.[209] There was no way to tell, to a

23   reasonable degree of medical certainty, how long the victims survived after receiving

24

25   [206]TR 12/18/90 at 6.

26   [207]TR 12/18/90 at 6.

27   [208]TR 10/19/90 at 12, 24.

28   [209]TR 10/19/90 at 16, 21.

Page 56 of 83

1    their fatal wounds and whether they experienced pain before their deaths.[210]  Further,

2    Dr. Bolduc could not say how long it took to inflict the wounds upon the victims.[211]

3        142.   The trial court also found that the murder was committed in an

4    "especially heinous and depraved manner."[212]  In support of this proposition, and in

5    order to satisfy a finding of the statutory aggravator  beyond a reasonable doubt, the

6    court cites to nothing in the record that does not require extensive extrapolation

7    and/or pure unsubstantiated speculation.

8        143.   The Arizona Supreme Court recognized that "the terms 'heinous' and

9    'depraved' focus on the *killer's* state of mind and attitude at the time of the offense."

10   *State v. Robinson*, 165 Ariz. 51, 60, 796 P.2d 853, 862 (1990).  The Supreme Court

11   interpreted these terms to mean "the perpetrator relishes the murder, evidencing

12   debasement or perversion or shows an indifference to the suffering of the victim and

13   evidences a sense of pleasure in the killing."  *Walton*, 497 U.S. at 649 (internal

14   citations omitted).

15       144.   There was simply no evidence presented which established that David

16   Ramirez relished or took pleasure in these killings.  There was no evidence presented

17   from which it could be deduced what was the cause or impetus for the crime.  In fact,

18   the only evidence presented on David Ramirez's state of mind at the time of the

19   killings lead the trial judge to find that his capacity to appreciate the wrongfulness of

20   his conduct or conform his conduct to the law was significantly impaired, a statutory

21   mitigating circumstance.[213]  However, the trial judge used the state's lack of evidence

22   on motive to jump to the conclusion that this same lack of evidence established that

23

24   _____

25   [210]TR 10/19/90 at 16, 18.

26   [211]TR 10/19/90 at 22.

27   [212]TR 12/18/90 at 8.

28   [213]TR 12/18/90 at 10.

                          Page 57 of  83

1    the crime was unprovoked and senseless.[214]   To attempt to parse the underlying

2    rationale for the crimes is unsubstantiated guess work at best.

3           145.   The sentencing judge also based his finding of "heinous and depraved"

4    on the fact that the victims were smaller than David Ramirez, and thus, he was able

5    to overpower the victims.[215]   However, the testimony established that Ramirez was

6    about the same size as the victims.[216]

7           146.   In finding this crime "especially heinous, cruel, or depraved", the trial

8    and appellate courts fell prey to a subjective determination based less on certitude,

9    and more on a speculative piecing together of the events of the crime.

10          147.   The trial court in this case strayed from the constitutionally narrow

11   construction of the aggravating circumstance defined by (F)(6). The finding that was

12   made does not satisfy the level of individual conduct required by the statute. Thus,

13   the trial court erred in finding this fact beyond a reasonable doubt. Because of the

14   pattern of arbitrariness in finding this factor, without adherence to statutory

15   requirements, and because the trial court found this factor without sufficient evidence

16   David Ramirez was unconstitutionally sentenced to death.

17                            **Ninth claim for relief.**

18          **The imposition of the death penalty on persons who**
19          **have not been found guilty of intentional murder**
     **violates due process of law and results in cruel and**
20          **unusual punishment.**

21          148.   The merits of this claim are before this Court pursuant to its Order dated

22   July 6, 2004.[217] The state court's rejection of this claim was contrary to, or involved

     an unreasonable application of, clearly established federal law, as determined by the
23

24   _____

25          [214]TR 10/19/90 at 8.

26          [215]TR 10/19/90 at 8-9.

27          [216]TR 7/12/90 at 63; TR 12/18/90 at 8-9; TR 7/23/90 at 19.

28          [217]Dist. Ct. Doc. No. 83.

                            Page 58 of 83

1    United States Supreme Court. The state court's rejection of this claim was also based
2    on an unreasonable determination of the facts in light of the evidence presented in the
3    state court proceedings.

4         149.   Mr. Ramirez alleges that he was not found guilty of intentional murder
5    and under this circumstance, imposition of the death penalty is unconstitutional. Mr.
6    Ramirez was found guilty of "knowing" murder, but not "intentional" murder. In this
7    case, the state did not argue that Mr. Ramirez intentionally murdered the victims;
8    rather, the state relied solely upon the "knowing" language of Ariz. Rev. Stat. §13-
9    1105.[218] Both counts one and two charged that Mr. Ramirez ". . . knowing that his
10   conduct would cause death . . .," caused the death of both the victims.[219]

11        150.   This was a strategic choice on the state's part, as it was attempting to
12   preclude Mr. Ramirez from presenting extensive evidence regarding excessive drug
13   and alcohol abuse prior to and during the commission of the crime, which makes a
14   finding of "intentional" murder all the more difficult.

15        151.   One of the most basic tenets of criminal law is that the more intentional
16   the act, the more culpable the defendant and, therefore, the harsher the punishment
17   should be. *See Enmund v. Florida*, 458 U.S. 782, 798, )quoting H. Hart, *Punishment*
18   *and Responsibility* 162 (1968)("It is fundamental that 'causing harm intentionally
19   must be punished more severely than causing the same harm unintentionally.'")).
20   Further, statutes which distinguish premeditated murder from other types of homicide

21               reflect a belief that one who meditates an intent to kill and
22               then deliberately executes it is more dangerous, more
                 culpable or less capable of reformation than one who kills
23               on sudden impulse; or that the prospect of the death
                 penalty is more likely to deter men from deliberate than
24               from impulsive murder. The deliberate killer is guilty of
                 first degree murder; the impulsive killer is not.

25

26       [218]Ariz. Rev. Stat. §13-1105 (a person commits first degree murder if
27   intending or knowing that his conduct will cause death, such person causes the death
     of another with premeditation).

28       [219]TR 7/10/90 at 18-19; TR 7/11/90 at 87.

