Jon M. Sands
Federal Public Defender

Paula K. Harms (Arizona Bar No. 022489)
Timothy M. Gabrielsen (Nevada Bar No. 8076)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
paula_harms@fd.org
tim_gabrielsen@fd.org
602.382.2756
602.889.3960 facsimile

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Martinez Ramirez, | No.  CIV 97-1331-PHX-JAT |
| Petitioner, | Death Penalty Case |
| vs. | |
| Charles L. Ryan, et al., | Memorandum Regarding Cause and Prejudice, and Fundamental Miscarriage of Justice in Regard to Claim 34 |
| Respondents. | |

## I.   INTRODUCTION

Ramirez requests that this court find that he has established either cause and prejudice to excuse any procedural default of Claim 34 or that there would be a fundamental miscarriage of justice if the court did not examine the underlying merits of his ineffective assistance of sentencing counsel claim.  In the alternative, Ramirez has established colorable claims of either cause and prejudice or a fundamental miscarriage of justice so that the discovery processes should be utilized and if necessary, a hearing should be held on any one or all of these questions.

In this case, post-conviction counsel did raise a claim of ineffective assistance of sentencing counsel in the first post-conviction proceeding.  However, this Court has ruled that prior post-conviction counsel did not raise the claim sufficiently so that factual aspects of it are procedurally defaulted.  This is important to consider because post-conviction counsel did recognize that sentencing counsel performed

1 ineffectively and the state court did have an opportunity to consider this claim and

2 allow evidentiary development before ruling on the merits.

3 **II.   IN DETERMINING CAUSE AND PREJUDICE AND MISCARRIAGE OF JUSTICE, THIS COURT SHOULD FACTOR IN THE UNIQUE NATURE OF**

4 **THE DECISION IN *ATKINS V. VIRGINIA*, 536 U.S. 304 (2002).**

5 A substantial portion of Ramirez's ineffectiveness claim involves facts

6 underlying his mental retardation developed at the state court hearing held pursuant

7 to *Atkins*. In assessing cause and prejudice and miscarriage of justice, this Court will

8 need to consider how Ramirez's mental retardation warrants special consideration and

9 relaxation of procedural rules.

10 *Atkins v. Virginia*, 536 U.S. 304 (2002), acts as an absolute bar to execution

11 and is of such constitutional magnitude that it must be applied retroactively.

12 Fundamental principles about human decency and due process trump the state's need

13 to speedily exact the ultimate punishment from a mentally retarded man by avoiding

14 addressing the merits due to procedural technicalities. *See State v. Canez*, 74 P.3d

15 932, 937-38 (Ariz. 2003) (holding that due process demanded a hearing on mental

16 retardation under the Eighth Amendment principles of *Atkins*, even though mental

17 retardation was litigated as a mitigating circumstance at sentencing).

18 In *Atkins*, the Court provided significant insight into the reasons why mentally

19 retarded individuals are entitled to heightened constitutional protection. The Court

20 noted that, "by definition . . . [the mentally retarded have] diminished capacities to

21 understand and process information, to communicate, to abstract from mistakes and

22 learn from experience, to engage in social reasoning, to control impulses and to

23 understand the reactions of others." *Id*. at 683 (quoting *Atkins*, 536 U.S. at 318).

24 They have difficulty communicating with counsel and making rational legal

25 decisions. *Id.* at 320-21. The Court reasoned that there are several characteristics of

26 mental retardation that undermine the strength of the heightened procedural

27 protections necessary in capital cases. *See Atkins*, 536 U.S. at 317. This reasoning

28 applies with equal strength to the determination of cause and prejudice and the

1   fundamental miscarriage of justice exception.[1]   Given that *Atkins* places a

2   constitutional "'substantive restriction on the state's power to take the life' of a

3   mentally retarded offender," procedural barriers, as applied to the factual

4   circumstances of this case, should not operate to bar such a claim.  *See Atkins*, 536

5   U.S. at 321.  The mentally retarded are a protected class under federal law, and courts

6   are under no obligation to apply procedural bars which directly conflict with their

7   rights to pursue remedies for violations of constitutionally protected rights.  *See Lake*

8   *v. Arnold*, 232 F.3d 360, 369-70 (3rd Cir. 2000) (even though claim was

9   unquestionably time-barred, statute of limitation would not be applied given

10   plaintiff's mental retardation, because application of the statute would violate federal

11   policy against protecting the mentally retarded).

12      Mental retardation is not a condition that is easily recognized and in the

13   majority of cases, easily diagnosed.  No one can tell whether a person is mentally

14   retarded simply by looking at them or giving them an IQ test.  *See State v. White*, 885

15   N.E.2d 905, 915 (Ohio 2008) (noting that lay people "cannot easily recognize mild

16   mental retardation.").  That Ramirez's condition may have gone unnoticed, and made

17   it more difficult for him to work with counsel and protect his rights to appellate

18   review, should not work against him given that society has recognized that mental

19   retardation makes him uniquely qualified for leniency.

20      Although the state post-conviction court may have found that Ramirez was not

21   mentally retarded, that finding is not binding on this court because questions of cause,

22   prejudice, and a fundamental miscarriage of justice are uniquely federal questions not

23   governed by the strictures of the AEDPA.  *See Holloway v. Horn*, 355 F.3d 707, 716

24   (3d Cir. 2004) (district court had authority to grant a hearing on ability to establish

25

26      [1]In a similar context, in regard to equitable tolling, Courts have recognized that
27   the unique nature of the *Atkins* decision requires relaxation of strict procedural rules.
    *See In re Hearn*, 376 F.3d 447, 455-457 (5th Cir. 2004) (equitable tolling possible
28   where successive habeas petition, raising *Atkins* claim, was filed more than one year
    after *Atkins* decision).

1    cause for procedural default and § 2254(e)(2) does not apply to this hearing); 2 R.

2    Hertz & J. Liebman, *Federal Habeas Corpus Practice and Procedure* § 26.3e, p.

3    1356 n.92 (hereinafter "Liebman") ("The federal nature of the controlling legal issues

4    . . . makes it unlikely that the state courts will have adequately adjudicated factual

5    questions regarding cause and prejudice."). Ramirez incorporates by reference the

6    prior *Atkins* briefing in this Court and in state court in regard to the numerous glaring

7    errors committed by the state court on the legal and factual questions underlying the

8    state court's decision. However, in summary, the post-conviction court found that:

9    1) Ramirez did establish his mental retardation by a preponderance of the evidence,

10   if all testing measurement errors were taken into account[2]; 2) that none of the state's

11   experts correctly administered an adaptive behavior test, a necessary part of the

12   diagnosis; and 3) that the prison behavior evidence, the evidence relied upon in

13   finding Ramirez not mentally retarded, should not be given much weight. PCR M.E.

14   4/4/07 at 4-7[3], Exhibit 76 at 12-13, 24. The finding that Ramirez was not mentally

15   retarded was not the result of reasoned decision making, good science, or a fair

16   assessment of the evidence.

17         The state court's finding that Ramirez had proven each individual prong of the

18   diagnosis by a preponderance of the evidence, if all measurement errors are taken into

19   account, means that Arizona is attempting to execute someone who is more likely

20   than not, ineligible to be put to death. In regard to the ineffective assistance of

21

22

23         [2]The state court was able to make its IQ finding by refusing to take all proven
24   measurement errors into account.

