**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

David Martinez Ramirez,     )     No. CV-97-1331-PHX-JAT
                            )
            Petitioner,     )     <u>DEATH PENALTY CASE</u>
                            )
vs.                         )
                            )
Charles L. Ryan, et al.,    )     **ORDER**
                            )
            Respondents.    )
                            )
_____)

In a prior Order, the Court concluded that Petitioner's remaining claim, Claim 34, had been procedurally defaulted in state court based on an independent and adequate procedural bar. (Doc. 207.)[1]  However, because the parties still needed an opportunity to fully brief the claim, the Court was not in a position to consider whether Petitioner had legitimate cause and prejudice to excuse the default or whether a fundamental miscarriage of justice would occur if Claim 34 was not reviewed on the merits.  Following briefing on these issues, the Court concludes that Petitioner has demonstrated neither cause and prejudice nor a fundamental miscarriage of justice to excuse his procedural default of Claim 34.

<u>Background Summary</u>[2]

In Petitioner's briefing in support of cause and prejudice, he alleges that certain pretrial,

---

[1]     "Doc." refers to the documents in this Court's case file.

[2]     This factual summary provides the background related to Petitioner's cause and prejudice arguments.  A more complete procedural history may be found in prior Orders. (*See, e.g.,* Doc. 190.)

1   trial, and sentencing events prevented his post-conviction counsel from raising Claim 34 in

2   a timely manner.  In pretrial proceedings, on September 28, 1989, Petitioner filed a motion

3   for appointment of experts, requesting an independent psychiatric evaluation, a child

4   psychologist, a mitigation specialist, a fingerprint examiner, a jury consultant, a serologist,

5   and a pathologist. (ROA-PCR 39.)[3]  In the motion, Petitioner cited *Ake v. Oklahoma*, 470

6   U.S. 68 (1985), and requested, without explanation, that an independent psychiatrist be

7   appointed to assess his sanity at the time of the crime.  (*Id.* at 2.)  He summarily requested

8   the appointment of the other experts.  (*Id.* at 3.)  Subsequently, the court appointed an

9   investigator to assist Petitioner, who at that point was representing himself with advisory

10  counsel.  (RT 10/6/89 at 13; ROA-PCR 43.)  The following week, the court denied the

11  remainder of the expert requests without prejudice, allowing for reconsideration after

12  Petitioner had an opportunity to consult with his investigator. (RT 10/11/89 at 5-6; ROA-

13  PCR-ME 45.)  At an ex parte proceeding, Petitioner's investigator asserted that a child

14  psychologist was important to help determine Petitioner's social upbringing and to

15  collaborate with a mitigation specialist. (RT 12/12/89 at 10.)  A mitigation specialist was

16  needed to work with the investigator, Petitioner, and mental health professionals in order to

17  prepare a complete mitigation presentation.  (*Id.* at 10-12.)  Advisory counsel explained that

18  the mental health experts were requested for mitigation purposes in the event Petitioner was

19  found guilty, not to evaluate his competency to stand trial.  (*Id.* at 13.)  The court denied the

20  request for a mitigation specialist but indicated that it would be reconsidered if Petitioner was

21  convicted.  (*Id.* at 17.)  It appears the Court appointed a serologist. (RT 12/12/89 at 16; ROA-

22  PCR-ME 140.)

23

24          [3]      "ROA-PCR" refers to documents in the four-volume record on appeal from
25  post-conviction proceedings prepared for Petitioner's first petition for review to the Arizona
    Supreme Court (Case No. CR-96-0464-PC).  "ROA-PCR-ME" refers to the one volume of
26  minute entries issued by the trial court.  "RT" refers to the reporter's transcript from
27  Petitioner's trial and sentencing in state court proceedings.  This record was provided to the
    Court by the Arizona Supreme Court on July 30, 2001.  (Doc. 53.)
28

Subsequently, prior to trial, there was a change of judge ordered, with Maricopa County Superior Court Judge Thomas W. O'Toole, presiding over the case. After jury selection, Petitioner requested that advisory counsel be appointed to represent him going forward, and the court granted the request. (RT 7/11/90 at 96-97; ROA-PCR-ME 108.) After the jury found Petitioner guilty on both murder counts, Petitioner's counsel informed the court that previously she had requested a mitigation specialist; when the judge asked if she was referring to Arizona Rule of Criminal Procedure 26.5, which provides for presentence mental health examinations, counsel answered, "Well, so to speak." (RT 7/27/90 at 6-7.) The court appointed the mental health expert proposed by Petitioner, Dr. McMahon, "to test and evaluate the defendant's current mental health and, if such is deemed appropriate, conduct further diagnostic testing and evaluation." (*Id.* at 7; ROA-PCR-ME 125.) The court authorized compensation in the amount of $500, but that additional fees and expenses could be obtained with "prior written approval of the court." (ROA-PCR-ME 125.) Petitioner made no other requests for the appointment of experts prior to sentencing.

In his sentencing memorandum, Petitioner's counsel relied on Dr. McMahon's August 18, 1990, evaluation to support assertion of A.R.S. § 13-703 (G)(1) statutory mitigating circumstance–that his ability to appreciate the wrongfulness of his conduct or conform his conduct to the law was significantly diminished. (ROA-PCR 149 at 18-19.) Dr. McMahon concluded that Petitioner's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirement of law was significantly diminished due to his psychological condition and his drug and alcohol intoxication on the night of the crimes. (ROA-PCR 160 at 8.) Dr. McMahon's psychological evaluation also measured Petitioner's intelligence quotient ("IQ"), utilizing the Peabody Picture Vocabulary Test ("PPVT"). Dr. McMahon reported: "The defendant obtained a PPVT IQ of 94, which is well within the average range of intelligence and in no way indicative of any form of mental retardation." (ROA-PCR 160 at 6.)

At sentencing, the judge found three aggravating circumstances: Petitioner had two

1    prior violent felony convictions (A.R.S. § 13-703(F)(2)); Petitioner committed the murders
2    in an especially cruel, heinous, or depraved manner (A.R.S. § 13-703 (F)(6)); and Petitioner
3    committed multiple homicides during the same episode (A.R.S. § 13-703(F)(8)).  The judge
4    found one statutory mitigating circumstance and seven non-statutory circumstances, but
5    determined they were not sufficiently substantial to warrant leniency, and sentenced
6    Petitioner to death on both murder counts.  (ROA-PCR 169.)  The Arizona Supreme Court
7    affirmed Petitioner's convictions and sentences on direct appeal.  *State v. Ramirez*, 178 Ariz.
8    116, 871 P.2d 237 (1994).

9         Prior to filing his post-conviction relief ("PCR") petition, Petitioner did not request any
10   investigative or expert resources.  (*See* ROA-PCR 177-190.)  In his PCR petition, Petitioner
11   raised a claim of ineffective assistance of counsel ("IAC"), alleging that counsel did not have
12   a cohesive defense strategy at trial or with regard to mitigation.  (ROA-PCR 190 at 7-8.)
13   With respect to IAC at sentencing, Petitioner alleged that counsel did not have a clear
14   strategy, which was evidenced by counsel's attempt to use Petitioner's alleged gang
15   membership in mitigation.  (*Id.* at 8.)  The PCR court ruled that Petitioner failed to raise a
16   colorable claim of ineffective assistance and denied relief.  (ROA-PCR-ME 192.)  The
17   Arizona Supreme Court denied review.

18        Petitioner initiated federal habeas proceedings, raising both conviction and sentencing
19   claims.  (Docs. 1, 2, 18, 40, 55, 76.)  Subsequently, the Court stayed Petitioner's sentencing
20   claims so that he could file a successive PCR petition in state court asserting that he is
21   mentally retarded and ineligible for capital punishment pursuant to *Atkins v. Virginia*, 536
22   U.S. 304 (2002) (recognizing that the Eighth Amendment prohibits a state from sentencing
23   to death or executing a mentally retarded person).  (Doc. 119.)  In state court, the Court
24   limited Petitioner's counsel, the Federal Public Defender ("FPD"), to the *Atkins* litigation.
25   (*Id.*)  In April 2005, Petitioner initiated an *Atkins* claim in successive PCR proceedings.

26
27
28

(Doc. 228 at 1-13.)[4]

Subsequently, also in April 2005, a private attorney "conducted an initial *pro bono* review" of Petitioner's case and filed a separate successive state PCR notice attempting to litigate five non-*Atkins* claims, including Claim 34, an allegation of ineffective assistance of counsel for failing to conduct a complete mitigation investigation, obtain, and present available mitigation evidence at sentencing.  (Doc. 145, Ex. A at 3.)  The PCR court summarily dismissed this action as unexceptional, rendering it subject to timeliness rules that required all PCR claims be filed during a petitioner's initial PCR proceeding.  (Doc. 145, Ex. B; *see* Ariz. R. Crim. P. 32.4(a), 32.2(b), 32.5 (West 2005)).  Based on the PCR court's ruling, for Claim 34 to be timely and considered on the merits, Petitioner was required to have raised it during his initial PCR proceeding. Petitioner did not raise Claim 34 during his initial PCR proceeding.  This Court has concluded that Claim 34 was procedurally defaulted according to an adequate and independent state procedural rule and will not be considered on the merits apart from a showing of cause and prejudice or a fundamental miscarriage of justice.  (Doc. 207.)[5]

Cause and Prejudice

In *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), the Court made explicit that if a state prisoner has procedurally defaulted a federal claim in state court pursuant to an independent and adequate procedural rule, "federal habeas review of the claim[] is barred

---

[4]     In response to this Court's Order, Respondents provided a complete copy of the state court record of Petitioner's *Atkins* litigation to the Court for its review.  (*See* Doc. 228, 1-8873.)

