1  Jon M. Sands
2  Federal Public Defender
   District of Arizona
3  Paula K. Harms (AZ Bar No. 022489)
   Timothy M. Gabrielsen (NV Bar No. 8076)
4  850 West Adams Street, Suite 201
5  Phoenix, Arizona 85007
   Paula_Harms@fd.org
6  Tim_Gabrielsen@fd.org
7  602.382.2816 telephone
   602.889.3960 facsimile
8

9           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF ARIZONA
10

11  David Martinez Ramirez,              No. CV-97-1331-PHX-JAT

12              Petitioner,              DEATH-PENALTY CASE

13        vs.
                                         **EXHIBITS TO PETITIONER'S**
14  Charles L. Ryan, et al.,             **SUPPLEMENTAL BRIEF ON**
                                         ***MARTINEZ V. RYAN*, 132 S. CT.**
15              Respondents.             **1309 (2012)**
16

17

18

19                        Volume 2
20                      EXHIBITS Q-KK

21

22

23

24

25

26

27

28

**In the United States District Court
for the District Arizona
Case No. CV-97-1331-PHX-JAT**
*Ramirez v. Ryan*
**Petitioner's Supplemental Brief on *Martinez v. Ryan*, 132 S. CT. 1309 (2012)**

**Exhibit List**

| | |
|---|---|
| **Exhibit A** | Copy of Dr. Tasse Report dated February 24, 2006 |
| **Exhibit B** | Copy of Dr. Weinstein Report dated February 14, 2006 |
| **Exhibit C** | Copy of School Records |
| **Exhibit D** | TR 4/24/06 at 70-71, 156, 159 |
| **Exhibit E** | TR 4/26/06 at 85, 93, 156-57 |
| **Exhibit F** | Copy of Declaration of Eloise Arce dated November 4, 2004 |
| **Exhibit G** | Copy of Declaration of Herminia Naranjo dated November , 2004 |
| **Exhibit H** | Copy of Declaration of Richard Garcia dated November 23, 2004 |
| **Exhibit I** | Copy of Declaration of Mary Helen Pierce dated November 5, 2004 |
| **Exhibit J** | Copy of Declaration of Julian Ramirez dated July 26, 2004 |
| **Exhibit K** | Copy of Declaration of William Laubner Jr. dated January 14, 2005 |
| **Exhibit L** | TR 10/19/90 at 32-33, 36-37, 64, 71 |
| **Exhibit M** | TR 4/19/06 Vol. B at 6, 17, 19, 20-34, 41, 45, 27-48, 70-71, 78 |
| **Exhibit N** | Copy of Declaration of John Pierce dated November 5, 2004 |

**Exhibit O**      TR 04/25/06 at 96-97, 117-149

**Exhibit P**      Copy of Declaration of Mickey McMahon dated November 5, 2004

**Exhibit Q**      Copy of Declaration of Mara Siegel dated April 26, 2010

**Exhibit R**      Copy of Declaration of Nora Shaw dated April 8, 2010

**Exhibit S**      Copy of Declaration of Russell Stetler dated April 30, 2015

**Exhibit T**      Copy of Declaration of William Sundermier dated April 26, 2005

**Exhibit U**      Copy of Declaration of Jean Howell dated May 10, 2005

**Exhibit V**      Copy of Declaration of Linda Wells dated May 9, 2005

**Exhibit W**      Copy of Declaration of Abigail Jensen dated May 27, 2010

**Exhibit X**      Copy of SKIL report by Ricardo Weinstein, Ph.D. dated December 28, 2008

**Exhibit Y**      TR 04/27/2006 at 36

**Exhibit Z**      Copy of Declaration of Rolando Rodriguez

**Exhibit AA**      Copy of Arizona Special Education Programs for Exceptional Children

**Exhibit BB**      Copy of Letter dated February 7, 2006

**Exhibit CC**      Copy of Letter from McGraw Hill dated November 22, 2004

**Exhibit DD**      Copy of AAMR Mental Retardation at 1, 26, 125, 127

**Exhibit EE**      Copy of Diagnostic and Statistical manual of mental disorders at 40-43

**Exhibit FF**      Copy of Ramirez, David Exhibit dated March 1, 2006

**Exhibit GG**      Copy of Declaration of Dr. Weinstein

**Exhibit HH**      Copy of Dr. Martinez  dated November 20, 2005

**Exhibit II**      TR 5/15/06 at 10

**Exhibit JJ**      TR 5/16/06 at 6, 10

**Exhibit KK**      TR 3/8/07 at 12-13, 24

# EXHIBIT Q

# EXHIBIT Q

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

## DECLARATION OF MARA SIEGEL

I, Mara Siegel, declare under penalty of perjury, the following to be true to the best of my information and belief,

1.  My name is Mara Siegel, and I was appointed to represent David Ramirez during his trial and capital sentencing. I have reviewed some documents to refresh my memory about David's case. I have also reviewed the declarations from Eloise Arce (David's aunt), Mary Helen Pierce (David's aunt), Herminia Naranjo (David's aunt), Richard Garcia (David's step-father), John Pierce (David's uncle), William Laubner (David's uncle), and Julian Ramirez (David's uncle). I also read Dr. Weinstein's report dated February 14, 2006 and his QEEG report dated I also reviewed Dr. Ricardo Weinstein's report dated February 14, 2006, and his QEEG report dated August 18, 2004.

2.  David's case was my first capital one. Prior to my appointment, I had never second-chaired a capital case or even observed one. Although Larry Matthew was initially appointed with me as advisory counsel, he had even less capital experience than I did and he did not try the case with me nor did he assist in sentencing proceedings. To the best of my recollection, he may have done some limited work on some pre-trial matters, but when it came to trial and sentencing, I was basically representing David alone, without the assistance of co-counsel. At that time in the Public Defender's Office, there were simply not enough resources available to staff the capital cases like they should have been staffed. In my experience since David's case, I have learned that two heads are better than one and in capital cases, the input of two attorneys is a must. The Public Defender's office now staffs their capital cases with two lawyers and to be lead counsel, one has to have second-chaired a capital case. It makes me think about David's case and I believe I could have better represented him had I had those resources or experience.

3.  Although I had done non-capital criminal trials while in Chicago and in the two years prior to this case that I was at the Maricopa County Public Defender's office, I do not think I was prepared to handle a capital case, especially the representation of someone as mentally disturbed as David Ramirez.

4.  When I first met with David, it was apparent to me that there was something, for a lack of a better phrase, indescribably odd about him. He also appeared to have some deficits in appreciating the legal peril he was in. Although initially he was somewhat reluctant, David did allow me to investigate and present mitigating evidence on his behalf.

1

5.   I would have wanted to have the information contained within the reports of Dr.
     Weinstein and the declarations shown to me by habeas counsel. This information
     would have changed the way I handled both David's guilt phase and his sentencing
     phase.

6.   The mitigating information that we did present was very limited and I only had a limited
     understanding at the time of trial and sentencing of how damaged David is.

7.   Had I had the information contained in the expert reports and from the family, I would
     have begun to weave my mitigation themes into my pretrial motions, in order to
     educate the judge about David's background and mental impairments prior to
     sentencing. Because I represented David prior to the right to capital jury sentencing,
     this would have been an important way to prepare the judge for sentencing
     proceedings. In addition, had I had this information, I may have handled competency
     proceedings differently. I had some difficulty getting things across to David in my
     representation of him, and this information would have helped explained how difficult it
     was for David to understand and assist me in a capital trial.

8.   As I recall, the prosecutor had also offered David a life sentence if he plead guilty. I
     believe now that had I had all this mitigating evidence, and understood David's mental
     limitations better, I may have been able to enlist the help of an expert and others in to
     convince David to plead guilty. However, because I did not fully understand his
     limitations, I may not have explained David's situation to him on a level that he could
     fully comprehend.

9.   I had no strategic reason for not presenting all the mitigating information available in
     the declarations and expert reports provided to me by habeas counsel. Had we found
     all this information, we would have presented it at sentencing. For instance, some of
     the facts presented by this information that we could have presented include 1) David's
     background and the physical, emotional, and sexual abuse he suffered as a child; 2) his
     exposure prenatally to toxic substances; 3) his exposure to alcohol at a very young age;
     4) his lack of a father figure and his mother's neglect, abuse, and alcoholism; 5) the
     poverty and malnourishment he suffered as a child; 6) his low IQ; 7) his mental
     retardation; 8) his developmental delays; 9) his brain damage and neuropsychological
     deficits; 10) the tragic circumstances surrounding his birth; 11) his problems in coping
     with daily life due to his developmental and neuropyschological deficits and how this
     lessened his culpability for the crime; and 12) his family's status as migrant farm
     workers and his exposure to pesticides and other toxic chemicals while living and
     working in those fields. This is just a short list of mitigating facts that these documents
     represent and is not meant to be exhaustive. I certainly think that there is much more

mitigating information to present in David's case than we did at the time of the original sentencing and that this information is of the type I would definitely wanted to present had I possessed this information.

I declare under penalty of perjury that the foregoing is a true and correct statement.

Signed this __26__ day of April, 2010.

Mara Siegel

3

# EXHIBIT R

# EXHIBIT R

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

## DECLARATION OF NORA SHAW

I, Nora Shaw, declare under penalty of perjury, the following to be true to the best of my information and belief:

1.  My name is Nora Shaw, and I was the court appointed investigator in the David Ramirez case. I have reviewed some of the trial transcripts to refresh my memory about David's case. I also read the declarations from Eloise Arce (David's aunt), Mary Helen Pierce (David's aunt), Herminia Naranjo (David's aunt), and Richard Garcia (David's step-father). I then read Dr. Marc Tasse's report dated February 24, 2006, and Dr. Ricardo Weinstein's report dated February 14, 2006.

2.  I saw first hand that David was incapable of providing accurate historical information relating to his personal history. David's memory was poor as it related to his family history.

3.  David did not understand what was going on in the courtroom, and he was incapable of answering even the simplest requests made by the judge. David also had a very difficult time articulating his thoughts or making himself clear. David simply did not have the mental capacity to represent himself in court. He relied heavily on his advisory counsel, Mara Siegel. Ms. Siegel did all of the paperwork and filings for him, and she often told him what to say while in the courtroom.

4.  I read the trial transcripts of December 29, 1989. On that date, I told the judge that David needed a mitigation expert, and I offered the name of a social worker named Gary Solomon (page 10). The judge replied "What's a mitigation expert? I have never heard of that in a quarter century." The judge called David's requests for some experts as being "novel matters that I have never read about or experienced." Referring to a mitigation expert, the judge said "Why give him somebody to do what a lawyer does (Page 12)?" The judge finished his thoughts by saying that David should be speaking on his own behalf.

5.  The declarations and reports provided to me by habeas counsel are very compelling mitigation that should have been investigated and presented on David's behalf at sentencing. Eloise and Richard Garcia provided information showing that David was exposed to pesticides in utero and as a young child. David was hit by a car and sent to the hospital when he was 14 years old. Richard Garcia talked about David's inability to solve even the simplest problems. David reached his milestones at a later age than his cousins. He lived in a totally dysfunctional household, and his mother was an alcoholic who drank heavily during David's pregnancy. David's conception was the result of a rape by his aunt Herminia's husband. Information was developed that David suffered some physical abuse, and he may have been sexually abused as well. David was neglected by his mother, and he was malnourished per his aunts. David's sister Mary Castillo receives social security disability because she is very slow according to Eloise and Mary Helen. Dr. Weinstein pointed out that David showed some frontal lobe damage to the brain based on

his QEEG exam. Both Dr. Tasse and Dr. Weinstein's assessment of David Ramirez's history resulted in a diagnosis that David suffers from mental retardation. They agreed that David met the criteria for mental retardation in that his IQ scores were low, his adaptive behavior skills showed significant impairments, and that the impairments in adaptive behaviors occurred before the age of 18.

6.     All of the information gleaned from the family declarations and the reports of Dr. Tasse and Dr. Weinstein should have been investigated and brought forth in mitigation prior to David Ramirez's sentencing. I am sure trial counsel, Mara Siegel would have presented this evidence as mitigation had we investigated it. The trial judge did not appoint someone to do mitigation work although a request was made to hire someone in that capacity.

I declare under penalty of perjury that the foregoing is a true and correct statement. Signed this _08_ day of April, 2010.

Nora Shaw

# EXHIBIT S

# EXHIBIT S

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

# DECLARATION OF RUSSELL STETLER

I, RUSSELL STETLER, declare as follows:

***Summary of Opinions***

    1.  I was asked by federal habeas corpus counsel for David Martinez Ramirez to summarize the prevailing professional norms in the investigation of mitigation evidence at the time of Mr. Ramirez's prosecution, trial and death sentence in 1989-90 and at the time of his state post-conviction proceedings in 1995-96, and then to review the performance of his trial and post-conviction counsel in light of those norms.   I was also asked to address the standard of care in capital mental health evaluations, with particular attention to the importance of the social history investigation.

    2.  The prevailing norms in mitigation investigation are addressed in detail in this declaration, but the critical points can be summarized succinctly.   Counsel's duty to conduct a thorough mitigation investigation was well established in 1989-90.   *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (ineffective assistance where capital counsel in a 1986 trial "did not fulfill their obligation to conduct a thorough investigation of the defendant's background").   Writing for the Court's majority, Justice Stevens cited the American Bar Association's STANDARDS FOR CRIMINAL JUSTICE (2d ed. 1980) concerning the need to investigate sentencing issues thoroughly. *Id.* at 396.   Standard 4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction.*" (Emphasis added.)   *Id.* at 4:53.   In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will

1

mitigating circumstances surrounding the commission of the offense itself." *Id.* at 4:55.   The

need to investigate mental illness in the context of mitigating evidence was also well established.

*See Ake v. Oklahoma*, 470 U.S. 68, 80 (1985) (due process right to psychiatric assistance when

mental condition is relevant to culpability *or punishment*).[1]   The Eighth Amendment

jurisprudence of the United States Supreme Court has mandated individualized sentencing in

death penalty cases since 1976.   *See Gregg v. Georgia*, 428 U.S. 153, 156 (1976) (finding

Georgia's death penalty statute Constitutional in part because it allowed for mercy based on

individualized consideration) and *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976) (finding

mandatory statute unconstitutional because it would allow the blind infliction of the death penalty

on members of a faceless undifferentiated mass).

    3.   Effective capital defense throughout the post-*Furman* era has required counsel to

conduct a thorough investigation of the client's life.   This investigation generally involves a

multigenerational inquiry into the biological, psychological, and social influences on the

development and adult functioning of the accused.   Mitigation investigation involves parallel

tracks of collecting and analyzing life-history records, and conducting multiple, in-person,

face-to-face interviews.   The purpose of this thorough investigation is to develop evidence that

will humanize the defendant, help jurors to understand why he may have committed the capital

offense, and to evoke compassion and empathy by identifying the client's individual frailties that

at once establish human kinship and expose vulnerabilities and disadvantage.   A thorough social

history investigation also provides the foundation for reliable mental health evidence and enables

---

[1] The High Court noted that "[m]any states, as well as the Federal Government currently make psychiatric assistance available to indigent defendants," citing, among other statutes, ARIZ. REV. STAT. ANN. § 13-4013 (1978) (capital cases; extended to noncapital cases in *State v. Peeler*, 126 Ariz. 254, 614 P.2d 335 (App. 1980)).

counsel to make informed decisions about what kind of mental health experts to consult and what questions they should address.   The fruits of a thorough mitigation investigation not only provide capital defendants with the effective representation to which they are entitled under the Sixth Amendment, but assure jurors of the opportunity to consider all the evidence relevant to the reasoned moral judgment they are asked to render, thereby also assuring the courts of an outcome that is reliable and just.   Based on the materials I have reviewed (summarized *infra* ¶ 44), it is my considered professional opinion that Mr. Ramirez's trial counsel failed to conduct the thorough mitigation investigation required by the prevailing professional norms of 1989-90, and the resulting penalty-phase presentation fell far below those norms.

4.   The need for thorough post-conviction mitigation investigation was also well established by the time of Mr. Ramirez's representation in state post-conviction proceedings.   It was readily apparent that post-conviction counsel need to conduct a thorough mitigation investigation in order to assess the effectiveness of defense counsel's performance at trial under the familiar two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984), requiring both deficient performance as measured against prevailing professional norms and resultant prejudice.[2] Based on the materials that I have reviewed (summarized *infra* ¶ 44), it is my considered professional opinion that Mr. Ramirez's state post-conviction counsel failed to conduct the thorough mitigation investigation required by the prevailing professional norms of 1995-96. Without the social history that results from a thorough mitigation investigation, neither trial nor post-conviction counsel can make an informed and thoughtful decision about which experts to retain in order to gauge the nature and extent of a client's possible mental disorders or

---

[2] Counsel has "a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."  *Strickland*, 466 U.S. at 687.   There is prejudice when confidence in the outcome of the proceeding has been undermined.

3

impairments.   Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation.

***Background and Qualifications***

5.   I am the National Mitigation Coordinator for the federal death penalty projects, which are described more fully at their web site, www.capdefnet.org.   This national position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases.[3]   In this capacity, I consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that are pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254 and 2255).

6.   From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel.   The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants.   I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases.

7.   From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a

---

[3] *See* Jon B. Gould & Lisa Greenman, REPORT TO THE COMMITTEE ON DEFENDER SERVICES, JUDICIAL CONFERENCE OF THE UNITED STATES, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN FEDERAL DEATH PENALTY CASES, 111-112, September 2010 (Commentary describes authorization of the position "to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts" and the role of the National Mitigation Coordinator in case consultations and training).

nonprofit law office in San Francisco that coordinated appellate and post-conviction

representation of all the prisoners under sentence of death in California.   In that capacity, I also

supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as

well as investigators, mitigation specialists, and experts outside the office who were retained to

assist counsel representing death-sentenced prisoners.

8.   I have investigated all aspects of death-penalty cases since 1980, first working in a

private office in California and later in institutional offices.   All my work on death penalty cases

has been on behalf of indigent clients, either through funding authorized by courts or public

defender offices, or as an employee of indigent defense agencies.   Since 1980, I have regularly

attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in

post-conviction proceedings.   Most of these conferences were organized and attended by

attorneys specializing in capital work.   I investigated mitigation evidence in over two dozen death

penalty cases in California in the 1980s.

9.   Since 1990, I have lectured extensively on capital case investigation, particularly the

investigation of mitigation evidence.   I have lectured on these subjects not only in New York and

California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas,

Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky,

Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina,

Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia,

Washington, and Wyoming, as well as in Puerto Rico, a jurisdiction where only federal death

penalty cases are prosecuted.   I have lectured at eight CLE programs in Arizona.   I have also

lectured on numerous occasions under the auspices of the Administrative Office of the United

States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at

the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service.   Over the past

two and a half decades, I have lectured at over three hundred fifty continuing legal education

programs around the country, as well as dozens of additional programs at law schools and related

professional conferences in the United States, Europe, and Asia.

10.   Since the 1990s, I have lectured on mitigation investigation in death penalty cases at

multiple national training conferences sponsored by the following organizations: the NAACP

Legal Defense Fund (annual Airlie conference), the National Legal Aid and Defender Association

("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the

Case for Life").   At various times over the past twenty-five years, I have served on the planning

committees for these national conferences, as well as the annual Capital Case Defense Seminar

sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public

Defenders Association (CPDA), which is attended by over a thousand practitioners.   I was a

co-chair of the planning committee for this seminar in 2009 and from 2011 to 2015.   I have also

taught at the death penalty colleges at the Santa Clara University School of Law in California and

the DePaul University College of Law in Illinois.   I have taught at a dozen capital defense

seminars throughout the country under the auspices of the National Institute of Trial Advocacy and

over a dozen "bring-your-own-case" capital brainstorming seminars under the auspices of the

National Consortium for Capital Defense Training and its regional counterparts.   I also designed

and organized the annual Capital Mitigation Skills Workshop under the auspices of the federal

Habeas Assistance and Training Counsel Project.

11.   Since 1993, I have contributed extensively to the California Death Penalty Defense

Manual published by the California defense bar (CACJ and CPDA).   This multi-volume reference

has a volume devoted to the investigation and presentation of mitigation evidence which I helped

to shape in the 1990s.   In 1999, I published articles on *Mitigation Evidence in Death Penalty Cases* and *Mental Disabilities and Mitigation* in THE CHAMPION, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in INDIGENT DEFENSE, published by the National Legal Aid and Defender Association.   These and other articles of mine were cited in the Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, rev. 2003, 31 HOFSTRA L. REV. 913 (2003), available at ambar.org/2003guidelines.   At the request of HOFSTRA LAW REVIEW, I wrote an article for their symposium issue on the revised ABA Guidelines, entitled *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*, 31 HOFSTRA LAW REVIEW 1157 (2003).   At the request of HOFSTRA LAW REVIEW, I also wrote an article for their symposium issue on the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 1067 (2008).   At the request of UMKC LAW REVIEW, I contributed an article to their symposium issue devoted to "Death Penalty Stories," *The Unknown Story of a Motherless Child*, 77 UMKC L. REV. 947 (2009).   I have recently written three additional articles on prevailing norms in the development of mitigation and mental health evidence: *The ABA Guidelines and the Norms of Capital Defense Representation* (written in collaboration with Professor W. Bradley Wendel), 41 HOFSTRA L. REV. 635 (2013); *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC LAW REVIEW 407 (2014); and *The ABA Guidelines: A Historical Perspective* (written in collaboration with Aurélie Tabureau), 43 HOFSTRA LAW REVIEW 731 (2015).

12.   I am the coauthor of chapters on psychiatric issues in death penalty cases in two books: *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL

HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., & Amy Smiley, Ph.D., eds.; Kingston, New Jersey: Civic Research Institute, Inc., 2001) and *Punishment*, in PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2nd ed. (Richard Rosner, M.D., ed.; London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press). I am also a coauthor of A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS WITH MENTAL DISORDERS AND IMPAIRMENTS (Bishop Auckland, U.K.: International Justice Project, 2008).

13. I have qualified as an expert witness in multiple state and federal courts and have provided opinion evidence on standard of care issues in capital cases (especially in the investigation and presentation of mitigation evidence) by live testimony or affidavit over one hundred fifty times in numerous jurisdictions, including Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming. I have testified as an expert witness twenty-five times, including testimony in capital habeas corpus cases in the District of Arizona, the Eastern District of California, the Northern District of Iowa, the Middle District of Louisiana, the Western District of Missouri, and the District of Wyoming, as well as in state capital post-conviction proceedings in Alabama, Arkansas, California, Colorado, Louisiana, Nevada, South Carolina, and Wyoming. I have also testified as an expert witness on mitigation standards in the state and federal trial courts of various states, including Arizona.

14. Over the years, I have been directly involved in hundreds of capital cases, including scores of trials and post-conviction hearings. I have also been consulted in various capacities on capital cases in numerous jurisdictions around the country, including many federal death penalty cases.

8

***Prevailing Norms in the Development of Mitigating Evidence in Capital Cases in 1989-90***

15.   Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work.   In every seminar in which I have participated since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases. When I began working on capital cases in 1980, investigation was already firmly established as an integral part of the criminal defense function generally.   When the American Bar Association published the second edition of its STANDARDS FOR CRIMINAL JUSTICE (2nd edition 1980), Standard 4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction*." (Emphasis added.)   *Id*. at 4:53.   The Commentary to this Standard noted concisely, "Facts form the basis of effective representation."   *Id*. at 4:54.   In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself."   *Id*. at 4:55.[4]   These ABA Standards were cited by Justice Stevens in reference to counsel's obligation to conduct a thorough investigation of a capital defendant's background.   *Williams v. Taylor*, 529 U.S. at 396 (2000).

---

[4] *See also* Joseph B. Cheshire V, *Ethics and the Criminal Lawyer: The Perils of Obstruction of Justice*, CHAMPION (Jan./Feb. 1989) at 12 ("Defense counsel have a right and a duty to approach and interview every witness that might have any information regarding the particular issue involved in their client's case.").

16.   These standards covered criminal defense generally.   Discussions of *capital* defense provided more specific detail about counsel's duties in investigating mitigating evidence.   As early as 1979, Dennis Balske (an effective capital litigator then practicing in the South) emphasized, "Importantly, the life story must be complete."   Dennis N. Balske, *New Strategies for the Defense of Capital Cases,* 13 AKRON L. REV. 331, 358 (1979).   In 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases.   He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings.   The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation.   The importance of this investigation, and the care with which it is conducted, cannot be overemphasized."   Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-324 (1983).   Writing again in 1984, Mr. Balske advised capital defense counsel that they "must conduct the most extensive background investigation imaginable.   You should look at every aspect of your client's life from birth to present.   Talk to everyone that you can find who has ever had any contact with the defendant."   Dennis Balske, *The Penalty Phase Trial: A Practical Guide*, THE CHAMPION (March 1984), at 40, 42.   *See also* David C. Stebbins and Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, (August 1986) at 14, 18 ("capital defense attorneys must recognize that the profession demands a higher standard of practice in capital cases"); and Robert R. Bryan, *Death Penalty Trials: Lawyers Need Help*, THE CHAMPION (August 1988) at 32 ("There is a requirement in every case for a comprehensive investigation not only of the facts but also the entire life history of the client.").

17.   At the beginning of the 1980s, a capital defense lawyer in California hired a former *New York Times* reporter to investigate the life history of his client.   The reporter, the late Lacey Fosburgh, had previously written a best-selling book about a murder case she had covered for the newspaper, CLOSING TIME: THE TRUE STORY OF THE "GOODBAR" MURDER (1977).   After her successful work in developing the capital client's mitigation evidence, Ms. Fosburgh wrote about the critical role she had played:

> A significant legal blind spot existed between the roles played by the private investigator and the psychiatrist, the two standard information-getters in the trial process.   Neither one was suited to the task at hand here – namely discovering and then communicating the complex human reality of the defendant's personality in a sympathetic way.
> Significantly, the defendant's personal history and family life, his obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence. Instead they are both discovered and portrayed through narrative, incident, scene, memory, language, style, and even a whole array of intangibles like eye contact, body movement, patterns of speech – things that to a jury convey as much information, if not more, as any set of facts.   But all of this is hard to recognize or develop, understand or systematize without someone on the defense team having it as his specific function.   *This person should have nothing else to do* but work with the defendant, his family, friends, enemies, business associates and casual acquaintances, perhaps even duplicating some of what the private detective does, but going beyond that and looking for more.   This takes a lot of time and patience. (Emphasis added.)[5]

Capital defense lawyers across the country soon recognized the value of nonlawyers with expertise in the development of sentencing evidence – ultimately referred to as "mitigation specialists." The California defense bar prominently featured one such nonlawyer on the cover of its monthly

---

[5] Lacey Fosburgh, *The Nelson Case: A Model for a New Approach to Capital Trials*, in CALIFORNIA STATE PUBLIC DEFENDER, CALIFORNIA DEATH PENALTY MANUAL, 1982 supplement, N6-N10, N7   (July 1982).   This article also appeared in the magazine of the California defense bar, FORUM (Sept.-Oct. 1982).   *See also* Report by the Team Defense Project, *Team Defense in Capital Cases*, FORUM (May-June 1978), and Michael G. Millman, *Interview: Millard Farmer*, FORUM (Nov.-Dec. 1984) at 31-33.

11

magazine FORUM in 1987.[6]   The national defense bar magazine, THE CHAMPION, discussed the

use of social workers in developing mitigating evidence in 1986.[7]   The following year, another

article in the same magazine commented tersely, "The mitigation specialist is a professional who,

as attorneys across the nation are now recognizing, should be included and will be primary to the

defense team."[8]

18.   Since the early 1980s, it has also been standard practice for competent defense

counsel to determine whether their capital client suffers from organic brain injury, psychiatric

disorders, or trauma outside the realm of ordinary human experience.   Whenever brain-behavior

relationships are at issue, a thorough investigation of the etiology of brain damage is needed to

determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental

exposures, head injuries, etc.   In a capital case, such investigation is particularly important

because of the additional mitigating factors that may be disclosed beyond the fact of psychiatric

disorder or organicity.   *See*, for example, John Hill and Mike Healy, *The Death Penalty and the

Handicapped*, FORUM (May-June 1986) at 18-20 (discussing implications of childhood disorders

affecting the brain and other disabilities for penalty phases in capital cases); and David C.

Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at

34, 36 (discussing need for adequate time to overcome clients' distrust and the value of a

neuropsychologist or neurologist in cases with head trauma).

19.   Over the past fifteen years, the U.S. Supreme Court has found trial counsel ineffective

in five cases for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S.

---

[6] Anne E. Fragasso, *Interview: Casey Cohen*, FORUM (Jan.-Feb. 1987) at 22, 26.
[7] Cessie Alfonso & Katharine Bauer, *Enhancing Capital Defense: The Role of the Forensic Social Worker*, CHAMPION (June 1986) at 26, 26-29.
[8] James Hudson et al., *Using the Mitigation Specialist and the Team Approach*, CHAMPION (June 1987) at 33, 36.

362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam).   Every case but *Sears* was tried in the 1980s.   In *Williams,* the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial in 1986 and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.).   In *Wiggins*, a case tried in 1989, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation in accordance with the ABA Guidelines.   "Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources."   539 U.S. at 524.   In *Rompilla*, tried in 1988, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts.   545 U.S. at 377, 379.   Similarly, in *Porter*, also tried in 1988, counsel were found deficient despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation.   558 U.S. at 40.   Quoting *Williams*, the Court in *Porter* reaffirmed this duty: "It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'"   (Citation omitted.)   *Id.* at 39.   Among the mitigation that Porter's counsel failed to present was "brain damage that could manifest in impulsive, violent behavior."   *Id.* at 36.   In *Sears*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings.   The Court noted, "We have never limited the

13

prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation

evidence' presented . . ." 561 U.S. at 954. Post-conviction evidence emphasized significant

frontal lobe brain damage causing deficiencies in cognitive functioning and reasoning. *Id.* at 946.

Four of these five individuals have subsequently received sentences of less than death, and the fifth

case is pending as of this writing. Terry Williams received a life sentence by negotiated

disposition in Danville, Virginia, in 2000.[9] On October 15, 2004, the State of Maryland agreed to

a disposition sending Kevin Wiggins to a state facility for mental health treatment and

rehabilitation services, but making him eligible for parole immediately based on time already

served.[10] On August 13, 2007, the Lehigh County (Pennsylvania) District Attorney's Office

stipulated to a life sentence for Ronald Rompilla.[11] On July 21, 2010, the Brevard-Seminole

(Florida) State Attorney's Office announced that it would allow George Porter, Jr., to be

resentenced to life.[12] All five cases involved mental health evidence that was not discovered and

presented at trial.

### The Need for a Qualified Mitigation Specialist

20. In a capital case, competent defense counsel have a duty to conduct life-history

investigations, but generally lack the skill to conduct the investigations themselves. *See,*

generally, Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help but Can't*

*Be Delegated,* THE CHAMPION (March 2007) at 61. Moreover, even if lawyers had the skills, it is

---

[9]*See* Frank Green, *Death Penalty Cases Scrutinized: More Hearings Are Being Ordered in Virginia,* RICHMOND TIMES-DISPATCH (Apr. 9, 2001) at A1, *available at* truthinjustice.org/va-dpreview.htm.

[10] *See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), jenner.com/news/news_item.asp?id=12759624

[11] *See* Associated Press, *Death Row Inmate Gets New Life Term,* USA TODAY, usatoday.com/news/topstories/2007-08-13-477084247_x.htm (last visited Apr. 8, 2008).

[12] Kaustuv Basu, *Aging Killer May Get Reprieve from Death Row,* FLA. TODAY (July 21, 2010).

14

more cost-effective to employ those with recognized expertise in developing mitigation evidence. Competent capital counsel have long retained a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes.   The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, for example, noted that mitigation specialists "have extensive training and experience in the defense of capital cases.   They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." The subcommittee report also bluntly commented, "The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal."   The Commentary also stated that the work of mitigation specialists "is part of the existing 'standard of care' in a federal death penalty case."   *Id.*, Commentary to 7. Experts, Sec. II, Recommendations and Commentary. FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION, Federal Judicial Conference (May 1998) (commonly known as "the Spencer Report"), *available at* americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Representation/Standards/Natio nal/federal_judicial_conference_recommendations.authcheckdam.pdf.   As noted *supra* ¶ 17, even before the term "mitigation specialist" was coined, penalty phase biographical investigation was widely accepted in the 1980s as a critical part of the capital defense function.

21.   As revised in 2003, the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (*hereinafter*, ABA Guidelines (rev. 2003), *available at* ambar.org/2003guidelines) state unequivocally that lead counsel at any stage of capital

representation (trial or post-conviction) should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11).   The original edition of the ABA Guidelines, adopted in 1989 (*available at* ambar.org/1989guidelines), similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence."  (1989 Guideline 11.4.1.C.)   The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation."  (1989 Guideline 11.4.1.D(7).)   Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered."  (1989 Guideline 11.4.1.C.)

