MARK BRNOVICH
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

JOHN PRESSLEY TODD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
1275 WEST WASHINGTON
PHOENIX, ARIZONA 85007-2997
TELEPHONE: (602) 542-4686
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 003863)

ATTORNEYS FOR RESPONDENTS

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| David Martinez Ramirez, | CV 97-1331-PHX-JAT |
| Petitioner, | |
| -vs- | |
| Charles Ryan, et al., | **Response in Opposition to Supplemental *Martinez* Brief** |
| Respondents. | |

In light of the Ninth Circuit's limited remand, Petitioner David Martinez Ramirez and Respondents both agree a merit review of Claim 34 (ineffective assistance of counsel at sentencing) is appropriate, but for different reasons.   Ramirez contends incorrectly that the Ninth Circuit excused Claim 34's procedural default and that this Court should review the claim *de novo*.   Respondents, however, maintain that a review of the state-court record demonstrates that Ramirez's trial attorney was not constitutionally ineffective in 1990 under the then existing circumstances and that Ramirez was not prejudiced by her performance in light of his

1

killings of a mother and her daughter.  Because the underlying ineffective-assistance claim is without substance, post-conviction counsel was not ineffective in failing to raise it.  Ramirez is not entitled to relief.

DATED this 6th day of July, 2015.

Respectfully submitted,

Mark Brnovich
Attorney General

Lacey Stover Gard
Chief Counsel

s/ John Pressley Todd
Assistant Attorney General

Attorneys for Respondents

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ......................................................................................... 3

TABLE OF AUTHORITIES ............................................................................... 4-5

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 6

I        Relevant state-court record ........................................................................ 6

II       Relevant law concerning *Martinez* and *Strickland* ................................. 36

III      Analysis ..................................................................................................... 42

IV       No evidentiary development is appropriate ............................................. 55

V        Certificate of Service ................................................................................ 56

## TABLE OF AUTHORITIES

CASES                                                                PAGE

Allen v. Woodford, 395 F.3d 979 (9th Cir. 2005)...........................................55

Atkins v. Virginia, 536 U.S. 304 (2002)................... 45, 47, 48, 49, 50, 52, 56

Baumann v. United States, 692 F.2d 564 (9th Cir. 1982)..............................44

Bible v. Ryan, 572 F.3d 860 (9th Cir. 2009)...................................... 24, 25, 54

Brown v. Ornoski, 503 F.3d 1006 (9th Cir. 2007)........................................54

Brumfield v. Cain, 576 U.S. ___, __S. Ct. __ (2015) ...................................50

Campbell v. Kincheloe, 829 F.3d 1453 (9th Cir. 1987)................................55

Clabourne v. Ryan, 745 F.3d 362 (9th Cir. 2014)................................... 38, 47

Coleman v. Thompson, 501 U.S. 722 (1991) ......................................... 23, 37

Detrich v. Ryan, 740 F.3d 1237 (9th Cir. 2013) ...........................................47

Dickens v. Ryan, 740 F.3d 1302 (9th Cir. 2014) ................................... 38, 47

Edwards v. Lemarque, 475 F.3d 1121 (9th Cir. 2007)...................................51

Gerlaugh v. Stewart, 129 F.3d 1027 (9th Cir. 1997)......................................55

Hall v. Florida, 572 U.S. ___, 134 S. Ct. 1986 (2014) ................................50

Harrington v. Richter, 562 U.S. 86 (2011)........................................ 40, 42, 43

Harris v. Vasquez, 949 F.2d 1497 (9th Cir. 1990) .......................................52

Heishman v. Ayers, 621 F.3d 1030 (9th Cir. 2010) ......................................54

King v. Schriro, 537 F.3d 1062 (9th Cir. 2008)............................................54

Knowles v. Mirzayance, 556 U.S. 111 (2009)................................... 42, 43, 44

Lilly v. Gilmore, 988 F.2d 783 (7th Cir. 1993)............................................44

Lowry v. Lewis, 21 F.3d 344 (9th Cir. 1994) ...............................................44

Martinez v. Ryan, 566 U.S. ___, 132 S. Ct. 1309 (2012). 1, 19, 37, 39, 44, 48

Padilla v. Kentucky, 559 U.S. 356 (2010) ....................................................43

Premo v. Moore, 562 U.S. 115 (2011)...........................................................39

Rhoades v. Henry (Baldwin), 638 F.3d 1027 (9th Cir. 2011)........................54

Roe v. Flores-Ortega, 528 U.S. 470 (2000)...................................................40

Rompilla v. Beard, 545 U.S. 374 (2005) ................................................ 40, 41

Schriro v. Landrigan, 550 U.S. 465 (2007) ....................................................56

Sexton v. Cozner, 679 F.3d 1150 (9th Cir. 2012) ................................... 44, 53

State v. Boyston, 298 P.3d 887 (Ariz. 2013)................................................49

State v. Ramirez, 871 P.2d 237 (Ariz. 1994) ..................................................35

State v. Sansing, 206 Ariz. 232, 77 P.3d 30 (2003) ......................................46

Strickland v. Washington, 466 U.S. 668 (1984) ................................... passim

United States v. Cronic, 466 U.S. 648 (1984) ........................................ 42, 51

United States v. Ventura-Cruel, 356 F.3d 55 (1st. Cir. 2003) .......................44

Wiggins v. Smith, 539 U.S. 510 (2003)........................................................54

Williams v. Woodford, 384 F.3d 567 (9th Cir. 2002) ............................ 36, 52

Wong v. Belmontes, 558 U.S. 15 (2009) ................................................ 40, 54

Woodford v. Visciotti, 537 U.S. 19 (2002) ...................................................54

## STATUTES

A.R.S. § 13-751(F)(2)............................................................... 32, 36

A.R.S. § 13-751(F)(6)............................................................... 32, 35

A.R.S. § 13-751(F)(8)............................................................... 33, 36

A.R.S. § 13-751(G)...............................................................................33

A.R.S. § 13-751(G)(1) .............................................................. 13, 36

A.R.S. § 13-753(G)...............................................................................49

A.R.S. § 13-753(K)(3) .........................................................................49

A.R.S. § 13-753(K)(5) .........................................................................50

28 U.S.C. § 2254................................................................. 44, 47, 56

## RULES

Rule 26.3(b), Ariz. R. Crim. P. ....................................................................9

Rule 26.5 of the Ariz. R. Crim. P...........................................................8, 46

## MEMORANDUM OF POINTS AND AUTHORITIES

The Ninth Circuit, in a limited remand, directed this Court to "reconsider, in light of the intervening law, Claim 34 (ineffective assistance of trial counsel, failure to adequately investigate and present mitigating evidence at sentencing)."  (Doc. 249.)  Claim 34 alleged that Ramirez's trial counsel was ineffective for:

> failing to conduct a complete mitigation investigation and presentation, which would have included evidence of Petitioner's mental retardation, brain damage, impaired intellectual functioning, childhood poverty, *in utero* exposure to pesticides and alcohol, the fact that he was the product of the rape of his fifteen-year-old mother by his uncle, and childhood neglect and abuse.

(Doc. 158, at 13.)

## I.   The relevant state-court record

### A.   *Pre-trial self-representation.*

To place Claim 34 in context, it is appropriate to review the pre-trial proceedings in 1989 and 1990.  For a period of time, Ramirez had waived counsel and represented himself with apparent legal assistance from his advisory counsel, Mara Siegel.  (Exh A.)  The state-court record does not reflect that Mara Siegel ever questioned Ramirez' competency to represent

himself.[1]  Ramirez represented himself for nine months through *voir dire*. (Exh. B.)  Thus, during his self-representation period, the trial, sentencing and post-conviction relief ("PCR") judge, Maricopa Superior Court Judge Thomas W. O'Toole, had a unique opportunity to observe Ramirez, and to directly and personally interact with him.  (*See*, *e.g.*, Exh. C.)

### B.    *The 1990 Sentencing Proceedings.*

In July 1990, jurors found Ramirez guilty of the premeditated first-degree murders of Mary Ann Gortarez and her 15-year-old daughter, Candie.  (Exh. D.)  Following the verdicts, Judge O'Toole, pursuant to Rule 26.5 of the Arizona Rules of Criminal Procedure, appointed Dr. Mickey McMahon, Ph.D., "to test and evaluate the defendant's current mental health and, if such is deemed appropriate, conduct further diagnostic testing and evaluation."  (Exh. E.)   Rule 26.5 empowers a trial court to order a defendant to undergo mental health examination or diagnostic evaluation at any time prior to sentencing.   Ariz. R. Crim. P. 26.5.   He authorized compensation to be no more than $500.  (Exh. E.)

---

[1] In her declaration, signed decades after the trial, Mara Siegel stated Ramirez was "mentally disturbed," "indescribably odd," and "appeared to have some deficits in appreciating the legal peril he was in."  Doc. 256-2, at 6 ¶¶ 3, 4).  She does not state when she formed these opinions, or claim that he appeared incompetent or mentally retarded in 1989 or 1990.

