**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| David Martinez Ramirez, | No. CV-97-01331-PHX-JAT |
| Petitioner, | |
| v. | **ORDER** |
| Charles L. Ryan, et al., | |
| Respondents. | |

On December 2, 2014, the Ninth Circuit Court of Appeals remanded this case for reconsideration of Claim 34 in light of *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). (Doc. 249.) Claim 34 alleges ineffective assistance of counsel at sentencing. *Martinez* holds that the ineffective assistance of post-conviction counsel can serve as cause for the procedural default of claims of ineffective assistance of trial counsel. This Court previously found Claim 34 defaulted and barred from federal review.

Ramirez filed his supplemental *Martinez* brief on March 4, 2015. (Doc. 256.) Respondents filed a response in opposition and Ramirez filed a reply. (Docs. 257, 260.) For the reasons set forth below, Claim 34 remains procedurally barred. Ramirez's request for evidentiary development is denied.

**I.      BACKGROUND**

In 1990, Ramirez was convicted of two counts of premeditated first-degree murder for the deaths of Mary Ann Gortarez and her 15-year-old daughter Candie. *See State v.*

*Ramirez*, 178 Ariz. 116, 119–21, 871 P.2d 237, 240–42 (1994) (describing facts of the crimes).

In the early morning hours of May 25, 1989, neighbors heard noise coming from the Gortarez apartment and called 911. Officers arrived and entered the apartment. They saw Mary Ann's body on the living room floor. Ramirez, shirtless and covered in blood, approached the officers. He appeared to be intoxicated.

Candie's body was found naked in one of the bedrooms. There was blood throughout the apartment. A knife blade was found in the front hall, a cake knife was found near Mary Ann's arm, part of the cake knife handle and a handle matching the blade found in the hall were in her hair, a pair of bloody scissors was found in the bathroom, and in a rear hallway there was a blood-soaked box cutter.

Mary Ann had been stabbed 18 times in the neck, and in the back and knee. She had defensive wounds on her hand and forearms. Her daughter had been stabbed 15 times in the neck. Vaginal swabs taken from Candie tested positive for semen; Petitioner could not be excluded as the donor of the semen.

At sentencing, the judge found three aggravating circumstances: Ramirez had two prior violent felony convictions, under A.R.S. § 13-703(F)(2); Ramirez committed the murders in an especially cruel, heinous, or depraved manner, A.R.S. § 13-703 (F)(6); and Ramirez committed multiple homicides during the same episode, A.R.S. § 13-703(F)(8). (Doc 257-2, Ex. N.) The judge found one statutory mitigating circumstance and seven non-statutory circumstances, but determined that they were not sufficiently substantial to warrant leniency. (*Id.*)

The court sentenced Ramirez to death on both murder counts. The Arizona Supreme Court affirmed Ramirez's convictions and sentences on direct appeal. *Ramirez*, 178 Ariz. 116, 871 P.2d 237. Ramirez filed a Petition for Post-conviction Relief (PCR), which the trial court denied in its entirety. The Arizona Supreme Court summarily denied review.

On June 26, 1997, Ramirez filed his initial habeas petition in this Court. (Doc. 1.) After briefing, the Court issued a ruling on the procedural status of the twelve claims

raised in Ramirez's amended petition, dismissing all except portions of Claims 1 and 2. (Doc. 26.) On July 6, 2004, Ramirez filed a supplemental petition alleging additional claims. (Doc. 84.)

The parties briefed the remaining claims. (Docs. 90, 97, 103, 110.) The Court subsequently granted a stay of the sentencing claims, to allow Petitioner to seek relief from his death sentence in state court based on a claim of mental retardation pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002). (Doc. 119.) During the stay, the Court issued a ruling denying evidentiary development and dismissing Ramirez's conviction claims. (Doc. 140.) The state court found that Ramirez was not mentally retarded under Arizona law. (Doc. 232-6.)

Ramirez filed a notice of PCR petition in state court regarding the *Atkins* claim and a separate successive PCR notice raising five additional claims. When those five claims had been exhausted in state court, Ramirez sought to amend the petition to include them in this Court. (Doc. 145.) The Court granted amendment only as to Claim 34 (Doc. 158), and Ramirez filed a second amended petition incorporating that claim (Doc. 162).

The Court initially concluded that Claim 34 had been procedurally defaulted in state court based on an independent and adequate procedural bar. (Doc. 207.) After further briefing, the Court concluded that Ramirez had demonstrated neither cause and prejudice nor a fundamental miscarriage of justice to excuse default of the claim. (Doc. 242.)

## II.    APPLICABLE LAW

Federal review is generally not available for a state prisoner's claims when those claims have been denied pursuant to an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In such situations, federal habeas review is barred unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice. *Id. Coleman* held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, however, the Court announced a new, "narrow exception" to the rule

set out in *Coleman*. The Court explained that:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. at 1320; *see also Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013).