                              Page 59 of 83

1    *Bullock v. United States*, 122 F.2d 213, 214 (D.C. Cir. 1941). There was no question

2    that this was an impulsive crime; the trial judge found that David Ramirez's capacity

3    to appreciate that wrongfulness of his conduct, or conform it to the law, was

4    significantly impaired.[220]  Accordingly, Mr. Ramirez's death sentence, based upon

5    "knowing" rather than "intentional" murder, entitles him to habeas relief.

6                              **Twelfth claim for relief.**

7                **The trial court denied Mr. Ramirez due process of law**
                 **when it rejected his request for funds to hire a**
8                **mitigation specialist and other experts to assist in**
                 **preparing his defense in violation of his rights under**
9                **the Fifth, Sixth, Eighth, and Fourteenth Amendments.**

10       152.   The merits of this claim are before this Court pursuant to its Order dated

11   July 6, 2004.[221]  The state court's rejection of this claim was contrary to, or involved

12   an unreasonable application of, clearly established federal law, as determined by the

13   United States Supreme Court. The state court's rejection of this claim was also based

14   on an unreasonable determination of the facts in light of the evidence presented in the

15   state court proceedings.

16       153.   "[A] criminal trial is fundamentally unfair if the State proceeds against

17   an indigent defendant without making certain that he has access to the raw materials

18   integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77

19   (1985).

20       154.   Mr. Ramirez's twelfth claim concerns the Maricopa County Superior

21   Court's unreasonable denial of his due process right to the appointment of certain

22   experts to assist in the preparation of his defense. This denial stems from the state

23   court's misunderstanding of the importance of these experts in preparing to defend

24   a capital case.

25

26

27       [220]TR 12/18/90 at 10.

28       [221]Dist. Ct. Doc. No. 83.

### A. Facts underlying the claim.

155.   Early on in the case, defense counsel filed a motion asking for funds for the appointment of a psychiatrist, a child psychologist, a mitigation expert, a jury consultant, and a serologist.[222]   When the matter was first addressed, the judge thought that appointing one investigator for Mr. Ramirez was enough and he summarily denied the request for any expert assistance at all.[223]  Defense counsel then requested a hearing.[224]   The trial court initially refused, insisting that because Mr. Ramirez had announced his decision that very day to represent himself, "Mr. Ramirez is arguing his own motion," even though defense counsel had written it and Mr. Ramirez was under the impression that defense counsel would be arguing it for him.[225]

156.   When defense counsel then attempted to argue *Ake*, the trial judge stated: "Well, I have a statute I prefer to follow in this case."[226]  Defense counsel then cites Arizona Supreme Court case law on the appointment of experts in capital cases and attempts to explain the holding, but she is interrupted by the judge, who wishes to delay the matter.[227]  Defense counsel asks for a hearing date on the motion for experts and the trial judge states, "I'm not going to spend a whole lot of time."[228]  He then sets the motion for a hearing: "Further ordered setting hearing on all pending motions for blank on blank.  We'll set them down and rule on them in five minutes and get them

---

[222]Td. 38, 39.

[223]TR 10/6/89 at 9.

[224]TR 10/6/89 at 9.

[225]TR 10/6/89 at 9, 11-12.

[226]TR 10/6/89 at 10.

[227]TR 10/6/89 at 12.

[228]TR 10/6/89 at 13.

Page 61 of 83

1    over with."[229]

2    157.    At a subsequent motions hearing, the trial judge took up the subject of

3    experts again, and remarks, "You have already had an investigator appointed.  That's

4    all you're entitled to, as a matter of right."[230]  The judge then compares the resources

5    defense counsel requests to pre-*Gideon* days: "I remember the days when the

6    defendant didn't even have attorneys. . . . How far does this thing go?"[231]  The trial

7    judge remained unimpressed at a capital defendant's need to present a case in

8    mitigation. "Most judges know long before [they impose a sentence] if they're going

9    to impose the death sentence.   At least, I think they do, or at least, they have

10    inclinations along those happenings."[232]  When asked to elaborate on this position,

11    the judge then explains that he does not think that judges "pay much heed" to

12    mitigating circumstances, which would explain his disdain for mitigation specialists

13    and other supporting experts.[233]

14    158.    At the hearing to determine whether Mr. Ramirez would have access to

15    some of his requested expert witnesses, the judge balked at the suggestion that the

16    government should pay for a mitigation specialist.  "What's a mitigation expert?  I

17    have never heard of that in a quarter century."[234]  The defense investigator then began

18    to explain that they had already spoken to someone who could serve as a mitigation

19    expert, a social worker, and that developing mitigation evidence is a lengthy

20

21

22    _____

23    [229]TR 10/6/89 at 14.

24    [230]TR 11/7/89 at 11.

25    [231]TR 11/7/89 at 30.

26    [232]TR 11/7/89 at 18-19.

27    [233]TR 11/7/89 at 19.

28    [234]TR 12/12/89 at 10.

1  process.[235]  Before the defense could finish explaining why they needed a mitigation

2  specialist on the team, the judge cut her off, stating: "this case has brought up a whole

3  bunch of things that I have never heard of, and I have had a lot of murder cases in my

4  day.  And these are all novel matters that are being called to the attention of the Court

5  that I have never read about nor experienced."[236]

6       159.  The investigator again attempted to explain the importance of a

7  mitigation specialist.  The judge then explains what *he* thinks mitigation is,

8  illustrating that his concept was out of step with basic standards of capital practice:

9        I always thought mitigating testimony was a matter of not
          so much some psychiatrist – of course, I have seen that, but
10       people come in and say that a guy has a job, he graduated
          from Yale, he did this and did whatever, and we never had
11       these things.  Maybe the dimensions of murder cases have
          changed a lot in the past few years, I don't know.  I'm not
12       familiar with that stuff.[237]

13  Defense counsel then points out that in the two seminars she has attended in the last

14  few months that dealt with capital work, the main emphasis was on how essential it

15  was to have a mitigation expert on the team.[238]  The judge thinks this has no relevance

16  because Mr. Ramirez is representing himself and that a mitigation expert would just

17  be doing "what a lawyer does."[239]  Defense counsel pointed out that a lawyer is

18  simply not trained to do the work of a mitigation expert.[240]

19       160.  The judge then equates the need for a hearing to determine competency

20  to stand trial with the threshold showing required to determine need for mitigation

21  resources:

22  _____

23  [235]TR 12/12/89 at 10.

24  [236]TR 12/12/89 at 11.