25         [3]This court has not made the state court *Atkins* proceedings part of the federal
26   court record. Ramirez again requests that this court do so because it must review
     these facts in order to determine the questions currently before the court. Ramirez
27   does note however, that the state court record is still incomplete because the corrected
     transcripts have never been prepared, despite multiple court orders directed to the
28   court reporter and despite numerous attempts by habeas counsel to have the
     corrections completed. Before this case proceeds any further, the state court record
     should be added and corrected.

1    sentencing counsel claim, if it is more likely than not[4] that Ramirez is mentally

2    retarded and counsel did not present this evidence, and did not fail to present it for

3    any strategic reason but as the result of a failure to investigate, as she and the

4    investigator have admitted, then Ramirez is entitled to relief under *Strickland v.*

5    *Washington*, 466 U.S. 668, 691 (1984), because he has established a reasonable

6    probability of a different result at sentencing. *See* Exhs. 72-73[5]. This fact alone

7    weighs heavily in favor of an excuse of any procedural default. *See* Liebman, §

8    26.3d, p. 1355 ("Although both prongs are required to be shown, "a strong showing

9    on one prong of the test may go a long way towards establishing the other prong.").

10            The state preclusion doctrine, applied appropriately, serves the legitimate ends

11    of encouraging contemporaneous objections at trial and on direct appeal, as well as

12    promoting the finality of judgments. The preclusion in Ramirez's case, however, goes

13    far beyond these legitimate interests. Comity requires federal courts to respect

14    legitimate state procedural bars. However, what the Arizona courts did in Ramirez's

15    case turns the notion of comity on its head. Ramirez pursued state post-conviction

16    remedies precisely because he was *not* interested in making an "end run" around the

17    state courts. He sought a meaningful opportunity to present his claims for relief to

18    the state courts. Yet no matter how he raised this claim, the state of Arizona objected

19    and the state courts summarily dismissed Ramirez's claims, erecting one procedural

20    bar after another. In Ramirez's case, the state courts chose to avoid opportunities to

21    address constitutional claims.

22

23            [4]Unlike the vast majority of states, which only require a defendant to prove his
24    mental retardation by a preponderance of the evidence, Arizona employs an
        unconstitutional burden of proof on the mental retardation question, requiring the
25    defendant to prove his mental retardation by clear and convincing evidence. *See*
        A.R.S.§ 13-753(G).

26            [5]This court did not allow briefing on evidentiary development of sentencing
27    claims. The exhibits attached to this motion also provide support for evidentiary
        development of other sentencing claims, such as the claim based upon *Ake*. Both
28    Shaw and Siegel's declarations indicate that the lack of funding affected their ability
        to competently represent Ramirez.

1    **III.   LEGAL STANDARDS FOR CAUSE FOR PROCEDURAL DEFAULT**

2    This court may excuse any procedural default if Ramirez has demonstrated

3    cause for violating the state procedural rule and prejudice resulting from the alleged

4    constitutional error. *Murray v. Carrier*, 477 U.S. 478, 492 (1986).  The concept of

5    cause for procedural default is a flexible one and has never been precisely defined.

6    *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  However, the Court has

7    generally defined cause as "some objective factor external to the defense [that]

8    impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477

9    U.S. at 488.  Situations which have been found to include this concept include

10   situations where the petitioner was denied effective assistance of counsel or situations

11   where the factual or legal basis for the claim was not reasonably available to counsel

12   at the time of the procedural default. *Id.* at 488; *see also Coleman v. Saffle*, 869 F.2d

13   1377, 1381 (10th Cir. 1989) (although it was arguable whether counsel should have

14   been aware of the issue previously, the court would reach the merits because there

15   was no reliable prior indication that constitutional violation existed and because case

16   was capital); *Canary v. Bland*, 583 F.2d 887, 894 (6th Cir. 1978) (Merrit, J.,

17   concurring) (noting that cause can be found if "neither the defendant nor his attorney

18   could reasonably have been expected to know or appreciate the legal significance of

19   the facts").  Situations in which the novelty of a legal issue has been found to

20   constitute cause include cases in which the Supreme Court precedent currently relied

21   upon explicitly overruled a prior Supreme Court decision. *Reed v. Ross*, 468 U.S. 1,

22   17 (1984).  External objective factors could also include interference by state actors,

23   including the state courts, which impeded or hindered compliance with the state's

24   procedural rule. *Murray*, 477 U.S. at 488; Liebman,§ 26.3b, p. 1330.

25   **IV.   CAUSE IN RAMIREZ'S CASE**

26   A number of circumstances in this case, considered either individually or

27   cumulatively, provide cause for any procedural default, or enough colorable evidence

28   of cause to warrant discovery or a hearing on the question.  These include sentencing

1    counsel's failures, the failure of the trial court to properly fund and timely appoint an

2    independent mental health expert or mitigation specialist under *Ake v. Oklahoma*, 470

3    U.S. 68 (1985), Dr. McMahon's misleading diagnosis based upon inadequate

4    information and improper testing, the fact that *Atkins* was not decided until after

5    Ramirez's first post-conviction proceeding, the inadequacies of Arizona's post-

6    conviction process and system for the appointment of qualified counsel, and any

7    alleged lack of diligence in preserving the claim due to post-conviction counsel's

8    ineffectiveness.

9            **A.**    **INTERFERENCE BY STATE ACTORS, INEFFECTIVE ASSISTANCE OF SENTENCING COUNSEL, AND THE TIMING OF THE *ATKINS***

10                **DECISION**

11        The trial court's actions, in refusing to appoint a mitigation specialist and an

12   independent mental health expert for the defense, virtually ensured that Ramirez's

13   sentencing counsel would perform ineffectively and that Dr. McMahon's evaluation

14   would be misleading and inaccurate because it would be based upon an inadequate

15   mitigation investigation.[6]  Dr. McMahon's admittedly erroneous statement in the

16   original sentencing report that he could positively "rule out" mental retardation had

17   consequences for post-conviction because it misled any later attorney from actively

18   investigating Ramirez's mental retardation.  Exh. 20; ROA 149, Exh. I to sentencing

19   memorandum, at p. 6.  Defense counsel begged the court for expert and investigative

20   resources early in the case so that she could properly prepare mitigation.  These

21   requests fell on deaf ears as the trial court had no appreciation for what mitigation

22   was, the time-consuming nature of the work, or the need for specialized assistance in

23   the mental health and investigative arena:

24        THE COURT:     Now, a child psychologist.  Why?

25        MS. SHAW:      Because a psychologist in a case like this, they play

26                        an important part in a death penalty case, along with

---

27        [6]In attempt to adhere to the page limit, habeas counsel incorporates by

28   reference the prior briefing on the Twelfth Claim for relief, which concerns the *Ake* violation.

1   to help us determine, you know, social upbringing, and things like that.

2

3   THE COURT:   Upbringing of who?

4   MS. SHAW:   Mr. Ramirez.  Mr. Ramirez, and also it helps with – they all kind of go along with the mitigation expert.