[5]     Due to his alleged mental retardation, Petitioner contends that the Court should relax the procedural rules regarding cause and prejudice and fundamental miscarriage of justice.  (Doc. 215 at 2-5.)  In *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988), the court considered and concluded that the petitioner's mental condition did not constitute cause.  Furthermore, the Court further notes that Petitioner had counsel during all of his post-conviction proceedings.  *See id.*  The Court addresses *infra* Petitioner's argument regarding allegations of mental retardation and whether they constitute an excuse in the context of a fundamental miscarriage of justice.

unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law[.]"  Ordinarily "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 753.  Objective factors constituting cause include interference by officials which makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Amadeo v. Zant*, 486 U.S. 214, 222 (1988) (cause is established if unavailable evidence was the reason for the default). "Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984).  To establish prejudice resulting from a procedural default, a habeas petitioner bears the burden of showing not merely that the errors at his trial or sentencing constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting the entire proceeding with errors of constitutional dimension. *United States v. Frady*, 456 U.S. 152, 170 (1982).

Discussion

Petitioner asserts that he has cause and prejudice to excuse his failure to present the claim because the trial court, thru interrelated failures, prevented PCR counsel from timely presenting it.  Specifically, the trial court failed to authorize funding for a mitigation specialist, failed to fund a mental health expert until sentencing proceedings, and then inadequately funded the court-appointed mental health expert, Dr. Mickey McMahon, Ph.D. (Doc. 215 at 9-10.)  These failures also prevented sentencing counsel from obtaining an adequate social history of Petitioner to provide to Dr. McMahon, which caused Dr. McMahon to conclude that Petitioner was not mentally retarded.  (*Id.* at 10-11.)  Dr. McMahon's allegedly inaccurate mental retardation conclusion caused PCR counsel not to actively investigate Petitioner's mental health and present Claim 34 during his initial PCR proceeding.  *See id.* at 11 (citing *Forman v. Smith*, 633 F.2d 634, 641 (2d Cir.1980)

1  (observing in *dicta* that an official's intentional or inadvertent misleading statement "that

2  obscures the opportunity to develop a federal constitutional violation" may constitute cause

3  to excuse a procedural default)).

4      *State Official Interference*

5      Cause may be established by demonstrating interference by state officials that made

6  compliance with the state procedural rule impracticable. *Coleman*, 501 U.S. at 753. The

7  external impediment, whether it be government interference or the reasonable unavailability

8  of the factual basis for the claim, must have prevented petitioner from constructing or raising

9  the claim. *See Murray*, 477 U.S. at 492.

10     In this case, nothing prevented Petitioner from presenting Claim 34 during his initial

11 PCR proceeding. Even though Petitioner argues that the trial court's interrelated failures

12 made compliance with the state procedural rule impracticable, the sentencing record shows

13 otherwise. Counsel submitted a sentencing memorandum specifically discussing that at the

14 age of 9 and 12, Petitioner's IQ was tested, and that he recorded low IQ scores of 70 and 77

15 respectively. (ROA-PCR 149 at 7.) Counsel presented Petitioner's scores in the context of

16 possible mental retardation and borderline intellectual functioning. (*Id.*) Counsel's

17 sentencing memorandum chronicled Petitioner's major difficulties progressing thru different

18 grades in school, and that at age 14, when he took the California Achievement Grade Point

19 Test, he scored 3-4 grade levels below his schoolmates. (*Id.* at 7-8.) Petitioner's presentence

20 report also described him as below average intelligence and socially immature. (ROA-PCR

21 171.)

22     Based on this sentencing record, the trial court's actions did not keep Petitioner's low

23 intelligence from being discovered, documented and further investigated as a mental health

24 issue. Rather, counsel presented it as mitigation at sentencing. (ROA-PCR 149 at 5-8.)

25 Counsel's presentation of Petitioner's low intelligence and possible mental retardation at

26 sentencing put PCR counsel on notice that his mental health was at issue and warranted

27 further investigation. PCR counsel was also on notice that Arizona required that all

28

1   allegations of ineffective assistance be brought during the initial PCR proceeding.  Ariz. R.

2   Crim. P. 32.5.  Where the petitioner had access to the information necessary to state the

3   claim, the failure to develop and present the claim will not constitute cause.  *See Murray*, 477

4   U.S. at 486 (citing *Engle v. Isaac*, 456 U.S. 107, 133-34 (1982) ("the mere fact that counsel

5   failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite

6   recognizing it, does not constitute cause for a procedural default")).  On this record, the trial

7   court's alleged failures did not impede or prevent PCR counsel from complying with the state

8   procedural rule.

9         Next, Petitioner alleges that Dr. McMahon's official interference establishes cause.

10  Petitioner contends that Dr. McMahon was a state actor and that his inaccurate testing and

11  reporting of Petitioner's IQ impeded PCR counsel from asserting Claim 34 at his initial PCR

12  proceeding.  (Doc. 215 at 10-12, 17-18.)  Petitioner argues that because Dr. McMahon was

13  authorized by the court, paid by the State to evaluate his mental health, and provide a report

14  to the court, his actions are attributable to the state and constitute "official interference" if

15  adverse to Petitioner.  (*Id.* at 10.)  The Court disagrees.

16        The Court need not decide whether Dr. McMahon was a state actor under these

17  circumstances because there is no constitutional right implicated even if the State did provide

18  an ineffective psychologist at sentencing for purposes of presenting mitigation.  *See Harris*

19  *v. Vasquez*, 949 F.2d 1497, 1517-18 (9th Cir. 1991) (rejecting the argument that petitioner

20  had a constitutional right to a competent mental health expert at trial or sentencing); *see also*

21  *Coleman*, 501 U.S. at 753 (stating that only when counsel is constitutionally required may

22  attorney error constitute cause and be imputed to the State)  Thus, any alleged misdiagnosis

23  by Dr. McMahon regarding Petitioner cannot constitute cause.

24        Furthermore, Dr. McMahon's alleged failures did not impede or prevent PCR counsel

25  from complying with the state procedural rule.  As the Court has already discussed, the

26  sentencing record gave PCR counsel notice that Petitioner's mental health was at issue and

27  warranted additional investigation.  Where the petitioner had access to the information

28

1   necessary to state the claim, the failure to develop and present the claim will not constitute

2   cause. *See Murray*, 477 U.S. at 486.

3        Petitioner relies on *Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994), to argue that state

4   officials prevented PCR counsel from raising Claim 34.  (Doc. 215 at 11.)  In *Parkus*, the

5   habeas petitioner had an extensive history as a mentally disturbed man who had been raised

6   in state institutions since the age of four. *Id.* at 934.  Trial counsel made a request for his

7   childhood mental health records, but was told by the records custodian that the records had

8   been destroyed. *Id.* at 936.  As a result, Parkus's mental health expert was unable to testify

9   at trial or at sentencing that Parkus suffered from a mental disease or defect. *Id.*  He was

10   convicted of first-degree murder and received the death penalty.  Parkus failed to raise an

11   IAC claim during post-conviction proceedings. *Id.* at 937.  During habeas proceedings,

12   however, Parkus obtained his childhood mental health records (which had not, in fact, been

13   destroyed) and, based on those records, his mental health expert submitted an affidavit

14   attesting that Parkus suffered from a mental disease or defect. *Id.* at 936.  Due to the missing

15   mental health records, the court concluded that Parkus did not have notice of his trial

16   counsel's ineffectiveness and therefore had adequate cause not to present the claim. *Id.* at

17   938. The Eighth Circuit decided that there was "some" official interference which made

18   compliance with the procedural rule impracticable and ordered an evidentiary hearing. *Id.*

19   at 938-39.

20        The lack of notice counsel had in *Parkus* is distinguishable from the facts at issue here.

21   Unlike *Parkus*, in this case, there are no missing records.  Based on the sentencing record,

22   PCR counsel was on notice that Petitioner had two IQ tests documenting low intelligence and

23   another test demonstrating he was behind his peers in educational development.  PCR

24   counsel was also on notice that the presentence report indicated that Petitioner displayed low

25   intelligence and emotional immaturity.  Even though Dr. McMahon reported that Petitioner

26   was not mentally retarded, PCR counsel was still on notice of the contrast between Dr.

27   McMahon's report and the low IQ scores being reported, as well as the mental health

28

deficiencies counsel presented as mitigation at sentencing.  PCR counsel was also on notice of his need to investigate mental health because in Arizona a "slow, dull and brain-damaged" mental impairment may have a significant mitigating effect as it may evidence an inability of the defendant to control his conduct.  *See, e.g., Walton v. Arizona*, 159 Ariz. 571, 588, 769 P.2d 1017, 1034 (1989).  Thus, unlike in *Parkus*, there was no official interference preventing PCR counsel from obtaining the factual basis for an IAC sentencing claim for presentation during the PCR proceeding.