***Evolution of Prevailing Norms***

22.   The 1989 edition of the ABA Guidelines reflected a national consensus among capital defense practitioners based on their practices in the 1980s.   These Guidelines were the result of years of work by the National Legal Aid and Defender Association (NLADA) to develop standards to reflect the prevailing norms in indigent capital defense.   NLADA published its Standards for the Appointment of Defense Counsel in Death Penalty Cases (available at americanbar.org/content/dam/aba/migrated/DeathPenalty/RepresentationProject/PublicDocuments/NLADA_Counsel_Standards_1985.authcheckdam.pdf) in 1985.   With initial support from the ABA's Standing Committee on Legal Aid and Indigent Defendants (SCLAID), NLADA developed its expanded Standards for the Appointment *and Performance* of Defense Counsel in Death Penalty Cases (emphasis added) over the course of several years.   In February 1988,

16

NLADA referred the Standards to SCLAID, which reviewed them and circulated them to appropriate ABA sections and committees.   SCLAID incorporated the only substantive concerns expressed (by the Criminal Justice Section) and changed the nomenclature to "Guidelines" as more appropriate than "Standards."   Each black-letter guideline is explained by a commentary, with references to supporting authorities.   *See* Introduction to ABA Guidelines, 1989 ed.

23.   Courts have found the various editions of the ABA Criminal Justice Standards and Death Penalty Guidelines useful in assessing the reasonableness of counsel performance.   As Justice Stevens noted in writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . .'"   Justice Stevens cited *Strickland*, 466 U.S. 668, 688 (1984), *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Florida v. Nixon*, 543 U.S. 175, 191, and n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000).   Justice Stevens concluded: "Although they are 'only guides,' *Strickland*, 466 U.S. at 688, and not 'inexorable commands,' *Bobby*, 558 U.S. at 8, these standards may be valuable measures of the prevailing norms of effective representation . . ."   Justice Stevens also cited law review articles and the publications of criminal defense and public defender organizations (such as the National Association of Criminal Defense Lawyers and the National Legal Aid and Defender Association) as guides to prevailing professional norms.   *Id.* at 367.   *Accord Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (per curiam) (capital reversal finding trial counsel ineffective and citing *Padilla*'s analysis of "prevailing professional norms," 559 U.S. at 366, and quoting verbatim the first two sentences of Justice Stevens's analysis of prevailing norms).

24.   SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN

17

DEATH PENALTY CASES, published in 36 HOFSTRA L. REV. 677 (2008), discuss in detail the skills

that mitigation specialists provide to the defense team – skills that most lawyers simply do not

possess.[13]   Supplementary Guideline 5.1.B, for example, specifies the need for someone with

"the training and ability to obtain, understand and analyze all documentary and anecdotal

information relevant to the client's life history.   Life history includes, but is not limited to:

medical history; complete prenatal, pediatric and adult health information; exposure to harmful

substances in utero and in the environment; substance abuse history; mental health history; history

of maltreatment and neglect; trauma history; educational history; employment and training

history; military experience; multi-generational family history, genetic disorders and

vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile

correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and

community influences; socio-economic, historical, and political factors."   *Id.* at 682.

       25.   Supplementary Guideline 5.1.C continues: "Mitigation specialists must be able to

identify, locate and interview relevant persons in a culturally competent manner that produces

confidential, relevant and reliable information.   They must be skilled interviewers who can

recognize and elicit information about mental health signs and symptoms, both prodromal and

acute, that may manifest over the client's lifetime.   They must be able to establish rapport with

witnesses, the client, the client's family and significant others that will be sufficient to overcome

barriers those individuals may have against the disclosure of sensitive information and to assist the

client with the emotional impact of such disclosures.   They must have the ability to advise counsel

---

[13] Although published long after Mr. Ramirez's trial and state post-conviction
proceedings, the Supplementary Guidelines reflect the long-evolving practice of capital defense
teams engaged in the mitigation function.   *See* Sean D. O'Brien, *When Life Depends on It*, 36
HOFSTRA L. REV. 693 (2008).

on appropriate mental health and other expert assistance." *Id.*   A core team member, usually the mitigation specialist, must also have the specialized training, as described in Supplementary Guideline 5.1.E, to identify, document and interpret "symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability, neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma." *Id.* at 683.

26.   Without the thorough social history investigation that a skilled mitigation specialist can provide, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence.   Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments.   Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation.   *See* Richard G. Dudley, Jr., and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); and Douglas Liebert and David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994).   *See also* George W. Woods, David Freedman, and Stephen Greenspan, *Neurobehavioral assessment in forensic practice*, 35 INT'L J. OF L. & PSYCHIATRY 432 (2012).

27.   The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational,

19

employment, social service, and court records.   Such contemporaneous records are intrinsically

credible and may document events which the client and other family members were too young to

remember, too impaired to understand and record in memory, or too traumatized, ashamed, or

biased to articulate.   The collection of records and analysis of this documentation involve a slow

and time-intensive process.   Many government record repositories routinely take months to

comply with appropriately authorized requests.   Records are sometimes mistakenly presumed

destroyed when they are in fact simply stored offsite in dusty warehouses that no one is eager to

visit.   Great diligence is required to ensure compliance with appropriate requests.   Careful

review of records often discloses the existence of collateral documentation which, in turn, needs to

be pursued.

28.   The Commentary to ABA Guideline 10.7 (Investigation) notes, "Records should be

requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and

children. . . .   The collection of corroborating information from multiple sources – a

time-consuming task – is important wherever possible to ensure the reliability and thus the

persuasiveness of the evidence. Counsel should use all appropriate avenues including signed

releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records

statutes . . ."   31 HOFSTRA L. REV. at 1024-25.

29.   Records invariably provide valuable background information on clients and their

families. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (court file – a readily available public

document – contained "a range of mitigation leads that no other source had opened up").   In an

earlier ineffectiveness case, *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court found the

life-history records such powerful mitigating evidence that the High Court added a footnote to

quote a caseworker report verbatim:

20

> The home was a complete wreck. . . .   There were several places on the floor where
> someone had had a bowel movement.   Urine was standing in several places in the
> bedrooms.   There were dirty dishes scattered over the kitchen, and it was impossible to
> step any place on the kitchen floor where there was no trash. . . .   The children were all
> dirty and none of them had on under-pants.   Noah and Lula were so intoxicated, they
> could not find any clothes for the children, nor were they able to put the clothes on them.
> . . .   The children had to be put in Winslow Hospital, as four of them, by that time, were
> definitely under the influence of whiskey.   529 U.S. at 395, n.19.

This excerpt provides a lucid example of a vivid illustration of family dysfunction – and a story

which even the most skilled interviewer could never have elicited simply by talking with family

members.   The records documented an event that Terry Williams and his siblings were too young

to remember, and his parents were too intoxicated to register in memory.   Records have no

inherent bias, and contemporaneous records are in any event more credible than witnesses who

share previously undisclosed memories.

    30.   Life-history records enable capital defense teams to interview all witnesses more

effectively – not only the witnesses who created the records in the first place (like the teachers who

produced report cards) but also family members and friends who can organize their memories

more accurately if there is hard documentation of dates and places.   The frailty of human memory

obliges us all to rely on records, and they provide the essential skeletal framework for the social

history investigation.   They are helpful in preparing witnesses to testify.

    31.   A social history cannot be completed in a matter of hours or days.   In addition to the

bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish

rapport with the client, his family, and others who may have important information to share about

the client's history.   It is quite typical, in the first interview with clients or their family members,

to obtain incomplete, superficial, and defensive responses to questions about family dynamics,

socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and

mentally ill family members.   These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed.   Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

32.   Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure.   One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required.   *See* Lee Norton, *Capital Cases: Mitigation Investigation*, THE CHAMPION (May 1992) at 43-45.   *See also* Pamela Blume Leonard, *A New Profession for an Old Need: Why a Mitigation Specialist Must Be Included on the Capital Defense Team*, 31 HOFSTRA L. REV. 1143, 1154 (2003) (reiterating a decade later that "it takes hundreds of hours to conduct a thorough social history investigation") and David DeMatteo, Daniel C. Murrie, Natalie M. Anumba, and Michael E. Keesler, FORENSIC MENTAL HEALTH ASSESSMENTS IN DEATH PENALTY CASES 244 (2011) ("Typically, mitigation specialists invest hundreds of hours in a detailed mitigation investigation.").

33.   Mitigation investigation is particularly complex when the client does not share the attorney's cultural background.[14]   Attorneys may too readily overlook symptoms of impairment, attributing them to language difficulties or cultural differences.   Cultural issues may involve not

---

[14] *See* Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation*, 36 HOFSTRA L. REV. 883 (2008).

only race and ethnicity, but sexual orientation, gender, socioeconomic status, or any other characteristics that define social identity.

34.   Mitigation evidence is not developed to provide a defense to the crime.   Instead, it provides evidence of a disability, condition, or set of life experiences that can inspire compassion, empathy, mercy and understanding.   Unlike insanity and competency, both of which are strictly defined by statute and temporal limitations, mitigation need not involve a mental disease or defect, and it may encompass the entire trajectory of the client's life.   In many cases, defendants suffer mental impairments that do not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities that are given great weight when juries are charged with assessing individualized culpability.

35.   For clients who are psychiatrically disordered, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions.   Psychiatric evidence can provide a context to explain the capital crime and past behaviors as more than simply bad choices made by the client.

36.   Over the years, I have been involved in hundreds of capital cases, including scores of trials and post-conviction hearings, throughout the country.   I have provided evidence as an expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in over one hundred fifty cases around the country.   *See supra* ¶ 13.   My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases.   *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially

mental impairment and mental illness). *See also* John H. Blume, Sheri Lynn Johnson & Scott E.

Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors*

*Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035, at 1038 (2008) ("The [Capital Jury Project]

studies reveal that many different types of mitigation resonate with jurors.   Low intelligence,

mental illness, child abuse, extreme poverty, remorse, lack of a significant prior record, and lesser

culpability are just some of the categories of mitigation that, in a particular case, can lead jurors to

choose life over death."); *id.* at 1051 ("[E]vidence that the defendant was under the influence of

extreme emotional disturbance or mentally ill at the time of the crime is also mitigating to almost

half of all jurors.   Almost a third of jurors found exposure to serious child abuse mitigating, and a

like number found childhood poverty mitigating.").

***Post-Conviction Duties in 1990***

37.   As the Chief Investigator at the California Appellate Project from 1990 to 1995, I was

intimately familiar with the prevailing professional norms in the area of post-conviction mitigation

investigation in the 1990s since my own work was exclusively in post-conviction cases in that

period.   *See supra* ¶ 7.   I was personally involved in numerous cases that won relief in this period

as a result of thorough investigation,[15] and I taught at numerous continuing legal education

seminars on post-conviction investigation and prevailing standards.   I have also published articles

in this specific area.   *See* Russell Stetler, *Post-Conviction Investigation in Death-Penalty Cases*,

THE CHAMPION (August 1999) at 41; and Mark E. Olive and Russell Stetler, *Using the*

*Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*

---

[15] One case that was litigated successfully in the early 1990s involved trial counsel's
failure to conduct thorough mitigation investigation that would have uncovered a history of sexual
abuse and an ultimate diagnosis of multiple disorders, including PTSD.   *See* Hendricks v.
Calderon, 70 F.3d 1032 (9th Cir. 1995).   The history of the case is discussed in detail in Russell
Stetler, *The Unknown Story of a Motherless Child*, 77 UMKC L. REV. 947 (2009).

*to Change the Picture in Post-Conviction,* 36 HOFSTRA. L. REV. 1067 (2008).

38.   The ABA Guidelines have always emphasized the quality of legal representation needed at "all stages" of the case (*see* Guideline 1.1 in both the 1989 and 2003 editions).   The extensive Commentary to Guideline 10.15.1 (Duties of Post-Conviction Counsel) in the 2003 revision draws on the national experience litigating these cases in the 1990s and is instructive:

> Ultimately, winning collateral relief in capital cases will require changing the picture that has previously been presented.   The old facts and legal arguments—those which resulted in a conviction and imposition of the ultimate punishment, both affirmed on appeal—are unlikely to motivate a collateral court to make the effort required to stop the momentum the case has already gained in rolling through the legal system.   Because an appreciable portion of the task of post-conviction counsel is to change the overall picture of the case, Subsection E(3) requires that they keep under continuing review the desirability of amending the defense theory of the case, whether one has been formulated by prior counsel in accordance with Guideline 10.10.1 or not.
>
> For similar reasons, collateral counsel cannot rely on the previously compiled record but must conduct a thorough, independent investigation in accordance with Guideline 10.7 (Subsection E(4)).   As demonstrated by the high percentage of reversals and disturbingly large number of innocent persons sentenced to death, the trial record is unlikely to provide either a complete or accurate picture of the facts and issues in the case. That may be because of information concealed by the state, because of witnesses who did not appear at trial or who testified falsely, because the trial attorney did not conduct an adequate investigation in the first instance, because new developments show the inadequacies of prior forensic evidence, because of juror misconduct, or for a variety of other reasons.
>
> Two parallel tracks of post-conviction investigation are required.   One involves reinvestigating the capital case; the other focuses on the client.   Reinvestigating the case means examining the facts underlying the conviction and sentence, as well as such items as trial counsel's performance, judicial bias or prosecutorial misconduct.   Reinvestigating the client means assembling a more-thorough biography of the client than was known at the time of trial, not only to discover mitigation that was not presented previously, but also to identify mental-health claims which potentially reach beyond sentencing issues to fundamental questions of competency and mental-state defenses.

31 HOFSTRA L. REV. 913, 1085-86 (2003); citations omitted.

39.   In an article entitled *The Indispensable Role of the Mitigation Specialist in a Capital Case: A View from the Federal Bench*, then Chief Judge Helen G. Berrigan of the United States District Court for the Eastern District of Louisiana also noted the critical importance of mitigation

investigation in post-conviction review: "A mitigation specialist on post-conviction can investigate and gather the evidence that was available but failed to be developed at the trial stage." 36 HOFSTRA L. REV. 819, 821 n.13 (2008).   In the same issue of that law review, Professor Eric M. Freedman noted that the duties of post-conviction counsel include "reviewing de novo the work of prior counsel," assessing "the accuracy of the factual premises underlying the adverse determinations in the client's case to date," and "re-thinking their prior theories and devising new ones."  Eric M. Freedman, *Introduction: Re-Stating the Standard of Practice for Death Penalty Counsel: The Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 HOFSTRA L. REV. 663, 676 (2008).

***Standard of Care in Capital Mental Health Evaluations***

40.   Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses and historical experts (i.e., the professionals who encountered the capital client long before the alleged offense).[16]  *See*, for example, Scott Sundby, *The Jury as Critic: An Empirical Look at How*

---

[16] During the operative years of the New York death penalty statute (1995 to 2004), for example, the Capital Defender Office offered the testimony of historical experts in several cases. A school psychologist who had tested a client routinely as part of mandated triennial review for Special Education explained the significance of his borderline intellectual functioning (FS IQ 76-81).   People v. George Davis Bell (Ind. 128-97, Judge Cooperman, Queens County, N.Y., 1999).   In another case, a different school psychologist explained the impact of learning disabilities (at age 11, reading just above a second grade level; at 14, just above fourth grade; and at 17, just above fifth grade).   People v. José J. Santiago (Ind. 1210/99, Judge Bristol, Monroe County, N.Y., 2000).   In a third case, a psychiatrist had treated the client's mother after her suicide attempt when the client was nine – thirty years before the capital trial.   From the records, the psychiatrist testified to the history of mood disorders and suicidality in the maternal lineage, as well as family dysfunction, including fights over promiscuity, gambling, and drinking.   From her current perspective, the psychiatrist opined about the devastating impact on the children of the mother's mood disorder, suicidality, and psychiatric removal from the family.   People v. John F.

*Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109 (1997) (finding that

two-thirds of the witnesses jurors thought "backfired" were defense experts).   Thus, if only for

pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without

the corroborative lay witnesses whose identity and potential evidence can only be discovered

through life-history investigation.   However, it is equally important to offer well-prepared expert

testimony to explain the effects of life experiences on an individual's functioning and behavior.

Lay witnesses on their own are unlikely to understand the significance of the symptoms and

behaviors they describe, and only an expert is likely to be able to provide an overview of the

factors that shaped the client over the course of her life and to be able to offer an empathic

framework for understanding the resultant disorders and disabilities.[17]   Expert testimony is

essential for placing the factual details elicited from lay witnesses into an interpretive context that

explains how various life events shaped the capital client's brain and behavior.

    41.   The proper standard of care for a competent mental health evaluation also requires an

accurate medical and social history as its foundation. Because psychiatrically disordered or

---

Owen (Ind. 547-99 cons. with 414-99, Judge Egan, Monroe County, N.Y., 2001).   *See* Russell
Stetler, *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in
Capital Sentencing*, 11 U. PA. J. L. & SOC. CHANGE 237, 258 (n.92) (2007-08).
    [17] It has long been recognized that lay and expert testimony must be harmonized to be
credible to the trier of fact.   As one capital defense lawyer pointed out in 1988, "[T]estimony
about the psycho-social development of the defendant explains the psychological diagnosis in
human terms that the jury can understand."   He continued, "Typical psychological testimony on
sanity, competency, or diminished capacity sounds like it comes out of a textbook.   Despite the
best efforts of the mental health professional and the attorneys, most of this type of testimony is
incomprehensible to a lay juror.   There is also an unfortunate tendency to get caught up in
technical terms that bore the jurors and do nothing to humanize the client.   It makes little sense to
spend several days putting on the testimony of relatives and friends of the defendant about the
human characteristics of the defendant, and then put on a psychologist or psychiatrist who
immediately turns this around by making the person sound like a casebook study out of some
obscure and arcane psychology textbook."   David C. Stebbins, *Psychologists and Mitigation:
Diagnosis to Explanation*, CHAMPION (Apr. 1988), at 34, 38.

cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons).

42.   Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts.   Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert.   Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including the disciplines that study the effects of trauma on human development.   The potential roles of experts include consultants; fact gatherers needed to measure cognitive capacities or to elicit client disclosures (and/or to assess their credibility); and testifying witnesses, to name but a few.   To make informed decisions about the kind of experts that may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

43.   The importance of independently corroborated social history data was also well recognized among mental health practitioners as early as the 1980s.   A leading psychiatric text in that period described an accurate and complete medical and social history as the "single most valuable element to help the clinician reach an accurate diagnosis."   H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 837 (4th ed. 1985).   The same text noted that the individuals being evaluated are often poor historians: "The past personal history is somewhat distorted by the patient's memory of events and by knowledge that the patient obtained from

family members." *Id.* at 488.   Thus, "retrospective falsification, in which the patient changes the

reporting of past events or is selective in what is able to be remembered, is a constant hazard of

which the psychiatrist must be aware." *Id.*   This problem is particularly acute in the forensic

context, as two other leading authorities pointed out in 1980:

> The thorough forensic clinician seeks out additional information on the alleged offense and
> data on the subject's previous antisocial behavior, together with general "historical"
> information on the defendant, relevant medical and psychiatric history, and pertinent
> information in the clinical and criminological literature.   To verify what the defendant
> tells him about these subjects and to obtain information unknown to the defendant, the
> clinician must consult, and rely upon, sources other than the defendant.

Richard J. Bonnie & Christopher Slobogin, *The Role of Mental Health Professionals in the*

*Criminal Process: The Case for Informed Speculation*, 66 VA. L. REV. 427, 508-509 (1980).

Capital defense lawyers also appreciated this need: "A psychologist armed with all of the records

of the client's history is much better equipped to present a sympathetic and truthful explanation of

the client's psychological make-up and of how the crime occurred."   David C. Stebbins,

*Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 37.

**Review of the case of David Martinez Ramirez**

44. At the request of Mr. Ramirez's federal habeas corpus counsel I have reviewed the

following materials: the Arizona Supreme Court's opinion affirming Mr. Ramirez's conviction

and death sentence, *State v. Ramirez*, 871 P.2d 237 (Ariz. 1994); the report of psychologist Mickey

McMahon, Ph.D. (August 18, 1990); the Defendant's Sentencing Memorandum Concerning

Mitigation A.R.S. § 13-703(G) (filed October 12, 1990); the transcript of the

Aggravation/Mitigation Hearing before the Hon. Thomas W. O'Toole, in the Superior Court of

Maricopa County, No. CR 89-05726 (October 19 and November 30, 1990); the transcript of the

Allocution proceedings (December 7, 1990); the transcript of the Special Verdict proceedings

29

(December 18, 1990); the state court petition for post-conviction relief, also assigned to Judge

O'Toole (filed November 5, 1995); the reply to the state's response to the post-conviction petition

(filed January 3, 1996); Judge O'Toole's order denying the petition (filed February 20, 1996); and

the declarations of Mara Siegel (April 26, 2010), Mickey McMahon, Ph.D. (November 5, 2004),

Abigail Jensen (May 27, 2010), and Nora Shaw (April 8, 2010).

45.    A Maricopa County jury convicted Mr. Ramirez of two counts of premeditated

first-degree murder of his girlfriend, Mary Gortarez. and her daughter, Candie.  *State v. Ramirez*,

871 P.2d at 242.   The homicides occurred on May 25, 1989.  *Id.* at 240.   Mr. Ramirez was

arrested in the victims' apartment, covered with blood.  Id. at 241.   Mrs. G. had been stabbed

eighteen times in the neck; there was another potentially fatal wound to her back.  *Id.* at 242.   The

daughter had been stabbed fifteen times.  *Id.*   Vaginal swabs from the daughter tested positive for

semen, and Mr. Ramirez could not be excluded as a possible semen donor.  *Id.*   Mr. Ramirez did

not testify.  *Id.*   His defense was, in essence, "that no direct evidence linked him to the crime –

i.e., that no fingerprints were found on the murder weapons – and that his mere presence was

insufficient to sustain a murder conviction."  *Id.*   The defense argued that a third party had

entered the apartment and committed the murders while Mr. Ramirez and the two victims were

asleep.  *Id.*

46.    Mr. Ramirez was represented by the Public Defender's Office, and the case was

assigned to Mara Siegel.   Siegel Dec. at ¶ 1.   It was her first capital case.  *Id.* at ¶ 2.   Prior to this

case, Ms. Siegel had "never second-chaired a capital case or even observed one."  *Id.*   A

colleague with even less experience was initially appointed as advisory counsel, and he did some

limited work on some pretrial matters.  *Id.*   However, "when it came to trial and sentencing," Ms.

Siegel "was basically representing David [Ramirez] alone."  *Id.*   According to Ms. Siegel, "At

30

that time in the Public Defender's Office, there were simply not enough resources available to staff the capital cases like they should have been staffed." *Id.* She had previously handled non-capital criminal trials in Chicago and, during the preceding two years, at the Maricopa County Public Defender's Office. *Id.* at ¶ 3. When she first met with Mr. Ramirez, it was apparent to Ms. Siegel "that there was something, for a lack of a better phrase, indescribably odd about him" and he "appeared to have some deficits in appreciating the legal peril he was in." *Id.* at ¶ 4. The prosecutor offered a plea to a life sentence, but Ms. Siegel has acknowledged that she "may not have explained David's situation to him on a level that he could fully comprehend." *Id.* at ¶ 8. Although initially "somewhat reluctant," Mr. Ramirez allowed Ms. Siegel to "investigate and present mitigating evidence." *Id.* at ¶ 4.

47. Following Mr. Ramirez's conviction (on July 27, 1990), Ms. Siegel retained psychologist Mickey McMahon, Ph.D. McMahon Report at 1. She provided Dr. McMahon with no records about Mr. Ramirez except those relating to his criminal history (a rap sheet listing offenses from 1975 to 1982, a police report on the capital murders, and records relating to prior charges of burglary, grand theft, robbery, and assault). *Id.*[18] Dr. McMahon interviewed Mr. Ramirez on August 14, 16, and 18, 1990, for a total of five hours. *Id.*[19] Mr. Ramirez told the psychologist that he had been drinking and injecting cocaine multiple times on the night of the homicides, but he claimed that two black men were the killers. *Id.* at 2. Mr. Ramirez said he did not care if he was executed for the crime: he felt responsible because the women would still be

---

[18] Dr. McMahon does not recall "being provided with any information regarding Mr. Ramirez's social history, other than that which Mr. Ramirez provided, which was insufficient and unreliable, as noted in my report. I also do not recall being provided with Mr. Ramirez's school, vocational, or medical records." McMahon Dec. at ¶ 5.

[19] Dr. McMahon's recollection is that "the trial judge limited the funding for my work to $500. I spent five hours with Mr. Ramirez and an equal amount of time preparing my report." McMahon Dec. at ¶ 5.

alive if he had not rushed the two black males because of the way they were talking to his

girlfriend.  *Id.*  Dr. McMahon used the framework of the "Mexican-American family, a

culturally quite stable and important socialization system for children," to normalize various

aspects of Mr. Ramirez's childhood.  *Id.* at 3.  Dr. McMahon viewed the grandmother's role in

helping to raise the children of her teenage daughter as "traditional."  *Id.*  Likewise, he found that

Mr. Ramirez's mother, an alcoholic who had children by several different men, "never worked,

devoting her time as a traditional Mexican-American mother whose responsibility revolves around

the home and her children."  *Id.*

48.   When Dr. McMahon inquired about exposure to traumatic events, Mr. Ramirez told

him that at age eleven "he had seen a lady lying on the street that had been beaten to death" and at

age thirteen "he saw a boy shot with a pistol."  *Id.* at 3.  Mr. Ramirez also disclosed that he was in

two car wrecks "where he believes he should have been killed, given the damage to the cars," but

he denied head injuries or loss of consciousness.  *Id.*

49.   Dr. McMahon also learned that Mr. Ramirez had been repeatedly sexually victimized

by family members as a young child.   Dr. McMahon's report recited the events as follows:

> The defendant admits that he was forced to have sexual intercourse with his
> aunt at age 10.   He says that one afternoon he was taking a nap and his aunt came
> in and got him while a cousin got another cousin.   This was the only time his aunt
> had sex with him.   He says he thought of telling his mother, but he didn't because
> he was fearful she would become extremely upset and angry.
> Actually, however, his cousin took advantage of him, sexually, on
> numerous occasions.   According to him, she would got out at night, come back
> early in the morning, make him perform cunnilingus on her, and have sex.   After a
> period of time, he knew that when she went out in the evenings, he could expect her
> in his bed later in the morning hours.   He estimates that he was sexually molested
> by her approximately 20 times.

*Id.*

50.   Dr. McMahon reported without further comment that Mr. Ramirez had "joined a

'gang' in California" at age thirteen, but "didn't know his friends were part of a gang and just enjoyed being with them." *Id.* There were no details about this experience. Dr. McMahon noted that Mr. Ramirez had been "in and out of prison," but his "understanding from defense counsel" was that Mr. Ramirez had been a model prisoner. *Id.* Dr. McMahon did not review any correctional records, but reported that Mr. Ramirez had escaped from state prison while incarcerated at Perryville. *Id.* at 5. Mr. Ramirez reportedly described the escape as a "spur of the moment" thing, but also justified the escape on the ground that his sentence had been excessive. *Id.* When asked about his assault of a female DOC employee, Mr. Ramirez told Dr. McMahon that he had been drinking heavily because his mother had died ("a few 6 packs and about 6 pitchers," plus "another quart of beer"). *Id.* He became suicidal and tried to convince the female DOC employee to kill him. *Id.* He finally tried to force her to by telling her, 'Kill me or I'll kill you.'" *Id.*

51.   Dr. McMahon reported that Mr. Ramirez had finished ninth grade, but dropped out of school in tenth grade. *Id.* at 6. He found no indication of mental retardation based on an average score in the Peabody Picture Vocabulary Test. *Id.* Dr. McMahon reported a variety of unskilled jobs held by Mr. Ramirez (picking up metal shreds at a sheet metal shop, helping out at the "chuckwagon" across the street from the shop, rebuilding alternators and generators, making waterbeds, and cutting up chickens at a poultry factory). *Id.* at 5-6.

52.   Dr. McMahon concluded "with reasonable psychological certainty that the defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly diminished" at the time of the capital offenses. *Id.* at 8. The psychologist identified a combination of causes: "the defendant's psychological makeup" and "the alcohol/cocaine intoxicated state he appears to have been in at the time of the offense," as well

33

as "more than 2 months of alcohol and cocaine abuse he underwent prior to the offense." *Id.*

*The Sentencing Proceedings*

53.   Ms. Siegel submitted a Sentencing Memorandum on October 10, 1990, which appears to summarize everything she had investigated in terms of potential mitigating evidence.   She noted that Mr. Ramirez was the eldest of eight children born to Maria Martinez.   Sentencing Memorandum at 4.   Maria was sixteen when Mr. Ramirez was born.   *Id.*   He never knew his father, and his siblings were fathered by other men.   *Id.*   Ms. Siegel requested Mr. Ramirez's school records, but concluded that most had been destroyed.   *Id.* at 5.   His elementary school identification card reflected sporadic attendance, multiple moves, and utter chaos.   *Id.* at 5-6.   He attended three schools before finishing first grade, and four school years over two more years to finish second grade.

54.   Two school psychologists obtained Full Scale IQ scores for Mr. Ramirez suggesting subaverage intellectual functioning: an IQ of 70 on February 14, 1967, and 77 on October 6, 1969. The director of pupil services sent a letter indicating that neither testing psychologist recalled Mr. Ramirez, but trial counsel ignored the potential value of calling them as witnesses in the sentencing proceeding simply to interpret the scores and explain their long-term significance.[20]

---

[20]   I was personally involved in two cases where school psychologists were called for that purpose (even though they had no direct recollection of the client), and to describe their methodology for ensuring that pupils' efforts were sufficient to produce reliable results.   *See* Russell Stetler, *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J.L. SOC. CHANGE 237, 258 n.92 (2007-2008).   During the operative years of the New York death penalty statute (1995 to 2004), for example, the Capital Defender Office offered the testimony of historical experts in several cases. In *People v. Bell*, a school psychologist who had tested a client routinely as part of mandated triennial review for Special Education explained the significance of his borderline intellectual functioning. 181 Misc.2d 186, 187-88 (N.Y. Sup. Ct. 1999). In *People v. Santiago*, a different school psychologist explained the impact of learning disabilities (at age 11, reading just above a second grade level; at 14, just above fourth grade; and, at 17, just above fifth grade). 183 Misc.2d 715 (N.Y. Sup. Ct.

*Id.* at 7.   Records from California indicated that Mr. Ramirez had poor academic functioning in the ninth grade (grade point average of 1.5 out of 6), and his California Achievement Grade Point Test in October 1971 obtained scores three to four grade levels below his schoolmates.   *Id.* at 7-8. These school records provide a simple example of why it is important to obtain records before selecting a mental health expert and to provide the records to the expert.   These records indicated the importance of selecting an expert who could assess Mr. Ramirez's intellectual functioning, rather than a generic psychologist with no specific referral questions.   The combination of significantly subaverage IQ scores and deficits in academic functioning documented prior to age eighteen made it imperative for trial counsel to explore intellectual disability, an inherently mitigating impairment.

55.   Trial counsel included in the Sentencing Memorandum the sexual victimization reported to Dr. McMahon, but offered no discussion of its significance.   The long-term impact of sexual victimization of males by female relatives was an important issue to explain to the sentencer.   The singular impact of rape on children was noted in both the majority and dissenting opinions in *Kennedy v. Louisiana*, 554 U.S. 407 (2008).   The main works cited had been published by the time of Mr. Ramirez's trial.   Writing for the majority, Justice Kennedy noted, "Rape has a permanent psychological, emotional and sometimes physical impact on the child. *See* C. BAGLEY & K. KING, CHILD SEXUAL ABUSE: THE SEARCH FOR HEALING 2-24, 111-112 (1990); FINKELHOR & BROWNE, ASSESSING THE LONG-TERM IMPACT OF CHILD SEXUAL ABUSE: A REVIEW AND CONCEPTUALIZATION in HANDBOOK ON SEXUAL ABUSE OF CHILDREN 55-60 (L. Walker ed. 1988).   We cannot dismiss the years of long anguish that must be endured by the victim of child rape."   554 U.S. at 435.   Justice Alito, in dissent, added, "Long-term studies show

2000).

35

that sexual abuse is 'grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate.' C. BAGLEY & K. KING, CHILD SEXUAL ABUSE: THE SEARCH FOR HEALING 2 (1990). . . . Psychological problems include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide. Meister,[21] *supra*, at 209; Broughton,[22] *supra*, at 38; Glazer, *Child Rapists Beware!   The Death Penalty and Louisiana's Amended Aggravated Rape Statute*, 25 AM. J. CRIM. L. 79, 88 (1997).   The deep problems that afflict child-rape victims often become society's problems as well.   Commentators have noted correlations between childhood sexual abuse and later problems such as substance abuse, dangerous sexual behaviors or dysfunction, inability to relate to others on an interpersonal level, and psychiatric illness.     Broughton, *supra*, at 38; Glazer, *supra*, at 89; HANDBOOK ON SEXUAL ABUSE OF CHILDREN 7 (L. Walker ed. 1988).   *Victims of child rape are nearly 5 times more likely than nonvictims to be arrested for sex crimes* and nearly 30 times more likely to be arrested for prostitution. *Ibid.*" 554 U.S. at 468-69, 128 S. Ct. at 2676-77.   (Emphasis added.)