In accordance with the version of Rule 26.3(b) then in effect, Judge O'Toole originally set the sentencing for September 21, 1990, within 60 days of the verdicts.  (Exh. D.)  At the defense request, Judge O'Toole continued the sentencing to October 19, 1990.  (Exh. F.)  Subsequently the court denied Ramirez' request to continue the Aggravation/Mitigation Hearing beyond the October 19 date, but agreed to schedule the imposition of sentence for a subsequent date.  (Exh. G.)  On October 19, the trial court permitted Ramirez to continue part of the mitigation presentation to November 30 as a result of a subpoena problem.  (Exh. J, at 112−13.)

### 1)   RAMIREZ'S SENTENCING  MEMORANDUM.

Prior to the mitigation hearing, Mara Siegel on behalf of Ramirez filed a 29-page sentencing memorandum with additional pages of supporting attachments.  (Exh. H.)  She described his family background as "poverty, uncertainty, chaos."  (*Id*. at 4.)  Ramirez was born to a 16-year-old mother, the eldest of eight siblings all fathered by different men.  (*Id*.)  Ramirez never knew his father.  (*Id*.)

> David Ramirez, Jr. did not complete high school until he was incarcerated in the Arizona Department of Corrections. David Ramirez changed schools ten times before he had completed the seventh grade.

(*Id*.)  To  prepare her sentencing memorandum, Mara Siegel had "requested all of David Ramirez's school records from kindergarten through high

school."   (*Id.*)   She discussed in the memorandum the difficulties she experienced, noting that "nearly all of David's school records were destroyed by the early 1970's."  (*Id.* at 5.)  Using a subpoena, she was able to obtain from the Phoenix Elementary School District his school identification card and his I.Q. test results from 1967 and 1969, all of which she attached.  (*Id.*)

Based on his elementary school identification card, she discussed in great detail Ramirez' attendance, or lack thereof, at the various schools.  (*Id.* at 5−7.)  Also in detail, she discussed the 1967 Stanford Binet I.Q. test administered by Dr. Wilson who reported Ramirez's I.Q. score as 70.  (*Id.* at 7.)  "D.S.M.—III-R states that a person is mildly retarded if he/she has an I.Q. of 50 to 55, to approximately 70 (D.S.M.-III-R)."  (*Id.*)  Two years later, Dr. McConkey re-tested Ramirez and reported an I.Q. of 77, which according to the D.S.M.-III-R was "borderline intellectual functioning." (*Id.*)  She attached the supporting documents.  (*Id.*)  A defense investigator contacted both doctors and neither had "any recollection of David Ramirez." (*Id.*)

She discussed Ramirez' move to El Monte, California and his extremely low high school grades and provided attached supporting documents.  (*Id.* at 7−8.)  She learned that, 5 years after a student's graduation, all of his psychological testing records are destroyed.  (*Id.* at 8.)

However, she did attach Ramirez's 1971 California Achievement Grade Point Test that his test scores revealed he was "3−4 grade levels below his schoolmates." (*Id*.)

Citing Dr. McMahon's report, Mara Siegel discussed Ramirez' sexual abuse by older female relatives. (*Id*. at 8.) She also discussed Ramirez joining an El Monte gang in part due to his mother's chronic alcoholism and problems she was having with his step-father. (*Id*. at 9.) And she discussed Ramirez' early involvement with the criminal justice system starting in 1970 and how well he did in the structured life in prison. (*Id*. at 9−11.) One supervisor described Ramirez as doing "a good job and is dependable." (*Id*. at 10.) Another supervisor described Ramirez as "[o]ne of the hardest working members of the work group." (*Id*. at 11.)

Conversely, Mara Siegel described the problems he had when released from prison. (*Id*. at 11−12.) Among them:

> On February 7, 1981, his mother, with whom he had a very complicated, but co-dependent relationship, died. She died of ethyl alcohol hepatitis, an alcohol-related disease. On February 15, 1981, (six days after his mother died), David Ramirez went to the home of a co-worker, Lydia Delgado, and demanded that she "kill him or he would kill her."

(*Id*. at 12−13.) Mara Siegel obtained a psychological evaluation of Ramirez done about 5 weeks after his mother's death. (*Id*. at 13−14.) It supported

her theory that Ramirez had become "institutionalized" and could function in confined environment, but had difficulty on the street.  (*Id*. at 14.)  She reported that his correctional supervisors described Ramirez as a "hard worker" and who "works well without supervision."  (*Id*. at 14−15.)  She briefly noted that in September 1982, Ramirez was convicted of escape, but after his return to custody was improving.  (*Id*. at 15−17.)  "Despite a less than perfect prison record, David Ramirez, on the whole, has had extended periods of time while confined at the Department of Corrections when his behavior was exemplary."  (*Id*. at 17.)  She noted that Ramirez had been "of great assistance to prison officials" and "often worked well with other inmates, often providing guidance to other inmates."  (*Id*.)  She argued, "given the structure of the Department of Corrections, David Ramirez can make a positive contribution to his fellow prisoners and prison authorities if the Court sees fit to impose a life sentence."  (*Id*. at 18.)

Additionally, relying on Dr. McMahon's report, Mara Siegel argued that Ramirez's "capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly diminished."  (*Id*.)  Such a finding supports Arizona's first statutory

mitigator, A.R.S. § 13−751(G)(1)[2].  She pointed out that Dr. McMahon thought a "combination of David's psychological makeup coupled with the indigestion of alcohol and cocaine for a period of 2 months prior to and including May 25, 1989," significantly impaired his capacity.  (*Id*. at 18−20.)

She noted that Ramirez was still "incapable of accepting responsibility" for the murders.  (*Id*. at 20.)  "David Ramirez has expressed his remorse in the most perplexing way.  DAVID RAMIREZ WANTS TO BE SENTENCED TO DEATH, in essence, for something he cannot admit to himself that he did."  (*Id*. at 20) (emphasis original).

> David Ramirez has wanted to be sentenced to death if convicted by a jury since June of 1989.  The defendant has been either reluctant or refused to cooperate with any efforts to collect background material on him, contact his family members, doctors, etc., since shortly after this counsel was appointed to represent Mr. Ramirez in June, 1989.

> David's decision to proceed in propia persona, while having neither argument with his counsel's competence nor having expressed problems in communicating with attorney-client communication, bespeaks a benign attempt to thwart or sabotage his own defense.  Throughout the preparation for a mitigation hearing, David has evidenced an inappropriate affect in his behavior, particularly when discussing the seriousness of the punishment to be imposed, if convicted.  If it was not so

---

[2] Respondents cite the current version of the statute, which does not differ materially from that in effect when Ramirez killed his victims.

> readily apparent as a defense mechanism, David has evidenced
> an almost flippant attitude toward being put to death.

(*Id*. at 20−21.)

Next with citation to supporting case law, Mara Siegel detailed Ramirez's chronic drug and alcohol abuse. (*Id*. at 21−22.)  She pointed out that he began using drugs as a young teenager and, on the night of the killings, "he had intravenously injected heroin 5 to 6 times within 4 to 5 hour period prior to the homicides.  He had also drank a substantial amount of beer." (*Id*. at 21.)  According to the McAndrews Alcohol Test, administered by Dr. McMahon, Ramirez has a "high degree of alcohol addiction." (*Id*. at 22.)

In reviewing Ramirez's psychological history, Siegel noted Ramirez' current I.Q. was 94 according to the Peabody Picture Vocabulary I.Q. Test ("PPVT"), "now well within the average range of intelligence." (*Id*. at 22.) She argued "[t]his increase in basic intelligence may be due to the structured environment of prison where David completed his G.E.D." (*Id*.)  She discussed the other tests administered by Dr. McMahon, the "Over-Controlled Hostility Test" and the "Ego Inflation Test." (*Id*. at 22−23.)  The results of this last test "might explain why several of the victims in the

criminal case with which Mr. Ramirez has been involved were women." (*Id.* at 23.)

"Obviously, Mr. Ramirez has a deep-seated sense of inferiority. Unfortunately, no steps were ever taken by David, his family, or the criminal justice system, to remedy his problems and direct his actions in a socially appropriate manner." (*Id.*) She argued this too supports providing a structured environment. (*Id.*) She also discussed the fact that many of Ramirez's relatives and family have been in contact with him. (*Id.*)

Finally, in detail, Mara Siegel discussed the relevant law on the accumulative effect of all the mitigating circumstances, the court's absolute discretion to grant mercy, and proportionality review . She concluded with an impassioned plea for two life sentences. (*Id.* at 23−29.)

### 2) DR. MIKEY MCMAHON'S REPORT TO THE COURT.

Dr. McMahon's report documents Ramirez's version of events. Ramirez had been out of prison for approximately 3 months before the murders of Mary and Candie Gortarez. (Exh. I, at 1.) Ramirez began drinking and using cocaine around 9:30 p.m. that evening; he injected cocaine once and initially had 2 glasses of beer. (*Id.*) At a "go-go" bar, he had 2 more beers, 2 mixed drinks, and "shot up with cocaine a second time that evening." (*Id.* at 1−2.) According to the report, Ramirez "went back to

his girlfriend's apartment around 10:45 pm and shot up with cocaine 4 more times and had approximately 6 more beers before the murder took place." (*Id.* at 2.)  Ramirez, however, emphasized to Dr. McMahon that when he does beer and cocaine together he "knows what's going on at all time[.]" (*Id.*)

Ramirez told Dr. McMahon he had sex with the 15-year-old daughter the night of the murders and had had sex with her on 4 previous occasions unknown to her mother.  (*Id.*)  Ramirez continued to blame "two black males" for the murders but did not want to talk about how the murders occurred, yet he stated "he didn't care if he was executed for the crime." (*Id.*)

Dr. McMahon reported that Ramirez discussed his philosophy "which included a quite mature-sounding concept of life and death."  (*Id.*) Concerning his family, Ramirez was "generally quite protective of family members and [would] not tolerate any probing into potentially negative aspects of their lives, insisting that our conversation be tinged with 'respect,' and only then would he be willing to talk, not otherwise."  (*Id.* at 3.)