Accordingly, under *Martinez* a petitioner may establish cause for the procedural default of an ineffective assistance claim "where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland* . . .' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S. Ct. at 1318); *see Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 818 (9th Cir. 2015) (en banc); *Dickens v. Ryan*, 740 F.3d 1302, 1319–20 (9th Cir. 2014) (en banc); *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc).

In *Clabourne*, the Ninth Circuit summarized its *Martinez* analysis. To demonstrate cause and prejudice sufficient to excuse the procedural default, a petitioner must make two showings:

> First, to establish 'cause,' he must establish that his counsel in the state postconviction proceeding was ineffective under the standards of *Strickland. Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different.

*Clabourne*, 745 F.3d at 377 (citations omitted). Determining whether there was a reasonable probability of a different outcome "is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective." *Id.* at 377–78. "PCR counsel

would not be ineffective for failure to raise an ineffective assistance of counsel claim with respect to trial counsel who was not constitutionally ineffective." *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012).

To establish prejudice, the petitioner must demonstrate that his underlying ineffective assistance of counsel claim is substantial, or "has some merit." *Id.* A claim is substantial if it meets the standard for issuing a certificate of appealability. *Martinez*, 132 S. Ct. 1318–19 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). According to that standard, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Detrich*, 740 F.3d at 1245 (quoting *Miller-El*, 537 U.S. at 336).

Claims of ineffective assistance of counsel are governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Id.* at 687–88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see Wong v. Belmontes*, 558 U.S. 15 (2009) (per curiam); *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010). To satisfy *Strickland*'s first prong, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

With respect to *Strickland*'s second prong, a defendant must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534

- 5 -

(2003). The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).

## III.    DISCUSSION

In Claim 34, Ramirez alleges that he received ineffective assistance of counsel at sentencing.  (Doc. 162 at 105.) The parties agree, though for different reasons, that the Court should reach the merits of this claim. . (*See* Doc. 257 at 1.) Respondents contend that review of the merits shows that PCR counsel did not perform ineffectively in failing to raise the claim in state court. (*Id.*) Ramirez argues that default of the claim is excused by PCR counsel's ineffective performance and therefore the claim must be reviewed *de novo*.[1] (Doc. 256 at 2–3). As Respondents note, the parties' arguments lead to the same place: an analysis of Claim 34.

Ramirez alleges that counsel was ineffective for failing to discover and present significant mitigating evidence. (Doc. 162 at 105.) Respondents argue that counsel's performance at sentencing was not deficient and that Ramirez was not prejudiced because the new information he offers is "*de minimis*, without significant probative value, and cumulative" to the evidence presented at sentencing.  (Doc. 257 at 42–55.)

As discussed next, the Court, after reviewing the parities' arguments and the new evidence submitted by Ramirez, finds that trial counsel did not perform at a constitutionally ineffective level during Ramirez's sentencing.

---

[1]  Ramirez contends that this Court has already determined that PCR counsel performed deficiently in presenting the claim of ineffective assistance of counsel at sentencing. (Doc. 256 at 2–3.) The Court disagrees. The Court outlined the facts concerning PCR counsel's performance while discussing cause and prejudice in a pre-*Martinez* context. (*See* Doc. 242 at 4–13.) The Court did not consider the question of whether PCR counsel's performance was both deficient and prejudicial under *Strickland*.

## A.     Additional facts

Ramirez originally chose to represent himself. After jury selection, he requested that advisory counsel, Mara Siegel, be appointed to represent him going forward. The court granted the request and Siegel represented Ramirez at trial and sentencing.

Following the guilty verdicts, the trial judge, Maricopa County Superior Court Judge Thomas O'Toole, appointed Dr. Mickey McMahon "to test and evaluate the defendant's current mental health and, if such is deemed appropriate, conduct further diagnostic testing and evaluation."[2] (Doc. 257-1, Ex. E.)

Judge O'Toole originally set the sentencing for September 21, 1990, within 60 days of the verdicts. (*Id.*, Ex. D.) At Siegel's request, he continued the sentencing to October 19, 1990. (*Id.*, Ex. F.) Subsequently the court denied Ramirez's request to continue the Aggravation/Mitigation Hearing beyond the October 19 date, but agreed to schedule the imposition of sentence for a subsequent date. (*Id.*, Ex. G.) On October 19, the trial court permitted Ramirez to continue part of the mitigation presentation to November 30. (*Id.*, Ex. J at 112−13.)

### 1.     Dr. McMahon's Report

Dr. McMahon met with Ramirez on three occasions. (*Id.*, Ex. I at 2.) He interviewed Ramirez, performed psychological tests, reviewed materials documenting Ramirez's criminal history, and prepared a report.