25  [237]TR 12/12/89 at 11.

26  [238]TR 12/12/89 at 12.

27  [239]TR 12/12/89 at 12.

28  [240]TR 12/12/89 at 12.

Page 63 of 83

1           THE COURT:  Have you asked for a Rule 11?

2           MS. SIEGEL:  No, because he is competent to stand trial.
3           We're talking about mitigating testimony in the case if the
           jury doesn't return a verdict of –

4           THE COURT:  Well, if he can understand the nature of the
5           proceedings against him and assist counsel in the
           preparation of his defense, and distinguish right from
6           wrong – I don't believe I have ever appointed a psychiatrist
           in my life.[241]

7 Although it may have been true that the judge had never before appointed experts to

8 aid in explaining and uncovering mitigating testimony, a capital case was the perfect

9 time to start.

10       161.   Defense counsel explained that this situation normally did not arise

11 because the Public Defender's Office would provide the mitigation expert for the

12 indigent defendant, and would not have to ask the court for money.[242]  However,

13 because Mr. Ramirez chose to represent himself, the Public Defender's Office would

14 not provide the expert for him.[243]  The trial judge rejects this reasoning, stating "I

15 don't think that the defendant in this case deserves any favors from this Court because

16 he represents himself.  He's pulling this Court's leg, and I'm not impressed by that

17 at all."[244]  When defense counsel points out that Mr. Ramirez should have "the same

18 rights as if he had privately retained counsel" and that the Court was thus "denying

19 him fundamental Constitutional rights," the judge relented, stating, "Maybe you're

20 right."[245]  However, the idea that constitutional rights may be violated simply did not

21 override the judge's concern that the Public Defender's Office should have to pay for

22

23 _____

24      [241]TR 12/12/89 at 13.

25      [242]TR 12/12/89 at 13-15.

26      [243]TR 12/12/89 at 13-15.

27      [244]TR 12/12/89 at 14.

28      [245]TR 12/12/89 at 15.

1    a mitigation specialist, not the court.[246]

2       162.   Defense counsel again points out the great length of time it takes to

3    develop mitigating evidence.[247]   The judge responds to this argument with "I don't

4    buy that at all."[248]   In accordance, he ends the matter by stating, "I'll protect his [Mr.

5    Ramirez's] right to the point where I understand them."[249]   He took the matter under

6    advisement, and the motion was denied by minute entry the next day.[250]   The judge

7    who ruled on this motion was later replaced by a new judge, less than one month

8    before trial.[251]

9       **B.   The Due Process Clause of the Fourteenth**

10      **Amendment gives indigent capital murder defendants**
       **the right to have the government pay for the basic tools**

11      **of a capital defense.**

12      163.   In a capital case, a mitigation specialist and other experts are an essential

13   part of the "raw materials integral to the building of an effective defense." *Ake v.*

14   *Oklahoma*, 470 U.S. 68, 77 (1985).   In 1989, the ABA recognized that in capital

15   cases, the need for experts, especially in the sentencing phase, is above and beyond

16   that required in non-capital cases: "The evidence to be presented by the defense –

17   indeed, the whole theory of proceeding – at the sentencing phase stands outside

18   normal criminal trial practice."[252]   Having a lawyer or an investigator is simply not

19   enough, the right experts are essential in the defense's ability to explain the

20   _____

21      [246]TR 12/12/89 at 15-16.

22      [247]TR 12/12/89 at 17.

23      [248]TR 12/12/89 at 17.

24      [249]TR 12/12/89 at 21.

25      [250]TR 12/12/89 at 20; M.E. 12/13/89.

26      [251]Td. 81; Td. 88.

27

28

1  ·defendant's life history to the fact-finder.  Mitigating evidence is absolutely crucial

2  in a capital case because it serves to humanize the defendant to the fact-finder, and

3  "enabling [the fact-finder to] better to understand and weigh [the defendant's]

4  apparently senseless act when deciding" between life and death.  *Stankewitz v.*

5  *Woodford*, 365 F.3d 706, 707 (9th Cir. 2004).

6        164.  Attorneys simply do not have the training necessary to recognize the

7  numerous social, psychological, and medical issues involved in capital cases:

8            Attorneys skilled in narrowing the focus of trial to exclude
           irrelevant references to the life and character of a client
9            may find themselves unprepared fore the sentencing phase
           of a capital case where the life and character of the client
10           may have to be revealed in detail.  The assistance of one or
           more experts (e.g. social worker, psychologist, psychiatrist,
11           investigator, etc.) may be determinative as to outcome.

12  American Bar Association, *Guidelines for the Appointment and Performance of*

13  *Counsel in Death Penalty Cases* § 11.8.4 cmt. (1989), available at

14  http://www.abanet.org/deathpenalty/Oldguidelines/dpguide.pdf (last visited Sept. 9,

15  2004) [hereinafter "1989 ABA Guidelines"].  Mitigation specialists in particular,

16           have the time and the ability to elicit sensitive,
           embarrassing, and often humiliating evidence (e.g., family
17           sexual abuse) that the defendant may never have disclosed.
           They have the clinical skills to recognize such things as
18           congenital, mental or neurological conditions, to
           understand how those conditions may have affected the
19           defendant's development and behavior, and to identify the
           most appropriate experts to examine the defendant or
20           testify on his behalf.  Moreover, they may be critical to
           assuring that the client obtains therapeutic services that
21           render him cognitively and emotionally competent to make
           sound decisions concerning his case.
22
23  American Bar Association, *Guidelines for the Appointment and Performance of*

24  *Defense Counsel in Death Penalty Cases* § 4.1 cmt., *reprinted in* 31 Hofstra L. Rev.

25  913, 959 (2003) (footnote omitted) [hereinafter "2003 ABA Guidelines"].[253]

26  _____

27      [253]The 2003 ABA Guidelines are applicable to this case, tried in 1990, because
    they represent a "codification of longstanding, common-sense principles of
28  representation understood by diligent, competent counsel in death penalty cases."
    *Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) (applying the 2003 ABA

165. Mitigation specialists are the lynchpin of the defense team's effort to present a comprehensive picture of the defendant himself; they are "'part of the existing "standard of care"' in capital cases, ensuring 'high quality investigation and preparation of the penalty phase.'" *Id.* at 960 (quoting Subcomm. on Federal Death Penalty Cases, Comm. on Defender Services, Judicial Conference of the United States, *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* § 7 cmt. (1998)).