5   THE COURT:   What's a mitigation expert?  I have never heard of that in a quarter century.

6

7   MS. SHAW:   I have a letter from someone we talked with, a Gary Solomen.  He's actually a social worker –

8   THE COURT:   Would a mitigation expert be able to testify at a hearing on mitigation –

9

10   MS. SHAW:   That would be what he would do, but he needs to work along with myself and Ramirez, and it takes a long time to gather the evidence.  What he would do is talk with different people, and this is as in mitigation. Should Ramirez be convicted, this is not something he can do in a month period of time, or whatever.  It's a long ongoing process –

11

12

13

14   THE COURT:   This case has brought up a whole bunch of things that I have never heard of, and I have had a lot of murder cases in my day.  And these are all novel matters that are being called to the attention of the Court that I have never read about nor experienced.

15

16   . . . .

17   THE COURT:   I always thought mitigating testimony was a matter of not so much some psychiatrist – of course, I have seen that, but people come in and say that a guy has a job, he graduated from Yale, he did this and did whatever, and we never had these things.  Maybe the dimensions of murder cases have changed a lot in the past few years, I don't know.  I'm not familiar with that stuff.

18

19

20

21   MS. SHAW:   I have atttended two seminars within the last few months and they were both dealing with capital cases.

22

23   THE COURT:   They're saying that the government should pay for the kind of experts you're talking about.

24

25   MS. SHAW:   Well, the main thing that came out as far as mitigation experts, they were essential in a capital case to help put everything together and bring a total picture to the jury.

26

27   THE COURT:   . . . . Why give him somebody to do what a lawyer does? . . . .

28

MS. SIEGEL:    Judge, I don't believe that a mitigation expert . . . can compile on the information that possibly on Mr. Ramirez talking to him, interview him, do a family history, do a family talk about the things that he's never known, his father, and coming from a family, a large family of kids, and that social worker, working in tandem with a psychologist and psychiatrist, can do with Mr. Ramirez. There's no amount of training that a lawyer gets in lawyer school or in the field that can compare.

TR 12/12/89 at 10-12.

The judge also equated competency to stand trial with mitigation, evidencing a fundamental misunderstanding about capital defense work: "Well, if he can understand the nature of the proceedings against him and assist counsel in the preparation of his defense, and distinguish right from wrong – I don't believe I have ever appointed a psychiatrist in my life." TR 12/12/89 at 13. The judge did not think that gathering mitigation was a lengthy process:

MS. SIEGEL:    . . . . I want that to be made a record, that the Court will give us enough time for preparing the mitigation evidence for the mitigation hearing, because we're asking for it now, today, . . .

THE COURT:    I think that would be discretionary with whoever would have the responsibility.

MS. SIEGEL:    What I'm saying is, we're asking for it now and making a record and requesting it now, because mitigation evidence takes a long time to –

THE COURT:    *I don't buy that at all.*

TR 12/12/89 at 17 (emphasis added).

Counsel's requests for a mental health expert and mitigation specialist were denied. ROA 61. Although a mitigation specialist was never appointed, eventually, a mental health expert did become involved: Dr. McMahon. However, Dr. McMahon was not the independent defense expert envisioned by *Ake*, but instead, the evaluation was court-ordered, the expert was chosen by the court after the parties made their nominations, defense counsel was not allowed to work with Dr. McMahon confidentially, the court unreasonably restricted the funding available for Dr.

1  McMahon to $500, and Dr. McMahon was not appointed until less than three months

2  before the sentencing hearing.  ROA 125 (minute entry dated 7/27/90).

3       Under Arizona rules at the time of Ramirez's sentencing, at any time before

4  sentence, and in conjunction with the presentence report, "the court may order the

5  defendant to undergo mental health examination or diagnostic evaluation."  Ariz. R.

6  Crim. P. 26.5 (West 1990).  Dr. McMahon was not a member of the defense team as

7  his report was court-ordered and the defense was not free to work confidentially with

8  Dr. McMahon as "[a] portion of any report not made available to one party shall not

9  be made available to any other."  Ariz. R. Crim. P. 26.6(a).

10       It was clear going into trial that absent significant mitigation evidence to

11  counter any aggravating factors, Ramirez would likely receive the death sentence,.

12  Ramirez stood accused of two murders, and his background included numerous "red

13  flags" which undoubtedly affected his mental condition.  Due to the trial court's

14  denial of funding for critical experts and investigation, petitioner was unable to fully

15  develop crucial mitigating evidence regarding his troubled and complex background,

16  and evidence regarding his mental health, brain damage and mental retardation.

17       Capital counsel must conduct a reasonable investigation regarding a

18  petitioner's background.  There is also a corresponding mandate that the court

19  provide reasonable funding and time to conduct the required investigation.  This is

20  especially true in cases such as the Ramirez's, who like the defendant in *Wiggins v.*

21  *Smith*, 539 U.S. 510 (2003), has a troubled history very probative in regard to his

22  moral culpability.  Accordingly, if the court fails to provide appropriate funding and

23  time for expert and investigative involvement, petitioner has shown a cause external

24  to the defense.

25       The state court and Dr. McMahon were both state actors whose actions

26  interfered with Ramirez's ability to present his claims in a procedurally proper

27  manner.  The sentencing court ordered the mental health evaluation with insufficient

28  time and funding in which to conduct the necessary background investigation,

1   ensuring that sentencing counsel would perform ineffectively. *See Allen v. Woodford*,

2   395 F.3d 979, 1001 (9th Cir. 2005) (noting that the acquisition of mitigating evidence

3   is a lengthy process that must begin early, in the guilt phase, because "if the life

4   investigation awaits the guilt verdict, it will be too late.").  However, by ruling out

5   mental retardation erroneously and purporting to opine on Ramirez's mental state and

6   background with insufficient information[7], Dr. McMahon's report made it reasonable

7   for first post-conviction counsel to think that these were not fruitful areas for

8   additional investigation.  *See Parkus v. Delo*, 33 F.3d 933, 938, 940 (8th Cir. 1994)

9   (petitioner had "cause" for failing to challenge trial counsel's inadequate

10  investigation of mitigation evidence because post-conviction counsel believed state

11  social services official's false representation that all mental health records had been

12  destroyed); *Forman v. Smith*, 633 F.2d 634, 641 (2d. Cir. 1980) (*dicta*) (intentionally

13  or inadvertently misleading statement by an officer of the state "that obscures the

14  opportunity to develop a federal constitutional violation would be 'cause' for not

15  pursing such a claim" as required under state law).

16      Sentencing counsel's failure to properly provide background information to Dr.

17  McMahon, leading him to improperly evaluate Ramirez and misleading post-

18  conviction counsel regarding the true nature of his mental health impairments,

19  constitute cause.  *Coleman v. Thompson*, 501 U.S. at 754 (ineffectiveness of counsel

20  in violation of the Sixth Amendment can constitute the type of external impediment

21  that satisfies cause because "'the Sixth Amendment itself requires that responsibility

22  for the default be imputed to the State.'") (quotation omitted).

23      The reasonableness of post-conviction counsel's actions must be viewed in

24  light of the fact that Dr. McMahon *specifically ruled out* the possibility of mental

25

26      [7]Dr. McMahon has admitted that he was provided with inadequate background
27  information.  Exh. 20 at pp. 1-2.  He specifically noted at the time of his original
    report that "the following background is not as detailed as I would have like [sic]."
28   ROA 149, Exh. I to sentencing memorandum, at 3.  In spite of this limitation, Dr.
    McMahon purported to reach an accurate diagnosis anyway.