Petitioner also argues that *Perkins v. LeCureux*, 58 F.3d 214, 218 (6th Cir. 1995) supports his contention that PCR counsel did not have the factual basis to raise Claim 34 due to Dr. McMahon's report.  (Doc. 215 at 12.)  In *Perkins*, a pre-AEDPA case, the court held that petitioner had cause to bring a new habeas claim in a successive petition because the facts underlying his new claim did not arise until years after his initial habeas proceeding had been concluded.  *Perkins*, 58 F.3d at 218.  Petitioner compares his case to *Perkins*, arguing that due to Dr. McMahon's misdiagnosis, the factual basis of Petitioner's mental retardation was unavailable to PCR counsel.  (Doc. 215 at 12.)  The Court disagrees.

The availability of the factual basis of Claim 34 was established by the sentencing record.  The sentencing record contained multiple records of low intelligence and possible mental retardation.  These records put PCR counsel on notice that Petitioner's mental health warranted further investigation for possible IAC allegations during PCR proceedings.  *See Williams v. Taylor*, 529 U.S. 420, 438-39, 444 (2000) (discussing the availability of a potential *Brady* claim since state habeas counsel was on notice of a psychiatric report, its possible materiality and the need for further investigation).  *Perkins* is inapposite.

The Court concludes that neither the trial court's actions nor Dr. McMahon's report prevented PCR counsel from investigating and timely presenting Claim 34 during his initial PCR proceeding.

*Ineffective Assistance of Sentencing Counsel*

Next, Petitioner contends sentencing counsel's ineffectiveness constitutes cause to

- 10 -

1   excuse the procedural default.  (Doc. 215 at 7, 10-11.)  Petitioner alleges that counsel was

2   ineffective due to his failure to properly provide background information to Dr. McMahon

3   prior to his psychological evaluation, which resulted in Dr. McMahon improperly concluding

4   that Petitioner was not mentally retarded.  (*Id.* at 11.)  Specifically, counsel should have

5   provided Dr. McMahon with Petitioner's educational, vocational, and medical records prior

6   to his evaluation.  (*Id.* at 13.)

7       Before ineffective assistance of counsel may be utilized as cause to excuse a procedural

8   default, the particular ineffective assistance allegation must first be submitted and exhausted

9   before the state courts as an independent claim.  *See Murray*, 477 U.S. at 489-90; *Tacho*, 862

10  F.2d at 1381.  A petitioner is not entitled to bring an ineffective assistance claim as cause to

11  excuse a procedural default when that particular ineffective assistance allegation itself is

12  defaulted.  *See Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000).  Here, PCR counsel did

13  not fairly present this particular IAC allegation in state court.  Therefore, it cannot serve as

14  cause to excuse the procedural default of Claim 34.

15      *Inadequacy of Arizona's Post-Conviction Process/IAC of PCR Counsel*

16      Alternatively, Petitioner argues cause to excuse his default because Arizona's post-

17  conviction process was inadequate to protect his rights due to its failure to ensure he was

18  appointed competent counsel and because PCR counsel performed ineffectively.  (Doc. 215

19  at 18-22.)

20      Although Petitioner contends that Arizona's PCR process failed to ensure he was

21  appointed competent counsel, Petitioner cites no case, and the Court has found none which

22  holds that a state is required by the federal constitution to provide counsel in PCR

23  proceedings.  The fact that a state may, "as a matter of legislative choice," *Ross v. Moffitt*,

24  417 U.S. 600, 618 (1974), provide for counsel in discretionary appeals following a first

25  appeal of right does not extend the Sixth Amendment's guarantee of effective counsel to

26  discretionary appeals.  *See Evitts v. Lucey*, 469 U.S. 387, 394, 397 n.7 (1985); *Pennsylvania*

27  *v. Finley*, 481 U.S. 551, 559 (1987) (where a state provides a lawyer in a state

28

post-conviction proceeding, it is not "the Federal Constitution [that] dictates the exact form such assistance must assume," rather, it is in a state's discretion to determine what protections to provide). Further, the Ninth Circuit has held explicitly that "ineffective assistance of counsel in [state] habeas corpus proceedings does not present an independent violation of the Sixth Amendment enforceable against the states through the Due Process Clause of the Fourteenth Amendment." *Bonin v. Calderon*, 77 F.3d 1155, 1160 (9th Cir. 1996). Since Petitioner's PCR proceeding took place after his appeal of right, it was a discretionary proceeding that did not confer a constitutional right to the effective assistance of counsel. Thus, even assuming that PCR counsel's performance did not conform to minimum standards, it did not violate the federal constitution and cannot excuse the procedural default.

As to Petitioner's argument that PCR counsel's ineffectiveness establishes cause, IAC can represent sufficient cause only when it rises to the level of an independent constitutional violation. *Coleman*, 501 U.S. at 755. When a petitioner has no constitutional right to counsel, there can be no constitutional violation arising out of ineffectiveness of counsel. *Id.* at 752. There is no constitutional right to counsel in state PCR proceedings. *See Finley*, 481 U.S. at 555; *Murray v. Giarratano*, 492 U.S. 1, 7-12 (1989) (the Constitution does not require states to provide counsel in PCR proceedings even when the putative petitioners are facing the death penalty); *Bonin v. Vasquez*, 999 F.2d 425, 429-30 (9th Cir. 1993) (refusing to extend the right of effective assistance of counsel to state collateral proceedings).

In the context of IAC of PCR counsel, the Ninth Circuit has considered and rejected the argument that cause exists to excuse a procedural default where PCR counsel failed to assert a claim during PCR proceedings. *See Ortiz v. Stewart*, 149 F.3d 923, 932 (9th Cir. 1998); *Nevius v. Sumner*, 105 F.3d 453, 460 (9th Cir. 1996); *Moran v. McDaniel*, 80 F.3d 1261, 1271 (9th Cir. 1996); *Bonin*, 77 F.3d at 1158-59.[6] Therefore, PCR counsel's alleged

---

[6]     *Manning v. Foster*, 224 F.3d 1129 (9th Cir. 2000) is not to the contrary. In *Manning*, the Ninth Circuit reiterated that the actions or omissions of PCR counsel cannot

1   ineffectiveness does not constitute cause.

2        The Court has denied all of Petitioner's argument regarding cause.  Because Petitioner

3   has not established cause to excuse the procedural default, the Court need not analyze

4   prejudice.  *See Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir.1998).

5        *Discovery*

6        Petitioner contends that he has produced enough colorable evidence of cause to warrant

7   discovery or an evidentiary hearing.  (*See, e.g.,* Doc. 215 at 6-7.)  Specifically, Petitioner

8   requests discovery in support of his cause arguments:  that sentencing counsel failed to obtain

9   and provide his necessary social history records to Dr. McMahon, the failure of the trial court

10  to properly fund and timely appoint an independent mental health expert or mitigation

11  specialist, Dr. McMahon's misleading diagnosis, the inadequacies of Arizona's post-

12  conviction relief system, including funding limitations and the appointment of post-

13  conviction counsel.  (*Id.*)  Petitioner also contends that he is entitled to conduct discovery

14  regarding deceased PCR counsel, including his bar records, depositions of those who worked

15  with him, and expert testimony on the duties of post-conviction counsel.  (Doc. 215 at 12,

16  n.8, 20-22.)

17       The Court first notes that Petitioner is not requesting discovery in the context of an

18  exhausted claim.  *See, e.g., Bracy v. Gramley*, 520 U.S. 899 (1997) (discussing good cause

19  for discovery in the context of an exhausted claim).  Rather, discovery is sought to support

20  Petitioner's various contentions of cause to excuse the procedural default of Claim 34.

21  However, to demonstrate cause, the petitioner must demonstrate some external factor

22  external to the defense impeded his efforts to comply with the state procedural rule.  *See*

23

24  _____

25  constitute cause to overcome a procedural default.  *Id*. at 1133 (stating that "any
    ineffectiveness of Manning's attorney in the post-conviction process is not considered cause

26  for the purposes of excusing the procedural default at that stage").  In *Manning*, rather, the
    court held that where direct appeal counsel actually interfered with the petitioner's ability to

27  initiate post-conviction proceedings, such conduct by constitutionally-entitled counsel may
    constitute cause to excuse a procedural default.  *See*

28

1   *Robinson v. Ignacio*, 360 F.3d 1044, 1052 (9th Cir. 2004) (internal citation and quotation

2   omitted).   The Court has already considered and concluded that none of Petitioner's

3   contentions constituted an external impediment that excused his failure to raise Claim 34 in

4   a timely manner.   Hence, Petitioner cannot justify his discovery requests as his cause

5   contentions have been rejected. *See Campbell v. Blodgett*, 997 F.2d 512, 524 (9th Cir. 1992)

6   (stating that an evidentiary hearing is not necessary to allow a petitioner to show cause and

7   prejudice if the court determines as a matter of law that he cannot satisfy the standard).