56.   Trial counsel claimed that Mr. Ramirez "sought support from outside the family" when his mother and stepfather had problems in California in 1971: "He joined the Barrio Monte Flores Gang in El Monte, California.   Gang life provided David with a sense of belonging." Sentencing Memorandum at 9.   Gang affiliation is most frequently alleged as an aggravating factor, and there are anthropologists and other social scientists who have the expertise to

---

[21] Melissa Meister, *Murdering Innocence: The Constitutionality of Capital Child Rape Statutes*, 45 ARIZ. L. REV. 197 (2003).
[22] J. Richard Broughton, *On Horror's Head Horrors Accumulate: A Reflective Comment on Capital Child Rape Legislation*, 39 DUQUESNE L. REV. 1 (2000).

contextualize it in mitigating terms.   *See*, for example, JAMES DIEGO VIGIL, BARRIO GANGS:

STREET LIFE AND IDENTITY IN SOUTHERN CALIFORNIA (1988).   However, without specific

testimony about the Barrio Monte Flores Gang and its significance for Mr. Ramirez, the alleged

affiliation was likely to be given little mitigating weight by the sentencer.

57.   Several pages of the Sentencing Memorandum are devoted to "Prison: The Structured

Life."   *Id.* at 10-18.   Mr. Ramirez received commendations for being a hard worker in prison and

an "excellent student" in the GED program.   *Id.* at 10-11.   Other records praised his work ethic,

cooperation, neatness, etc.   *Id.* at 14.   However, trial counsel offered nothing to mitigate the July

1982 escape, which resulted in an additional two year sentence and raised serious questions about

Mr. Ramirez's positive adjustment to incarceration.   *Id.* at 15.   This section of the memorandum

concludes, "Despite a less than perfect prison record, David Ramirez, on the whole, has had

extended periods of time while confined at the Department of Corrections when his behavior was

exemplary."   *Id.* at 17.

58.   The Sentencing Memorandum devotes two pages to Dr. McMahon's opinion that Mr.

Ramirez's ability to appreciate the wrongfulness of his conduct "was and is" substantially

impaired.   *Id.* at 18-19.   The memorandum then turns to Mr. Ramirez's "inability to accept the

wrongfulness of his conduct" as another variety of impairment.   *Id.* at 20.   Offering her own

idiosyncratic interpretation, trial counsel argued, "David Ramirez has expressed his remorse in the

most perplexing way.   DAVID RAMIREZ WANTS TO BE SENTENCED TO DEATH, in

essence, for something he cannot admit to himself that he did."   *Id.* at 20.   (Emphasis in original.)

Trial counsel provided no support for the notion that a suicidal statement should be viewed as

remorse.   Trial counsel noted Mr. Ramirez's reluctance to cooperate in collecting background

information or contacting his family since the public defender was appointed in June 1989.   *Id.* at

37

20-21.   Mr. Ramirez at one point had proceeded in propria persona "while having neither

argument with his counsel's competence nor having expressed problems in communicating with

attorney-client communication [sic]."   *Id.* at 21.[23]   Trial counsel reiterated, "David Ramirez's

request to be killed is David Ramirez's only way of emotionally expressing his remorse."   *Id.*

59.   The Sentencing Memorandum listed "chronic drug and alcohol abuse" as another

mitigating factor, but mistakenly alleged that Mr. Ramirez had injected heroin, rather than cocaine,

on the night of the homicides.   *Id.*   There was no attempt to contextualize his substance abuse

history (even though it was noted earlier in the memorandum that his mother died of ethyl alcohol

hepatitis, an alcohol-related disease).   The failure to explore the familial history of alcohol and

substance abuse is a glaring deficiency in the mitigation investigation and left the sentencer to

believe that Mr. Ramirez's alcohol and substance abuse was simply a matter of choice.   The

familial patterns of alcohol and substance abuse were well recognized at the time of Mr. Ramirez's

prosecution.   The American Psychiatric Association's DIAGNOSTIC AND STATISTICAL MANUAL

OF MENTAL DISORDERS, 3d Ed. Rev. (DSM-III-R) (1987) noted at 174-75: "Alcohol dependence

tends to cluster in families.   Recent evidence, based on adoption studies, indicates that the

transmission of Alcohol Dependence from generation to generation does not require

---

[23]   During the period when Mr. Ramirez represented himself, he had advisory counsel from
the Public Defender's Office and a court-appointed investigator, Nora Shaw.   According to Ms.
Shaw's declaration, "The trial judge did not appoint someone to do mitigation work although a
request was made to hire someone in that capacity."   Shaw Dec. at ¶ 6.   Ms. Shaw has indicated
that she "saw first hand that David was incapable of providing accurate historical information
relating to his personal history.   David's memory was poor as it related to his family history."   *Id.*
at ¶ 2.   Ms. Shaw offered this characterization of Mr. Ramirez's self-representation: "David did
not understand what was going on in the courtroom, and he was incapable of answering even the
simplest requests made by the judge.   David also had a very difficult time articulating his thoughts
or making himself clear.   David simply did not have the mental capacity to represent himself in
court.   He relied heavily on his advisory counsel, Mara Siegel.   Ms. Siegel did all of the
paperwork and filings for him, and she often told him what to say while in the courtroom."   *Id.* at
¶ 3.

environmental exposure to family members with alcohol problems: it occurs at increased rates
even when the children are reared by adoptive parents without alcohol problems, which suggests a
genetic influence in the disorder."[24]

60.    Trial counsel noted the higher IQ score obtained by Dr. McMahon using the Peabody
Picture Vocabulary Test (*see supra* ¶ 51) and attributed the "24-point increase from the time he
was rested in grammar school" to the "structured environment of prison where David completed
his G.E.D."  Sentencing Memorandum at 22.   Trial counsel seems not to have considered the
"essentially verbal nature" of the Peabody Picture Vocabulary Test.  *See* MURIEL D. LEZAK ET
AL., NEUROPSYCHOLOGICAL TESTING, 4ᵗʰ ed., 516-17 (2004).[25]

61.    The remainder of the Sentencing Memorandum stressed Mr. Ramirez's love of family
(Sentencing Memorandum at 23), the cumulative weight of all the mitigation (*id.*), the court's
absolute discretion to dispense mercy (*id.* at 24), and proportionality (*id.*).   The last few pages
simply quoted Clarence Darrow's Sentencing Speech attacking capital punishment in the Leopold
and Loeb murder trial in 1924.  *Id.* at 26-29.

---

[24] By the time of Mr. Ramirez's post-conviction representation, the fourth edition of the
DSM (1994) offered a more extensive discussion (citing more recent twin studies) under "Familial
Pattern": "Alcohol dependence often has a familial pattern, and at least some of the transmission
can be traced to genetic factors.   The risk for Alcohol Dependence is three to four times higher in
close relatives of people with Alcohol Dependence.   Higher risk is associated with a greater
number of affected relatives, closer genetic relationships, and the severity of the alcohol-related
problems in the affected relative."  *Id.* at 203.

[25] Dr. McMahon has confirmed that he would have used a more appropriate instrument to
assess Mr. Ramirez's intellectual functioning if he had been provided with the school records:
. . . instead of conducting the Peabody Pictorial [sic] Vocabulary Test [PPVT], I would have given
Mr. Ramirez a comprehensive IQ test.   The PPVT is not a comprehensive IQ test.   Although I
said in my report that Mr. Ramirez's score on this test was 'in no way indicative of any form of
mental retardation,' I would not have made this statement had I seen Mr. Ramirez's school
records, which show IQ scores of 70 and 77 on the more comprehensive WISC IQ tests.   These
scores would have indicated to me that Mr. Ramirez may be retarded and it would have greatly
expanded the nature of the evaluation I did conduct."   McMahon Dec. at ¶ 6.   He would have
"insisted on obtaining information about Mr. Ramirez's adaptive behavior."   *Id.*

62.   The Aggravation/Mitigation Hearing commenced on October 19, 1990.   Tr., October

19, 1990, at 1.   The prosecution called George Bolduc, M.D., a forensic pathologist from the

Maricopa County Medical Examiner's Office, and Evidence Technician Robert Kortum from the

Sheriff's Office.   Dr. Bolduc testified that the stab wounds would have been painful.   *Id.* at 18.

The evidence technician testified to a matched fingerprint comparison, but he also noted for the

record that Mr. Ramirez was wearing red suspenders at the hearing – coincidentally, the attire that

one of the police officers had been looking for at the scene of the homicides.   *Id.* at 28; *see also*

*State v. Ramirez*, 871 P.2d at 241 ("there is a guy in the apartment with suspenders, you need to

find him").   The prosecution seemed to understand that the suspenders worn to the

Aggravation/Mitigation hearing undermined the third-party culpability defense that had been

presented in the guilt/innocence phase.

63.   The defense called three witnesses: Erlinda Martinez, a maternal aunt; Mary Castillo,

Mr. Ramirez's younger sister; and Cynthia Orozco, his youngest sister.   Erlinda Martinez stated

that she was approximately the same age as David Ramirez (thirty-four), so there were no

witnesses who were adults when David was growing up.[26]   Tr., October 19, 1990, at 31.   Erlinda

testified that her sister was sixteen when David was born.   *Id.*   The mother had an alcohol

problem and used to come home drunk.   *Id.* at 32.   Erlinda "used to hear how [David's mother]

used to party when she was pregnant with David."   *Id.* at 33.   The mother was involved with "a

lot of men."   *Id.*   The eight half-siblings had four different fathers.   *Id.* at 37.   Erlinda told the

court that David's two sons were present in court with their mother.[27]   *Id.* at 45.   She had visited

---

[26]   In fact, when Erlinda's memory of which school David attended conflicted with the
school records, trial counsel explained that "she was little" at the time.   Tr., October 19, 1990, at
66.

[27]   The sons were subsequently identified as Isaac, age fourteen, and David Jr., age thirteen.

40

David at the jail, but he was upset and not seeing people at the beginning and she had had problems of her own more recently.   *Id.* at 46-47.   Erlinda described David as a "beautiful," "sentimental," and "caring" person: "He's always been a good guy."   *Id.* at 48.   Erlinda had been subpoenaed to testify; David did not want her to come to court.   *Id.* at 49.   She does not believe in the death penalty for anyone: "Nobody, period."   *Id.* at 48-49.

64.   On cross-examination, Erlinda agreed that David is a fairly intelligent individual.   *Id.* at 55.   He had adequate food and clothing when he was growing up.   *Id.* at 57-58.   She lost contact with David when she got married and moved to California.   *Id.* at 59.   The capital prosecution had reunited them.   *Id.*   On redirect, Erlinda testified that David's mother died from "too much liquor to the liver."   *Id.* at 64.

65.   Mary Castillo, then twenty-eight, testified that she was David's younger sister.   *Id.* at 72.   He took care of her when she was young.   *Id.* at 73.   She did not recall her mother having a drinking problem until later in life.   *Id.* at 74.   She did not know her own father, or David's, or Cindy's, or Michael's.   *Id.* at 75.   She did not recall problems between David and their strict step-father, Richard Garcia.   *Id.* at 76.   Since David's arrest, Mary had visited him at the jail and spoken to him by telephone during the previous three months.   *Id.* at 77-78.   She testified pursuant to a subpoena because David did not want her be involved.   *Id.* at 78.   She had little contact with Mr. Ramirez when he was in prison.   *Id.* at 80.   Mary testified that she loves her brother and does not want him to receive the death penalty, but she could not explain why.   *Id.* at 80-81.   She said that David was "a very good brother" who had "always just been there for us." *Id.* at 83.   On cross-examination, she said that their family was not close-knit: they all love one another, but are "not real close or nothing."   *Id.* at 85.

The ex-wife was identified as Lydia Blanco.   *Id.* at 88.

66.   Cynthia Orozco, Mr. Ramirez's twenty-six-year-old sister, was the last witness on October 19, 1990.   Her description of her brother in childhood was vague and conclusory: she just remembered that "he's been real good with us.   He's always been there for us."   *Id.* at 90. Cynthia lived with Mr. Ramirez for a couple of months when he was married and she was about thirteen years old.   *Id.* at 93.   She visited him in prison a couple of times but did not know why he was in prison.   *Id.* at 94-95.   Mr. Ramirez lived with Cynthia and her husband when he was released from prison in 1989.   *Id.* 97.   He worked at a furniture company doing "[s]anding and stuff, I guess."   *Id.* at 98.   He helped with cooking and cleaning.   *Id.*   He talked about his girlfriend and her daughter (the homicide victims), but Cynthia never met them.   *Id.* at 99.   He stayed with the two victims once or twice a week over a period of about a month and a half.   *Id.* at 103.   Cynthia also testified pursuant to subpoena, and she knew that her brother did not want her to come.   *Id.* at 106-07.

67.   Trial counsel attempted to elicit from Cynthia reasons why the court should spare Mr. Ramirez's life.   This was the colloquy:

> Q       What do you think, given the facts of the limitation in a sentence
> that's possible for David to receive, what do you think Judge O'Toole should do in
> this case and why?
> A       What I think he should do?
> Q       Yes, what do you think?
> A       It's up to him.
> Q       Do you think your brother should be sentenced to die?
> A       No.
> Q       Why?
> A       Because it's not right, you know.
> Q       Why?
> A       For nobody.   I don't think it's –
> Q       How would you feel if your brother were sentenced to death?
> A       Well, not good.

*Id.* at 107-08.   Cynthia denied that Mr. Ramirez had a drinking or drug problem when he

42

lived with her.   *Id.* at 110.   She did not respond when asked whether there was anything else that she wanted to tell the Court about her feelings for her brother.   *Id.*   On cross-examination, Cynthia confirmed that she does not believe that it is ever right for anyone to suffer from the death penalty under any circumstances.   *Id.* at 112.   Trial counsel indicated for the record that Cynthia's children were present in court.   *Id.*

68.   The Aggravation/Mitigation Hearing resumed on November 30, 1990.   Tr., November 30, 1990, at 1.   Trial counsel called two witnesses to testify that Mr. Ramirez had been a reliable food-services worker in prison.   Michael Coleman and Wharton Eggar knew Mr. Ramirez at Florence.   *Id.* at 6.   Mr. Ramirez advanced from cutting up potatoes and celery to running the officers' dining room.   *Id.* at 7.   Mr. Ramirez was willing and cooperative; when he was not working, he sat in the corner and read the Bible.   *Id.* at 10.   On cross-examination, he said that inmates were motivated to behave properly in order to obtain jobs where they got to eat more.   *Id.* at 15.   On redirect, Mr. Eggar confirmed that he would hire Mr. Ramirez if he owned a restaurant outside prison based on his work ethic.   *Id.* at 15.

69.   Robert Lee Larry, a higher grade food supervisor at Florence, described Mr. Ramirez as polite and a good worker: "No problems.   Very clean about his work.   Always on time."   *Id.* at 17, 19.   Mr. Ramirez was nicknamed "Wino."   *Id.* at 22.   On cross-examination, Mr. Larry said he did not know why Mr. Ramirez had been in prison and he was not permitted to review his case file.   *Id.* at 25-26.   On redirect, he said he would employ Mr. Ramirez if he were outside the prison.   *Id.* at 27.

70.   The parties returned on court on December 7, 1990, for final arguments and allocution.   Tr., December 7, 1990, at 2.   Trial counsel began to summarize information about Mr. Ramirez's life, but the Court interrupted to say that it had "difficulty placing substantial

43

significance on the lifestyle that this Defendant experienced," although it would give it some

weight.  *Id*. at 2-3.   Trial counsel turned to the testimony from the correctional staff to argue that

Mr. Ramirez has the potential to be a useful inmate.  *Id*. at 8.   The Court noted that there is "no

doubt that he's a so-called model inmate.   But he did escape . . .   Which kind of puts a damper on

his being a model inmate."  *Id*.   Mr. Ramirez declined to address the Court.  *Id*. at 9-10.   The

prosecution articulated "the State's position . . . that if there ever was a case for the imposition of

the death penalty, this is the case."  *Id*. at 10.   The transcript of the whole proceeding amounted to

only sixteen pages.

    71.   On December 17, 1990, the Court announced its sentencing decision at a Special

Verdict proceeding.   Tr., December 17, 1990, at 1-16.   The Court found three aggravating

circumstances had been proved: (1) that Mr. Ramirez had two prior violent felony convictions; (2)

that the murders were committed in an especially cruel, heinous, or depraved manner; and (3) that

Mr. Ramirez committed a multiple homicide.  *State v. Ramirez*, 871 P.2d at 242.   In mitigation,

the Court found statutory impairment and seven non-statutory mitigating circumstances: (1)

unstable family background, (2) poor educational experiences, (3) that he was the victim of sexual

abuse when he was young, (4) gang affiliation, (5) chronic substance abuse, (6) psychological

history, and (7) love of family.  *Id*.   The Court determined that none of the mitigating

circumstances, taken individually or collectively, warranted leniency, so it imposed a sentence of

death.  *Id*.

*The Rule 32 Proceedings*

    72.   State post-conviction counsel John C. Williams filed a nine-page petition before

Judge O'Toole on November 5, 1995.   Seven claims were raised; six were purely legal.   The

claim of Ineffective Assistance of Counsel constituted a page and a half in the petition.   Petition

for Post-Conviction Relief at 7-8.   Most of the claim was under "A. No coherent theory of the

case," summarized as follows:

> In this case, the defense lawyer did not pursue an integrated theory of the
> case.   The result was a trial in which the jury had no clear alternative to the state's
> theory of the case.   With no clear alternative theory, the jury had no choice but to
> convict.   Mr. Ramirez did not have the effective assistance of trial counsel.

*Id.* at 8.   Two additional sentences alleged the rest of the ineffectiveness claim, "B.   No clear

theory of the case in mitigation":

> It is also apparent from the record that the defense had no clear strategy at
> sentencing.   The clearest evidence of this fact is the defense attempt to use
> defendant's alleged gang membership in *mitigation*.

*Id.*   (Record citation omitted.)

73.   In a Reply to State's Response to Petition for Post-Conviction Relief, an additional

claim of ineffective assistance of appellate counsel was raised.   Reply at 1.   The Reply was a

page and a half in length.   Its only additional argument concerned whether the capital murder in

this case was "above the norm," and a list of cases discussing this standard was appended.   *Id.* at

1-2.

74.   On February 18, 1996, Judge O'Toole denied the Petition and dismissed it with

prejudice.   Ruling on Petition for Post-Conviction Relief at 1.   The Court found that six of the

seven claims were precluded from being raised in a Rule 32 proceeding because they were either

raised and rejected on direct appeal or could have been raised but were not.   *Id.* at 2.   It disposed

of the ineffectiveness claim succinctly:

> Contrary to what is required by law, the defendant has failed to detail how (1) trial
> counsel's performance at trial and during the mitigation phase of the trial was
> deficient, (2) how the alleged deficient performance prejudiced the defendant and,
> (3) how, but for trial counsel's performance, the result of the trial and mitigation
> proceedings would have been different.

45

*Id.*  The Court also offered its own view of trial counsel's performance based on its observation of the proceedings: "Counsel zealously and effectively defended the defendant and made well reasoned legal and tactical decision in all phases of the trial and sentencing proceedings."  *Id.* at 3.

**Conclusions**

75.   It is my considered professional opinion that trial counsel's duty to conduct a thorough mitigation investigation was well-established at the time of Mr. Ramirez's trial in 1989-90.   Trial counsel in this case did not conduct a thorough mitigation investigation, but instead, as in the *Wiggins* case cited *supra* ¶ 19, "abandoned [her] investigation" of Mr. Ramirez's background "after having acquired only rudimentary knowledge of his history from a narrow set of sources."  539 U.S. at 524.

76.   Trial counsel failed to conduct the thorough social history investigation necessary for an informed decision about what kind of mental health expert to consult and what issues that expert should address.   This case represents a classic example of how *not* to work with a mental health expert in a capital case.   *See* Russell Stetler, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. REV. 407, 424 (2014) (discussing how multiple appellate courts have recognized trial counsel's specific duty to investigate signs of mental health issues thoroughly, to choose experts wisely, and to provide experts with the appropriate background information that will enable them to render trustworthy opinions).   Trial counsel provided Dr. McMahon with no social history information – not even the school records that were apparently obtained subsequent to Dr. McMahon's interviews with Mr. Ramirez.

77.   There were numerous "red flags" in Mr. Ramirez's case that should have prompted further investigation by both trial and post-conviction counsel: childhood trauma (*supra* ¶ 48: witnessing at age eleven body on street of woman beaten to death and at age thirteen seeing boy

46

shot with pistol), possible head injuries from two car wrecks (*id.*), sexual victimization (*supra* ¶ 49), intellectual impairment (*supra* ¶ 54), familial substance abuse (*supra* ¶ 59), and potential fetal alcohol exposure suggested by Mr. Ramirez's mother's alcoholism and teenage pregnancy (*supra* ¶¶ 59, 63).[28]  As in *Wiggins*, "the many red flags . . . would have prompted a reasonable attorney to conduct additional investigation."  539 U.S. at 525.  *Accord Rompilla*, 545 U.S. at 391 (Counsel "could not have reasonably ignored mitigation evidence or red flags because they were unexpected.").  *See also Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (Trial counsel "failed to act while potentially powerful mitigating evidence stared [him] in the face" and ignored evidence that "would have been apparent from documents any reasonable attorney would have obtained.").

78.  It is also my considered professional opinion that prevailing norms in post-conviction practice in 1995 required a thorough mitigation investigation.  There is no evidence that Mr. Ramirez's state post-conviction counsel conducted any investigation.  The petition included only a perfunctory allegation of ineffective assistance of counsel.  The only specified deficiency was trial counsel's use of "gang affiliation" as a mitigating factor (even though the trial court in fact accepted it as such).  There was no proof of prejudice and no enumeration of the areas of potential mitigation investigation which I outlined as "red flags" in the preceding paragraph.

79.  As the Supreme Court of the United States has noted, "The right to the effective

---

[28]  The medical and scientific community had been conducting research and publishing articles on the effects of fetal alcohol exposure since the 1970s.  *See* Ernest Abel, *Fetal Alcohol Exposure and Effects, A Comprehensive Bibliography* (1985) and *New Literature on Fetal Alcohol Exposure and Effects, A Bibliography 1983-1988* (1988) (listing 1818 articles published in that five-year period).  The capital defense community began using fetal alcohol exposure as mitigating evidence in sentencing proceedings in the late 1980s and early 1990s.  By the time of Mr. Ramirez's post-conviction proceedings, numerous national and regional capital defense seminars had offered training on the effects of fetal alcohol exposure.  In 1992, the clemency petition for Robert Harris was based on his fetal alcohol exposure and cited Ann P. Streissguth, Ph.D., et al, *Fetal Alcohol Syndrome in Adolescents and Adults*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, April 17, 1991.

assistance of counsel at trial is a bedrock principle in our justice system.   It is deemed as an

'obvious truth' the idea that 'any person haled into court, who is too poor to hire a lawyer, cannot

be assured a fair trial unless counsel is provided for him.'"   *Martinez v. Ryan*, 132 S. Ct. 1309,

1317 (2012) (citation omitted).   As the Court also recognized, "Ineffective-assistance claims

often depend on evidence outside the trial record."   *Id.* at 1318.   In my professional opinion,

there was a substantial claim of ineffective assistance at trial, but the ineffectiveness of state

post-conviction counsel in failing to develop that claim has denied Mr. Ramirez, until now, a fair

opportunity to adjudicate its merits.

80.   The harm in this case is not just to Mr. Ramirez, whose life is in jeopardy, but to the

sentencer who rendered a life-and-death decision with insufficient information to produce a

morally reliable result and to the justice system itself, which holds the public's trust only to the

extent that its proceedings are fair and "appear fair to all who observe them."[29]


I declare under penalty of perjury pursuant to 28 U.S.C. §1746, and under the laws of the

States of Arizona and California, that the foregoing is true and correct and was executed this _30_

day of April 2015 at Oakland, California.

RUSSELL STETLER

---

[29] This is Chief Justice Rehnquist's language in a case where he noted "the institutional interest in the rendition of just verdicts" as being just as important as the rights of the criminally accused.   *Wheat v. United States*, 486 U.S. 153, 160 (1988).   *See also* Justice Marshall's comment in *Ake v. Oklahoma*, 470 U.S. at 79: "The State's interest in prevailing at trial – unlike that of a private litigant – is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases."

48

# EXHIBIT T

# EXHIBIT T

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

# DECLARATION OF WILLIAM SUNDERMIER

I, William Sundermier, declare under penalty of perjury, the following to be true to the best of my information and belief:

1. My name is William Sundermier and I was a juror on David Ramirez's case in 1990.

2. During deliberations, I remember that we talked about seeing tattoos on Mr. Ramirez and that meant to us that he may have been in prison.

3. Had trial counsel introduced evidence of Mr. Ramirez's mental retardation during the guilt phase, there is a reasonable chance that I would have found the crime to be second degree murder instead of first degree premeditated murder.

4. If I were in charge of sentencing Mr. Ramirez, evidence of his mental retardation and family background would be facts that would play into my decision.

I declare under penalty of perjury that the foregoing is a true and correct statement. Signed this _26_ day of _APRIL_ , 2005.

William Sundermier

1                                              Initials

# EXHIBIT U

# EXHIBIT U

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

# DECLARATION OF JEAN HOWELL

I, Jean Howell, declare under penalty of perjury, the following to be true to the best of my information and belief:

1. My name is Jean Howell and I was a juror on David Ramirez's case in 1990.

2. I have been informed that Mr. Ramirez has been diagnosed as mentally retarded and I was shown a printout of school records that indicate his IQ scores as a child. Had the defense attorney presented evidence showing that Mr. Ramirez was mentally retarded, and explained how this affected his ability to premeditate the crime, I would have considered this, along with evidence presented about the case's multiple murders, in reaching a verdict.

3. Had I been in charge of sentencing Mr. Ramirez and heard testimony about his mental retardation and family background (i.e. the rape of his mother by his uncle, her attempts to abort the fetus, his mother's drinking during pregnancy, Mr. Ramirez being fed alcohol as a baby, the abuse and neglect he suffered during his childhood, etc), I would have weighed this testimony with the facts of the crime in my sentencing decision.

4. I recall that the jury submitted a request to the judge for clarification on the definition of premeditation. We were not given further information and were advised to rely on the jury instructions for our understanding and application of premeditation in Mr. Ramirez's crime.

6. We deliberated for more than one day and took at least two votes. I recall that one female juror initially had problems with returning a guilty verdict.

8. I recall that the prosecuting attorney presented a factually compelling argument for Mr. Ramirez's guilt in causing the death of the victims. The defense attorney's defense, however, seemed vague and insubstantial. During deliberations, the jury considered the fact that the defense attorney's decision not to have Mr. Ramirez testify may have indicated that the case for his innocence was weak.

9. I recall that ours was a conscientious and analytical jury. One juror suggested that Mr. Ramirez might have been in prison previously due to his wearing long sleeved and high collared shirts to hide prison tattoos during the trial. Our foreman, however, kept us to a

1

JH
Initials

rigorous examination of the present case, and speculation about Mr. Ramirez's past criminality was dismissed. Testimony in support of Mr. Ramirez's mental impairment would have been given serious consideration. I cannot say, however, because I have not been presented with this information in a court setting, how the information about mitigating factors would have affected our decision.

I declare under penalty of perjury that the foregoing is a true and correct statement.

Signed this ___10___ day of May, 2005.

*Jean Howell*

Jean Howell

OFFICIAL SEAL
SOPHIA BECKMAN
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Nov. 25, 2005

*Sophia Beckman*

— Notary —

2

*JH*
Initials

# EXHIBIT V

# EXHIBIT V

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

# DECLARATION OF LINDA WELLS

I, Linda Wells, declare under penalty of perjury, the following to be true to the best of my information and belief:

1.  My name is Linda Wells and I was a juror on the David Ramirez case in 1990.

2.  Had I been involved in sentencing Mr. Ramirez after his finding of guilt, and had I heard about his mental retardation and family background and other mitigating evidence, I would have given it consideration in my sentencing decision. Had I been responsible for sentencing Mr. Ramirez, I would have sentenced him to life in prison without the possibility of parole. I would not have voted for a death sentence.

3.  I recall that there were two women who had serious doubts about finding Mr. Ramirez guilty of capital murder during deliberations. One of the women was the jury foreman, and she was the last holdout. We finally voted unanimously after 2 or 3 attempts.

4.  I remember that I was personally disappointed that Mr. Ramirez did not testify in his own defense during trial. I felt that it would have been nice to see him in action, and I was curious to see if he had anything to say in order to defend himself.

I declare under penalty of perjury that the foregoing is a true and correct statement. Signed this _9_ day of May, 2005.

*Linda Wells*

Linda Wells

# EXHIBIT W

# EXHIBIT W

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

## DECLARATION OF ABIGAIL JENSEN

I, Abigail Jensen, declare under penalty of perjury, the following to be true to the best of my information and belief:

1. I began working for John C. "Jack" Williams, doing legal work, in May 1997. I took the Arizona bar in February 1998 and was sworn into the Arizona bar in October 1998. I have done criminal appellate work since I began working for Jack. I was first admitted to the Bar in the State of Washington in 1982.

2. About two weeks before I began working for Jack, he was diagnosed with amyotrophic lateral sclerosis, aka ALS, or Lou Gehrig's disease. He died of this disease in May 1998.

3. Jack was not one to argue an appellate issue at any length. In his briefs, he tended to just state an issue without a lot of argument or discussion. A few months after I began working for him, it became clear that we had very different styles of appellate briefing. Initially, Jack paid me by the hour, but we soon discovered that I was doing much more work on the appellate cases than Jack would have done himself and more than he was willing to pay me for. As a result, Jack began paying me a salary, so that I could devote the amount of time I thought was necessary to the cases.

4. Jack had his own system for appellate work. His wife did the factual and court file summaries, though she was not a lawyer. He did not read the entire transcripts in his cases himself. Instead, he would hire paralegals to read them and produce summaries. Jack would then read the portions of the court file and transcriptions he thought were relevant based on those summaries.

5. While I worked for him, Jack had three appellate contacts, with Mohave, Yavapai, and Maricopa Counties. At that time, he was the only attorney doing indigent appeals for Yavapai County. Jack was sometimes overextended in terms of his case load. In those

situations, he would sometimes hire other attorneys to review cases and "ghost write" briefs for him.

6.    Habeas counsel contacted me prior to April 29, 2010, and left a message. However, I did not actually speak to habeas counsel until she called me again after April 29, 2010.

Initials A J

I declare under penalty of perjury that the foregoing is a true and correct statement.

Signed this 27th day of May, 2010.

Abigail Jensen

# EXHIBIT X

# EXHIBIT X

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

# SKIL Report

**Name:** David Ramirez

**DOB:** 04/07/1957

**Report Date:** 12/28/08

**Reason For Study:** Comprehensive Neurocognitive Evaluation

**Referral Source:** Paula Harms, Esq.

**Medications: None**

**Prepared by:** M.B. Sterman, Ph.D. and R. Weinstein, Ph.D.

## Methodology:

Nineteen-channel EEG was recorded using conventional 10-20 electrode placements and linked-ears reference. Impedance was requested to be below 5 Ohms at each electrode. EEG was digitized 128 times a second with high and low pass filters of 2 Hz and 40 Hz, respectively, during replicated eyes closed and eyes open resting states. Data records underwent automated artifact detection along with manual review and removal. Spectral coefficients of uncorrupted data were statistically compared to age-matched normative values.



**Legend 1. International 10-20 electrode placements are shown against associated MRI slices.**

An evaluation of cortical function based on Brodmann areas (cytoarchitectural features such as cell type and distribution) was also performed. Higher cognitive functions are served by specific regions and networks of the cortex. Executive functions include goal–directed behaviors such as planning behaviors, initiating behavior, sequencing behavior, and ceasing behavior, as well as evaluating behavior and changing a behavioral approach or mind set (see yellow areas, below). Emotional regulation is served by orbitofrontal and temporal pole regions (orange, below).