Ramirez "denied that his stepfather ever hit him, his seven siblings, or their mother."  (*Id.*)  As a young boy of 8, he worked for his stepfather cleaning up around the sheet metal shop and did some work for an operator of a "chuck wagon."  (*Id.*)  From age 18−19, Ramirez told Dr. McMahon

that he "worked rebuilding alternators and generators." (*Id*. at 5.)  Then for about 2 years he worked in a waterbed store, making the beds.  (*Id*.)  And later he worked in a deli-type of restaurant.  (*Id*. at 6.)  In 1979, he went to prison and, when he got out, he was paid to put up fences until he got a better paying job cutting up chickens at Desert Poultry.  (*Id*.)

According to Ramirez's interview, his mother devoted "her time as a traditional Mexican-American mother whose responsibility revolve[d] around the home and her children.  She was always there for the client when he needed her as he was growing up." (*Id*. at 3.)  Her death "had a profound effect" on him and "played a significant part" in his Aggravated Assault on a DOC employee that occurred days after her death.  (*Id*.)  His maternal grandmother was "like a mother" to him.  (*Id*.)  She died a week or so after Ramirez was charged with the murders.  (*Id*.)

Ramirez said he was involved in car accidents in which he believed he should have been killed, but denied ever sustaining a head injury or being knocked unconscious.  (*Id*. at 4.)  He told Dr. McMahon about having sexual intercourse with his aunt at age 10 and how his cousin took advantage of him sexually about 20 times.  (*Id*.)

Dr. McMahon discussed Ramirez' significant criminal history, including his recent Aggravated Assault on a female DOC employee he knew from being an inmate and his escape.  (*Id*. at 4−5.)

16

Ramirez told Dr. McMahon that he finished 9th grade, but left high school in 10th grade because he had joined a teenage gang. (*Id*. at 6.) Dr. McMahon, based on PPVT score, stated that Ramirez was "well within the average range of intelligence and in no way indiative [sic] of any form of mental retardation." (*Id*.) Additionally, Dr. McMahon discussed other psychological findings based on the results from a battery of tests. (*Id*. at 6−7.) He found no evidence from the history or other testing that Ramirez suffered from schizophrenia, paranoid type. (*Id*. at 6.) His MacAndrew's Alcoholism scale was "understandably high" given his reported history of drinking. (*Id.*) In Dr. McMahon's opinion, Ramirez's "manic-like behavior [was] due to more than just the cocaine abuse." (*Id*. at 7.) Dr. McMahon reported:

> Although the defendant was quite resistant to discussing the details of the current murder, he did cooperate on all the testing and was generally open about everything else. However, he was quite protective of his family and not willing to include them in any way he thought would place them in a negative light, other than to discuss the sexual molestation as a child and adolescent.

(*Id*.) In conclusion, Dr. McMahon wrote "[t]he above results indicate that most likely the primary factor related to the murder was the abuse of alcohol and cocaine." (*Id*.) He further emphasized: "I can state with reasonable psychological certainty that the defendant's capacity to appreciate the

wrongfulness of his conduct or conform his conduct to the requirement so the law as significantly diminished." (*Id*. at 8.)

### 3)   RAMIREZ' LETTERS TO THE COURT AND PROSECUTOR.

Days before the Aggravation/Mitigation evidentiary hearing, Ramirez sent hand-written letters to the prosecutor and Judge O'Toole threatening them with death. (Exh. J, at 4; Exh K.) Because of the penmanship, certain words could not be deciphered. (*Id*.) However, while the message was clear, nothing about the wording of the letters suggested any mental incapacity that would set him apart from other inmates. (*see* Exh. K.) It was not the first time Judge O'Toole had been threatened by a defendant and he and the prosecutor stated that the letters could not, and would not, be considered in the process. (Exh. J, at 6.)

### 4)   AGGRAVATION/MITIGATION HEARING.

In mitigation, Mara Siegel presented Ramirez' aunt, Erlinda Martinez, and two of Ramirez' sisters, Mary Castillo and Cynthia Orozco. (Exh. J, at 30, 72, 89.) His aunt, who was about the same age as Ramirez, testified that Ramirez' mother was about 16 when Ramirez was born and that she always had a drinking problem. (*Id*. at 31−32, 42−43.) She had heard how Ramirez' mother had partied when she was pregnant with him, drinking beer staying out all night. (*Id*. at 33.) His mother died of alcohol-related problems. (*Id*. at 64.)

Ramirez' mother had a lot of male friends.  (*Id*. at 33.)  She used Ramirez as a housekeeper and to take care of the other children, who were as young as 6 years of age.  (*Id*. at 34.)  She taught Ramirez to scramble eggs for his sisters.  (*Id*.)  At one point, Ramirez lived with his grandmother for about 3 years, but his mother wanted him back because she had no one else to take care of the children.  (*Id*. at 35.)  When Ramirez lived with her, he was like a live-in maid; he was raised to clean and cook.  (*Id*. at 38−39.)

Ramirez' biological father was not around and none of Ramirez' siblings had the same father as Ramirez; four different men fathered the children in his family.  (*Id*. at 36−37.)  His aunt did not recall Ramirez having problems in school when they went to grammar school together.  (*Id*. at 39.)  He never talked about problems while attending school.  (*Id*. at 61.)  Because his mother moved frequently, Ramirez attended over seven grammar schools.  (*Id*. at 65.)  His aunt could not remember if Ramirez had been kept back in school.  (*Id*. at 68.)

As a teenager Ramirez had a number of problems with his stepdad and ran away often.  (*Id*. at 40−41, 43−44.)  His aunt thought he was being beaten with a belt by his stepfather.  (*Id*. at 41.)  His mother and stepfather had numerous fights.  (*Id*. at 43.)

Ramirez had two sons with his first wife and still helped raise his younger sisters.  (*Id*. at 45.)  Ramirez was working as a dishwasher and

janitor at the time. (*Id*. at 59, 68.)  His sons, Isaac Ramirez age 14 and David Ramirez, Jr., age 13 attended the hearing with Ramirez's ex-wife, Lydia Blanco.  (*Id*. at 45, 88.)

His aunt considered Ramirez a letter writer, often writing to her daughter.  (*Id*.)  She felt she could confide in him knowing he would keep things confidential.  (*Id*. at 49.)

When Ramirez found out that the defense investigator had subpoenaed his aunt to testify, he called her to express how bad he felt about involving her and her daughter.  (*Id*. at 51−52.)  She learned that Ramirez had specifically told family members not to come to the trial or sentencing. (*Id*. at 52.)

His aunt believed that while growing up Ramirez and his family had adequate food and clothing.  (*Id*. at 57−58.)  His aunt characterized Ramirez as "a beautiful person," "very sentimental," "caring," "always been a good guy," "always level-headed," and "a responsible worker."  (*Id*. at 48, 61, 69.) She considered Ramirez to be a "fairly intelligent individual."  (*Id*. at 55.)

Ramirez's sister, Mary Castillo, who was just younger than he, testified how Ramirez helped as a child with cleaning the house, making meals for his sisters, and being sure his sisters were clothed and fed.  (*Id*. at 73−74.)  Castillo did not recall her mother having a terrible drinking problem, but later in life her mother drank heavily and died of her alcohol

abuse.  (*Id*. at 74.)  Until his stepfather joined the family, Ramirez was "the man around the house."  (*Id*. at 76.)  She testified that she considered the stepfather strict, but not unreasonably so; that Ramirez followed the stepfather's orders; and that she did not recall Ramirez having any problems with his stepfather.  (*Id*.)  While incarcerated, Ramirez had written letters to her daughters.  (*Id*. at 77.)

Ramirez did not want Castillo to testify because he did not want her involved in his case, but she testified anyway because she was subpoenaed. (*Id*. at 78−79.)  Like her aunt, she did not think death was an appropriate sentence; she loved her brother very much.  (*Id*. at 50, 80.)  Such a sentence would hurt the entire family in her opinion.  (*Id*. at 81.)  Castillo described Ramirez as "a very good brother," who had "been there for," the family, was "real kind" and sensitive," "care[d] about people in the family," and was "very affectionate" with family.  (*Id*. at 83−84.)

Cynthia Orozco, Ramirez and Castillo's younger sister, also testified. (*Id*. at 89.)  She had lived with Ramirez and his wife when he was working as a dishwasher and cook at restaurants in Park Central.  (*Id*. at 93.)  His wife did not work.  (*Id*. at 94.)  She described that time as "[h]e would come home from work, she'd have his dinner ready, then [he would] just go back to work."  (*Id*.)  She was about 15 years of age the first time Ramirez went to

prison.  (*Id*. at 95.)  They wrote one another while he was in prison.  (*Id*. at 96−97.)