The report first recounts Ramirez's version of the crimes. Ramirez had been out of prison for approximately three months before the murders. (*Id.* at 1.) He began drinking and using cocaine around 9:30 p.m. that evening; he injected cocaine once and initially had two glasses of beer. (*Id.*) He had two more beers and two mixed drinks at a bar and then "shot up with cocaine a second time that evening." (*Id.* at 1−2.) He "went back to his girlfriend's apartment around 10:45 pm and shot up with cocaine 4 more times and had approximately 6 more beers before the murder took place." (*Id.* at 2.)

---

[2] The appointment was made pursuant to Rule 26.5 of the Arizona Rules of Criminal Procedure, which allows the trial court to order a defendant to undergo mental health examination or diagnostic evaluation at any time prior to sentencing. Ariz. R. Crim. P. 26.5.

Ramirez told Dr. McMahon he had sex with the 15-year-old daughter the night of the murders and had had sex with her on four previous occasions. (*Id*.) Ramirez claimed the murders were committed by two black men but stated "he didn't care if he was executed for the crime." (*Id*.)

Ramirez "denied that his stepfather ever hit him, his seven siblings, or their mother." (*Id*. at 3.) According to Ramirez, his mother devoted "her time as a traditional Mexican-American mother whose responsibility revolve[d] around the home and her children. She was always there for the client when he needed her as he was growing up." (*Id*.)

Dr. McMahon noted that Ramirez was "generally quite protective of family members and [would] not tolerate any probing into potentially negative aspects of their lives, insisting that our conversation be tinged with 'respect,' and only then would he be willing to talk, not otherwise." (*Id*.) Dr. McMahon reported that Ramirez "was quite protective of his family and not willing to include them in any way he thought would place them in a negative light." (*Id*. at 7.)

Ramirez said he was involved in serious car accidents but denied ever sustaining a head injury or being knocked unconscious. (*Id*. at 4.)

Ramirez told Dr. McMahon that he had sexual intercourse with his aunt when he was 10 years old and that his cousin took advantage of him sexually about 20 times. (*Id*.)

Ramirez finished ninth grade but left school in tenth grade when he joined a gang. (*Id*. at 6.)

Dr. McMahon administered the Peabody Picture Vocabulary IQ Test ("PPVT"), which resulted in an IQ score of 94. Accordingly, Dr. McMahon opined that Ramirez was "well within the average range of intelligence and in no way indiative [sic] of any form of mental retardation." (*Id*.)

Dr. McMahon discussed the results of other psychological tests. (*Id*. at 6−7.) Although Ramirez fit the profile of one who withdraws into fantasy under extreme stress, Dr. McMahon found no evidence that Ramirez suffered from schizophrenia, paranoid type. (*Id*. at 6.) He found that Ramirez's alcoholism scale was high given his history of

alcohol abuse. (*Id.*) Ramirez scored high on the psychomotor acceleration test. (*Id.* at 7.) Dr. McMahon opined that Ramirez's "manic-like behavior [was] due to more than just the cocaine abuse." (*Id.* at 7.)

In summary, Dr. McMahon wrote, "The above results indicate that most likely the primary factor related to the murder was the abuse of alcohol and cocaine." (*Id.*) He concluded, "I can state with reasonable psychological certainty that the defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly diminished." (*Id.* at 8.)

2.    Sentencing Memorandum

Prior to the mitigation hearing, Siegel filed a 29-page sentencing memorandum with supporting attachments, including school records, jail records, and pre-sentence reports. (Doc. 257-1, Ex. H.) In arguing for a life sentence, the main themes of the memorandum were Ramirez's chaotic childhood and school years, his ability to adapt to the structured life of prison, his history of drug and alcohol abuse, and his impaired state of mind at the time of the murders.

Siegel described Ramirez's family background as characterized by "poverty, uncertainty, chaos." (*Id.* at 4.) Ramirez, the oldest of eight siblings, was born to a 16-year-old mother. (*Id.*) He never knew his own father. (*Id.*) His mother, an alcoholic, died of ethyl alcohol hepatitis. (*Id.* at 12.)

To prepare the memorandum, Siegel "requested all of David Ramirez's school records from kindergarten through high school." (*Id.*) She discovered, however, that "nearly all of David's school records were destroyed by the early 1970's." (*Id.* at 5.) She was able to obtain from the Phoenix Elementary School District his school identification card and his IQ test results from 1967 and 1969. (*Id.*) These records showed that Ramirez changed schools 10 times before he had completed the seventh grade and did not complete high school. (*Id.*)

Siegel detailed Ramirez's poor attendance at the various schools. (*Id.* at 5−7.) She discussed the results of IQ tests administered when Ramirez was a student. These included a score of 70 on the Stanford Binet test in 1967, and a 1969 test, which

measured Ramirez's IQ as 77. (*Id*. at 7.) Siegel noted that this score indicated "borderline intellectual functioning," explaining that "D.S.M.–III-R states that a person is mildly retarded if he/she has an I.Q. of 50 to 55, to approximately 70 (D.S.M.-III-R)." (*Id*.) Siegel reported that a defense investigator contacted the individuals who administered the tests but neither remembered Ramirez. (*Id*.)