166. Building a case in mitigation is a "lengthy process." *Allen v. Woodford*, 366 F.3d 823, 845 (9th Cir. 2004). Witnesses are often reluctant to provide information. *Id.* Persuading reluctant witnesses to provide valuable information takes time, and "their reluctance can be overcome as they understand the role that they would play in the penalty phase of the trial and the significance of their testimony." *Id.* For this reason, "[p]reparation for the sentencing phase should begin early and even inform preparation for a trial's guilt phase." *Id.* "[I]f the life of the investigation awaits the guilt verdict, it will be too late." *Id.*

167. Because the existence of "mitigating circumstances sufficiently substantial to call for leniency" precludes a death sentence in Arizona, Ariz. Rev. Stat. § 13-703(E), Arizona law requires the state to furnish indigent capital defendants with adequate resources to develop the existence of any such mitigating circumstances and present evidence of them at trial and sentencing. *See id.*, § 13-4013(B). Where the defendant does not have access to these resources, Arizona law and due process forbid a capital sentence. *State v. Bocharski*, 200 Ariz. 50, 62, 22 P.3d 43, 55 (2001).

168. Due process requires the court to appoint a capital defendant certain experts when he can show that it is "reasonably necessary to adequately present his

Guidelines to a 1982 trial). "The 2003 Guidelines do not depart in principle or concept from *Strickland, Wiggins*, or our court's previous cases concerning counsel's obligation to investigate mitigating circumstances." *Hamblin*, 354 F.3d at 487.

1    defense at trial and any subsequent proceeding." Ariz. Rev. Stat. § 13-4013(B); *see*
2    *also Ake*, 470 U.S. at 82; *State v. Williams*, 166 Ariz. 132, 139, 800 P.2d 1240, 1247
3    (1987).  In Arizona, there is a "constitutional and statutory duty to provide [the
4    indigent] with certain essential tools of trial defense." *State v. Correll*, 179 Ariz. 314,
5    320-21, 878 P.2d 1352, 1358-59 (1994).  "So long as the law permits capital
6    sentencing, Arizona's justice system must provide adequate resources to enable
7    indigents to defend themselves in a reasonable way." *Bocharski*, 200 Ariz. at 62, 22
8    P.3d at 55.

9         169.  In dismissing Mr. Ramirez's request for mitigation and other experts, the
10   judge suggested that Mr. Ramirez was only trying to gain "favors from this Court
11   because he represents himself" and "special concessions" that would give him some
12   kind of advantage over other capital defendants.[254]  However, Mr. Ramirez was not
13   seeking anything out of the ordinary, he was only seeking the basic tools of an
14   adequate capital defense. *Ake*, 470 U.S. at 77.  "[J]ustice cannot be equal where,
15   simply as a result of his poverty, a defendant is denied the opportunity to participate
16   meaningfully in a judicial proceeding in which his liberty is at stake." *Ake*, 470 U.S.
17   at 76.

18        170.  When the state charges an indigent with a crime, it must ensure that he
19   has a meaningful opportunity to mount a defense against those charges. *See Douglas*
20   *v. California*, 372 U.S. 353 (1963).  If his defense will reasonably require the
21   assistance of an expert, the state must furnish one. *Ake*, 470 U.S. at 83.  "[M]ere
22   access to the courthouse doors does not by itself assure a proper functioning of the
23   adversary process . . . ." *Ake*, 470 U.S. at 77.  Principles of fundamental fairness
24   require the state to furnish the indigent defendant with the "basic tools of an adequate
25   defense." *Id.* (quoting *Britt v. North Carolina*, 404 U.S. 226, 227 (1971)).

26        171.  In *Ake*, the Court weighed the three familiar factors of *Mathews v.*
27

28        [254]TR 12/12/89, at 14.

*Eldridge*, 424 U.S. 319 (1976), to determine whether Ake had a due process right to expert assistance at government expense in presenting his insanity defense. First, it determined the "private interest that will be affected by the action of the State." *Ake*, 470 U.S. at 77. Second, it identified the "governmental interest that will be affected if the safeguard is provided." *Id*. Third, it asked about the "probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." *Id*. These three factors led it to conclude that due process required the State of Oklahoma to furnish Ake with expert assistance to mount his insanity defense.

172. As to the first factor, "[t]he interest of the individual in the outcome of the State's effort to overcome the presumption of innocence is obvious and weighs heavily in our analysis." *Id*. at 78. Second, it inquired into the financial burden on the state in furnishing a psychiatrist to the indigent. "Many states, as well as the Federal Government, currently make psychiatric assistance available to indigent defendants, and they have not found the financial burden so great as to preclude this assistance." *Id*. (citing, *inter alia*, Ariz. Rev. Stat. § 13-4013). "The State's interest in prevailing at trial—unlike that of a private litigant—is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases." *Id*. at 79. The State's interest in accuracy trumps its adversarial interest in "maint[aining] a strategic advantage over the defendant." *Id*. On this score, "the State's interest in its fisc must yield." *Id*. at 83.

173. Third, the Court considered the contemporary role of experts in an accurate determination of the defendant's insanity.

> [P]sychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question.

1  *Id.* at 80.

2       174.  Because "the evolving practice" of insanity cases entails "the widespread

3  reliance on psychiatrists," the Court recognized that it would be unfair to let a

4  defendant's financial resources determine whether or not he may use a psychiatrist

5  in his defense. *Id.* at 82.