1   retardation, due to the lack of accurate background information and his use of an

2   outdated and inappropriate test.  As a lay person, post-conviction counsel[8] could not

3   be expected to know that Dr. McMahon's report was inaccurate and it would have

4   been reasonable for him to believe that Dr. McMahon, as a psychologist, acted

5   competently in preparing his report.  Because Dr. McMahon's erroneous evaluation

6   was done at the behest of the court itself, his involvement, and misleading report, was

7   an objective factor external to the defense that lead Ramirez's mental retardation to

8   remain ignored for years.  The facts underlying the claim did not come to light until

9   years later, but that does not mean that post-conviction counsel should be blamed for

10  Dr. McMahon's inaccurate and misleading report.  *See Perkins v. LeCureux*, 58 F.3d

11  214, 218 (6th Cir. 1995) (petitioner had clear cause, to avoid abuse of writ defense,

12  because facts underlying claim regarding judge and consideration of racial factors did

13  not come to light until the judge testified in co-defendant's proceedings).

14          The difficulties inherent in identifying mental retardation are graphically

15  illustrated in Mr. Ramirez's case.  Prior to sentencing, Dr. McMahon examined Mr.

16  Ramirez and administered the Peabody Pictorial Vocabulary Test (PPVT).  Dr.

17  McMahon reported that he obtained an "I.Q." score of 94, and that this was in "no

18  way indicative of any form of mental retardation."  ROA 149, Exh. I to sentencing

19  memorandum, at 6.  However, the PPVT cannot be used as an intelligence test to rule

20  out the possibility of mental retardation. In addition, prior to the examination, Dr.

---

[8]Post-conviction counsel is deceased, so habeas counsel was unable to obtain a declaration from him, a fact which should not be held against Ramirez.  Habeas counsel did attempt to contact a lawyer who habeas counsel learned had possibly worked on this case with post-conviction counsel while a law student.  Habeas counsel was unable to obtain this information at the time of this filing, as this person did not return habeas counsel's phone calls.  Locating this person's contact information was complicated due to the fact that they legally changed their first name from Sherman to Abigail. However, the reasonableness of post-conviction counsel's actions can nonetheless be viewed objectively.  In the alternative, habeas counsel requests the court's assistance through discovery processes to obtain information about post-conviction counsel's representation of Ramirez, through state bar records and depositions of those who worked with or knew post-conviction counsel at the time of the representation.  Habeas counsel has located one of these people: Mr. John Sears, an attorney in Prescott, Arizona.

1    McMahon did not recall:

2         being provided with any information regarding Mr. Ramirez's social
         history, other than that which Mr. Ramirez provided, which was
3         insufficient and unreliable, as noted in my report.  I also do not recall
         being provided with Mr. Ramirez's school, vocational, or medical
4         records.

5    Exh. 20 at  pp. 1-2.  Dr. McMahon further indicated that:

6         [H]ad I been provided with these records at the time of sentencing, I
         would have insisted on obtaining information about Ramirez's adaptive
7         behavior.  In addition, instead of conducting the Peabody Pictorial
         Vocabulary Test [PPVT], I would have given Mr. Ramirez a
8         comprehensive IQ test.  The PPVT is not a comprehensive IQ test.
         Although I said in my report that Mr. Ramirez's score on this test was
9         "in no way indicative of any form of mental retardation," I would not
         have made this statement had I seen Mr. Ramirez's school records,
10        which show IQ scores of 70 and 77 on the more comprehensive WISC
         IQ tests.  These scores would have indicated to me that Mr. Ramirez
11        may be retarded and it would have greatly expanded the nature of the
         evaluation I did conduct.
12
13   *Id.* at pp. 2-3.

14        It is established that the PPVT cannot be used as an intelligence test to rule out

15   the possibility of mental retardation.  The most current version of the PPVT available

16   at the time of sentencing, which was *not* employed by Dr. McMahon, did not purport

17   to convert the PPVT score to an IQ score.  *See* Elisabeth H. Wiig, *Review of Peabody*

18   *Picture Vocabulary Test – Revised*, *in* The Ninth Mental Measurements Yearbook

19   1127 (James V. Mitchell, Jr., edl, 1985).  Although the outdated version fo the PPVT

20   used by Dr. McMahon purported to convert the scores to "IQ," the PPVT-R

21   abandoned this practice in recognition of the inherent limitations of the test.  *Id.*; *see*

22   *also* Howard B. Lyman, *Review of Peabody Picture Vocabulary Test*, *in* The Sixth

23   Mental Measurements Yearbook, 820-21 (Oscar K. Buros, ed., 1965).

24        Subjects should always be administered the most updated version of a test in

25   order to guard against such dangers as outdated normative populations, which can

26   artificially inflate the subjects' score.  Committee on Disability Determination for

27   Mental Retardation, National Research Council (2002) *Mental Retardation:*

28   *Determining Eligibility for Social Security Benefits*, 123 (Daniel J. Reschly, Tracy G.

1   Myers, and Christine R. Hartel eds. 2002) (available online at http://www.nap.edu)

2   (explaining that IQ increases over the entire population at a rate of approximately

3   three points per decade, so "tests with norms older than 10 to 12 years will tend to

4   produce inflated scores and could result in the denial of benefits to significant

5   numbers of individuals who would be eligible for them if more recent norms had been

6   used."); *see also* R. Steve McCallum, *Review of Peabody Picture Vocabulary Test –*

7   *Revised*, *in* The Ninth Mental Measurements Yearbook, 1126-27 (James V. Mitchell,

8   Jr., ed., 1985) (noting that when compared to scores on the original PPVT, scores on

9   the PPVT-R have been significantly lower nad noting that the normative population

10  used in the original PPVT did not represent minority populations well).

11      Ramirez, in preparation for his 1990 sentencing, was given the original version

12  of the PPVT, a test whose normative population consisted entirely of white children

13  and youth living  in Nashville, Tennessee, in the late 1950s.  Howard B. Lyman,

14  *supra* at 820-21.  Therefore, in 1990, Ramirez was given a test devised in 1959, more

15  than three decades earlier.  This factor alone can account for a large inflation in score,

16  without even taking into account the standard deviation for this test.  Lyman, at 820;

17  *In re Salazar*, 443 F.3d 430, 433 n.1 (5th Cir. 2006) (explaining this proven concept,

18  known as the Flynn effect).

19      Although Dr. McMahon's failures, in employing this test and in purporting to

20  rule out mental retardation, are now evident to habeas counsel after extensive

21  research into mental retardation and consultation with an expert who literally co-

22  wrote the book on mental retardation, TR 4/25/06 at 123-134, these failures would

23  not have been so evident to post-conviction counsel, tasked with drafting a petition

24  without the assistance of an expert and without the emphasis placed on mental

25  retardation post-*Atkins*. *See, e.g., State v. White*, 885 N.E.2d 905, 915 (Ohio 2008)

26  (noting that lay people "cannot easily recognize mild mental retardation.").