8   Therefore, Petitioner's requests for discovery are denied.

9       <u>Fundamental Miscarriage of Justice</u>

10      If a petitioner cannot meet the cause and prejudice standard, the Court still may hear the

11  merits of procedurally defaulted claims if the failure to hear the claims would constitute a

12  "fundamental miscarriage of justice."   *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992). The

13  fundamental miscarriage of justice exception is also known as the "actual innocence"

14  exception.   "[A] claim of actual innocence is not itself a constitutional claim, but instead a

15  gateway through which a habeas petitioner must pass to have his otherwise barred

16  constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993).

17  There are two types of claims recognized under this exception: 1) that a petitioner is

18  "innocent of the death sentence," or, in other words, that the death sentence was erroneously

19  imposed; and 2) that a petitioner is actually innocent of the capital crime. *See Calderon v.*

20  *Thompson*, 523 U.S. 538, 559-60 (1998).   To be innocent of the crime itself, the petitioner

21  must show that "a constitutional violation has probably resulted in the conviction of one who

22  is actually innocent[.]" *Schlup v. Delo*, 513 U.S. 298, 327 (1995).   The requisite probability

23  requires a showing "that it is more likely than not that no reasonable juror would have found

24  petitioner guilty beyond a reasonable doubt."   *Id*.   To be innocent of a death sentence, the

25  petitioner must show by clear and convincing evidence that, but for a constitutional error, no

26  reasonable juror would have found the existence of an aggravating circumstance or some

27  other condition of eligibility for the death sentence under the applicable state law. *Sawyer*,

28

1    505 U.S. at 336, 345.  Under this standard, a showing of actual innocence refers to those

2    state-law requirements that must be satisfied to impose the death penalty.  *Id.* at 348.

3        In *Atkins*, 536 U.S. 304, the Supreme Court altered the death penalty landscape by

4    prohibiting states from sentencing to death or executing a mentally retarded person.  The

5    *Atkins* Court specifically reserved to the states how mental retardation would be defined and

6    proven.  536 U.S. at 317; *State v. Grell*, 212 Ariz. 516, 521, 135 P.3d 696, 701 (2006).  In

7    the context of a fundamental miscarriage of justice challenge, clear and convincing proof that

8    the petitioner is mentally retarded under state law forecloses a condition of eligibility for

9    imposition or continued imposition of a death sentence.  *See Sasser v. Norris*, 553 F.3d 1121,

10   1126 n.4 (8th Cir. 2009) (applying Arkansas law and stating that a petitioner is "actually

11   innocent" and thus ineligible for the death penalty where he demonstrates that he is mentally

12   retarded).

13           <u>Actual Innocence of the Death Penalty</u>

14       Petitioner contends that his mental retardation renders him ineligible and actually

15   innocent of the death penalty. (Doc. 215 at 24.)  Because fundamental miscarriage of justice

16   is a federal issue, Petitioner contends that this Court is not bound by the fact finding or the

17   disposition of his *Atkins* hearing in state court that he is not mentally retarded.  (*Id.* at 25.)

18   On the other hand, Petitioner concedes that determining actual innocence of the death penalty

19   is determined by reference to Arizona law.  (Doc 219 at 5.)

20       Both state and federal law are involved in this Court's fundamental miscarriage of

21   justice analysis. Under *Sawyer*, innocence of the death penalty requires a proper showing by

22   petitioner that he does not meet some condition of eligibility for the death penalty under state

23   law.  *Sawyer*, 505 U.S. at 345.  Under *Atkins*, it is up to the states to develop "appropriate

24   ways to enforce the constitutional restriction" upon the execution of the mentally retarded.

25   *Atkins*, 536 U.S. at 317.  Thus, both *Sawyer* and *Atkins* point this Court to state law to

26   determine as a condition for eligibility of the death penalty whether Petitioner is mentally

27   retarded.  Yet, it is under *Sawyer* that this Court evaluates, based on the state court record,

28

- 15 -

whether Petitioner has demonstrated that he is mentally retarded.  *See Sawyer*, 505 U.S. at 348; *Winston v. Kelly*, 600 F.Supp.2d 717, 735-36 (W.D. Va. 2009), *vacated and remanded on other grounds*, 592 F.3d 535 (4th Cir. 2010) (evaluating whether petitioner demonstrated that was actually innocent of the death penalty due to mental retardation in the context of the fundamental miscarriage of justice exception).  Under *Sawyer*, the Court is not undertaking a *de novo* review of Petitioner's *Atkins* hearing; rather, the Court is undertaking a limited review of the record to assess whether Petitioner demonstrated by clear and convincing evidence that no reasonable factfinder would have determined that he is not mentally retarded.

*Arizona's Mental Retardation Statute*

In Arizona, similar to *Sawyer's* burden of proof, the statutory scheme requires that the petitioner prove mental retardation to the trial court by clear and convincing evidence.  *Grell*, 212 Ariz. at 524, 135 P.3d at 704 (concluding that Arizona's burden of proof is not unconstitutional); A.R.S. § 13-703.02(G) (West 2005).[7]  Under Arizona law, a petitioner establishes mental retardation by proving that he meets the statutory definition, which is "a mental deficit that involves significantly subaverage general intellectual functioning, existing concurrently with significant impairment in adaptive behavior, where the onset of the foregoing conditions occurred before the [petitioner] reached the age of eighteen." A.R.S. § 13-703.02(K)(2).  To establish mental retardation, a petitioner must prove all three elements, the intellectual functioning prong, the adaptive behavior prong, and onset before the age of eighteen.  *See State v. Roque*, 213 Ariz. 193, 227-28, 141 P.3d 368, 402-03 (2006).

Under the intellectual functioning prong, "'[s]ignificantly subaverage general intellectual functioning' means a full scale intelligence quotient of seventy or lower." A.R.S. § 13-703.02(K)(4).  The court is further directed to "take into account the margin of error for the test administered." *Id.*  In *Roque*, the Arizona Supreme Court reiterated that the

---

[7]     Arizona's current statute for mental evaluations for capital defendants is codified at A.R.S. § 13-753.

statute does not refer to individual IQ sub-tests, but rather employs a single intelligence quotient, the full scale IQ score. *Roque*, 213 Ariz. at 228, 141 P.3d at 403. Because mental retardation is generally a static mental condition, full scale IQ testing is relevant both before and after the age of eighteen. *State v. Arellano*, 213 Ariz. 474, 479-80, 143 P.3d 1015, 1020-21 (2006).

The standard error of measurement means that an IQ score can overestimate or underestimate a person's true level of intellectual functioning. *See Ledford v. Head*, No. 02-CV-1515, 2008 WL 754486 at *8 (N.D. Ga. March 19, 2008). However, it may be speculative to conclude that IQ scores receive either a downward adjustment or an upward adjustment. *See Walton v. Johnson*, 440 F.3d 160, 178 (4th Cir. 2006) (noting that petitioner could only speculate that the standard error of measurement would lower his IQ score). Moreover, measurement error is more of a factor when only one IQ test is given. *See Ledford*, 2008 WL 754486 at *8. When more than one IQ test is given and the scores corroborate each other, the possibility of measurement error is substantially reduced. *Id.*

Under the adaptive behavior prong, the statute requires an overall assessment of the petitioner's ability to meet society's expectations of him; it does not require a finding of mental retardation based solely on proof of specific deficits in only a couple of areas. *Grell*, 212 Ariz. at 529, 135 P.3d at 709. The statute defines adaptive behavior as "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." A.R.S. § 13-703.02(K)(1). In *Arellano*, 213 Ariz. at 478-80, 143 P.3d at 1019-21, the Arizona Supreme Court clarified that behavior after age eighteen is relevant to the adaptive behavior inquiry, even if the behavior under review comes from within a prison context. In *Arellano*, the court reversed a trial court ruling precluding Arizona Department of Correction officials from testifying at a mental retardation hearing regarding the petitioner's present adaptive behavior in prison. *Id.* at 480, 143 P.3d at 1021. In *Grell*, the court reiterated that the statute requires a showing of current impairment in adaptive ability and that an assessment based on recent

1    interviews is persuasive. *Grell*, 212 Ariz. at 527-28, 135 P.3d at 707-08.  Finally, the statute
2    requires the onset of mental retardation to occur before the age of eighteen.  A.R.S. § 13-
3    703.02(K)(2).

4        Petitioner's Atkins Proceeding

5        In support of his claim of innocence of the death penalty, Petitioner filed numerous
6    exhibits from his 2005 *Atkins* proceeding where he sought post-conviction relief.  (Doc. 215,
7    Ex. 1-84.)

8        In 2005, Petitioner filed a successive PCR petition alleging that he is mentally retarded.
9    (Doc. 228 at 210-244.)  He supported his petition with scores from two full scale IQ tests
10   given to him at school, where his IQ was reported at 70 and 77.  (*Id.*)  Petitioner also attached
11   to his petition a declaration from Dr. Ricardo Weinstein, Ph.D., a psychologist who opined
12   that he was mentally retarded.  (*Id.* at 246-300.)