**Legend 2. Cognitive functions associated with Brodmann areas. Only the left hemisphere is shown but the areas of the right hemisphere serve analogous and often complementary functions.**

3

## INFORMATION ABOUT STATISTICAL EVALUATION



**Legend 3. Careful data collection and redundant findings assure validity and reliability of an evaluation. Only spectral coefficients that exceed 2 standard deviations in two or more replicated recordings (or halves of a recording) were considered reliable. Any exception to this criterion is noted. As normal distributions of spectral coefficients are anticipated in healthy individuals, a 1 in 20 (5%) chance of deviation from a healthy age-matched comparison group may indicate abnormal EEG functionality for an individual.**



**Legend 4. <u>Evaluation of cortical module activity.</u> Each brain map consists of 19 electrode sites evenly spaced across the head. Color indicates microvolts (data or raw view) or statistical deviation from a comparison group average (stat view). Spectral magnitude coefficients that exceed +/- 2 standard deviations are indicative of localized hyper- or hypo-excitability in cortical neuronal pools, depending upon the frequency of interest.**



**Legend 5. <u>Evaluation of cortical network activity.</u> Each network map of 19 heads consists of 171 unique site pairings (e.g., Fp1-Fp2, Fp1-T3, F3-T3). Each brain map presents 19 pairings of one site (labeled above left) and all sites including itself. Every auto-pairing (a site to itself, e.g., Fp1-Fp1) appears statistically normal (green, i.e., z-score of 0.0). Statistical hyper-connectivity is indicated by pink and hypo-connectivity by blue in most circumstances.**

**History:** Death row inmate convicted of first-degree murder.

**Findings:**

A number of reliable and convergent quantitative finding documented here indicate disturbances in right frontal and temporal parietal areas. Slowing at right medial and lateral frontal sites was observed intermittently in the raw EEG (fig. 1). Further, a consistent elevation of dominant 9-10 Hz activity was seen at these sites and in pre-frontal and right temporal-parietal areas as well (fig. 2). A system analysis using Brodmann areas also revealed abnormal rhythmic activity in motor and cingulate cortex in the right hemisphere (fig. 3). Finally, a totally independent evaluation focusing on the functional coordination between brain areas also revealed an abnormality in frontal integration (fig. 4). All of these convergent findings were reliable across multiple replications in both eyes closed and eyes open conditions.

**Figures:**



DRaEC2.dat - Laplacian - Gain 25.9

**Figure 1** Sample of EEG with eyes closed using Laplacian mathematical reference transform to maximize localization accuracy. A clear dominant rhythm is seen in posterior region, greatest on the right in parietal cortex. A slower rhythm is seen here in right frontal area, particularly at F4.

7



**Figure 2.** Two separate brain map studies with eyes closed showing the head from the top in single hertz intervals, and identifying frequencies and location of abnormally elevated activity. Color scale at left shows statistical probabilities, with pink color indicating most affected sites. Disturbed function is reliably indicated at 9-10 Hz in right frontal and temporo-parietal cortical areas.



**Figure 3.** Analysis of EEG abnormality with the eyes open based on regional cell-types, called Brodmann areas, disclosed functional inadequacy of motor and emotional control, as indicated here by pink areas in right lateral central cortex, associated with motor control, and anterior midline cingulate cortex, associated with affect and impulse control.



**Figure 4.** An independent analysis of coordination among brain systems, termed "comodulation", revealed a significant disturbance in the coordination of frontal cortex functions between hemispheres. With reference to statistical color code at left, dark blue areas show cortical zones not sufficiently regulated by the sites indicated at upper right of each head. In particular right and left medial frontal areas (F3, Fz, and F4) do not interact normally. This pattern is also characteristic of a history of acquired brain injury.

**Conclusions:**

The highly reliable findings reported here, together with associated neuropsychological observations, indicate that this subject has a functionally disturbed Central Nervous System. Functional compromises observed in right frontal and in temporal-parietal areas, as well as in frontal cross-hemispheric interactions, provide a physiological basis for inadequate regulation in brain areas associated with higher cognitive functions manifested in poor judgment, inability for planning and organizing behavior in a goal directed manner and limitations in impulse control.

M. Barry Sterman, Ph.D.

Professor Emeritus,

Psychiatry & Neurobiology,

Geffen School of Medicine,

University of California, Los Angeles

Ricardo Weinstein, Ph.D.

# EXHIBIT Y

# EXHIBIT Y

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

1       A.   I did not, no.

2       Q.   You met with David Ramirez in 2000.   We discussed

3    did the ABIS II?

4       A.   I met him in 2005.

5       Q.   I'm sorry, 2005.   And you testified earlier that

6    you had interviewed some people in connection with this

7    case?

8       A.   Yes, I did.

9       Q.   And could you tell us who those were?

10      A.   Do you mind if I refer to my report just for --

11      Q.   No.

12      A.   I met and interviewed Herminia Neranjo --

13   apologize for my pronunciation of those names -- Eloise

14   Arce, Ignacio Gamaros, William Lobner, Jr., John Pierce,

15   and Mary Hellen Pierce.

16      Q.   And these are all individuals that you personally

17   interviewed?

18      A.   With the exception of William Lobner, who I

19   interviewed by phone.   The others I interviewed in

20   person, yes.

21      Q.   Eloise is the individual who you were present for

22   her testimony?

23      A.   Earlier this week.   That was the same lady, yeah.

24      Q.   Or last week, maybe.

25      A.   Last week.

# EXHIBIT Z

# EXHIBIT Z

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

# DECLARATION OF ROLANDO RODRIGUEZ

I, Rolando Rodriguez, declare under penalty of perjury, the following to be true to the best of my information and belief:

1. My name is Rolando Rodriguez, and I currently live at 2306 W. Carson St. in Tempe, Arizona. I was friends with David Ramirez when we were kids. I knew David Ramirez from around 1968 until about 1970. David, Abel Garza, and I attended Sullivan School, located at 31st Avenue and Jefferson in Phoenix. The three of us often hung around together after school in those days.

2. David Ramirez, Abel Garza, and myself were all classified as learning disabled, and we all attended special education classes together at Sullivan School. That is how we became friends initially. I remember that we had special tutors in remedial English, reading, math, and social studies because none of us could read and write as well as our peers.

3. David Ramirez especially hated to read in front of the class because the teacher would always have to read for him almost every word. I never saw David Ramirez reading anything outside of the classroom because he just couldn't do it. David Ramirez and I always got the most help from the teachers whenever there was a test.

4. David Ramirez did not have any other friends, that I can recall, during the time I knew him. David used to come by my house to eat tortillas and beans on a frequent basis. I never visited David's house, and David did not have any friends over to his house that I can remember.

5. I can remember playing football with David Ramirez in the park near our house. I played quarterback because David could not figure out what to do or tell the others where to go, so he played receiver. Even as a receiver, David had a hard time figuring out right from left when I told him which way to go. I had to point in the direction he was supposed to go. If I told him to go long or go criss-cross, David would ask me what I meant, and I would have to explain. I had to repeat these instructions to him on almost every play.

6. David was more of a follower than a leader. He would not seek people out, especially adults. David was not on a par with Abel and I when it came to expressing himself. Abel and I were better at our social and communication skills than David was. David was very quiet and when he responded to a question, it seemed like it took him a long time to do so.

7. David Ramirez and I could not sit still for more than twenty or thirty minutes in those days, even if we were watching television. We both needed to get out and do something or run around outside.

DML Disclosure 1259

I declare under penalty of perjury that the foregoing is a true and correct statement. Signed this _19th_ day of November, 2005.

Rolando Rodriguez

# EXHIBIT AA

# EXHIBIT AA

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)



# 1963

# PROGRAMS

# for EXCEPTIONAL

# CHILDREN



# ARIZONA Division of SPECIAL EDUCATION

**FLOYD L. BARIBEAU**
Director

**KENNETH S. SIDES**
Ass't. Director

OUR COVER · ·

'DESERT POOL'
by Esther Henderson

A magnificent view
in Sabino Canyon,
near Tucson · ·

CAPITOL          PHOENIX

DMR Disclosure 1228



# Educable

# Mentally

# Retarded

THE TERM "educable mentally retarded" is usually applied to children whose I.Q.'s, as determined by accepted individual psychometrics, fall within the range of from 55-80. In school, they are the group of children who will experience much failure and many difficulties; who cannot be expected to learn or profit from the formal regular school program. These children will require some adjustment of the physical factors, modification of the curricula and adaptation of teaching materials and methods to meet their slower rate of learning. These children are educable in the sense that they can acquire sufficient knowledge and ability in the academic areas to become self sufficient, useful and happy citizens of our society.

It is not considered educationally sound to place the educable mentally retarded in the regular classroom where the primary emphasis is the acquisition of academic skills and the class load is too great to allow the teacher to work individually with her children. Also, the achievements of educable retarded children, when placed in academic competition with children of greater ability, will be low and discouraging to them.

Separate classes for the education of this group of children are now widely accepted. Almost every state has made provisions to develop such programs. The separate class does not mean that these children never come in contact with the other classes and children.

Arizona law provides that these classes must be housed in regular school buildings and integrated in many appropriate activities in school. This type of organization enables the teacher to help the child develop self-confidence, self-reliance and effort to work to full potential where there are more opportunities to experience success.

## DEFINITION

Section 15-1016-1 (b) of the Arizona Revised Statutes defines the educable mentally retarded as: "means limitations in mental growth to the extent that the child is educable but requires special facilities, techniques and curricula to meet his maximum educational development."

The term "educable mentally retarded" is usually applied to those children who have impaired or incomplete mental development which may have originated before or during birth or in early childhood. It is further defined as a condition, characterized by faulty development of intelligence which impairs the individual's ability to learn and adapt normally to the demands of society.

The failure of intelligence to develop normally may be due to diseases or conditions which damage the brain or to factors determined by heredity. Sometimes the condition is accentuated by socio-cultural environments which fail to provide adequate opportunities and stimulation.

DMR Disclosure 1229

## ESTABLISHING CLASSES

The local community, through their school board and district administrators, determines the need for establishing classes. A study of local situations will determine responsibilities, number of children requiring special services, availability of school space and objectives of the special class.

### Organization:

Classes may be operated by a school district or jointly with another district or districts.

In organization of classes, the school must give consideration to chronological age, mental age and emotional stability of the children. In the elementary programs, the special class teacher works with the children full time with the possible exception of physical education and certain art and music classes. In the secondary programs all academic work, personal and occupational guidance shall be carried on in the special unit or units by the special teacher or teachers. In addition, the special teacher or teachers in the secondary programs have the responsibility where pupils participate in portions of the regular non-academic program for coordination of the total instructional program of these children. Depending upon the capabilities of the children in the special classes and upon available facilities within the secondary school, educable mentally retarded children may participate with the general student body in selected non-academic courses. Among these are physical education, art, music, home economics, manual arts, personal typing and driver education. Work experience programs in the senior high school should be a part of the total curriculum offering for these students.

In one room facilities on the elementary level, the age range should be from 8 to 14 years, however one room facilities are not highly recommended. In some instances, if no secondary special class is available, children may be enrolled in the one room unit until age 16. It is suggested that younger retarded children be allowed to attend kindergarten and/or first grade rooms for social reasons so that this age span may be maintained. However, if these retarded children become disturbing factors in the classroom, delayed school attendance or limited time attendance is often feasible until the age of entrance to a special unit. This tends to keep the special room more homogenous and allows for more effective grouping. It is preferable, however, that educable mentally retarded children be placed in special classes as early as possible or when a suitable class is available. This placement will tend to eliminate failures which may cause serious problems later in the school life of the child.

In multiple room setups, it is advisable to consider no more than a four year age range for each unit. The age range in the total program could be from ages 6 through 16. Ranges in ages for secondary units should be 14 to 15 and up.

Guiding principles in a two class unit elementary organization are suggested as:

| | | C.A.'s | | M.A.'s | |
|---|---|---|---|---|---|
| PRIMARY | ........ | 6-11 | | 3½-8 | |
| ADVANCED | .... | 10-15 | | 6-11 | |

In multiple room organization these ranges are suggested as guiding principles:

| | | C.A.'s | M.A.'s | |
|---|---|---|---|---|
| PRE-ACADEMIC | | 6- 9 | 3½-7 | |
| INTERMEDIATE | | 9-13 | 5-9 | |
| ADVANCED | | | | |
| (Jr. High | ...... | 13-15 | 7-10 | |
| OCCUPATIONAL | | | | |
| (Sr. High) | .... | 15-20 | 8-12 | |

In considering new enrollees in the special education program on the elementary level, late age and personality factors of children 13 years of age and older must be considered. These older children tend to be more emotionally affected and resist when placed in a special class at too late an age. In opening new units, this policy toward favoring initial enrollment at an early age should be a guide to administrators.

All parents of potential enrollees should be contacted and their child's abilities or limitations and special services needs interpreted to them. Ordinarily children should not be placed in a special room unless parental consent is given, since children tend to carry parental attitudes with them to the special room and make little progress if parents oppose the efforts of the teacher and other school personnel.

Children are segregated for special instructional purposes only and should participate in all other non-instructional activities of the regular school programs. In secondary units, it is possible for these children to be departmentalized by skillful class scheduling.

### Identification:

There are numerous ways in which the educable mentally retarded can be identified. It is well to remember that these children will not necessarily look retarded or subnormal.

The teacher usually plays the most important role in initial identification. The teacher will generally recognize the lack of achievement, lack of attention and concentration and inability to comprehend as possible factors involved in retardation. Referral should be made for a complete study. Teachers should also be encouraged to refer children suspected of retardation.

Superintendents should have a continuous screening program in their schools. A careful screening procedure will include all of the steps listed below. Children who qualify on all three categories should be given an individual psychological examination by a qualified person and further study as the tests seem to direct.

P7072

A. Group intelligence tests.

*This is the most effective single screening method of identifying these pupils. Generally, pupils who score below 80 I.Q. should be given an individual intelligence test.*

B. Group achievement tests.

*Children who score markedly below grade level on these tests may be possible candidates for a special class. Scores of regularly administered tests may be evaluated from the child's cumulative record.*

C. Teacher referral.

*Teachers should refer these pupils who are failing to make normal progress in school and are not profiting from the regular class setting.*

It should be anticipated that all pupils identified by these screening techniques will not be found to be mentally retarded and eligible for special classes. The individual psychometric results and the recommendation for such action by the psychologist are necessary before an accurate determination of what services the child needs can be formulated.

The individual evaluation should include a study of the health and medical record, all previous test data, teacher reports, evaluation of behavior as well as the individual test results.

**Eligibility of Pupils:**

The eligibility of pupils shall be determined by certified school psychologists or other personnel approved by the State Superintendent of Public Instruction. There should be sufficient evidence that the child is mentally retarded and requires special services. This is the essential basis of eligibility for service.

The following criteria will aid in determining eligibility:

*A. The children must be of lawful school age in the district operating the class and must have sufficient maturity to permit adjustment to general school routines.*

*B. The approximate I.Q. limits for children in these classes are within the 55 to 80 I.Q. range as determined on accepted individual intelligence tests.*

*C. The child must be emotionally stable to the extent that group stimulation will not intensify his problems unduly, that he can react to learning situations and that his presence is not inimical to the welfare of other children.*

*D. The child must be in such a physical condition that there is no undue risk to himself or hazard to others involved in his daily work and play activities.*

The I.Q. ranges, as recommended, are approximate and are intended as characterizations of a rate of growth which is derived from competent analysis of all data. The Stanford-Binet Intelligence Scale, Form L-M, is recommended for children with chronological ages below nine years and the Wechsler Scales for older pupils. There are other tests which can be utilized, if the child is non-verbal, lacks coordination,

is partially sighted or hard of hearing. Occasionally children testing outside these ranges are admitted on a trial basis if recommended by a qualified school psychologist and the local school administrator. In these instances prior approval is to be obtained from the Division of Special Education. Failure to follow the recommended eligibility requirements may place a school district in jeopardy of losing state aids for the entire class.

A copy of each child's psychological report should be sent to the Division of Special Education and an additional copy be made available to the classroom teacher. No particular form is recommended and may be carbon copies of the report on the child submitted by the examiner. The recommendation of the psychologist and his signature must be on the report.

**Enrollment Size of Classes:**

The size of the class will depend on such factors as the children's ages, degrees of retardation, degrees of educational achievement and difficulties in management. Elementary classes should have enrollment sizes ranging from a minimum of eight pupils to an outside maximum of fifteen pupils.

In secondary special class programs (grades 9-12), pupils are conceivably of a higher level of intellectual competence, socially more mature and there is a narrower age span covering units so it is possible for the class numbers to be somewhat larger. The enrollment of secondary school classes shall not be beyond seventeen children. In secondary class programs, scheduling for core or departmentalized classes into class year groups, one needs to consider certain factors, including total single class load, age span, social maturity, teacher experience and flexibility, provision for school work experience program, availability of non-academic and extra-curricular classes and the instructors' teaching schedule. Each teacher should have a minimum of one hour of preparation time.

Failure to keep the enrollment within these workable limits may jeopardize the special state aid for the total class.

**Room Facilities and Housing:**

It is very necessary that proper facilities for the efficient functioning of the services be made available. Section 15-1018 A.R.S. provides that educable retarded classes be housed in a regular elementary school. This eliminates the stigma frequently attached to segregated schools. Further, if we expect these children to enter into society normally as adults, we must allow them to associate with so-called normals during their formative years. Whenever possible, these units should be centrally located. The basic criteria for approval of a physical plant may be stated as follows: The room or rooms for mentally retarded children should be as good but not necessarily any better than is provided in the regular classrooms and should be located in a school where regular classes are housed.

In view of the fact that related activities are stressed

DMR Disclosure 1231

P7073

in the program, some provisions should be made for these activities. Whenever possible, the modern type of classroom with ample storage and sink facilities at the rear should be provided. In secondary schools, classrooms tend toward more specifically academic equipment requirements unless it is a self contained unit. In rooms where occupational skills are taught, special consideration should be given to size, location, noise factors, and availability to activity and equipment.

The above mentioned description is the minimal standards set for rooms. It is recommended that communities building new facilities or remodeling older structures develop housing as recommended by the U.S. Office of Education. Their recommendations call for a classroom unit based on 900 square feet, suggest a unit and a half per 15 pupils to provide essential space for the broad non-academic activities of special education. Communities considering development of new units or renovation of existing plants may secure drawings and pictures of these recommended facilities from the State Division of Special Education.

Equipment:

Since the daily curriculum will include manual activities, it is important that such special equipment as hand tools, work tables, large toys, games, portable chalkboards and easels be available. Some special equipment may be needed and planned for when the ages, abilities and interests of the children are known.

High interest-low vocabulary books are recommended rather than regular developmental series. New books should be selected after the teacher becomes acquainted with the ages, abilities and interests of the children.

To assist local districts in their efforts to establish special classes, a suggested list of equipment is included in the appendix and a list of high interest-low vocabulary books may be secured from the State Division of Special Education.

Psychological Services:

It is the responsibility of the local administrative units to obtain the required psychological examinations.

Psychological services in the public schools are discussed very thoroughly in "A Guide for Establishing Psychological Services in the Public Schools of Arizona."

The State Office may be able to suggest qualified personnel to accomplish the required testing. It is preferable that psychologists have a close working knowledge of the objectives and goals of special education and preferably personal knowledge of the actual problems.

## CURRICULUM

The curriculum for the educable mentally retarded children should provide realistic educational experiences at each child's mental level and suitable in helping them reach their highest potential development in all areas. Special attention should be given to the rise of concrete and practical situations. The programs should provide for experiences in all areas of living. Learning activities may be guided in many directions, but teaching-learning procedures are usually more effective when they relate to experiences close to the child and to those which are familiar to him.

A school curriculum for the educable retarded should include the following aims and objectives:

A. *Achievement and mastery of fundamental skills within the child's ability.*

B. *Development of civic and social skills, which may be learned incidentally in regular classes, to include participation in civic, religious, social and cultural activities in the community in which they live.*

C. *Promotion of good mental and physical health.*

D. *Wise use of leisure time through wholesome endeavors.*

E. *Preparation for some gainful occupation.*

F. *Work experience programs to aid child's adjustment to job and less supervised world in which he is to live.*

The experience centered unit is one of the best methods of providing unified learning activities based on the needs and interests of these children. The experience unit is organized around a subject or "center of interest" and is designed to enable pupils to gain important concepts and skills that function in their daily lives in school and that will function when they have completed their schooling. Provision is made for various academic skills commensurate with the child's mental and social age directly related to his environment. It lends itself to more flexibility within the classroom.

Program Concentrations:

The following, in a very brief form, is a suggested program of concentration and activities for various developmental levels.

### Pre-Academic—Primary: Ages 6-9

The M.A. in this group will generally fall below six years of age. Emphasis will be on:

A. *Development of speaking vocabulary.*

B. *Habit training as emphasis on personal cleanliness.*

C. *Social experiences as talking about experiences and relationships at home, on field trips, visits, etc.*

D. *Sense training as recognizing one's name, matching shapes and colors, sizes, position of objects, picture completion puzzles, recognition of objects, sounds, smell, touch, taste and recognition of primary colors.*

E. *Meanings and concepts of words and numbers.*

*F. Motor and muscular coordination activities such as rhythms, marching, outdoor games, singing, walking rails, stepping through rails or tires, walking up steps.*

*G. Speech training with emphasis on clear enunciation and correction of baby talk, lisping, etc.*

*H. Nature study and seasonal changes.*

*I. Crafts as hammering nails, stringing beads, cutting paper, blocks, etc.*

*J. Emphasis should be placed on developing independent self-direction both in individual and group experiences.*

### Intermediate Ages 9-13

*A. Emphasis on progress in reading, writing and number concepts within ability.*

*B. Continued social experiences.*

*C. Formal social studies with emphasis on immediate community and every day life experiences.*

*D. Need to develop instructional materials in accordance with interests.*

*E. Appreciation of good citizenship, manners, good attitudes.*

*F. Health training and grooming, physical education.*

### Advanced or Jr. High Level Ages 13-15

*A. Continued development of basic academic skills.*

*B. More emphasis on practical social experiences.*

*C. Study of jobs, job opportunities, as well as social and community agencies that can help them.*

*D. Appreciation for good citizenship and attitudes.*

*E. Music and art — leisure time activities.*

*F. Writing for instruction, information and social.*

### Occupational—Sr. High Level Ages 15-21

*A. Extension of converting academic skills into competencies required in every day life.*

*B. Preparation for homemaking.*

*C. Appreciation for social and civic values.*

*D. Provision for health and physical training.*

*E. Leisure time activities with emphasis on cultural areas, recreational activities and appreciation of both music and art.*

*F. Acquisition of various types of occupational experiences through manual activities in shop, kitchen and industry.*

*G. Development of practical, useful social and occupational skills to become a happy, useful member of society— work experience.*

### High School Programs:

The organization and daily scheduling of high school mentally retarded children will generally fall into two systems or forms.

The first form is a "departmentalized schedule" of regular daily periods and completion of modified academic requirements by special instruction. This system generally consists of three phases: academic, social and work experience. The work

experience phase will take most of the activity time in the last two years of school. Although the academic areas taught by the special class teachers may bear classical titles of English, math, science and social studies, the content matter of these courses is not similar to regular classes but geared to practical experiences and occupational education.

This special class should be an integral part of the total school program. The special teacher takes the responsibility of enrolling the retarded children in classes such as music, art, home economics, industrial arts and physical education with regular students or special teachers, if they can participate.

The second type of schedule or form of organization is the "core curriculum." The students remain with the same teacher for a block of time. Its daily schedule is sub-divided into block time unit studies. Electives and work experience are again an integral part of the curriculum and placed in the scheduling. This type of organization gives greater time for study of persistent life problems and insures special instruction and is especially adaptable in the smaller high schools.

In some schools, special students are assigned to regular homerooms in order to provide for social experiences with their peers. The special class teachers will work closely with the homeroom teacher for better understanding and adjustment.

The special teacher will consult with other teachers who have special education children and may work part-time as a work experience coordinator. She also must insure that the academic curriculum content is practical, functional and related to the child's capabilities and that it is occupationally and living oriented.

Work experience is not merely employment. There are generally two stages: (1) In school and (2) Out of school experiences. During the eleventh year, the student may be assigned to the cafeteria, shop, office or maintenance for a period or so a day. This will help further exploration of the students abilities, help in supervision and adjustment to the working world. The special class teacher contributes in making periodic visits and evaluations. Students could be given opportunities in several areas, as work experience should not train for just a specific job but rather for general skills, proper attitudes toward work and development of positive habits. This work may or may not be compensated.

The next step is to place the student in a business or industry on a part-time basis during his last year in school. The usual pattern for work programs is for the student to attend school in the morning and participate in work training in the afternoon for three or four hours. Another method is two weeks in full-time school attendance, two weeks of full time work with students alternating. This gives the employer full time help he may desire. An average of three hours per day must be spent with the teachers in a school situation. Work experience is usually credited toward the high school diploma. Sometimes the student is paid full wages for time spent, but in most cases it is a reduced amount until after the training period.

DMR Disclosure (?)

# EXHIBIT BB

# EXHIBIT BB

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)



Office of the Attorney General
State of Arizona
CAPITAL LITIGATION SECTION

Myles A. Braccio
(602) 542-8595
Myles.Braccio@azag.gov

Terry Goddard
Attorney General

February 7, 2006

JON M. SANDS
Federal Public Defender
PAULA HARMS
Assistant Federal Public Defender
Capital Habeas Unit
850 West Adams St., Suite 201
Phoenix, Arizona 85007

Re:   **Records Disclosure; David Ramirez**

Paula:

Enclosed please find the school records we have received for David Ramirez. Please note that these records are simply better copies of the records that Mara Siegel submitted to the Court in October, 1990 (DMR Disclosure 0618, 0626, 0628).

El Monte High School – reported that their records are sent to El Monte High School District after several years and they do not keep copies. In addition, they searched for records for Ramirez and reported that none were found.

El Monte High School District – enclosed copy of cover letter, addressed to Myles Braccio, postage dated January 31, 2006, with two pages of transcripts.

Sullivan School – Jorge Aldas of the Sullivan School reported that their records are sent to their district office – Murphy School District – and that they do not keep copies. In addition, he searched for records for Ramirez and reported that none were found.

Murphy School District – Lupita Lopez conducted a search of records for David Ramirez and reported that none were found. She is sending a letter to the Arizona Attorney General's Office memorializing that no records were found.

**AG Disclosure 01**

P7220

Phoenix Elementary School District No. 1 – Dr. Marylynn Griffin reported that they would microfiche only certain documents and the remaining records were destroyed. She conducted a search of their archives and produced a better photocopy of the Phoenix Elementary Schools card (copy enclosed).

If you have any questions or comments, please do not hesitate to give me a call.

Very truly yours,

Myles A. Braccio
Capital Litigation Paralegal

MAB:erg
Enclosures

AG Disclosure 02

P7221

# EXHIBIT CC

# EXHIBIT CC

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

## The McGraw-Hill Companies

1221 Avenue of the Americas
New York, NY 10020-1095
212 512 3625 Tel
212 512 6531 Fax
william_farley@mcgraw-hill.com

### Facsimile

| | | | |
|---|---|---|---|
| Attention | Mr. John Castro<br>Investigator, Capital Habeas Unit | From | William P. Farley |
| Company | Federal Public Defender's Office | Date | Nov. 22, 2004 |
| Fax Number | 602-382-2801 | Total Number of Pages<br>Including Cover | 3 |

*Confidentiality Notice: The information contained in this facsimile message is intended only for the persons or entities named above and may be a confidential attorney-client communication or may otherwise be privileged and confidential. If you are not the intended recipient please be aware that any review, dissemination or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the above address via the United States Postal Service at our expense. Thank you.*

DMR Disclosure 1218

P7227

**The McGraw·Hill Companies**

William P. Farley
Associate General Counsel

1221 Avenue of the Americas
New York, NY 10020-1095
212 512 3625 Tel
212 512 6531 Fax
william_farley@mcgraw-hill.com

November 22, 2004

FAX 602-382-2801 and First Class Mail
Mr. John Castro
Investigator, Capital Habeas Unit
Federal Public Defender's Office
850 West Adams St, Ste 201
Phoenix, AZ 85007

Dear Mr. Castro:

Your FAX to CTB/McGraw-Hill, LLC ("CTB"), a subsidiary of The McGraw-Hill Companies, Inc., dated October 29, 2004, has been referred to me. Your FAX inquired about the meaning of notations on a report of test scores you indicated belong to David Ramirez, an inmate on death row in Arizona. I am responding on the basis of information provided to me by CTB.

First, it appears that the scores are from the California Test of Mental Maturity® (CTMM, 1957; California Test Bureau), and the California Achievement Test® (CAT, 1963; California Test Bureau).

The CTMM was published as a group administered intelligence test modeled after the Stanford-Binet IQ Test. The CAT was published as a group administered achievement test. The CTMM, like the Stanford-Binet, had a mean of 100 and a standard deviation of 16. The CAT had a mean national percentile of 50, and for a student in grade 8, month four (8.4), a grade mean equivalent of 8.4.

The report you supplied for Mr. Ramirez appears to have the following scores on the CTMM:

L IND 78—This is a Language IQ score. The L stands for Language and the IND indicates that it is an individual score rather than a group score (e.g., a mean score for a class).

N-L 62—Non-Language IQ score. IND is not shown, however, perhaps due to space limitations on this particular report.

IND 69—Total IQ score, equivalent to an IQ score on the Stanford-Binet. (Your re-statement of this score shows it as 68.)

The report you supplied for Mr. Ramirez appears to have the following scores on the CAT:

**RV 4.2**—This stands for Reading Vocabulary and indicates that a scale score the same as the average student (i.e., student at the 50th national percentile) in grade 4, second month. It does not necessarily mean that the test taker was "capable" of doing grade 4, second month work—the most common misinterpretation of grade equivalents.

**RC 4.4**—Reading Comprehension, indicating a scale score the same as the average student in grade 4, fourth month.

**AR 6.2**—Arithmetic Reasoning, indicating a scale score the same as the average student in grade 6, second month. (On the report, this appears to be listed as AP because of the poor quality of the copy, but it should be AR.)

**AF 5.3**—Arithmetic Fundamentals, indicating a scale score the same as the average student in grade 5, third month.

**ME 5.5**—Mechanics of English, indicating a scale score the same as the average student in grade 5, fifth month.

**S 6.4**—Spelling, indicating a scale score the same as the average student in grade 6, fourth month.

A CTMM Total IQ score of 69 is at the 1st national percentile, meaning all but 1% of the students in the national standardization sample for CTMM obtained a higher Total IQ score. A Total IQ score of 69 is almost two standard deviations ("SD") below the mean of 100; two SDs would be a Total IQ score of 68 or lower.

The CAT scores from the reports you supplied are below average for Reading Vocabulary, Reading Comprehension, and Arithmetic Fundamentals, but in the average range (national percentile of 27-74) for the other CAT tests.

Please direct any further questions to me. This response is without prejudice to any of CTB's legal or equitable rights and CTB does not consent to provide any further information or testimony of any kind, including any expert testimony.

Sincerely,

William P. Farley

WF/

# EXHIBIT DD

# EXHIBIT DD

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

# Mental Retardation

Definition, Classification, and Systems of Supports

10th Edition

AAMR

categories. In 1910 the Committee on Classification of Feeblemindedness of AAMR's precursor organization created three subcategories of individuals with mental retardation; after an individual was categorized as "feebleminded" (a mental age of 12 or less), he or she was then classified into groups by decreasing mental age: "morons," "imbeciles," and "idiots" (Field & Sanchez, 1999). When it was realized that mental age does not grow in a linear fashion, IQ scores replaced mental-age scores as the metric for classifying people by intelligence.

In the early 1950s, the *Diagnostic and Statistical Manual: Mental Disorders (DSM–1)* (as referenced in Trent, 1994), published by the American Psychiatric Association, devised different categories of mental retardation founded on IQ level. These levels, with some differences, were reflected in later AAMR definitions from 1959 until 1983 (see Table 2.1).

The 1992 definition dropped levels of mental retardation based on IQ scores for several reasons: (a) Mental retardation relies on both limitations in IQ and adaptive skills, whereas an individual's "level of severity" was based only on IQ; (b) the accuracy of IQ scores at the extremes of measurement is regarded as less reliable than of those closer to the mean; (c) "mild mental retardation," a condition that represents considerable disadvantage, was a misnomer (Tymchuk, Lakin, & Luckasson, 2001); and (d) too much trust was being put in a person's subclassification, and it often influenced the perception of potential special education placement and types of services as well as adult opportunities for services. When the ninth (1992) edition of the AAMR manual dropped the use of levels of severity as a classification system, IQ scores were used only for making a diagnosis and not for classification. Following a diagnosis of mental retardation, an individual's adaptive skill assessments were examined by an interdisciplinary team and coupled with clinical judgments and findings from observations, interviews, and reports of those who knew the individual well. This process enabled the team to (a) identify strengths and needs for supports across four life dimensions (i.e., Intellectual Functioning and Adaptive Skills; Psychological and Emotional Considerations; Health and Physical Considerations; and Environmental Considerations), and (b) create a profile of the person's needed supports.