When Ramirez got out of prison in 1989, he came to live with her and her family.  (*Id*. at 97.)  He was working at a furniture place and had bought her a TV stand.  (*Id*. at 97−98.)  He cleaned the house for her and did some cooking.  (*Id*. at 98.)  Every week, he gave her money.  (*Id*. at 100.) Ramirez always took time to listen to her and she felt closer to Ramirez than to her other brother.  (*Id*. at 101.)  While Ramirez was living with her, he would stay at the victims' apartment once or twice a week.  (*Id*. at 103, 105, 111.)  She thought Ramirez and Mary Ann had a boyfriend-girlfriend relationship.  (*Id*. at 105.)

Ramirez told her not to come to the aggravation/mitigation proceeding, so she was subpoenaed.  (*Id*. at 106.)  She stated that it would affect her "[r]eal bad" if the court sentenced Ramirez to death.  (*Id*. at 108.)

### 5)   CONTINUATION OF THE MITIGATION HEARING

At the continuation of the mitigation presentation on November 30, 1990, Mara Siegel presented two additional witnesses, employees of the Department of Corrections.  Food Service Supervisor Michael Coleman Wharton Eggar, who had extensive experience in the civilian food-service industry and had supervised Ramirez beginning in July 1987.  (Exh. L, at 4−6.)  Initially, Ramirez was assigned to prepare all the fresh vegetables for

the different meals and ultimately advanced to running the officers' dining room.  (*Id*. at 7.)  He was paid one of the top wages in the kitchen.  (*Id*.)  His duties in the officers' dining room meant he was under less security.  (*Id*. at 8.)  Eggar did not recall Ramirez having any disciplinary issues while he supervised him.  (*Id*. at 9.)  According to Eggar, Ramirez "got along fine," "did his work," "got the place cleaned up," and then sat in a corner and read his Bible.  (*Id*. at 10.)  "He was not any problem."  (*Id*.)  Using the prison rating system, Eggar would rate Ramirez the highest among inmates because Ramirez was "very willing," "very cooperative," and "knowledgeable." "He'd get a five."  (*Id*.)  Eggar only learned of Ramirez' charges from the defense investigator who had contacted him.  (*Id*. at 12−13.)  Because of Ramirez's work ethic, Eggar would have hired him in the private sector.  (*Id*. at 15.)

Robert Larry, another Food Supervisor who had supervised Ramirez for a year, also testified on behalf of Ramirez.  (*Id*. at 17, 21−22, 26.)  He remembered Ramirez working in the officers' dining room.  (*Id*. at 19.) Ramirez was "very polite," "a good worker," "[n]o problems," "very clean about his work," and "[a]lways on time."  (*Id*.)  Larry had never heard of Ramirez being a threat to anyone.  (*Id*. at 19−20.)  Ramirez was able to anticipate what needed to be done and did not need to be told what to do. (*Id*. at 21.)  He recalled seeing Ramirez reading during breaks, but did not

know whether he was reading the Bible or something else.  (*Id*. at 23.)
Under the rating system he would give Ramirez the top score for effort,
responsibility, and cooperation.  (*Id*. at 23−24.)

At the conclusion of the evidentiary hearing, Mara Siegel advised the
court that she had filed post-conviction relief petitions in CR-106711 and
CR-121377 to collaterally attack the judgments in those prior convictions
and sought to delay the sentencing in this case until those petitions were
resolved.  (*Id*. at 28−30.)  The court denied her oral motion to continue the
sentencing.  (*Id*. at 31.)

### 6)  PRESENTENCE REPORTS: 1990, 1982, 1981, 1979, 1977.

In addition to the information furnished by Mara Siegel, the trial court
also considered Ramirez's current and prior presentence reports.  (Exh. M.)
In brief summary, the reports contained some additional information.

### CR 89-05726:  The instant offenses

Ramirez elected not to make any statement to the presentence officer.
(Exh. M, at 1.)  Mara Siegel recommended two concurrent life sentences,
noting Ramirez had done well in a structured setting and had experienced a
"very troubled life, a transient upbringing, and a long history of substance
abuse."  (*Id*. at 2.)  The presentence-report writer observed that "Mr.
Ramirez's criminal history is extensive and includes one failed probation
grant and several commitments to the Department of Corrections.  He was

out of custody on his most recent commitment less than 3 months when he savagely murdered the two innocent victims." (*Id.* at 3.) The trial court found this initial report "[i]ncomplete" and requested a more through one. (*Id.* at 4.)

Ramirez was again provided the opportunity to include a statement in the new report and the writer was informed that Ramirez had no interest in participating. (*Id.* at 1.) The revised report contained more complete information concerning Ramirez' his prior arrest history. (*Id.* at 2−4.)

According to parole authorities, other than Ramirez' escape in 1982, he had never been released from the Department of Corrections, except for supervised conditional releases, since his initial commitment in 1979. (*Id.* at 4.) Additionally, on four occasions he went AWOL from various halfway houses. (*Id.*) He was on mandatory release when he committed the double homicide at issue here, having been released on March 2, 1989. (*Id.* at 5.)

The social history was generally consistent with what Mara Siegel had presented in her sentencing memorandum. Based on prior presentence reports, the writer noted that "[d]uring [Ramirez'] childhood, he remembers both 'hard times and good times' but could not recall experiencing any problems with any family member." (*Id.* at 5.)

Concerning his education, the presentence writer noted "[a]lthough in one presentence report the defendant advised that he experienced neither

academic nor disciplinary difficulties, in another, he related that he was accused of extorting money from others." (*Id*.)  His work history included employment as a dishwasher and cook at Neptune Table Restaurant for about 3 years.  (*Id*.)  The "Substance Use" section stated that Ramirez consumed a case of beer a week and a kilo of marijuana a week, and used heroin if he had it.  (*Id*.)  Ramirez married Lydia, who was 13 years old at the time, in 1975, and the presentence writer stated that in 1982 Ramirez had indicated that they planned to divorce.  (*Id.* at 5−6.)

### CR-128529:  the escape conviction

On July 27, 1982, Ramirez and two other inmates escaped from Perryville training center. (*Id.* at 1.)  Ramirez was apprehended by Phoenix Police on August 9, 1982.  (*Id*.)  Ramirez pled guilty to escape in return for the State not alleging his prior convictions.  (*Id*.)  Ramirez said his escape was an impulsive act and refused to discuss it further.  (*Id*.)  He claimed he was looking for a job and planning on marriage, and felt he should get no more jail time given his previous sentence.  (*Id.* at 2.)

As part of the family history, Ramirez said "he was the black sheep and got into trouble for the first time when he was twenty years old." (*Id.* at 3.)  He said he left high school because he was working at the time as a sheet metal worker.  (*Id*.)  Ramirez said at 17 he left his parents' home to become independent and went to live with Lydia.  (*Id*.)  Concerning his health,

Ramirez reported that he was "in perfect health" and denied ever receiving professional help for mental problems or being on any kind of medication. (*Id.*)  He reported being hit by a car in 1972 and as a result having a plastic knee cap inserted.  (*Id.*)

### CR-121377 1981:  aggravated assault conviction

On February 15, 1981, Lydia Delgedo, a friend, invited Ramirez into her residence not expecting him to stay the night.  (*Id.* at 1.)  In the early morning, Ramirez entered her bedroom, put a butcher knife to her face and told her he was going to cut off her ear.  (*Id.*)  Then holding a fork and bottle opener to her face, Ramirez kept saying, "Kill me or I'll kill you."  (*Id.*)  Ms. Delgedo was finally able to talk him out of killing her and phone the police. (*Id.*)  Ramirez entered into a plea agreement with the State in which the State dropped one of the prior allegations.  (*Id.*)

Ramirez said he had dated Ms. Delgedo in the past and that night had played with her children.  (*Id.* at 2.)  He had been drinking quite a lot and did not remember anything after Ms. Delgedo went to bed.  (*Id.*)  The victim agreed that he had been drinking and felt sorry for him, but was emotionally traumatized by the offense and believed that Ramirez would kill her and her children.  (*Id.*)

The presentence writer learned from Ramirez's prison file that on March 18, 1981, he had been psychologically evaluated and showed

evidence "of substantial generalized psychotic illness which tend[ed] to make his behavior bizarre and inappropriate." (*Id*. at 3.)  Ramirez appeared to be "institutionalized," being able to function in a confined environment, but has a difficult time on his own; and that he had a "bitter, hostile attitude toward society" and when intoxicated became a "very aggressive person." (*Id*.)

Ramirez's last full-time employment was in 1975 where he worked as a dishwasher and cook.  (*Id*. at 5.)  Ramirez reported "occasional use of alcohol, usually in the form of beer." (*Id*.)  He claimed he had experienced "no problems due to his drinking," but had attended AA meetings. (*Id*.)  He admitted occasional use of marijuana, but denied experimenting with any other illicit drugs.  (*Id*.)

At the time of this report, Ramirez was 24 and had cooperated with the presentence writer.  (*Id*.)  The writer concluded that Ramirez had experienced "an unstable home environment during his formative years." (*Id*.)  "It appears the defendant's home and social environment contributed to his failure to complete his basic education."  (*Id*.)  The writer continued:

> Since reaching his majority, the defendant has failed to internalize the proper attitude and appropriate behavior needed to function in society, as evidence by his unstable social environment, sketchy employment history, deteriorating home environment and numerous incidents of anti-social behavior and possible substance abuse.