Siegel discussed Ramirez's move to El Monte, California, and his poor high school grades. (*Id*. at 7−8.) She learned that, five years after a student's graduation, all of his psychological testing records are destroyed. (*Id*. at 8.) However, she did attach Ramirez's 1971 California Achievement Grade Point Test, with test scores revealing he was "3−4 grade levels below his schoolmates." (*Id*.)

Siegel wrote about the sexual abuse Ramirez experienced as a child. At age 10, his 15-year-old aunt forced him to have intercourse, and at age 10 and 11 he was molested by an older female cousin. (*Id*. at 8.)

Siegel noted that in California Ramirez joined a gang in part due to family problems caused by his mother's alcoholism. (*Id*. at 9.)

Siegel discussed Ramirez's early involvement with the criminal justice system. She cited records indicating that Ramirez had become "institutionalized," so that he was able to function productively within the structured prison environment. (*Id*. at 9−12.) Siegel noted that Ramirez's IQ score 94 of as measured by Dr. McMahon was "now well within the average range of intelligence." (*Id*. at 22.) She argued "[t]his increase in basic intelligence may be due to the structured environment of prison where David completed his G.E.D." (*Id*. at 22.)

Siegel detailed Ramirez's history of drug and alcohol abuse, noting that he began using drugs as a young teenager. (*Id*. at 21.) She explained that on the night of the killings, "he had intravenously injected heroin 5 to 6 times within 4 to 5 hour period prior to the homicides. He had also drank a substantial amount of beer." (*Id*.)

Citing Dr. McMahon's report, Siegel argued that Ramirez's "capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly diminished," a statutory mitigating fact under A.R.S. §

13−751(G)(1). She cited Dr. McMahon's opinion that a "combination of David's psychological makeup coupled with the indigestion [sic] of alcohol and cocaine for a period of 2 months prior to and including May 25, 1989," significantly impaired his capacity at the time of the murders. (*Id*. at 18−20.)

Siegel also expressed concern about Ramirez's mental outlook and his attitude toward his sentencing:

> David Ramirez has wanted to be sentenced to death if convicted by a jury since June of 1989. *The defendant has been either reluctant or refused to cooperate with any efforts to collect background material on him, contact his family members, doctors, etc., since shortly after this counsel was appointed to represent Mr. Ramirez in June, 1989.*
> . . . .
>
> Throughout the preparation for a mitigation hearing, David has evidenced an inappropriate affect in his behavior, particularly when discussing the seriousness of the punishment to be imposed, if convicted. If it was not so readily apparent as a defense mechanism, David has evidenced an almost flippant attitude toward being put to death.

(*Id*. at 20−21) (emphasis added).

### 3.   Mitigation Hearing

At the mitigation hearing, Siegel presented testimony from Ramirez's aunt, Erlinda Martinez, and two of Ramirez's sisters, Mary Castillo and Cynthia Orozco. His aunt, who was about the same age as Ramirez, testified that Ramirez's mother was about 16 when Ramirez was born. She was "always drinking" and often intoxicated.  (Ex. J at 31−32, 42−43.) When she was pregnant with Ramirez, she would stay out all night drinking beer; sometimes she would be gone for days. (*Id*. at 33.) His mother died of alcohol-related problems. (*Id*. at 64.)

Ramirez's mother had a lot of male friends. (*Id*. at 33.) She used Ramirez as a housekeeper and babysitter for her other children. (*Id*. at 34.) At one point, Ramirez lived with his grandmother for about three years, but his mother wanted him back because she had no one else to take care of the children. (*Id*. at 35.)

Ramirez's biological father was not around and none of Ramirez's siblings had the same father as Ramirez; four different men fathered the children in his family. (*Id*. at 36−37.)

His aunt did not recall Ramirez having problems in school. (*Id*. at 39.) Because his mother moved frequently, Ramirez attended more than seven grammar schools. (*Id*. at 65.) His aunt could not remember if Ramirez had been kept back in school. (*Id*. at 68.) She believed that while growing up Ramirez and his family had adequate food and clothing. (*Id*. at 57−58.)

As a teenager Ramirez had a number of problems with his stepfather and ran away often. (*Id*. at 40−41, 43−44.) Ramirez had belt marks on his body; his aunt believed he was beaten by his stepfather. (*Id*. at 41.) Once he had a "busted lip." (*Id.*) His mother and stepfather had numerous fights. (*Id*. at 43.)

Although Ramirez had two sons with his first wife, he still helped raise his younger sisters. (*Id*. at 45.) Ramirez was working as a dishwasher and janitor at the time. (*Id*. at 59, 68.) His sons and ex-wife attended the mitigation hearing. (*Id*. at 45, 88.)