6              **C.  The logic of *Ake* requires the government to afford**
                **an indigent capital defendant access to a mitigation**
7              **specialist because such an expert is "crucial to the**
                **defendant's ability to marshal his defense" to the**
8              **government's assertion that he is morally worthy of the**
                **death penalty.**
9

10      175.  The same due process concerns that led the *Ake* Court to require the state

11  to provide experts at trial led it to require the state to provide experts in a capital

12  sentencing proceeding.  Without the assistance of experts, "the defendant . . . loses

13  a significant opportunity to raise in the jurors' minds questions about" the existence

14  of mitigating factors that might call for a sentence less than death. *Ake*, 470 U.S. at

15  84. "In such a circumstance, where the consequence of error is so great, the relevance

16  of responsive [expert] testimony so evident, and the burden on the State so slim, due

17  process requires access" to necessary experts and their testimony "to assist[] in

18  preparation at the sentencing phase." *Id.*

19      176.  The Eighth and Fourteenth Amendments require "that the sentencer... not

20  be precluded from considering, *as a mitigating factor*, any aspect of the defendant's

21  character or record . . . that the defendant proffers as a basis for a sentence less than

22  death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Because "the imposition of death

23  by public authorities is so profoundly different from all other penalties, we cannot

24  avoid the conclusion that an individualized determination is essential in capital

25  cases." *Id.* at 605. Furthermore, "[j]ust as the State may not by statute preclude the

26  sentencer from considering any mitigating factor, neither may the sentencer refuse to

27  consider, *as a matter of law*, any relevant mitigating evidence." *Eddings v.*

28  *Oklahoma*, 455 U.S. 104, 113-14 (1982).

Page 70 of 83

177. Taken together, *Ake* and the *Lockett* line of cases stand for the proposition that a capital defendant must have access to experts in preparing his case in mitigation—that is, his case in support of the contention that the proper "reasoned moral response" to *his* crime is a sentence of life in prison rather than death. *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). A case in mitigation is not merely "likely to be a significant factor" in a capital defendant's case; once he is convicted, it is the most important aspect of his case. *Cf. Ake v. Oklahoma*, 470 U.S. 68, 86 (1985) (noting that "the question of Ake's sanity was likely to be a significant factor in his defense"). Fundamental fairness demands that a capital defendant have "an adequate opportunity to present their claims fairly within the adversarial" context of a capital sentencing hearing. *Cf. Ross v. Moffitt*, 417 U.S. 600, 612 (1974); *see also Bullington v. Missouri*, 451 U.S. 430, 444 (1981) (noting a "capital sentencing procedure that resembles a trial on the issue of guilt or innocence"). Without a mitigation specialist, a capital defendant has no such opportunity.

178. The *Mathews* due process balancing test that the *Ake* Court adopted applies not solely to the particular determination of whether an indigent defendant should receive a psychiatrist at government expense, but to the broader contention that an indigent defendant should receive the assistance of *any* expert services necessary to an adequate defense. *Mason v. Mitchell*, 95 F. Supp. 2d 744, 774-775 (N.D. Ohio 2000). Like a psychiatrist for a defendant who seeks to mount an insanity defense, a mitigation specialist can "identify and develop those aspects of [a] defendant's background, character or record and those circumstances of the offense that may be proffered as a reasonable basis for imposing a sentence other than death." *Williams v. State*, 669 N.E.2d 1372, 1384 (Ind. 1996). In this sense, a mitigation expert for a capital defendant, like a psychiatrist for a defendant who pleads insanity, is "crucial to the defendant's ability to marshal his defense" to the government's claim that he should die for his crime. *Ake v. Oklahoma*, 470 U.S. 68, 80 (1985).

179.  The American Bar Association's *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* recommend that the defense team investigate the client's background beginning with the "moment of conception." 2003 ABA Guidelines § 10.7 cmt., *reprinted in* 31 Hofstra L. Rev. at 1022 (footnote omitted).  The defense team must explore the defendant's medical history, family and social history, educational history, military service, employment history, and prior experience in the penal system.  *Id.* at 1022-23.  It must uncover information about mental illness, substance abuse, physical abuse, sexual abuse, poverty, deaths in the family, racial, cultural, or religious background, placement in foster homes or juvenile detention facilities, educational history, special educational needs, exposure to toxic chemicals during childhood or military service, useful skills or lack of employment training, and conduct during prior periods of incarceration.  *Id.*  "Obtaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments from which the client may suffer. . . . [A] mitigation specialist who is trained to recognize and overcome these barriers . . . , is invaluable in conducting this aspect of the investigation."  *Id.* at 1024.

180.  The same due process balancing factors that led the *Ake* Court to require the state to furnish Ake with a psychiatrist to assist in his defense also require the state, when reasonably necessary, to furnish an indigent defendant with a mitigation expert to assist him in defending against the state's effort to execute him.  *Cf.* Ariz. Rev. Stat. § 13-4013(B) (requiring the appointment of experts where they are "reasonably necessary"); *Ake*, 470 U.S. at 82-83 (requiring the appointment of an expert upon a threshold showing that an issue is "likely to be a significant factor in [the] defense").

181.  A capital defendant's interest "in the outcome of the State's effort" to impose the death penalty "is obvious" and weighs just as heavily in the due process calculus as the initial determination of guilt or innocence.  *Cf. id.* at 78; *see also id.*

1   at 83 ("We have repeatedly emphasized the defendant's compelling interest in fair
2   adjudication at the sentencing phase of a capital case."). Second, "[t]he State . . . has
3   a profound interest in assuring that its ultimate sanction is not erroneously carried
4   out." *Id.* at 83-84. To this end, "a State may not legitimately assert an interest in
5   maintaining a strategic advantage over the defense, if the result of that advantage is
6   to cast a pall on the accuracy of the verdict obtained." *Cf. id.* at 79.

7   182. Nor does the state's interest in saving money weigh heavily in this
8   inquiry either. "Many States, as well as the Federal Government, currently make
9   psychiatric assistance available to indigent defendants, and they have not found the
10  financial burden so great as to preclude this assistance."[255] *Ake*, 470 U.S. at 78.

11  183. The Arizona Supreme Court has recognized that a mitigation specialist
12  must be appointed where it is "'reasonably necessary' for an indigent to adequately
13  present a defense." *State v. Bocharski*, 200 Ariz. 50, 62, 22 P.3d 43, 55 (2001)
14  (quoting Ariz. Rev. Stat. § 13-4013). Because mitigation experts are reasonably
15  necessary for indigent capital defendants to present an adequate defense, the financial
16  burden of providing one, like the financial burden of providing a psychiatrist in *Ake*,
17  must yield. *Cf. Ake*, 470 U.S. at 79; *see also Jacobson v. Anderson*, 203 Ariz. 543,
18  545, 57 P.3d 733, 735 (Ariz. Ct. App. 2002) ("The interest of the body politic in a fair
19  trial as well as that same interest of the defendant outweighs any State interest in
20  avoiding expenditures for such expert witnesses as are reasonably necessary for the
21  defense of an indigent person.").