27      Because the first post-conviction proceeding occurred prior to *Atkins*, post-

28  conviction counsel would not have had the incentive to obtain IQ testing or

investigate the facts underlying the mental retardation diagnosis.[9]  *See Morris v. Dretke*, 413 F.3d 484, 500 (5th Cir. 2005) (Higginbotham, J., concurring) (petitioner had no incentive to obtain IQ testing prior to *Atkins*, given the Supreme Court's position in *Penry*).  In Ramirez's case, at the time of his trial, direct appeal, post-conviction, and initial habeas pleadings, it was well-settled Supreme Court law that it was not cruel and unusual to execute the mentally retarded.  *Penry v. Lynaugh*, 492 U.S. 302 (1989), *abrogated by Atkins*, 536 U.S. 304.  This Court has specifically noted that Ramirez could not have raised the *Atkins* claim prior to filing his federal habeas petition "because *Atkins* was decided in 2002 and Petitioner's original petitioner was filed in 1997." Dist. Ct. Doc. No. 126 at 2.  For similar reasons, first post-conviction counsel, at the time of the alleged default, could not have known about the prime importance that would be placed on the facts underlying mental retardation.  The effort to uncover mental retardation at the time of post-conviction, as prejudice for an ineffective assistance of sentencing counsel claim, was not at the premium it is now.  *Atkins* so completely changed the legal and factual landscape regarding mental retardation, that cases have been sent back on the mental retardation question even if mental retardation could have been raised earlier and was not.  *See, e.g., In re Holladay*, 331 F.3d 1169, 1172 (11th Cir. 2003) (granting stay of execution so that second habeas petition could be pursued, because even though evidence of mental retardation was presented in state court, it was not presented in the contet of a complete Eighth Amendment bar against execution, a "substantively different inquiry"); *State v. Lott*, 779 N.E.2d 10111, 1015 (Ohio 2002) ("Admittedly, he could have raised mental retardation as a mitigating factor during the penalty phase of the trial, but not as a complete bar to the death penalty."); *see also Perkins v. Alabama*,

---

[9]The adaptive behavior inquiry involves investigating Ramirez's background, which was a rich source of mitigating evidence in this case, even absent the diagnosis of mental retardation.  Ramirez incorporates by reference the prior briefing and exhibits on the ineffective assistance of counsel claim, mental retardation claims, and the exhibits attached to this memorandum to illustrate this point.

536 U.S. 953 (2002) (memo.) (despite a lower court finding that petitioner's IQ was 76, judgment vacated and remanded for further consideration in light of *Atkins*), vacating and remanding *Ex Parte Perkins*, 808 So.2d 1143 (Ala. 2001).  The Arizona Supreme Court has also taken the position that earlier litigation of mental retardation, pre-*Atkins*, is not sufficient to satisfy the Eighth Amendment and due process because "*Atkins* so changed the landscape of death penalty jurisprudence. . . the trial court simply could not have applied the correct principles during sentencing."  *State v. Grell*, 66 P.3d 1234, 1240 (Ariz. 2003).

At the time of Ramirez's trial, and during his first post-conviction proceeding, the U.S. Supreme Court was of the opinion that prevailing standards of decency allowed the execution of the mentally retarded and thus, post-conviction counsel's duty to more specifically investigate this diagnosis did not exist.  That Ramirez was able to reach the final stage of review, federal habeas, before the U.S. Supreme Court recognized the inherent cruelty in executing the mentally retarded, is a circumstance beyond his control.

The mentally retarded are simply incapable of possessing the moral culpability required for a capital sentence.  Society has no interest in exacting the ultimate punishment from them.  The passage of time has lead to the recognition that Ramirez cannot be held capitally responsible for his crime.  The fact that his mental retardation was not discovered sooner is not sufficient justification for the continued pursuit of his execution.

Sentencing counsel's inadequate mitigation presentation, and Dr. McMahon's inaccurate portrait of Ramirez's background,[10] due to the trial court's failure to

---

[10]For instance, Dr. McMahon described Ramirez's mother as "devoting her time as a traditional Mexican-American mother whose responsibility revolves around the home and her children.  She was always there for the client when he needed her as he was growing up."  ROA 149, Exh. I to sentencing memorandum, at 3.  As declarations from family members make clear, this assertion was far from the truth, as Ramirez's mother was an alcoholic who frequently abandoned her children to fend for themselves while she went out drinking and picking up men.  She repeatedly tried to abort Ramirez while pregnant with him and fed him beer in his baby bottle as a

provide necessary funding and time for a proper evaluation and investigation, were also misleading in the picture they painted of Ramirez's childhood and background. Many family secrets did not come out at sentencing and instead, a relatively innocuous picture was painted by sentencing counsel. This is not surprising, as family secrets such as attempted abortions, an unnamed father, and physical abuse, all present in Ramirez's background, normally do not come out upon initial investigation. It is only with time and repeated contacts that family witnesses feel comfortable enough with an investigator to tell the ugly truths about their family. *See Allen*, 395 F.3d at 1001 (mitigation witnesses are often reluctant to provide information, but if the process is long enough, through time and multiple contacts, their reluctance can be overcome). However, given the relatively normal portrait presented by the sentencing testimony, it is understandable that post-conviction counsel may not have investigated these avenues of information.

It must also be remembered that at the time of the alleged procedural default, during the first post-conviction proceeding, Ramirez was not provided a hearing on his ineffective assistance of sentencing counsel claim. Therefore, it is only logical that additional pieces of evidence would not surface until later. *See Roberts v. Dretke*, 356 F.3d 632, 639 (5th Cir. 2004) (due diligence does not mean that if the evidence was theoretically available, prior counsel should have acquired it). Petitioner is only required to make a "reasonable attempt, in light of the information available at the time, . . . it does not depend, . . . upon whether those efforts could have been successful." *Williams v. Taylor*, 529 U.S. 420, 435 (2000).

For example, if no evidence puts a "reasonable attorney on notice" of additional information about a juror's omissions on voir dire about possible bias, prior counsel cannot be faulted for not discovering this information or for only

---

child. These are just a few examples of the physical, emotional and sexual abuse that Ramirez's mother exposed the children to and they are hardly the actions of a "traditional" and loving maternal figure. *See, e.g.,* Exhs. 9, 11, 12, 13.

vaguely alleging a need to examine all the circumstances surrounding the jury's impanelment and consideration of the case. *Id.* at 442; *see also Roberts v*, 356 F.3d at 638 (if there is a reason for prior counsel to believe that time and labor intensive discovery efforts will not bear fruit, discovery of this type of evidence "is beyond the requirements of due diligence."). In such a situation, it would be absurd to think "that in all cases diligent counsel must check public records containing personal information pertaining to each and every juror." *Id*. at 443. However, if there is a reason to believe that the prior attorney's assumptions were incorrect, new evidence should be allowed to surface in federal habeas and should be considered "in determining whether to accept the state habeas court's factual determinations." *Id.* Post-conviction counsel could not be expected to know that Dr. McMahon's "IQ" test was not really an IQ test and that Dr. McMahon used an outdated test, contrary to competent and ethical psychological practice. Likewise, he was reasonable in assuming that the background picture painted by Dr. McMahon had been confirmed as true and accurate and was sufficiently reliable, otherwise Dr. McMahon would not have included it in his report or relied on it in reaching his diagnosis. The fact that the state courts refused to provide sufficient resources to uncover Ramirez's substantial mitigation, including his mental retardation, but provided just enough assistance at trial to mislead post-conviction counsel, cannot be held against Ramirez and work to deprive him of federal merit's review of this claim. *See, e.g., Morris*, 413 F.3d at 500 (Higginbotham, J., concurring) (when a prisoner seeks to develop his claim in state court, but is denied the funding to do so, fault lies with the state, not the petitioner).