13       Under the statute, if a petitioner's IQ is tested at 75 or less, the court appoints additional
14   experts to evaluate the petitioner and will hold a subsequent hearing to determine whether
15   petitioner is mentally retarded.  *See* A.R.S. § 13-703.02(D), (G); *State ex rel Thomas v.*
16   *Duncan*, 222 Ariz. 448, 451, 216 P.3d 1194, 1197 (App. 2009).  In a post-trial evaluation of
17   mental retardation, each party selects one psychological expert to evaluate and report to the
18   court their findings on whether the petitioner is mentally retarded.  *See* A.R.S. § 13-
19   703.02(D); *State v. Cañez*, 205 Ariz. 620, 626, 74 P.3d 932, 938 (2003) (because the
20   statutory procedures focus on a pre-trial mental retardation evaluation, in a post-trial setting,
21   courts utilize the statutory procedures as applicable).  In addition, the statute allows
22   appointment of a third psychologist, appointed on behalf of the court, not the state or the
23   petitioner. *See id.*  The PCR court appointed Dr. Ricardo Weinstein for Petitioner, Dr. Sergio
24   Martinez for the State and Dr. John Toma, on behalf of the court.  (Doc. 228 at 504.)

25       On November 25, 2005, Dr. Toma submitted his report to the court.  (*Id.* at 1875-1884.)
26   Regarding intellectual functioning, Dr. Toma administered the Wechsler Adult Intelligence
27   Scales-Third Edition ("WAIS III") to Petitioner on November 9, 2005.  Petitioner's full scale

28

1   IQ for the test was 77.  (*Id.* at 1878.)  Regarding adaptive behavior, Dr. Toma used the

2   Adaptive Behavior Scale–Residential and Community: Second Edition ("ABS-RC:2").  (*Id.*

3   at 1880.)  Dr. Toma reviewed all of Petitioner's childhood records but also focused on

4   Petitioner's current level of functioning and concluded that he showed no significant deficits

5   in adaptive functioning. (*Id.* at 1880-84.)  Dr. Toma concluded that Petitioner did not meet

6   the statutory definition for mental retardation.  (*Id.* at 1884.)

7        On January 20, 2006, Dr. Martinez submitted his report to the court.  (*Id.* at 2396-2412.)

8   Regarding intellectual functioning, Dr. Martinez administered WAIS III to Petitioner on

9   January 11, 2006, reporting a full scale IQ score of 87.  (*Id.* at 2404.)  Dr. Martinez also

10  administered the Reynolds Intellectual Assessment Scales ("RIAS") to Petitioner, with a

11  score of 91. (*Id.* at 2403.)  Regarding adaptive behavior, Dr. Martinez utilized the Adaptive

12  Behavior Assessment System-II ("ABAS-II").  (*Id.* at 2405.)  Based on Petitioner's self-

13  report and an extensive review of background materials, Dr. Martinez concluded that

14  Petitioner demonstrated low average scores, not significant impairment scores in adaptive

15  functioning testing. (*Id.* at 2408-09.) Dr. Martinez concluded that Petitioner did not meet the

16  statutory definition of mental retardation.  (*Id.* at 2411.)

17       On February 14, 2006, Dr. Weinstein submitted his report to the court.  (*Id.* at 1103-

18  1135.)  Regarding intellectual functioning, Dr. Weinstein administered the WAIS III to

19  Petitioner on July 29, 2004, with a full scale IQ score of 70.  (*Id.* at 1111.)  On November 11,

20  2004, Dr. Weinstein administered the Woodcock-Johnson Intelligence Test-Third Edition

21  (W-J III) to Petitioner, with a full scale IQ score of 71.  (*Id.* at 1112.)  Dr. Weinstein also

22  reported that Petitioner's two school-age IQ tests utilized the Wechsler Intelligence Scale for

23  Children ("WISC"), scoring a 70 in 1967 and a 77 in 1969.  (*Id.* at 1122.)  Dr. Weinstein also

24  utilized the ABAS-II to evaluate adaptive behavior.  (*Id.* at 1125-27.)  Dr. Weinstein had

25  Richard Garcia, Petitioner's step-father, rate Petitioner's adaptive behavior utilizing the

26  ABAS-II.  Dr. Weinstein identified a number of childhood adaptive behavior deficits based

27  upon other interviews and declarations from Petitioner's family and friends regarding his

28

- 19 -

formative years. (*Id.* at 1123-1125.) Dr. Weinstein identified deficits in conceptual, social, and practical adaptive behavior skills. (*Id.*)  Additionally, he found deficits in Petitioner performing major activities for daily living. (*Id.*)  Dr. Weinstein concluded that Petitioner met the statutory definition of mental retardation. (*Id.* at 1127.)

Although not appointed by the court, on February 24, 2006, Dr. Marc Tasse, a recognized mental retardation expert, submitted a report on behalf of Petitioner. (*Id.* at 2425-2445.) Dr. Tasse did not administer an IQ test to Petitioner, but reviewed the intelligence testing that had been done. (*Id.* at 2432.) Dr. Tasse opined that the RIAS test utilized by Dr. Martinez was unreliable, that there would be a significant practice effect on the last WAIS III test administered by Dr. Martinez due to the short eight week duration between the last time that Petitioner had taken the same test, and that when all scores are adjusted for the "Flynn Effect,"[8] Petitioner meets the statutory definition of significant subaverage intellectual functioning. (*Id.* at 2434-36.) Dr. Tasse utilized the ABAS II to administer an adaptive behavior test to Petitioner. (*Id.* at 2436.) Dr. Tasse concluded that Petitioner was significantly impaired in adaptive functioning, with onset before the age of eighteen. (*Id.* at 2443.) Finally, Dr. Tasse concluded that Petitioner was mentally retarded under the statutory definition. (*Id.* at 2445.)

The PCR court conducted an eight-day evidentiary hearing.  Dr. Weinstein and Dr. Tasse testified on behalf of  Petitioner.  Dr. Martinez testified for the State, and Dr. Toma testified on behalf of the court.  The following persons also testified,  Petitioner's Aunt, Eloise Arce, and Phoenix School District Psychologists Sidney Wilson and Gloria McConkey. Petitioner formally waived his right to be present at the hearing before the PCR

---

[8]       According to the Flynn Effect theory, the passage of time inflates full scale IQ test scores by approximately one-third to two-thirds of a point per year since the normalization of the particular test in question.  The premise of the Flynn Effect theory is that IQ tests that are not renormed to take rising IQ scores into account will overstate a test taker's score.  Once calculated, these amounts are subtracted from the full scale IQ score before applying the standard margin of error. *See, e.g., In Re Salazar*, 443 F.3d 430, 433 (5th Cir. 2006).

court.

*Intellectual Functioning*

At the hearing, the experts testified that the WAIS III was the most widely used IQ test. (*See, e.g.,* Doc. 228 at 4797.) The third edition of the test is a 1997 revision of the second edition. (*Id.* at 5070.)   It is an individually administered test designed to assess the intelligence of individuals ranging in age from 16 to 89 years. (*Id.*)   Three experts tested Petitioner utilizing the WAIS III. (*Id.* at 8728.)  Dr. Tasse testified that it was appropriate to adjust the WAIS III administered by Dr. Martinez by five points downward due to practice effect because he administered the test to Petitioner within one year of the previous time that WAIS III was administered. (*Id.* at 5251-52, 5255, 5265.)  Dr. Martinez alternatively administered the RAIS, but Dr. Tasse discounted its use because it is a fairly new test and not as comprehensive as WAIS III. (*Id.* at 2434-36.)  Dr. Tasse testified that the following full scale IQ scores were valid:  70, 77, 70, 71, 77 and 82 (after receiving the five point reduction for practice effect). (*Id.* at 5250-51.)

The PCR court throughly reviewed and discussed the evidence regarding the intellectual functioning prong, as follows:

Full Scale I.Q. Testing

The Defendant has failed to establish by clear and convincing evidence or by a preponderance of the evidence that he suffers from "significantly sub average general intellectual functioning" which means a "full scale intelligence quotient (IQ) of seventy or lower."  A.R.S. § 13-703.02(G), (K)(2) & (4).

Beginning in February of 1967, when he was 9 years of age, through January of 2006, when he was 38 years of age, the Defendant has been given six full-scale IQ tests, as well as several less thorough IQ tests.  The six tests included two WISC tests, a Woodcock-Johnson, 3rd edition test (W-J III) and three WAIS III tests.  In each test, except for the WAIS-III test administered by Dr. Martinez on January 11, 2006, where the practice effect skewed and raised the score to 87, the Defendant's IQ was determined to be 70, 77, 70, 71 and 77. . . . Applying the accepted "margin of error for the tests administered," it is 95 percent certain that the Defendant's full scale IQ is within the range of 63 to 82.  This consistency in IQ test scores over [more than a] 38 year period of time, especially on the "gold standard" WISC and WAIS III tests,[FN1] compels the conclusion that the Defendant has failed to establish by clear and convincing evidence or by a preponderance of the evidence that his IQ is 70 or lower.

FN 1.     The court agrees with Dr. Marc Tasse that these tests were

- 21 -

1    properly administered and scored.