## Assessment of IQ and "Cutoff" Limits

Starting in 1973, the criterion for having significant limitations in intellectual functioning was increased from one to two standard deviations below the mean. This single change drastically reduced the number of people theoretically eligible to be classified as having mental retardation. Heber's 1961 definition overidentified people as having mental retardation, theoretically labeling 16% of the population, whereas Grossman's 1973 definition, which lowered the IQ cutoff from one to two or more standard deviations below the mean, theoretically labeled only 3% of the population. At the same time, the 1973 definition was made more conservative by

©American Association on Mental Retardation

In some situations, an etiology cannot be determined at the present time. It is important to remember that an inability to determine an etiology does not necessarily mean that there is no etiology. Similarly, an inability to determine an etiology does not necessarily mean there is no mental retardation.

# MULTIFACTORIAL NATURE OF ETIOLOGY

This chapter builds on the approach to etiology described in the 1992 American Association on Mental Retardation (AAMR) manual (Luckasson et al.). In that manual, etiology was conceptualized as a multifactorial construct composed of four categories of risk factors (biomedical, social, behavioral, and educational) that interact across time, including across the life of the individual and across generations from parent to child. This construct replaced prior historical approaches that had divided the etiology of mental retardation into two broad types: mental retardation of biological origin and mental retardation due to psychosocial disadvantage (Grossman, 1983). McLaren and Bryson (1987) had noted in their review of epidemiological studies of mental retardation that as much as 50% of the population of individuals with mental retardation have more than one causal risk factor. Furthermore, mental retardation often reflects the cumulative or interactive effects of more than one risk factor. Similarly, Scott (1988) observed that from a public health perspective, the data do not support separating the etiology of mental retardation into biological and psychosocial categories. He proposed a multiple risk-factor approach that would include factors from both categories that may interact to cause mental retardation. Thus the historical distinction between biological and psychosocial types may be blurred in many cases (Rowitz, 1986). The Institute of Medicine of the National Academy of Sciences also noted that multiple risk factors converge to predispose an individual to the disabling process and that risk factors interact at different stages of the disabling process (Institute of Medicine, 1991).

The two-group approach (biological and cultural-familial) has been defended on the basis of developmental theory (Hodapp, Burack, & Zigler, 1990). Different developmental pathways have been associated with mental retardation of biological origin (due to identified biological disorders) compared to those with mental retardation for which no organic etiology is apparent (due to cultural-familial factors or psychosocial disadvantage). The former group tends to have lower IQ scores compared to the latter. The latter group comprises much of what has been termed *mild mental retardation.* Hodapp et al. recommended a biological or genetic classification of etiology, in which there is either a demonstrated biological cause or there is not. This approach is not inconsistent with the risk-factor model described here. In fact, the risk-factor approach can be seen as a fine tuning of the developmental (two-group) approach. Mental retardation of biological origin can be seen as involving individuals for whom biomedical risk factors predominate, whereas mental

TABLE 8.1
Risk Factors for Mental Retardation

| Timing | Biomedical | Social | Behavioral | Educational |
|---|---|---|---|---|
| Prenatal | 1. Chromoso-mal disorders<br>2. Single-gene disorders<br>3. Syndromes<br>4. Metabolic disorders<br>5. Cerebral dysgenesis<br>6. Maternal illnesses<br>7. Parental age | 1. Poverty<br>2. Maternal malnutrition<br>3. Domestic violence<br>4. Lack of access to prenatal care | 1. Parental drug use<br>2. Parental alcohol use<br>3. Parental smoking<br>4. Parental immaturity | 1. Parental cognitive disability without supports<br>2. Lack of preparation for parenthood |
| Perinatal | 1. Prematurity<br>2. Birth injury<br>3. Neonatal disorders | 1. Lack of access to birth care | 1. Parental rejection of caretaking<br>2. Parental abandon-ment of child | 1. Lack of medical referral for intervention services at discharge |
| Postnatal | 1. Traumatic brain injury<br>2. Malnutrition<br>3. Meningoen-cephalitis<br>4. Seizure disorders<br>5. Degenerative disorders | 1. Impaired child-caregiver<br>2. Lack of adequate stimulation<br>3. Family poverty<br>4. Chronic illness in the family<br>5. Institutional-ization | 1. Child abuse and neglect<br>2. Domestic violence<br>3. Inadequate safety measures<br>4. Social deprivation<br>5. Difficult child behaviors | 1. Impaired parenting<br>2. Delayed diagnosis<br>3. Inadequate early inter-vention services<br>4. Inadequate special-educational services<br>5. Inadequate family support |

©American Association on Mental Retardation

# EXHIBIT EE

# EXHIBIT EE

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FOURTH EDITION

## TEXT REVISION

# ⌐DSM-IV-TR™¬

## AMERICAN PSYCHIATRIC ASSOCIATION

**Motor Skills Disorder.** This includes Developmental Coordination Disorder, which is characterized by motor coordination that is substantially below that expected given the person's chronological age and measured intelligence.

**Communication Disorders.** These disorders are characterized by difficulties in speech or language and include **Expressive Language Disorder, Mixed Receptive-Expressive Language Disorder, Phonological Disorder, Stuttering,** and **Communication Disorder Not Otherwise Specified.**

**Pervasive Developmental Disorders.** These disorders are characterized by severe deficits and pervasive impairment in multiple areas of development. These include impairment in reciprocal social interaction, impairment in communication, and the presence of stereotyped behavior, interests, and activities. The specific disorders included in this section are **Autistic Disorder, Rett's Disorder, Childhood Disintegrative Disorder, Asperger's Disorder,** and **Pervasive Developmental Disorder Not Otherwise Specified.**

**Attention-Deficit and Disruptive Behavior Disorders.** This section includes **Attention-Deficit/Hyperactivity Disorder,** which is characterized by prominent symptoms of inattention and/or hyperactivity-impulsivity. Subtypes are provided for specifying the predominant symptom presentation: **Predominantly Inattentive Type, Predominantly Hyperactive-Impulsive Type,** and **Combined Type.** Also included in this section are the Disruptive Behavior Disorders: **Conduct Disorder** is characterized by a pattern of behavior that violates the basic rights of others or major age-appropriate societal norms or rules; **Oppositional Defiant Disorder** is characterized by a pattern of negativistic, hostile, and defiant behavior. This section also includes two Not Otherwise Specified categories: **Attention-Deficit/Hyperactivity Disorder Not Otherwise Specified** and **Disruptive Behavior Disorder Not Otherwise Specified.**

**Feeding and Eating Disorders of Infancy or Early Childhood.** These disorders are characterized by persistent disturbances in feeding and eating. The specific disorders included are **Pica, Rumination Disorder,** and **Feeding Disorder of Infancy or Early Childhood.** Note that Anorexia Nervosa and Bulimia Nervosa are included in the "Eating Disorders" section presented later in the manual (see p. 583).

**Tic Disorders.** These disorders are characterized by vocal and/or motor tics. The specific disorders included are **Tourette's Disorder, Chronic Motor or Vocal Tic Disorder, Transient Tic Disorder,** and **Tic Disorder Not Otherwise Specified.**

**Elimination Disorders.** This grouping includes **Encopresis,** the repeated passage of feces into inappropriate places, and **Enuresis,** the repeated voiding of urine into inappropriate places.

**Other Disorders of Infancy, Childhood, or Adolescence.** This grouping is for disorders that are not covered in the sections listed above. **Separation Anxiety Disorder** is characterized by developmentally inappropriate and excessive anxiety concerning

P8321

separation from home or from those to whom the child is attached. **Selective Mutism** is characterized by a consistent failure to speak in specific social situations despite speaking in other situations. **Reactive Attachment Disorder of Infancy or Early Childhood** is characterized by markedly disturbed and developmentally inappropriate social relatedness that occurs in most contexts and is associated with grossly pathogenic care. **Stereotypic Movement Disorder** is characterized by repetitive, seemingly driven, and nonfunctional motor behavior that markedly interferes with normal activities and at times may result in bodily injury. **Disorder of Infancy, Childhood, or Adolescence Not Otherwise Specified** is a residual category for coding disorders with onset in infancy, childhood, or adolescence that do not meet criteria for any specific disorder in the Classification.

Children or adolescents may present with problems requiring clinical attention that are not defined as mental disorders (e.g., Relational Problems, Problems Related to Abuse or Neglect, Bereavement, Borderline Intellectual Functioning, Academic Problem, Child or Adolescent Antisocial Behavior, Identity Problem). These are listed at the end of the manual in the section "Other Conditions That May Be a Focus of Clinical Attention" (see p. 731).

DSM-III-R included two anxiety disorders specific to children and adolescents, Overanxious Disorder of Childhood and Avoidant Disorder of Childhood, that have been subsumed under Generalized Anxiety Disorder and Social Phobia, respectively, because of similarities in essential features.

# Mental Retardation

## Diagnostic Features

The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.

*General intellectual functioning* is defined by the intelligence quotient (IQ or IQ-equivalent) obtained by assessment with one or more of the standardized, individually administered intelligence tests (e.g., Wechsler Intelligence Scales for Children, 3rd Edition; Stanford-Binet, 4th Edition; Kaufman Assessment Battery for Children). Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean). It should be noted that there is a measurement error of approximately 5 points in assessing IQ, although this may vary from instrument to instrument (e.g., a Wechsler IQ of 70 is considered to represent a range of 65–75). Thus, it is possible to diagnose Mental Retardation in

P8322

individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning. The choice of testing instruments and interpretation of results should take into account factors that may limit test performance (e.g., the individual's socio-cultural background, native language, and associated communicative, motor, and sensory handicaps). When there is significant scatter in the subtest scores, the profile of strengths and weaknesses, rather than the mathematically derived full-scale IQ, will more accurately reflect the person's learning abilities. When there is a marked discrepancy across verbal and performance scores, averaging to obtain a full-scale IQ score can be misleading.

Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation. *Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting. Adaptive functioning may be influenced by various factors, including education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation. Problems in adaptation are more likely to improve with remedial efforts than is the cognitive IQ, which tends to remain a more stable attribute.

It is useful to gather evidence for deficits in adaptive functioning from one or more reliable independent sources (e.g., teacher evaluation and educational, developmental, and medical history). Several scales have also been designed to measure adaptive functioning or behavior (e.g., the Vineland Adaptive Behavior Scales and the American Association on Mental Retardation Adaptive Behavior Scale). These scales generally provide a clinical cutoff score that is a composite of performance in a number of adaptive skill domains. It should be noted that scores for certain individual domains are not included in some of these instruments and that individual domain scores may vary considerably in reliability. As in the assessment of intellectual functioning, consideration should be given to the suitability of the instrument to the person's sociocultural background, education, associated handicaps, motivation, and cooperation. For instance, the presence of significant handicaps invalidates many adaptive scale norms. In addition, behaviors that would normally be considered maladaptive (e.g., dependency, passivity) may be evidence of good adaptation in the context of a particular individual's life (e.g., in some institutional settings).

## Degrees of Severity of Mental Retardation

Four degrees of severity can be specified, reflecting the level of intellectual impairment: Mild, Moderate, Severe, and Profound.

| 317 | Mild Mental Retardation: | IQ level 50–55 to approximately 70 |
| 318.0 | Moderate Retardation: | IQ level 35–40 to 50–55 |
| 318.1 | Severe Mental Retardation: | IQ level 20–25 to 35–40 |
| 318.2 | Profound Mental Retardation: | IQ level below 20 or 25 |

319 **Mental Retardation, Severity Unspecified,** can be used when there is a strong presumption of Mental Retardation but the person's intelligence is untestable by standard tests (e.g., with individuals too impaired or uncooperative, or with infants).

# 317 Mild Mental Retardation

Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0–5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age. By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

# 318.0 Moderate Mental Retardation

Moderate Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "trainable." This outdated term should not be used because it wrongly implies that people with Moderate Mental Retardation cannot benefit from educational programs. This group constitutes about 10% of the entire population of people with Mental Retardation. Most of the individuals with this level of Mental Retardation acquire communication skills during early childhood years. They profit from vocational training and, with moderate supervision, can attend to their personal care. They can also benefit from training in social and occupational skills but are unlikely to progress beyond the second-grade level in academic subjects. They may learn to travel independently in familiar places. During adolescence, their difficulties in recognizing social conventions may interfere with peer relationships. In their adult years, the majority are able to perform unskilled or semiskilled work under supervision in sheltered workshops or in the general workforce. They adapt well to life in the community, usually in supervised settings.

# 318.1 Severe Mental Retardation

The group with Severe Mental Retardation constitutes 3%–4% of individuals with Mental Retardation. During the early childhood years, they acquire little or no communicative speech. During the school-age period, they may learn to talk and can be trained in elementary self-care skills. They profit to only a limited extent from instruction in pre-academic subjects, such as familiarity with the alphabet and simple counting, but can master skills such as learning sight reading of some "survival" words. In their adult years, they may be able to perform simple tasks in closely supervised set-

tings. Most adapt well to life in the community, in group homes or with their families, unless they have an associated handicap that requires specialized nursing or other care.

## 318.2   Profound Mental Retardation

The group with Profound Mental Retardation constitutes approximately 1%–2% of people with Mental Retardation. Most individuals with this diagnosis have an identified neurological condition that accounts for their Mental Retardation. During the early childhood years, they display considerable impairments in sensorimotor functioning. Optimal development may occur in a highly structured environment with constant aid and supervision and an individualized relationship with a caregiver. Motor development and self-care and communication skills may improve if appropriate training is provided. Some can perform simple tasks in closely supervised and sheltered settings.

## 319   Mental Retardation, Severity Unspecified

The diagnosis of Mental Retardation, Severity Unspecified, should be used when there is a strong presumption of Mental Retardation but the person cannot be successfully tested by standardized intelligence tests. This may be the case when children, adolescents, or adults are too impaired or uncooperative to be tested or, with infants, when there is a clinical judgment of significantly subaverage intellectual functioning, but the available tests (e.g., the Bayley Scales of Infant Development, Cattell Infant Intelligence Scales, and others) do not yield IQ values. In general, the younger the age, the more difficult it is to assess for the presence of Mental Retardation except in those with profound impairment.

## Recording Procedures

The specific diagnostic code for Mental Retardation is selected based on the level of severity as indicated above and is coded on Axis II. If Mental Retardation is associated with another mental disorder (e.g., Autistic Disorder), the additional mental disorder is coded on Axis I. If Mental Retardation is associated with a general medical condition (e.g., Down syndrome), the general medical condition is coded on Axis III.

## Associated Features and Disorders

**Associated descriptive features and mental disorders.**      No specific personality and behavioral features are uniquely associated with Mental Retardation. Some individuals with Mental Retardation are passive, placid, and dependent, whereas others can be aggressive and impulsive. Lack of communication skills may predispose to disruptive and aggressive behaviors that substitute for communicative language. Some general medical conditions associated with Mental Retardation are characterized by certain behavioral symptoms (e.g., the intractable self-injurious behavior associated with Lesch-Nyhan syndrome). Individuals with Mental Retardation may be

P8325

vulnerable to exploitation by others (e.g., being physically and sexually abused) or being denied rights and opportunities.

Individuals with Mental Retardation have a prevalence of comorbid mental disorders that is estimated to be three to four times greater than in the general population. In some cases, this may result from a shared etiology that is common to Mental Retardation and the associated mental disorder (e.g., head trauma may result in Mental Retardation and in Personality Change Due to Head Trauma). All types of mental disorders may be seen, and there is no evidence that the nature of a given mental disorder is different in individuals who have Mental Retardation. The diagnosis of comorbid mental disorders is, however, often complicated by the fact that the clinical presentation may be modified by the severity of the Mental Retardation and associated handicaps. Deficits in communication skills may result in an inability to provide an adequate history (e.g., the diagnosis of Major Depressive Disorder in a nonverbal adult with Mental Retardation is often based primarily on manifestations such as depressed mood, irritability, anorexia, or insomnia that are observed by others). More often than is the case in individuals without Mental Retardation, it may be difficult to choose a specific diagnosis and in such cases the appropriate Not Otherwise Specified category can be used (e.g., Depressive Disorder Not Otherwise Specified). The most common associated mental disorders are Attention-Deficit/Hyperactivity Disorder, Mood Disorders, Pervasive Developmental Disorders, Stereotypic Movement Disorder, and Mental Disorders Due to a General Medical Condition (e.g., Dementia Due to Head Trauma). Individuals who have Mental Retardation due to Down syndrome may be at higher risk for developing Dementia of the Alzheimer's Type. Pathological changes in the brain associated with this disorder usually develop by the time these individuals are in their early 40s, although the clinical symptoms of dementia are not evident until later.

Associations have been reported between specific etiological factors and certain comorbid symptoms and mental disorders. For example, fragile X syndrome appears to increase the risk for Attention-Deficit/Hyperactivity Disorder and Social Phobia; individuals with Prader-Willi syndrome may exhibit hyperphagia and compulsivity, and those with William's syndrome may have an increased risk of Anxiety Disorders and Attention-Deficit/Hyperactivity Disorder.

**Predisposing factors.** Etiological factors may be primarily biological or primarily psychosocial, or some combination of both. In approximately 30%–40% of individuals seen in clinical settings, no clear etiology for the Mental Retardation can be determined despite extensive evaluation efforts. Specific etiologies are more likely to be identified in individuals with Severe or Profound Mental Retardation. The major predisposing factors include:

*Heredity:* These factors include inborn errors of metabolism inherited mostly through autosomal recessive mechanisms (e.g., Tay-Sachs disease), other single-gene abnormalities with Mendelian inheritance and variable expression (e.g., tuberous sclerosis), and chromosomal aberrations (e.g., translocation Down syndrome, fragile X syndrome). Advances in genetics will likely increase the identification of heritable forms of Mental Retardation.

*Early alterations of embryonic development:* These factors include chromosomal changes (e.g., Down syndrome due to trisomy) or prenatal damage due to toxins (e.g., maternal alcohol consumption, infections).

P8326

*Environmental influences:* These factors include deprivation of nurturance and of social, linguistic, and other stimulation.

*Mental disorders:* These factors include Autistic Disorder and other Pervasive Developmental Disorders.

*Pregnancy and perinatal problems:* These factors include fetal malnutrition, prematurity, hypoxia, viral and other infections, and trauma.

*General medical conditions acquired in infancy or childhood:* These factors include infections, traumas, and poisoning (e.g., due to lead).

**Associated laboratory findings.** Other than the results of psychological and adaptive behavior tests that are necessary for the diagnosis of Mental Retardation, there are no laboratory findings that are uniquely associated with Mental Retardation. Diagnostic laboratory findings may be associated with a specific accompanying general medical condition (e.g., chromosomal findings in various genetic conditions, high blood phenylalanine in phenylketonuria, or abnormalities on central nervous system imaging).

**Associated physical examination findings and general medical conditions.** There are no specific physical features associated with Mental Retardation. When Mental Retardation is part of a specific syndrome, the clinical features of that syndrome will be present (e.g., the physical features of Down syndrome). The more severe the Mental Retardation (especially if it is severe or profound), the greater the likelihood of neurological (e.g., seizures), neuromuscular, visual, auditory, cardiovascular, and other conditions.

## Specific Culture, Age, and Gender Features

Care should be taken to ensure that intellectual testing procedures reflect adequate attention to the individual's ethnic, cultural, or linguistic background. This is usually accomplished by using tests in which the individual's relevant characteristics are represented in the standardization sample of the test or by employing an examiner who is familiar with aspects of the individual's ethnic or cultural background. Individualized testing is always required to make the diagnosis of Mental Retardation. The prevalence of Mental Retardation due to known biological factors is similar among children of upper and lower socioeconomic classes, except that certain etiological factors are linked to lower socioeconomic status (e.g., lead poisoning and premature births). In cases in which no specific biological causation can be identified, the Mental Retardation is usually milder (although all degrees of severity are represented) and individuals from lower socioeconomic classes are overrepresented. Developmental considerations should be taken into account in evaluating impairment in adaptive skills because certain of the skill areas are less relevant at different ages (e.g., use of community resources or employment in school-age children). Mental Retardation is more common among males, with a male-to-female ratio of approximately 1.5:1.

## Prevalence

The prevalence rate of Mental Retardation has been estimated at approximately 1%. However, different studies have reported different rates depending on definitions used, methods of ascertainment, and population studied.

## Course

The diagnosis of Mental Retardation requires that the onset of the disorder be before age 18 years. The age and mode of onset depend on the etiology and severity of the Mental Retardation. More severe retardation, especially when associated with a syndrome with a characteristic phenotype, tends to be recognized early (e.g., Down syndrome is usually diagnosed at birth). In contrast, Mild Retardation of unknown origin is generally noticed later. In more severe retardation resulting from an acquired cause, the intellectual impairment will develop more abruptly (e.g., retardation following an encephalitis). The course of Mental Retardation is influenced by the course of underlying general medical conditions and by environmental factors (e.g., educational and other opportunities, environmental stimulation, and appropriateness of management). If an underlying general medical condition is static, the course is more likely to be variable and to depend on environmental factors. Mental Retardation is not necessarily a lifelong disorder. Individuals who had Mild Mental Retardation earlier in their lives manifested by failure in academic learning tasks may, with appropriate training and opportunities, develop good adaptive skills in other domains and may no longer have the level of impairment required for a diagnosis of Mental Retardation.

## Familial Pattern

Because of its heterogeneous etiology, no familial pattern is applicable to Mental Retardation as a general category. The heritability of Mental Retardation is discussed under "Predisposing Factors" (see p. 45).

## Differential Diagnosis

The diagnostic criteria for Mental Retardation do not include an exclusion criterion; therefore, the diagnosis should be made whenever the diagnostic criteria are met, regardless of and in addition to the presence of another disorder. In **Learning Disorders** or **Communication Disorders** (unassociated with Mental Retardation), the development in a specific area (e.g., reading, expressive language) is impaired but there is no generalized impairment in intellectual development and adaptive functioning. A Learning Disorder or Communication Disorder can be diagnosed in an individual with Mental Retardation if the specific deficit is out of proportion to the severity of the Mental Retardation. In **Pervasive Developmental Disorders**, there is qualitative impairment in the development of reciprocal social interaction and in the development of verbal and nonverbal social communication skills. Mental Retardation often accompanies Pervasive Developmental Disorders.

Some cases of Mental Retardation have their onset after a period of normal functioning and may qualify for the additional diagnosis of dementia. A diagnosis of dementia requires that the memory impairment and other cognitive deficits represent a significant decline from a previously higher level of functioning. Because it may be difficult to determine the previous level of functioning in very young children, the diagnosis of dementia may not be appropriate until the child is between ages 4 and 6 years. In general, for individuals under age 18 years, the diagnosis of dementia is

P8328

made only when the condition is not characterized satisfactorily by the diagnosis of Mental Retardation alone.

Borderline Intellectual Functioning (see p. 740) describes an IQ range that is higher than that for Mental Retardation (generally 71–84). As discussed earlier, an IQ score may involve a measurement error of approximately 5 points, depending on the testing instrument. Thus, it is possible to diagnose Mental Retardation in individuals with IQ scores between 71 and 75 if they have significant deficits in adaptive behavior that meet the criteria for Mental Retardation. Differentiating Mild Mental Retardation from Borderline Intellectual Functioning requires careful consideration of all available information.

## Relationship to Other Classifications of Mental Retardation

The classification system of the American Association on Mental Retardation (AAMR) includes the same three criteria (i.e., significantly subaverage intellectual functioning, limitations in adaptive skills, and onset prior to age 18 years). In the AAMR classification, the criterion of significantly subaverage intellectual functioning refers to a standard score of approximately 70–75 or below (which takes into account the potential measurement error of plus or minus 5 points in IQ testing). Furthermore, DSM-IV specifies levels of severity, whereas the AAMR 1992 classification system specifies "Patterns and Intensity of Supports Needed" (i.e., "Intermittent, Limited, Extensive, and Pervasive"), which are not directly comparable with the degrees of severity in DSM-IV. The definition of developmental disabilities in Public Law 95-602 (1978) is not limited to Mental Retardation and is based on functional criteria. This law defines *developmental disability* as a disability attributable to a mental or physical impairment, manifested before age 22 years, likely to continue indefinitely, resulting in substantial limitation in three or more specified areas of functioning, and requiring specific and lifelong or extended care.

## Diagnostic criteria for Mental Retardation

A.  Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test (for infants, a clinical judgment of significantly subaverage intellectual functioning).

B.  Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

C.  The onset is before age 18 years.

Code based on degree of severity reflecting level of intellectual impairment:

| | | |
|---|---|---|
| 317 | Mild Mental Retardation: | IQ level 50–55 to approximately 70 |
| 318.0 | Moderate Mental Retardation: | IQ level 35–40 to 50–55 |
| 318.1 | Severe Mental Retardation: | IQ level 20–25 to 35–40 |
| 318.2 | Profound Mental Retardation: | IQ level below 20 or 25 |
| 319 | Mental Retardation, Severity Unspecified: | when there is strong presumption of Mental Retardation but the person's intelligence is untestable by standard tests |

# Learning Disorders
# (*formerly* Academic Skills Disorders)

The section on Learning Disorders includes Reading Disorder, Mathematics Disorder, Disorder of Written Expression, and Learning Disorder Not Otherwise Specified.

## Diagnostic Features

Learning Disorders are diagnosed when the individual's achievement on individually administered, standardized tests in reading, mathematics, or written expression is substantially below that expected for age, schooling, and level of intelligence. The learning problems significantly interfere with academic achievement or activities of daily living that require reading, mathematical, or writing skills. A variety of statistical approaches can be used to establish that a discrepancy is significant. *Substantially below* is usually defined as a discrepancy of more than 2 standard deviations between achievement and IQ. A smaller discrepancy between achievement and IQ (i.e., between 1 and 2 standard deviations) is sometimes used, especially in cases where an individual's performance on an IQ test may have been compromised by an associated disorder in cognitive processing, a comorbid mental disorder or general medical condition, or the individual's ethnic or cultural background. If a sensory deficit is

# EXHIBIT FF

# EXHIBIT FF

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)



DEPOSITION
EXHIBIT
1
3-1-06 DS,

FORM G-114—2N-7-68—McGREW PRINTERY

FILE # _____ 67-62

NAME:    RAMIREZ       DAVID
               LAST             FIRST

4-7-57         Male          Mex.
BIRTHDATE        SEX          EXTRACTION
754 E. Adams       Monroe          6
~~1438 E. Taylor~~     ~~Garfield~~      2
ADDRESS              SCHOOL          GRADE

2-14-67         Wilson       CA 9-9   MA       IQ
DATE EXAMINED        EXAMINER                 STANFORD-BINET, LM

WISC:    VERB. SC. IQ 77     PERF. SC. IQ 68     FULL SC. IQ 70

                                   WISC Verb. Sc. IQ 77
RETEST: 10-6-69        McConkey       Perf. Sc. IQ 80
    DATE           EXAMINER            TEST Full Sc. IQ 77

RETEST:
    DATE           EXAMINER            TEST        IQ

# EXHIBIT GG

# EXHIBIT GG

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

# DECLARATION OF RICARDO WEINSTEIN, Ph.D.

I, Ricardo Weinstein, Ph.D., declare as follows:

1.     I am a psychologist licensed to practice in the State of California. I specialize in the practice of neuropsychology and neuropsychological assessment. I have a Ph.D. in Clinical Psychology, and attended a Post-Doctoral Certificate Program in Neuropsychology at the Fielding Institute in Santa Barbara, California. I obtained my undergraduate degree at the Universidad Nacional Autonoma De Mexico (UNAM) and my master's degree at the Merrill Palmer Institute. I obtained my Ph.D. from International College. I have received extensive training and supervision in Quantitative Electroencephalography (QEEG).

2.     I currently am in private practice in San Diego, California, where I specialize in clinical and forensic neuropsychology. I am a member of the San Diego County Superior Court panel of approved psychologists for criminal court referrals. I have served as an adjunct professor at San Diego State University, and worked as a consultant in the Comer Program in elementary public schools for over eight years. I frequently lecture on issues of psychology and neuropsychological assessment as well as child abuse and neglect. I have lectured extensively in the areas of drug abuse and suicide prevention. I have presented papers on issues of neuropsychology and

1

neuropsychological assessment, as well as on child abuse and neglect, at national and international scientific meetings and conferences, and have published articles on topics in neuropsychology in peer-reviewed journals. I have been qualified as an expert in federal court and in state courts in California, Washington, Florida and Arizona. I have conducted court-appointed neuropsychological evaluations in California, Washington, Oregon, Arizona, New Mexico and Florida. I have conducted mental retardation evaluations and/or testified regarding issues of mental retardation in California, Arizona, Virginia, Arkansas, Oklahoma and Florida. As a neuropsychologist, I am trained to administer tests to measure the relationship between brain injuries and the ability to process and utilize information. The tests are standardized and yield scientifically quantifiable, reproducible results, using scores that can be compared to persons of similar age and demographic background as the person being tested.

3.      During my eight years as a Comer Psychologist, I consulted and provided assistance in the assessment of numerous elementary school children, many for the purpose of diagnosing or ruling out mental retardation, learning disabilities or developmental disorders.

4.      As a parent of a child with Down's Syndrome, born in 1973, I was

2

instrumental in the creation of a special school in Mexico City. I conducted extensive research and developed a curriculum, hired and assisted in the training of personnel, and co-founded an organization that continues to operate in Mexico in serving the mentally retarded.

5.     I was asked by counsel for David Martinez Ramirez to give an informed opinion as to whether Mr. Ramirez currently qualifies for the diagnostic label of "Mental Retardation" and/or suffers from brain dysfunction. In addressing this question, I have: (a) reviewed the medical, psychological and descriptive records that are available on Mr. Ramirez, (b) I personally interviewed, tested, scored and interpreted test results obtained from Mr. Ramirez, and (c) reviewed and collected information on Mr. Ramirez's adaptive behavior, at various points in his life, from knowledgeable sources. I personally interviewed the following relatives who had information about Mr. Ramirez's development:  Eloise Arce, Mary Helen Pierce, Richard Garcia, Herminia Naranjo, and John Pierce.

6.     In evaluating Mr. Ramirez's intellectual functioning, I have considered and discussed key elements of the diagnostic construct of Mental Retardation, as it has evolved, and continues to evolve, in various manuals of the American Association on Mental Retardation (AAMR) and the Diagnostic and

3

Statistical Manual of the American Psychiatric Association.

7.    For the purpose of evaluating Mr. Ramirez I reviewed a substantial number of documents prepared in connection with his trial fourteen years ago, as well as numerous documents subsequently obtained by current counsel. A list of these documents is attached to this declaration.

8.    The following tests and techniques were utilized in Mr. Ramirez's evaluation:

    Clinical Interview
    Mental Status Examination
    Soper Neuropsychology Status Examination
    Wechsler Adult Intelligence Scale BThird Edition (WAIS-III)
    Wechsler Memory Scale- Third Edition (WMS-III)
    Woodcock-Johnson III:
        Cognitive and Achievement Tests
    Comprehensive Test of Non Verbal Intelligence (CTONI)
    Wide Range Achievement Test, (WRAT3)
    Test of Memory Malingering (TOMM)
    Computerized Assessment of Response Bias (CARB)
    Rey Fifteen Item Test
    Rey Complex Figure Drawing
    Wisconsin Card Sorting Test

    Delis Kaplan Executive Function System (D-KEFS)
        Trail Making Test
        Verbal Fluency Test
        Design Fluency Test
        Color Word Interference Test
        Sorting Test
        Tower Test
        Proverb Test

4

Street Completion Test
Tactual Performance Test
House , Tree, Person
Quantitative Electroencephalogram (QEEG)

9.     Based upon the test results and the information I have received I have reached the following conclusion:  **Mr. Ramirez is currently impaired and his intellectual functioning falls within the range of mental retardation.  In addition he suffers from significant brain dysfunction.**

MENTAL RETARDATION:

10.    The DSM-IV-TR contains the following criteria for diagnosis of mental retardation:

A.    Significant subaverage intellectual functioning:  an IQ of approximately 70 or below on an individually administered IQ test, (approximately 2 standard deviations below the mean). It should be noted that there is a measurement error of approximately 5 points.

B.    Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

C.    The onset is before age 18 years.

11.    The AAMR defines mental retardation as:

5

"Mental retardation is a disability characterized by significant limitations both in intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." (AAMR, 2002)

12. In addition the AAMR's definition includes the following assumptions essential to the application of the definition.

    A. Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture.

    B. Valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors.

    C. Within an individual, limitations often coexist with strengths.

    D. An important purpose of describing limitations is to develop a profile of needed supports.

    E. With appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation generally will improve.

13. AAMR defines a disability as:

A disability refers to personal limitations that represent a substantial disadvantage when attempting to function in society. A disability should be considered within the context of the environment, personal factors, and the need for individualized supports.