(*Id*.)  The writer viewed the aggravated assault as a continuation of his prior manifested behavior.  (*Id*. at 6.)  Ramirez showed no remorse or concern toward the victim.  (*Id*.)   "This act was opportunistic, narcisstic and impulsive and correlates with the defendant's history of prior anti-social behavior." (*Id*.)

### CR 106711:  1979 Armed Robbery

While on probation, on March 7, 1979, Ramirez entered the Ozark Market and robbed the cashier.  Simulating a weapon, he told her to turn around and sit down, stating "You don't want me to shoot you, do you? Don't turn around or I'll shoot your ass off."  As a result of this Armed Robbery and probation violation (see below), Ramirez was sentenced to prison for 5 years.

### CR 96009: 1979 probation violation report

In June 1977, Ramirez was placed on probation grand theft.  On April 10, 1979, a court found him in violation.  (*Id*. at 1.)  Ramirez had been a vagabond throughout his probationary term, with sporadic employment  and scant restitution payments.  (*Id*.)

### CR 96009: 1976 second-degree burglary

Late on the night of December 10, 1976, Ramirez forced entry into an apartment and stole a number of items, primarily a drum set.  Two weeks later, Ramirez contacted the Phoenix Police Department and turned himself

in, and the drum set was returned to the victim.  (*Id*. at 1.)  Ramirez entered into a plea agreement with the State with the understanding that, in exchange for pleading guilty, the State would dismiss a grand theft charge in CR 96121 and a possession of marijuana charge in CR 96706.  (*Id*.)

Ramirez told the presentence writer that 2 weeks after his theft of the drums, he got into a fight with his mother and "no longer cared what happened to himself," so he called the police and turned himself in.  (*Id*.)  At the time, the only listed prior arrest was for disturbing the peace in June 1975.  (*Id*. at 2.)  Ramirez reported that he had been arrested on several occasions as runway while a juvenile.  (*Id*.)

Ramirez "appears to be of average or slightly below average intelligence" and socially immature for his age.  (*Id*. at 3.)  "For the most part he is a regular worker but as he lacks any real vocational skills his earning capacity is quite limited."  (*Id*.)  The writer thought Ramirez was "a good candidate for probation."  (*Id*.)

### 6)   SPECIAL VERDICT

The trial court, with Judge O'Toole presiding, sentenced Ramirez to death on December 18, 1990.  (Exh. N.)  Ramirez chose not to exercise his right of allocution.  (*Id*. at 2.)

The trial court found beyond a reasonable doubt three aggravating circumstances.   First,  the  court  found  beyond  a  reasonable  doubt  that

Ramirez "was previously convicted of a felony in the United States involving the use or threat of violence on another person." *See* A.R.S. § 13−751(F)(2). "In fact, the defendant has been convicted of 2 violent felonies." (Exh. N, at 2−3; citing the Aggravated Assault in CR121377 and the 1979 Robbery conviction in CR106711).

Second, the court found beyond a reasonable doubt that Ramirez committed the murders in an "especially cruel, heinous, or depraved manner." *See* A.R.S. § 13-751(F)(6). The witness testimony and the physical evidence demonstrated "that both Candie and Mary Ann Gortarez were conscious during the time that the defendant inflicted at least 15 to 18 stab wounds on each of them, as well as other slices, cuts and defensive type injuries. The evidence further shows that the defendant intended or reasonably foresaw that both victims would suffer pain and mental distress from his repeated vicious assaults." (Exh. N, at 4.) The trial court then recounted the testimony concerning the "violent and deadly episode" that lasted for about half-an-hour between 5:00 a.m. to 5:30 a.m. (*Id*. at 5.) The court found that the evidence further showed that the victims "fought valiantly for their lives before succumbing to the defendant's vicious and senseless assaults." (*Id*.) "[T]heir cries for help were heard but not answered because of the defendant's unrelenting and overpowering deadly assault." (*Id*.)

"The Court further finds beyond a reasonable doubt that the murders of Candie and Mary Ann Gortarez were committed in an 'especially heinous and depraved' manner because the defendant acted in an especially hateful or reprehensible manner in committing these offenses." (*Id*. at 6.)  The trial court continued:

> The defendant inflicted gratuitous and unnecessary violence, pain and suffering, both physical and emotional, on both victims.  This is evidenced by the large number of stab wounds, cuts and abrasions over all parts of Mary Ann Gortarez' body and the upper parts of Candie Gortarez' body, and by the fact that both murders were unprovoked, senseless and without apparent motive.  Furthermore, the fact that the defendant used at least four weapons (including a box cutter, manicure scissors, cake knife, and large kitchen knife) to commit these offense [sic] and that he had sexual intercourse with Candie Gortarez either shortly before or when he killed her, shows that he was acting in an especially perverted, hateful, cold blooded, sadistic and reprehensible manner in killing both victims.  Finally, that the defendant acted in an especially heinous and depraved manner is evidenced by the fact that Candie Gortarez was only 15 years of age, and that both victims were physically smaller, weaker and essentially helpless in the face of the defendant's overpowering, armed, prolonged assaults.

(*Id*.)

Third, the trial court also found beyond a reasonable doubt:  that the two murders were committed during the same episode.  (*Id*. at 7.)  *See* A.R.S. § 13−751(F)(8)).

In mitigation, the trial court found the strongest statutory mitigator, A.R.S. § 13−751(G).  Relying on the undisputed opinion of Dr. McMahon,

the court found by a preponderance of the evidence that when Ramirez committed these homicides his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to the prosecution." (*Id*. at 7−8.)  Quoting Dr. McMahon, the trial court stated "[t]he cause of such diminished capacity is at least a combination of the defendant's psychological makeup … and the alcohol/cocaine intoxication state he appears to have been in at the time of the offense." (*Id*. at 8.)

The trial court also "considered nonstatutory mitigating circumstances, including 'any aspect of the defendant's character, propensities or record and any of the circumstances of the offense,'" to determine the mitigation was not "sufficiently substantial to call for leniency." (*Id*. at 9.)  "Among the matters considered" include Ramirez's "1) unstable family background, 2) poor educational experience, 3) that he was the victim of sexual abuse while he was young, 4) his gang affiliation, 5) his excellent work record while in prisons, 6) his remorse, 7) his chronic substance abuse, 8) his psychological history, and 9) his love of family." (*Id*.)

The court found that this mitigation had been proven by the preponderance of the evidence, except Ramirez' purported remorse and excellent prison record.  "In fact, the defendant has never admitted harming

either victim and has shown no remorse for their deaths." (*Id*. at 10.) "In addition, although his work record while in prison is excellent, his overall performance as an inmate has been poor, as is evidenced by his escape conviction in CR128529 and his going AWOL and being written up on several occasions, as outlined in the presentence report in this case and the report filed in CR128529." (*Id*.)

## C. *The direct appeal*

At the time of Ramirez's direct appeal, the Arizona Supreme Court in every capital case independently reviewed the record "to determine the existence of both aggravating and mitigating circumstances" and "whether the trial court properly imposed the death sentence." *State v. Ramirez*, 871 P.2d 237, 249 (Ariz. 1994). In upholding the finding of the F6 aggravator here, the Arizona Supreme Court stated that its "independent review of the grisly facts of this case" confirmed the trial court's finding that the murders were committed in an "especially cruel" manner. *Id*. at 250. "The victims in this case endured great pain and suffering over a prolonged period of time." *Id*. "When the police arrived, they found evidence of great violence; they discovered blood and murder weapons throughout the apartment." *Id*. The record supported the finding that both victims were conscious as they were repeatedly stabbed and were obviously aware of the other's suffering. *Id*. "The victims' sufferings were inescapably foreseeable to defendant." *Id*.

The Arizona Supreme Court additionally found that the record supported the F2 and F8 aggravating circumstances found by the trial court. *Id.* at 250−52.

The Arizona Supreme Court noted that the trial court found that Ramirez had "proved the existence of one statutory mitigating circumstance and 7 non-statutory mitigating circumstances." *Id.* at 252. The Court agreed that the G1 statutory mitigator had been established. *Id.* It also agreed with the trial court's rejection of Ramirez's remorse and excellent prison work record because the defense did not prove either by a preponderance of the evidence. *Id.* at 253. Additionally, after reviewing the record, the Arizona Supreme Court expressly found "no residual doubt about defendant's guilt." *Id.* The Court also did not find any additional mitigating factors. *Id.*

After reviewing and considering all the mitigation evidence, "both individually and cumulatively," the Court found that the mitigation was not sufficiently substantial to call for leniency. *Id.* "We therefore find that the trial court properly imposed the death penalty on both counts." *Id.*

## D.   *Post-conviction relief ("PCR") proceedings*

John C. Williams filed a PCR petition on behalf of Ramirez. (Exh. O.) Among other claims, Williams asserted that Mara Siegel's representation was constitutionally ineffective at trial and at sentencing. (Exh. O, at 7−8.) The sentencing claim was based on the defense not having a "clear strategy at sentencing." (*Id.* at 8.)