His aunt testified that Ramirez often wrote to her daughter. (*Id.*) She felt she could confide in him. (*Id*. at 49.)

When Ramirez found out that the defense investigator had subpoenaed his aunt to testify, he called to tell her he felt bad about involving her and her daughter in the case. (*Id*. at 51−52.) She learned that Ramirez had specifically told family members not to come to the trial or sentencing. (*Id*. at 52.)

Ramirez's aunt also testified about his positive traits, characterizing him as "a beautiful person," "very sentimental," "caring," "a good guy," "level-headed," "fairly intelligent," and "a responsible worker." (*Id*. at 48, 61, 55, 69.) She couldn't believe he committed the crimes he was accused of. (*Id*. at 50.) She didn't believe Ramirez should get the death penalty. (*Id.*)

Ramirez's younger sister Mary Castillo also testified that as a child he helped with household chores and made sure his sisters were clothed and fed. (*Id*. at 73−74.) Castillo did not recall her mother having a terrible drinking problem, but later in life she drank

heavily and died of her alcohol abuse. (*Id*. at 74.) Ramirez was "the man around the house" until his stepfather joined the family (*Id*. at 76.)

Castillo testified that she considered the stepfather strict, but not unreasonably so; that Ramirez followed the stepfather's orders; and that she did not recall Ramirez having any problems with his stepfather. (*Id*.)

While incarcerated, Ramirez had written letters to Castillo's daughters. (*Id*. at 77.) Ramirez did not want Castillo to testify because he did not want her involved in his case. (*Id*. at 78−79.) Castillo did not think death was an appropriate sentence. (*Id.* at 50.) She loved her brother and felt that a death sentence would hurt the entire family. (*Id*. at 80–81.) Castillo also had positive views of Ramirez's character. She described him as "a very good brother," who had "been there for" the family and was kind, sensitive, and affectionate. (*Id*. at 83−84.)

Cynthia Orozco, another of Ramirez's sisters, also testified. (*Id*. at 89.) She had lived with Ramirez and his wife when he was working as a dishwasher and cook. (*Id*. at 93.) His wife did not work. (*Id*. at 94.) According to Orozco, Ramirez would come home from work, eat dinner, and then go back to work. (*Id*.) She was about 15 the first time Ramirez went to prison. (*Id*. at 95.) They wrote one another while he was in prison. (*Id*. at 96−97.)

When Ramirez got out of prison in 1989, he came to live with her and her family. (*Id*. at 97.) He was working at a furniture store and bought her a TV stand. (*Id*. at 97−98.) He cleaned the house, cooked, and gave her money every week. (*Id*. at 98, 100.) Ramirez always took time to listen to her; she felt closer to Ramirez than to her other brother. (*Id*. at 101.)

Ramirez told her not to come to the aggravation/mitigation hearing, but she was subpoenaed. (*Id*. at 106.) She stated that it would affect her "[r]eal bad" if the court sentenced Ramirez to death. (*Id*. at 108.)

At the continuation of the mitigation hearing, Siegel presented two additional witnesses, employees of the Department of Corrections, food service supervisors who testified that Ramirez was hardworking, responsible, and cooperative. (Ex. L at  7–10,

19–21.) Both witnesses would assign Ramirez the top rating as an employee. (*Id.* at 10, 24.)

As noted, following the sentencing hearing, the court found three aggravating factors: that Ramirez had two prior violent felony convictions; that he committed the murders in an especially cruel, heinous, or depraved manner; and that he committed multiple homicides during the same episode. (Doc 257-2, Ex. N.)

In mitigation, the court found that Ramirez was impaired under § 13–703(G)(1). The court also found seven non-statutory mitigating circumstances: (1) Ramirez's unstable family background, (2) his poor educational experience, (3) that he was the victim of sexual abuse when he was young, (4) his gang affiliation, (5) his chronic substance abuse, (6) his psychological history, and (7) his love of family. (*Id.*) The court determined that none of the mitigating circumstances, taken individually or collectively, warranted leniency. (*Id.*)

## B.     Analysis

Ramirez alleges that Siegel performed ineffectively under *Strickland* by failing to present mitigating evidence of Ramirez's mental retardation, brain damage, impaired intellectual functioning, childhood poverty, childhood neglect and abuse, *in utero* exposure to pesticides and alcohol, and the fact that he was the product of the rape of his 15-year-old mother by his uncle. He also contends that Siegel performed ineffectively in failing to provide Dr. McMahon with additional information concerning Ramirez's low IQ scores and poor grades.