22  184. Finally, we must "inquire into the probable value of the" mitigation
23  assistance sought, "and the risk of error in the proceeding if such assistance is not
24  offered." *Cf. id.* The value of mitigation assistance is clear. It allows a capital
25

26  ----
27  [255]At the *ex parte* hearing at which the judge denied Ramirez's request for a mitigation specialist, he asked, "Would the Public Defender provide a mitigation expert?" When informed that it would, he stated, "It has a bigger budget than I thought it does." TR 12/12/89, at 15.
28

1   defendant "a significant opportunity to raise in the jurors' minds questions about" the

2   appropriateness of the death penalty for him.  *Id.* at 84.  Both legally and practically,

3   a capital defendant's failure to present a case in mitigation leads inexorably to a death

4   sentence.  In Arizona, no one may receive a death sentence who shows the existence

5   of "mitigating circumstances sufficiently substantial to call for leniency."  Ariz. Rev.

6   Stat. § 13-703(E).

7      185.   When a capital defendant fails to present a case in mitigation, there is a

8   substantial risk that an unwarranted death sentence will be imposed.  In *Williams v.*

9   *Taylor*, 529 U.S. 362 (2000), the Supreme Court set aside a death sentence on habeas

10  review because his trial attorneys failed to uncover and present at the sentencing

11  hearing evidence of his parents' criminal neglect, severe physical abuse at the hands

12  of both natural and foster parents, borderline mental retardation, lack of secondary

13  education, and his extensive criminal record as a juvenile.  *Id.* at 395-96.  Though

14  "not all of the additional evidence was favorable to Williams," "trial counsel did not

15  fulfill their obligation to conduct a thorough investigation of the defendant's

16  background."  *Id.* at 396.

17     186.   In *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527 (2003), the Court set

18  aside Wiggins' death sentence because his trial counsel failed to uncover and present

19  evidence of Wiggins' "disgusting" childhood, physical and emotional abuse he

20  suffered at the hands of his alcoholic mother, and sexual abuse he suffered while in

21  foster care.  *See id.* at 2536, 2537, 2533.  "[H]ad the jury been confronted with this

22  considerable mitigating evidence, there is a reasonable probability that it would have

23  returned with a different sentence."  *Id.* at 2543.

24     187.   Because mitigation evidence is directly relevant to the punishment a

25  capital defendant might suffer, the assistance of a mitigation specialist is "crucial to

26  the defendant's ability to marshal his defense."  *Ake v. Oklahoma*, 470 U.S. 68, 80

27  (1985).  By organizing a defendant's background, social history, family history, and

28  other mitigating evidence, mitigation specialists "enable the jury to make its most

Page 74 of 83

1  accurate determination of" the question whether the defendant should live or die. *Id*

2  at 81. To acknowledge the integral role of mitigation specialists in our system of

3  capital punishment is to "recognize the unfairness of a contrary holding in light of the

4  evolving practice." *Id*. at 82. Thus, "where the consequence of error is so great, the

5  relevance of" mitigation evidence so obvious, "and the burden on the State so slim,

6  due process requires access to" a mitigation specialist who can "assist[] in preparation

7  at the sentencing phase." *Id*. at 84.

8        188.   When an Arizona trial court has thwarted a capital defendant's efforts

9  to present a case in mitigation, the Arizona Supreme Court has subsequently reversed

10  his death sentence. In *State v. Bocharski*, 200 Ariz. 50, 22 P.3d 43 (2001), the trial

11  court initially appropriated $1500 for a mitigation expert. It rejected a second

12  request, but approved a third request for another $2500. "[T]he defendant struggled

13  to obtain funding during the entire presentencing period, including an eight-week

14  hiatus in which he was essentially prevented from continuing the mitigation

15  investigation because of the county's reluctance to pay for it." *Id*. at 59, 22 P.3d at

16  52. Bocharski grew frustrated with the court's stubbornness, and requested that he

17  be sentenced without the presence of his attorneys. "[T]his decision was based on his

18  belief that further mitigation evidence would not affect the judge's decision and

19  would be cumulative." *Id*. at 60, 22 P.3d at 53. Not even the prosecutor wanted to

20  expedite sentencing; he even suggested forcing the mitigation specialist to testify by

21  way of subpoena. *Id*. Nevertheless, the trial court accepted Bocharski's "waiver" of

22  further mitigation witnesses, and sentenced him to death.

23        189.   The Arizona court was "initially troubled by the defense's difficulty in

24  obtaining funds to support the mitigation investigation." *Id*. Bocharski did not

25  "voluntarily, knowingly, and intelligently" waive his right to present mitigation

26  evidence. *Id*. at 61, 22 P.3d at 54 (citing *State v. Djerf*, 191 Ariz. 583, 591, 959 P.2d

27  1274, 1282 (1998)). Having grown frustrated with the trial court's recalcitrance,

28  "Bocharski essentially gave up." *Id*. The trial court "never heard from" "the

1   defendant's mother, foster parents, wife, uncle, brother, and the pedophile truck
2   driver to whom the defendant was sold as a child" "at least in part because Yavapai
3   County denied funds . . . ." *Id.* at 62, 22 P.3d at 55.

4          190.   The denial of funds in *Bocharski*, in contravention of *Ake* and section 13-
5   4013, led the Arizona court to reverse Bocharski's death sentence. "Here, funding
6   problems interfered with the fair and orderly administration of justice." *Id.* "We do
7   not expect mitigation funds to be unlimited, nor is there a set amount that will suffice.
8   The unique facts of each case will determine what is 'reasonably necessary' for an
9   indigent to adequately present a defense." *Id.* (quoting Ariz. Rev. Stat. § 13-
10  4013(B)). Because the trial court denied Bocharski "adequate resources to . . . defend
11  [himself] in a reasonable way," *id.*, the Arizona court reversed his death sentence.

12         191.   In the face of the trial court's failure to appoint him a mitigation
13  specialist, Mr. Ramirez's death sentence likewise cannot stand.  Where Bocharski
14  received $4000 to hire a mitigation specialist, Mr. Ramirez was completely denied
15  one. The judge complained, "What's a mitigation expert? I have never heard of that
16  in a quarter century."[256] "Maybe the dimensions of murder cases have changed a lot
17  in the past few years, I don't know.  I'm not familiar with that stuff."[257] "Why give
18  him somebody to do what a lawyer does?"[258] "I don't think that the defendant in this
19  case deserves any favors from this Court because he represents himself. He's pulling
20  this Court's leg, and I'm not impressed by that at all."[259]

21         192.   There can be no fair and orderly administration of the death penalty
22  when the trial court denies the defendant the basic tools he requires to present his case
23  in mitigation.  As the *Bocharski* court recognized, mitigation experts are "reasonably

24  _____

25  [256]TR 12/12/89 at 10.