### B.   THE INADEQUACY OF ARIZONA'S POST-CONVICTION PROCESS AND INEFFECTIVENESS OF POST-CONVICTION COUNSEL

Should this Court rule that post-conviction counsel was not reasonable in relying upon a licensed psychologist's diagnosis and background investigation, Ramirez argues in the alternative that Arizona's post-conviction process was

1   inadequate to protect his rights, due to its failure to ensure that he was appointed
2   competent counsel and because post-conviction counsel performed ineffectively.
3   Ramirez was entitled to the appointment of qualified and effective post-conviction
4   counsel based upon Arizona statute, and the state and federal constitutions.  Although
5   not recognized by the state post-conviction court in this case, another state post-
6   conviction court has recognized that in Arizona, capital post-conviction petitioners
7   do possess a right to competent representation.  Exh. 75.

8   　　　　Post-conviction counsel's failures can be imputed to the state as the state was
9   responsible for ensuring that properly qualified and competent post-conviction
10  counsel were appointed to capital cases.  *See Griffin v. Delo*, 961 F.2d 793  (8th Cir.
11  1992) (remanding a capital petition for consideration of whether attorney who
12  represented petitioner in prior state post-conviction and federal proceedings was
13  ineffective in failing to raise several claims including ineffectiveness of counsel at
14  trial); *Weekley v. Jones*, 927 F.2d 382, 38-87 (8th Cir. 1991) (remanding for cause for
15  procedural default determination on whether post-conviction counsel was ineffective
16  for failing to raise a claim); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)
17  ("Although we have not identified with precision exactly what constitutes 'cause' to
18  excuse a procedural default, we have acknowledged that in certain circumstances
19  counsel's ineffectiveness in failing to preserve the claim for review in state court will
20  suffice."); *McFarland v. Yukins*, 356 F.3d 688, 709, 712 (6th Cir. 2004) (appellate
21  counsel's failure to challenge ineffectiveness of trial counsel "amount[ed] to
22  constitutionally ineffective assistance" on appeal and furnished cause for default in
23  failing "to raise ineffectiveness of trial counsel on appeal"); *Reagan v. Norris*, 279
24  F.3d 651, 657 (8th Cir. 2002) ("cause" existed for failure to properly preserve an
25  issue regarding trial counsel's ineffectiveness because "post-trial counsel either failed
26  to recognize or did not adequately assist [prisoner] in pursuing this claim and thus
27  failed to preserve it on appeal").

28  　　　　Ramirez has already briefed this issue in a prior pleading, and incorporates by

reference this issue as briefed in Dist. Ct. Doc. No. 110 at pp. 24-36.  In addition, on this specific claim, Ramirez would request that he be allowed to request discovery on facts such as post-conviction counsel's bar records, his application in the state courts to represent capital post-conviction defendants, depositions of those who worked with or knew of post-conviction counsel's practice during this time frame, and the ability to present expert testimony on the duties of post-conviction counsel, including the duties of post-conviction counsel at that time in Arizona.[11]  Discovery requests should also be entertained on the systemic problems with Arizona's post-conviction system, including funding limitations and the appointment of post-conviction counsel.  Other post-conviction counsel have indicated that Arizona has put up funding roadblocks to representation, and that the practice was that funding for investigators and experts was not requested until after an evidentiary hearing had been ordered, after the petition stage.  *See* Exh. 84.

The ABA Guidelines indicate that post-conviction counsel is tasked with "seek[ing] to litigate all issues, whether or not previously presented, that are arguably meritorious. . ., including challenges to any overly restrictive procedural rules." American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, Guideline 10.15.1(c) (2d ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913, 1079 (2003) (hereinafter "Guidelines").  "[W]inning collateral relief in capital cases will require changing the picture that has previously been

---

[11]Habeas counsel has learned that post-conviction counsel, John C. Williams, had nine disciplinary complaints but that those records have been expunged by the state bar.  However, these records may still exist in post-conviction counsel's files. In addition, as noted in a previous footnote, habeas counsel has attempted to contact a law clerk who may have worked with post-conviction counsel on the Ramirez case, but as yet, has been unsuccessful in interviewing this person.  The discovery process could bring this information to light.  Ramirez's counsel has learned from another attorney who knew Mr. Williams, John Sears, that perhaps post-conviction counsel took on too many cases and that he tended to do the minimum of briefing in the vast majority of his appeals. Because of the difficulty in obtaining information about post-conviction counsel's representation due to his death, Ramirez requests the opportunity to conduct discovery, and after completion of discovery, if necessary, hold a hearing on post-conviction counsel's ineffectiveness in this case.

1    presented.  The old facts and legal arguments. . . are unlikely to motivate a collateral

2    court."  *Id.* at 1085, Guideline 10.15.1, cmt.  New counsel must "keep under

3    continuing review the desirability of modifying prior counsel's theory of the case in

4    light of subsequent developments."  *Id.* at (E)(3).  Relying on the facts as they stand

5    in the record is not good enough because post-conviction counsel must "continue an

6    aggressive investigation of all aspects of the case."  *Id.* at (E)(4) and at 1085,

7    Guideline 10.15.1, cmt. (collateral counsel "cannot rely on the previously compiled

8    record").  "[T]he trial record is unlikely to provide either a complete or accurate

9    picture of the facts and issues in the case."  *Id.* at 1086, Guideline 10.15.1, cmt.  This

10   can be for any number of reasons, including some of those advanced by Ramirez in

11   his habeas proceedings – that the trial attorney failed to conduct an adequate

12   investigation in the first instance.  *Id.*.

13        Close contact with the client is also required.  *Guidelines* at 1079, Guideline

14   10.15.1(E)(1).  Though the attorney must certainly exercise his own independent

15   judgment in ultimately choosing which claims to pursue, the attorney can only make

16   those decisions "after consulting with his client."  *Jones v. Barnes*, 463 U.S. 745, 753

17   n.6 (1983); *see also Florida v. Nixon*, 543 U.S. 175, 178 (2004) ("Defense counsel

18   undoubtedly has a duty to discuss potential strategies with the defendant.").

19   Ramirez's visitation records show no visits from post-conviction counsel.

20        Ineffectiveness claims may be "based in whole or in part on counsel's

21   procedural defaults" themselves.  *Murray*, 477 U.S. at 496.  The failure to raise a

22   valid constitutional claim without any "conceivable tactical or strategic reason" can

23   amount to ineffective assistance, and "cause" excusing the default of that claim.  *See*

24   *United States v. De la Fuente*, 8 F.3d 1333, 1336-37 (9th Cir. 1993).  The deficient

25   performance of Ramirez's post-conviction counsel constitutes "cause" for Ramirez's

26   failure to raise the defaulted claim.  The merits of this issue demonstrate the prejudice

27   Ramirez suffered as a result of counsel's gross omissions.  *See, e.g., Freeman v. Lane*,

28   962 F.2d 1252, 1262 (7th Cir. 1992).

1     Under these standards, and looking at the post-conviction record in this case,

2  post-conviction counsel's representation was arguably ineffective on its face.