2        Flynn Effect:

3        Though it has considered the "Flynn Effect" in determining the defendant's
     IQ, the Court is not persuaded that it is required to apply it to adjust downward
4    each of the six full scale test IQ scores for alleged test obsolescence. See exhibits
     223 and 210, where the Flynn Effect is and is not applied to the various IQ test
5    scores. As shown by Exhibit 223, the defendant's expert, Dr. Marc Tasse, applies
     the Flynn Effect, as well as the practice effect to the January 11, 2006 test, in
6    finding that the Defendant's IQ is 70 or lower (these Flynn Effect adjusted scores
     are 64, 70, 69, 74 and 78 respectively). Although the 2005 AAMR User's Guide,
7    Exhibit 59, directs that the Flynn Effect, standard error of measurement and
     practice effect, <u>all</u> be used when scoring the WAIS-III test to determine a person's
8    IQ, the Court concludes that use of the Flynn Effect is not mandated by the statute
     and is not part of the "current community, nationally, and culturally accepted . .
9    . psychological and intelligence testing procedures" that must be used when
     scoring all full scale IQ tests. A.R.S. § 13-703.02(E)[FN2]

10

11       FN 2.        Although the Flynn Effect was widely known when A.R.S. §
         13-703.02 was enacted in 2001, and when *Atkins* was decided in 2002,
12       it was not adopted or discussed by either. Recently, some appellate
         courts have directed that the trial court consider it when determining a
13       person's IQ, *Green v. Johnson*, [No. CIVA 2:05CV340, 2006 WL
         3746138 (E.D. Va. Dec. 15, 2006)]; *Walton v. Johnson*, 440 F.3d 160,
14       176-178 (4th Cir. 2006) and *Walker v. True*, 399 F.3d [3]15, 322-328
         (4th Cir. 2005), while other courts have rejected its application absent
15       statutory authorization. *See Bowling v. Kentucky*, 163 S.W.3d 361, 375
         (2005) and cases cited therein.

16       In fact, Dr. Weinstein, a defense expert, did not adjust the full-scale IQ score
     for the Flynn Effect in his 2004 Declaration and in his 2006 report to the court.
17   In addition, Dr. Toma, the court-appointed expert, did not use the Flynn Effect in
     scoring his testing of the defendant and testified that such was not required for
18   those tests.

19       In addition, the Flynn Effect is not part of the "margin of error . . ."
     calculation that A.R.S. § 13-703.02(K)(4) and the current WAIS Scoring Manual
20   require to be used in scoring the WAIS-III tests administered in 2004, 2005 and
     2006, and was not used when the WISC tests were given to the Defendant as a
21   child in 1967 and 1969. Instead the manual merely directs that a standard error
     of measurement of ± 7 be applied in scoring the 1967 and 1969 WISC tests, and
22   that a standard error of measurement of ± 5 be applied for W[AIS]-III tests given
     in 2004, 2005 and 2006.

23

24       In sum, the defendant has failed to show by clear and convincing evidence
     or a preponderance of evidence that he possesses "significant sub average general
25   intellectual functioning," as defined and required by A.R.S. § 13-703.02(G) &
     (K)(2) & (4).[FN3]

26       FN 3.        If the Flynn Effect was required to be used in scoring these
         tests, the court finds that the defendant has proved by a preponderance
27       of the evidence that his full scale IQ is 70 or lower.

28

1   (*Id.* at 3828-30.)

2        *Intellectual Functioning Discussion*

3        Under *Sawyer*, the Court's limited review is to assess whether Petitioner demonstrated

4   by clear and convincing evidence that no reasonable fact finder would have determined that

5   he is not mentally retarded.  According to Dr. Tasse's testimony at the evidentiary hearing,

6   there were six valid full scale IQ scores posted for Petitioner, 70, 77, 70, 71, 77 and 82.  (*Id.*

7   at 5250-51.)  These full scale IQ scores are represented in the following chart.[9]

| Date of Administration | IQ Test and Administrator | Results Obtained | Standard Margin of Error |
|---|---|---|---|
| 2/14/1967 | WISC (Wilson) | FSIQ = 70 | 63 to 77 |
| 10/6/1969 | WISC (McConkey) | FSIQ = 77 | 70 to 84 |
| 7/29/2004 | WAIS-III (Weinstein) | FSIQ = 70 | 65 to 75 |
| 11/11/2004 | W-J III (Weinstein) | GIA = 71 | 67 to 75 |
| 11/9/2005 | WAIS-III (Toma) | FSIQ = 77 | 72 to 82 |
| 1/11/2006 | WAIS-III (Martinez) | FSIQ = 82 (after 5 point deduction) | 77 to 87 |

15        Based on the evidence, Petitioner had two full scale IQ scores that met the statutory

16  requirement for mental retardation and four scores that did not meet the statutory

17  requirement.  A reasonable factfinder could easily find Petitioner's four IQ scores over 70

18  more persuasive than his two scores of 70 or below.  *See Winston*, 600 F. Supp.2d at 736

19  (concluding that the petitioner failed to establish mental retardation in the context of a

20  fundamental miscarriage of justice inquiry because his three scores over 70 were more

21  persuasive than his one score below 70).

22        When accounting for margin of error, as this Court has already noted, it is necessarily

23  speculative to conclude that Petitioner's IQ scores should receive either a downward

24  _____

25        [9]    The PCR court utilized the following margin of error calculations for the IQ
26  tests–a standard error of measurement of ± 7 for scoring the 1967 and 1969 WISC tests, and
    a standard error of measurement of ± 5 for scoring the WAIS III tests.  (*Id.* at 3830.)
27  Excluding any correction for the alleged Flynn Effect, Dr. Tasse testified that the margin of
    error range for the WJ-III test was 67 to 75.  (*Id.* at 5270.)
28

adjustment or an upward adjustment.  *See Walton*, 440 F.3d at 178 (stating that petitioner could only speculate that the standard error of measurement would lower his IQ score); *see also Winston*, 600 F. Supp.2d at 729 ("there is no basis in practice for using [standard error of measurement] to find that an individual's true IQ falls in the range below the earned score on a given IQ test because it was equally likely that the test-taker's true IQ could fall in the range above the earned score.").  In review of Dr. Tasse's testimony he made the same point at the evidentiary hearing.  During cross-examination about Petitioner's IQ score on WJ-III, Dr. Tasse reiterated his contention that Petitioner's full scale IQ score of 71 should be adjusted downward for the Flynn Effect to 69.  (Doc. 228 at 5261-62.)  Dr. Tasse was then questioned about margin of error and its effect on Petitioner's IQ score.

> **State's Attorney**:  This test doesn't establish that his IQ falls below 70?
>
> **Dr Tasse**:  Yes, it does, in my opinion. . . .  The Woodcock-Johnson III, it established his IQ is below 70.
>
> **State's Attorney**:  The range is 65 to 74; correct?
>
> **Dr. Tasse**:  Yes.
>
> **State's Attorney**:  Okay.  Explain your position?
>
> **Dr. Tasse**:  The GIA is 69; that is below 70.

(Doc. 228 at 5263.)  Based on the testimony of Petitioner's own expert, Dr. Tasse agreed with what this Court previously recognized–that the most important number in the range is the earned full scale IQ score.  A reasonable factfinder could reject the factual assertion that Petitioner's full scale IQ scores should be adjusted downward based on standard margin of error.  *See Winston*, 600 F. Supp.2d at 736.

Petitioner contends, however, that the Court should disregard the state court's conclusion regarding the Flynn Effect, utilize it to adjust downward his full scale IQ scores, and conclude that he has adequately proven mental retardation.  (Doc. 215 at 24.)

Dr. Tasse indicated that there were six valid full scale IQ scores posted for Petitioner, 70, 77, 70, 71, 77 and 82.  (*Id.* at 5250-51.)  According to Dr. Tasse, the full scale IQ scores should be further reduced for the Flynn Effect, recommending the six scores be reduced to,

64, 70, 69, 67, 74 and 78.  (*Id.* at 8801.)  Drs. Toma and Martinez disagreed with Dr. Tasse's testimony regarding whether the Flynn Effect should be applied to reduce individual full scale IQ scores.  (*Id.* at 5509-10; 5568-69.)  Drs. Toma and Martinez both testified that it is not their clinical practice to reduce full scale IQ scores for the Flynn Effect.  (*Id.*)

For a number of reasons, the Court concludes that there is fair support in the record not to factor in the Flynn Effect to reduce Petitioner's full scale IQ scores.  First, Arizona's mental retardation statute does not indicate that the Flynn Effect should be applied to full scale IQ scores.  Second, there is no Arizona precedent indicating that the Flynn Effect should be applied.  Third, in Dr. Tasse's testimony, he conceded that the WAIS III administrative manual does not recommend deducting points from an IQ test to factor in for the Flynn Effect. (Doc. 228 at 5357-59.)  Fourth, the experts at the hearing did not all agree that individual IQ scores should be adjusted downward for the Flynn Effect.  (*Id.* at 5250-51.)  Finally, other courts have arrived at the same conclusion that the Flynn Effect need not be factored in to reduce a full scale IQ score.  *See, e.g., Winston*, 600 F. Supp.2d at 736 (stating that a reasonable factfinder could reject the factual assertion that full scale IQ scores should be adjusted downward for the Flynn Effect).