14. AAMR defines intelligence as:

6

Intelligence refers to a general mental capability. It involves the ability to reason, plan, solve problems, think abstractly, comprehend complex ideas, learn quickly, and learn from experience. Although not perfect, intelligence is represented by Intelligent Quotient (IQ) scores obtained from standardized tests given by a trained professional. In regard to the intellectual criterion for the diagnosis of mental retardation, mental retardation is generally thought to be present if an individual has an IQ test score of approximately 70 of below. An obtained IQ score must always be considered in light of its standard error of measurement, appropriateness, and consistency with administration guidelines. Since the standard error of measurement for most IQ tests is approximately 5, the ceiling may go up to 75. This represents a score approximately 2 standard deviations below the mean, considering the standard error of measurement. It is important to remember, however, that an IQ score is only one aspect in determining if a person has mental retardation. Significant limitations in adaptive behavior skills and evidence that the disability was present before age 18 are two additional elements that are critical in determining if a person has mental retardation.

15. AAMR defines adaptive behavior as:

Adaptive behavior is the collection of conceptual, social, and practical skills that people have learned so they can function in their everyday lives. Significant limitations in adaptive behavior impact a person's daily life and affect the ability to respond to a particular situation or to the environment.

Limitations in adaptive behavior can be determined by using standardized tests that are normed on the general population including people with disabilities and people without disabilities. On these standardized measures, significant limitations in adaptive behavior are operationally defined as performance that is at least 2 standard deviations below the mean of either (a) one of the following three types of adaptive

7

behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills.

Specific examples of adaptive behavior skills according to AAMR include:

Conceptual Skills-
      Receptive and expressive language
      Reading and writing
      Money concepts
      Self-directions

Social Skills-
      Interpersonal
      Responsibility
      Self-esteem
      Gullibility
      Naiveté
      Follows Rules
      Obeys laws
      Avoids victimization

Practical Skills-
      Personal activities of daily living

      Instrumental activities of daily living

      Occupational skills

      Maintaining a safe environment (AAMR, 2002).

8

Causes of Mental Retardation:

16.     The etiology of mental retardation is variable and complex.  In fact, there are more than 350 known disorders and conditions, both genetic and acquired that can result in mental retardation at different developmental stages.

A.     Prenatal Etiology

17.     Among the most common causes of mental retardation are genetic factors.  In addition during the pregnancy numerous events can contribute to mental retardation: Numerous agents can have significant deleterious effects on the fragile central nervous system of a child *in utero*.  Such teratogens are nongenetic, nonchromosomal agents that are major causes of mental subnormality.  These include poor nutrition, toxic substances, maternal disease or infection, blood incompatibility, drugs and alcohol exposure, and cigarettes.

18.     Maternal alcohol abuse during pregnancy can result in fetal alcohol syndrome (FAS) or fetal alcohol effects (FAE).  The dangers of consuming alcohol during pregnancy are well-known.  The teratogenic effects, that alcohol and other illicit substances produce, impact on the developing, vulnerable brain and cause a disruption in the developmental stages of the organs, most often the central nervous system.

9

B. Perinatal Etiology

19. The perinatal stage is the time period surrounding the birth (e.g. +/- 7 days). During this time, several obstetric complications may arise that place a child at increased risk of having mental retardation. Included in these are prematurity and low birth weight. Prematurity may be the result of many other risk factors that contribute to the manifestation of mental retardation. Further, a premature infant is born with more biological and environmental risk factors and will likely have additional risks throughout their lifetime.

C. Postnatal Etiology

20. "[M]any conditions in these early years can lead to mental retardation. In fact, it has been estimated that between 5 and 20% of cases of mental retardation are a result of trauma or neglect." Causes of postnatal mental retardation include traumatic brain injury, cerebral infections (e.g., meningitis and encephalitis), child abuse (e.g., shaken baby syndrome), lead poisoning, and nutritional deficiencies. Sandra C. Redden, Stephen R. Hooper, & Martha Pope (2002). *Mental Retardation*. San Diego, CA: Academic Press.

10

21.     Table of Potential Risk Factors for Mental Retardation

11

TABLE 8.1

Risk Factors for Mental Retardation

| Timing | Biomedical | Social | Behavioral | Educational |
|--------|-----------|--------|-----------|-------------|
| Prenatal | 1. Chromoso-mal disorders<br>2. Single-gene disorders<br>3. Syndromes<br>4. Metabolic disorders<br>5. Cerebral dysgenesis<br>6. Maternal illnesses<br>7. Parental age | 1. Poverty<br>2. Maternal malnutrition<br>3. Domestic violence<br>4. Lack of access to prenatal care | 1. Parental drug use<br>2. Parental alcohol use<br>3. Parental smoking<br>4. Parental immaturity | 1. Parental cognitive disability without supports<br>2. Lack of preparation for parenthood |
| Perinatal | 1. Prematurity<br>2. Birth injury<br>3. Neonatal disorders | 1. Lack of access to birth care | 1. Parental rejection of caretaking<br>2. Parental abandon-ment of child | 1. Lack of medical referral for intervention services at discharge |
| Postnatal | 1. Traumatic brain injury<br>2. Malnutrition<br>3. Meningoen-cephalitis<br>4. Seizure disorders<br>5. Degenerative disorders | 1. Impaired child-caregiver<br>2. Lack of adequate stimulation<br>3. Family poverty<br>4. Chronic illness in the family<br>5. Institutional-ization | 1. Child abuse and neglect<br>2. Domestic violence<br>3. Inadequate safety measures<br>4. Social deprivation<br>5. Difficult child behaviors | 1. Impaired parenting<br>2. Delayed diagnosis<br>3. Inadequate early inter-vention services<br>4. Inadequate special-educational services<br>5. Inadequate family support |

12

DMR Disclosure 0256

AAMR (2002).

IQ Scores and the Normal Curve:

22.   The formal testing of cognitive abilities was developed in the middle of the 20th century.  Prior to this time, the intellectual deficit criterion was assessed informally and intuitively, according to how someone appeared to function in everyday life.  With the invention of IQ testing, the intellectual criterion came to be assessed through the individual's performance in tests of intelligence or IQ tests. Initially IQ or "Intelligence Quotient" was determined by dividing the individual's Mental Age (a raw score obtained on the test) by his or hers chronological age and then multiplying this ratio by 100. The inaccuracy of this measurement led to development of what is known as a "deviation IQ" score.   In this form of determining IQ scores, an individual's raw score is now located on a distribution of raw scores for the general population adjusted to his/hers chronological age.  This is a reflection of one's percentile rank.  Percentile ranks indicate the percent of the normative population that fall below the score obtained by the individual.  The fiftieth percentile rank in most modern IQ tests is arbitrarily set at an IQ of 100, indicating that 50% of the population will obtain an IQ score of 100 or above and 50% of the population will obtain an IQ score of 100 or below. A "standard

13

deviation" is a widely used measure of statistical variability representing the average distance of the data from the mean. In most IQ tests, the standard deviation is arbitrarily set at 15. The mean is the point that divides the normal curve in half (50% of the data falls above the mean and 50% of the data falls below the mean). On the normal curve, as expressed on this metric, a score of minus one standard deviation, equivalent to approximately the 17th percentile, places one at an IQ score of 85, a score of minus two standard deviations equivalent to approximately the second percentile, places one at an IQ score of 70, and a score of minus three standard deviations, equivalent to a fraction of the first percentile, places one at an IQ score of 55, and so on.

23.    The upper IQ limit for defining Mental Retardation has fluctuated across the various AAMR manuals. In the 1961 AAMR Manual, the upper level of Mental Retardation was set at IQ=85, which includes approximately 17% of the population. It has been historically determined that between 2% and 3% of the population suffers from mental retardation. Therefore it was determined that this ceiling was too high. The reason for setting the ceiling so high was to create a "borderline" category of Mental Retardation which, would be determined not just by IQ level, but also by deficits in adaptive behavior. The intent was to avoid becoming

14

locked into an overly-strict reliance on IQ scores, and to open up the possibility that one could have Mental Retardation (*i.e.*, be below the second or third percentile in competence), even if one's IQ was in the Borderline range, if one functioned in the real world (*i.e.*, in terms of adaptive behavior) in a more impaired manner. However, because clinicians often ignored the adaptive behavior criterion, and over-relied on IQ scores, excessive numbers of young people (most of them from poor minority backgrounds) were labeled as having mild Mental Retardation. In reaction, the 1973 AAMR Manual eliminated the Borderline category, and the upper IQ level for diagnosing Mental retardation was reset at IQ=70, or minus 2 standard deviations (approximately the second percentile) below the population mean.

24.     In the 1973 manual, clinicians and agencies were asked to take into account the "standard error of measurement" of IQ tests. This term refers to the known fact that, as with any psychological measure, an individual's IQ score will vary to some extent from one test administration to another. Although IQ tests have relatively high reliability (similar scores will be obtained utilizing the same instrument), it has been established that an individual's Full-Scale IQ score will vary within a range of five points (at a high level of probability) from one administration to another.

15

25.    The 1992 Manual states that Mental Retardation should be diagnosed if an individual's IQ score is "below 70-75," in consideration of the standard error of measurement. Therefore the 1992 AAMR Manual changed the IQ ceiling for diagnosing mental retardation from IQ=70 to IQ=75.

26.    The figure below depicts the normal curve with the percent of cases that fall within standard deviations, standard scores, the equivalent IQ/Index scores ranges and descriptive categories.



From: WAIS III Record Form. Psychological Corporation (1997)

DMR Disclosure 0260

27.     The following are IQ test scores I obtained from Mr. Ramirez which are consistent with prior testing administered to Mr. Ramirez as a juvenile, see *infra* at paragraph 99[1]:

WAIS III:

| | |
|---|---|
| Verbal IQ | 71 |
| Performance IQ | 74 |
| Full Scale IQ | 70 |

Woodcock-Johnson III:

| | |
|---|---|
| Verbal Ability | 76 |
| Thinking Ability | 67 |
| Cognitive Efficiency | 74 |
| GIA (Full Scale) | 71 |

CTONI:

| | |
|---|---|
| Nonverbal Intelligence Quotient (Full Scale) | 56 |
| Pictorial Nonverbal Intelligence Quotient | 57 |
| Geometric Nonverbal Intelligence Quotient | 61 |

28.     Adaptive Behaviors:  The 1961 AAMR Manual adopted a "dual criteria" approach to the definition of mental retardation because of the imprecise and misuse of IQ scores.  An IQ score below a specific point (85 in 1961, 70-75 after 1973) would also have to be accompanied by a significant deficiency in "adaptive

---

[1]Before sentencing, psychologist Dr. Mickey McMahon examined Mr. Ramirez. Dr. McMahon administered the Peabody Pictorial Vocabulary Test (PPVT) to Mr. Ramirez and reported that he received a purported "I.Q." score of 94, and this was "no way indicative of any form of mental retardation." Td. 149, Exh. I to sentencing memorandum, at 6. However, I have since spoken to Dr. McMahon and he agrees that the PPVT is not a comprehensive IQ score and that he would not have ruled out mental retardation had he seen Mr. Ramirez's school records, which showed IQ scores of 70 and 77 on the more comprehensive WISC IQ tests.  *See* Exh. 8,

17

behavior."[note] This construct was imprecisely defined (as relative impairment in independent living skills and in the ability to engage in appropriate social behaviors) and this, along with the absence of adequate measures, contributed to widespread ignoring of the adaptive behavior construct and continued sole reliance on a single IQ score.

29.     The 1992 and 2002 AAMR Manuals both emphasized the importance of assessing adaptive behavior, criticizing the tendency of clinicians to diagnose mental retardation based upon rigid reliance on IQ tests alone.  The 1992 Manual recognized that while "previous definitions have indicated that intelligence and adaptive behavior should have equal weight in diagnosis, in practice, IQ has typically dominated and, thus, has been overemphasized both in terms of professional decision making and classification and research." (1992 AAMR Manual.)  The 1992 Manual was specifically designed "to encourage a balanced consideration of IQ and adaptive skill measures."

30.     The AAMR has emphasized the adaptive behavior criterion to avoid the inclusion of individuals who are not significantly impaired and to avoid the exclusion of people who should be classified as mentally retarded even though they obtained relatively high scores in IQ tests. The 1992 AAMR Manual states that "[b]y

Declaration of Mickey McMahon.            18

shifting to greater reliance on adaptive skills in the diagnosis of mental retardation, embedded within an orientation toward observation and clinical judgment, all persons who have significant limitations associated with the defined concept of mental retardation  will be included in the definition". The 2002 Manual expressed significant concern about the possibility that the continued over-reliance on IQ scores would produce "false negatives," mentally impaired individuals who deserved the protections afforded to mentally retarded people but had no access to them:

> There are those who would argue that the considerable correlation between IQ scores and adaptive behavior among people who have mental retardation, in effect, creates a redundant process to assure better diagnosis. No such safeguards exist, however, for a false negative, a serious problem that demands the field's attention. The problems faced by people who have mental retardation but do not receive the diagnosis can be severe. These individuals are vulnerable to the denial of essential supports and exclusion from eligibility for important protections.

2002 AAMR Manual.

31.    There has been, and continues to be, efforts to develop and standardize tests that measure adaptive behaviors. By definition, one must rely on descriptions of behaviors observed in the individual assessed. These observations are by necessity performed by people that have knowledge of the assessed individual either because of personal contact or reliable references. Primary sources of information regarding

19

developmental history are parents, siblings, other relatives, teachers, physicians, peers and other individuals that had intimate contact with the subject of the evaluation during his or her developmental years.

32.    Measures of adaptive behavior have tended to rely on rating instruments.    These instruments contain multiple items referring to specific competencies, the informant is asked to rate the relative degree to which the rated individual can perform such tasks.   The rating can be performed by the clinician performing the evaluation during or after interviewing appropriate sources, the clinician then scores the instruments according to tables provided in the test manuals. Or the informing sources can directly score the assessed individual in the scoring forms. Originally adaptive behavior scales were not normed; they simply provided descriptions of behaviors. More recently efforts have been made to design questionnaires of adaptive behaviors that can be scored and compared to a normative sample. Consistent with IQ scores these instruments tend to have a mean of 100 and a standard deviation of 15.

33.    Evaluations of adaptive deficits should not rely exclusively on the results obtained on adaptive deficit rating scales.  Clinicians must rely on their clinical judgment to provide a diagnosis of mental retardation.  Review of relevant records

20

and the interviews with significant sources provide invaluable information regarding the subject's adaptive behaviors. Rating scales are useful tools, but they are not a substitute for the knowledge, training and experience of a qualified clinician.

34.     When the subject to be evaluated is a member of a minority and developed in an environment significantly different than that of the dominant culture, the rating scales are possibly not useful and should only be used with extreme caution. Growing in up in the environment that David Ramirez did demands adaptive behaviors very different from the ones existing in the average American household. What follows is a social history of David that presents those factors relevant to assessing the presence or absence of adaptive deficits.

A.     The migrant farm life.

35.     Julian Ramirez and Benita Santos, David's maternal grandparents, had twelve children which they supported through migrant farm work. The Santos Ramirez family traveled around the country in trucks and buses, moving from camp to camp in Texas, Arizona, Idaho, California, Colorado, Washington, Michigan, Nebraska and Illinois. They picked apples, cherries, strawberries, cucumbers, onions, carrots, green beans, potatoes, beets, lettuce, cotton, and tomatoes. They went wherever there was work, and picked whatever was in season.

21

36.     David's grandmother Benita worked in the fields while she was pregnant with many of her children, including his mother Maria. David's grandfather Julian forced his children to work in the fields when they reached the age of five or six. The children would work in the fields ten to twelve hours each day, six days a week.

'37.     As David's aunt Mary Helen Pierce recalls:

> Our family survived through migrant farm work. I was six years old when I started working in the fields in 1950. I was forced to work in the fields by my father, Julian Santos, along with my sisters Hermina, Eloise, and Maria.

Exh. 3, Declaration of Mary Helen Pierce, para. 15. As David's aunt Hermina Naranjo similarly recalls:

> Our family made a living through migrant farm work. I remember working in the fields along with my sisters and brothers from around 1952 until 1957. We started working the fields in Del Rio, Texas, in 1952, and we also worked in Colorado, Idaho, Wisconsin, and Utah. In later years we worked throughout the valley in Arizona, picking cotton.

Exh. 5, Declaration of Herminia Naranjo, para. 9.

38.     The conditions in the migrant farm camps were deplorable. The camps, situated in or near the fields where the families worked, were overcrowded. The family lived in the same shacks and tents previously used by other migrant

22

workers. They were often run down and filthy. When no shacks or tents were available, the family would simply sleep in the fields.

39.     The fields where the family worked and lived were almost continually being sprayed with herbicides and pesticides. Although the family members would sometimes cover their mouths with handkerchiefs, it was impossible to work without inhaling the vapors from the spray.

40.     David's aunt Herminia Naranjo specifically recalls "the airplanes spraying clouds of pesticides as we worked in the fields, and [using] handkerchiefs to cover our mouths." Exh. 5, Declaration of Herminia Naranjo, para. 9. David's aunt Eloise Arce similarly recalls:

> [T]he clouds of chemicals drifting over us after the planes would spray the fields. We sometimes wore hankies over our mouths, but we still inhaled the vapors. The spraying was especially bad in Idaho and in Buckeye, Arizona.

Exh. 4, Declaration of Eloise Arce, para. 19.

41.     Family members saw the clouds of chemicals settle on the soil and water, their skin and the camps where they lived. They often developed open sores on their bodies which went untreated. The water supply for drinking, cooking and bathing came directly from the ponds in the sprayed fields. As David's aunt Mary Helen Pierce recalls:

23

The fields were constantly sprayed with herbicides and pesticides. We came in contact with the chemicals and breathed them in as we worked. We drank water from the ponds in those fields, and we did our cooking, bathing and cleaning using that same water. It was common to have open sores from the hard work, and there was no treatment to speak of.

Exh. 3, Declaration of Mary Helen Pierce, para. 23.

42.     Because there was little other food to be had, the family would often eat the produce while they worked. They ate the produce without washing it, seasoning it with salt and pepper that they carried into the fields. Sometimes the pesticide-laden produce, such as the cherries, would make them ill.

43.     A fellow farm worker was told by his doctor that his illness, which led to his death, was caused by his exposure to pesticides in the fields. Family members have experienced numerous health problems which may be attributable to exposure to pesticides and herbicides. These include respiratory problems, cancers at an early age, strokes at an early age, epileptic seizures, and unexplained infant deaths. As David's aunt Mary Helen Pierce notes, "I believe our exposure to pesticides contributed to the health problems [cancer, epilepsy, diabetes, respiratory ailments and heart disease] that my family [subsequently] developed." Exh. 3, Declaration of Mary Helen Pierce, para. 24.

44.     Maria Ramirez, pregnant with David at age fifteen, worked the fields of

24

Arizona throughout her pregnancy. As David's aunt Eloise Arce recalls in regard to

Maria's pregnancy with David:

> In 1957, my sister Maria Ramirez was pregnant with David
> Ramirez. At that time she was employed by a company called
> Bodine Produce in Goodyear, Arizona, where she worked
> handling lettuce, onions, and carrots . . . I got married in 1958
> and stopped working in the fields, but Maria continued to work
> in the fields for several years after that.

Exh. 4, Declaration of Eloise Arce, para. 16.

    45.    Maria continued to work the fields when David was a child, and at an

early age, David himself began working in the Arizona cherry orchards. David loved

to eat the cherries directly from the trees without washing them first. As David's aunt

Eloise Arce further recalls:

> I believe that I developed asthma and other illnesses as a result
> of pesticide exposure. David Ramirez has asthma, too. My
> daughter Linda was born with a cleft palate, and I have since
> learned that pesticide exposure has been linked to an increased
> risk of cleft palate. I have also been told that pesticide exposure
> has been linked to breast cancer and in 1973, I had to have a
> mastectomy. Later, I had another mastectomy.

Exh. 4, Declaration of Eloise Arce, para. 20. Eloise further notes that "Maria

Ramirez (David Ramirez's mother) has a daughter named Mary Castillo who is also

very slow. She cannot read or write." *Id.*, para. 21.

25

**B.    A family history of substance abuse**

46.    Alcoholism and drug use permeated and continues to affect the Santos Ramirez family.  David Ramirez's maternal grandparents, Benita and Julian, were both alcoholics.  Other maternal aunts and uncles have also struggled with alcoholism and drug use.

47.    David's aunt Herminia Naranjo recalls that "Drug[s] and alcohol . . . have been a big problem with our family for several generations."  Exh. 5, Declaration of Herminia Naranjo, para. 6.  David's mother Maria drank heavily while she was pregnant with David, often staying out all night and disappearing from the rest of the family for days.  TR 10/19/90 at 33.  In regard to her sister Maria's alcohol usage, Herminia recalls that:

> Maria started drinking alcohol at thirteen, and her drinking got worse after she became pregnant with David.  I remember that Maria fought with our mother Benita all the time about [her] drinking while she was pregnant with David.  Maria became a lifelong alcoholic, and she died from cirrhosis of the liver.

*Id.*, para. 3.

48.    David's aunt Eloise Arce similarly recalls that:

> Alcoholism was rampant in our family.  My father Julian and my mother Benita were both alcoholics.  My sister Herminia also suffered from alcoholism, and my other sister Edna abused both alcohol and drugs.  My younger brothers, Julian and Manuel,

26

were both bad alcoholics, and currently they are in recovery. Maria Ramirez was a horrible alcoholic and continued to drink up to her death in 1981.

Exh. 4, Declaration of Eloise Arce, para. 30. Eloise further recalls that "Maria drank heavily during all of her pregnancies" and "used whatever drugs she could get her hands on." *Id.*, para. 31.

49.     David's stepfather Richard Garcia recalls that "Maria was already an alcoholic when I met her, and she continued to drink heavily throughout our marriage." Exh. 2, Declaration of Richard Garcia, para. 3. Richard further recalls that:

> Maria also used marijuana and cocaine when she could get her hands on it. She was arrested several times in Phoenix and Cashion, Arizona for alcohol related offenses while driving, and she spent some time in jail as a result.

*Id.*, para. 20. Richard also notes that:

> Maria drank heavily through all of her pregnancies with our children in California: Deborah, Richard, Jr., Jeffrey, and Jenny. It is my impression that Maria was drinking when she was pregnant with all of her previous children, including David Ramirez. I remember that Maria got drunk on New Year's while nine months pregnant with Deborah. She drank and partied until the day Deborah was born on January 2, 1970.

*Id.*, para. 28. Richard also recalls that:

> Maria told me that she would put beer in David's bottle to keep

27

him quiet and put him to sleep, when he was just a few years old. Maria continued to do the same thing with all of her kids, in fact, Maria and Benita both thought it was cute to let the kids drink from their beer glasses. I remember that David got to the point where he liked to drink beer as a child. I did not allow Maria to do that with our common children after they were born.

*Id.*, para. 24.

50.     For a time Maria was also addicted to Vicodin and when her regular doctors refused to continue the prescription, she was able to obtain it from an unscrupulous clinic. David Ramirez once took his mother's Vicodin and became ill. Maria often spoke of suicide and on one occasion was hospitalized after trying to commit suicide with alcohol and drugs. David Ramirez was approximately ten years old at the time.

51.     Maria was a lifelong alcoholic who died of liver failure in 1981 at the age of thirty-nine. Towards the end of her life, Maria's sister and mother learned of her liver test results and went to her house to see her. She was not at home, but they located her at a cheap motel in Phoenix where she used to hang out. Maria would not come out of her room, so they waited for several hours until Maria finally came out to get more beer. Maria died within the week. As her sister Mary Helen Pierce recalls, Maria "died when she was thirty-nine due to cirrhosis of the liver, as a result of [her]

28

heavy drinking." Exh. 3, Declaration of Mary Helen Pierce, para. 11.

## C.  Conception by rape.

52.    David Ramirez was the product of rape. His uncle Freddie is also his father. Freddie Garza, her brother-in-law, raped Maria in a car when she was barely fifteen years old. An aunt witnessed this rape and recalls that Mr. Garza continued to have sex with Maria after this incident. This traumatic event was to change Maria forever.

53.    As David's aunt Mary Helen Pierce recalls, her sister Maria Ramirez:

> [W]as raped, when she was about 14 years old, by the husband of our older sister, Herminia Naranjo. His name was Freddie Garza, and David was [conceived] as a result of that rape. Maria never wanted or loved David because of this.

Exh. 3, Declaration of Mary Helen Pierce, para. 3.

54.    David's aunt Eloise Arce, who was present at the time of the rape, recalls:

> I was in the same car when Freddie Garza raped my sister Maria in 1956, when Maria was about 15. Freddie Garza continued having sex with her regularly after that. David Ramirez was born to Maria as a result of those rapes. Freddie is David's father and also his uncle, having married Maria's sister prior to that.

Exh. 4, Declaration of Eloise Arce, para. 3.

29

55.     After learning that she was pregnant as a result of the rape, David's

mother attempted in vain to abort the fetus.  Mary Helen Pierce recalls that her sister

Maria:

> [T]ried to abort David Ramirez by jumping off the counter in our
> home.  The noise woke me up one night, and Maria told me she
> was trying to lose the baby that way because somebody told her
> that it would cause her to abort.  She continued to jump off the
> counter several more times after telling me what she was up to.

Exh. 3, Declaration of Mary Helen Pierce, para. 4.

56.     Eloise Arce also recalls that her sister Maria:

> [T]ried to abort David Ramirez using herbal recipes that she got
> form some of the older women in the filed camps they all
> worked at.  I saw her take these herbal remedies frequently,
> hoping that she could abort the fetus.

Exh. 4, Declaration of Eloise Arce, para. 4.

57.     A childhood rape by a close relative and the subsequent birth of an

unwanted child scarred Maria for life.  As Eloise Arce notes, "My sister Maria was

never the same after she became pregnant with David.  She lost her sense of self

worth, and she didn't care about anything for the rest of her life.  *Id.*, para. 25.  In

regard to her relationship with David, Eloise recalls, "Maria never learned to be a

mother because of all the hate she had inside after what happened to her." *Id.*, para.

30

33. Furthermore, "David did not get any love or nurturing from Maria, and no mother/child bond was ever formed between them." *Id.*, para. 3.

58.    After David was born, Maria became involved with a number of different men. As David's stepfather Richard Garcia recalls:

> Maria had four children when I met her: David Ramirez, Mary Castillo, Cynthia Orozco, and Michael Ramirez. All four of the children were fathered by different men. Maria also had another child that died as an infant.

Exh. 2, Declaration of Richard Garcia, para. 4.

59.    Maria had eight children by four different fathers, of which David Ramirez was the oldest. TR 10/19/90 at 36, 37, 71. She would frequently leave David and the other children alone, even when they were very young, so that she could go out drinking at the bars, often accompanied by her mother, Benita. Sometimes Maria would leave the children alone for two or three days at a time. This was a regular occurrence until David married and left home at age seventeen.

60.    In addition to the eight children who survived, Maria also gave birth to another child that died as an infant as a result of her neglect. The child was born when David Ramirez was approximately ten years old. Early one winter morning, one of Mr. Ramirez's aunts brought his mother Maria home after a night of drinking.

31

The aunt noticed that there was no heat in the house and that no adult was present. David Ramirez and the other children were home alone, sleeping. They found the infant on the couch --- dead. This event caused Maria to sink into a deeper depression, fueled by her continued alcoholism. Exh. 4, Declaration of Eloise Arce, para. 34.

### D. The childhood of David Ramirez.

61.     Because of Maria's neglect, David Ramirez was often shuffled around from family member to family member. An aunt, who lived with David from the time he was about a year and a half to age three, describes him as a very frightened child. He would urinate on himself if scolded or if he thought he was going to be punished. He was a slow learner who often had difficulty grasping ideas. Exh. 4, Declaration of Eloise Arce, para. 7, 9.

62.     David suffered from malnutrition as a child. As his aunt Eloise Arce recalls:

> David Ramirez suffered from malnourishment while growing up because his mother was never around to properly feed and take care of him. He was a skinny little thing, and he would sometimes go 2 or 3 days without eating while Maria was out drinking and partying at the local bars and cheap hotels.

Exh. 4, Declaration of Eloise Arce, para. 5. David's stepfather Richard Garcia

32

similarly recalls that:

> David used to hoard food in his room. I felt it was because he had suffered hunger in the past. David was extremely thin when I met Maria, and I believe he suffered from malnutrition. David and the other kids did not eat properly because Maria was too busy partying at the bars. Benita or one of David's aunts had to step in and feed the kids when Maria would abandon them for two or three days at a time. The only reason David liked going to school was because of the hot lunches he received.

Exh. 2, Declaration of Richard Garcia, para. 6.

63.     Among his siblings and cousins, David stood out as being "different." His developmental milestones came much later in life. He had an extremely short attention span and was unable to grasp abstract concepts. David was considered "not right mentally" by almost everyone with whom he interacted.

64.     David's aunt Herminia Naranjo recalls:

> I remember that David did not start talking until he was about 3 years old, unlike the other children. He never learned to do things at the same rate as his uncles, Tony and Armando, who were younger than David. David was slower that Tony and Armando, and he was always embarrassed and uncomfortable about that around other people.

Exh. 5, Declaration of Herminia Naranjo, para. 4.

65.     David's aunt Eloise Arce similarly recalls:

> David Ramirez lived with me and my family from the age of about 18 months until he was almost 3 years old. David did not learn to talk

33

properly until he was about 3 years old, much later than my own kids. David used to do what I called the "butt shuffle" along the floor because he never learned to walk until he was well past his second birthday. My daughter, who was 2 years younger than David, learned to walk and talk at a much earlier age.

Exh. 4, Declaration of Eloise Arce, para. 6. In regard to his toilet training, Eloise

notes:

Even at age 3, David Ramirez [was] still soiling his diapers. Even as an older child, David also urinated on himself. He would urinate on himself if you scolded him or if he thought he was going to be punished.

*Id.*, para. 7. In regard to his overall mental functioning, Eloise recalls:

David was a much slower learner than my other children. He had difficulty grasping ideas. My former husband was a teacher, and he tutored David as a child. I always felt that David was not right mentally, and that his mother's alcoholism and all the other things that happened to him as he grew up contributed to that. David never had a chance to succeed because his mental functioning would not allow him to.

*Id.*, paras. 9 and 10.

66. David's uncle John Pierce, who worked as a policeman for the City of

Phoenix when David was a child and observed his behavior and interaction with his

mother and siblings as he grew up, recalls:

David Ramirez was passive, shy, and immature for his age as a child. David was slow in his responses and verbal replies. I and other people would talk to David, but he was just not there.

34

There were no expectations of David because he just couldn't do
things.

Exh. 6, Declaration of John Pierce, para. 4. John Pierce continues, "In my opinion,
David's development was delayed by the family circumstances." *Id.*, para. 6.

61.    David's stepfather Richard Garcia recalls that, "David was slower and
had more problems learning than my other four kids. David never read on his own
and he never made any drawings or wrote notes to his mother or grandmother, even at
Christmas or on their birthdays." Exh. 2, Declaration of Richard Garcia, para. 5.
Richard continues:

> I remember that David used to wet himself as a youngster, even
> at 8 or 9 years old. At that age David could not sit still long
> enough to watch a half hour cartoon show, like the other kids
> did. He would wander off in the middle of the show to be by
> himself. David often isolated himself from the other kids,
> sometimes talking to himself or his pillows for hours. He
> seldom made eye contact with adults, and he withdrew further
> into his own little world when he was under stress.

*Id.*, para. 7.

62.    David also had difficulty doing such simple activities as tying his own
shoes:

> David could not tie his shoes properly as a 10 year old. He
> always wanted his mother to get him slip-on shoes to avoid the
> struggle of tying them. Even at age 12, he had trouble lacing his
> shoes and then tying a knot. I remember that he wore his shoes

35

backwards, long after the other kids learned how to put them on correctly.

*Id.*, para. 8.

63.     Nor could David make simple repairs:

> At the age of 11 or 12, David could not fix things. When his bicycle got a flat, it would sit for weeks, unless David's uncle Julian fixed it. My other kids learned to fix a flat at 8 or 9 years old.

*Id.*, para. 10.

64.     In regard to David's ability to grasp abstract concepts, Richard also recalls that:

> David attended Sunday School for a while when he was about 10, along with his younger siblings. Unlike his younger brothers and sisters, David could not understand the concept of God and the Bible, so he never wanted to attend classes. When David did attend, he did not speak up in class.

*Id.*, para. 11.

65.     David also had problems with hygiene:

> David had terrible hygiene and he would not wash his hands before eating, even if they were filthy. He had to be forced to do so. He never seemed to learn that simple routine. At 10, he could not bathe properly, taking what I called "the world's quickest baths." He did not comb his own hair, so somebody else would comb it for him.

*Id.*, para. 12.

36

DMR Disclosure 0280

66.     Nor could David properly use dining utensils:

> David could not use eating utensils properly, even at age 10. He used a spoon for everything, and he told me that he didn't like to use a fork because "You poke your mouth with it." David could not cut up a hot dog with a knife like the other kids because he found it impossible to hold food and cut it at the same time.

*Id.*, para. 13.