Judge O'Toole rejected Ramirez's PCR petition, finding it did not raise a colorable claim. (Exh. P.) In specifically rejecting the ineffective assistance of counsel ("IAC") claims, Judge O'Toole noted that "[t]he evidence of the defendant's guilt was overwhelming and the evidence showing that the aggravating circumstances far outweighed the mitigating circumstances was compelling." (*Id*. at 2.) Finding that Ramirez "failed to meet both prongs necessary to establish a constitutional claim," Judge O'Toole further observed:

> This Court presided over the trial and observed the conduct of counsel throughout. Counsel zealously and effectively defended the defendant and made well reasoned legal and tactical decisions in all phases of the trial and sentencing proceedings.

(*Id*. at 3.)

## II.   THE RELEVANT LAW CONCERNING *MARTINEZ* AND *STRICKLAND*

### A.   *Martinez*

In *Martinez v. Ryan*, 566 U.S. ___, 132 S. Ct. 1309 (2012), the Supreme Court created a narrow exception to the holding of *Coleman v. Thompson*, 501 U.S. 722, 756−56 (1991), that any PCR attorney error that led to a default of claims in state court cannot constitute cause to excuse the default in federal habeas. *Martinez*, 132 S. Ct. at 1315. This narrow exception applies where "the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance

at trial[.]"  *Id*. at 1317.  As a matter of equity, a prisoner may establish cause

for a default of an IAC claim of trial counsel in two circumstances.  *Id*. at

1318.

> The first is where the state courts did not appoint counsel in the
> initial-review collateral proceeding for a claim of ineffective
> assistance at trial.  The second is where appointed counsel in
> the initial-review collateral proceeding, where the claim should
> have been raised, was ineffective under the standards of
> *Strickland v. Washington*, 466 U.S. 668 (1984).  To overcome
> the default, a prisoner must also demonstrate that the
> underlying ineffective-assistance-of-trial-counsel claim is a
> substantial one, which is to say that the prisoner must
> demonstrate that the claim has some merit.

*Id*.; *Dickens v. Ryan*, 740 F.3d 1302, 1319 (9th Cir. 2014) (*en banc*) (to

establish "cause" in Arizona case a prisoner must show (1) the claim is

substantial and (2) that his PCR counsel was ineffective under *Strickland*).

The Ninth Circuit's general rule is "to remand the matter to the district

court to conduct such a review in the first instance, if the result is uncertain."

*Clabourne v. Ryan*, 745 F.3d 362, 376 (9th Cir. 2014).  Ramirez argues that

"[b]y granting Ramirez's motion for a limited remand, specifically

instructing this court to reconsider Claim 34, Ramirez believes it is arguable

that the Ninth Circuit has already concluded the underlying claim is

substantial."  (Doc. 256, at 3.)

Of course, the Ninth Circuit made no such finding.  A more plausible

explanation is that the remand was necessary because after 5 years in the

Ninth Circuit no Opening Brief was ever filed, and thus the Ninth Circuit had no context in which to evaluate the *Martinez* argument.  The remand necessarily entails reviewing the *Martinez* claim in the context of *Strickland*.

Ramirez also contends that this Court has already found post-conviction counsel's ineffectiveness, and thus he has established cause to excuse the procedural default.  (Doc. 256, at 4.)  Ramirez is incorrect.  This Court did not expressly find PCR counsel ineffectiveness under *Strickland*, but merely viewed the record in a pre-*Martinez* context and concluded in that context "PCR counsel's *alleged* ineffectiveness does not constitute cause."  (Doc. 242, at 12−13.

**B.    *Strickland***

The Supreme Court has warned lower courts to apply the *Strickland* standard "with scrupulous care, lest 'intrusive post-trial inquiry' threatens the integrity of the very adversary process the right to counsel is meant to serve."  *Premo v. Moore*, 562 U.S. 115, 122 (2011) (citing *Strickland*, 466 U.S. at 689).  The *Strickland* standard requires the defendant to show that his counsel's performance was constitutionally deficient and but for the serious deficient performance there was a reasonable probability that the result of the proceeding would have been different.  466 U.S. at 687.  The defendant is not entitled to relief unless he makes both showings.  *Id*.

To establish deficient performance, the defendant must show that "counsel's representation fell below an objective standard of reasonableness. *Id*. at 688; *Harrington v. Richter*, 562 U.S. 86, 104 (2011). The *Strickland* standard requires that counsel's performance be evaluated "considering all the circumstances." *Strickland*, 466 U.S. at 688; *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000) (vacating the lower court opinion for failure "to engage in the circumstance-specific reasonableness inquiry required by *Strickland*"). "[T]he performance inquiry necessarily turns on 'whether counsel's assistance was reasonable considering all the circumstances.'" *Wong v. Belmontes*, 558 U.S. 15, 17 (2009) (quoting *Strickland*, 466 U.S. at 688−89).

The Supreme Court's decision in *Rompilla v. Beard*, 545 U.S. 374 (2005), illustrates the importance of considering, when evaluating a *Strickland* claim, the circumstances defense counsel faced at the time of the act or omission at issue decision. In *Rompilla*, the Court held "when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make *reasonable efforts* to obtain and review material that counsel knows the prosecution will probably rely on as *evidence of aggravation* at the sentencing phase of trial." *Id*. at 377 (emphasis added). The Court discussed the circumstances. Defense counsel knew the prosecution was

going to use Rompilla's prior conviction file.  *Id*. at 388.  The file was at the courthouse, "open for the asking."  *Id*.

Justice O'Connor, the fifth vote, went into greater detail to explain why counsel's behavior "was not 'reasonable' considering all the circumstances."  *Id*. at 394.  "First, Rompilla's attorneys knew that their client's prior conviction would be at the very heart of the *prosecution*'s case."  *Id*. (emphasis original).  The prosecution intended "to read testimony about the details of the crime."  *Id*.  "Second, the prosecution's planned use of the prior conviction threatened to eviscerate one of the *defense*'s primary mitigation arguments. . . . residual doubt."  *Id*. (emphasis original).  "Third, the attorneys' decision not to obtain Rompilla's prior conviction file was not the result of an informed, tactical decision about how the lawyers' time would best be spent."  *Id*. at 395.  His attorneys did not ignore the prior case file to spend their time on other "crucial leads," or because it was "inaccessible" or "so large" that it would necessarily divert them from more promising pursuits, or because they learned that it would be used at the last minute.  *Id*.  Justice O'Connor joined the Court's opinion because it was "consistent with the 'case-by-case examination of the evidence'" demanded by the *Strickland* standard.  *Id*. at 396.

The focus of the *Strickland* standard is on counsel.  Thus, *Strickland* requires evaluating the objective reasonableness of counsel's performance

after considering all the circumstances encountered by counsel.  466 U.S. at 688.  Counsel does not control the limitations of time and resources required or limited by the procedural rules or by the court.  Counsel does not have control over a defendant's willingness to cooperate.  The facts of the case and the settled law are all additional circumstances that restrict counsel's choices.  These, as well as other circumstances may constrain counsel's elections and determine the reasonableness of them.  Moreover, "the Sixth Amendment does not require that counsel do what is impossible or unethical.  If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade."  *United States v. Cronic*, 466 U.S. 648, 657 n. 19 (1984)

Thus, this Court must apply a "strong presumption" that counsel's choices were within the "wide range" of reasonable professional assistance.  *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689).  "Judicial scrutiny of counsel's performance must be highly deferential."  *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (quoting *Strickland*, 466 U.S. at 689).  The reason that review must be most deferential is that, unlike a reviewing court, the defense attorney "observed the relevant proceedings, knew of the materials outside the record, and interacted with the client, with opposing counsel, and with the judge."  *Richter*, 562 U.S. at 105.  "It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse

sentence.' *Id*. (quoting *Strickland*, 466 U.S. at 689 and citing cases). "The question is whether an attorney's representation amounted to *incompetence* under 'prevailing professional norms,' not whether it deviated from best practices or *most common custom*." *Id*. (citing *Strickland*, 466 U.S. at 690) (emphasis added).

With respect to the prejudice showing, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceedings.'" *Id*. at 104 (quoting *Strickland*, 466 U.S. at 693). Instead, Ramirez must show a reasonable probability—one sufficient to undermine confidence in the outcome—that he would have received two life sentences absent counsel's alleged errors. *See Strickland*, 466 U.S. at 694. "Surmounting *Strickland*'s high bar is never an easy task." *Richter*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). Because the *Strickland* standard is a general one, the range of reasonable applications is "substantial." *Id*. (citing *Knowles*, 556 U.S. at 123).

## III.   ANALYSIS

Based on the state-court record, Ramirez cannot establish "cause" because Claim 34 lacks merit and Ramirez therefore cannot show that his

PCR counsel was constitutionally incompetent for failing to raise it.[3]   For the same reasons, Ramirez cannot show that the underlining IAC-of-sentencing-counsel claim was "substantial."[4]

The Supreme Court has stated that an attorney is not necessarily ineffective for failing to raise a *non*frivolous claim.   *Knowles*, 556 U.S. at 127.   But failure to raise a *meritless* claim does not constitute ineffective assistance of counsel.   *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994); *Baumann v. United States*, 692 F.2d 564, 572 (9th Cir. 1982); *see also United States v. Ventura-Cruel*, 356 F.3d 55, 61 n. 8 (1st. Cir. 2003); *Lilly v. Gilmore*, 988 F.2d 783, 786 (7th Cir. 1993).   Thus, "a PCR counsel would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective." *Sexton*, 679 F.3d at 1157, 1159 (holding that trial counsel was not ineffective, thus there was no reason

_____

[3] Ramirez's reliance on this Court's pre-*Martinez* "cause and prejudice" order (Doc. 242, at 4, 713) to argue that this Court's observations of PCR counsel's conduct are factual findings that "are *res judicata* for purposes of the *Martinez* inquiry" is unavailing.   (Doc 256, at 2)   This Court did not *find* PCR counsel ineffective under *Strickland*.   (Doc. 242, at 1213)   Moreover, PCR counsel's purported errors do not alter the fact that Claim 34 would have failed had counsel raised it, and this fact alone precludes a finding of PCR counsel's ineffectiveness under *Strickland*.