In support of this claim, Ramirez submits new evidence about counsel's sentencing stage performance. In a declaration from 2010, 20 years after Ramirez's trial, Siegel states that she does not think she was prepared to handle a capital trial as sole counsel and that if she had discovered the new information obtained by habeas counsel, she would have presented it at sentencing. (Doc. 256-2, Ex. Q at 1, 2.) In her declaration, also from 2010, Nora Shaw, the defense investigator, stated that this additional mitigating information should have been investigated and presented at sentencing. (*Id.*, Ex. R.) Dr. McMahon attested in a 2004 declaration that he was not provided information about

Ramirez's social history, or school, vocational, or medical records. (Doc. 256-1, Ex. P.) If he had been provided with the records showing Ramirez's previous IQ scores, he would have investigated whether Ramirez was mentally retarded. (*Id.*)

Ramirez's family members testified at the *Atkins* hearing in 2004 and have provided declarations describing the circumstances of Ramirez's birth and childhood. (Doc. 256-1, Ex's D–N.) According to this information, Ramirez was conceived when his 15-year-old mother was raped. She drank during her pregnancy and tried on several occasions to abort the fetus. When Ramirez was a toddler his mother fed him beer in a bottle. Ramirez's family were migrant workers, and he was exposed to pesticides *in utero* and as a child working in the fields. Ramirez appeared slow, and was late in reaching his developmental milestones.

Ramirez grew in extreme poverty. He was thin and malnourished, and stole food or relied on charity or handouts from neighbors. The living conditions were filthy due to his mother's neglect.

His mother would leave the children at home while she went out drinking. Ramirez and the other children were exposed to sex and violence when their mother brought men home from the bars. She physically abused Ramirez with slaps and kicks.

Drs. Ricardo Weinstein and Mark Tasse prepared reports in connection with the *Atkins* litigation in state court. (Doc. 256-1, Ex's A, B.) They both concluded that Ramirez met the definition of mentally retarded. Dr. Weinstein performed neurological testing and a Quantitative Electroencephalogram, which revealed that Ramirez suffered from "extensive and diffuse brain dysfunction with particular involvement of the frontal lobes." (Doc. 245-1, Ex. A at 29.)

### 1.   Siegel's performance was not deficient under *Strickland*

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Thus, to satisfy the deficient performance prong, Ramirez must overcome "the presumption that, under the circumstances, the challenged

action might be considered sound trial strategy." *Id.* The court "cannot 'second-guess' counsel's decisions or view them under the 'fabled twenty-twenty vision of hindsight.'" *Edwards v. Lamarque*, 475 F.3d 1121, 1127 (9th Cir. 2007) (quoting *LaGrand v. Stewart*, 133 F.3d 1253, 1271 (9th Cir. 1998)). "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir.), *rev'd on other grounds*, 525 U.S. 141 (1998).

Ramirez has not shown that Siegel's performance at sentencing fell below an objective standard of reasonableness. The fact that she represented Ramirez on her own without previous capital experience does not establish deficient performance. *Woods v. Sinclair*, 764 F.3d 1109, 1132 (9th Cir. 2014) *cert. denied sub nom. Holbrook v. Woods*, 135 S. Ct. 2311 (2015); *see Ortiz v. Stewart*, 149 F.3d 923, 933 (9th Cir. 1998) ("It is well established that an ineffective assistance claim cannot be based solely on counsel's inexperience."); *LaGrand*, 133 F.3d at 1275 ("In considering a claim of ineffective assistance of counsel, it is not the experience of the attorney that is evaluated, but rather, his performance.").

The most notable factor in assessing the quality of Siegel's performance is that it led the trial judge to find that one statutory and seven nonstatutory mitigating circumstances had been proved. The nonstatutory circumstances included Ramirez's unstable family background, poor educational experience, sexual abuse, substance abuse, and psychological history.

Next, the Court must take into account the circumstances of Siegel's representation. *See Strickland*, 466 U.S. at 691. These include Ramirez's reluctance to involve his family in the proceedings. Despite this reluctance, counsel called three family members to testify on his behalf at the mitigation hearing.

Although Siegel was able to collect Ramirez's Arizona and California school records, they were not provided to Dr. McMahon prior to his evaluation of Ramirez. Dr. McMahon, after examining Ramirez and administering the PPVT, found no evidence of

retardation. It was reasonable for Siegel to rely on Dr. McMahon's findings and not pursue the issue of mental retardation. *See Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense."); *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) ("It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts.") (quotation omitted); *see also West v. Ryan*, 608 F.3d 477, 487–89 (9th Cir. 2010) (holding counsel was not deficient for failing to unearth additional mental health evidence where the doctor's report contained no red flags).

This is not a case where counsel completely failed to investigate or present mitigating evidence. *See Porter v. McCollum*, 558 U.S. 30, 39–40 (2009) (finding deficient performance where counsel collected no records, conducted no interviews, and had only one short meeting with his client concerning the penalty phase); *Silva v. Woodford*, 279 F.3d 825, 846 (9th Cir. 2002) (finding deficient performance where counsel "conducted no investigation whatsoever into Silva's past and also failed to even minimally assist in the preparation of possible mental defenses"); *Bean v. Calderon*, 163 F.3d 1073, 1078 (9th Cir. 1998) (finding deficient performance where counsel "engaged in no preparation" and "conducted no investigation of penalty-phase issues"); *Clabourne v. Lewis*, 64 F.3d 1373, 1386–87 (9th Cir. 1995) (holding that counsel provided ineffective assistance when he "gave up" and failed to present mitigating evidence at the sentencing hearing).