26  [257]TR 12/12/89 at 11.

27  [258]TR 12/12/89 at 12.

28  [259]TR 12/12/89 at 14.

necessary" for presenting a viable defense in a capital murder case.  *See* Ariz. Rev. Stat. § 13-4013(B).  Because the trial judge denied Mr. Ramirez a mitigation expert, this Court must reverse his death sentence.

> **D.   The error committed by the trial court in not affording Mr. Ramirez a mitigation specialist and other experts was not harmless; therefore, this Court must grant Mr. Ramirez relief on this claim.**

193.   Under Arizona law, "[w]hen a person is charged with a capital offense the court . . . shall upon . . . a showing that the defendant is financially unable to pay for such services, appoint such investigators and expert witnesses as are reasonably necessary adequately to present his defense at trial and at any subsequent proceeding."  Ariz. Rev. Stat. § 13-4013(B).  Section 13-4013 thus codifies the right recognized in *Ake*.  *State v. Eastlack*, 180 Ariz. 243, 260, 883 P.2d 999, 1016 (1994). Thus, "an indigent defendant has an *absolute right* to the help of expert witnesses at the sentencing stage and to have those witnesses reasonably compensated by the county."  *Id*.  The only determination left for the trial court under section 13-4013 is the extent to which such assistance is reasonably necessary.  *See, e.g., State v. Williams*, 166 Ariz. 132, 139, 800 P.2d 1240, 1247 (1987) (denying funds for an expert where the defendant could not make "at least a minimal showing").

194.   The Due Process Clause of the Fourteenth Amendment gives rise to a capital defendant's liberty interest in the trial court making this determination.  "As we read *Ake*..., the due process clause requires at least this same threshold showing: that the appointment of such an expert is reasonably necessary."  *Id*.  Where the trial court has denied a prisoner the process due him under clearly established Supreme Court precedent, the habeas court must grant relief.  *See Chaney v. Stewart*, 156 F.3d 921, 926 (9th Cir. 1998) ("[T]o prevail on his habeas petition, Chaney must show that he had a liberty interest in the appointment of the sought experts."); *Gretzler v. Stewart*, 112 F.3d 992, 1000 (9th Cir. 1997) ("The State concedes... that the mandatory language of section 13-4013(B) creates a protected liberty interest and that

1    due process requires its fulfillment.").

2    195.   Where the state denies a capital defendant the procedural protections it
3    has established to ensure the accurate imposition of the death penalty, federal courts
4    may grant habeas relief. In *Fetterly v. Paskett*, 997 F.2d 1295 (9th Cir. 1993), the
5    court found that the "failure of a state to abide by its own statutory commands may
6    implicate a liberty interest protected by the Fourteenth Amendment against arbitrary
7    deprivation by a state." *Id*. at 1300. In *Fetterly*, the Idaho courts had improperly
8    applied its own mechanism for weighing the aggravating and mitigating factors with
9    respect to the prisoner's death sentence. The court remarked that the statute gave rise
10   to a liberty interest protected by the Fourteenth Amendment and that harmless error
11   analysis was appropriate "to guarantee that the defendant received an individualized
12   sentence." *Id*. at 1301 (quoting *Stringer v. Black*, 503 U.S. 222, 232 (1992)).

13   196.   The trial court's denial of Mr. Ramirez's procedural due process
14   protections was not harmless; it was prejudicial, as it deprived him of the basic tools
15   necessary for him to present a case in support of a sentence less than death. *Cf. Ake*,
16   470 U.S. at 77. Without those tools, he did not have "an adequate opportunity to
17   present [his] claims fairly within the adversary system." *Ross v. Moffitt*, 417 U.S.
18   600, 612 (1974).

19   197.   When the defendant's attorney *himself* fails to investigate the
20   defendant's background for a capital sentencing proceeding, rather than finding
21   himself unable to do so because the government has unreasonably constrained him,
22   that attorney provides constitutionally ineffective assistance to the prejudice of the
23   defendant. This is not due to the attorney's incompetence *per se*; rather, it is because
24   his incompetence prejudiced the defendant in some way. "The purpose of the Sixth
25   Amendment guarantee of counsel is to ensure that a defendant has the assistance
26   necessary to justify reliance on the outcome of the proceeding." *Strickland v.*
27   *Washington*, 466 U.S. 668, 691-92 (1984).   "[A]ny deficiencies in counsel's
28   performance must be prejudicial to the defense in order to constitute ineffective

Page 78 of 83

1   assistance under the Constitution." *Id.* at 692.

2   198.   When the state fails to provide the assistance of experts, it denies the

3   defendant effective trial representation just as surely as if his attorney had failed to

4   avail himself of their services. *Mason v. Arizona*, 504 F.2d 1345, 1351 (9th Cir.

5   1974). Ramirez can demonstrate a reasonable probability that had he been provided

6   with the basic tools of an adequate capital defense, he would not have received a

7   death sentence. *Stankewitz v. Woodford*, 365 F.3d 706, 723 (9th Cir. 2004) (citing

8   *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 2542-44 (2003)).

9   199.   One of the most effective kinds of mitigation evidence evokes "a

10   disadvantaged background or . . . emotional and mental problems" so as to suggest

11   that the defendant is "less culpable than defendants who have no such excuse."

12   *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003).   Mr. Ramirez's life

13   history is rich with this kind of evidence. *See infra* Part I.

14   200.   Although the defense was provided with a psychologist a few months

15   before the sentencing hearing, this was too little, too late.[260] *See Allen*,  366 F.3d at

16   845 (the mitigation investigation must begin early, before the guilt phase, because

17   developing mitigating evidence is a lengthy process); *see also Williams*, 524 U.S. at

18   398 (although counsel presented some mitigating evidence, Williams was

19   nevertheless prejudiced by the failure to investigate additional facts because "the

20   graphic description of Williams' childhood, filled with abuse and privation, or the

21   reality that he was 'borderline mentally retarded,' might well have influenced the

22   jury's appraisal of his moral culpability.").