3  Although post-conviction counsel raised ineffective assistance of sentencing counsel

4  at sentencing, almost no case law was cited, and no effort was made to plead facts to

5  prove prejudice.  Habeas counsel has not uncovered any requests for expert or

6  investigative assistance made by post-conviction counsel, although this may have

7  been due to funding problems systemic in Arizona.  Whatever the reason, the lack of

8  expert and investigative assistance on post-conviction will ensure that no relief or

9  hearing is granted since post-conviction is specifically reserved for claims which

10  require reference to facts outside of the existing record at trial and direct appeal.  In

11  ruling on the claim, the post-conviction court noted that the claim of ineffective

12  assistance of sentencing counsel was both legally and factually unsupported.  ROA

13  192.  However, it is clear now that Ramirez's claim has a substantial amount of legal

14  and factual support, showing prejudice from post-conviction counsel's failures, or at

15  least a colorable enough claim to warrant federal discovery.[12]  *See  Delgado v. Lewis*,

16  223 F.3d 976, 980-81 (9th Cir. 2000) (noting that appellate counsel performs

17  ineffectively when he fails to discovery and brief nonfrivolous issues).

18  **V.    PREJUDICE**

19     The definition of "prejudice" for the cause and prejudice inquiry has not yet

20  been precisely defined.  *See United States v. Pettigrew*, 346 F.3d 1139, 1144 (D.C.

21  Cir. 2003); *Tyler v. McCaughtry*, 293 F.Supp.2d 920, 925 (E.D. Wis. 2003).

22  However, in *Strickler v. Greene*, 527 U.S. 263 (1999) and *Banks v. Dretke*, 540 U.S.

23  668 (2004), the Court's analysis seemed to indicate that the prejudice inquiry was

24  grounded in the underlying potential merits of the defaulted claim.  *See also Lynch*

25

26     [12]Ramirez incorporates by reference the prior briefing and exhibits in this
proceeding on ineffective assistance of sentencing counsel and mental retardation,

27  and relies upon the exhibits attached to this pleading to illustrate this point. *See, e.g.,*
Exhs. 1-7, 9-25, 27-32, 38, 44-45, 64-74, 76-83.  These pleadings and exhibits

28  provide a wealth of information regarding Ramirez's mental retardation, brain
damage, and other mitigating background information.

1    *v. Ficco*, 438 F.3d 35, 48 (1st Cir. 2006) (holding that *Strickler* requires a finding that

2    if a petitioner can meet the prejudice standard to establish ineffective assistance under

3    *Strickland*, then the prejudice standard for cause and prejudice is met).  In assessing

4    the potential merits of the ineffectiveness of sentencing counsel claim for the

5    purposes of cause, this Court should not assess the claim under the AEDPA

6    limitations upon relief.  *Joseph v. Coyle*, 469 F.3d 441, 459 (6th Cir. 2006) (holding

7    that "[a]lthough Joseph must satisfy the AEDPA standard with respect to his

8    independent IAC claim, he need not do so to claim ineffective assistance for the

9    purpose of establishing cause").  Although both prongs are required to be shown, "a

10   strong showing on one prong of the test may go a long way towards establishing the

11   other prong."  *See* Liebman,§ 26.3d, p. 1355.  Because Ramirez can make such a

12   strong showing of prejudice on the merits of his claim, this Court should excuse the

13   default.

14        For the prejudice inquiry, Ramirez incorporates by reference the prior briefing

15   and exhibits in this proceeding on ineffective assistance of sentencing counsel, mental

16   retardation, and also the exhibits attached to this pleading.  Although not meant to be

17   an exhaustive list, Ramirez has come forward with evidence of low IQ, an

18   impoverished and extremely abusive childhood, evidence of prenatal trauma, brain

19   damage, and mental retardation.  This evidence paints an entirely different picture of

20   Ramirez's moral culpability than was presented at sentencing.

21   **VI.    FUNDAMENTAL MISCARRIAGE OF JUSTICE**

22        Even if cause and prejudice is not demonstrated, a federal court may still

23   address the merits of a procedurally defaulted claim to avoid a miscarriage of justice.

24   *Dretke v. Haley*, 541 U.S. 386 (2004).  The standard of proof for the miscarriage of

25   justice exception is less stringent than the standard of proof governing claims of

26   constitutional insufficiency of the evidence under *Jackson v. Virginia*, 443 U.S. 307

27   (1979).  *Schlup v. Delo*, 513 U.S 298, 330 (1995).  Ramirez requests the opportunity

28   to file for discovery requests relating to his miscarriage of justice claim and he also

1  requests that a hearing be held on the fundamental miscarriage of justice exception
2  to procedural default.

3       The miscarriage of justice exception exists because the cause and prejudice
4  standard may be insufficient to correct injustices that have been overlooked due to
5  procedural technicalities: "the principles of comity and finality that inform the
6  concepts of cause and prejudice 'must yield to the imperative of correcting a
7  fundamentally unjust incarceration.'" *Murray*, 477 U.S. at 496 (quotation omitted).
8  As with cause and prejudice, the fundamental miscarriage of justice exception is
9  meant to be a flexible concept that has not yet been precisely defined by the United
10  States Supreme Court.  Liebman, § 26.4 at p. 1359.  In recognition of this, Ramirez
11  requests that the court cumulatively consider all the various  errors, failures of
12  counsel, failures in process, and the overwhelming amount of additional mitigation
13  uncovered for Ramirez in determining whether he is entitled to the benefit of the
14  fundamental miscarriage of justice exception.  *See House v. Bell*, 547 U.S. 518, 536
15  (2006) (general rule that claims are defaulted unless cause and prejudice should not
16  be invoked if to do so would thwart the individual interest in justice in an exceptional
17  case).  The sentencing court was not presented with a wealth of mitigation evidence,
18  including Ramirez's evidence of mental retardation, low IQ, brain damage, and
19  traumatic childhood, that would have prevented a reasonable fact-finder from
20  sentencing Ramirez to death.  His mitigation is precisely the type which warrants
21  leniency and in fact, his mental retardation and brain damage makes it unlikely that
22  he could even have been found guilty of first-degree premeditated murder.

23       Although the exact contours of the fundamental miscarriage of justice
24  exception are not well-defined, it is clear that actual innocence of the death penalty
25  or the underlying crime will suffice.  Under *Sawyer v. Whitley*, 505 U.S. 333, 345
26  (1992), a petitioner is actually innocent of the death penalty if he is ineligible for that
27  sentence.  Ramirez's mental retardation renders him ineligible for the death penalty
28  and therefore, the "actual innocence" exception for procedural default applies to this

claim.  In addition, additional neuropsychological information uncovered by habeas counsel indicates that Ramirez suffers from brain damage, in addition to mental retardation, so that he does not have even have the ability to premeditate the crime, making him innocent of first-degree premeditated murder.  *See, e.g,* Exh. 74.  Even though not presented with any of this evidence during the guilt phase, Ramirez's guilt phase jury was struggling with the premeditation question, because they asked the court: "'[d]oes premeditation mean before you stab or during the stabbing, before death occurs?'".  TR 7/27/90 at 2.

Ramirez has set forth strong evidence of his mental retardation and because the question of procedural default and its exceptions is a uniquely federal question, this Court is not bound by the state court fact-finding on this issue.  In a fair forum, which pays heed to science and the proper psychological determination of mental retardation, along with the proper burden of proof, Ramirez would have prevailed on his mental retardation claim.  The state court found, that had the recognized measurement error of the Flynn effect been taken into account, Ramirez had proven each of the three prongs of mental retardation by a preponderance of the evidence.  Both of the state's mental retardation "experts" were shown not to be experts in mental retardation – one even admitted this – and were shown to have used methods of determining mental retardation that are completely at odds with the established diagnostic methods in the field.