Under *Sawyer*, Petitioner has failed to establish by clear and convincing evidence that no reasonable factfinder would have determined that his full scale IQ is not 70 or lower.  Therefore, he has failed to establish the significant subaverage general intellectual functioning prong of the mental retardation statute.  *See* A.R.S. § 13-703.02(K)(2).  Even though Petitioner must establish all three prongs of the statute in order to be found mentally retarded, the Court will proceed to discuss the adaptive behavior prong and onset before age 18.

*Adaptive Behavior*

In Petitioner's fundamental miscarriage of justice arguments, although he generally alleged that his mental retardation renders him actually innocent of the death penalty, his only specific argument regarding adaptive behavior was that neither Dr. Toma nor Dr.

1    Martinez utilized established diagnostic methods to assess adaptive behavior.  (Doc. 215 at

2    24-25.)

3        The PCR court throughly reviewed and discussed the evidence regarding Petitioner's

4    adaptive behavior, as follows.

> The court further finds that the Defendant has proved by a preponderance of the evidence, but not by clear and convincing evidence, that throughout his childhood and adult life he has suffered from significant impairment in adaptive behavior in meeting the standards of personal independence and social responsibility expected of a person of his age and cultural group. A.R.S. 13-703.02(K)(1). All experts agreed that the AAMR [American Association on Mental Retardation] Users Guide, 2002 edition, provides the "current community, nationally, and culturally accepted…procedure" for evaluating a person's adaptive behavior, as required by A.R.S. 13-703.02(E). In essence, this requires that the experts investigate and determine a defendant's conceptual, social and practical adaptive behavior and skills in the context of his or her behavior in the community. However, the court can also consider a defendant's institutional behavior in determining whether he has significant adaptive behavior deficits. *See State v. Arellano (Appelt)* [sic], 213 Ariz. 474, ¶¶ 14-23 (2006), where the court held that, pursuant to A.R.S. 13-703.02(K), the trial court has the discretion to consider defendant's adult institutional behavior, including his communication, social and interpersonal skills, and work, leisure and health habits, in determining the existence of adaptive behavior deficits. This behavior is especially relevant in this case, where the defendant has spent nearly his entire his adult life in prison before and after he committed these murders in 1989. Finally, the experts agree that the Adaptive Behavior Assessment System, 2d edition, (ABAS-II) test is the most appropriate and accepted formal assessment tool for determining whether the Defendant has significant adaptive behavior deficits.

> Viewed in this context, the Court agrees in part with the findings of Drs. Weinstein and Tasse, that the Defendant has significant adaptive behavior deficits as defined by A.R.S. 13-703.02(K)(1), particularly in the area of conceptual, social, and practical skills. As detailed in their reports and testimony, both experts investigated all aspects of the defendant's life before and after turning 18 years of age, including his institutional behavior. In addition to reviewing the testimony of the mitigation witnesses at the 1990 aggravation and mitigation hearing, they also interviewed several family members who were close to the Defendant in his formative years when he grew up in Phoenix and in southern California. They also considered sworn declarations from individuals who were familiar with the Defendant's behavior in non-institutional and institutional settings. The defendant also presented the testimony of Eloise Arce, an aunt who cared for him for about 18 months until age three and who also observed him in his youth, about his maladaptive conduct during his childhood years in Phoenix. This information confirmed, as detailed in the testimony and reports of Drs. Weinstein and Tasse, that although the Defendant as a young boy was a good care giver to his younger siblings in the absence of their alcoholic mother, he showed many symptoms of very slow and delayed development of conceptual, social and practical skills. Finally, Dr. Tasse, unlike Drs. Toma and Martinez, correctly administered the ABAS-II test, the most appropriate adaptive behavior test, to the Defendant and Richard Garcia, his stepfather from approximately 1966 to 1973. This test, together with the independent evidence of the defendant's non-institutional

behavior, establishes probable cause to believe that since childhood the Defendant has displayed significant adaptive behavior impairments in conceptual, social and practical skills.

The Court is unable to conclude, however, that there is clear and convincing evidence that the defendant has significant adaptive behavior deficits. A more complete picture of his conduct in his formative years as a child and teenager, as well as his conduct in prison over nearly all of the last twenty-six years, shows that the defendant has regularly shown adequate personal independence and social responsibility expected of a person of his age and cultural group, including proper conceptual, social and practical skills. In contrast to numerous hearsay declarations of Richard Garcia and others,[FN6] and the somewhat conflicting and unreliable testimony of Eloise Arce about certain adaptive behavior deficits of the defendant, the testimony at the October 19, 1990 and November 30, 1990 sentencing mitigation hearing of Erlinda Martinez, his aunt and the sister of the defendant's mother, and of two of the defendant's immediately younger sisters, shows that when the defendant grew up in Phoenix he exercised personal independence and proper conceptual, social and practical skills for a person of his age and cultural group. Before he became a teenager, and in the frequent absence of his alcoholic mother, he was described as the "man of the family," who did most of the cooking, cleaning and caring for his younger siblings. In addition, they attributed his poor school performance and being "kept back" in school to his frequently missing school and constantly changing schools due to his mother being regularly on the move around Phoenix. This nomadic existence is corroborated by the school records and Joint Chronology timeline submitted by the parties, which shows that over a seven-year time frame from September of 1963 to September of 1970, the defendant attended at least ten different schools, was regularly absent and was twice held back.

FN 6.    Most of the critical fact witnesses relied on by the defendant's experts were not called to testify and thus not subjected to cross-examination.

In 1971, at approximately the age 14, the defendant moved to El Monte, California with his mother and her husband, Richard Garcia. Three years later the defendant and his mother returned to Arizona without Richard. The defendant then married and fathered two sons, and was gainfully employed as a cook and dishwasher at various locations before being sent to prison for the first time in April of 1979.

The defendant's conduct in prison, where he has been since April of 1979 except for only two short periods of release, further compels the conclusion that the defendant has failed to show by clearing [sic] and convincing evidence that he has significant adaptive behavior deficits. Department of Corrections officers who supervised the defendant from 1987 to 1989 at Florence, testified that the defendant worked as a porter in the officers dining room and prepared and served food to DOC officers. His supervisors described him as a self-starter, who was polite, acted with responsibility, and was trusted and skilled. At one point, he was promoted and put in charge of running the morning shift at the dining room.

In concluding that the defendant has failed to show by clear and convincing evidence that he has significant adaptive behavior deficits, the court agrees with Dr. Toma's opinion that the defendant does not suffer from significant adaptive behavior deficits and that as an adult the defendant has consistently displayed the

ability to engage in independent and self-directed thinking, planning and conduct. Although Dr. Toma did not fully administer the ABAS-II test to formally determine if the defendant had significant impairment in adaptive behavior, his opinion is credible because it is based on numerous contacts with the defendant during interviews and I.Q. testing, and his evaluation of the defendant's well documented conduct during nearly 26 years in prison from 1979 to 1989 and then from 1991 to 2006.[FN8]

> FN 8     This conduct is portrayed in the voluminous prison and inmate records he reviewed, exhibits 138-209 not in evidence.

> In sum, although the conflicting evidence shows by a preponderance of the evidence that the defendant has significant adaptive behavior deficits, the court is unable to conclude that the evidence of these deficits is clear and convincing.

(Doc. 228 at 3830-3833 (footnote 7 omitted.)

*Adaptive Behavior Discussion*

The Court's limited *Sawyer* review evaluates whether Petitioner established by clear and convincing evidence that no reasonable factfinder would have determined that he lacks significant adaptive behavior deficits.  In *Apelt*, 213 Ariz. at 478-80, 143 P.3d at 1019-21, the Arizona Supreme Court clarified that it is proper to consider a petitioner's institutional behavior in determining whether he has significant adaptive behavior deficits.  Further, the controlling statute defines mental retardation as including current impairment in adaptive ability.  *See* A.R.S. § 13-703.02(K); *Grell*, 212 Ariz. at 527, 135 P.3d at 707.

Dr. Toma concluded, based on his interview with Petitioner,  and his review of Petitioner's institutional records as well as childhood records, that Petitioner does not have significant adaptive behavior deficits.  (Doc. 228 at 1884.)  Dr. Toma further concluded that as an adult Petitioner had consistently displayed the ability to engage in independent, self directed thinking, citing his ability to utilize the prison library, maintaining correspondence with pen pals, defending his rights in prison based on prison regulations, dealing with monies in his prison account, and other various correspondence with the prison.  (*Id.* at 5519-24; 1881-84.)  Dr. Martinez concluded, based on a current interview and assessment of Petitioner's adaptive behavior, that Petitioner did not have significant adaptive behavior deficits.  (*Id.* at 2408-09.)  In contrast, both Dr. Tasse and Dr. Weinstein focused on Petitioner formative and early teen-age years in concluding that he did have significant

adaptive behavior deficits.  (*Id.* at 1123-25, 2443.)

The PCR court reviewed all of the evidence taken from the *Atkins* hearing and from Petitioner's mitigation hearing prior to sentencing and concluded that Petitioner did not have significant adaptive behavior deficits. (*Id.* at 3830-33.)  Based on this evidence, a reasonable fact finder could conclude that Petitioner does not currently have significant adaptive behavior deficits.  *See Winston*, 600 F. Supp.2d at 736 (concluding that Petitioner failed to establish adaptive behavior deficits due in part to differing expert testimony).