67.     Even as a teenager, basic math concepts eluded David. Richard recalls that:

> David worked at a store in California when he was 14-15 years old. He stole a box of 100 items that sold for $1 each at the store. He told me that he planned to sell them for 50 cents each, so I asked him how much he would make. He could not figure out the total amount that he would make once he sold all the items, and after thinking about it for a minute, he told me "none of your business."

*Id.*, para. 16.

68.     Other times David's behavior was simply inexplicable:

> I remember on one occasion, I looked out the back window and I saw David outside playing with a clothesline. When I checked on him a few minutes later, I saw him twirling and dangling from the clothesline by his neck. David never cried out or attempted to free himself, he simply hung there and looked at me as I cut him down. He appeared to pass out and when I got him on the ground and asked him what happened, he simply told me that he was only playing. David could not explain what happened or how he got tangled in the line.

37

DMR Disclosure 0281

*Id.*, para. 9.

69.    Growing up David had few friends. Those that he did have tended to be younger and often used him. David's stepfather Richard Garcia recalls that "David did not have many friends and I don't recall him bringing any of them by the house." Exh. 2, Declaration of Richard Garcia, para. 17. Richard further recalls that "David spent hours alone in my car playing with the radio dial, rather than joining the other kids at play. He was not a happy child growing up." *Id.*, para. 7.

70.    David's aunt Mary Helen Pierce recalls that:

> David hung out with his uncles Armando and Tony, who were younger than David. Armando and Tony were more clever than David, and they took advantage of him when playing games or getting into mischief. David got picked on because he was quiet and he could not defend himself as well as Armando and Tony.

Exh. 3, Declaration of Mary Helen Pierce, para. 6.

71.    In regard to his relationship with his younger uncles Armando and Tony, David's aunt Eloise Arce recalls:

> Although David Ramirez was older than his uncles Tony and Armando, he was slower than they were. Tony and Armando took advantage of David and used him as a pawn to hustle up marijuana, booze, or spending money as pre-teens and teenagers. They knew they could let David take the risk of getting caught.

38

Exh. 4, Declaration of Eloise Arce, para. 11.

### E. Difficulties in School.

72.    Because of her alcoholism, Maria found it difficult to hold down a steady job.  As a result, she was constantly moving from place to place with her children.  TR 10/19/90 at 33-34, 53, 65.  As evidenced by the frequency with which he changed schools, David Ramirez's school records illustrate this chaotic home life. Td. 149, Exhibit C to sentencing memorandum.

73.    During the 1963-64 school year, when David was in first grade, he attended three different elementary schools.  Td. 149, Exhibit C to sentencing memorandum.  The following year, when David was in second grade, he attended five different schools.  *Id.*

74.    David was apparently retained in the second grade twice, since he was not promoted to third grade until 1967.  Td. 149, Exhibit C to sentencing memorandum.  From the ages of ten to thirteen, David Ramirez changed elementary schools in Phoenix three more times.  *Id.*

75.    During his school years, David Ramirez was given at least four different IQ or achievement tests.  The scores on these tests illustrate Mr. Ramirez's intellectual deficits.  *See* para. 99, *infra*.

39

76.     As his aunt Mary Helen Pierce recalls:

> David did very poorly in school, and he was much slower than my own kids.

Exh. 3, Declaration of Mary Helen Pierce, para. 5.

77.     David's stepfather Richard Garcia recalls that:

> David always had an excuse for not doing his homework. He often told me that he didn't have any homework when he actually did. He would claim that he lost his homework. He would hide his schoolbooks so he wouldn't have to attempt to do homework. David did not have the capacity to learn at the same rate as his schoolmates and he could not keep up with his schoolwork. He always did poorly in school.

Exh. 2, Declaration of Richard Garcia, para. 14. Richard further recalls:

> I would ask David simple questions such as "How much is 2 plus 2?" David would never try to answer, and instead would say things like "You know the answer" or "Why do you want to know?" I got the impression he was avoiding answering because he didn't know. I once showed David my check stub when he was 10 or 11, and asked him to tell me what the amount was. David could not and again his answer was, "You already know." I believe what David needed were Special Education classes.

*Id.*, para. 15.

78.     David then moved to California and during the 1971-1973 school years attended eighth and ninth grades at El Monte. Td. 149, Exhibit F to sentencing

40

memorandum.  His grade cards from El Monte consist mainly of D's, with one lone A for citizenship. *Id.*

**Specific adaptive behavior deficits identified in Mr. Ramirez.**

<u>Conceptual Adaptive Behavior Skills</u>

79.    <u>Receptive language</u> --- As indicated above, David Ramirez's uncle John Pierce, who was a policeman for the City of Phoenix when David was a child, related that he and others would try to talk to David "but he was just not there.  There were no expectations of David because he just couldn't do things."  Exh. 6, Declaration of John Pierce, para 4.

80.    <u>Expressive language</u> --- David did not start talking until he was about 3 years old, much later than his siblings and cousins Exh. 5, Declaration of Herminia Naranjo, para. 4; Exh. 4, Declaration of Eloise Arce, para. 6.  According to his uncle John Pierce, David was 'slow in his responses and verbal replies." Exh. 6, Declaration of John Pierce, para. 4.)

81.    <u>Reading</u> --- As a child, David would never read on his own  Exh. 2, Declaration of Richard Garcia, para. 5.

82.    <u>Writing</u> --- As a child David never made any drawings or wrote notes to his mother or grandmother, even at Christmas or on their birthdays  Exh. 2,

41

Declaration of Richard Garcia, para. 5.

83.   Money concepts --- Even as a teenager, basic math concepts eluded David. As set forth above, his stepfather Richard Garcia recalls an incident in which David worked at a store in California when he was 14-15 years old. David stole a box of 100 items that sold for $1 each at the store and told his stepfather that he planned to sell them for 50 cents each. When Richard asked him how much he would make, David could not figure out the total amount. Exh. 2, Declaration of Richard Garcia, para. 16.

84.   Self-direction --- David was not self-directed. Again, as set forth above, David always had an excuse for not doing his homework. He often told his stepfather Richard Garcia that he did not have any homework when he actually did. He would also claim that he lost his homework. He was also known to hide his schoolbooks so that he wouldn't have to attempt to do homework. Exh. 2, Declaration of Richard Garcia, para. 14.

**Social Adaptive Behavior Skills**

85.   Interpersonal --- As set forth above, David was "passive, shy, and immature for his age as a child." Exh. 6, Declaration of John Pierce, para. 4. Even at the age of 8 or 9, David could not sit still long enough to watch a half hour

42

cartoon show along with the other kids. He would wander off in the middle of the show by himself. David often isolated himself from the other kids, sometimes talking to himself or his pillow for hours. He seldom made eye contact with adults, and he withdrew further into his own little world when he was under stress. According to David's stepfather Richard Garcia, David did not have many friends and "I don't recall him bringing any of them by the house." Exh. 2, Declaration of Richard Garcia, para. 2.

86.    Gullibility --- David hung out with his uncles Armando and Tony, who were younger than him. According to David's aunt Mary Helen Pierce, Armando and Tony were more clever than David, and they took advantage of him when playing games or getting into mischief. David got picked on because he was quiet and could not defend himself as well as Armando and Tony. Exh. 3, Declaration of Mary Helen Pierce, para. 6.

87.    Naiveté --- See above.

88.    Follows rules --- He had problems understanding and following rules. He engaged in dangerous behaviors; i.e crossing the street without looking. He engaged in petty theft from early on. Exh. 2, Declaration of Richard Garcia, para. 16, 18.

43

89. Avoids victimization --- As set forth above, although David Ramirez was older than his uncles Tony and Armando, he was slower than they were. According to David's Aunt Eloise Arce, Tony and Armando took advantage of David and "used him as a pawn to hustle up marijuana, booze, or spending money as pre-teens and teenagers. They knew they could let David take the risk of getting caught." Exh. 4, Declaration of Eloise Arce, para. 11.

90. Other --- As detailed above, David attended Sunday school for a while when he was about 10, along with his younger siblings. Unlike his younger brothers and sisters, David could not understand the concept of God and the Bible, so he never wanted to attend classes. When David did attend, he did not speak up in class. Exh. 2, Declaration of Richard Garcia, para. 11.

**Practical Adaptive Behavior Skills**

91. Eating --- As set forth above, even at the age of ten, David could not use eating utensils properly. He used a spoon for everything, and would tell his stepfather that he didn't like to use a fork because "You poke your mouth with it." David could not cut up a hot dog with a knife like the other kids because he found it impossible to hold food and cut it at the same time. Exh. 2, Declaration of Richard Garcia, para. 13.

44

92.    Transfer/mobility --- As set forth above, David used to do what his aunt Eloise referred to as the "butt shuffle" along the floor because he did not learn to walk until well past his second birthday, much later than Eloise's own daughter who was two years younger than David  Exh. 4, Declaration of Eloise Arce, para. 6. Even as a ten year old, David could not tie his shoes properly.  He always wanted his mother to get him slip-on shoes to avoid the struggle of tying a knot.  He continued to wear his shoes backwards long after the other children learned how to put them on correctly  Exh. 2, Declaration of Richard Garcia, para. 8.

93.    Toileting --- According to his aunt Eloise, David was still soiling his diapers at age three.  Even at the age of eight or nine, David continued to urinate on himself.  He would urinate on himself if you scolded him or he thought he was going to be punished.  Exh. 4, Declaration of David's aunt Eloise Arce, para. 7; Exh. 2, Declaration of Richard Garcia, para. 7.  David had terrible hygiene and would not wash his hands before eating, even if they were filthy.  He had to be forced to do so. He never seemed to learn that simple routine.  At 10 he could not bathe properly, and took what his stepfather referred to as "the world's quickest baths."  He did not comb his own hair.  Someone else would have to comb it for him.  Exh. 2, Declaration of Richard Garcia, para. 12.

45

## Instrumental Activities of Daily Living

94.   Meal preparation --- As set forth above, David's stepfather Richard Garcia, "David used to hoard food in his room. I felt it was because he had suffered hunger in the past. David was extremely thin when I met [his mother], and I believe he suffered from malnutrition." Richard also believes that the only reason David enjoyed going to school was because they served hot lunches. Exh. 2, Declaration of Richard Garcia, para. 6.

95.   Transportation --- When he was 11 or 12, David could still not fix a flat on his bicycle, even though his siblings learned how to fix a flat when they were 8 or 9. His bicycle would sit for weeks unless his uncle Julian would fix it for him. Exh. 2, Declaration of Richard Garcia, para. 10.

96.   Money management --- Basic math and money management concepts have always eluded David. As set forth above, his stepfather Richard Garcia recalls asking David such simple questions as "How much is 2 plus 2?" David would never try to answer, but instead would say things like "You know the answer" or "Why do you want to know?" Richard got the impression that David avoided answering because he didn't know the answer. When David was 10 or 11, Richard showed him his check stub and asked David to tell him what the amount was. David could

46

not and again his answer was, "You already know." Exh. 2, Declaration of Richard Garcia, para. 15.

97.   Maintain safe environment --- As a child, David was known to place himself in life threatening situations with no apparent understanding of how he got there or how he could extricate himself. As set forth above, his stepfather Richard Garcia once looked out the back window and saw David outside playing with a clothesline. When he checked on him a few minutes later, Richard saw him twirling and dangling from the clothesline by his neck. David never cried out or attempted to free himself. He simply hung there and looked at his stepfather as he cut him down. David appeared to pass out when Richard got him on the ground, and when asked what happened, David replied that he was only playing. David was unable to explain what happened or how he got tangled in the line. Exh. 2, Declaration of Richard Garcia, para. 9.

98.   Etiology --- As set forth in the social history in this declaration, there are multiple risk factors present in David Ramirez's background that could have caused his mental retardation. Paragraph 21 sets forth the potential risk factors for mental retardation. Some of those listed which are present in Mr. Ramirez's background include:   poverty, domestic violence, parental drug/alcohol abuse,

47

parental immaturity, and child abuse/neglect.

## Age of onset in which mental retardation was identified

The information provided by relevant witnesses and the records reviewed clearly indicate that Mr. Ramirez's cognitive deficits are developmental in nature and existed prior to the age of 18.

99. The following is a table setting forth the results of all available intelligence tests conducted on David Ramirez prior to his 18th birthday:

| Tests Administered to David Ramirez prior to age 18 | | | |
|---|---|---|---|
| Date Tested | Age | Test Used | IQ, or other score, attained |
| 2/14/67 | 9 | WISC[1] | 70 |
| 10/6/69 | 12 | WISC | 77 |
| 10/71 | 15 | California Test of Mental Maturity | 69 |

---

[1]The record also lists the Stanford-Binet as another test employed, but it appears from the format of the record that Mr. Ramirez was given the WISC. Td. 149, Exhibit C to sentencing memorandum.

48

| 10/71 | 15 | California Achievement Test | Reading Vocabulary 4.2[2]<br>Reading Comprehension 4.4<br>Arithmetic Reasoning 6.2<br>Arithmetic Fundamentals 5.3<br>Mechanics of English 5.5<br>Spelling 6.4 |
|-------|-----|-----|-----|

100. Prior test results for Mr. Ramirez indicate that he consistently exhibited significant subaverage intellectual functioning from a young age. At age nine, school records indicate that Mr. Ramirez was given a WISC intelligence test and he received a full scale IQ score of 70, which is within the range of mental retardation. Just two years later, Mr. Ramirez is retested on the WISC and he receives an IQ score of 77. However, with the standard error of measurement being approximately five points, and when the well-known practice effect and other factors are taken into account, this score is consistent with the prior score.

101. School records also indicate that at age fifteen, Mr. Ramirez was given the California Test of Mental Maturity, a group administered intelligence test modeled after the Stanford-Binet IQ Test. Mr. Ramirez received a total IQ

---

[2]The first number indicates a scale score the same as the average student (i.e., student at the 50th National percentile) in that grade (here, it would be Fourth grade). The second number reflects the month of that grade (i.e. score same as average student in the second month of the Fourth grade). See Exh. 7, fax from McGraw-Hill.

49

score of 69 on this test, another score which is within the range of mental retardation.

102. At age fifteen, school records indicate that Mr. Ramirez was also given the California Achievement Test, a group administered test. Mr. Ramirez was tested for reading vocabulary, reading comprehension, arithmetic reasoning, arithmetic fundamentals, mechanics of English, and spelling. Even though Mr. Ramirez was fifteen, his scores on these tests indicate that his intellectual functioning was significantly below that of the average child his age. For instance, in reading vocabulary and comprehension, Mr. Ramirez's scores were what would be expected of an average student in fourth grade. His scores in the other areas tested (Arithmetic Reasoning and Fundamentals, Mechanics of English, and Spelling) fell within the fifth and sixth grade range.

50

103." In addition to interviewing and testing Mr. Ramirez, I reviewed numerous records, including declarations chronicling the poverty, malnutrition, physical abuse, alcoholism, exposure to neurotoxins, and closed head injuries suffered by Mr. Ramirez *in utero*, as a child, and throughout his adult life. I also personally interviewed several family members. These declarations, the documents reviewed, and the family interviews, attest to the many deficits in adaptive behaviors that Mr. Ramirez exhibited prior to the age of 18.

## CONCLUSIONS:

105. From the materials reviewed and the interviews I conducted with David Ramirez and his family members, it is evident that many of the risk factors for mental retardation existed in Mr. Ramirez's life. These were present at the prenatal, perinatal and postnatal stages. His mother was exposed to teratogenic substances (alcohol, pesticides, etc.) while pregnant.

106. Her environment was extremely stressful. David was conceived as a result of her rape at the age of fifteen by a close relative who continued to have sexual relations with her. She unsuccessfully attempted to abort the fetus by repeatedly jumping off a counter and also through the use of herbal recipes she obtained from the older women in the migrant field camps. David's mother, a lifelong alcoholic, started

51

drinking alcohol when she was thirteen. Her drinking got worse when she became pregnant with David.

107. Postnatally Mr. Ramirez was exposed to poverty, malnutrition, and neglect. He lacked opportunities for proper stimulation and direction. There were no interventions to assist with his identified delays in developmental stages.

108. I evaluated Mr. Ramirez in a quiet test surrounding, free from distractions. Mr. Ramirez exhibited good rapport with me and expended good effort. I tested Mr. Ramirez with multiple measures of the same domain and obtained the same or similar results. These consistent results confirm that Mr. Ramirez expended his best effort and did not malinger. Objective evidence of his good cooperation was provided by the Test of Memory Malingering (TOMM), a measure of malingering and exaggeration of memory deficits. Mr. Ramirez's score on this test demonstrates that he was putting forth his best efforts. He obtained a score 48 (2 errors) in the 1st trial and a score of 50 (0) errors in the second trial. He also performed well in the CARB, a test specifically developed to identify an individual=s cooperation and effort in the testing process. Mr. Ramirez obtained a Type I result: "This person gave a good effort on this test."

109. In my opinion, to a high degree of professional certainty, the evaluation

52

results are valid indicators of Mr. Ramirez's present mental functioning.

110.    In addition to the diagnosis of mental retardation, the tests I administered to David Ramirez also revealed significant brain dysfunction, particularly in measures of frontal lobe function. The results of these tests were confirmed by a neurophysiological test which provides a quantitative analysis of Mr. Ramirez's brain waves, called a quantitative electroencephalography or "QEEG." Mr. Ramirez's QEEG results are attached. Exh. 9, QEEG. The brain's frontal lobes control judgment, inhibition, concentration, self control, conscience, personality and emotional traits, cognition, memory, motor speech and movement skills. The frontal lobe is the area of the brain responsible for higher cognitive functions. These include: problem solving, spontaneity, memory, language, motivation, judgment, impulse control, and social and sexual behavior.

111.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on _DECEMBER 14_, 2004, at _ENCINITAS, CA_.

_RICARDO WEINSTEIN_ Ph.D

53

# EXHIBIT HH

# EXHIBIT HH

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

**SERGIO I. MARTINEZ, PH.D.**
**LICENSED PSYCHOLOGIST**                               *FORENSIC PSYCHOLOGY*

*7624 N. La Cholla Blvd.-Tucson, Az. 85741*
*Phone: 520/297-9638 - Fax: 520/297-9634*

## FORENSIC PSYCHOLOGICAL REPORT
### (Confidential)

| | |
|---|---|
| **DEFENDANT:** | **MARTINEZ-RAMIREZ, DAVID** |
| **D.O.B.:** | 04-07-57 (48 yrs. 9 mos.) |
| ETHNICITY/GENDER: | Hispanic (Mexican Descent) Male |
| CASE NO.: | CR- 1989-005726 |
| PRESIDING JUDGE: | Hon. Thomas W. O'Toole, Superior Court of Arizona, Maricopa County, Phoenix, Az. |
| REFERRAL SOURCE: | John Pressley Todd, Assistant Attorney General State of Arizona |
| EXAMINATION DATE: | 01-11-06 |
| PLACE: | ASPC, Eyman Prison Complex-SMU-II, Florence, Az. |
| REPORT DATE: | 11-20-05 |

## PURPOSE OF EXAMINATION:

The above-named Defendant, henceforth, Mr. Ramirez, was referred for psychological examination on a Court-ordered Motion to determine whether he is mentally retarded pursuant to A.R.S. 13-703.02, (A), (E), (K).

For purposes of this examination, "Mental Retardation" as defined in A.R.S. 13-703.02, (K) 2, "means a condition based on a mental deficit that involves significantly subaverage general intellectual functioning, existing concurrently with significant impairment in adaptive behavior, where the onset of the foregoing conditions occurred before the defendant reached the age of eighteen." A.R.S. 13-703.02, Section K-1 defines "Adaptive Behavior" as "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group."

Similarly, the Diagnostic and Statistical Manual of Mental Disorders-IV Edition (DSM- IV) requires the following criteria for a diagnosis of mental retardation:

Significantly subaverage intellectual functioning: an IQ of approximately 70

Ψ

**David Martinez-Ramirez**
Forensic Psychological Report
Page 2 of 17

> or below on an individually administered IQ test…Concurrent deficits or
> impairments in present adaptive functioning (i.e., the person's effectiveness in
> meeting the standards expected for his or her age by his or her cultural
> group) in at least two of the following areas: communication, self-care,
> home living, social/interpersonal skills, use of community resources, self-
> direction, functional academic skills, work, leisure, health, and safety…
> The onset is before age 18 years. (DSM-IV, pg.46).

The American Association on Mental Retardation (AAMR; 1992, 2002b) provides the following
definition of mental retardation:

> For the diagnosis of mental retardation, significant limitations in adaptive behavior
> should be established through the use of standardized measures normed on the
> general population, including people with disabilities and people without disabilities.
> On these standardized measures, significant limitations in adaptive behavior are
> operationally defined as performance that is at least two standard deviations below
> the mean of either (a) one of the following three types of adaptive behavior:
> conceptual, social, or practical, or (b) an overall score on a standardized measure
> of conceptual, social, and practical skills (p.76), (In Adaptive Behavior Assessment
> System II, 2003, pg. 9.)

**EXAMINATION PROCEDURES:**

Extensive Review of Records (See Attachment # 1)
Mental Status Examination
Clinical Interview
Reynolds Intellectual Assessment Scales (RIAS)
Wechsler Adult Intelligence Scale- III (WAIS-III)
Adaptive Behavior Assessment II (ABAS-II)
Test of Memory Malingering (TOMM)

**INFORMED CONSENT:**

Prior to the onset of the examination, Mr. Ramirez was appraised as to the purpose and nature of
this examination and the limits of confidentiality, being that this was a Court-ordered evaluation.
Mr. Ramirez indicated that he understood the information given and agreed to undergo
examination. The Examination was conducted in English, with occasional use of jargon in
Spanish by Mr. Ramirez and the Examiner, as appropriate within the context of general
conversation. In reference to his understanding of the reason for the examination, Mr. Ramirez
stated, "To see whether or not I am mentally retarded. To see what my I.Q. is." The interview
and assessment process lasted approximately four and-a-half hours of direct face-to-face
interaction.

Ψ

David Martinez-Ramirez
Forensic Psychological Report
Page 3 of 17

## MENTAL STATUS EXAM/BEHAVIORAL OBSERVATIONS:

The following clinical observations were noted during the interview and examination process.

- **Appearance:** Mr. Ramirez was dressed in the usual prison attire. He presented with good personal hygiene and grooming, particularly for prison standards. He appeared to be slightly younger than his stated age. He seemed to be in adequate physical shape. There were no visible or unusual physical characteristics noted aside from various tattoos on his forearms. He remained shackled at the ankles. Both hands were free to perform needed testing tasks.

- **Behavior:** Mr. Ramirez was friendly, cooperative and attentive. Rapport was easily established. He seemed comfortable, trusting and adequately interactive throughout the interview and testing session. He did not make socially inappropriate comments or actions of an aggressive, threatening or hostile content toward the Examiner, although he occasionally stated with a sense of humor that he was going to have to beat up the Examiner because the testing was interfering with his soap opera time. His overall demeanor was of a jovial but mature quality. He occasionally complained that he was tired of having to undergo so many tests by various doctors. His statements, however, were colored with a slight sense of humor/teasing, as he continued to fully participate with the examination. He seemed to posses a normal sense of self esteem as evidenced by his somewhat confident and at times amusing attitude.

- **Mood and Affect:** Mr. Ramirez's mood was within normal limits. He smiled and laughed at appropriate times during the session. At the end of the session he stated that he was going to tell his friend on the cell next to his, Cody Martinez, that he had beaten up the doctor (Examiner) and knocked out his teeth because he had made him miss his favorite soap opera. His statement was mixed with a degree of off-color humor as he added, "That'll mess with his head for a while, just kidding." He did not report experiencing any serious difficulties with his mood. He denied any suicidal thinking. Sleep, appetite, and general level of energy were reported as normal. There were no indications of overt impulsivity, anger, anxiety, worry, or fear noted.

- **Speech:** Mr. Ramirez's speech was clear and easy to understand. There was no evidence of stuttering, word-finding difficulties or obvious language impairments. There were no indications of difficulties with expressive or receptive language functions.

- **Perceptual Functioning:** Perceptual disturbances were not evident. He did not report past or present experiences with auditory, visual, tactile, or olfactory hallucinations or loss of contact with reality.

- **Thinking Processes:** Thinking was logical and goal-directed. His responses were relevant. There was no evidence of flight of ideas or jumping from one topic to another

Ψ

in a disconnected fashion.  There was no evidence of delusional, paranoid, suicidal, or homicidal ideation.

- **Intellectual Functions:**  Mr. Ramirez was alert and oriented to self, place, time, and general situation.  Remote and recent memory, concentration, attention, comprehension, and fund of general information were considered to be within normal limits.  He was able to process verbal information at a normal rate.  There were no obvious or significant reasoning deficits noted in his overall presentation or manner of interacting with the Examiner. He was able to follow instructions and did not require frequent repetition of questions from the Examiner. He evidenced low or poor vocabulary skills that were considered to be consistent with an impoverished educational background.  There was no evidence of mental fatigue noted during the nearly four and-a-half hour examination.

**RELIABILITY OF SELF-REPORTED SYMPTOMS AND OBSERVED BEHAVIORS:**

Mr. Ramirez's observed behavior during examination is not characteristic of a conscious effort to fabricate or exaggerate cognitive deficits, or appear more psychologically impaired than what in fact may be the case.  An effort to feign symptoms is not suspected. This is based on clinical impression along with the results obtained from the Test of Memory Malingering which were within normal limits.

**CLINICAL INTERVIEW:**

The following information was obtained from Mr. Ramirez with the benefit of corroboration from available records. The value of the opinions and conclusions provided in this report is dependant upon the completeness and accuracy of the available records and the information provided by Mr. Ramirez.

**Family Hx.:**  Mr. Ramirez reports that he is divorced.  He stated he was married at the age of seventeen and that his marriage lasted approximately eleven years.  He has two adult sons who are now twenty-seven and twenty-eight.  He reported that they are both in prison and that he corresponds with them.  He indicated that he has not seen his family in over fifteen years.  He added that all they did was cry when he talked to them. He stated that last time he saw them was at County Court.  Available records in the form of Declarations from individuals who knew Mr. Ramirez and his family during his childhood and adolescence depict a picture of an impoverished and unstable familial and social environment, with reported incidents of physical, emotional, and sexual abuse.

**Education Hx.:**  Mr. Ramirez completed 10th grade .  No other formal education is reported. Records indicate that he had an extremely low attendance record and poor academic achievement, e.g., mainly C's and D's with an occasional F.  He attended multiple elementary and secondary schools in the Phoenix, Arizona and El Monte, California area.  There is no record to indicate that he was ever placed in Special Education. Mr. Ramirez stated, "They say I

**David Martinez-Ramirez**
Forensic Psychological Report
Page 5 of 17

was in Special Ed. Don't remember any of that." During his elementary school years he was tested on two occasions with the Wechsler Intelligence Scale for Children. The Declaration of Sidney L. Wilson dated June 30, 2005 indicates that Mr. Ramirez obtained a "verbal score of 77, a performance score of **68**, and a full scale IQ of **70**", when the Wechsler Intelligence Scale for Children was administered on 2-14-67.   The Declaration of Gloria J. McConkey dated June 30, 2005 indicates that "David had a verbal IQ score of 77, a Performance IQ of **80**, and a full scale IQ score of **77**", when she tested him on   10-6-69.   A Phoenix Elementary Schools record indicates enrollment at multiple schools, along with extremely poor attendance.  In spite of his low achievement records and poor attendance, however, he appears to have been moved from fourth grade to sixth grade from Capital Elementary to Monroe Elementary school in 1969. In reference to psychological testing conducted with Mr. Ramirez by Dr. Mickey McMahon on 8/14 to 8/16 1990, in which Mr. Ramirez obtained an I.Q. of 94 on the Peabody Picture Vocabulary Test, <u>The Defendant's Sentencing Memorandum Concerning Mitigation</u> dated October 10, 1990, page 22 states, "This increase in basic intelligence may be due to the structured environment of prison where David completed his G.E.D."   A more recent letter from the Arizona Department of Corrections (ADOC) submitted by Mr. Tim Byrns, dated 12/9/05 indicates that there is no record that Mr. Ramirez earned a G.E.D. from ADOC.

**Employment Hx.:** Mr. Ramirez reported that prior to his incarceration he worked in restaurants cooking food and performing kitchen work.  He also reported having worked for a company that made wood furniture.  He indicated that his work involved manufacturing water beds and bedroom furniture.  He indicated that the location of the company was somewhere on 40th avenue and Buckeye, across from an electronics plant on 35th. He stated that the first time he worked for that company he worked on-and-off for approximately three years.  The second time he worked for the same company was for approximately three months during his brief release from prison in 1989. Mr. Ramirez added that he was required to use power tools such as sanding machines and saws, as well as instruments such as rulers and tape measures when performing his work at the wood furniture company.

The previously quoted document, <u>The Defendant's Sentencing Memorandum Concerning Mitigation</u> submitted by Mr. Ramirez' counsel on October 10th, 1990, indicates that Mr. Ramirez was allowed to work in the kitchen, landscaping, maintenance, and electronics while incarcerated.  He seems to have generally received positive reviews from his supervisors as noted by statements such as, "He does a good job and is dependable...excellent student...giving him 15 out of 15 total score in effort, responsibility, and cooperation...One of the hardest working members of the work group.  His attitude was excellent, he got along very well with his peers and with Hot Springs staff, and his behavior was beyond reproach...consistent work record." There is also indication that Mr. Ramirez experienced difficulties reintegrating himself back into the community following his release from prison in 1980.   He was evidently reprimanded at work.  He apparently confessed that he had exhibited an aggressive attitude.  He was given his job back and it was reported that, "Ramirez began working once again on August 9, 1980.  Since then, he has been exhibiting a mellow, humorous and cooperative attitude."  In 1981 he was given a 90-day satisfactory review.  The same memorandum states, "His ability and his behavior were exemplary.  His participation and work ethic excelled.  He was given excellent ratings in effort, responsibility, cooperation and neatness.  His supervisor, P.R. Bates, described

Ψ

**David Martinez-Ramirez**
Forensic Psychological Report
Page 6 of 17

David:  Resident Ramirez is a hard worker and works well with others, and his cooperation on the job is appreciated...In January of 1982, his supervisor, Mr. Woodrone, described David: works well without supervision." The same document indicates that from 1985 to 1989 Mr. Ramirez continued to receive positive job evaluations as noted by statements from his supervisors such as, "first-rate cook, and an excellent worker...takes pride in his work and keeps his area clean...a good worker who does all the jobs required, helps others and deserves a raise...good worker, giving him excellent marks...makes efforts to complete his duties. He is very cooperative and gets along with staff." It is also noted that during his incarceration prior to his release in 1989 Mr. Ramirez received a Certificate of Completion for work in the Food Service at the Arizona State Prison.  It is also noted that he often provided guidance to other inmates (see pgs. 10 to17 of said Memorandum,DMR Disclosure 0906 to 0913).

Mr. Ramirez indicated that he is not allowed to work anymore. He stated that he had at one time been allowed to work eight hours a day, but that he was discontinued after he assaulted a guard who disrespected him. He indicated that he had warned the guard that he would "eventually get his ass". He added that they stopped the chain-gangs after that incident. He admitted that he was often shot at with bird shot by the guards due to fights with other inmates while on the chain gang.

**Drug/Alcohol Hx.:** Mr. Ramirez admits to a past history of drug use. He indicated that he had used inhalants in the past. The previously noted 1990 Memorandum indicates that prior to his incarceration Mr. Ramirez had a chronic drug problem with heroin and alcohol as well.

**Psychiatric Hx.:** Mr. Ramirez reports no history of previous contact with mental health professionals other than in connection with his legal situations. He denies any history of loss of contact with reality.   He is not presently on any prescribed medications nor under the care of a mental health professional.

**Medical Hx.:** Mr. Ramirez reports stable medical/physical health.

**Current Typical Daily Routine:** Mr. Ramirez stated that he writes letters every day to correspond with his many pen-pals from different parts of the world, including England and Australia. He indicated that Annie Peters from Australia was special to him. He described her as being very rich and as owning many cattle and horses on some eighty-thousand acres in Halray. He added that she was part Ausie and part English. He also mentioned Helen Panessa as being a special friend. He stated that she visits him at the prison on Mondays from 8 to 10 in the morning and then from 1 to 2 in the afternoon for a total of four hours. He described her as being "beautiful people", a Christian, and charismatic. He added that she was very quick with words, humorous and funny, and as very loving and caring. Mr. Ramirez stated that he had made contact with his pen-pals through Life-line, an agency from England that tracks individuals who are in death row. He stated that he had received letters from Rome, Italy as well. He indicated that he answers all of his letters. Indeed, a search on the Internet revealed a webpage for David Ramirez, Arizona Death Row 039656 that was apparently set up when Mr. Ramirez was 42 years of age.