[4] For these reasons, Ramirez' claim fails on *de novo* review under 28 U.S.C. § 2254 even if this Court sets aside the procedural default and considers its merits.

for Sexton's PCR counsel to pursue an IAC claim of trial counsel). The holding of *Sexton* controls the disposition of this case.

Even under *de novo* review, for the reasons set forth below, the state-court record demonstrates that Mara Siegel was not constitutionally incompetent a quarter of a century ago when she investigated and presented a case for life sentences, particularly in light of the constraining circumstances of the lack of time, resources, Ramirez's full cooperation and the horrific double homicide. Further, Ramirez admits that a "substantial portion" of his IAC claims involve facts developed during his state-court litigation concerning his mental retardation claim under *Atkins v. Virginia*, 536 U.S. 304 (2002). (Doc. 256, at 5.). In fact, Ramirez explicitly states that he "relies on the entirety of [the state court *Atkins* proceedings] to set forth his colorable claim of ineffectiveness of sentencing and post-conviction counsel." (*Id.* at 7 n. 2.) Yet despite having abundantly more resources and years in which to conduct further investigation, including the prolonged *Atkins* litigation in 2005−08, the minimal new information uncovered since sentencing does not create even a remote possibility, let alone a reasonable probability, that Ramirez would have been sentenced to life if the information had been presented in 1990.

Claim 34 alleged that Ramirez's trial counsel was ineffective for:

failing to conduct a complete mitigation investigation and

> presentation, which would have included evidence of Petitioner's <u>mental retardation</u>, <u>brain damage</u>, impaired intellectual functioning, childhood poverty, *in utero* exposure to <u>pesticides</u> and alcohol, the fact that he was the <u>product of the rape</u> of his fifteen-year-old mother by his uncle, and childhood neglect and abuse.

(Doc. 158, at 13.) (new information underlined). Despite Ramirez's relentless argument to the contrary, the state court found that he *was not mentally retarded*—either at the time of sentencing or in 2006. (Exhs. I and Q.) When Ramirez was psychologically examined in 1990 under Rule 26.5 no "brain damage" was detected. And given the Arizona Supreme Court's and the trial court's finding that Ramirez's capacity was "significantly impaired" at the time of the murders, even assuming there is now reliable evidence of "brain damage" any additional weight would be trivial.

Further assuming that there is reliable, admissible evidence that Ramirez's mother was exposed to pesticides while pregnant with Ramirez and that Ramirez was a product of rape, such evidence does not explain Ramirez' conduct in committing the horrific double murder at 32 years of age. "No reasonable jury would have accorded his age any mitigating weight." *State v. Sansing*, 206 Ariz. 232, ¶ 33, 77 P.3d 30 (2003) (Sansing was 31 when he committed his violent murder; Ramirez was a year older when he committed his two violent murders). The circumstances of Ramirez' conception and in vitro existence are even more remote.

Nevertheless, Ramirez argues that the only thing for this Court to decide is "whether he is entitled to habeas relief under 28 U.S.C. § 2254 on the claim."  (Doc. 256, at 4 (citing Doc. 250).)  In reaching this conclusion (in addition to misunderstanding what the Ninth Circuit found before remanding the case and what this Court found concerning PCR counsel), Ramirez misreads *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc) to hold that "a habeas petitioner need only show that post-conviction counsel performed deficiently and 'need not show actual prejudice resulting from his PCR counsel's deficient performance, over and above his required showing that the trial-counsel IAC claim be 'substantial.'"  (Doc. 256, at 4) (citing *Detrich*, at 124546.)  However, a majority of the en banc panel explicitly rejected this view presented in the plurality opinion.  *Clabourne*, 745 F.3d at 376.   Rather, "the petitioner must show that his post-conviction relief counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984)."  *Id*.; *Dickens*, 740 F.3d at 1320.  Ramirez has failed to make that showing.

## A.    *The Atkins litigation is irrelevant.*

Despite the state-court finding that Ramirez was not mentally retarded, Ramirez now argues that finding should not bound this Court because "questions of cause and prejudice are uniquely federal questions not governed by the strictures of the AEDPA."  (Doc. 256, at 6.)  He then

attempts to relitigate the state-court finding. (*Id*. at 7−9.) He concludes that he "cannot be held capitally responsible for his crime" because his "intellectual disability" was not "discovered sooner." (*Id*. at 9.)

But the only question before this Court is whether it should excuse Claim 34's procedural default under *Martinez*. While Ramirez is correct that cause and prejudice are federal questions, the *Martinez* analysis asks whether Ramirez's trial and PCR attorneys were constitutionally ineffective, an issue unrelated to the *Atkins* litigation that occurred over a decade after those attorneys were no longer involved in his case. In 2008, Ramirez sought to amend his second amended petition to add a claim based on *Atkins* (Claim 38) and three other related claims (Claims 37, 39, 40). (Doc. 176.) This Court rejected the amendment and expressly found that an *Atkins* claim is not based on attorney error. (Doc. 190, at 10, 12, 44.) Nevertheless, a substantial portion of Ramirez's prejudice argument in this *Martinez* motion (Doc. 256, at 20−38) is simply a repetition of what he presented in support of his rejected Claim 38 (Doc. 176, at 1−30.)

Furthermore, even if this Court were to consider the *Atkins* issue, Ramirez does not precisely summarize the state court's findings on the *Atkins* claim (Doc. 256, at 7). After a 9-day evidentiary hearing, on September 22, 2006, Judge O'Toole found that Ramirez had "*failed to prove by clear and convincing evidence or by a preponderance of the evidence that*

he is mentally retarded," as defined by A.R.S. § 13-753(G) and (K)(3). (Exh. Q.) (emphasis added).   Under Arizona law, then and now, to establish mental retardation or "intellectual disability," a defendant needed to prove all three of the following statutory elements: "significantly subaverage general intellectual functioning, existing concurrently with significant impairment in adaptive behavior" and onset before age 18.   A.R.S. § 13−753(K)(3); *see State v. Boyston*, 298 P.3d 887, 895 at ¶¶ 31−38 (Ariz. 2013).   Beyond the overall finding, Judge O'Toole also found: Ramirez failed to prove "by clear and convincing evidence *or* by a preponderance of the evidence that he suffers from "significantly sub average general intellectual functioning" which means "a full scale intelligence quotient [IQ] of seventy or lower."  (Exh. Q, at 2.)  Contrary to Ramirez's footnote 1, the state court explicitly stated it applied the accepted "margin of error for the tests administered," Ramirez's full scale IQ ranged from 63 to 82.  (*Id.*)

The state court did find Ramirez proved by "preponderance of the evidence, but not by clear and convincing evidence" significant impairment in adaptive functioning and that Ramirez' adaptive behavior deficits occurred before age 18.  (*Id*. at 4, 7.)

Even if the *Atkins* issue was before this Court, the two recent Supreme Court decisions would have no application.  The *Atkins* court noted that the

mildly mentally retarded have an IQ level of 50–55 to approximately 70.

*Atkins*, 536 U.S. at 308 n.3. The Arizona definition is consistent.

> "Significantly subaverage general intellectual functioning" means a full scale intelligence quotient of seventy or lower. *The court in determining the intelligence quotient shall take into account the margin of error for the test administered.*

A.R.S. § 13-753(K)(5) (emphasis added)  Unlike the situation in *Hall v. Florida*, 572 U.S. ___, 134 S. Ct. 1986, 1990 (2014), Judge O'Toole did not apply a "rigid rule" that foreclosed all further exploration of intellectual disability because Ramirez scored above 70 in some of his IQ tests.  Also unlike in *Brumfield v. Cain*, 576 U.S. ___, __S. Ct. __ (2015), Judge O'Toole held an extended evidentiary hearing despite IQ scores of 70 or above.  Contrary to Ramirez's contentions, he had a fair forum in which to prove his *Atkins* claim in 2006, this is not the forum to revisit the careful, detailed findings by the state court.

### B. *Mara Siegel's conduct at the 1990 sentencing was not constitutionally deficient.*

Relying significantly on "hindsight" declarations from Mara Siegel, her investigator Nora Shaw, and Dr. McMahon, declarations based in part on information that was not available in 1990, Ramirez argues his attorney was constitutionally deficient for not doing more investigation.  The state court record, however, demonstrates that, under the circumstances, her

performance was far from incompetent and certainly professionally reasonable.