Instead, this case more closely resembles *Schurz v. Ryan*, 730 F.3d 812, 815 (9th Cir. 2013), where the Ninth Circuit held that counsel's failure to present mitigating evidence at sentencing did not constitute deficient performance. The court found that the unpresented mitigating evidence about the petitioner's drug abuse and dysfunctional family life was cumulative to the information counsel provided in his sentencing memorandum and attached psychological evaluation. *Id.* The court also noted that the new evidence that was not cumulative, including allegations of childhood sexual abuse,

cerebral dysfunction, and fetal alcohol syndrome, was either "speculative" or minimally "relevant." *Id.*

In Ramirez's case, Siegel prepared a detailed sentencing memorandum and attached exhibits, including school records, IQ test scores, and Dr. McMahon's report. Siegel argued Ramirez was impaired at the time of the crimes and that his background contained a number of mitigating circumstances. The court found that these circumstances were proved. Siegel's performance was not deficient. *See Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (rejecting ineffective assistance "arguments predicated upon showing what defense counsel could have presented, rather than upon whether counsel's actions were reasonable").

### 2.    Ramirez was not prejudiced by Siegel's performance

Even if Siegel's performance were deficient, Ramirez cannot show prejudice. First, much of the evidence Ramirez claims should have been offered was, in fact, presented to the sentencing court. The court was aware of Ramirez's difficulties as a student, his poor grades and his low IQ test scores. The court was aware that Ramirez's mother was an alcoholic who drank while she was pregnant with Ramirez. The court knew that Ramirez's home life was chaotic, with an absent father, an abusive stepfather, and a neglectful mother, and that he was obliged to care for his younger siblings. This profile of Ramirez's background is not significantly altered by the new evidence. *See Strickland*, 466 U.S. at 699–700 (finding no prejudice where omitted evidence "would barely have altered the sentencing profile presented to the sentencing judge."); *see also Woratzeck v. Stewart*, 97 F.3d 329, 336–37 (9th Cir. 1996) (finding no prejudice from counsel's failure to investigate or call additional witnesses at mitigation phase because all of the information the witnesses would have presented was contained in the presentence report); *Babbitt*, 151 F.3d at 1176 (finding no prejudice where evidence omitted at sentencing was "largely cumulative of the evidence actually presented").

Ramirez contends that the new "evidence paints an entirely different picture of Ramirez's moral culpability than was presented at sentencing." (Doc. 256 at 38.)  The Court disagrees. Ramirez cites mental retardation as one of the categories of mitigating

evidence omitted by Siegel. As noted, at the time of sentencing, Siegel relied on Dr. McMahon's opinion that Ramirez's IQ was in the average range. (Doc. 257-1, Ex. I at 6; *id.*, Ex. H at  22.) She did, however, present Ramirez's prior IQ scores of 70 and 77. Moreover, the trial court, again presided over by Judge O'Toole, determined at the conclusion of the *Atkins* litigation that Ramirez had failed to prove he met the statutory definition of mentally retarded.

In support of his claim of mental retardation, Ramirez cites statements of family members that he was exposed to pesticides *in utero* and as a young child working in the fields. Dr. Weinstein also cited his findings of brain dysfunction as "consistent with and confirmatory of mental retardation." (Doc. 256-1, Ex. B at 29.) While this evidence was not presented at sentencing, its omission has little prejudicial effect given the court's conclusion that Ramirez was not mentally retarded.

Other new evidence cited by Ramirez includes information that he was the product of the rape of his teenage mother by his uncle, and that his mother attempted to terminate the pregnancy. On their own, these circumstances have little mitigating value as they do not bear on Ramirez's "character or record" or the "circumstances of the offence." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). To the extent the information is relevant to Ramirez's intellectual capacity, as just discussed that issue was before the court at sentencing and during the PCR proceedings.

In *Schriro v. Landrigan*, 550 U.S. 465, 481 (2007), the Supreme Court held the petitioner was not prejudiced by counsel's failure to present mitigating evidence indicating that the petitioner suffered from fetal alcohol syndrome with attendant cognitive and behavioral defects, was abandoned by his birth mother, was raised by an alcoholic adoptive mother, began abusing alcohol and drugs at an early age, and had a genetic predisposition to violence. The Court described the evidence as "poor quality," and therefore not supportive of a colorable claim of ineffective assistance of counsel. *Id.*; *see Rhoades v. Henry*, 638 F.3d 1027, 1052 (9th Cir. 2010) (holding "that [petitioner's] newly proffered facts . . . add too little, and the aggravating circumstances are too strong, to make it reasonably probable that the sentencing decision would have been different but

for counsel's performance"); *Heishman v. Ayers*, 621 F.3d 1030, 1038 (9th Cir. 2010) ("[E]ven if Heishman had offered the additional evidence of his difficult upbringing, he has not shown a reasonable probability that the jury would have imposed a sentence of life without parole.").