23   201.   If a mitigation specialist had been provided prior to the guilt phase, when

24   defense counsel asked for it, a mitigation specialist could have gathered all the social

25   and other factual evidence necessary for a thorough and competent psychological

26   evaluation. *See Stankewitz v. Woodford*, 365 F.3d 706, 724-25 (citing *Douglas v.*

27

28   [260]Td. 134.

1 | *Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003)) (although counsel introduced some
2 | evidence of social history, including some evidence regarding the defendant's
3 | difficult childhood, the defendant was prejudiced at sentencing because counsel did
4 | not provide the complete picture of the defendant's troubled childhood, only a
5 | cursory sketch, which was not presented in a compelling manner).

6 |     202.   The reason the mitigation investigation must begin early, before the guilt
7 | phase begins, is because the work of a mitigation specialist often requires repeated
8 | contacts with family members. *See Allen*, 366 F.3d at 845.  Although the second
9 | judge assigned to the case appointed Dr. McMahon, a psychologist, to "test and
10 | evaluate" Mr. Ramirez's mental health a few months before trial, he ordered that Dr.
11 | McMahon could not be compensated any more than $500 to do his work.[261]  By this
12 | point in the proceedings, a mitigation specialist would have gathered the available
13 | mitigating evidence and provided it to Dr. McMahon.  Had Dr. McMahon been
14 | provided with the evidence, it may well have changed the course of his evaluation
15 | and defense counsel's presentation.  However, under the limited funds available and
16 | because a competent mitigation investigation had not been conducted, Dr. McMahon
17 | was not provided with the complete picture of Mr. Ramirez's background.

18 |     203.  Dr. McMahon's report reveals that he was never provided with the
19 | detailed social history necessary to complete a thorough psychological report: "the
20 | following background is not as detailed as I would have like [*sic*].[262]  Dr. McMahon
21 | report relies heavily upon Mr. Ramirez as the basis of his information, while at the
22 | same time acknowledging that this was insufficient given Mr. Ramirez's tendency to
23 | protect his family when interviewed.[263]  Dr. McMahon's report never mentions:  that
24 | Mr. Ramirez was the product of rape; that his uncle was also his father; that he was

25 |

26 |    [261]Td. 134.

27 |    [262]Td. 149, Exhibit I at 3-4.

28 |    [263]Td. 149, Exhibit I at 3.

1    exposed to alcohol and pesticides *in utero* and as a child; his mother's chronic
2    alcoholism; the profound neglect that Mr. Ramirez experienced as a child in the care
3    of his mother; that his mother provided him with alcohol as a small child; that Mr.
4    Ramirez had a sibling that died of exposure due to his mother's neglect and his
5    mother's attempted suicide as a result; that Mr. Ramirez and his siblings were
6    physically abused; the school records and reports of family members which reveal
7    signs of mental retardation; Mr. Ramirez's exposure as a child to his mother's sexual
8    activity with various men; the physical abuse he witnessed his mother suffer at the
9    hands of these men; the family history of alcoholism; and innumerable other evidence
10   which a mitigation specialist would have provided had one been appointed and able
11   to conduct the detailed investigation that capital sentencing proceedings require.[264]

12        204.   Had the appropriate funds been allocated for the basic tools of a capital
13   defense team, this information could have been presented to the fact-finder.   There
14   is a reasonable probability that if a reasonable fact-finder was presented with this
15   information, that the result of the proceedings would have been different.   The
16   mitigation testimony presented by defense counsel was "half-hearted" and was only
17   the tip of the iceberg as far as available mitigating evidence.

18        205.   Because Mr. Ramirez was denied the basic tools of an adequate capital
19   defense under *Ake*, and the denial resulted in prejudice to his defense, Mr. Ramirez
20   is entitled to habeas relief.

21                              **VI. Prayer for relief.**

22        WHEREFORE, David Ramirez respectfully prays this Court:

23        1.   Order that Mr. Ramirez be granted leave to conduct discovery

24

25   _____
     [264]*See* Section II, A-D of this petition.  Habeas counsel obtained most of this
     information from family members who were never contacted by the defense team and
26   who would have provided this information, or testified, if they had been asked to by
     the defense team.  Petitioner will provide support for the factual allegations in this
27   petition in his First Motion to Expand the Record under Rule 7 of the Rules
     Governing Habeas Corpus Proceedings under § 2254, pursuant to this Court's Order
28   Re: Motion to Amend, filed July 6, 2004.  Dist. Ct. Doc. No. 83.

1   pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Mr.

2   Ramirez to utilize the processes of discovery set forth in Federal Rules

3   of Civil Procedure 26-37, to the extent necessary, to fully develop and

4   identify the facts supporting his petition and any defenses thereto raised

5   by the Respondents' Answer;

6   2. Order that upon completion of discovery, Mr. Ramirez be granted

7   leave to amend the instant petition to include any additional claims or

8   allegations not presently known to him or his counsel, which are

9   identified or uncovered in the course of discovery;

10   3.   Grant an evidentiary hearing at which proof may be offered

11   concerning the allegations of this petition;

12   4. Issue a writ of habeas corpus to have Mr. Ramirez brought before it

13   to the end that he may be discharged from his unconstitutional

14   confinement;

15   5. In the alternative to the relief requested in Paragraph 6, if this Court

16   should deny the relief as requested, issue a writ of habeas corpus to have

17   Mr. Ramirez brought before it to the end that he may be relieved of his

18   unconstitutional sentences; and

19   6. Grant such other relief as may be appropriate and to dispose of the

20   matter as law and justice require.

21   Respectfully submitted this 10th day of September, 2004.

22                                          Jon M. Sands
                                            Federal Public Defender
23                                          Paula K. Harms
                                            Dale A. Baich
24

25

26                           By
                                          Counsel for Petitioner
27

28

Page 82 of 83

1    A copy of the foregoing was mailed this
2    10th day of September, 2004, to:

3    John Pressley Todd
      Assistant Attorney General
      Attorney General's Office
4    Capital Litigation Section
      1275 West Washington
5    Phoenix, Arizona 85007-2997

6

7    *Jennifer Cody*

8    I:\Harms\2_Open_Case\Ramirez\usdc\merit.petition.wpd

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 83 of  83