Also, in a state like Arizona, to determine "innocence" of the death penalty, the court must balance the mitigating evidence against the aggravating evidence to see if a reasonable sentencer would impose a death sentence, because both the existence of aggravating circumstances and the absence of mitigating circumstances are required before a death sentence can be imposed.  The *Ring v. Arizona*, 536 U.S. 584, 609 (2002) remand cases illustrate that this is true, as the Arizona Supreme Court examined both the aggravating factors *and* mitigating evidence to determine if the *Ring* error was harmless.  *See, e.g., State v. Lamar*, 115 P.3d 611 (Ariz. 2005); *State*

1   *v. Murdaugh*, 97 P.3d 844 (Ariz. 2004); *State v. Moody*, 94 P.3d 1119 (Ariz. 2004);

2   *State v. Dann*, 79 P.3d 58 (Ariz. 2003).  In *State v. Roque*, 141 P.3d 368 (2006), the

3   Arizona Supreme Court overturned the jury's death sentence based upon evidence of

4   low IQ (without a mental retardation diagnosis) and mental illness.   Ramirez

5   possesses these very same qualities, illustrating that had his case been argued

6   properly the first time, he would not have received the death sentence.  At the very

7   least, Ramirez has shown enough evidence of a fundamental miscarriage of justice

8   to warrant either discovery or an evidentiary hearing.  *See Rivera v. Quarterman*, 505

9   F.3d 349, 354 (5th Cir. 2007) (record was "not sufficiently developed for us to

10  engage in the fact-intensive determination of whether equitable tolling is

11  appropriate," particularly given the importance of "the relationship between his

12  retardation and his ability to pursue habeas relief.").

13  **VII.   OTHER CONSIDERATIONS IN DETERMINING THE PROCEDURAL DEFAULT QUESTION**

14
15          There is no procedural default because Ramirez did not actually violate a state

16  procedural rule.  "The procedural default doctrine self-evidently is limited to cases

17  in which a 'default' actually occurred – *i.e.*, cases in which the prisoner actually

18  violated the applicable state procedural rule."  *See* Liebman, § 26.2c, p. 1272.

19  "Adjudicating this prerequisite to the procedural default defense requires close

20  scrutiny of the law and 'procedural practices of the States.'"  *Id.* at n.15 (citation

21  omitted).  "[T]he question of the sufficiency of the petitioner's effort to abide by the

22  state rule is one of federal, not state law."  *Id.* at 1276 n.16.  Arizona's rules for

23  successive post-conviction petitions specifically allow claims to be filed that are

24  exceptions to preclusion and Ramirez's claim fit these exceptions.  *See Selvage v.*

25  *Collins*, 494 U.S. 108 (1990) (*per curiam*) (remanding to state court to determine

26  whether petitioner's failure to raise claim would be considered procedural default

27  under state law).

28          Also, a state rule will not bar federal review if the right in question is

1   unwaivable, such as the right not to be tried while incompetent. *See* Liebman, §

2   26.2d, p. 1282. The right to not to be executed due to mental retardation, and to have

3   that evidence placed before the fact-finder, is of similar character and is not waivable.

4   In the alternative, it is a right that could only have been waived by Ramirez himself,

5   not by his counsel. *See id.* at 1284. Furthermore, even if the right could have been

6   personally waived by Ramirez, his mental retardation made him incapable of

7   knowingly or intelligently waiving his right to raise this claim. *See id.* at 1286; *see*

8   *also St. Pierre v. Cowan*, 217 F.3d 939, 940, 947 (7th Cir. 2000) (petitioner of

9   questionable competency did not procedurally default claim when the state post-

10   conviction procedures did not involve a formal or informal determination that the

11   petitioner's waiver was knowing and voluntary).

12   **VIII. THE NEED FOR DISCOVERY AND A HEARING**

13       Given the colorable nature of Ramirez's claims, these questions require

14   utilization of this court's discovery processes and if necessary, an evidentiary hearing.

15   *See Jenkins v. Anderson*, 447 U.S. 231, 234-35 n.1 (1980) ("[A]pplication of the

16   'cause' and 'prejudice' standard may turn on factual findings that should be made by

17   a district court."); *see also Williams v. Turpin*, 87 F.3d 1204, 1211 (11th Cir. 1996)

18   (district court erred in refusing to hold evidentiary hearing to assess sufficiency of

19   petitioner's allegation of cause and prejudice for default); *Buffalo v. Sunn*, 854 F.2d

20   1158, 1165-66 (9th Cir. 1988) (district court should conduct hearing where there are

21   disputed facts concerning cause)

22       There are factual disputes about cause, prejudice, and the miscarriage of justice

23   exception that cannot be resolved on the paper record.

24       Factual questions relating to "cause" and "prejudice" include the
        competence of counsel, whether some state official impeded the

25       petitioner's ability or effort to comply with a procedural rule, whether
        basis fo the decision not to object was tactical, whether the petitioner or

26       his attorney was aware of the relevant facts when the alleged default
        occurred, whether the petitioner's attorney at the time of the alleged

27       default should have anticipated the since-recognized claim that he failed
        to raise, and the degree of prejudice resulting from an unobjected-to-

28       error.

*See* Liebman,§ 26.3e, p. 1356 n.91.  When a substantial procedural default question exists, as it does here, the federal court has a duty to address the controverted factual issues surrounding the default.  *Id.* at 1356; *see also Porter v. Singletary*, 49 F.3d 1483, 1489-90 & n.13 (11th Cir. 1995) (petitioner was entitled to hearing to show cause on grounds that he did not know and could not reasonably have known the factual predicate for the claim at the time of the default); *Barnard v. Collins*, 13 F.3d 871, 878 (5th Cir. 1994) (district court's finding of absence of "cause" was premature in the absence of a hearing or other proceeding to determine when counsel could have discovered the claim through reasonable diligence and investigation).  This is because procedural default is a uniquely federal question not governed by the strictures of the AEDPA.  *See Holloway*, 355 F.3d at 716 (district court had authority to grant a hearing on ability to establish cause for procedural default and § 2254(e)(2) does not apply to these hearing); Liebman at § 26.3e, p. 1356 n.92 ("The federal nature of the controlling legal issues . . . makes it unlikely that the state courts will have adequately adjudicated factual questions regarding cause and prejudice.").

## IX.   CONCLUSION

Ramirez requests that this Court find that he has shown cause and prejudice, or a fundamental miscarriage of justice, so as to warrant merits review of his ineffective assistance of counsel claim.  In the alternative, Ramirez requests leave to conduct discovery and an evidentiary hearing on these claims.

Respectfully submitted this 29th day of April, 2010.

Jon M. Sands
Federal Public Defender

Paula K. Harms

By s/Paula K. Harms
Counsel for Petitioner

///
///
///

1

**CERTIFICATE OF SERVICE**

2   On this 29th day of April, 2009, I electronically transmitted the attached document
3   to the Clerk's Office using the CM/ECF system for filing and transmittal of a notice
    of electronic filing to the following CM/ECF registrants:

4   John Pressley Todd
    Assistant Attorney General
5   Capital Litigation Section
    1275 West Washington
6   Phoenix, Arizona 85007-2997

7   s/ Samantha Linley
       Secretary, Capital Habeas Unit

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28