Petitioner's main argument against this conclusion is that neither Dr. Toma nor Dr. Martinez utilized established diagnostic methods to assess his adaptive behavior.  (Doc. 215 at 24-25.)  Petitioner is referring to Dr. Toma utilizing an adaptive behavior scale that was not specifically designed to assess mental retardation and Dr. Martinez, although properly utilizing the ABAS-II, only relying on Petitioner's self report of his adaptive behavior, and not conducting independent interviews dating back to Petitioner's non-institutional behavior.

The PCR court reviewed this contention and discounted the opinions of Drs. Toma and Martinez regarding Petitioner's pre-institutional adaptive behavior.  (Doc. 228 at 3831.)  Citing agreement with the reports of Drs. Weinstein and Tasse, the court found that Petitioner, in his formative years as a child and teenager displayed significant adaptive behavior deficits.  (*Id.*)  However, under the statute, adaptive behavior is measured by an overall assessment of the Petitioner's abilities; it is not based only on administration of adaptive behavior scales.  *See Grell*, 212 Ariz. at 529, 135 P.3d at 709.  The *Grell* court also emphasized that the statute defines mental retardation as including current impairment in adaptive ability.  *Id.* at 527, 135 P.3d at 707 (stating that assessments based on recent interviews of the petitioner are persuasive).

After reviewing all of the adaptive behavior evidence, both pre-institutional and institutional behavior, Dr. Toma and Dr. Martinez concluded that Petitioner did not currently have significant adaptive behavior deficits. (Doc. 228 at 5519-24; 1881-84 (Toma); 2408-09 (Martinez).)  Concurring, the court concluded that "as an adult the [petitioner] has

1    consistently displayed the ability to engage in independent and self-directed thinking,

2    planning, and conduct." (*Id.* at 3833.)  After reviewing all of this evidence, under *Sawyer*,

3    Petitioner has failed to establish by clear and convincing evidence that no reasonable fact

4    finder would have determined that he lacks significant adaptive behavior deficits.[10]

5           *Conclusion*

6           Under *Sawyer*, Petitioner cannot demonstrate that no reasonable juror would have found

7    him ineligible for the death penalty due to his mental retardation.  Accordingly, his claim of

8    actual innocence of the death penalty cannot excuse the procedural default of Claim 34.

9           Actual Innocence of the Capital Crime

10          Petitioner argues that a fundamental miscarriage of justice will occur if Claim 34 is not

11   resolved on the merits because he is actually innocent of the capital crime due to new

12   evidence of brain damage demonstrating that he would be unable to premeditate, an essential

13   element of his first degree murder charge.  (Doc. 215 at 25; 219 at 7-8.)

14          In *Schlup*, the Court discussed the fundamental miscarriage of justice exception in the

15   context of a claim of actual innocence of the capital crime.  513 U.S. at 324-27.  In *Schlup*,

16   the petitioner accompanied his actual innocence evidence with an assertion of constitutional

17   error at trial.  *Id.* at 315.  The *Schlup* Court ruled that if a petitioner "presents evidence of

18   innocence so strong that a court cannot have confidence in the outcome of the trial unless the

19   court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner

20   should be allowed to pass through the gateway and argue the merits of  his underlying

21   claims."  *Id.* at 316.  To establish the requisite probability, the petitioner must prove with

22   "new reliable evidence" that "it is more likely than not that no reasonable juror would have

23   found petitioner guilty beyond a reasonable doubt."  *Id.* at 324, 327.

24   _____

25          [10]     Petitioner raised no argument regarding the statutory requirement that onset of

26   adaptive behavior deficits occur before the age of eighteen.  The PCR court concluded that
     Petitioner established by a preponderance of the evidence that onset of adaptive behavior

27   deficits occurred before he reached the age of eighteen, citing A.R.S. § 13-703.02(K)(2).
     (Doc. 228 at 3833.)

28

1    However, even if Petitioner does have new evidence indicative of brain damage,

2  "Arizona does not allow evidence of a defendant's mental disorder short of insanity either

3  as an affirmative defense or to negate the *mens rea* element of a crime." *State v. Mott*, 187

4  Ariz. 536, 541, 931 P.2d 1046, 1051 (1997). A defendant cannot present evidence of mental

5  disease or defect to show that he was *incapable* of forming a requisite mental state for a

6  charged offense. *Id.* at 540, 931 P.2d at 1050; *see Clark v. Arizona*, 548 U.S. 735 (2006)

7  (upholding the constitutionality of the *Mott* rule and finding that the exclusion of expert

8  testimony regarding diminished capacity does not violate due process); *see also Cook v.*

9  *Schriro*, 538 F.3d 1000, 1029 (9th Cir. 2008) (holding that in the context of a fundamental

10  miscarriage of justice challenge, evidence of voluntary intoxication cannot negate

11  premeditation under Arizona law). Thus, because Petitioner's new evidence of brain damage

12  would not negate premeditation, Petitioner's actual innocence of the capital crime claim fails;

13  it is not more likely than not that no reasonable juror would have convicted him of the crime

14  in light of the new evidence.

15    Finally, Petitioner argues that all of the new mitigation evidence that he obtained at his

16  *Atkins* hearing should be considered to determine whether on the basis of the additional

17  mitigation, he has established the fundamental miscarriage of justice exception. (Doc. 215

18  at 24; 219 at 5-6.) This argument was specifically rejected in *Sawyer*. The *Sawyer* Court

19  rejected the argument that the fundamental miscarriage of justice exception should be

20  extended beyond the elements of eligibility for a capital sentence to the existence of

21  additional mitigating evidence. 505 U.S. at 345. The Court reasoned:

22    A federal district judge confronted with a claim of actual innocence may with
      relative ease determine whether a submission, for example, that a killing was not
23    intentional, consists of credible, noncumulative, and admissible evidence negating
      the element of intent. But it is a far more difficult task to assess how jurors would
24    have reacted to additional showings of mitigating factors, particularly considering
      the breadth of those factors that a jury under our decisions must be allowed to
25    consider. . . . the "actual innocence" requirement must focus on those elements
      that render a defendant eligible for the death penalty, and not on additional
26    mitigating evidence that was prevented from being introduced as a result of a
      claimed constitutional error.
27
   *Sawyer*, 505 U.S. at 345-46, 347.
28

1

**PENDING MOTION**

2      Respondents have asked the Court to strike the exhibits that Petitioner filed in support

3  of his arguments regarding cause and prejudice and fundamental miscarriage of justice.

4  (Doc. 220.)  Respondents' motion will be summarily denied; the exhibits Petitioner filed in

5  support of his memorandum regarding cause and prejudice and fundamental miscarriage of

6  justice are certainly relevant to this Court's consideration of his arguments.

7

**CERTIFICATE OF APPEALABILITY**

8      In the event Petitioner appeals from this Court's judgment, the Court has evaluated the

9  claims within the petition for suitability for the issuance of a certificate of appealability.  *See*

10  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b)(1); Rule 11(a), 28 U.S.C. foll. § 2254.

11      Rule 22(b) of the Federal Rules of Appellate Procedure provides that an applicant

12  cannot take an appeal unless a certificate of appealability has been issued by an appropriate

13  judicial officer.  Rule 11(a), 28 U.S.C. foll. § 2254, provides that the district judge must

14  either issue or deny a certificate of appealability when it enters a final order adverse to the

15  applicant.  If a certificate is issued, the court must state the specific issue or issues that satisfy

16  28 U.S.C. § 2253(c)(2).  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when

17  the petitioner "has made a substantial showing of the denial of a constitutional right."  This

18  showing can be established by demonstrating that "reasonable jurists could debate whether

19  (or, for that matter, agree that) the petition should have been resolved in a different manner"

20  or that the issues were "adequate to deserve encouragement to proceed further."  *Slack v.

21  McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4

22  (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1)

23  whether the petition states a valid claim of the denial of a constitutional right and (2) whether

24  the court's procedural ruling was correct.  *Id.*  The Court finds that reasonable jurists could

25  debate its resolution of Claims 12 and 34.

26      Based on the foregoing,

27      **IT IS HEREBY ORDERED** that Petitioner's second amended petition for writ of

28

habeas corpus (Doc. 162) is **DENIED WITH PREJUDICE.** The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** concluding that Claim 34 is procedurally barred. Petitioner has not established cause and prejudice or that a fundamental miscarriage of justice will occur if Claim 34 is not reviewed on the merits. (Doc. 215.)

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issues:

> Claim 12: Whether the trial court violated his due process right to independent mental health experts in preparation for his defense at trial and sentencing in violation of *Ake v. Oklahoma*, 470 U.S. 68 (1985)

> Claim 34: Whether this Court properly found Claim 34 procedurally defaulted according to an adequate and independent state procedural rule and whether this Court properly concluded that the procedural default of Claim 34 was not excused by cause and prejudice or a fundamental miscarriage of justice.

**IT IS FURTHER ORDERED** denying Respondents motion to strike cause and prejudice exhibits. (Doc. 220.)

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona 85007-3329.

DATED this 28th day of September, 2010.

James A. Teilborg
United States District Judge