Ψ

On a typical day, Mr. Ramirez stated that he is up by 4:30 a.m. He showers and brushes his teeth, and "do all my necessities", e.g., combs his hair, shaves. He then gets out his writing materials and starts to write. He likes to listen to his Walk-man, watches T.V., or reads magazines that he ordered, e.g., "like gangster books, biographies of women, Married to the Mob, Al Capone, Murder Inc., men's magazines like Gallery, FHM (For Him), something about rucas (chicks) from T.V., sexy lingerie (spells out l-i-n-g-e-r-i-e), Maxim, Details, People magazine from my pen pal from Australia. They are more risqué, more body, naked."

With reference to television programs, Mr. Ramirez indicated that he likes to watch soap operas, comedies, TLC, Learning Channel. His favorite soap operas are in Spanish, e.g., Alborada, Rebelde, on channel 14, Univision. He indicated that he typically only watches the first five minutes of the news. He was aware of recent events in the news such as Sadam's court trial in Iraq, the war over oil, "you know they want the oil." He was particularly interested in the reported possibility that the "Salva Truchas" gangs from Peru and El Salvador might be crossing the border into Arizona, and that Ben Laden was ready to commit crimes against the U.S. He elaborated on the nature of the Salva Truchas as being a very dangerous gang moving into the Los Angeles area.

In reference to other recreational activities, Mr. Ramirez indicated that he liked to play hand-ball and exercise. He stated that inmates are not allowed to play with other inmates for fear that they would kill each other. He is also allowed to use the phone one time per week for two ten minute calls. He indicated he requires no assistance in setting up his phone calls. He also likes to engage in a game of chess with the inmate adjacent to his cell, Mr. Cody Martinez. He indicated that he and Cody play chess by using two game boards each and telling each other where to move, since they cannot see each other because they are in separate cells. He stated that Cody Martinez had moved in to the adjacent cell approximately two weeks ago and that he was on death row working on his appeal. He added that he and Cody keep up-to-date with their legal process to see if their attorneys are doing their job or just so that they get paid. He stated that he and Cody were not stupid and that they were doing their job. He indicated that he makes his own selections of books he requests from the prison library. He also indicated that at some point in his legal proceedings a Federal judge questioned the amount of money his attorneys were getting paid and that the judge later got rid of them and replaced them with Ms. Paula Harms. Towards the end of the interview, Mr. Ramirez stated that he might be going to court on the 18th or the 23rd because, "Paula said the State Attorney wants to cross-examine me. Don't know for what. Could you ask Paula about it? Tell her I need to know."

In reference to finances, Mr. Ramirez, stated that he keeps a close check on his budget. He indicated that he believed that Keefe-Co., an agency that evidently sells merchandise to inmates, was trying to cheat him. He stated that they had overcharged him for "stuff". He also stated that he had bought 985.00 dollars worth of merchandize and that D.O.C. had taken 10 percent, which they were not supposed to do. He stated, "If I got 100.00 dollars they would take 10.00 dollars off. I have $1,145.78 plus the money D.O.C or Keefe owes me; $13.50 plus $7.80. It's like $21 and 30 cents in change."

Ψ

Mr. Ramirez reported that he cleans his own cell. He likes to eat kosher foods consisting of vegetables, tomatoes, whole onions, etc. On Mondays and Sundays, and Wednesdays and Fridays he gets a T.V. dinner, his favorite being roasted chicken.

### TEST RESULTS - Intellectual Functioning:

The following test results were obtained from the **Reynolds Intellectual Assessment Scales, (RIAS)**. As noted in the test manual, "The RIAS is an individually administered test of intelligence appropriate for ages 3 years through 94 years with a co-normed, supplemental measure of memory" (pg. 1). In reference to the assessment of mental retardation, the manual indicates that, "The RIAS will be widely applicable to the diagnosis of mental retardation for which the evaluation of verbal and nonverbal intelligence as well as adaptive functioning is necessary." (pg.12).

The **RIAS** employs Index Scores with a Mean of 100 points and a Standard Deviation of 15 points to derive the final test results for any one individual.

| Domain | Index Score | Percentile Rank | 95% C.I.* |
|---|---|---|---|
| Verbal Intelligence (VIX) | 92 | 30 | 86 to 99 |
| Nonverbal Intelligence (NIX) | 91 | 27 | 85 to 98 |
| Composite Intelligence (CIX) | 91 | 27 | 86 to 97 |
| Composite Memory (CMX) | 91 | 27 | 85 to 98 |

*Confidence Interval

The RIAS results are all in the Average range of general intellectual ability, with the exception of the Composite Memory Index score (CMX) of 74 which is in the Borderline range. As can be noted, the 95 percent Confidence Interval, which provides an estimate of the Standard Error of Measurement, indicates that Mr. Ramirez' true level of intellectual abilities in the various areas assessed by the RIAS is in the **Low Average to Average range**, again, with the exception of the CMX, which is estimated to be in the Significantly Below Average to Below Average range, employing the RIAS classification labels.

In general, the above results indicate that Mr. Ramirez possess low average to average verbal reasoning abilities in the areas of vocabulary knowledge, reasoning skills, and fund of general information. He is also considered to possess average non-verbal reasoning skills in his ability to pay attention to visual detail and in distinguishing essential from nonessential components of visual stimuli. No significant difficulties are noted in his visual-perceptual skills.

Ψ

The Average Memory Composite Index score is indicative of normal immediate or short-term memory functioning employing both, auditory (verbal) and visual (nonverbal) modalities.

Results obtained from the **Wechsler Adult Intelligence Scale-III, (WAIS-III)**, a measure of verbal and nonverbal intellectual ability were as follows. The WAIS-III, also employs a Mean of 100 and a Standard Deviation of 15 in deriving the final I.Q. and Index scores.

| Domain | I.Q./Index Score | Percentile Rank | 95%  C.I. |
|---|---|---|---|
| Verbal | 87 | 19 | 82 to 92 |
| Performance (nonverbal) | 87 | 19 | 81 to 95 |
| Full Scale | 87 | 19 | 83 to 91 |
| Verbal Comprehension | 84 | 14 | 79 to 90 |
| Perceptual Organization | 91 | 27 | 84 to 99 |
| Working Memory | 94 | 34 | 88 to 101 |
| Processing Speed | 79 | 8 | 73 to 90 |

The above results are indicative of **Low Average** general intelligence. Employing a Confidence Interval at the 95 percent level, Mr. Ramirez' verbal, non-verbal, and general reasoning skills are estimated to be in the **Low Average to Average range.**

The overall WAIS-III results indicate average skills in areas of abstract concept formation, numerical reasoning, auditory attention, and common sense related to typical social situations. Low average verbal reasoning skills are noted in areas of fund of general information, and in the area of vocabulary or word-knowledge.   Average nonverbal reasoning skills are noted in areas of ability to pay attention to visual detail, spatial relations, and sequential/organizational skills. Borderline to low average skills are noted in the area of visual processing speed, as noted by the borderline Processing Speed Index score of 79. This particular Index measures an individual's ability to process visual information under pressure of time.

Ψ

**David Martinez-Ramirez**
Forensic Psychological Report
Page 10 of 17

## Adaptive Functioning:

For purposes of the present examination, the **Adaptive Behavior Assessment System- II, (ABAS-II) Adult,** (ages 16 to 89) was employed to assess various areas of adaptive functioning. As noted in the **ABAS-II** manual, "The comprehensive range of specific adaptive skills and broad adaptive domains measured by the ABAS-II correspond to the specifications identified by the American Association on Mental Retardation (AAMR;1992, 2002b) and the Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition-Test Revision (DSM-IV-TR; American Psychiatric Association (APA), 2000)". pg.1.

Information provided by Mr. Ramirez along with information obtained from the available records was utilized in completing the ABAS-II form. The overall results were as follows:

| Domain | Composite Score | Percentile Rank | 95% C.I. |
|---|---|---|---|
| General Adaptive (GAC) | 83 | 13 | 80 to 86 |
| Conceptual | 88 | 21 | 84 to 92 |
| Social | 79 | 8 | 74 to 84 |
| Practical | 82 | 12 | 78 to 86 |

The ABAS-II also employs a Mean of 100 and a Standard Deviation of 15 points in deriving the final Composite scores. As can be noted, Below Average (Low Average) skills were found in the Conceptual and Practical adaptive domains. Borderline skills were found in the Social adaptive domain. The **General Adaptive Composite (GAC) score of 83** places Mr. Ramirez in the **Below Average (Low Average) range.** The GAC score represents a comprehensive and global estimate of an individual's adaptive functioning in comparison to others in the same age range.

In reference to the specific areas of adaptive functioning, the following is provided:

**Conceptual:** This area of adaptive functioning measures communication, functional academics, and self-direction. Communication skills were considered to be in the average range. This includes areas of speech, language, vocabulary, and listening skills needed for communication. Functional academics were also found to be in the average range. This consists of skills that

Ψ

**David Martinez-Ramirez**
Forensic Psychological Report
Page 11 of 17

form the foundation for reading, writing, mathematics, letter recognition, counting, telling time, writing letters. Self-direction was considered to be in the <u>borderline</u> range. This area includes skills needed for independence, responsibility, and self-control.

**Social:** <u>Average</u> adaptive skills were noted in areas of leisure activities such as ability to engage in planning recreational activities, including playing with others and following rules in games. <u>Borderline</u> skills were found in the area of social skills. This includes skills needed to interact and get along with other people, including having friends, showing and recognizing emotions, assisting others, and using good manners. Noted antisocial traits would obviously have a negative impact upon this area of adaptive functioning.

**Practical:** <u>Average</u> skills were noted for functioning in the context of one's community, including shopping skills and use of community resources, e.g., library. <u>Average</u> skills are also noted in the ability to provide basic care of one's living setting and cooking. <u>Low average</u> skills are noted in areas needed for protection of one's health, following safety rules, showing caution, grooming, dressing, ability to hold on a job working with supervisors, etc.

## COMPARISON OF TEST RESULTS ACROSS EXAMINATIONS:

**Intellectua Functioning:** The present WAIS-III test results are considered to be comparable to results obtained by Dr. John J. Toma on 11/09/05. Although Dr. Toma obtained a VIQ of 78, a PIQ of 80, and a FSIQ of 77, he indicated that when culture was taken into consideration applying Hispanic demographic norms, all three I.Q. T-scores were in the **Low Average range.** The WAIS-III tests results from this evaluation are in the **Low Average Range, i.e., 87.**

Additional factors considered in arriving at the conclusion of comparable results between the present WAIS-III scores, when compared to Dr. Toma's results, include the level of motivation and effort put forth on the part of Mr. Ramirez during each examination, and the issue of possible practice effects. On page 3, paragraph 7 of his report, Dr. Toma states, "In addition, it appeared that poor motivation may have been a factor for some of the subtest scores. Specifically, Mr. Ramirez repeatedly stated 'I'm not mental' and that he was 'bored'. Several points were lost on some subtests, for impulsivity, low frustration tolerance resulting in lack of effort, and antisocial traits leading to responses that could not be scored in spite of the likely possibility that ability existed." For purposes of the present examination, Mr. Ramirez is considered to have established excellent rapport with the Examiner. Furthermore, aside from his occasional comments about the test interfering with his soap opera time, Mr. Ramirez is considered to have placed an adequate level of motivation and effort in completing the required testing tasks. In some respects, he seemed to enjoy the degree of interaction and attention provided during the examination process. Raw data from Dr. Toma's evaluation was not available at the time of this report which might have provided more evidence of response and scoring patterns. If any raw data is made available in the future, any needed corrections to the present conclusions based on such data will be presented in the form of an addendum report.

Ψ

The second factor considered in analyzing the scores across WAIS-III results between Dr. Toma's and this Examiner's examination is related the issue of practice effects. As noted in the WAIS-III Manual, current data is not available regarding the question about the shortest test-retest interval that will not produce significant practice effects. The Manual notes that, "Some research with the earlier Wechsler scales (Matarazzo, 1972; Matarazzo, Carmody, & Jacobs, 1980) has indicated that practice effects on the Performance subtests are minimized after an interval of 1-2 years; for the Verbal subtests, that interval is shorter." pg. 35. The updated 2002 WAIS-III Technical Manual states that the test-retest data indicate higher mean retest scores than scores obtained from the first testing due primarily to practice effects over periods of 2 to 12 weeks. The present examination was conducted eight weeks (60 days) after Dr. Toma's examination employing the WAIS-III. More specifically, the data provided in the WAIS-III Technical Manual indicated that following an average of a 35 day interval between testings, the differences due to practice effects were 2.0 to 3.2 points for the Verbal I.Q. score, 3.7 to 8.3 points for the Performance I.Q., and 3.2 to 5.7 points for the Full-Scale I.Q. Employing these practice effects data, the present WAIS-III results would be adjusted as follows:

Verbal I.Q. between 84 and 85 **(Low Average)**

Performance I.Q. between 79 and 83 **(Borderline/Low Average)**

Full Scale I.Q. between 81 and 84 **(Low Average)**

As can be noted, when the scores are adjusted for possible practice effects, the VIQ and the FSIQ are in the **Low Average range**. The PIQ is in the **Borderline to Low Average range**.

In reviewing Dr. Weinstein's WAIS-III test administration conducted on 7-29-04, scoring errors were noted that, when recalculated, yielded slightly higher overall I.Q. scores. More specifically, the Vocabulary raw score increased from 17 to 20 points after readjustments in scoring were made on items 12 and 15. The Similarities raw score increased from a score of 10 to 13 after scoring adjustments were made on items # 9, 10, and 14. The Comprehension raw score increased from 14 to 16 points based on readjustments made in scoring items 12 and 13. The Symbol Search raw score actually resulted in a lower score following re-scoring. Dr. Weinstein provided a raw score of 23 on the scoring form. The actual number of correct responses was 19 minus 4 incorrect responses, for a total score of 15. It is also noted that there were several test items that could possibly have received a higher score if Dr. Weinstein had inquired or probed further in reference to Mr. Ramirez' noted response. The WAIS-III Manual states that, "Occasionally, the examinee's response may be unclear or too vague to be readily scored, or a marginal 0 – 1-point response may indicate that a superior response could be evoked. In such instances, you may say:

Tell me more about it or Explain what you mean

Ψ

**David Martinez-Ramirez**
Forensic Psychological Report
Page 13 of 17

Or make a similarly neutral inquiry. However, no other form of questioning may be used. In the case of a clear-cut 0- or 1-point response, no such inquiry should be made. See the sample responses listed after each item for further querying guidelines." pg. 69.

When Dr. Weinstein's WAIS-III raw scores were re-calculated and converted into Scaled Scores, and I.Q./Index Scores, the following overall scores were obtained:

| Domain | I.Q./Index Score | | Percentile Rank | 95% C.I. |
|---|---|---|---|---|
| VIQ | * (71) | 74 | 4 | 70 to 80 |
| PIQ | *(74) | 74 | 4 | 69 to 82 |
| FSIQ | *(70) | 72 | 3 | 68 to 77 |
| VCI | * (68) | 72 | 3 | 67 to 79 |
| POI | * (76) | 76 | 5 | 70 to 85 |
| WMI | * (75) | 75 | 5 | 70 to 83 |
| PSI | * (81) | 73 | 4 | 67 to 85 |

*Dr. Weinstein's 7-29-04 obtained I.Q./Index Scores

**Adaptive Functioning:** The present results of adaptive functioning are estimated to be in the Low Average range across all domains on the ABAS-II, with the exception of the Social skills domain which was found to be in the borderline range, as noted in the previous table on page 10 of this report. These results are in line with the ABAS-II test results obtained by Dr. Marc J. Tasse from his ABAS-II results obtained on 5/10/05 which indicate Low Average composite scores of 88, 96, and 85 across the various adaptive domains. His final General Adaptive Composite score of 88 is slightly higher than the present GAC score, but nonetheless within the Low Average range of adaptive functioning.

Although Dr. Toma did not provide any actual scores of adaptive functioning within the body of his report, and no raw data was available to compare with the present results, he indicated in his 11/25/05 report that he found "no deficits in adaptive functioning." Dr. Toma's and Dr. Tasse's findings, with respect to the question of Mr. Ramirez' level of adaptive functioning, are considered to be consistent with the results obtained from this evaluation. Additionally, the Low Average level of adaptive functioning obtained by these evaluations is considered to be

David Martinez-Ramirez
Forensic Psychological Report
Page 14 of 17

consistent with the reported level of intellectual functioning obtained by Dr. Toma and this Examiner.

From a review of the raw data from Dr. Weinstein's ABAS-II results, it is noted that his ABAS-II Composite Scores are significantly lower (approximately two standard deviations, i.e., 30 points) than the Composite Scores obtained by this Examiner, Dr. Toma's, and Dr. Tasse's scores on adaptive functioning. Dr. Weinstein provided Composite Scores of 53, 56, and 58 on the various domain areas, with a **General Adaptive Composite score of 52**, which is in the **Extremely Low** level of adaptive functioning. The GAC of 52 is considered to be somewhat inconsistent with his findings regarding Mr. Ramirez' I.Q. of 70. This is likely due to the fact that his results are based on a retroactive assessment of Mr. Ramirez' adaptive functioning some 35 years ago rather than on an assessment employing more current level of everyday adaptive functioning. Furthermore, it is noted that Dr. Weinstein employed the ABAS-II Parent Form, Ages 5 to 21. The form was completed by Mr. Richard Garcia, step-parent, who evidently completed the form by providing information about Mr. Ramirez as he knew him between the ages of 7 to 12 years. The Parent Form, according to the ABAS-II manual, is to be used for children in grades Kindergarten through 12. The manual further states that, "adaptive skills as measured by the ABAS-II are defined as those practical, everyday skills required to function and meet environmental demands, including effectively and independently taking care of oneself and interacting with other people."


**Other Available Tests Results:**

From an historical standpoint, Dr. Mickey McMahon evaluated Mr. Ramirez on 8/90 employing the Peabody Picture Vocabulary Test which revealed an I.Q. or **94**, and that, according to Dr. McMahon, "is well within the average range of intelligence and in no way indicative of any form of mental retardation." Dr. McMahon more recently, in his Declaration dated November 5, 2000, stated that, "I would not have made this statement had I seen Mr. Ramirez's school records, which show IQ scores of 70 and 77 on the more comprehensive WISC IQ tests. These scores would have indicated to me that Mr. Ramirez may be retarded and it would have greatly expanded the nature of the evaluation I did conduct."

It is worth noting that Dr. McMahon states in his Declaration that he spent "five hours with Mr. Ramirez and an equal amount of time preparing my report." This would seem to be an adequate amount of evaluation time for Dr. McMahon to have been able to detect, via behavioral observation and clinical judgment, whether Mr. Ramirez was evidencing any significant or serious deficits in intellectual functioning, particularly since he apparently had the opportunity to meet with Mr. Ramirez on three separate occasions, as noted on page 2 of his 8/90 psychological report. It is also noted that Dr. McMahon allowed Mr. Ramirez to take the MMPI on his own. In his report, Dr. McMahon did not indicate that the results from this widely used personality test were invalid. The MMPI consists of 566 items that the examinee must answer as true or false. A sixth grade reading level of ability is required to complete the test. Roger L. Greene, in "The MMPI, An Interpretive Manual (1980), states, "Persons who score below a Wechsler Adult Intelligence Scale IQ of 80 probably will be unable to complete the MMPI." pg.15.

Ψ

**David Martinez-Ramirez**
Forensic Psychological Report
Page 15 of 17

In reference to the use of the PPVT, while it is true that this is an easily administered vocabulary test, Muriel Lezak, in Neuropsychological Assessment, Third Edition, 1995, states that, "this test goes quickly and as such may be a useful screening instrument for general mental ability. For severely impaired patients, particularly when their ability to communicate has been compromised, this test may give the examiner the best access to the patient's residual vocabulary and fund of information." pg. 542. It is likely that had Dr. McMahon observed significant language, comprehension, or reasoning deficits during his interview with Mr. Ramirez, along with a significantly low scores on the PPVT, i.e., 70 or below, he probably would indeed have "greatly expanded" the nature of his intellectual assessment of Mr. Ramirez, particularly in light of the importance and seriousness of the evaluation in the context of a possible death sentence. Furthermore, irregardless of any collateral background information that would have been available at the time of Dr. McMahon's assessment, the obtained scores on the PPVT would have remained the same since they are based on present performance and not on historical data. At a minimum, his results would have been considered inconsistent with prior assessments of Mr. Ramirez' general reasoning ability.

It is also worth noting that the results obtained by Dr. Weinstein's administration of the Wechsler Memory Scale-III indicate Index Scores that are between the Low Average to Average range. One area of memory, Auditory Recognition Delayed, shows an Index score of 115 which would place Mr. Ramirez in the High Average range of functioning on this subtest. The General Memory Index score of 95 places Mr. Ramirez well within the Average range. The WMS-III also employs a Mean of 100 and a Standard Deviation of 15 in portraying the results. Generally, WAIS-III I.Q., and WMS-III Index scores are anticipated to be moderately correlated. It is an accepted fact within clinical practice that impairment in general intellectual functioning is likely to impact upon one's performance on memory measures. Although some degree of variance can be expected between   the WAIS-III and WMS-III I.Q. and Index scores, the noted difference of 25 points between Dr. Weinstein's FSIQ score of 70 and the General Memory Index of 95 seems somewhat inconsistent.   The level of inconsistency between the WMS-III results would be considered significantly greater in the context of Dr. Weinstein's results for adaptive functioning, i.e., 40 plus points).   There appears to be no mention of the obtained WMS-III test results in the body of Dr. Weinstein's report.

Somewhat related to the above-noted discrepancies in performance across different measures of intellectual, memory, and adaptive functioning, are the results obtained by Mr. Ramirez on the Wide Range Achievement Test-3, administered presumably by Dr. Weinstein (no examiner name noted) on 11/11/04 in which Mr. Ramirez (age 37) obtained a Standard Score of 75 for Reading, a Standard Score of 103 for Spelling, and an Arithmetic Standard Score of 69. The Standard Score of 103 for Spelling, in particular, is not considered to be commensurate with Mr. Ramirez' level of intellectual and adaptive functioning as reported by Dr. Weinstein.

Other test results from cognitive and achievement testing performed by Dr. Weinstein appear to provide similar variations in level of performance across skill areas. Results from the

Ψ

David Martinez-Ramirez
Forensic Psychological Report
Pager 16 of 17

Woodcock-Johnson (W-J) for example, provided variable performances across different achievement areas that are in the low average to average range, i.e., 83 to 95 range, with a Total Achievement score of 90. With reference to cognitive performance on the W-J, it is noted that Mr. Ramirez obtained a Standard Score (SS) of 76 on the Verbal Ability sub-test, a SS of 67 for Thinking Ability, and a SS of 74 for Cognitive Efficiency. His final cognitive SS from the W-J was 71. Dr. Weinstein also administered the Comprehensive Test of Non-Verbal Intelligence for which he reported a Full Scale Standard Score of 56, or extremely low range. Generally speaking, individuals with mental retardation tend to produce rather flat test profiles across testing modalities. The more significant deficits are typically found in areas of acquired learning, i.e., achievement.

A review of the various Declarations provided by different individuals who had some knowledge of Mr. Ramirez during his childhood, adolescence, and early adulthood, for the most part, depict a picture of an individual raised in a an impoverished familial and socio-cultural environment along with evidence of physical, sexual, and emotional abuse. Mr. Ramirez is also described as having exhibited difficulties with learning. Other aspects of these Declarations depict an individual with significant antisocial traits characterized by poor school attendance, behavioral difficulties, substance abuse problems, gang affiliation, and serious legal difficulties beginning at an early age that could certainly have been considered to meet some of the criteria for a diagnosis of Conduct Disorder. Although the information in the noted Declarations was taken into consideration in the context of the present findings, this pre-morbid information did not appear to be consistent with the objective test results obtained from the present assessments of intellectual and adaptive functioning. Furthermore, a review of prison records did not reveal information that would have indicated significantly subaverage intellectual or adaptive functioning for Mr. Ramirez during his incarceration.

**DIAGNOSTIC IMPRESSION:**

In response to the referral question, it is concluded, with a high degree of psychological certainty, that Mr. Ramirez does not meet the criteria for a diagnosis of Mental Retardation as set forth in A.R.S. 13-703.02 (A), (E), (K), in that he is not considered to demonstrate, "significantly subaverage general intellectual functioning, existing concurrently with significant impairment in adaptive functioning, where the onset of the foregoing conditions occurred before the defendant reached the age of eighteen."

Thank you for asking me to provide consultation in this case. I hope that this rather lengthy report is useful in assisting the Court arrive at a final opinion regarding Mr. Ramirez' case.

Respectfully Submitted,

Sergio I. Martinez, Ph.D.
Forensic Psychologist

Ψ

**David Martinez-Ramirez**
Attachment # 1
Records Reviewed by Dr. Sergio I. Martinez, Ph.D., from 01-10-06 through 01-20-06
Page 17 of 17

The following records were reviewed in connection with Mr. David Ramirez' 01-20-06 Forensic Psychological evaluation report:

Dr. Ricardo Weinstein's Declaration and Raw Test data
Dr. John J. Toma's 11-25-05 Psychological Report
Dr. Marc J. Tasse's ABAS-II raw data dated 10-20-05
Dr. Mickey McMahon's 11-05-04 Declaration and 8-18-90 Psychological Report
Declaration of Gloria J. McConkey dated 6-30-05
Declaration of Sidney L. Wilson dated 6-30-05
Various other Declarations from individuals familiar with Mr. Ramirez' background
Mental Measurements Yearbook, 1965
McGraw-Hill Letter dated 1-22-04
Birth Certificate and School Records
Public Defender's Disclosures, Interviews
Undated and Unsigned Letter to "Hey Stalzer"
Maricopa Medical Center Records, 1980
Phoenix Police Department Records 2-6-77 to 5-4-90
Homicide Report dated 5-25-89
Maricopa County Public Defender's Reports
Arizona Department of Public Safety Records
Aggravation/Mitigation Transcript
Pre-sentence Report for Michael Anthony Sanders dated 1980 and 1990
Arizona Department of Corrections (ADOC) Visitation Records
ADOC Medical Records from 5-11-79 to 9-13-05
Social Security Employment Records
1963 Arizona Special Education Programs for Exceptional Children
Letter from Tim Byrnes, ADOC, Education Operations, dated 12-9-05

# EXHIBIT II

# EXHIBIT II

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

1      A.   Approximately 2000.

2      Q.   Correct.  And that was eight years after the AAMR

3   did away with the classification; correct?

4      A.   Yes.

5              THE JUDGE:  This is DSM-IV?

6              MR. TODD:  DSM-IV TR.

7              THE JUDGE:  Okay.

8              THE WITNESS:  And again, text revised just

9   means editing, correcting typos and stuff.

10     Q.   (By MR. TODD)  Bringing empirical data

11   up-to-date?

12     A.   The TR version is not really a new manual.  It

13   otherwise would be the DSM-V.

14     Q.   Correct.

15     A.   The TR just indicates they correct typos and

16   actually change very few definitions.

17     Q.   But some definitions?  Some definitions, Doctor?

18     A.   I'm not sure.

19     Q.   So the at least as far as that change with the

20   AAMR, the American Psychiatric Association has not

21   followed it since the change in 1992; correct?

22     A.   They've kept the level of mental retardation,

23   yes.

24     Q.   Do you believe that the AAMR in that instance has

25   lost credibility by taking positions without a

# EXHIBIT JJ

# EXHIBIT JJ

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

1    the Calderone Palomino case, Pima County case, in which
2    you and Dr. Weinstein found the client to be mentally
3    retarded.  The judge agreed you're having a little
4    trouble recalling yesterday what test was given to
5    Mr. Calderone Palomino by all three experts in that
6    case?
7        A.   That is correct, yes.
8        Q.   Would it refresh your recollection if I could
9    point you to that portion of the transcript that
10   discusses the testing in that case?
11                  THE JUDGE:   Doctor, pull the microphone
12   closer to your mouth.  See how that does as far as
13   picking up your voice.
14                  THE WITNESS:   All right.
15       Q.   (BY MS. HARMS)   Let's go to 113, page 14,
16   reflects that this is your testimony ; is that correct?
17       A.   Yes.
18       Q.   Okay.  And then if you go to page 34, if you
19   could take the time to read that and tell me what test
20   was given to Mr. Calderone Palomino.
21       A.   I'm having a difficult time.  Oh, I see.  Okay.
22   The first line and that is the Bateria-R, which is the
23   Woodcock -- Monroe's version of the Woodcock-Johnson 61.
24   It's the Spanish version.
25       Q.   And it's -- so it's comprehensive IQ test for

1    back in '67, '69, so that might have been one of the

2    times he was referred for that testing.

3       Q.   Do you agree that an impoverished childhood

4    environment is a risk factor for mental retardation?

5       A.   Yes.

6       Q.   And do you agree that drinking during pregnancy

7    is a risk factor for mental retardation?

8       A.   Yes.

9       Q.   And would you agree that unsuccessful --

10   unsuccessful abortion attempts upon a fetus would also

11   be risk factors for mental retardation?

12      A.   Yes, that is possible.

13      Q.   And do you agree that a young child being fed

14   beer in his baby bottle would be a risk factor for

15   mental retardation?

16      A.   Certainly, yes.

17      Q.   And you agree exposure to pesticides is also a

18   risk factor for mental retardation?

19      A.   Yes.

20      Q.   Do you agree if Mr. Ramirez also had a younger

21   sister who was mentally retarded, that would be a fact

22   which would be helpful for you to know in determining

23   Mr. Ramirez' mental retardation?

24      A.   Yes.

25      Q.   And that is because a family history of mental

# EXHIBIT KK

# EXHIBIT KK

*Ramirez v. Ryan,* CV-97-1331-PHX-JAT
Supplemental Brief on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

1  Neither spoke to a single individual besides David.

2          Example of this, they both relied on David's

3  assertion and sentencing counsel's assertion that he

4  completed a GED.  This assertion was false.

5          The masking problem, the cloak of confidence

6  problem.  This is why you need to talk to third parties.

7  Even Martinez had to agree that's an issue and it was a

8  potential problem in David's case, yet they spoke to no

9  one.

10          Toma, he used an adaptive behavior scale

11  that is specifically not approved for diagnosis.  It's

12  normed on other people with mental retardation.  You

13  could score perfectly on it and still be mentally

14  retarded.  He had to admit his adaptive behavior

15  assessment was not a standardized administration; a

16  clear violation of the statute.  And, in addition, he

17  admits to giving David perfect -- a perfect score on

18  several items when he said he should have given him a

19  zero.

20          He even administered ABS-RC II wrong.  It's

21  the wrong test and did it the wrong way.  He gave it as

22  a self-report and did document review.

23          THE JUDGE:  I found the adaptive behavior

24  prong had been proved by a preponderance of the

25  evidence; correct?

1          MS. HARMS:  Yes, you did.

2          THE JUDGE:  Okay.

3          MS. HARMS:  He misunderstood the most basic

4   definition of adaptive behavior.  It's not what they can

5   do, it's what you typically do.  And even then has

6   admitted he made assumptions what David could do when

7   the manual says you have to be perfectly certain.

8          He characterized his assessment of David's

9   behavior, adaptive behavior, as an exercise in futility.

10  That's how seriously he took it.  He disagrees with

11  current clinical practice on Flynn effect.  He could

12  cite to no scientific authority for his disagreement

13  with the AAMR on this point.  He admits the store 73

14  that David got on his test with him would cause him to

15  look at a possibility of mental retardation.

16         He improperly used demographically adjusted

17  scores when the very manual for using those scores says

18  it's not intended for diagnosis, not particular

19  purposes, which is why we're here for.

20         Dr. Martinez, his reports in another mental

21  retardation case, Dicochea, reveal he is not even

22  familiar with the basic criteria.  He found another

23  defendant not to be mentally retarded even though, by

24  his own adaptive behavior testing, the defendant

25  qualified.  He said that he needed --

```
 1    keeps money on his books.   This is Dr. Weinstein
 2    reporting what he learned from Ramirez.
 3                 Meanwhile, Candy, his 15-year-old victim,
 4    would have been 33 years --
 5                 MS. HARMS:   Objection; relevance.
 6                 THE JUDGE:   Overruled.
 7                 MR. TODD:   33 years old, while he is
 8    gathering money in prison from these different people.
 9    Certainly goes to his ability to function within prison.
10                 THE JUDGE:   Well, I guess the bottom line is
11    -- and this is the same comment I made to Ms. Harms --
12    is I don't read any statute or case law to preclude the
13    Court from considering institutional conduct.   Although,
14    the experts certainly tell us that you should not give
15    nearly as much weight as you give to non-institutional
16    conduct.   And I don't read Arrellano as saying anything
17    different.
18                 MR. TODD:   Right.
19                 THE JUDGE:   Do you agree with that?
20                 MR. TODD:   I agree with that.   And -- but
21    that -- there is some weight that you can give to it and
22    it certainly shows that he is functioning.   Dr. Tasse
23    read these records.
24                 Dr. Toma, the reason he, of course, felt it
25    wasn't -- the scale itself wasn't that significant, so
```