Mara Siegel *proved* seven nonstatutory mitigating factors and one statutory mitigating factor at sentencing. (Exh. N, at 7−10.)  Twenty years later, with the benefit of hindsight, Mara Siegel declared she could have provided "better" representation had she had more resources or experience. (Doc 256-2, at 6 ¶ 2.)  However, Siegel's opinions are not dispositive of the question whether her representation of Ramirez fell below an objective standard of reasonableness.  *See, e.g., Edwards v. Lemarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (court is "not obligated to accept a self-proclaimed assertion by trial counsel of inadequate performance") (quotations omitted). Her lack of resources was part of the circumstances to be considered in judging the reasonableness of her performance.  Furthermore, the mere lack of experience is not the test, but rather an IAC claim must be based on "specific errors made by trial counsel."  *United States v. Cronic*, 466 U.S. 648, 666 (1984).

Mara Siegel was limited by additional circumstances.  Her pre-trial request for a mitigation specialist was denied, to be reconsidered if Ramirez was convicted.  (Doc. 242, at 2.)  Jurors convicted Ramirez of the two murders on July 27, 1990.  (Exh. E.)  The trial court appointed Dr. McMahon the same day and Dr. McMahon filed his report on August 18,

1990.  (Exhs. E, I.)  Given this short window, it is remarkable the amount of material Mara Siegel was able to provide Dr. McMahon.  (*See* Exh. I, at 1, listing the items).[5]   Mara Siegel filed her sentencing memorandum on October 12, 1990, after receiving an extension from the trial court.  (Exh. H.)  The trial court sentenced Ramirez about 60 days later, on December 18, 1990, following the two mitigation hearings.  (Exhs. J, L, N.)

Another circumstance the Supreme Court discussed in *Strickland* was the role of the defendant in assessing the reasonableness of counsel's decisions.  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."  *Id.* 466 U.S. at 691.  Here the record is clear that Ramirez had encouraged his family members not to assist in the mitigation investigation and given his convictions he wanted to be sentenced to death.  (Exh. H at 20−21; Exh. J, at 51, 78, 105−06.)  But despite these circumstances, Mara Siegel amassed and presented to the court significant information about Ramirez's childhood,

---

[5] The Ninth Circuit has held that "[i]t is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts."  *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990). There is no suggestion that there was anything improper about Dr. McMahon's selection.  It was also reasonable for Mara Sigel not to further pursue the issue of mental retardation given Dr. McMahon's opinion.  *See Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2002) (an attorney is entitled to rely on opinions of mental health experts in deciding on what issues to pursue).  Dr. McMahon's speculation based on hindsight concerning what he might have done in 1990 had he seen Ramirez IQ scores of 70 and 77 is no better than speculation on how his opinion might change if he had sat through the *Atkins* hearing in 2006.

absent father, alcoholic mother, sexual abuse, lack of schooling, intellectual deficits, vocational history, and substance abuse.  Ramirez has not shown that Mara Siegel's conduct was not within the "wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.

### C.    *There was no deficient performance of PCR counsel in failing to raise IAC of sentencing counsel.*

As previously discussed, because Mara Siegel's performance at sentencing was well within the bounds of professional conduct, if PCR counsel had raised Claim 34 it would have been meritless.  Thus, PCR counsel would not have been constitutionally ineffective for failing to raise a meritless IAC claim.  *See Sexton*, 679 F.3d at 1157.

### D.    *There was no prejudice*

The information offered here that was available in 1990 and not presented by Mara Siegel is *de minimis*, without significant probative value, and cumulative mainly providing additional details of Ramirez' upbringing.[6] This Court assesses prejudice by reweighing the totality of available mitigation against the evidence of aggravation.  *Wiggins v. Smith*, 539 U.S.

---

[6] Ramirez also offers new information that was not available in 1990, such as the three juror declarations signed in 2005.  (Doc. 256-2, at 61−67.) These declarations are entirely speculative, are based on incorrect facts, and concern a subject none the jurors were empaneled or qualified to consider: sentencing.  Nor do the declarations reflect that juror contact was authorized by this Court.  *Cf.* LRCiv 39.21(b) (requiring good cause and court approval to contact jurors after a federal trial within the time granted for a motion for a new trial).

510, 534 (2003).  Given the aggravation findings in this case, there is no reasonable probability that additional less-weighty mitigation would have changed the sentence.  *See*, *e.g.*, *Wong v. Belmontes*,  558 U.S. 15, 26−28 (2009) (*per curiam*) (finding no prejudice where the aggravation was "simply overwhelming"); *Woodford v. Visciotti*, 537 U.S. 19, 26 (2002) (*per curiam*) (trial counsel's failure to introduce evidence of having been born with club feet, having feelings of inadequacy, incompetence, inferiority, markedly lacking in self-esteem, being berated, was not ineffective); *Rhoades v. Henry (Baldwin)*, 638 F.3d 1027, 1052 (9th Cir. 2011) (the aggravating circumstances were too strong to make it reasonably probable that the additional mitigation would have changed the result); *Heishman v. Ayers*, 621 F.3d 1030, 1037 (9th Cir. 2010) (the additional mitigation that might have been uncovered was not compelling when weighed against the aggravating circumstances); *Bible v. Ryan*, 572 F.3d 860, 870 (9th Cir. 2009) (given the aggravating circumstances there was no reasonable probability that the sentence would have been different); *King v. Schriro*, 537 F.3d 1062, 1074 (9th Cir. 2008) (subsequent post-conviction investigation did not show anything substantially different or more helpful than previous available information that would probably change the death sentence); *Brown v. Ornoski*, 503 F.3d 1006, 1016 (9th Cir. 2007) (quality of the additional mitigation was not sufficient to overcome the substantial

aggravation); *Allen v. Woodford*, 395 F.3d 979, 1009−10 (9th Cir. 2005) (even though counsel's mitigation investigation was deficient, the total potential evidence of mitigation did not outweigh the aggravation); *Campbell v. Kincheloe*, 829 F.3d 1453, 1464 (9th Cir. 1987) (potential mitigation of defendant's background, childhood and family relationships would not outweigh the aggravation); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1042 (9th Cir. 1997) (counsel's failure to introduce available mitigation did not entitle Gerlaugh to relief because of the substantial aggravation).

Much of the humanizing information Ramirez claims should have been presented was, in fact, presented to the sentencing court.  The court was aware of  Ramirez's Arizona and California school records, including IQ scores from the schools; that his mother drank during her pregnancy; that his mother neglected her children; that his mother died from alcoholic liver failure; that his father was absent ; that his siblings had different fathers; that he cared for his younger siblings; that he lived with his grandmother for a while; that he had a low-skilled employment history; and that he lacked a history of serious injuries.  The court considered this evidence, among other information.

Most of the new social evidence Ramirez now offers is the type of information that he would have known at the time of trial, when he was not fully cooperating with Mara Siegel's mitigation investigation efforts.  And

the 1990 record undercut some more recent claims by relatives.  For instance, he was not a pawn or a follower when he committed his last two violent crimes, the aggravated assault and the murders.  He was by himself when he committed each.

## IV.   NO EVIDENTIARY DEVELOPMENT IS APPROPRIATE

Ramirez argues he is entitled to evidentiary development because he has established that his IAC claim of sentencing counsel has "some merit." (Doc. 256, at 39.)  Respondents' believe the state-court record demonstrates the opposite; his IAC of sentencing counsel claim has no merit.  Because the existing record shows that Mara Siegel was not incompetent at sentencing when judged under *Strickland* standard, there is no legal necessity for further delay and expense in pursuing in additional litigation.[7]  *See generally Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

---

[7]  If there existed a question of "cause" that required evidentiary development. Ramirez is correct that AEDPA's limitations on factual development, contained in 28 U.S.C. § 2254(e)(2) and *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388 (2011), would not apply to that inquiry.  He is incorrect, however, insofar as he argues that § 2254(e)(2) would not apply to an evidentiary hearing on the merits of the claim.  Also, Ramirez discusses technical corrections to the state-court *Atkins* transcripts.  Because those transcripts are not part of this IAC claim, that argument is not relevant here. Moreover, Ramirez does not state what steps he has taken to obtained correction of the technical errors since 2010.

DATED this 6th day of July, 2015.

                                                    Respectfully submitted,

                                                    Mark Brnovich
                                                    Attorney General

                                                    Lacey Stover Gard
                                                    Chief Counsel

                                                    s/ John Pressley Todd
                                                    Assistant Attorney General

                                                    Attorneys for Respondents

I hereby certify that on July 6, 2015, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Jon M. Sands
Federal Public Defender
District of Arizona
Paula K. Harms (Az Bar No. 022489)
Timothy M. Gabrielsen (NV Bar No. 8076)
850 West Adams Street, Suite 201
Phoenix, Arizona 85007

Attorney for Petitioner

s/ Barbara Lindsay
4530158

LIST OF EXHIBITS

A.   WAIVER OF COUNSEL

B.   M.E. 7/11/90

C.   R.T. 7/10/90

D.   JURY VERDICTS

E.   VERDICT

F.   M.E. 8/22/90

G.   M.E. 10/4/90

H.   DEFENDANT'S SENTENCING MEMORANDUM

I.   REPORT OF DR. MICKEY MCMAHON

J.   R.T. 10/19/90

K.   CORRESPONDENCE

L.   R.T. 11/30/90

M.   PRESENTENCE REPORT

N.   SPECIAL VERDICT

O.   PETITION FOR POST-CONVICTION RELIEF

P.   M.E. I2/16/96

Q.   RULING