In determining prejudice the court weighs the totality of the mitigating evidence against the aggravating factors. In this case there were three aggravating factors. First, Ramirez was previously convicted of two violent felonies, aggravated assault and robbery. A.R.S. § 13-703(F)(2). Next, Ramirez committed multiple murders, killing both Mrs. Gortarez and her teenage daughter. A.R.S. § 13-703(F)(8). The multiple murders aggravating factor "is entitled to 'extraordinary weight.'" *State v. Garza*, 216 Ariz. 56, 72, 163 P.3d 1006, 1022 (2007) (quoting *State v. Hampton*, 213 Ariz. 167, 185, 140 P.3d 950, 968 (2006)). Finally, the murders were especially heinous, cruel, or depraved. A.R.S. § 13-703(F)(6). The Arizona Supreme Court, in its independent review of the (F)(6) factor, described the supporting facts:

> The victims in this case endured great pain and suffering over a prolonged period of time. The neighbors testified to the banging, screaming, cries for help, and running noises that alerted them to the homicides and that continued for 20 to 30 minutes. When the police arrived, they found evidence of great violence; they discovered blood and murder weapons throughout the apartment. Expert testimony as well as the physical evidence established that both victims were conscious during the time that defendant repeatedly stabbed each of them 15–20 times. Each was obviously aware of the other's suffering. Both sustained numerous other cuts and bruises. Mrs. G suffered defensive wounds while fighting unsuccessfully to save her life. The victims' sufferings were inescapably foreseeable to defendant.

*Ramirez*, 178 Ariz. at 129, 871 P.2d at 250.

Given the strength of these aggravating factors, there is not a reasonable probability that the additional evidence cited by Ramirez would have resulted in a different verdict. *See Samayoa v. Ayers*, 649 F.3d 919, 929 (9th Cir. 2011) (finding no prejudice from failure to present additional mitigation where the crimes, the murder of a mother and child, were "brutal and horrific"); *Leavitt v. Arave*, 646 F.3d 605, 616 (9th Cir. 2011) ("Given the exceptional depravity of this murder, it is unlikely that additional evidence of a brain abnormality would have made a difference."); *Bible v. Ryan*, 571 F.3d

860, 872 (9th Cir. 2009) (finding no prejudice for failure to present evidence of brain injury where the "significant amount of aggravating circumstances" consisted of the especially cruel murder of a nine-year-old child). Ramirez was not prejudiced by Siegel's performance at sentencing.

## IV.    EVIDENTIARY DEVELOPMENT

Ramirez seeks an evidentiary hearing, discovery, and expansion of the record. (Doc. 256 at 39–45.) Having reviewed the entire record, including the evidence presented by Ramirez in his supplemental *Martinez* brief, the Court concludes that an evidentiary hearing is not warranted. *See Landrigan*, 550 U.S. at 474 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); Rule 8(a) of the Rules Governing Section 2254 Cases. There are no contested facts concerning Siegel's performance at sentencing. Whether Petitioner's allegations of ineffective assistance of trial counsel are "substantial" under *Martinez* is resolvable on the record. *See Sexton*, 679 F.3d at 1161 (finding record "sufficiently complete" with respect to underlying ineffective assistance of trial counsel claim); *cf. Dickens*, 740 F.3d at 1321 (explaining that "a district court *may take evidence to the extent necessary* to determine whether the petitioner's claim of ineffective assistance of trial counsel is substantial under *Martinez*") (emphasis added). However, the Court will expand the record to include the exhibits attached to Ramirez's supplemental brief, as both parties have relied on the information contained therein.

## V.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c)(2), a certificate of appealability may issue only when a petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a certificate will issue only if reasonable jurists could debate whether the petition states a

valid claim of the denial of a constitutional right and whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate the conclusion that Claim 34 is procedurally barred.

## VI.    CONCLUSION

Siegel's performance at sentencing was neither deficient nor prejudicial. Claim 34 is without merit. If PCR counsel had raised the claim, there is no reasonable probability that the result of the post-conviction proceedings would have been different. *Clabourne*, 745 F.3d at 377; *see Sexton*, 679 F.3d at 1157.

The default of Claim 34 is not excused under *Martinez*. The claims remains defaulted and barred from federal review.

**IT IS ORDERED** that Claim 34 is denied as procedurally barred

**IT IS FURTHER ORDERED** granting a Certificate of Appealability as to Claim 34.

Dated this 14th day of September, 2016.

James A. Teilborg
Senior United States District Judge